E-filing

ORIGINAL
FILED

JUN - 1 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

1    Alan R. Plutzik (State Bar No. 077785)
     Kathryn A. Schofield (State Bar No. 202939)
2    BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
     2125 Oak Grove Road, Suite 120
3    Walnut Creek, California  94598
     Telephone:  (925) 945-0200
4    Facsimile:  (925) 945-8792

5    Nadeem Faruqi
     FARUQI & FARUQI, LLP
6    320 East 39th Street
     New York, NY 10016
7    Telephone:  (212) 983-9330
     Facsimile:  (212) 983-9331

8

9    Attorneys for Plaintiff

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

                    SAN FRANCISCO DIVISION

STEPHEN KNEE, Derivatively On Behalf of      Case No. C05-02233
BROCADE COMMUNICATION SYSTEMS,
INC.,

                    Plaintiff,

          vs.                                VERIFIED DERIVATIVE COMPLAINT
                                             FOR BREACH OF FIDUCIARY DUTY,
GREGORY L. REYES, ANTONIO CANOVA,            ABUSE OF CONTROL, GROSS
SETH D. NEIMAN, NEAL DEMPSEY,                MISMANAGEMENT, WASTE OF
CHRISTOPHER B. PAISLEY, DAVID L.             CORPORATE ASSETS, AND UNJUST
HOUSE, NICHOLAS G. MOORE, L.                 ENRICHMENT
WILLIAM KRAUSE, SANJAY VASWANI and
ROBERT R. WALKER,

                    Defendants,

and BROCADE COMMUNICATION
SYSTEMS, INC.,

          Nominal Defendant.

ADR

COPY

Plaintiff, by his attorneys, demands a trial by jury and submits this verified derivative complaint (the "Complaint") against the defendants named herein.

## I. NATURE OF ACTION

1.     This is a shareholder derivative action brought by shareholders of Brocade Communications Systems, Inc. ("Brocade" or the "Company"), a Delaware corporation, with its headquarters in California, on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between February 21, 2001 and the present (the "Relevant Period"). These breaches of fiduciary duty and violations of law have caused Brocade to suffer damages, as alleged herein.

2.     On May 15, 2005, the Individual Defendants caused the Company to issue a press release announcing the restatement of its fiscal 2001 to fiscal 2004[1] earnings. The release was entitled "Brocade Restates Financial Statements to Reflect Additional Stock-Based Compensation Earnings," and stated in part:

> Brocade Communications Systems, Inc. announced today that the Company will restate its financial statements for the fiscal years ending 2002 through 2004 to record additional charges for stock-based compensation expense. The Company affirmed that one of the charges will have an impact on Brocade's historical revenues, cash positions, or non-stock option related operating expenses. The company expects related adjustments will be made to the Company's financial information for fiscal 2001, as necessary.
>
> Following the completion of an Audit Committee review announced on January 24, 2005, additional information came to the Company's attention that indicated that its guidelines regarding stock option granting practices were not followed during the period from August 2003 through November 2004. After further review, the Company concluded that it could not rely on the documentation used to support the recorded measurement dates for stock options granted in that period. As a result, the Company will restate its financial statements to account for additional stock-based compensation for stock options granted from August 2003 through November 2004. The additional charges are expected to result in a cumulative increase in non-cash stock option compensation expense of $0.8 million over fiscal years 2003 and 2004.
>
> After discovering the additional information regarding non-compliance of its guidelines, the Company commenced a review of certain

---

[1]  Brocade's fiscal year ends on the last Saturday in October.

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

1

other practices that could impact stock option accounting. This review determined that from 2001 through 2004, the Company had not appropriately accounted for the cost of stock based compensation for certain employees on leaves of absence (LOA) and in transition roles prior to ceasing employment with Brocade. Prior to 2003, Brocade's LOA policy allowed certain employees to continue vesting in their stock options and to have extended stock option exercise periods of up to three months from the state of LOA. The expected charges related principally to options that continue to vest for employees who were on LOAs for a period greater than three months. The Company also expects to record additional adjustments related to options that continued to vest for certain employees in transition roles. Management estimates the total increase in non-cash compensation expense related to these matters to be in a range of approximately $31 to $52 million for fiscal years 2001 through 2004.

Brocade's Audit Committee has commenced an independent review of the Company's stock option accounting regarding LOAs. Based on that ongoing review, the Company's preliminary estimates of anticipated adjustments are subject to change.

The table below reflects the total effects of these combined adjustments and are the Company's preliminary estimate of the approximate impact to the Company's non-cash expenses and EPS. The Company does not currently expect that there will be any impact on non-cash expenses and EPS for any period in fiscal year 2005.

| Fiscal Year Ending: | Additional Non-Cash Expense | Reduction in EPS |
|---|---|---|
| 2001 | $12.0-$26.0 million | $0.05-$0.11 |
| 2002 | $19.0-$23.0 million | $0.08-$0.09 |
| 2003 | $0.2-$0.8 million | $0.00-$0.01 |
| 2004 | $0.8-$2.8 million | $0.00-$0.01 |

The Company also announced today that it has been informed that the Department of Justice (DOJ) is working with the SEC in a joint investigation regarding the Company's stock option granting practices. Brocade has no further information regarding the timing or scope of the investigation.

"It is not unusual in the current environment that multiple relevant government agencies will take an interest in these types of matters," said Michael Klayko, Brocade's newly appointed Chief Executive Officer. We are cooperating fully with the SEC and DOJ and hope that the investigation can be concluded as quickly as possible." Klayko continued, "The Board and management team are absolutely committed to the highest standard of accounting and continuously improving our internal controls and compliance with our policies. I have confidence in my team and we remain focused on executing to our business plan."

3.     As a result of this announcement, Brocade's stock dropped to $4.13 per share, compared to the $40+ per share prices it traded at during the Relevant Period.

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

2

## II.  JURISDICTION AND VENUE

4.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between plaintiffs and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

5.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## III.  PARTIES

7.      Plaintiff is, and was at all relevant times, a shareholder of nominal defendant Brocade.  Plaintiff is a citizen of New York.

8.      Nominal defendant Brocade is a corporation organized under the laws of Delaware, with its principal executive offices located in San Jose, California.  Brocade designs, develops, markets, sells and supports data storage networking products and services.

9.      Defendant Gregory L. Reyes ("Reyes") was, from 1988 to January 2005, Brocade's Chief Executive Officer, and was a director through the time of Brocade's annual shareholder meeting in 2005.  Thereafter, Reyes entered into an employment contract to serve as a consultant to the CEO in exchange for payment of $910,000 per year, continued Company benefits, continued coverage under Brocade's Directors and Officers Insurance, and reimbursement of expenses,

1  including the cost of operating his private plane.  Because of Reyes' positions with the Company,

2  he knew material, adverse non-public information regarding Brocade and the fact that the

3  Company disseminated false and misleading financial information throughout the Relevant Period.

4  Among other things, Reyes was aware of the fact that the Company improperly recorded charges

5  for stock-based compensation expense during the Relevant Period.  Reyes was aware of this

6  information via his access to internal corporate documents, conversations and connections with

7  other corporate officers and employees, attendance at management and Board meetings and

8  committees thereof and via reports and other information provided to him in connection therewith.

9  During the Relevant Period, Reyes participated in the issuance of false and/or misleading

10 statements, including the preparation of false and/or misleading press releases and Securities and

11 Exchange Commission ("SEC") filings. During the Relevant Period, Reyes sold 4,957,053 Brocade

12 shares for insider trading proceeds of more than $30 million. Upon information and belief, Reyes is

13 a citizen of California.

14       10.      Defendant Antonio Canova ("Canova") was, throughout the Relevant Period,

15 Brocade's Chief Financial Officer and Vice President, Administration.  Because of Canova's

16 positions with the Company, he knew material, adverse non-public information regarding Brocade

17 and the fact that the Company disseminated false and misleading financial information throughout

18 the Relevant Period. Among other things, Canova was aware of the fact that the Company

19 improperly recorded charges for stock-based compensation expense during the Relevant Period.

20 Canova was aware of this information via his access to internal corporate documents, conversations

21 and connections with other corporate officers and employees, attendance at management and Board

22 meetings and committees thereof and via reports and other information provided to him in

23 connection therewith.  During the Relevant Period, Canova participated in the issuance of false

24 and/or misleading statements, including the preparation of false and/or misleading press releases

25 and Securities and Exchange Commission ("SEC") filings During the Relevant Period, Canova

26 sold 4,903 Brocade shares for insider trading proceeds of $31, 526. Upon information and belief,

27 Canova is a citizen of California.

28

11.     Defendant Michael Klayko ("Klayko") has served as Chief Executive Officer and a director of the Company since January 2005. Prior to that, Klayko served as Vice President, Worldwide Sales from May 2004 until January 2005. From April 2003 until May 2004, Mr. Klayko served as Vice President, Worldwide Marketing and Support, and from January 2003 until April 2003, he was Vice President, OEM Sales.  Because of Klayko's positions with the Company, he knew material, adverse non-public information regarding Brocade and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Among other things, Klayko was aware of the fact that the Company improperly recorded charges for stock-based compensation expense during the Relevant Period.  Klayko was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Klayko participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Upon information and belief, Klayko is a citizen of California.

12.     Seth D. Neiman ("Neiman") is currently, and has been a director of the Company since 1995. Neiman served as Chairman of the Board of Directors of Brocade from August 1995 until May 2001, and as the Company's Chief Executive Officer from August 1995 until June 1996. Because of Neiman's positions with the Company, he knew material, adverse non-public information regarding Brocade and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Among other things, Neiman was aware of the fact that the Company improperly recorded charges for stock-based compensation expense during the Relevant Period.  Neiman was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Neiman

1    participated in the issuance of false and/or misleading statements, including the preparation of false

2    and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Upon

3    information and belief, Neiman is a citizen of California.

4        13.    Neal Dempsey ("Dempsey") is currently, and has been a director of the Company

5    since 1995.  Dempsey is a member of the board's Nominating and Corporate Governance

6    Committee, and is Chairman of its Compensation Committee.  Because of Dempsey's positions

7    with the Company, he knew material, adverse non-public information regarding Brocade and the

8    fact that the Company disseminated false and misleading financial information throughout the

9    Relevant Period. Among other things, Dempsey was aware of the fact that the Company

10   improperly recorded charges for stock-based compensation expense during the Relevant Period.

11   Dempsey was aware of this information via his access to internal corporate documents,

12   conversations and connections with other corporate officers and employees, attendance at

13   management and Board meetings and committees thereof and via reports and other information

14   provided to him in connection therewith.  During the Relevant Period, Dempsey participated in the

15   issuance of false and/or misleading statements, including the preparation of false and/or misleading

16   press releases and Securities and Exchange Commission ("SEC") filings.   Upon information and

17   belief, Dempsey is a citizen of California.

18       14.    Christopher B. Paisley ("Paisley") is currently, and has been a director of the

19   Company since 2002.  Paisley is the Chairman of the board's Audit Committee.  Because of

20   Paisley's positions with the Company, he knew material, adverse non-public information regarding

21   Brocade and the fact that the Company disseminated false and misleading financial information

22   throughout the Relevant Period. Among other things, Paisley was aware of the fact that the

23   Company improperly recorded charges for stock-based compensation expense during the Relevant

24   Period.  Paisley was aware of this information via his access to internal corporate documents,

25   conversations and connections with other corporate officers and employees, attendance at

26   management and Board meetings and committees thereof and via reports and other information

27   provided to him in connection therewith.  During the Relevant Period, Paisley participated in the

28

1  issuance of false and/or misleading statements, including the preparation of false and/or misleading

2  press releases and Securities and Exchange Commission ("SEC") filings.  Upon information and

3  belief, Paisley is a citizen of California.

4        15.      David L. House ("House") has served as Executive Chairman of the Company

5  since January 2005, and has been a director of the Brocade since 2004. In January 2005, House

6  also served as Chief Executive Officer of the Company.  Because of House's positions with the

7  Company, he knew material, adverse non-public information regarding Brocade and the fact that

8  the Company disseminated false and misleading financial information throughout the Relevant

9  Period. Among other things, House was aware of the fact that the Company improperly recorded

10  charges for stock-based compensation expense during the Relevant Period.  House was aware of

11  this information via his access to internal corporate documents, conversations and connections with

12  other corporate officers and employees, attendance at management and Board meetings and

13  committees thereof and via reports and other information provided to him in connection therewith.

14  During the Relevant Period, House participated in the issuance of false and/or misleading

15  statements, including the preparation of false and/or misleading press releases and Securities and

16  Exchange Commission ("SEC") filings.  Upon information and belief, House is a citizen of

17  California.

18        16.      Nicholas G. Moore ("Moore") is currently, and has been a director of the Company

19  since March 21, 2003, and was nominated to that position at the suggestion of Defendant Klayko

20  Moore is a member of  the board's Audit Committee and Nominating and Corporate Governance

21  Committee.  Because of Moore's positions with the Company, he knew material, adverse

22  non-public information regarding Brocade and the fact that the Company disseminated false and

23  misleading financial information throughout the Relevant Period. Among other things, Moore was

24  aware of the fact that the Company improperly recorded charges for stock-based compensation

25  expense during the Relevant Period.  Moore was aware of this information via his access to internal

26  corporate documents, conversations and connections with other corporate officers and employees,

27  attendance at management and Board meetings and committees thereof and via reports and other

28

1   information provided to him in connection therewith.  During the Relevant Period, Moore

2   participated in the issuance of false and/or misleading statements, including the preparation of false

3   and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Upon

4   information and belief, Moore is a citizen of California.

5          17.     L. William Krause ("Krause") is currently, and has been a director of the Company

6   since 2004, and acts as the Lead Director for the board.  Krause is a member of the board's Audit

7   and Compensation Committees, and is the Chairman of its Nominating and Corporate Governance

8   Committee.  Because of Krause's positions with the Company, he knew material, adverse

9   non-public information regarding Brocade and the fact that the Company disseminated false and

10   misleading financial information throughout the Relevant Period. Among other things, Krause was

11   aware of the fact that the Company improperly recorded charges for stock-based compensation

12   expense during the Relevant Period.  Krause was aware of this information via his access to

13   internal corporate documents, conversations and connections with other corporate officers and

14   employees, attendance at management and Board meetings and committees thereof and via reports

15   and other information provided to him in connection therewith.  During the Relevant Period,

16   Krause participated in the issuance of false and/or misleading statements, including the preparation

17   of false and/or misleading press releases and Securities and Exchange Commission ("SEC")

18   filings.  Upon information and belief, Krause is a citizen of California.

19          18.     Sanjay Vaswani ("Vaswani") is currently, and has been a director of the Company

20   since 2004.  Vaswani is a member of the board's Compensation and Nominating and Corporate

21   Governance Committees. Because of Vaswani's positions with the Company, he knew material,

22   adverse non-public information regarding Brocade and the fact that the Company disseminated

23   false and misleading financial information throughout the Relevant Period. Among other things,

24   Vaswani was aware of the fact that the Company improperly recorded charges for stock-based

25   compensation expense during the Relevant Period.  Vaswani was aware of this information via his

26   access to internal corporate documents, conversations and connections with other corporate officers

27   and employees, attendance at management and Board meetings and committees thereof and via

28

reports and other information provided to him in connection therewith. During the Relevant Period, Vaswani participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Upon information and belief, Vaswani is a citizen of California.

19.     Defendant Robert R. Walker has been a director of the Company since April 27, 2005. Because of Walker's positions with the Company, he knew material, adverse non-public information regarding Brocade and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Among other things, Walker was aware of the fact that the Company improperly recorded charges for stock-based compensation expense during the Relevant Period. Walker was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Walker participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Upon information and belief, Walker is a citizen of California.

20.     The defendants identified in ¶¶ 9 and 11-19 are referred to herein as the "Director Defendants." The defendants identified in ¶¶ 9-11 and 15 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶ 9 and 10  are referred to herein as the "Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Selling Defendants are referred to herein as the "Individual Defendants."

## IV.  BROCADE'S BOARD, AND BOARD SUBCOMMITTEES

21.     The Company's Amended Annual Proxy Statement for the Company's Annual Meeting was filed on March 4, 2005 (the "2005 Proxy"). Among other things, the 2005 Proxy provides information pertaining to executive compensation, ownership of securities and organizational  information pertaining to the Board. During the Company's 2004 fiscal year ("FY 2004"), the full Board met four times. Each director attended 75% of the total number of meetings

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

9

of the Board and Board committees of which he was a member, except for Dempsey who attended 72% of the aggregate of all Board of Directors meetings and committees meetings for committees on which he served during fiscal year 2004..   The current standing committees of the Board are: (i) the Audit Committee; (ii) the Compensation Committee; and (iii) the Nominating Committee and Corporate Governance Committee.

### A.   Audit Committee

Defendants Krause, Moore and Paisley were members of the Audit Committee during FY 2004. According to the 2005 Proxy, the Audit Committee "oversees our accounting, financial reporting and audit processes; makes recommendations to the Board of Directors regarding the selection of independent auditors; reviews the results and scope of audit and other services provided by the independent auditors; reviews the accounting principles and auditing practices and procedures to be used in preparing our financial statements; and reviews our internal controls." The Audit Committee met eight times in FY 2004.  Pursuant to the Audit Committee Charter:

> The purpose of the Audit Committee of the Board of Directors of Brocade Communications Systems, Inc. (the "Company") shall be to:

- *Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;*

- *Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications, independence and performance; and (iv) the Company's internal accounting and financial controls;*

- Prepare the report that the rules of the Securities and Exchange Commission (the "SEC") require be included in the Company's annual proxy statement;

- Provide the Company's Board with the results of its monitoring and recommendations derived therefrom; and

1    • Provide to the Board such additional information and materials as it may deem necessary to

2    make the Board aware of significant financial matters that require the attention of the

3    Board.

4    More specifically, the Audit Committee Charter states that the Audit Committee is responsible for ,

5    *inter alia*:

6    Financial Statements, Disclosure and Other Risk Management and Compliance Matters

7    • *Reviewing and discussing with management and the independent auditors the annual*

8    *audited financial statements and quarterly unaudited financial statements, including the*

9    *Company's disclosures under "Management's Discussion and Analysis of Financial*

10    *Condition and Results of Operations," prior to filing the Company's Annual Reports on*

11    *Form 10 K and Quarterly Reports on Form 10 Q, respectively, with the SEC;*

12    • Directing the Company's independent auditors to review before filing with the SEC the

13    Company's interim financial statements included in Quarterly Reports on Form 10 Q, using

14    professional standards and procedures for conducting such reviews;

15    • ***Conducting a post audit review of the financial statements and audit findings, including***

16    ***any significant suggestions for improvements provided to management by the***

17    ***independent auditors;***

18    • ***Reviewing before release the unaudited quarterly operating results in the Company's***

19    ***quarterly earnings release;***

20    • Overseeing compliance with the requirements of the SEC for disclosure of auditor's

21    services and audit committee members, member qualifications and activities;

22    • Reviewing on a continuing basis the adequacy of the Company's system of internal

23    controls, including meeting periodically with the Company's management and the

24    independent auditors to review the adequacy of such controls and to review before release

25    the disclosure regarding such system of internal controls required under SEC rules to be

26    contained in the Company's periodic filings and the attestations or reports by the

27    independent auditors relating to such disclosure;

28

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,    11
GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

- Providing a report in the Company's proxy statement in accordance with the rules and regulations of the SEC;

- Reviewing the Company's policies and practices with respect to risk assessment and risk management, including discussing with management the Company's major financial risk exposures and the steps that have been taken to monitor and control such exposures;

- Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- ***If necessary, instituting special investigations with full access to all books, records, facilities and personnel of the Company;***

- ***As appropriate, obtaining advice and assistance from outside legal, accounting or other advisors (without seeking Board of Directors approval);***

- Reviewing, approving and monitoring the Company's code of ethics for its senior financial officers;

- Reviewing management's monitoring of compliance with the Company's standards of business conduct and with the Foreign Corrupt Practices Act;

- ***Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;***

- ***Reviewing the Company's financial and accounting reporting compliance relating to its employee benefit plans; and***

- Reviewing and approving in advance any proposed related party transactions.

**B.      Compensation Committee**

Defendants Dempsey, Krause and Vaswani were members of the Compensation Committee for FY 2004.   The Compensation Committee met twice in FY 2004.   The Compensation Committee "oversees and makes recommendations to the Board of Directors regarding our compensation and benefits policies; and oversees, evaluates and approves cash and stock

1    compensation plans, policies and programs for our executive officers and employees." Pursuant to

2    the Compensation Committee Charter:

3              The Compensation Committee has overall responsibility for (i) overseeing
               the Company's compensation and benefits policies generally; (ii)
4              overseeing, evaluating and approving executive officer compensation plans,
               policies and programs; and (iii) preparing the report on executive
5              compensation that is required by Securities and Exchange Commission rules
               to be included in the Company's annual proxy statement.
6

7                                          ***

8              The Compensation Committee shall review and approve the Company's
               compensation and benefits policies generally (subject, if applicable, to
9              stockholder ratification), including reviewing and approving any incentive
               compensation plans and equity-based plans of the Company. The
10             Compensation Committee shall report the results of such review and any
               action it takes with respect to the Company's compensation and benefits
11             policies to the Board.

12                                         * * *

13             The Compensation Committee shall prepare the report on executive
               compensation that that [*sic*] is required by Securities and Exchange
14             Commission rules to be included in the Company's annual proxy statement.

15                                         * * *

16             The Compensation Committee shall make regular reports to the Board.
               These reports shall include a review of any recommendations or issues that
17             arise with respect to Company compensation and benefits policies, executive
               compensation and any other matters that the Compensation Committee
18             deems appropriate or is requested to be included by the Board.

19             At least annually, the Compensation Committee shall (i) review and assess
               the adequacy of this charter and recommend any proposed changes to the
20             Board for approval; and (ii) evaluate its own performance and report to the
               Board on such evaluation.

21        **C.    Nominating Committee**

22        Defendants Dempsey, Krause, Moore and Vaswani, in addition to Larry W. Sonsini, who

23   resigned from the Board of Directors on March 3, 2005, were members of the Nominating and

24   Corporate Governance Committee for FY 2004. Pursuant to the 2005 Proxy, "[t]he Nominating

25   and Corporate Governance Committee considers and periodically reports on matters relating to the

26   identification, selection and qualification of the Board of Directors and candidates nominated to the

27   Board of Directors and its committees; develops and recommends governance principles applicable

28

1  to Brocade; oversees the evaluation of the Board of Directors and management; and oversees and

2  sets compensation for the Board of Directors.  The Nominating and Corporate Governance

3  Committee met four times during FY 2004.  Pursuant to the Nominating and Corporate

4  Governance Committee charter:

5  > The purpose of the Nominating and Corporate Governance Committee of the
   > Board of Directors (the "Board") of Brocade Communications Systems, Inc.
6  > (the "Company") shall be to ensure that the Board is properly constituted to
   > meet its fiduciary obligations to stockholders and the Company, and that the
7  > Company has and follows appropriate governance standards. To carry out
   > this purpose, the Nominating and Corporate Governance Committee shall:
8  > (i) identify prospective director nominees and recommend to the Board the
   > director nominees for the next annual meeting or special meeting of
9  > stockholders at which directors are to be elected, and recommend individuals
   > to the Board to fill any vacancies or newly created directorships that may
10 > occur between such meetings; (ii) *develop and recommend to the Board the*
   > *governance principles applicable to the Company*; (iii) oversee the
11 > evaluation of the Board and management from a corporate governance
   > perspective; (iv) identify and recommend to the Board directors for
12 > membership on Board committees; (v) *oversee and set compensation for the*
   > *Company's directors; and (vi) review the Company's reporting in*
13 > *documents filed with the Securities and Exchange Commission, to the*
   > *extent related to corporate governance and other matters set forth in this*
14 > *charter.*

15 To fulfill these responsibilities, the Nominating and Corporate Governance Committee charter

16 requires the Committee to, *inter alia*:

17 > At least annually, the Nominating and Corporate Governance Committee
   > shall (i) review and assess the performance of the Board and its committees,
18 > and senior management of the Company; and (ii) report such assessments,
   > including any recommendations for proposed changes, to the Board.
19

20 >                                              ***

21 > The Nominating and Corporate Governance Committee shall oversee the
   > development of Corporate Governance Guidelines for the Company. At least
22 > annually, the Nominating and Corporate Governance Committee shall
   > review and reassess the adequacy of such Corporate Governance Guidelines
23 > and recommend any proposed changes to the Board.

24 >                                              * * *

25 > The Nominating and Corporate Governance Committee shall review the
   > Company's reporting in documents filed with the Securities and Exchange
26 > Commission, to the extent specifically related to corporate governance and
   > the other matters set forth in this charter.

27

28

1

## V. DUTIES OF THE INDIVIDUAL DEFENDANTS

2    22.    In addition to the foregoing, by reason of their positions as officers, directors and/or

3    fiduciaries of Brocade and because of their ability to control the business and corporate affairs of

4    Brocade, the Individual Defendants owed Brocade and its shareholders fiduciary obligations of

5    trust, loyalty, good faith and due care, and were and are required to use their utmost ability to

6    control and manage Brocade in a fair, just, honest and equitable manner.  The Individual

7    Defendants were and are required to act in furtherance of the best interests of Brocade and its

8    shareholders so as to benefit all shareholders equally and not in furtherance of their personal

9    interest or benefit.

10    23.    Each director and officer of the Company owes to Brocade and its shareholders the

11    fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

12    Company and in the use and preservation of its property and assets, and the highest obligations of

13    fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual

14    Defendants had a duty to promptly disseminate accurate and truthful information with regard to the

15    Company's revenue, margins, operations, performance, management, projections and forecasts so

16    that the market price of the Company's stock would be based on truthful and accurate information.

17    24.    The Individual Defendants, because of their positions of control and authority as

18    directors and/or officers of Brocade, were able to and did, directly and/or indirectly, exercise

19    control over the wrongful acts complained of herein, as well as the contents of the various public

20    statements issued by the Company.  Because of their advisory, executive, managerial and

21    directorial positions with Brocade, each of the Individual Defendants had access to adverse

22    non-public information about the financial condition, operations, and improper representations of

23    Brocade.

24    25.    At all times relevant hereto, each of the Individual Defendants was the agent of each

25    of the other Individual Defendants and of Brocade, and was at all times acting within the course

26    and scope of such agency.

27

28

26.     To discharge their duties, the officers and directors of Brocade were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Brocade were required to, among other things:

(i)     refrain from acting upon material inside corporate information to benefit themselves;

(ii)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(iii)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iv)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(v)     remain informed as to how Brocade conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(vi)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

27.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the

Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Brocade, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Brocade's Board during the Relevant Period.

28.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent the safety of its products, together with the Company's financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of an SEC investigation, several class action law suits that allege violations of federal securities laws, and is currently subjected to personal injury lawsuits as a result of the misrepresentations regarding the safety of its products. As a result of the foregoing, Brocade has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(i)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(ii)    Costs incurred in investigating and defending Brocade and certain officers in the SEC and Department of Justice investigations, and class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgments.

29.     Moreover, these actions and failures to act, have irreparably damaged Brocade's corporate image and goodwill. For at least the foreseeable future, Brocade will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Brocade's ability to raise equity capital or debt on favorable terms in the future is now impaired.

1

## VI.  CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

2    30.    In committing the wrongful acts alleged herein, the Individual Defendants have

3    pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

4    and conspired with one another in furtherance of their common plan or design.  In addition to the

5    wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants

6    further aided and abetted and/or assisted each other in breach of their respective duties.

7    31.    During all times relevant hereto, the Individual Defendants collectively and

8    individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the

9    Company was improperly misrepresenting its financial results and prospects, in order to allow

10   defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual

11   Defendants' executive and directorial positions at Brocade and the profits, power and prestige that

12   the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing

13   public, including shareholders of Brocade, regarding the Individual Defendants' management of

14   Brocade's operations, the safety of the Company's products, the Company's financial health and

15   stability, and future business prospects throughout the Relevant Period.  In furtherance of this plan,

16   conspiracy and course of conduct, the Individual Defendants collectively and individually took the

17   actions set forth herein.

18   32.    The Individual Defendants engaged in a conspiracy, common enterprise and/or

19   common course of conduct commencing by at least February 2001 and continuing thereafter.

20   Certain of the Individual Defendants subsequently joined in the conspiracy upon accepting a

21   position as an officer and/or director of the Company and by taking the actions alleged herein

22   ratified the actions and conduct committed in furtherance of the conspiracy prior to that time.

23   During this time the Individual Defendants caused the Company to conceal the true fact that

24   Brocade was misrepresenting the expense incurred by the Company in granting lucrative stock

25   based compensation to officers and directors of the Company, together with the Company's

26   financial results and prospects.  In addition, defendants also made other specific, false statements

27   about Brocade's expenses, financial performance and future business prospects, as alleged herein.

28

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,    18
GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

33.     The purpose and effect of the Individual Defendants' conspiracy, common

enterprise, and/or common course of conduct was, among other things, to disguise the Individual

Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement,

waste of corporate assets and unjust enrichment; to conceal adverse information concerning the

Company's operations, financial condition and future business prospects; and to artificially inflate

the price of Brocade common stock so they could: (i) dispose of over $30 million of their

personally held stock;  and (ii) protect and enhance their executive and directorial positions and the

substantial compensation and prestige they obtained as a result thereof.

34.     The Individual Defendants accomplished their conspiracy, common enterprise

and/or common course of conduct by causing the Company to purposefully, recklessly or

negligently misrepresent its financial results.  Because the actions described herein occurred under

the authority of the Board, each of the Individual Defendants was a direct, necessary and

substantial participant in the conspiracy, common enterprise and/or common course of conduct

complained of herein.

35.     Each of the Individual Defendants aided and abetted and rendered substantial

assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

wrongdoing, and was aware of his or her  overall contribution to and furtherance of the

wrongdoing.

## VII.  SUBSTANTIVE ALLEGATIONS

36.     On February 21, 2001, the Individual Defendants caused the Company to issue a

press release entitled "Brocade Announces Record Revenue and Earnings for First Quarter of

Fiscal 2001."  The press release stated  in part:

> Brocade Communications Systems, Inc., the leading provider of Storage
> Area Networking infrastructure, reported today record revenue and earnings
> for the first quarter of fiscal 2001 (Q1 01).  For Q1 01, net revenues were
> $165.0 million, as compared to the $42.7 million reported in the first quarter
> of fiscal 2000 (Q1 00) and the $132.1 million reported in the fourth quarter

of fiscal 2000 (Q4 00). During Q1 01, deferred revenue increased by $7.1 million to $9.1 million.

Net income for Q1 01 was $32.5 million as compared to the $7.3 million reported in Q1 00 and the $27.2 million reported in Q4 00. Diluted net income per share for Q1 01 was $0.13 as compared to the $0.03 reported in Q1 00 and the $0.11 reported in Q4 00.

Operating income as a percentage of net revenues in Q1 01 increased to 26.9 percent of revenues, up from 25.5 percent in Q4 00. This is the seventh consecutive quarter that operating income, as a percentage of revenues, has increased.

In Q1 01 Brocade generated $56.0 million in cash after purchasing $26.1 million in capital equipment and making $6.4 million in minority investments. Total cash at the end of Q1 01 was $211.0 million.

For Q1 01, accounts receivable days sales outstanding was 53 days and the annualized return on equity when excluding deferred tax assets and unrealized gains on marketable equity securities was 49 percent.

Greg Reyes, Brocade President and CEO, commented on the quarter: "We are very pleased with our financial results for the quarter, which demonstrate our continued focus and execution in providing the world's leading networking infrastructure for storage area networks. In every industry, in every sector across the globe, companies are relying on Brocade SAN infrastructure to network their servers and storage, keep pace with exponential growth in data storage requirements, and deliver a platform to reduce the cost of managing, administering, and moving business-critical data."

***

Reyes concluded, "We are pleased that we have executed on all fronts during the first quarter of 2001 and we believe that our business fundamentals and competitive position in the SAN infrastructure market have never been stronger. The future of storage area networking is about building large heterogeneous, block-data storage networks that can scale to meet customers' future SAN requirements of limitless SAN scalability, continuous information availability, enterprise level manageability, and end-to-end interoperability. As the SAN market expands, Brocade will continue to deliver best-in-class products to allow our global customers to put in place a networking foundation for their storage environments that meets their storage needs today and scales to support the future SAN requirements of tomorrow."

37.    On February 26, 2001, the Individual Defendants caused the Company to issue  the Company's Proxy Statement on Schedule 14A for the annual meeting of shareholders ("2001 Proxy"). The 2001 Proxy contained a proposal approved and recommended by the board of directors to increase the authorized number of shares of Brocade common stock from 400,000,000

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT    20
CASE NO.
44545

1    to 800,000,000. The Director Defendants represented in the 2001 Proxy that the purpose and effect

2    of the increase, *inter alia*, was to make more shares available for issuance pursuant to stock based

3    compensation plans as follows:

4            The Board of Directors also believes that the availability of additional
             authorized but unissued shares will provide it with the flexibility to issue
5            Common Stock for other proper corporate purposes that may be identified in
             the future, such as to raise equity capital, to make acquisitions through the
6            use of stock, to establish strategic relationships with other companies, ***to
             adopt additional employee benefit plans or reserve additional shares for
7            issuance under such plans***. The Board of Directors has no immediate plans,
             understandings, agreements or commitments to issue additional Common
8            Stock for any such purposes.

9    With respect to incentive and stock based compensation, the 2001 Proxy state in relevant part:

10           Long-Term Stock Option Incentives

11               The Board provides the Company's executive officers with long-term
             incentive compensation through grants of options to purchase the Company's
12           Common Stock. The goal of the long-term stock option incentive program is
             to align the interests of executive officers with those of the Company's
13           stockholders and to provide each executive officer with a significant
             incentive to manage the Company from the perspective of an owner with an
14           equity stake in the business. It is the belief of the Board that stock options
             directly motivate an executive to maximize long-term stockholder value. The
15           options also utilize vesting periods that encourage key executives to continue
             in employ of the Company. The Board considers the grant of each option
16           subjectively, reviewing factors such as the individual performance, the
             anticipated future contribution toward the attainment of the Company's
17           long-term strategic performance goals and the number of unvested options
             held by each individual at the time of the new grant. In fiscal 2000,
18           1,040,000 options to purchase shares of the Company's Common Stock were
             granted to Mr. Reyes.
19
             Section 162(m)
20
                 The Company has considered the potential future effects of Section
21           162(m) of the Internal Revenue Code on the compensation paid to the
             Company's executive officers. Section 162(m) disallows a tax deduction for
22           any publicly held corporation for individual compensation exceeding $1.0
             million in any taxable year for any of the Named Executive Officers, unless
23           compensation is performance-based. The Company has adopted a policy
             that, where reasonably practicable, the Company will seek to qualify the
24           variable compensation paid to its executive officers for an exemption from
             the deductibility limitations of Section 162(m).
25
         38.     On April 20, 2001, the Individual Defendants caused the Company to issue a press
26
     release entitled "Brocade Announces  Preliminary Q2 01 Financial Results."  The press release
27
     stated in part:
28
     VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,     21
     GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
     CASE NO.
     44545

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

Brocade Communications Systems, Inc. Announced today preliminary results for the second quarter of fiscal 2001. Brocade expects to report total net revenue for the second quarter of fiscal 2001 (Q2 01) that will be approximately 30 percent less than the net revenue reported in the first quarter of fiscal 2001 (Q1 01). Diluted net income per share for Q2 01 is expected to be in the range of $0.05.0.06 per share. During the second quarter, Brocade expects that gross margins will remain in the 60 percent range and will continue at those levels for the next several quarters. Additionally, Brocade expects that DSOs will be within the target range of 50 to 60 days.

Brocade will host a live conference call today at 6:00 am Pacific Time to discuss the preliminary financial results. To listen to the call, dial (719) 467-2650, or connect via the Brocade web site at www.brocade.com. Details on the replay are available at www.brocade.com. Brocade plans to announce complete second quarter results on May 15, 2001 at 1:00 pm Pacific Time.

"We are sober about the effect that the economy has had on the enterprise technology marketplace and on our short-term business outlook. We are committed to doing what is right to the business and will continue to invest in engineering resources and quota-carrying sales personnel at a rate that will continue to outpace our competitors. We believe that our long-term prospects and competitive position in delivering the world's leading intelligent platform for networking storage have never been stronger. As enterprise capital spending continues to thaw, we are well positioned for growth in the latter part of fiscal 2001 and we expect our year-over-year revenue growth will be approximately 58 percent," said Greg Reyes, Brocade President and CEO.

16    39.    On May 15, 2001, the Individual Defendants caused the Company to issue a press

17  release entitled "Brocade Announces Second Quarter Fiscal 2001 Financial Results." The press

18  release stated in part:

19

20

21

Brocade Communications Systems, Inc. Reported today financial results for the second quarter of fiscal 2001 (Q2 01). For Q2 01, net revenues were $115.2 million as compared to the $62.1 million reported in the second quarter of fiscal 2000 (Q2 00).

22

23

Net income for Q2 01 was $12.0 million as compared to the $13.3 million reported in Q2 00. Diluted net income per share of Q2 01 was $0.05 as compared to the $0.06 reported in Q2 00. During the second quarter, gross margins remained at 60 percent.

24

25

26

27

In Q2 01, Brocade generated $6.1 million in cash after purchasing $16.9 million in capital equipment and making $10.6 million in minority investments. Total cash at the end of Q2 01 was $217.1 million. Brocade exited the quarter with $5.7 million in deferred revenue. The majority of the deferred revenue was related to inventory held by Brocade master resellers that has not sold through to the end customer.

28

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT   22
CASE NO.
44545

1

2

3

> For Q2 01, accounts receivable days sales outstanding was 58 days and continues to remain within the Brocade target range. Inventory at the end of the second quarter was $8.4 million, and annualized inventory turns were 22 times.

4

> Greg Reyes, Brocade Chairman and CEO, commented on the quarter:

5

6

7

8

9

10

> Considering the current difficult economic environment for technology companies, the second quarter was a period of significant achievement for Brocade. We are pleased that we met the expectations that we set out in April, and we believe that the second quarter was the low water mark for our business. We are now seeing signs that IT budgets may be thawing as companies reprioritize projects based on Return On Investment (ROI). Storage Area Networks (SANs) remain at the to of the priority list. Using Brocade SAN infrastructure, companies can dramatically reduce the cost of managing their data while keeping pace with ever-increasing information storage requirements."

40.     On August 15, 2001, the Individual Defendants caused the Company to issue a press

11

release entitled "Brocade Exceeds Revenue Estimates for the Third Quarter of Fiscal 2001." The

12

press release stated in part:

13

14

15

16

17

> Brocade Communications Systems, Inc. Reported today financial results for the third quarter of fiscal 2001 (Q3 01). For Q3 01, net revenues were $116.3 million, a $24.2 million increase from the $92.1 million reported in the third quarter of fiscal 2000 (Q3 00) and a $1.1 million increase from the second quarter of fiscal 2001 (Q2 01). Brocade exited the quarter with $13.4 million in deferred revenue, an increase of $7.7 million over the $5.7 million reported in Q2 01.

18

19

20

> Net income for Q3 01 was $12.0 million as compared to the $20.1 million reported in Q3 00 and the $12.0 million reported in Q2 01. Diluted net income per share of Q3 01 was $0.05 as compared to the $0.08 reported in Q3 00 and the $0.05 reported in Q2 01. During the third quarter, gross margins remained at 60 percent, an improvement over the 58.6 percent reported in Q3 00 and consistent with Q2 01.

21

22

> In Q3 01, Brocade generated $23.8 million in cash after investing $20.6 million in capital equipment. Total cash at the end of Q3 01 was $241.0 million.

23

24

25

> For Q3 01, accounts receivable days sales outstanding was 57 days and continues to remain within the Brocade target range. Inventory at the end of the third quarter was $8.0 million, and annualized inventory turns were 23 times.

26

27

28

> Greg Reyes, Brocade Chairman and CEO, commented on the quarter: "We are pleased with our results for the third quarter, which demonstrate our ability to manage well through a challenging economic environment. As the amount of data that companies need to store, move, administer, and manage continues to grow at an exponential rate, companies

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT   23
CASE NO.
44545

are challenged to keep pace with this data growth with tight IT budgets. With IT projects being prioritized on their Return On Investment (ROI) and their effect on the business bottom line, companies are turning to Storage Area Networks (SANs) to dramatically reduce the cost of managing their data, optimized their investments in compute, storage, and personnel resources, and achieve a rapid ROI.  Using Brocade SAN infrastructure, companies can now cost-effectively connect servers and storage subsystems, scale them independently of one another, consolidate and share server and storage resources, and centralize and simplify the labor-intensive aspects of data management."

Reyes continued, "We continue to be mindful about the effect that the economy is having on IT budgets.  However, we believe that we are uniquely positioned to take advantage of the massive market opportunity as companies seek to get more out of their compute, storage, and personnel resources by networking storage and expanding initial SAN deployments into heterogeneous, enterprise storage networks.  We are also at the beginning of a new product cycle that will continue to raise the bar for the competition, and we are continuing to invest in all aspects of our business to position for growth in 2002.  We believe that the powerful combination of our new hardware and software products—including the Brocade SilkWorm® 12000 Core Fabric Switch—will further accelerate Brocade's leadership position as the storage infrastructure of choice."

41.     On November 28, 2001, the Individual Defendants caused the Company to issue a press release entitled "Brocade Announces Record Revenue for Fiscal Year 2001; Storage Networking Leader Reports Annual Revenue Growth of 56 Percent."  The press release stated in part:

Brocade Communications Systems, Inc. Reported today financial results for the fourth quarter ended October 27, 2001 (Q4 01).  In Q4 01, net revenue was $116.5 million, as compared to the $116.3 million reported in the third quarter of fiscal 2001 (Q3 01).  For fiscal year 2001 (FY 01), revenue was a record $513.0 million, an increase of $184.0 million, or 56 percent, from fiscal year 2000 (FY 00).  Brocade exited Q4 01 with $12.6 million in deferred revenue.

Diluted pro forma net income per share for Q4 01 was $0.05, consistent with the diluted net income per share reported in Q3 01.  Pro forma net income for Q4 01 was $10.9 million as compared to net income of $12.0 million reported in Q3 01.  For FY 01, pro forma net income was $67.4 million and pro forma diluted net income pr share was $0.28, as compared to net income of $67.9 million and diluted net income per share of $0.28, respectively, reported in FY 00.  These pro forma results exclude charges of $77.1 million related to purchase commitments, facilities lease losses and asset impairments, and the write-down of private minority equity investments.

These results compare to net revenue of $132.1 million reported in the fourth quarter of fiscal 2000 (Q4 00) and net income and diluted net income per share of $27.2 million and $0.11, respectively.

During the fourth quarter, pro forma gross margins remained at 60.0 percent, a slight improvement over the 59.8 percent gross margins reported in Q4 00 and consistent with Q3 01 gross margins.  Gross margins on a pro forma basis for FY 01 were 60.0 percent, as compared to 58.2 percent gross margins for FY 00.

In Q4 01 Brocade generated $14.2 million in cash after purchasing approximately $18.7 million in capital equipment.  For FY 01, Brocade generated more than $100 million in cash, after investing $82.3 million in capital equipment.  Brocade's total cash balance at the end of Q4 01 was a record $255.1 million.

For Q4 01, accounts receivable days sales outstanding was 54 days, down from 57 days achieved during Q3 01.  Inventory at the end of the fourth quarter was $10.3 million and represented annualized inventory turns of 18 times on a pro forma basis.

Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are very pleased with our results for 2001 and our ability to manage and optimize our business model in a challenging economic environment.  We believe that our investments in 2001, including our significant investment in research and development, will allow us to take full advantage of the next phase in the market's evolution and position us for resumed growth in 2002."

Reyes continued, "In today's cost-conscious business environment, the value proposition for Brocade storage area networks has never been more relevant—helping companies optimize capital assets, increase productivity of personnel, and significantly reduce the total cost of ownership of storage environments.  As we move into fiscal year 2002, we believe that we are incredibly well positioned to continue to expand our leadership position as the world's leading provider of storage area networking infrastructure."

During the fourth quarter, Brocade further expanded its market leadership position with the introduction and general availability of the SilkWorm 3800 Enterprise Fabric Switch.  The SilkWorm 3800, based on brocade's next-generation architecture, is the industry's first 2 Gigabite per second (Gbit/sec) Fabric Switch designed to meet the levels of manageability, availability, scalability and security required for today's storage applications.  As further validation of the product's importance to the SAN market, the SilkWorm 3800 was awarded Best of Comdex 2001 award earlier this month, recognized as the most innovative and noteworthy networking hardware product of the year.

Expanding on the capabilities of Brocade's existing product family, the next-generation architecture is also the foundation of other upcoming 2 Gbit/sec products from Brocade, including the SilkWorm 12000 128 port Core Fabric Switch.  Based on a common set of advanced fabric services and fully forward and backward compatible with the installed base of more than 1,200,000 Brocade fabric ports, the SilkWorm 3800 is available today from nearly all Brocade primary OEM and channel partners and the SilkWorm 12000 is expected to be in volume production in first calendar quarter of 2002.

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT   25
CASE NO.
44545

Reyes concluded, "We believe that our industry-first, next generation 2 Gbit/sec architecture will accelerate the market transition to 2 Gbit/sec technologies and further solidify Brocade's leadership position as the world's storage networking infrastructure of choice. With the SilkWorm 3800, Brocade enables a new level of intelligence in storage networking, making SANs easier to manage, more highly available and scalable, and more secure than ever before. Through this intelligent platform, our partners can deliver advanced capabilities to their customers through high performance SAN management applications that further reduce the total cost of ownership for storage environments."

42. In fact, Brocade's fiscal year 2001 EPS was overstated by between $0.05 and $0.11 per share as a result of the Company's failure to properly expense stock based compensation during Fiscal 2001. Thus, Brocade's reported pro forma EPS of $0.28 per share was overstated by as much as 64%.

43. On February 13, 2002, the Individual Defendants caused the Company to issue a press release entitled "Brocade Reports Financial Results for the First Quarter of Fiscal year 2002." The press release stated in part:

Brocade Communications Systems, Inc. Reported today financial results for the first fiscal quarter of 2002 (Q1 02), which ended January 26, 2002. In Q1 02, net revenue was $123.1 million, gross margins were 50 percent, net income was $11.7 million and diluted net income per share was $0.05. Quarterly sequential revenue growth for Q1 02 was nearly six percent.

Brocade exited Q1 02 with $13.9 million in deferred revenue, an increase of $1.3 million over deferred revenue at the end of the fourth fiscal quarter of 2001 (Q4 01).

In Q1 02 Brocade generated $568.7 million in cash including $537.6 million received from the issuance of convertible subordinated debt. Excluding the net proceeds from the convertible debt offering, cash increased $31.1 million after purchasing $24.5 million in capital equipment. Brocade's total cash, cash equivalents and short-term investments were $823.9 million at the end of Q1 02.

For Q1 02, accounts receivable days sales outstanding were 54 days, consistent with Q4 01. Inventory at the end of Q1 02 was $9.2 million, down from the $10.3 million at the end of Q4 01.

Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are extremely pleased with our results for the first fiscal quarter of 2002. In today's business environment, the value proposition for Brocade Storage Area Networks (SANs) has never been more relevant-helping companies optimize capital assets, increase personnel productivity, and significantly reduce the total cost of ownership of storage environments. As companies rapidly migrate to 2 Gigabit per second (Gbit/sec) SAN infrastructure and expand SANs over a common storage networking

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT  26
CASE NO.
44545

1    platform, Brocade is uniquely positioned to capitalize on these dynamics
     with our industry-first, intelligent 2 Gbit/sec architecture.

2
          Reyes added, "We achieved every development milestone during the
3    quarter, including those for the SilkWorm(R) 12000, our software products,
     and our new entry-level product. The SilkWorm 12000 remains on track for
4    volume shipments in the first calendar quarter of 2002. During the first
     quarter, we also continued to optimize our world-class supply chain, increase
5    our demand generation capabilities, and expand our international operations.
     As a result, we believe that Brocade is now the lowest cost manufacturer in
6    the SAN infrastructure market. In addition, with a presence in more than
     fourteen countries, during the first quarter we increased our worldwide field
7    sales force by nearly one-third, greatly expanding the demand generation
     resources for our OEM and channel partners worldwide. We believe that
8    with these continued investments, combined with our industry-first
     intelligent 2 Gbit/sec architecture, we are extremely well positioned for
9    growth in the latter half of 2002."

10        44.    On February 25, 2002, the Individual Defendants caused the Company to issue  the

11   Company's Proxy Statement on Schedule 14A for the annual meeting of shareholders ("2002

12   Proxy"). The 2002 proxy contained a proposal approved and recommended by the board of

13   directors which sought the approval of the shareholders for grant limitations contained in the 1999

14   Stock Plan . The Individual Defendants caused the Company to represent that:

15        A favorable vote for this proposal will allow us to continue to deduct
          executive compensation in excess of $1 million and provide us with
16        potentially significant future tax benefits and associated cash flows. We have
          taken historical tax deductions for executive compensation in excess of $1
17        million in contemplation of stockholder approval of the Section 162(m)
          option grant limitations within the allowable time period. An unfavorable
18        vote for this proposal would disallow those historical tax deductions, reduce
          our net operating loss carryforward, and disallow any future tax deductions
19        for executive compensation in excess of $1 million.

20   To obtain the shareholder approval, the 2002 proxy represented that:

21        The purpose of the 1999 Stock Plan is to increase stockholder value by
          attracting and retaining the best available personnel for positions of
22        substantial responsibility, providing additional incentive to our employees
          and directors and promoting the success of our business. Options and stock
23        purchase rights may be granted under the 1999 Stock Plan. Options granted
          under the 1999 Stock Plan may be either "incentive stock options" or
24        nonstatutory stock options. Every employee of Brocade is an option or
          stockholder. We believe that commitment to employee ownership has
25        limited employee turnover and improved our operational performance.

26                                      ***

27        The 1999 Stock Plan is administered by the Board or a committee appointed
          by the Board. The administrator determines the terms of the options and

28   VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,     27
     GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
     CASE NO.
     44545

stock purchase rights granted, including the exercise price, number of shares subject to the options and stock purchase rights, and the exercisability. All questions of interpretation are determined by the administrator and its decisions are final and binding upon all participants. Directors receive no additional compensation for their services in connection with the administration of the 1999 Stock Plan.

The 2002 Proxy also contained a report from the Audit Committee, signed, *inter alia*, by Defendant Dempsey, which stated in part:

> The Audit Committee has reviewed and discussed our audited financial statements for the fiscal year ended October 27, 2001 with our management. In addition, the Audit Committee has discussed with Arthur Andersen LLP, our independent auditors, the matters required to be discussed by Statement on Auditing Standards No. 61 (Communications with Audit Committee). The Audit Committee also has received the written disclosures and the letter from Arthur Andersen LLP as required by the Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees) and the Audit Committee has discussed the independence of Arthur Andersen LLP with that firm.
>
> Based on the Audit Committee's review of the matters noted above and its discussions with our independent auditors and our management, the Audit Committee recommended to the Board of Directors that the financial statements be included in our Annual Report on Form 10-K.

In seeking the shareholders' approval of the grant limitations contained in the 1999 Stock Plan and issuing the Audit Committee Report, however, the 2002 Proxy did not disclose that the Individual Defendants had failed to properly expense stock based compensation granted by the board and the Compensation Committee, nor that the Company's financial results for fiscal 2001 were falsely overstated as a result.

45.     On May 14, 2002, the Individual Defendants caused the Company to issue a press release entitled "Brocade Releases Statement Regarding Second Quarter Financial Results." The press release stated in part:

> Brocade Communications Systems, Inc. Announced today that, due to a clerical error, a financial webcast held today contained internal preliminary Question and Answer session preparation notes for the company's upcoming Financial Results conference call for the second fiscal quarter, ended April 27,2002 (Q2 02). The communication contained the following information that the company had expected to disclose during its financial conference call to be held on Wednesday, May 15:
>
> – Forward-looking guidance that revenue for the third quarter of fiscal 2002 will be in the range of $145 to $150 million.

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT     28
CASE NO.
44545

– Strong software revenue growth experienced during Q2 02 resulted in the establishment of an increased target of 15 percent for software as a percentage of total revenue exiting the fourth quarter of 2002.

– An achievement of net revenue of $12 million related to sales of the SilkWorm 12000 Core Fabric Switch for Q2 02.

The communications did not include any other material information about revenues or earnings for the second quarter.

46.     On May 15, 2002, the Individual Defendants caused the Company to issue a press release entitled "Brocade Reports Financial Results for the Second Fiscal Quarter of 2002; And More Than 9 Percent Quarterly Sequential Revenue Growth." The press release stated in part:

Brocade Communications Systems, Inc. Reported today financial results for the second fiscal quarter ended April27, 2002 (Q2 02). In Q2 02, net revenues were $135.0 million, which is an increase of more than 17 percent from the $115.2 million reported  in the second fiscal quarter of 2001 (Q2 01), and an increase of more than 9 percent from the $123.1 million reported in the first fiscal quarter of 2002 (Q1 02). Brocade exited Q2 02 with $16.1 million in deferred revenue, which is an increase of $2.2 million from Q1 02.

Net income for Q2 02 was $14.0 million, which is an increase of nearly 17 percent from the $12.0 million reported in Q2 01 and a nearly 20 percent increase from the $11.7 million reported in Q1 02. Diluted net income per share for Q2 02 was $0.06, an increase from the $0.05 reported in Q1 02 and $0.05 for Q2 01. During Q2 02, gross margins were 60.2 percent.

In Q2 02 cash and investments increased by $23.8 million, after purchasing approximately $17.8 million in capital equipment. Total cash and investments at the end of Q2 02 were a record $847.7 million. For Q2 02, accounts receivable days sales outstanding were 53 days, an improvement of 1 day over that reported in Q1 02. Inventory at the end of Q2 02 was $5.5 million.

Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are extremely pleased with our results for the second fiscal quarter of 2002. In today's business environment, the value proposition for Brocade Storage Area Networks (SANs) resonates more powerfully than ever before with end users; allowing companies to optimize asset utilization, increase productivity, and significantly reduce the total cost of ownership of their storage environments. As companies continue to expand their SAN deployments over a common storage networking platform, the SAN architectural decision is now becoming a strategic business decision to support storage and server consolidation, deliver secure, efficient data backup and assure high data availability and business continuity."

Reyes continued, "With more than 1.6 million Brocade SAN ports deployed worldwide, Brocade is uniquely positioned to expand our market leadership position as the intelligent storage networking platform of choice. We believe that our continued investments in our business, combined with

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT CASE NO.
44545

29

our product leadership and vision, strong OEM and industry partnerships, and unrelenting focus on execution, uniquely position Brocade to capitalize on the expanding market opportunity for intelligent storage area networking infrastructure."

47.    On August 14, 2002, the Individual Defendants caused the Company to issue a press release entitled "Brocade Reports Third Quarter 2002 Financial Results; Achieves 30 Percent Revenue Growth and 52 Percent Net Income Growth."  The press release stated in part:

> Brocade Communications Systems, Inc. Reported financial results today for the third fiscal quarter ended July 27, 2002 (Q3 02).  In Q3 02, net revenues were $151.2 million, an increase of 30 percent over the $116.3 million reported in the third fiscal quarter of 2001 (Q3 01), and an increase of 12 percent over the $135.0 million reported in the second fiscal quarter of 2002 (Q2 02).  Brocade exited Q3 02 with $18.3 million in deferred revenue, an increase of $2.2 million from Q2 02.
>
> Net income for Q3 02 was $18.3 million, an increase of 52 percent from the $12.0 million reported in Q3 01 and a 31 percent increase from the $14.0 million reported in Q2 02.  Diluted net income per share for Q3 02 was $0.08, an increase from the $0.05 reported in Q3 01 and the $0.06 reported in Q2 02.
>
> During Q3 02 cash, cash equivalents, and investments increased by $34.6 million from Q2 02.  Total cash, cash equivalents, and investments at the end of Q3 02 were $882.3 million.  For Q3 02, days sales outstanding were 53 days, consistent with that reported in Q2 02.  Net inventory at the end of Q3 02 was $7.1 million.
>
> Greg Reyes, Brocade Chairman and CEO, commented on the quarter, We are extremely pleased with our results for the third fiscal quarter of 2002. IN today's business environment, the value proposition for Brocade Storage Area Networks (SANs) resonates more powerfully than ever, allowing companies to optimize asset utilization, increase productivity, and significantly reduce the total cost of ownership of their storage environments.  As companies continue to expand their SAN deployments utilizing a common storage networking architecture, SANs are emerging as the critical building block to enable storage and server consolidation; secure, efficient data backup; and lower cost high availability and business continuity.
>
> Reyes continued, Our vision and product leadership, strong OEM and industry partnerships, and unrelenting focus on execution, combined with our installed base of more than 1.8 million Brocade Fibre Channel ports, uniquely position Brocade to capitalize on the expanding market opportunity for intelligent SAN infrastructure.

48.    On November 5, 2002, the Individual Defendants caused the Company to announced its planned stock-for-stock acquisition of Rhapsody Networks, Inc., wherein the Company proposed to issue some 20 million shares of Brocade stock in exchange for Rhapsody.

1    By issuing stock at inflated prices the Company was able to make the acquisition less dilutive to

2    defendants own shares. Ultimately the Company completed the acquisition of Rhapsody issuing

3    stock valued at $129.3 million.

4         49.    On November 21, 2002, the Individual Defendants caused the Company to issue a

5    press release entitled "Brocade Announces Q4 and Fiscal 2002 Financial Results; Storage

6    Networking Leader Achieves 31 Percent year over Year Revenue Growth in Q4 02; Reports

7    Record Revenue for Fiscal 2002 of $562.4 Million." The press release stated in part:

> Brocade Communications Systems, Inc. Announced today financial results
> for its fourth quarter ended October 26, 2002 (Q4 02). For Q4 02, net
> revenue was $153.1 million, an increase of 31 percent from $116.5 million
> reported in the fourth quarter of fiscal 2001 (Q4 01). This compares to
> $151.2 million reported in the third quarter of fiscal 2002 (Q3 02). For fiscal
> 2002 (FY 02), revenue was a record $562.4 million, an increase of 10
> percent from $513.0 million reported in fiscal 2001 (FY 01).

> Net income for Q4 02 was $15.7 million, or $0.07 per share. This
> compares to a net loss of $53.7 million for Q4 01 or $0.24 per share. For FY
> 02, net income was $59.7 million or $0.25 per share, as compared to net
> income of $2.8 million or $0.01 per share, reported in FY 01.

> Deferred revenue at the end of Q4 02 was $22.4 million, and increase
> of $4.1 million from $18.3 million at the end of Q3 02. During Q4 02, gross
> margins were 58.5 percent.

> During Q4 02 Brocade generated $20.6 million in cash flow from
> operations. For the year, cash flow from operations was $110.6 million.
> Excluding the proceeds from the convertible debt offering, cash and
> investments balances grew by $95.6 million for FY 02.

> "As the storage network market leader, we are pleased with our
> progress in expanding our leadership position in fiscal 2002. In a
> challenging economic environment we grew revenue and market share,
> expanded our intelligent platform for networking storage, increase dour
> installed base to more than 2 million ports, strengthened our OEM
> relationships worldwide, and helped accelerate time to market for our broad
> ecosystem of partners," said Greg Reyes, Brocade Chairman and CEO.

> Brocade also announced today that it has realigned the organization
> and reduced its expense structure. Brocade expects these and other actions
> to result in a cost savings of more than $8 million in the first quarter of fiscal
> 2003. These actions include aligning the organization to better serve
> customers and streamlining management levels, resulting in a flatter, more
> efficient organization. These actions resulted in a workforce reduction of
> approximately 12 percent. Total employees worldwide is now
> approximately 1200.

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,    31
GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

1
2
3
4
5

> Reyes continued, "Aligning the company required some difficult decisions, but we believe that we made the right decisions for the business. With the expense reduction plan that we have implemented, and the strategic investments that we continue to make in our business, we believe that we are well positioned as the economy recovers.  Our technology and market leadership, large installed base, storage networking expertise, and the industry's broadest ecosystem of application partners are a powerful combination that will uniquely position Brocade to lead the next phase of the evolution of the storage networking market."

6      50.    In fact, Brocade's fiscal year 2002 EPS was overstated by between $0.08 and $0.09

7  per share as a result of the Company's failure to properly expense stock based compensation during

8  Fiscal 2001. Thus, Brocade's reported pro format EPS of $0.25 per share was overstated by as

9  much as 56%.

10     51.    On December 9, 2002, the Individual Defendants caused Brocade to announced that

11  the board of directors had approved a voluntary stock option exchange program (the Exchange

12  Program) for employees, including Company executives. Under the Exchange Program, employees

13  were offered the opportunity to exchange an aggregate of approximately 67.3 million outstanding

14  out-of-the-money stock options with exercise prices equal to or greater than $12.00 per share, for

15  newly priced stock options.  In accordance with the Exchange Program, on January 9, 2003,

16  Brocade cancelled 58.7 million outstanding stock options and issued promises to grant new stock

17  options to participating employees. Of the 58.7 million stock options cancelled by participating

18  employees, 15.3 million, or more than 26%, were surrendered by participating executive officers.

19  On July 10, 2003,  Brocade granted to participating employees 26.6 million new stock options at an

20  exercise price of $6.54 per share.

21     52.    On February 12, 2003, the Individual Defendants caused the Company to issue a

22  press release entitled "Brocade Reports Financial Results for the First Quarter of Fiscal 2003;

23  Storage Networking Leader Achieves Business Optimization Targets and Expands Market

24  Leadership Position."  The press release stated in part:

25
26
27

> Brocade Communications Systems, Inc. Reported financial results today for its first quarter of fiscal year 2003 ended January 25, 2003 (Q1 03).  Net revenue for Q1 03 was $123.1 million.  This compares to $153.1 million reported in the fourth quarter of fiscal year 2002 (Q4 02), and 123.1 million reported in the first quarter of fiscal year 2002 (Q1 02).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pro forma net income for Q1 03 was $0.03 million or $0.00 per share. Pro forma net income excludes a restructuring charge of $10.1 million associated with 12 percent reduction in workforce that was announced on November 21, 2002. Reporting on a Generally Accepted Accounting Principles (GAAP) basis, net loss for Q1 03 was $6.9 million, or $0.03 per share. This compares to GAAP net income for Q4 02 of $15.7 million, or $0.07 per share, and GAAP net income of $11.7 million or $0.05 per share in Q1 02. A reconciliation between pro forma net income and net loss on a GAAP basis is provided in a table summary immediately following the Pro Forma Condensed Consolidated Statements of Operations.

Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are pleased with our financial results for the first quarter of fiscal year 2003. This was a quarter of continued execution for Brocade. We met our business optimization goals, reducing operating expenses by 12 percent quarter over quarter, and continued to expand our leadership position in delivering the industry's leading intelligent platform for networking storage, growing our installed base to 2.3 million Fibre Channel ports and completing the acquisition of Rhapsody Networks. By continuing to optimize and invest strategically in our business, we are positioned well for renewed growth in 2003 as we continue to drive the next phase of the evolution of the storage networking market.

53.     On February 21, 2003, the Individual Defendants caused the Company to issue the Company's Proxy Statement on Schedule 14A for the annual meeting of shareholders ("2003 Proxy"). The 2003 Proxy reported that the board of directors had approved payment of $20,000 per year to each non-employee director, in addition to granting each non-employee director stock options under the 1999 Director Option Plan. The 2003 Proxy stated, in relevant part:

In July 2002, the Board of Directors approved an annual fee of $20,000 for each non-employee director for their services as members of the Board of the Directors. We paid each non-employee director a pro rata payment of $5,425 for fiscal year 2002, except for Mr. Paisley, who was elected to the Board in August 2002, and received a pro rata payment of $4,274 for fiscal 2002. We are also authorized to reimburse directors for expenses in connection with attendance at meetings.

Non-employee directors have received grants of stock options to purchase shares of Common Stock under our 1999 Director Option Plan, as amended (the "Director Plan"). See "Certain Relationships and Related Transactions — Stock Option Grants to Certain Directors." Only non-employee directors may participate in the Director Plan.

The Director Plan provides that new non-employee directors will receive an initial grant to purchase 80,000 shares of Common Stock upon becoming a director (the "First Option"). The First Option vests as to 1/16 of the shares each quarter, so as to be fully vested on the fourth anniversary of the date of grant of the First Option. The Director Plan provides for the automatic grant of options to purchase 20,000 shares of Common Stock to each non-employee director on each anniversary of the date on which such person

first became a non-employee director (the "Subsequent Option"). The Subsequent Option vests as to 1/4 of the shares each quarter commencing on the third anniversary of the date of grant so as to be fully vested on the fourth anniversary of the date of grant.

54.     The 2003 Proxy also contained a report from the Audit Committee, signed, *inter alia*, by Defendant Dempsey, which stated:

> The Audit Committee has reviewed and discussed our audited financial statements for the fiscal year ended October 26, 2002 with our management. In addition, the Audit Committee has discussed with KPMG LLP, our independent auditors, the matters required to be discussed by Statement on Auditing Standards No. 61 (Communications with Audit Committee). The Audit Committee also has received the written disclosures and the letter from KPMG as required by the Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees) and the Audit Committee has discussed the independence of KPMG LLP with that firm.

> Based on the Audit Committee's review of the matters noted above and its discussions with our independent auditors and our management, the Audit Committee recommended to the Board of Directors that the financial statements be included in our Annual Report on Form 10-K.

The 2003 Proxy, however, did not disclose that the Company, under the guidance and control of the Individual Defendants had failed to properly expense stock based compensation granted by the board and the Compensation Committee, nor that the Company's financial results for fiscal 2002 were falsely overstated as a result.

55.     On May 14, 2003, the Individual Defendants caused the Company to issue a press release entitled "Brocade Reports Second Quarter Fiscal 2003 Financial Results." The press release stated in part:

> Brocade Communications Systems, Inc. Reported today financial results for its second quarter of fiscal year 2003, which ended April 26, 2003 (Q2 03). Net revenue for Q2 03 was $130.9 million, which compares to $123.1 million reported in the first quarter of fiscal year 2003 (Q1 03), and $135.0 million reported in the second quarter of fiscal year 2002 (Q2 02).

> Reporting on a Generally Accepted Accounting Principles (GAAP) basis, net loss for Q2 03 was $146.0 million, or $0.57 per share. This compares to a GAAP net loss for Q1 03 of $6.9 million, or $0.03 per share, and GAAP net income of $14.0 million or $0.06 per share in Q2 02.

> Non-GAAP net loss for Q2 03 was $1.0 million or $0.00 per share, as compared to non-GAAP net income of $0.3 million or $0.00 pr share in Q1 03. There was no difference between GAAP and non-GAAP net income in Q2 02. Non-GAAP net income for Q2 03 excludes in-process research and development, deferred stock compensation and other acquisition costs

related to the acquisition of Rhapsody Networks, Inc. (Rhapsody) in Q2 03, and severance, asset impairment, and other charges related to the restructuring of business operations that was announced on April 10, 2003. A reconciliation between GAAP and non-GAAP information is attached to this press release.

"I am pleased with the results that we have delivered in meeting our expectations of revenue, gross margin and operating expense," said Greg Reyes, Brocade Chairman and CEO. "Moving forward, we remain committed to driving revenue growth and profitability."

56. On August 13, 2003, the Individual Defendants caused the Company to issue a press release entitled "Brocade Reports Third Quarter Fiscal 2003 Financial Results; Storage Networking Leader Increases Revenue, Net Income, and EPS On a Sequential Basis." The press release stated in part:

Brocade Communications Systems, Inc. Reported today financial results for its third quarter of fiscal year 2003 (Q3 03), which ended July 26, 2003. Net revenue for Q3 03 was $133.5 million, an increase from the $130.9 million reported in the second quarter of fiscal year 2003 (Q2 03). Net revenue reported in the third quarter of fiscal year 2002 (Q3 02) was $151.2 million.

Non-GAAP net income for Q3 03 was $2.0 million, or $0.01 per share, as compared to a non-GAAP net loss of $1.0 million or $0.00 per share in Q2 03. Non-GAAP net income for Q3 03 excludes deferred stock compensation related to the acquisition of Rhapsody Networks, Inc. (Rhapsody) that was complete din Q2 03. A reconciliation between GAAP and non-GAAP information is contained in the tables below.

Reporting on a Generally Accepted Accounting Principles (GAAP) basis, net income for Q3 03 was $1.9 million, or $0.01 per share. This compares to a GAAP net loss for Q2 03 of $146.0 million, or $0.57 per share, and a GAAP net income of $18.3 million or $0.08 per share in Q3 02. There was no difference between GAAP and non-GAAP net income in Q3 02.

"We are pleased with our results for our third fiscal quarter in which we delivered increased revenue, operating income, and earnings per share to our shareholders," said Greg Reyes, Brocade Chairman and CEO. "Although the economic environment continues to be challenging, storage area networking remains an important area of IT investment as companies optimize their storage, server and application infrastructures to reduce cost and improve productivity. The actions that we have taken over the last several quarters have resulted in a more efficient and flexible business model more closely aligned with our go to market strategy. Moving forward, we are confident of our market position, and believe that we are well positioned for continued revenue and earnings growth."

57. On November 20, 2003, the Individual Defendants caused the Company to issue a press release entitled "Brocade Reports Fourth Quarter and Fiscal Year 2003 Results; Storage

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT   35
CASE NO.
44545

1    Networking Leader Increases Revenue, Net Income, and EPS on a Sequential Basis." The press

2    release stated in part:

3        Brocade Communications Systems, Inc. Reported today financial results for
         its fourth quarter (Q4 03) and fiscal year 2003 (FY 03) which ended October
4        25, 2003. Net revenue for Q4 03 was $137.8 million, an increase of three
         percent from $133.5 million reported in the third quarter of fiscal year 2003
5        (Q3 03). Net revenue reported in the fourth quarter of fiscal year 2002 (Q4
         02) was $153.1 million. Net revenue for FY 03 was $525.3 million, as
6        compared to net revenue of $562.4 million reported in fiscal year 2002 (FY
         02).
7

8        Non-GAAP net income for Q4 03 was $4.6 million, or $0.02 per
         share, as compared to a non-GAAP net income of $2.0 million, or $0.01 per
9        share, in Q3 03. Non-GAAP net income for Q4 03 excludes gains related to
         repurchases of convertible subordinated debt, a gain on the disposition of
10       private strategic investments, a reduction of previously recorded
         restructuring costs, and deferred stock compensation expense related to the
11       acquisition of Rhapsody Networks, Inc. For FY03, non-GAAP net income
         was $5.6 million, or $0.02 per share. Non-GAAP net income for FY 03
12       excludes gains related to repurchases of convertible subordinated debt, net
         gains on the disposition of private strategic investments, restructuring costs,
13       and deferred stock compensation and in-process research and development
         expenses related to the Rhapsody acquisition.

14       58.    In fact, Brocade's FY 2003 EPS was overstated by as much as $0.01 per share as a

15   result of the Company's failure to properly expense stock based compensation during Fiscal 2001.

16       59.    On February 11, 2004, the Individual Defendants caused the Company to issue a

17   press release entitled "Brocade Reports First Quarter of Fiscal 2004 Results; Revenues Increase 5%

18   Sequentially and 18% Year Over year." The press release stated in part:

19       Brocade Communications Systems, Inc. Reported today financial results for
         its first quarter of fiscal year 2004 (Q1 04) which ended January 24, 2004.
20       Net revenues for Q1 04 were $145.0 million, an increase of five percent
         from $137.8 million reported in the fourth quarter of fiscal year 2003 (Q4
21       03) and an increase of 18 percent from $123.1 million reported in the first
         quarter of fiscal 2003 (Q1 03).
22

23       Our first quarter was a good one, and fiscal 2004 is off to an
         excellent start for Brocade. During the first quarter, we saw revenue growth
         across our entire business," said Greg Reyes, Brocade Chairman and CEO.
24       "This represents our 4th quarter in a row of improved revenue, gross margin
         and operating margin. With our upcoming product cycle and improving
25       trends in the storage sector, we continue to be confident in our market
         position and future prospects."
26

27       Non-GAAP net income for Q1 04 was $8.0 million, o $0.03 per
         share, as compared to non-GAAP net income of $4.6 million, or $0.2 per
28       share, reported inQ4 03 and non-GAAP net income of $0.0 million, or $0.00

pr share, reported in Q1 03. Non-GAAP net income for Q1 04 excludes gains related to repurchases of convertible subordinated debt, deferred stock compensation expense related to the acquisition of Rhapsody Networks, Inc. (Rhapsody), and lease termination, facilities consolidation and other related costs. Non-GAAP net income for Q4 03 excludes gains related to repurchases of convertible subordinated debt, a gain on the disposition of private strategic investments, a reduction of previously recorded restructuring costs, and deferred stock compensation expense related to the acquisition of Rhapsody. Non-GAAP net income for Q1 03 excludes net gains on the disposition of private strategic investments and restructuring costs associated with a company-wide workforce reduction in Q1 03. A reconciliation between GAAP and non-GAAP information is contained in the tables below.

Reporting on a GAAP basis, net loss for Q1 04 was $35.8 million, or $(0.14) per share. This compares to GAAP net income for Q4 03 of $14.8 million, or $0.06 per share, and GAAP net loss for Q1 03 of $6.9 million, or $(0.03) per share.

60.     On February 23, 2004, the Individual Defendants caused the Company to issue the Company's Proxy Statement on Schedule 14A for the annual meeting of shareholders ("2004 Proxy"). The 2004 Proxy reported that the board of directors had approved an increase in the amounts paid to non-employee directors from $20,000 per year to $25,000 per year.. In addition, each member of a standing committee of the Board of Directors received additional compensation for their services on such committee, with each member of the Compensation Committee and Nominating and Corporate Governance Committee receiving an annual fee of $5,000, and each member of the Audit Committee receiving an annual fee of $10,000  The 2004 Proxy further contained a proposal submitted, approved and recommended by the board of directors seeking shareholder approval of an amendment to the 1999 Director Option Plan. The Individual Defendants caused the Proxy to represent:

We are asking our stockholders to approve the amended and restated 1999 Director Option Plan so that we can continue to use the current 1999 Director Option Plan to attract and retain the best available personnel for service as non-employee directors and to encourage their continued service on our Board of Directors. Our Board has approved the amended and restated 1999 Director Option Plan, subject to approval from our stockholders at the Annual Meeting. If the stockholders approve the amended and restated 1999 Director Option Plan, it will replace the current version of the 1999 Director Option Plan. Otherwise, the current version of the 1999 Director Option Plan will remain in effect. All of our non-employee directors, to the extent that they may receive additional stock options under the 1999 Director Option Plan in the future, have an interest in this proposal.

1
2
3
4
5
6
7
8
9
10

We are proposing to amend the 1999 Director Option Plan to provide our Board of Directors with the flexibility to determine the terms and conditions of the stock options to be granted thereunder, including, without limitation, when the options are granted, the number of shares subject to the options, the vesting provisions associated with the options and the term of the options. Currently, stock options are granted pursuant to a formula. New non-employee directors receive an initial stock option to purchase 80,000 shares of Brocade Common Stock upon becoming a director, and all non-employee directors receive an annual stock option to purchase 20,000 shares of Common Stock on each anniversary of the date on which such person first became a non-employee director. The initial stock option vests as to 1/16 of the shares each quarter, so as to be fully vested on the fourth anniversary of the date of grant; and the annual stock option vests as to 1/4 of the shares each quarter commencing on the third anniversary of the date of grant, so as to be fully vested on the fourth anniversary of the date of grant. In addition, all stock options granted under the 1999 Director Option Plan must have a term of ten years. The Board of Directors has no flexibility to determine these and other terms of the stock options because the terms may not vary.

11

\*\*\*

12
13
14
15
16
17
18
19

A committee of the Board of Directors (the "Committee") administers the amended and restated 1999 Director Option Plan. The Committee shall consist of not less than two directors who are "non-employee directors" under Rule 16b-3 of the Securities Exchange Act. Subject to the terms of the amended and restated 1999 Director Option Plan, the Committee has the sole discretion to select the non-employee directors who will receive options, determine the terms and conditions of options (for example, the number of shares, vesting provisions, term and exercise price, which must be at least fair market value), and interpret the provisions of the amended and restated 1999 Director Option Plan and outstanding options. The Committee may delegate any part of its authority and powers under the 1999 Director Option Plan to one or more directors; provided, however, that the Committee may not delegate its authority and powers in any way that would jeopardize the amended and restated 1999 Director Option Plan's qualification under certain Securities and Exchange Commission rules.

20

\*\*\*

21
22
23

The Committee selects the non-employee directors who will be granted options under the 1999 Director Option Plan, and Brocade anticipates that all non-employee directors will be granted options. Employees, including the Chief Executive Officer, and consultants are not eligible to receive options under the 1999 Director Option Plan.

24        61.     The 2004 proxy also contained a report of the Audit Committee, signed, *inter alia*,

25    by Defendants Dempsey and Moore, which stated:

26
27
28

The Audit Committee has reviewed and discussed our audited financial statements for the fiscal year ended October 25, 2003 with our management. In addition, the Audit Committee has discussed with KPMG LLP, our independent auditors, the matters required to be discussed by Statement on

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT          38
CASE NO.
44545

Auditing Standards No. 61 (Communications with Audit Committee). The Audit Committee also has received the written disclosures and the letter from KPMG as required by the Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees) and the Audit Committee has discussed the independence of KPMG LLP with that firm.

Based on the Audit Committee's review of the matters noted above and its discussions with our independent auditors and our management, the Audit Committee recommended to the Board of Directors that the financial statements be included in our Annual Report on Form 10-K.

In seeking the shareholders approval of the amendment to the 1999 Directors Option Plan and issuing the Audit Committee Report, however, the 2004 Proxy did not disclose that the Individual Defendants had failed to properly expense stock based compensation granted by the board and the Compensation Committee, nor that the Company's financial results for fiscal 2003 were falsely overstated as a result.

62. On May 19, 2004, the Individual Defendants caused the Company to issue a press release entitled "Brocade Reports Second Quarter of Fiscal 2004 Results; Revenues and Gross Margins Increase for Fifth Consecutive Quarter."   The press release stated in part:

Brocade Communications Systems, Inc. Reported today financial results for its second quarter of fiscal year 2004 (Q2 04) which ended May 1, 2004. Net revenues for Q2 04 were $145.6 million, a slight increase from $145.0 million reported in the first quarter of fiscal year 2004 (Q1 04) and an increase of 11 percent from $130.9 million reported in the second quarter of fiscal 2003 (Q2 03).

"In addition to delivering our fifth consecutive quarter of improvement in revenue and gross margin, during the quarter we continued to execute on our long term strategy by extending our product portfolio with four major product introductions," said Greg Reyes, Brocade Chairman and CEO. "We also strengthened the company's position across the entire spectrum of the SAN market and have set the stage to accelerate the achievement of our previously stated financial model targets by a full year."

Non-GAAP net income for Q2 04 was $8.1 million, or $0.03 per share, as compared to non-GAAP net income of $8.0 million, or $0.03 per share, reported in Q1 04 and non-GAAP net loss of $1.1 million, or $(0.00) per share, reported in Q2 03.  Non-GAAP net income for Q2 04 excludes restructuring charges, settlement cost of a claim associated with the acquisition of Rhapsody Networks, Inc. (Rhapsody), deferred stock compensation expense related to Rhapsody, and gains on the disposition of private strategic investments.  Non-GAAP net income for Q1 04 excludes lease termination, facilities consolidation and other related costs, deferred stock compensation expense related to the acquisition of Rhapsody, and gains related  to repurchases of convertible subordinated debt.  Non-GAAP net loss for Q2 03 excludes restructuring charges, in-process research and

development, and deferred stock compensation expense related to the acquisition of Rhapsody.  A reconciliation between GAAP and non-GAAP net income (loss) is contained in the tables below.

Reporting on a GAAP basis, net loss for Q2 04 was $2.0 million, or $(0.01) per share.  This compares to GAAP net loss for Q1 04 of $36.8 million, or $(0.14) per share, and GAAP net loss for Q2 03 f $146.0 million, or $(0.57) pr share.

Next Phase of Business Model Optimization

Building on its continued positive financial performance, improved operational efficiencies, and successful execution of product development programs, Brocade today announced the next phase of its plan to optimize the company's business model to drive improved profitability while sustaining revenue growth.  This phase of the plan encompasses organizational changes that include a reduction in force of 110 employees, focusing of resources to better support OEM partners, and continued investments in intelligent SAN switching technology.  As a result, Brocade will incur a $10.5 million restructuring charge for severance, asset impairments, and contract terminations.  (See today's press release: "Brocade Announces Next State In Strategic Growth and Market Segmentation Plan.")

In addition, Brocade announced that it has recently settled a claim with former Rhapsody shareholders regarding the Earn-Out Payment associated with the Rhapsody merger agreement.  As disclose din Brocade's Form 10-K for the fiscal year ended October 25, 2003 and Q1 04 Form 10-Q, Brocade did not issue the 2.9 million Earn Out shares because Brocade believed that the milestones for making the Earn Out Payment were not met. "We continue to believe that the terms of the contract were not met," said Reyes.  "However, in the best interest of all concerned, we determined it was better to settle than litigate in a costly and protracted legal dispute."  As a result of the settlement Brocade has recorded a $6.9 million charge and will issue 1.3 million shares of common stock to the former Rhapsody shareholders.

63.     On August 12, 2004,the Individual Defendants caused the Company to issue a press release entitled "Brocade Announces Preliminary Q3 2004 Results; Revenue on Track, Exceeds EPS Guidance."  The press release stated in part:

Brocade Communications Systems, Inc., the world's leading provider of infrastructure solutions for Storage Area Networks (SANs), today announced preliminary results for the third quarter of fiscal 2004 (Q3 04) ended July 31, 2004.  Brocade expects to report net revenue for Q3 04 in a range of $149.5 to $150.5 million and GAAP net income per share of $0.06 to $0.07. The GAAP earnings include a pre-tax gain of $3.5 million, equivalent to $0.01 per share, related to repurchases of $47.4 million of the company's convertible subordinated debt.

"I am pleased to announce revenue that is in line with our previous outlook and better than expected EPS," said Greg Reyes, Brocade Chairman

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT   40
CASE NO.
44545

and CEO.  "Given the unusually large number of pre-announcements by storage-related companies with lower than expected financial results, we believe that it is important to provide our preliminary results so the market can assess Brocade's performance and competitively position accurately."

64.    On November 22, 2004, the Individual Defendants caused the Company to issue a press release entitled "Brocade Reports Fourth Quarter and Fiscal Year 2004 Results; Record Annual Revenue of $596.3 Million Increases 14% Year Over Year Fourth Quarter Operating Margin Increases 16%."  The press release stated in part:

Brocade Communications Systems, Inc. Reported today financial results for its fourth quarter (Q4 04) and fiscal year 2004 (FY 04) which ended October 30, 2004.  Net revenues for Q4 04 were $155.6 million, an increase of four percent from $150.0 million reported in the third quarter of fiscal year 2004 (Q3 04) and an increase of 13 percent from $137.8 million reported in the fourth quarter of fiscal 2003 (Q4 03).  Net revenues for FY 04 were $596.3 million, an increase of 14 percent from $525.3 million reported in fiscal year 2003 (FY 03).

Non-GAAP net income for Q4 04 was $18.6 million, or $0.07 per share, as compared to non-GAAP net income of $15.2 million, or $0.06 per share, reported in Q3 04 and non-GAAP net income of $4.6 million, or $0.02 per share, reported in Q4 03.  Non-GAAP net income for Q4 04 excludes deferred stock compensation expense related to Rhapsody Networks, Inc. (Rhapsody), a reduction of previously recorded restructuring costs, and gains related to repurchases of the Company's convertible subordinated debt.  Non-GAAP net income for Q3 04 excludes deferred stock compensation expense related to the acquisition of Rhapsody, gains related to repurchases of the Company's convertible subordinated debt, and gains on the disposition of private strategic investments.  Non-GAAP net income for Q4 03 excludes deferred stock compensation expense related to the acquisition of Rhapsody, a reduction of previously recorded restructuring costs, gains related to repurchases of the Company's convertible subordinated debt, and gains on the disposition of private strategic investments.  A reconciliation between GAAP and non-GAAP net income is contained in the tables below.

Reporting on a GAAP basis, net income for Q4 04 was $20.4 million, or $0.08 pr share basic and diluted.  This compares to GAAP net income for Q3 04 of $17.0 million, or $0.06 per share diluted, $0.07 per share basic, and GAAP net income for Q4 03 of $14.8million, or $0.06 per share basic and diluted.

"Fiscal 2004 was a good year for Brocade and I am very proud of our results," said Greg Reyes, Brocade Chairman and CEO.  "During the year we expanded and extended our product line, introduced new products in new segments, executed on our business strategy, achieved our financial model targets, and strengthened the overall position of the Company."

65.   In fact, Brocade's FY 2004 EPS was overstated by as much as $0.01 per share as a result of the Company's failure to properly expense stock based compensation during Fiscal 2001.

## VIII.   THE TRUTH BEGINS TO EMERGE

66.   On January 6, 2005, the Individual Defendants caused the Company to issue a press release entitled "Brocade Communications to Restate Financial Statements; Company Currently Expects Adjustments to Relate to Stock Compensation; Company Plans to Delay the Filing of its Form 10-K for Fiscal Year Ending October 30, 2004."   The press release stated in part:

> Brocade Communications Systems, Inc., the world's leading provider of infrastructure solutions for Storage Area Networks (SANs), announced today that it currently expects to restate its financial statements for fiscal years ending 2002 and 2003 to record additional stock-based compensation expense as a result of an internal review.   During the course of the review, which is still ongoing, the Company determined that the way in which it accounted for stock option grants was incorrect and requires restatement. The Company currently expects the restatement to relate to stock compensation.   The Company does not currently anticipate any material adjustments to its historical revenues, non-stock option related operating expenses or cash positions.   The Company expects related adjustments will be made to the Company's financial statements for fiscal years prior to 2002, as necessary.

> Specifically, the Company has determined it incorrectly accounted for, and will record historical stock-based compensation charges relating to, (i) grants that were made to new hires on their offer acceptance date, rather than the date of their commencement of employment, during the period May 1999 to July 2000, and (ii) grants that were made to persons engaged on a part-time basis prior to their new hire full-time employment during the period August 2000 to October 2002.

> *Brocade's audit committee is conducting the internal review with the assistance of outside counsel and accountants, both of whom were retained for this purpose.   The review is ongoing.   There can be no assurance that additional adjustments will not be required.   The Audit Committee expects to complete the review process in the next few weeks. The Company intends to provide more information as soon as it is available.*

> *"Our core business remains strong and the restatement does not affect the underlying fundamentals of our business.   We continue to successfully execute on our strategies and plans and to further strengthen the overall position of the Company," said Greg Reyes, Brocade Chairman and Chief Executive Officer.*

67.   On January 24, 2005, the Individual Defendants caused the Company to issue a press release entitled "Brocade Announces the Completion of Audit Committee Internal Review;

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT   42
CASE NO.
44545

All Adjustments Are Non Cash and Relate to Stock-Based Compensation and Associated Tax

Adjustments." The press release stated in part:

> Brocade Communications Systems, Inc., the world's leading provider of infrastructure solutions for Storage Area Networks (SANs), announced today that its Audit Committee has completed its previously announced internal review. As a result of the findings of the review, the Company expects to record additional stock-based compensation charges, which are non-cash. In addition the Company expects to record a valuation allowance associated with deferred tax assets related to previously recorded stock option tax benefits.

> The Company affirmed that none of the adjustments impact historical revenues, cash positions, or non-stock option related operating expenses. The Company emphasized that its core business remains strong and the financial restatement does not affect the underlying fundamentals of the business. Brocade is working to prepare revised financial statements to reflect the net stock compensation expenses and associated income tax effect. Brocade will provide more information as soon as it is available.

> The table below reflects the Company's expectations of the approximate impact to the Company's Pre-Tax Income (Loss) and Net Income (Loss):

| (Amounts in Millions (1)) | FY02 (1) | FY03(1) | FY04(1) |
|---|---|---|---|
| Pre tax income (loss) as reported | $84 | $(134) | $(16) |
| Adjustments to pre tax income (loss): | | | |
| Stock based compensation | 47 | -1 | -2 |
| Adjusted pre tax income (loss) | $131 | $(135) | $(18) |
| Income tax provision (benefit) as reported | 24 | 2 | -14 |
| Adjustment to tax provision (benefit): | | | |
| Changes in effective tax rate | -19 | 10 | 28 |
| Adjusted tax provision (benefit) | $5 | $12 | $14 |
| Net income (loss) as restated | $126 | $(147) | $(32) |
| Net income loss) as reported | $60 | $(136) | $(2) |
| Change in reported net income | $66 | $(11) | $(30) |

> (1)     The amounts provided are estimates and subject to audit. The Company has not yet filed its Form 10-K report for the Year Ended October 30, 2004, and there can be no assurance that these amounts may not change.

> As announced on January 6, the Company determined it incorrectly accounted for, and would record historical stock-based compensation

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT CASE NO. 44545

43

charges relating to, (i) grants that were made to new hires on their offer acceptance date, rather than the date of their commencement of employment, during the period May 1999 to July 2000, and (ii) grants that were made to persons engaged on a part-time basis prior to their new hire full-time employment during the period August 2000 to October 2002.

> *Upon completion of the internal review, the Audit Committee further determined that there was insufficient basis to rely on the Company's process and related documentation to support recorded measurement dates used to account for certain stock options granted prior to August 2003. As a result, the Company will record additional stock-based compensation charges relating to many of its stock option grants from the periods 1999 through the third quarter of fiscal 2003. In addition, it was concluded that there were improprieties in connection with the documentation of stock option grants and related employment records of a small number of employees prior to mid 2002, which resulted in immaterial adjustments included in this restatement.*

These charges will affect the previously filed financial statements for fiscal years 2002 and 2003. The Company also expects to make stock based compensation and associated income tax adjustments to previously reported fiscal year 2004 financial results. These adjustments relate solely to matters pertaining to stock options granted prior to August 2003. For years prior to 2002, the Company will reduce previously reported net income by approximately $304 million (consisting of a reduction to net income for years 1999 and 2000 of $15 million and $1,019 million, respectively, and an increase to net income in 2001 of $730 million) relating solely to stock based compensation and associated income tax adjustments. The Company will calculate the additional historical stock based compensation charges using the variable method of accounting under APB 25. The stock compensation and related tax adjustments are all non-cash.

As a result of the stock compensation adjustments, the Company's deferred tax assets previously recognized have now been fully reserved. The Company expects to realize a tax benefit in future reporting periods when it is able to utilize its Net Operating Losses to offset future Income. This will result in a lower future effective income tax rate than previously expected.

Brocade also announced today that Michael Klayko, previously Vice President of Worldwide Sales, has been named Chief Executive Officer, and that David House, who previously served as lead outside director of the Company, has been named Executive Chairman of Brocade, effective immediately. Greg Reyes, who served in these positions for six years, will remain active as an employee advisor to Brocade. For more information, please see press release entitled, "Brocade Announces Executive Appointments" issued today.

Brocade does not expect these developments to impact the timing of its release of financial results for the first quarter fiscal year 2005, ending January 29, 2005, expected to occur on February 15, 2005.

68.   Notwithstanding the fact that the Individual Defendants had been forced to admit that the Company would be forced to restate its financial results, on February 18, 2005 the Director

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT   44
CASE NO.
44545

1   Defendants announced that they had unanimously approved an increase in compensation paid to

2   themselves as directors.  Under this increase, in addition to annual fees for sitting on the board and

3   each respective committee thereof, each non-employee receives $1,500 for each committee

4   meeting the director attends in person and $1,000 for each committee meeting in which the director

5   participates by telephone.   Moreover, the chairman of each committee receives an additional

6   annual cash payment of $5,000, and the non-employee Lead Director will receive an annual cash

7   payment of $15,000. The Director Defendants made this increase retroactive to apply to all

8   meetings conducted during fiscal year 2005, including meetings that occurred prior to the date of

9   approval.

10          69.      Also on February 18, 2005, the Individual Defendants caused the Company to enter

11   into an employment agreement with Defendant Reyes, whereby the Company agreed to pay Reyes

12   $910,000 per year for two years to serve as a consultant to the CEO of the Company.  In addition,

13   the Company agreed to continue to reimburse Reyes for all expenses incurred "in furtherance of his

14   duties," including the cost of operating his private plane.  Moreover, the employment agreement

15   extended Reyes rights to receive all Company benefits, his Brocade stock options continued to

16   vest, and Brocade committed to continue to cover Reyes under its Director's and Officer's

17   Insurance.

18          70.      On April 27, 2005, Wall Street's well-known analysts became aware that the

19   Company  would fall short of its forecasted results.  Defendants realized that their improper

20   accounting scheme could go on no longer as the SEC was already investigating the Company.

21   Wall street analysts went on a rampage urging clients to immediately sell the Company's shares,

22   warning that the Company would not meet its forecast.

23          71.      For example, Merrill Lynch wrote on the morning of April 28, 2005:

24              •   We are downgrading shares of Brocade Communications from Buy
                   to Sell.  We expect Brocade to miss consensus earnings expectations
25                 from the April quarter by about $.02 (20%).  This could cause further
                   downward pressure on the stock, even at currently depressed levels.
26                 Also, as investors weigh options-adjusted EPS more over the next
                   few months, Brocade's shares could act weakly.  We estimate that
27                 when adjusted for full tax rate and options-related expensing,

28   VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,     45
     GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
     CASE NO.
     44545

Brocade's C2006 EPS is $.18, 49% lower than our $.37 estimate excluding such adjustments.

- Revenue decline of 10% expected in FQ2 (Apr). Our research suggests that Brocade may post revenue of $145M (-10% seq.) Vs. Our prior estimate of $150M (-1% seq.) In its FQ2. The consensus estimate is for revenue of $159M. This would imply a $14M (9%) revenue miss relative to expectations.

72.     On these revelations the Company's shares fell more than 10% on huge volume of 23 million shares traded.

73.     On May 2, 2005, the Individual Defendants caused the Company to issue a press release entitled "Brocade Announces Preliminary Second Quarter Fiscal 2005 Results." The press release stated in part:

> Brocade Communications Systems, Inc., the world's leading provider of infrastructure solutions for Storage Area Networks (SANs), today announced preliminary results for the second quarter of fiscal 2005 (Q2 05), ending April 30, 2005. Brocade expects to report net revenue for Q2 05 in a range of $144 to $145 million, which is below previous guidance issued on February 16, 2005 of $155 to $161 Million, and diluted GAAP net income per share of $0.07. The company expects non-GAAP results to be generally consistent with GAAP results. These preliminary results compare to net revenue of $161.6 million and diluted GAAP net income per share of $0.10, for the first quarter of fiscal 2005 (Q1 05) and net revenue of $145.6 million and GAAP diluted net income per share of $.01 for the second quarter of fiscal 2004 (Q2 04). As previously disclosed, fiscal 2004 was a 53-week year instead of a 52-week year and the extra week fell into Q2 04. As a result, net revenue in Q2 04 included approximately $5 to $6 million in additional revenue, without which net revenue for Q2 04 would have been approximately $140 million.
>
> These preliminary results are based on management's initial estimates of operating results and there can be no assurance that the amounts may not change.
>
> Brocade attributed the revenue shortfall to greater seasonality than expected, reflected a lower level of enterprise spending, and an extended sales cycle causing business from end customers to push outside of the quarter.
>
> "Our sales pipeline indicates that the underlying fundamentals of our business remain intact, and while we are disappointed to miss our original guidance, we continue to manage expenses and remain at a healthy level of profitability," said Michael Klayko, CEO. "As reported recently by several industry observers, the storage environment in the last two weeks of March was weak and while April was a good month, it was not enough to offset the weakness in March. As we enter the third fiscal quarter, our sales pipeline continues to grow and the pipeline we see today is a stronger one than it was entering our second quarter," continued Klayko.

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT     46
CASE NO.
44545

1

2

> Brocade will report final financial results for its second quarter fiscal year 2005 on Wednesday, May 18, 2005 after the close of market.

3

4

5

6

7

74.    Then, on May 16, 2005, before the markets opened, the Individual Defendants caused the Company to issue a press release entitled "Brocade Restates Financial Statements to Reflect Additional Stock-Based Compensation Expense; Company Affirms That None of the Adjustments Impact Historical Revenues, Cash Positions, or Non-Stock Option Related Operating Expenses." The press release stated in part:

8

9

10

11

> Brocade Communications Systems, Inc. announced today that the Company will restate its financial statements for the fiscal years ending 2002 through 2004 to record additional charges for stock-based compensation expense. The Company affirmed that none of the charges will have an impact on Brocade's historical revenues, cash positions, or non-stock option related operating expenses. The company expects related adjustments will be made to the Company's financial information for fiscal 2001, as necessary.

12

13

14

15

16

17

> Following the completion of an Audit Committee review announced on January 24, 2005, additional information came to the Company's attention that indicated that its guidelines regarding stock option granting practices were not followed during the period from August 2003 through November 2004. After further review, the Company concluded that it could not rely on the documentation used to support the recorded measurement dates for stock options granted in that period. As a result, the Company will restate its financial statements to account for additional stock-based compensation for stock options granted from August 2003 through November 2004. The additional Charges are expected to result in a cumulative increase in non-cash stock option compensation expense of $0.8 million over fiscal years 2003 and 2004.

18

19

20

21

22

23

24

25

26

> After discovering the additional information regarding non-compliance of its guidelines, the Company commenced a review of certain other practices that could impact stock option accounting. This review determined that from 2001 through 2004, the Company had not appropriately accounted for the cost of stock based compensation for certain employees on leaves of absences (LOA) and in transition roles prior to ceasing employment with Brocade. Prior to 2003, Brocade's LOA policy allowed certain employees to continue vesting in their stock options and to have extended stock option exercise periods for up to three months from the state of the LOA. The expected charges relate principally to options that continued to vest for employees who were on LOAs for a period greater than three months. The Company also expects to record additional adjustments related to options that continued to vest for certain employees in transition roles. Management estimates the total increase in non-cash compensation expense related to these matters to be in a range of approximately $31 to $52 million for fiscal years 1001 through 2004.

27

> Brocade's Audit Committee has commenced an independent review of the Company's stock option accounting regarding LOAs. Based on that

28

ongoing review, the Company's preliminary estimates of anticipated adjustments are subject to change.

The table below reflects the total effects of these combined adjustments and are the Company's preliminary estimate of the approximate impact to the Company's non-cash expenses and EPS. The Company does not currently expect that there will be any impact on non-cash expenses and EPS for any period in fiscal year 2005.

| Fiscal Year Ending: | Additional Non-Cash Expense | Reduction in EPS |
| --- | --- | --- |
| 2001 | $12.0 - $25.0 million | $0.05 - $0.11 |
| 2002 | $19.0 - $23.0 million | $0.00 - $0.09 |
| 2003 | $0.2 - $0.8 million | $0.00 - $0.01 |
| 2004 | $0.8 - $2.8 million | $0.00 - $0.01 |

The Company also announced today that it has been informed that the Department of Justice (DOJ) is working with the SEC in a joint investigation regarding the Company's stock option granting practices. Brocade has no further information regarding the timing or scope of the investigation.

"It is no unusual in the current environment that multiple relevant government agencies will take an interest in these types of matters," said Michael Klayko, Brocade's newly appointed Chief Executive Officer. "We are cooperating fully with the SEC and DOJ and hope that the investigation can be concluded as quickly as possible." Klayko continued, "The Board and management team are absolutely committed to the highest standard of accounting and continuously improving our internal controls and compliance with our policies. I have confidence in my team and we remain focused on executing to our business plan."

## IX. UNDISCLOSED ADVERSE INFORMATION

75.    In fact, Brocade's financials had been false for at least four years due to its improper accounting for compensation expenses. As a result, Brocade's results were presented in violation of Generally Accepted Accounting Principles ("GAAP").

76.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Regulation S-X, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

48

1   GAAP, with the exception that interim financial statements need not include disclosures that would

2   be duplicative of disclosures accompanying annual financial statements.

3       77.     Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB")

4   No. 20, the type of restatements and revisions announced by Brocade were to correct for material

5   errors in previously issued financial statements. APB No. 20, ¶¶7-13. The restatement for past

6   financial statements is a disfavored method of recognizing an accounting change as it dilutes

7   confidence by investors in the financial statements, it makes it difficult to compare financial

8   statements and it is often difficult, if not impossible, to generate the numbers when restatement

9   occurs. *Id.* ¶14. Thus, GAAP provides that financial statements should only be restated in limited

10  circumstances, *i.e.,* when there is a change in the reporting entity, there is a change in accounting

11  principles used or to correct an error in previously issued financial statements. Brocade's

12  restatements and revisions were not due to a change in reporting entity or a change in accounting

13  principle, but rather to errors in previously issued financial statements. Thus, the restatements and

14  revisions were an admission by defendants that Brocade's previously issued financial results and

15  its public statements regarding those results were false and misleading. Moreover, immaterial

16  corrections are not required to be restated. APB No. 20, ¶38. Thus, the restatement indicates that

17  the errors were material.

18      78.     As a result of these materially false and misleading statements and failures to

19  disclose, Brocade's publicly traded securities traded at inflated prices during the Class Period.

20  Plaintiff and other members of the Class purchased or otherwise acquired Brocade publicly traded

21  securities relying upon the integrity of the market price of Brocade publicly traded securities and

22  market information relating to Brocade, and have been damaged thereby.

23          **X.  THE SELLING DEFENDANTS' ILLEGAL INSIDER SELLING**

24      79.     During the Relevant Period, based on his knowledge of material non-public

25  information regarding the Company, defendant Reyes sold 4,957,053 Brocade shares for insider

26  trading proceeds of more than $30 million. These sales were unusual in both their timing and

27  amount.

28

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,     49
GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

80.     During the Relevant Period, based on his knowledge of material non-public information regarding the Company, defendant Canova sold 4,903 Brocade shares for insider trading proceeds of $31, 526.  These sales were unusual in both their timing and amount.

## XI.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

81.     Plaintiff brings  this action derivatively in the right and for the benefit of Brocade to redress injuries suffered, and to be suffered, by Brocade as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Brocade is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

82.     Plaintiff will adequately and fairly represent the interests of Brocade in enforcing and prosecuting its rights.

83.     Plaintiff is and was an owner of Brocade common stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and  remains a Brocade shareholder.

84.     At the time this action was initiated, the Brocade Board consisted of the following nine individuals: defendants Klayko, Dempsey, Paisley, House, Moore, Krause, Neiman, Vaswani and Walker (the "Demand Directors").  Plaintiffs did not make a pre-suit demand on the Demand Directors to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     The Compensation Committee of the Board determines salaries and bonuses and considers employment agreements for elected officers of the Company, and prepares reports on these matters; considers, reviews and grants options under the Company's compensation plans and administers the plans; and considers matters of director compensation, benefits and other forms of remuneration. Throughout the Relevant Period, the Compensation Committee has approved and recommended repeated increases in the compensation and award of stock options pursuant to the Company's stock option plans to each of the Director Defendants.  The Compensation Committee

1   is comprised of defendants Dempsey, Krause and Vaswani. As the members of the Compensation

2   Committee singularly control the other defendants' awards, the remaining members of the Board

3   will not institute this action against defendants Dempsey, Krause and Vaswani. To do so would

4   jeopardize each defendant's personal financial compensation. Thus, demand on defendants

5   Klayko, Paisley, House, Moore, Neiman and Walker is futile;

6           (b)     The principal professional occupation of defendant Klayko is his

7   employment with Brocade, pursuant to which he received and continues to receive substantial

8   monetary compensations and other benefits. Specifically, for FY:05, Brocade has entered into an

9   employment agreement pursuant to which he will receive a base salary of $520,000 with a target

10  incentive bonus of 75% of his base salary or $390,000, and will also be granted 1,000,000 options

11  to purchase common stock of the Company. Accordingly, defendant Patrick Smith lacks

12  independence from defendants, Dempsey, Krause and Vaswani., defendants who are not

13  disinterested and/or independent and who exert influence over defendant Klayko's compensation

14  by virtue of their position as the Compensation Committee. This lack of independence renders

15  defendant Klayko incapable of impartially considering a demand to commence and vigorously

16  prosecute this action;

17          (c)     According to Brocade's Amended Proxy Statement filed with the SEC on or

18  about March 4,2005, defendants Dempsey, Moore and Paisley were, during the Relevant Period,

19  members of the Audit Committee, and defendant Krause currently also sits on the Audit

20  Committee. The Audit Committee is responsible for "The Audit Committee oversees our

21  accounting, financial reporting and audit processes; makes recommendations to the Board of

22  Directors regarding the selection of independent auditors; reviews the results and scope of audit

23  and other services provided by the independent auditors; reviews the accounting principles and

24  auditing practices and procedures to be used in preparing our financial statements; and reviews our

25  internal controls." Specifically, the "Audit Committee works closely with management and our

26  independent auditors. The Audit Committee also meets with our independent auditors without

27  members of management present, on a quarterly basis, following completion of their quarterly

28

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,   51
GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

reviews and annual audit and prior to our earnings announcements, to review the results of their work. The Audit Committee also meets with our independent auditors to approve the annual scope of the audit services to be performed." Nonetheless, the Audit Committee recommended that the Board include the improper financial statements and publish the improper and misleading press releases throughout the Relevant Period. By such actions, defendants breached their duties by causing or allowing the improper financials and press releases described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

(d)     The entire Brocade Board and senior management participated in the wrongs complained of herein. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the Director Defendants breached the fiduciary duties that they owed to Brocade and its shareholders in that they failed to prevent and correct the improper financials. Thus, the Brocade Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Brocade to millions of dollars in liability for possible violations of applicable securities laws;

(e)     The Individual Defendants, because of their inter-related familiar, business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the improper public statements and insider selling, as detailed herein *supra*, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)     From September 1985 until May 2000, defendant. Paisley was the Senior Vice President of Finance and Chief Financial Officer of 3Com Corporation ("3Com"). Also from 1981 to 1990, defendant Krause was President and Chief Executive Officer of 3Com. Because of their long-standing and entangling business and professional relationships, defendants Paisley and Krause will not take the action requested by plaintiffs herein against one another or the remainder of the Individual Defendants; and

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

52

(ii)     Prior to forming Rhapsody networks, which was acquired by Brocade, defendant Klayko held numerous executive sales and marketing positions at Hewlett-Packard ("HP"). Also for 24 years, defendant Walker worked in a wide range of positions at HP, including controller for various business groups, business manager for U.S. field operations, and executive in charge of HP's Information Technology function. Because of their long-standing and entangling business and professional relationships, defendants Klayko and Walker will not take the action requested by plaintiffs herein against one another or the remainder of the Individual Defendants.

(f)     As of February 14, 2005, defendants Klayko, Neiman, Dempsey, Paisley, House, Moore and Vaswani owned millions of Brocade shares. Specifically, defendant Klayko owned 1,799,331 shares; defendant Neiman owned 240,625 shares; defendant Dempsey owned 240,625 shares; defendant Paisley owned 50,000 shares; defendant House owned 56,000 shares; defendant Moore owned 40,000    shares; and defendant Vaswani owned 16,000 shares. Thus, these defendants had every incentive to participate in the false and misleading press releases and improper accounting in order to effectuate a commensurate rise in Brocade's stock price;

(g)     Each of the Director Defendants knew of and/or directly benefited from the wrongdoing complained of herein;

(h)     The Director Defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Brocade's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(i)     In order to bring this suit, all of the directors of Brocade would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(j)     The acts complained of constitute violations of the fiduciary duties owed by Brocade's officers and directors and these acts are incapable of ratification;

(k)     Each of the defendant directors of Brocade authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT   53
CASE NO.
44545

1     wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such

2     suit was instituted by them;

3              (l)      Any suit by the current directors of Brocade to remedy these wrongs would

4     likely expose the Individual Defendants and Brocade to further violations of the securities laws that

5     would result in civil actions being filed against one or more of the Individual Defendants, thus,

6     they are hopelessly conflicted in making any supposedly independent determination whether to sue

7     themselves;

8              (m)     Brocade has been and will continue to be exposed to significant losses due to

9     the wrongdoing complained of herein, yet the Individual Defendants and current Board have not

10     filed any lawsuits against themselves or others who were responsible for that wrongful conduct to

11     attempt to recover for Brocade any part of the damages Brocade suffered and will suffer thereby;

12              (n)      If the current directors were to bring this derivative action against

13     themselves, they would thereby expose their own misconduct, which underlies allegations against

14     them contained in class action complaints for violations of securities law, which admissions would

15     impair their defense of the class actions and greatly increase the probability of their personal

16     liability in the class actions, in an amount likely to be in excess of any insurance coverage available

17     to the Individual Defendants.  In essence, they would be forced to take positions contrary to the

18     defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand

19     is futile; and

20              (o)      If Brocade's current and past officers and directors are protected against

21     personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty

22     alleged in this Complaint by directors' and officers' liability insurance, they caused the Company

23     to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the

24     stockholders of Brocade.  However, due to certain changes in the language of directors' and

25     officers' liability insurance policies in the past few years, the directors' and officers' liability

26     insurance policies covering the defendants in this case contain provisions that eliminate coverage

27     for any action brought directly by Brocade against these defendants, known as, *inter alia*, the

28

1    "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain

2    of the officers of Brocade, there would be no directors' and officers' insurance protection and thus,

3    this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought

4    derivatively, as this action is brought, such insurance coverage exists and will provide a basis for

5    the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all

6    then the current directors will not cause Brocade to sue them, since they will face a large uninsured

7    liability.

## COUNT I
### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

10        85.    Plaintiff incorporates by reference and realleges each and every allegation set forth

11   above, as though fully set forth herein.

12        86.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew

13   the information described above, and sold Brocade common stock on the basis of such information.

14        87.    The information described above was proprietary non-public information

15   concerning the Company's accounting and financial statements, together with its financial

16   condition and future business prospects. It was a proprietary asset belonging to the Company,

17   which the Insider Selling Defendants used for their own benefit when they sold Brocade common

18   stock.

19        88.    At the time of their stock sales, the Insider Selling Defendants knew that the

20   Company's financial statements, results and prospects were not as stated. The Insider Selling

21   Defendants' sales of Brocade common stock while in possession and control of this material

22   adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

23        89.    Since the use of the Company's proprietary information for their own gain

24   constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to

25   the imposition of a constructive trust on any profits the Insider Selling Defendants obtained

26   thereby.

27

28   VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,    55
     GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
     CASE NO.
     44545

1

2

## COUNT II

3

### Violation of Section 20(a) of the Exchange Act Against All Defendants

4   90.   Plaintiff incorporates by reference and realleges each and every allegation contained

5   above, as though fully set forth herein.

6   91.   The Individual Defendants owed and owe Brocade fiduciary obligations.  By reason

7   of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe

8   Brocade the highest obligation of good faith, fair dealing, loyalty and due care.

9   92.   The Individual Defendants, and each of them, violated and breached their fiduciary

10   duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

11   93.   Each of the Individual Defendants had actual or constructive knowledge that they

12   had caused the Company to improperly misrepresent its financial statements, prospects and results

13   and failed to correct the Company's public statements, as well as its publicly reported financial

14   results and guidance.  These actions could not have been a good faith exercise of prudent business

15   judgment to protect and promote the Company's corporate interests.

16   94.   As a direct and proximate result of the Individual Defendants' failure to perform

17   their fiduciary obligations, Brocade has sustained significant damages.  As a result of the

18   misconduct alleged herein, the Individual Defendants are liable to the Company.

19   95.   Plaintiff on behalf of Brocade has no adequate remedy at law.

20

## COUNT III

21

### Against All Defendants for Abuse of Control

22   96.   Plaintiff  incorporates by reference and realleges each and every allegation

23   contained above, as though fully set forth herein.

24   97.   The Individual Defendants' misconduct alleged herein constituted an abuse of their

25   ability to control and influence Brocade, for which they are legally responsible.

26   98.   As a direct and proximate result of the Individual Defendants' abuse of control,

27   Brocade has sustained significant damages.

28

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,   56
GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

99.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

100.    Plaintiff on behalf of Brocade has no adequate remedy at law.

### COUNT IV

### Against All Defendants for Gross Mismanagement

101.    4Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Brocade in a manner consistent with the operations of a publicly held corporation.

103.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Brocade has sustained significant damages in excess of hundreds of millions of dollars.

104.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

105.    Plaintiff on behalf of Brocade has no adequate remedy at law.

### COUNT V

### Against All Defendants for Waste of Corporate Assets

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    As a result of the improper public statements, financial results and prospects as alleged herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Brocade to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,     57
GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

1     108.    As a result of the waste of corporate assets, the Individual Defendants are liable to

2     the Company.

3     109.    Plaintiff on behalf of Brocade has no adequate remedy at law.

### COUNT VI

#### Against All Defendants for Unjust Enrichment

6     110.    Plaintiff incorporates by reference and realleges each and every allegation set forth

7     above, as though fully set forth herein.

8     111.    By their wrongful acts and omissions, defendants were unjustly enriched at the

9     expense of and to the detriment of Brocade.

10    112.    Plaintiff, as a shareholder and representative of Brocade, seeks restitution from

11    these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits

12    and other compensation obtained by these defendants, and each of them, from their wrongful

13    conduct and fiduciary breaches.

### XII.  PRAYER FOR RELIEF

15    WHEREFORE, plaintiff demands judgment as follows:

16    1.    Against all of the Individual Defendants and in favor of the Company for the

17    amount of damages sustained by the Company as a result of the Individual Defendants' breaches

18    of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust

19    enrichment, and extraordinary equitable and/or injunctive relief as permitted by law, equity and

20    state statutory provisions sued hereunder, including attaching, impounding, imposing a

21    constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their

22    other assets so as to assure that plaintiff on behalf of Brocade has an effective remedy;

23    2.    Awarding to Brocade restitution from the defendants, and each of them, and

24    ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

25    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys'

26    fees, accountants' and experts' fees, costs, and expenses; and

27    3.    Granting such other and further relief as the Court deems just and proper.

28

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,     58
GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

1

## XIII.  JURY DEMAND

2

Plaintiff demands a trial by jury.

3

Dated: June 1, 2005                    BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP

4

5

Alan R. Plutzik

6

7    BRAMSON, PLUTZIK, MAHLER &
     BIRKHAEUSER, LLP
     Alan R. Plutzik

8    Kathryn A. Schofield
     2125 Oak Grove Road, Suite 120

9    Walnut Creek, CA 94598
     Telephone:  (925) 945-0200

10

11   Nadeem Faruqi
     FARUQI & FARUQI, LLP

12   320 East 39th Street
     New York, NY 10016
     Telephone:  (212) 983-9330

13   Facsimile:  (212) 983-9331

14   Attorneys for Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL,        59
GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT
CASE NO.
44545

## VERIFICATION

I, Nadeem Faruqi, hereby declare as follows:

1.     I am a member of the law firm of Faruqi & Faruqi, LLP, counsel for plaintiff Stephen Knee in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.     I make this Verification because plaintiff is absent from the County of New York where I maintain my office.

Executed this 1st day of June, 2005, at New York, New York.

_____
Nadeem Faruqi