1  FARUQI & FARUQI, LLP
   Nadeem Faruqi
2  Adam Gonnelli
   320 East 39th Street
3  New York, NY 10016
   Telephone: (212) 983-9330
4  Facsimile: (212) 983-9331

5  FEDERMAN & SHERWOOD
   William B. Federman
6  120 N. Robinson, Suite 2720
   Oklahoma City, OK 73102
7  Telephone: (405) 235-1560
   Facsimile: (405) 239-2112
8
   Co-Lead Counsel for Plaintiffs
9

10                    UNITED STATES DISTRICT COURT
11                   NORTHERN DISTRICT OF CALIFORNIA
                        SAN FRANCISCO DIVISION
12
   IN RE BROCADE COMMUNICATIONS          Case No. C05-02233 CRB
13 SYSTEMS, INC. DERIVATIVE LITIGATION
                                         **CONSOLIDATED AMENDED**
14 This Document Relates to:             **COMPLAINT**

15     ALL ACTIONS

16

17

18                      PART ONE OF TWO

19

20

21

22

23

24

25

26

27

28

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs, by their attorneys, demand a trial by jury and submit this verified derivative complaint (the "Complaint") against the defendants named herein.

## NATURE OF ACTION

1.     This is a shareholder derivative action brought by shareholders of Brocade Communications Systems, Inc. ("Brocade" or the "Company"), a Delaware corporation, with its headquarters in California, on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between February 21, 2001 and the present (the "Relevant Period"). These breaches of fiduciary duty and violations of law have caused Brocade to suffer damages, as alleged herein.

2.     On May 15, 2005, the Individual Defendants caused the Company to issue a press release announcing the restatement of its fiscal 2001 to fiscal 2004 [1] earnings. The release was entitled "Brocade Restates Financial Statements to Reflect Additional Stock-Based Compensation Earnings," and stated in part:

> Brocade Communications Systems, Inc. announced today that the Company will restate its financial statements for the fiscal years ending 2002 through 2004 to record additional charges for stock-based compensation expense. The Company affirmed that one of the charges will have an impact on Brocade's historical revenues, cash positions, or non-stock option related operating expenses. The company expects related adjustments will be made to the Company's financial information for fiscal 2001, as necessary.

> Following the completion of an Audit Committee review announced on January 24, 2005, additional information came to the Company's attention that indicated that its guidelines regarding stock option granting practices were not followed during the period from August 2003 through November 2004. After further review, the Company concluded that it could not rely on the documentation used to support the recorded measurement dates for stock options granted in that period. As a result, the Company will restate its financial statements to account for additional stock-based compensation for stock options granted from August 2003 through November 2004. The additional charges are expected to result in a cumulative increase in non-cash stock option compensation expense of $0.8 million over fiscal years 2003 and 2004.

> After discovering the additional information regarding non-compliance of its guidelines, the Company commenced a review of certain other practices that

[1]    Brocade's fiscal year ends on the last Saturday in October.

could impact stock option accounting. This review determined that from 2001 through 2004, the Company had not appropriately accounted for the cost of stock based compensation for certain employees on leaves of absence (LOA) and in transition roles prior to ceasing employment with Brocade. Prior to 2003, Brocade's LOA policy allowed certain employees to continue vesting in their stock options and to have extended stock option exercise periods of up to three months from the state of LOA. The expected charges related principally to options that continue to vest for employees who were on LOAs for a period greater than three months. The Company also expects to record additional adjustments related to options that continued to vest for certain employees in transition roles. Management estimates the total increase in non-cash compensation expense related to these matters to be in a range of approximately $31 to $52 million for fiscal years 2001 through 2004.

Brocade's Audit Committee has commenced an independent review of the Company's stock option accounting regarding LOAs. Based on that ongoing review, the Company's preliminary estimates of anticipated adjustments are subject to change.

The table below reflects the total effects of these combined adjustments and are the Company's preliminary estimate of the approximate impact to the Company's non-cash expenses and EPS. The Company does not currently expect that there will be any impact on non-cash expenses and EPS for any period in fiscal year 2005.

| Fiscal Year Ending: | Additional Non-Cash Expense | Reduction in EPS |
|---|---|---|
| 2001 | $12.0-$26.0 million | $0.05-$0.11 |
| 2002 | $19.0-$23.0 million | $0.08-$0.09 |
| 2003 | $0.2-$0.8 million | $0.00-$0.01 |
| 2004 | $0.8-$2.8 million | $0.00-$0.01 |

The Company also announced today that it has been informed that the Department of Justice (DOJ) is working with the SEC in a joint investigation regarding the Company's stock option granting practices. Brocade has no further information regarding the timing or scope of the investigation.

"It is not unusual in the current environment that multiple relevant government agencies will take an interest in these types of matters," said Michael Klayko, Brocade's newly appointed Chief Executive Officer. We are cooperating fully with the SEC and DOJ and hope that the investigation can be concluded as quickly as possible." Klayko continued, "The Board and management team are absolutely committed to the highest standard of accounting and continuously improving our internal controls and compliance with our policies. I have confidence in my team and we remain focused on executing to our business plan."

3.    As a result of this announcement, Brocade's stock dropped to $4.13 per share, compared to the $40+ per share prices it traded at during the Relevant Period.

**JURISDICTION AND VENUE**

4.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between plaintiffs and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

5.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

**PARTIES**

7.     Plaintiff is and was at all relevant times, a shareholder of nominal defendant Brocade.  Plaintiff is a citizen of the State of New York.

8.     Nominal defendant Brocade is a corporation organized under the laws of Delaware, with its principal executive offices located in San Jose, California.  Brocade designs, develops, markets, sells and supports data storage networking products and services.

9.     Defendant Gregory L. Reyes ("Reyes") was, from 1988 to January 2005, Brocade's Chief Executive Officer, and was a director through the time of Brocade's annual shareholder meeting in 2005.  Thereafter, Reyes entered into an employment contract to serve as a consultant to the CEO in exchange for payment of $910,000 per year, continued Company benefits, continued coverage under Brocade's Directors and Officers Insurance, and reimbursement of expenses, including the cost of operating his private plane.  Because of Reyes' positions with the Company,

CONSOLIDATED AMENDED COMPLAINT
CASE NO. C05-02233 CRB
45699

3

he knew material, adverse non public information regarding Brocade and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Among other things, Reyes was aware of the fact that the Company improperly recorded charges for stock-based compensation expense during the Relevant Period.  Reyes was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Reyes participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. During the Relevant Period, Reyes sold 4,957,053 Brocade shares for insider trading proceeds of more than $30 million. Upon information and belief, Reyes is a citizen of California.

10.     Defendant Antonio Canova ("Canova") was, throughout the Relevant Period, Brocade's Chief Financial Officer and Vice President, Administration.  Because of Canova's positions with the Company, he knew material, adverse non public information regarding Brocade and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Among other things, Canova was aware of the fact that the Company improperly recorded charges for stock-based compensation expense during the Relevant Period. Canova was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Canova participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings During the Relevant Period, Canova sold 4,903 Brocade shares for insider trading proceeds of $31, 526. Upon information and belief, Canova is a citizen of California.

11.     Defendant Michael Klayko ("Klayko") has served as Chief Executive Officer and a director of the Company since January 2005. Prior to that, Klayko served as Vice President,

1 | Worldwide Sales from May 2004 until January 2005. From April 2003 until May 2004, Mr.
2 | Klayko served as Vice President, Worldwide Marketing and Support, and from January 2003 until
3 | April 2003, he was Vice President, OEM Sales. Because of Klayko's positions with the Company,
4 | he knew material, adverse non public information regarding Brocade and the fact that the Company
5 | disseminated false and misleading financial information throughout the Relevant Period. Among
6 | other things, Klayko was aware of the fact that the Company improperly recorded charges for
7 | stock-based compensation expense during the Relevant Period. Klayko was aware of this
8 | information via his access to internal corporate documents, conversations and connections with
9 | other corporate officers and employees, attendance at management and Board meetings and
10 | committees thereof and via reports and other information provided to him in connection therewith.
11 | During the Relevant Period, Klayko participated in the issuance of false and/or misleading
12 | statements, including the preparation of false and/or misleading press releases and Securities and
13 | Exchange Commission ("SEC") filings. Upon information and belief, Klayko is a citizen of
14 | California.

15 |    12.  Seth D. Neiman ("Neiman") is currently, and has been a director of the Company
16 | since 1995. Neiman served as Chairman of the Board of Directors of Brocade from August 1995
17 | until May 2001, and as the Company's Chief Executive Officer from August 1995 until June 1996.
18 | Because of Neiman's positions with the Company, he knew material, adverse non public
19 | information regarding Brocade and the fact that the Company disseminated false and misleading
20 | financial information throughout the Relevant Period. Among other things, Neiman was aware of
21 | the fact that the Company improperly recorded charges for stock-based compensation expense
22 | during the Relevant Period. Neiman was aware of this information via his access to internal
23 | corporate documents, conversations and connections with other corporate officers and employees,
24 | attendance at management and Board meetings and committees thereof and via reports and other
25 | information provided to him in connection therewith. During the Relevant Period, Neiman
26 | participated in the issuance of false and/or misleading statements, including the preparation of false
27 | and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Upon
28 | information and belief, Neiman is a citizen of California.

1    13.    Neal Dempsey ("Dempsey") is currently, and has been a director of the Company

2    since 1995. Dempsey is a member of the board's Nominating and Corporate Governance

3    Committee, and is Chairman of its Compensation Committee. Because of Dempsey's positions

4    with the Company, he knew material, adverse non public information regarding Brocade and the

5    fact that the Company disseminated false and misleading financial information throughout the

6    Relevant Period. Among other things, Dempsey was aware of the fact that the Company

7    improperly recorded charges for stock-based compensation expense during the Relevant Period.

8    Dempsey was aware of this information via his access to internal corporate documents,

9    conversations and connections with other corporate officers and employees, attendance at

10   management and Board meetings and committees thereof and via reports and other information

11   provided to him in connection therewith. During the Relevant Period, Dempsey participated in the

12   issuance of false and/or misleading statements, including the preparation of false and/or misleading

13   press releases and Securities and Exchange Commission ("SEC") filings.   Upon information and

14   belief, Dempsey is a citizen of California.

15   14.    Christopher B. Paisley ("Paisley") is currently, and has been a director of the

16   Company since 2002. Paisley is the Chairman of the board's Audit Committee. Because of

17   Paisley's positions with the Company, he knew material, adverse non public information regarding

18   Brocade and the fact that the Company disseminated false and misleading financial information

19   throughout the Relevant Period. Among other things, Paisley was aware of the fact that the

20   Company improperly recorded charges for stock-based compensation expense during the Relevant

21   Period. Paisley was aware of this information via his access to internal corporate documents,

22   conversations and connections with other corporate officers and employees, attendance at

23   management and Board meetings and committees thereof and via reports and other information

24   provided to him in connection therewith. During the Relevant Period, Paisley participated in the

25   issuance of false and/or misleading statements, including the preparation of false and/or misleading

26   press releases and Securities and Exchange Commission ("SEC") filings. Upon information and

27   belief, Paisley is a citizen of California.

28

CONSOLIDATED AMENDED COMPLAINT
CASE NO. C05-02233 CRB
45699

15.    David L. House ("House") has served as Executive Chairman of the Company since January 2005, and has been a director of the Brocade since 2004. In January 2005, House also served as Chief Executive Officer of the Company.  Because of House's positions with the Company, he knew material, adverse non public information regarding Brocade and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Among other things, House was aware of the fact that the Company improperly recorded charges for stock-based compensation expense during the Relevant Period.  House was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, House participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Upon information and belief, House is a citizen of California.

16.    Nicholas G. Moore ("Moore") is currently, and has been a director of the Company since March 21, 2003, and was nominated to that position at the suggestion of Defendant Klayko Moore is a member of  the board's Audit Committee and Nominating and Corporate Governance Committee.  Because of Moore's positions with the Company, he knew material, adverse non public information regarding Brocade and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Among other things, Moore was aware of the fact that the Company improperly recorded charges for stock-based compensation expense during the Relevant Period.  Moore was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Moore participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  Upon information and belief, Moore is a citizen of California.

17.    L. William Krause ("Krause") is currently, and has been a director of the Company since 2004, and acts as the Lead Director for the board. Krause is a member of the board's Audit and Compensation Committees, and is the Chairman of its Nominating and Corporate Governance Committee. Because of Krause's positions with the Company, he knew material, adverse non public information regarding Brocade and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Among other things, Krause was aware of the fact that the Company improperly recorded charges for stock-based compensation expense during the Relevant Period. Krause was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Krause participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Upon information and belief, Krause is a citizen of California.

18.    Sanjay Vaswani ("Vaswani") is currently, and has been a director of the Company since 2004. Vaswani is a member of the board's Compensation and Nominating and Corporate Governance Committees. Because of Vaswani's positions with the Company, he knew material, adverse non public information regarding Brocade and the fact that the Company disseminated false and misleading financial information throughout the Relevant Period. Among other things, Vaswani was aware of the fact that the Company improperly recorded charges for stock-based compensation expense during the Relevant Period. Vaswani was aware of this information via his access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Vaswani participated in the issuance of false and/or misleading statements, including the preparation of false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. Upon information and belief, Vaswani is a citizen of California.

1    19.    Defendant Robert R. Walker ("Walker") has been a director of the Company since

2    April 27, 2005. Because of Walker's positions with the Company, he knew material, adverse non

3    public information regarding Brocade and the fact that the Company disseminated false and

4    misleading financial information throughout the Relevant Period. Among other things, Walker was

5    aware of the fact that the Company improperly recorded charges for stock-based compensation

6    expense during the Relevant Period. Walker was aware of this information via his access to

7    internal corporate documents, conversations and connections with other corporate officers and

8    employees, attendance at management and Board meetings and committees thereof and via reports

9    and other information provided to him in connection therewith. During the Relevant Period,

10    Walker participated in the issuance of false and/or misleading statements, including the preparation

11    of false and/or misleading press releases and Securities and Exchange Commission ("SEC")

12    filings. Upon information and belief, Walker is a citizen of California.

13    20.    KMPG, LLP ("KPMG") is a global audit, tax and advisory firm. KMPG is based

14    in New York. KPMG was the independent auditor of Brocade Communication System's finanical

15    statements during the Relevant Period.

16    21.    The defendants identified in ¶¶ 9 and 11-19 are referred to herein as the "Director

17    Defendants." The defendants identified in ¶¶ 9-11 and 15 are referred to herein as the "Officer

18    Defendants." The defendants identified in ¶¶ 9 and 10 are referred to herein as the "Selling

19    Defendants." Collectively, the Director Defendants, the Officer Defendants and the Selling

20    Defendants are referred to herein as the "Individual Defendants."

21    **BROCADE'S BOARD, AND BOARD SUBCOMMITTEES**

22    22.    The Company's Amended Annual Proxy Statement for the Company's Annual

23    Meeting was filed on March 4, 2005 (the "2005 Proxy"). Among other things, the 2005 Proxy

24    provides information pertaining to executive compensation, ownership of securities and

25    organizational information pertaining to the Board. During the Company's 2004 fiscal year ("FY

26    2004"), the full Board met four times. Each director attended 75% of the total number of meetings

27    of the Board and Board committees of which he was a member, except for Dempsey who attended

28    72% of the aggregate of all Board of Directors meetings and committees meetings for committees

on which he served during fiscal year 2004.  The current standing committees of the Board are: (i) the Audit Committee; (ii) the Compensation Committee; and (iii) the Nominating Committee and Corporate Governance Committee

### A.     Audit Committee

Defendants Krause, Moore and Paisley were members of the Audit Committee during FY 2004. According to the 2005 Proxy, the Audit Committee "oversees our accounting, financial reporting and audit processes; makes recommendations to the Board of Directors regarding the selection of independent auditors; reviews the results and scope of audit and other services provided by the independent auditors; reviews the accounting principles and auditing practices and procedures to be used in preparing our financial statements; and reviews our internal controls." The Audit Committee met eight times in FY 2004.  Pursuant to the Audit Committee Charter:

> The purpose of the Audit Committee of the Board of Directors of Brocade Communications Systems, Inc. (the "Company") shall be to:
>
> *· Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;*
>
> *· Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications, independence and performance; and (iv) the Company's internal accounting and financial controls;*
>
> · Prepare the report that the rules of the Securities and Exchange Commission (the "SEC") require be included in the Company's annual proxy statement;
>
> · Provide the Company's Board with the results of its monitoring and recommendations derived therefrom; and
>
> · Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

More specifically, the Audit Committee Charter states that the Audit Committee is responsible for , *inter alia*:

> Financial Statements, Disclosure and Other Risk Management and Compliance Matters
>
> *· Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's*

CONSOLIDATED AMENDED COMPLAINT
CASE NO. C05-02233 CRB
45699

10

*Discussion and Analysis of Financial Condition and Results of Operations,"*
*prior to filing the Company's Annual Reports on Form 10 K and Quarterly*
*Reports on Form 10 Q, respectively, with the SEC;*

· Directing the Company's independent auditors to review before filing with
the SEC the Company's interim financial statements included in Quarterly
Reports on Form 10 Q, using professional standards and procedures for
conducting such reviews;

· ***Conducting a post audit review of the financial statements and audit
findings, including any significant suggestions for improvements provided
to management by the independent auditors;***

· ***Reviewing before release the unaudited quarterly operating results in the
Company's quarterly earnings release;***

· Overseeing compliance with the requirements of the SEC for disclosure of
auditor's services and audit committee members, member qualifications and
activities;

· Reviewing on a continuing basis the adequacy of the Company's system of
internal controls, including meeting periodically with the Company's
management and the independent auditors to review the adequacy of such
controls and to review before release the disclosure regarding such system of
internal controls required under SEC rules to be contained in the Company's
periodic filings and the attestations or reports by the independent auditors
relating to such disclosure;

· Providing a report in the Company's proxy statement in accordance with
the rules and regulations of the SEC;

· Reviewing the Company's policies and practices with respect to risk
assessment and risk management, including discussing with management the
Company's major financial risk exposures and the steps that have been taken
to monitor and control such exposures;

· Establishing procedures for receiving, retaining and treating complaints
received by the Company regarding accounting, internal accounting controls
or auditing matters and procedures for the confidential, anonymous
submission by employees of concerns regarding questionable accounting or
auditing matters;

· ***If necessary, instituting special investigations with full access to all
books, records, facilities and personnel of the Company;***

· ***As appropriate, obtaining advice and assistance from outside legal,
accounting or other advisors (without seeking Board of Directors
approval);***

· Reviewing, approving and monitoring the Company's code of ethics for its
senior financial officers;

· Reviewing management's monitoring of compliance with the Company's
standards of business conduct and with the Foreign Corrupt Practices Act;

· *Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;*

· *Reviewing the Company's financial and accounting reporting compliance relating to its employee benefit plans; and*

· Reviewing and approving in advance any proposed related party transactions.

**B.      Compensation Committee**

Defendants Dempsey, Krause and Vaswani were members of the Compensation Committee for FY 2004.   The Compensation Committee met twice in FY 2004.   The Compensation Committee "oversees and makes recommendations to the Board of Directors regarding our compensation and benefits policies; and oversees, evaluates and approves cash and stock compensation plans, policies and programs for our executive officers and employees." Pursuant to the Compensation Committee Charter:

> The Compensation Committee has overall responsibility for (i) overseeing the Company's compensation and benefits policies generally; (ii) overseeing, evaluating and approving executive officer compensation plans, policies and programs; and (iii) preparing the report on executive compensation that is required by Securities and Exchange Commission rules to be included in the Company's annual proxy statement.
> * * *
> The Compensation Committee shall review and approve the Company's compensation and benefits policies generally (subject, if applicable, to stockholder ratification), including reviewing and approving any incentive compensation plans and equity based plans of the Company. The Compensation Committee shall report the results of such review and any action it takes with respect to the Company's compensation and benefits policies to the Board.
> * * *
> The Compensation Committee shall prepare the report on executive compensation that that [sic] is required by Securities and Exchange Commission rules to be included in the Company's annual proxy statement.
> * * *
> The Compensation Committee shall make regular reports to the Board. These reports shall include a review of any recommendations or issues that arise with respect to Company compensation and benefits policies, executive compensation and any other matters that the Compensation Committee deems appropriate or is requested to be included by the Board.
>
> At least annually, the Compensation Committee shall (i) review and assess the adequacy of this charter and recommend any proposed changes to the Board for approval; and (ii) evaluate its own performance and report to the Board on such evaluation.

CONSOLIDATED AMENDED COMPLAINT
CASE NO. C05-02233 CRB
45699

12

**C.    Nominating Committee**

Defendants Dempsey, Krause, Moore and Vaswani, in addition to Larry W. Sonsini, who resigned from the Board of Directors on March 3, 2005, were members of the Nominating and Corporate Governance Committee for FY 2004. Pursuant to the 2005 Proxy, "[t]he Nominating and Corporate Governance Committee considers and periodically reports on matters relating to the identification, selection and qualification of the Board of Directors and candidates nominated to the Board of Directors and its committees; develops and recommends governance principles applicable to Brocade; oversees the evaluation of the Board of Directors and management; and oversees and sets compensation for the Board of Directors. The Nominating and Corporate Governance Committee met four times during FY 2004. Pursuant to the Nominating and Corporate Governance Committee charter:

> The purpose of the Nominating and Corporate Governance Committee of the Board of Directors (the "Board") of Brocade Communications Systems, Inc. (the "Company") shall be to ensure that the Board is properly constituted to meet its fiduciary obligations to stockholders and the Company, and that the Company has and follows appropriate governance standards. To carry out this purpose, the Nominating and Corporate Governance Committee shall: (i) identify prospective director nominees and recommend to the Board the director nominees for the next annual meeting or special meeting of stockholders at which directors are to be elected, and recommend individuals to the Board to fill any vacancies or newly created directorships that may occur between such meetings; (ii) *develop and recommend to the Board the governance principles applicable to the Company*; (iii) oversee the evaluation of the Board and management from a corporate governance perspective; (iv) identify and recommend to the Board directors for membership on Board committees; (v) *oversee and set compensation for the Company's directors; and (vi) review the Company's reporting in documents filed with the Securities and Exchange Commission, to the extent related to corporate governance and other matters set forth in this charter*.

To fulfill these responsibilities, the Nominating and Corporate Governance Committee charter requires the Committee to, *inter alia*:

> At least annually, the Nominating and Corporate Governance Committee shall (i) review and assess the performance of the Board and its committees, and senior management of the Company; and (ii) report such assessments, including any recommendations for proposed changes, to the Board.
>
> * * *
>
> The Nominating and Corporate Governance Committee shall oversee the development of Corporate Governance Guidelines for the Company. At least

annually, the Nominating and Corporate Governance Committee shall review and reassess the adequacy of such Corporate Governance Guidelines and recommend any proposed changes to the Board.

\* \* \*

The Nominating and Corporate Governance Committee shall review the Company's reporting in documents filed with the Securities and Exchange Commission, to the extent specifically related to corporate governance and the other matters set forth in this charter.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.    In addition to the foregoing, by reason of their positions as officers, directors and/or fiduciaries of Brocade and because of their ability to control the business and corporate affairs of Brocade, the Individual Defendants owed Brocade and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Brocade in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Brocade and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

24.    Each director and officer of the Company owes to Brocade and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

25.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Brocade, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Brocade, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of Brocade.

26.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Brocade, and was at all times acting within the course and scope of such agency.

27.    To discharge their duties, the officers and directors of Brocade were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Brocade were required to, among other things:

(i)  refrain from acting upon material inside corporate information to benefit themselves;

(ii)  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(iii)  conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iv)  properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(v)  remain informed as to how Brocade conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(vi)  ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

28.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the

Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Brocade, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Brocade's Board during the Relevant Period.

29.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent the safety of its products, together with the Company's financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of an SEC investigation, several class action law suits that allege violations of federal securities laws, and is currently subjected to personal injury lawsuits as a result of the misrepresentations regarding the safety of its products. As a result of the foregoing, Brocade has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(i) Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(ii) Costs incurred in investigating and defending Brocade and certain officers in the SEC and Department of Justice investigations, and class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgments.

(iii) The loss of approximately $4.7 million dollars caused by the default and need to redeem the 2% convertible debt because of the failure to timely file financial statements with the SEC and the ongoing restatement of past financial statements.

30.     Moreover, these actions and failures to act, have irreparably damaged Brocade's corporate image and goodwill. For at least the foreseeable future, Brocade will suffer from what is

1    known as the "liar's discount," a term applied to the stocks of companies who have been

2    implicated in illegal behavior and have misled the investing public, such that Brocade's ability to

3    raise equity capital or debt on favorable terms in the future is now impaired.

4                **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

5         31.     In committing the wrongful acts alleged herein, the Individual Defendants have

6    pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

7    and conspired with one another in furtherance of their common plan or design.  In addition to the

8    wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants

9    further aided and abetted and/or assisted each other in breach of their respective duties.

10        32.     During all times relevant hereto, the Individual Defendants collectively and

11   individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the

12   Company was improperly misrepresenting its financial results and prospects, in order to allow

13   defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual

14   Defendants' executive and directorial positions at Brocade and the profits, power and prestige that

15   the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing

16   public, including shareholders of Brocade, regarding the Individual Defendants' management of

17   Brocade's operations, the safety of the Company's products, the Company's financial health and

18   stability, and future business prospects throughout the Relevant Period.  In furtherance of this plan,

19   conspiracy and course of conduct, the Individual Defendants collectively and individually took the

20   actions set forth herein.

21        33.     The Individual Defendants engaged in a conspiracy, common enterprise and/or

22   common course of conduct commencing by at least February 2001 and continuing thereafter.

23   Certain of the Individual Defendants subsequently joined in the conspiracy upon accepting a

24   position as an officer and/or director of the Company and by taking the actions alleged herein

25   ratified the actions and conduct committed in furtherance of the conspiracy prior to that time.

26   During this time the Individual Defendants caused the Company to conceal the true fact that

27   Brocade was misrepresenting the expense incurred by the Company in granting lucrative stock

28   based compensation to officers and directors of the Company, together with the Company's

1    financial results and prospects. In addition, defendants also made other specific, false statements

2    about Brocade's expenses, financial performance and future business prospects, as alleged herein.

3         34.    The purpose and effect of the Individual Defendants' conspiracy, common

4    enterprise, and/or common course of conduct was, among other things, to disguise the Individual

5    Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement,

6    waste of corporate assets and unjust enrichment; to conceal adverse information concerning the

7    Company's operations, financial condition and future business prospects; and to artificially inflate

8    the price of Brocade common stock so they could: (i) dispose of over $30 million of their

9    personally held stock; and (ii) protect and enhance their executive and directorial positions and the

10    substantial compensation and prestige they obtained as a result thereof.

11         35.    The Individual Defendants accomplished their conspiracy, common enterprise

12    and/or common course of conduct by causing the Company to purposefully, recklessly or

13    negligently misrepresent its financial results. Because the actions described herein occurred under

14    the authority of the Board, each of the Individual Defendants was a direct, necessary and

15    substantial participant in the conspiracy, common enterprise and/or common course of conduct

16    complained of herein.

17         36.    Each of the Individual Defendants aided and abetted and rendered substantial

18    assistance in the wrongs complained of herein. In taking such actions to substantially assist the

19    commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

20    knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

21    wrongdoing, and was aware of his or her overall contribution to and furtherance of the

22    wrongdoing.

23                **SUBSTANTIVE ALLEGATIONS**

24         37.    On February 21, 2001, the Individual Defendants caused the Company to issue a

25    press release entitled "Brocade Announces Record Revenue and Earnings for First Quarter of

26    Fiscal 2001." The press release stated in part:

27                Brocade Communications Systems, Inc., the leading provider of Storage
            Area Networking infrastructure, reported today record revenue and earnings

28                for the first quarter of fiscal 2001 (Q1 01). For Q1 01, net revenues were

$165.0 million, as compared to the $42.7 million reported in the first quarter of fiscal 2000 (Q1 00) and the $132.1 million reported in the fourth quarter of fiscal 2000 (Q4 00). During Q1 01, deferred revenue increased by $7.1 million to $9.1 million.

Net income for Q1 01 was $32.5 million as compared to the $7.3 million reported in Q1 00 and the $27.2 million reported in Q4 00. Diluted net income per share for Q1 01 was $0.13 as compared to the $0.03 reported in Q1 00 and the $0.11 reported in Q4 00.

Operating income as a percentage of net revenues in Q1 01 increased to 26.9 percent of revenues, up from 25.5 percent in Q4 00. This is the seventh consecutive quarter that operating income, as a percentage of revenues, has increased.

In Q1 01 Brocade generated $56.0 million in cash after purchasing $26.1 million in capital equipment and making $6.4 million in minority investments. Total cash at the end of Q1 01 was $211.0 million.

For Q1 01, accounts receivable days sales outstanding was 53 days and the annualized return on equity when excluding deferred tax assets and unrealized gains on marketable equity securities was 49 percent.

Greg Reyes, Brocade President and CEO, commented on the quarter: "We are very pleased with our financial results for the quarter, which demonstrate our continued focus and execution in providing the world's leading networking infrastructure for storage area networks. In every industry, in every sector across the globe, companies are relying on Brocade SAN infrastructure to network their servers and storage, keep pace with exponential growth in data storage requirements, and deliver a platform to reduce the cost of managing, administering, and moving business-critical data."

*    *    *

Reyes concluded, "We are pleased that we have executed on all fronts during the first quarter of 2001 and we believe that our business fundamentals and competitive position in the SAN infrastructure market have never been stronger. The future of storage area networking is about building large heterogeneous, block-data storage networks that can scale to meet customers' future SAN requirements of limitless SAN scalability, continuous information availability, enterprise level manageability, and end-to-end interoperability. As the SAN market expands, Brocade will continue to deliver best-in-class products to allow our global customers to put in place a networking foundation for their storage environments that meets their storage needs today and scales to support the future SAN requirements of tomorrow."

38.    On February 26, 2001, the Individual Defendants caused the Company to issue the

Company's Proxy Statement on Schedule 14A for the annual meeting of shareholders ("2001

Proxy"). The 2001 Proxy contained a proposal approved and recommended by the board of

directors to increase the authorized number of shares of Brocade common stock from 400,000,000

to 800,000,000. The Director Defendants represented in the 2001 Proxy that the purpose and effect

of the increase, *inter alia*, was to make more shares available for issuance pursuant to stock based

compensation plans as follows:

> The Board of Directors also believes that the availability of additional authorized but unissued shares will provide it with the flexibility to issue Common Stock for other proper corporate purposes that may be identified in the future, such as to raise equity capital, to make acquisitions through the use of stock, to establish strategic relationships with other companies, to adopt additional employee benefit plans or reserve additional shares for issuance under such plans. The Board of Directors has no immediate plans, understandings, agreements or commitments to issue additional Common Stock for any such purposes.

With respect to incentive and stock based compensation, the 2001 Proxy state in relevant part:

> Long Term Stock Option Incentives
>
> The Board provides the Company's executive officers with long term incentive compensation through grants of options to purchase the Company's Common Stock. The goal of the long term stock option incentive program is to align the interests of executive officers with those of the Company's stockholders and to provide each executive officer with a significant incentive to manage the Company from the perspective of an owner with an equity stake in the business. It is the belief of the Board that stock options directly motivate an executive to maximize long term stockholder value. The options also utilize vesting periods that encourage key executives to continue in employ of the Company. The Board considers the grant of each option subjectively, reviewing factors such as the individual performance, the anticipated future contribution toward the attainment of the Company's long term strategic performance goals and the number of unvested options held by each individual at the time of the new grant. In fiscal 2000, 1,040,000 options to purchase shares of the Company's Common Stock were granted to Mr. Reyes.
>
> Section 162(m)
>
> The Company has considered the potential future effects of Section 162(m) of the Internal Revenue Code on the compensation paid to the Company's executive officers. Section 162(m) disallows a tax deduction for any publicly held corporation for individual compensation exceeding $1.0 million in any taxable year for any of the Named Executive Officers, unless compensation is performance based. The Company has adopted a policy that, where reasonably practicable, the Company will seek to qualify the variable compensation paid to its executive officers for an exemption from the deductibility limitations of Section 162(m).

39.     On April 20, 2001, the Individual Defendants caused the Company to issue a press release entitled "Brocade Announces Preliminary Q2 01 Financial Results." The press release stated in part:

> Brocade Communications Systems, Inc. Announced today preliminary results for the second quarter of fiscal 2001. Brocade expects to report total net revenue for the second quarter of fiscal 2001 (Q2 01) that will be approximately 30 percent less than the net revenue reported in the first quarter of fiscal 2001 (Q1 01). Diluted net income per share for Q2 01 is expected to be in the range of $0.05.0.06 per share. During the second quarter, Brocade expects that gross margins will remain in the 60 percent range and will continue at those levels for the next several quarters. Additionally, Brocade expects that DSOs will be within the target range of 50 to 60 days.

> Brocade will host a live conference call today at 6:00 am Pacific Time to discuss the preliminary financial results. To listen to the call, dial (719) 467-2650, or connect via the Brocade web site at www.brocade.com. Details on the replay are available at www.brocade.com. Brocade plans to announce complete second quarter results on May 15, 2001 at 1:00 pm Pacific Time.

> "We are sober about the effect that the economy has had on the enterprise technology marketplace and on our short-term business outlook. We are committed to doing what is right to the business and will continue to invest in engineering resources and quota-carrying sales personnel at a rate that will continue to outpace our competitors. We believe that our long-term prospects and competitive position in delivering the world's leading intelligent platform for networking storage have never been stronger. As enterprise capital spending continues to thaw, we are well positioned for growth in the latter part of fiscal 2001 and we expect our year-over-year revenue growth will be approximately 58 percent," said Greg Reyes, Brocade President and CEO.

40.     On May 15, 2001, the Individual Defendants caused the Company to issue a press release entitled "Brocade Announces Second Quarter Fiscal 2001 Financial Results." The press release stated in part:

> Brocade Communications Systems, Inc. Reported today financial results for the second quarter of fiscal 2001 (Q2 01). For Q2 01, net revenues were $115.2 million as compared to the $62.1 million reported in the second quarter of fiscal 2000 (Q2 00).

> Net income for Q2 01 was $12.0 million as compared to the $13.3 million reported in Q2 00. Diluted net income per share of Q2 01 was $0.05 as compared to the $0.06 reported in Q2 00. During the second quarter, gross margins remained at 60 percent.

> In Q2 01, Brocade generated $6.1 million in cash after purchasing $16.9 million in capital equipment and making $10.6 million in minority investments. Total cash at the end of Q2 01 was $217.1 million. Brocade exited the quarter with $5.7 million in deferred revenue. The majority of the

deferred revenue was related to inventory held by Brocade master resellers that has not sold through to the end customer.

For Q2 01, accounts receivable days sales outstanding was 58 days and continues to remain within the Brocade target range. Inventory at the end of the second quarter was $8.4 million, and annualized inventory turns were 22 times.

Greg Reyes, Brocade Chairman and CEO, commented on the quarter:

Considering the current difficult economic environment for technology companies, the second quarter was a period of significant achievement for Brocade. We are pleased that we met the expectations that we set out in April, and we believe that the second quarter was the low water mark for our business. We are now seeing signs that IT budgets may be thawing as companies reprioritize projects based on Return On Investment (ROI). Storage Area Networks (SANs) remain at the to of the priority list. Using Brocade SAN infrastructure, companies can dramatically reduce the cost of managing their data while keeping pace with ever-increasing information storage requirements."

41.     On August 15, 2001, the Individual Defendants caused the Company to issue a press release entitled "Brocade Exceeds Revenue Estimates for the Third Quarter of Fiscal 2001." The press release stated in part:

Brocade Communications Systems, Inc. Reported today financial results for the third quarter of fiscal 2001 (Q3 01). For Q3 01, net revenues were $116.3 million, a $24.2 million increase from the $92.1 million reported in the third quarter of fiscal 2000 (Q3 00) and a $1.1 million increase from the second quarter of fiscal 2001 (Q2 01). Brocade exited the quarter with $13.4 million in deferred revenue, an increase of $7.7 million over the $5.7 million reported in Q2 01.

Net income for Q3 01 was $12.0 million as compared to the $20.1 million reported in Q3 00 and the $12.0 million reported in Q2 01. Diluted net income per share of Q3 01 was $0.05 as compared to the $0.08 reported in Q3 00 and the $0.05 reported in Q2 01. During the third quarter, gross margins remained at 60 percent, an improvement over the 58.6 percent reported in Q3 00 and consistent with Q2 01.

In Q3 01, Brocade generated $23.8 million in cash after investing $20.6 million in capital equipment. Total cash at the end of Q3 01 was $241.0 million.

For Q3 01, accounts receivable days sales outstanding was 57 days and continues to remain within the Brocade target range. Inventory at the end of the third quarter was $8.0 million, and annualized inventory turns were 23 times.

Greg Reyes, Brocade Chairman and CEO, commented on the quarter: "We are pleased with our results for the third quarter, which demonstrate our ability to manage well through a challenging economic environment. As the amount of data that companies need to store, move, administer, and manage

continues to grow at an exponential rate, companies are challenged to keep pace with this data growth with tight IT budgets. With IT projects being prioritized on their Return On Investment (ROI) and their effect on the business bottom line, companies are turning to Storage Area Networks (SANs) to dramatically reduce the cost of managing their data, optimized their investments in compute, storage, and personnel resources, and achieve a rapid ROI. Using Brocade SAN infrastructure, companies can now cost-effectively connect servers and storage subsystems, scale them independently of one another, consolidate and share server and storage resources, and centralize and simplify the labor-intensive aspects of data management."

Reyes continued, "We continue to be mindful about the effect that the economy is having on IT budgets. However, we believe that we are uniquely positioned to take advantage of the massive market opportunity as companies seek to get more out of their compute, storage, and personnel resources by networking storage and expanding initial SAN deployments into heterogeneous, enterprise storage networks. We are also at the beginning of a new product cycle that will continue to raise the bar for the competition, and we are continuing to invest in all aspects of our business to position for growth in 2002. We believe that the powerful combination of our new hardware and software products—including the Brocade SilkWorm® 12000 Core Fabric Switch—will further accelerate Brocade's leadership position as the storage infrastructure of choice."

42.    On November 28, 2001, the Individual Defendants caused the Company to issue a press release entitled "Brocade Announces Record Revenue for Fiscal Year 2001; Storage Networking Leader Reports Annual Revenue Growth of 56 Percent." The press release stated in part:

Brocade Communications Systems, Inc. Reported today financial results for the fourth quarter ended October 27, 2001 (Q4 01). In Q4 01, net revenue was $116.5 million, as compared to the $116.3 million reported in the third quarter of fiscal 2001 (Q3 01). For fiscal year 2001 (FY 01), revenue was a record $513.0 million, an increase of $184.0 million, or 56 percent, from fiscal year 2000 (FY 00). Brocade exited Q4 01 with $12.6 million in deferred revenue.

Diluted pro forma net income per share for Q4 01 was $0.05, consistent with the diluted net income per share reported in Q3 01. Pro forma net income for Q4 01 was $10.9 million as compared to net income of $12.0 million reported in Q3 01. For FY 01, pro forma net income was $67.4 million and pro forma diluted net income pr share was $0.28, as compared to net income of $67.9 million and diluted net income per share of $0.28, respectively, reported in FY 00. These pro forma results exclude charges of $77.1 million related to purchase commitments, facilities lease losses and asset impairments, and the write-down of private minority equity investments.

These results compare to net revenue of $132.1 million reported in the fourth quarter of fiscal 2000 (Q4 00) and net income and diluted net income per share of $27.2 million and $0.11, respectively.

During the fourth quarter, pro forma gross margins remained at 60.0 percent, a slight improvement over the 59.8 percent gross margins reported inQ4 00 and consistent with Q3 01 gross margins.  Gross margins on a pro forma basis for FY 01 were 60.0 percent, as compared to 58.2 percent gross margins for FY 00.

In Q4 01 Brocade generated $14.2 million in cash after purchasing approximately $18.7 million in capital equipment.  For FY 01, Brocade generated more than $100 million in cash, after investing $82.3 million in capital equipment.  Brocade's total cash balance at the end of Q4 01 was a record $255.1 million.

For Q4 01, accounts receivable days sales outstanding was 54 days, down from 57 days achieved during Q3 01.  Inventory at the end of the fourth quarter was $10.3 million and represented annualized inventory turns of 18 times on a pro forma basis.

Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are very pleased with our results for 2001 and our ability to manage and optimize our business model in a challenging economic environment.  We believe that our investments in 2001, including our significant investment in research and development, will allow us to take full advantage of the next phase in the market's evolution and position us for resumed growth in 2002."

Reyes continued, "In today's cost-conscious business environment, the value proposition for Brocade storage area networks has never been more relevant—helping companies optimize capital assets, increase productivity of personnel, and significantly reduce the total cost of ownership of storage environments.  As we move into fiscal year 2002, we believe that we are incredibly well positioned to continue to expand our leadership position as the world's leading provider of storage area networking infrastructure."

During the fourth quarter, Brocade further expanded its market leadership position with the introduction and general availability of the SilkWorm 3800 Enterprise Fabric Switch.  The SilkWorm 3800, based on brocade's next-generation architecture, is the industry's first 2 Gigabyte per second (Gbit/sec) Fabric Switch designed to meet the levels of manageability, availability, scalability and security required for today's storage applications.  As further validation of the product's importance to the SAN market, the SilkWorm 3800 was awarded Best of Comdex 2001 award earlier this month, recognized as the most innovative and noteworthy networking hardware product of the year.

Expanding on the capabilities of Brocade's existing product family, the next-generation architecture is also the foundation of other upcoming 2 Gbit/sec products from Brocade, including the SilkWorm 12000 128 port Core Fabric Switch.  Based on a common set of advanced fabric services and fully forward and backward compatible with the installed base of more than 1,200,000 Brocade fabric ports, the SilkWorm 3800 is available today from nearly all Brocade primary OEM and channel partners and the SilkWorm 12000 is expected to be in volume production in first calendar quarter of 2002.

Reyes concluded, "We believe that our industry-first, next generation 2 Gbit/sec architecture will accelerate the market transition to 2 Gbit/sec technologies and further solidify Brocade's leadership position as the world's storage networking infrastructure of choice. With the SilkWorm 3800, Brocade enables a new level of intelligence in storage networking, making SANs easier to manage, more highly available and scalable, and more secure than ever before. Through this intelligent platform, our partners can deliver advanced capabilities to their customers through high performance SAN management applications that further reduce the total cost of ownership for storage environments."

43.    In fact, Brocade's fiscal year 2001 EPS was overstated by between $0.05 and $0.11 per share as a result of the Company's failure to properly expense stock based compensation during Fiscal 2001. Thus, Brocade's reported pro forma EPS of $0.28 per share was overstated by as much as 64%.

44.    On February 13, 2002, the Individual Defendants caused the Company to issue a press release entitled "Brocade Reports Financial Results for the First Quarter of Fiscal year 2002." The press release stated in part:

Brocade Communications Systems, Inc. Reported today financial results for the first fiscal quarter of 2002 (Q1 02), which ended January 26, 2002. In Q1 02,net revenue was $123.1 million, gross margins were 50 percent, net income was $11.7 million and diluted net income per share was $0.05. Quarterly sequential revenue growth for Q1 02 was nearly six percent.

Brocade exited Q1 02 with $13.9 million in deferred revenue, an increase of $1.3 million over deferred revenue at the end of the fourth fiscal quarter of 2001 (Q4 01).

In Q1 02 Brocade generated $568.7 million in cash including $537.6 million received from the issuance of convertible subordinated debt. Excluding the net proceeds from the convertible debt offering, cash increased $31.1 million after purchasing $24.5 million in capital equipment. Brocade's total cash, cash equivalents and short-term investments were $823.9 million at the end of Q1 02.

For Q1 02, accounts receivable days sales outstanding were 54 days, consistent with Q4 01. Inventory at the end of Q1 02 was $9.2 million, down from the $10.3 million at the end of Q4 01.

Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are extremely pleased with our results for the first fiscal quarter of 2002. In today's business environment, the value proposition for Brocade Storage Area Networks (SANs) has never been more relevant-helping companies optimize capital assets, increase personnel productivity, and significantly reduce the total cost of ownership of storage environments. As companies rapidly migrate to 2 Gigabit per second (Gbit/sec) SAN infrastructure and expand SANs over a common storage networking platform, Brocade is

uniquely positioned to capitalize on these dynamics with our industry-first, intelligent 2 Gbit/sec architecture.

Reyes added, "We achieved every development milestone during the quarter, including those for the SilkWorm(R) 12000, our software products, and our new entry-level product. The SilkWorm 12000 remains on track for volume shipments in the first calendar quarter of 2002. During the first quarter, we also continued to optimize our world-class supply chain, increase our demand generation capabilities, and expand our international operations. As a result, we believe that Brocade is now the lowest cost manufacturer in the SAN infrastructure market. In addition, with a presence in more than fourteen countries, during the first quarter we increased our worldwide field sales force by nearly one-third, greatly expanding the demand generation resources for our OEM and channel partners worldwide. We believe that with these continued investments, combined with our industry-first intelligent 2 Gbit/sec architecture, we are extremely well positioned for growth in the latter half of 2002."

45.     On February 25, 2002, the Individual Defendants caused the Company to issue the Company's Proxy Statement on Schedule 14A for the annual meeting of shareholders ("2002 Proxy"). The 2002 proxy contained a proposal approved and recommended by the board of directors which sought the approval of the shareholders for grant limitations contained in the 1999 Stock Plan . The Individual Defendants caused the Company to represent that:

A favorable vote for this proposal will allow us to continue to deduct executive compensation in excess of $1 million and provide us with potentially significant future tax benefits and associated cash flows. We have taken historical tax deductions for executive compensation in excess of $1 million in contemplation of stockholder approval of the Section 162(m) option grant limitations within the allowable time period. An unfavorable vote for this proposal would disallow those historical tax deductions, reduce our net operating loss carryforward, and disallow any future tax deductions for executive compensation in excess of $1 million.

To obtain the shareholder approval, the 2002 proxy represented that:

The purpose of the 1999 Stock Plan is to increase stockholder value by attracting and retaining the best available personnel for positions of substantial responsibility, providing additional incentive to our employees and directors and promoting the success of our business. Options and stock purchase rights may be granted under the 1999 Stock Plan. Options granted under the 1999 Stock Plan may be either "incentive stock options" or nonstatutory stock options. Every employee of Brocade is an option or stockholder. We believe that commitment to employee ownership has limited employee turnover and improved our operational performance.

* * *

The 1999 Stock Plan is administered by the Board or a committee appointed by the Board. The administrator determines the terms of the options and stock purchase rights granted, including the exercise price, number of shares

1                 subject to the options and stock purchase rights, and the exercisability. All
questions of interpretation are determined by the administrator and its

2                 decisions are final and binding upon all participants. Directors receive no
additional compensation for their services in connection with the

3                 administration of the 1999 Stock Plan.

4  The 2002 Proxy also contained a report from the Audit Committee, signed, *inter alia*, by Defendant

5  Dempsey, which stated in part:

6                 The Audit Committee has reviewed and discussed our audited financial
statements for the fiscal year ended October 27, 2001 with our management.

7                 In addition, the Audit Committee has discussed with Arthur Andersen LLP,
our independent auditors, the matters required to be discussed by Statement

8                 on Auditing Standards No. 61 (Communications with Audit Committee).
The Audit Committee also has received the written disclosures and the letter

9                 from Arthur Andersen LLP as required by the Independence Standards
Board Standard No. 1 (Independence Discussions with Audit Committees)

10                and the Audit Committee has discussed the independence of Arthur
Andersen LLP with that firm.

11

12                Based on the Audit Committee's review of the matters noted above and its
discussions with our independent auditors and our management, the Audit

13                Committee recommended to the Board of Directors that the financial
statements be included in our Annual Report on Form 10 K.

14  In seeking the shareholders' approval of the grant limitations contained in the 1999 Stock Plan and

15  issuing the Audit Committee Report, however, the 2002 Proxy did not disclose that the Individual

16  Defendants had failed to properly expense stock based compensation granted by the board and the

17  Compensation Committee, nor that the Company's financial results for fiscal 2001 were falsely

18  overstated as a result.

19         46.      On May 14, 2002, the Individual Defendants caused the Company to issue a press

20  release entitled "Brocade Releases Statement Regarding Second Quarter Financial Results." The

21  press release stated in part:

22                 Brocade Communications Systems, Inc. Announced today that, due to a
clerical error, a financial webcast held today contained internal preliminary

23                 Question and Answer session preparation notes for the company's upcoming
Financial Results conference call for the second fiscal quarter, ended April

24                 27,2002 (Q2 02). The communication contained the following information
that the company had expected to disclose during its financial conference

25                 call to be held on Wednesday, May 15:

26                    – Forward-looking guidance that revenue for the third quarter of
fiscal 2002 will be in the range of $145 to $150 million.

27

28

1    – Strong software revenue growth experienced during Q2 02 resulted
in the establishment of an increased target of 15 percent for software as a
2    percentage of total revenue exiting the fourth quarter of 2002.

3    – An achievement of net revenue of $12 million related to sales of
the SilkWorm 12000 Core Fabric Switch for Q2 02.

4
        The communications did not include any other material information
5    about revenues or earnings for the second quarter.

6    47.    On May 15, 2002, the Individual Defendants caused the Company to issue a press

7    release entitled "Brocade Reports Financial Results for the Second Fiscal Quarter of 2002; And

8    More Than 9 Percent Quarterly Sequential Revenue Growth."  The press release stated in part:

9    Brocade Communications Systems, Inc. Reported today financial results for
the second fiscal quarter ended April27, 2002 (Q2 02).  In Q2 02, net
10   revenues were $135.0 million, which is an increase of more than 17 percent
from the $115.2 million reported  in the second fiscal quarter of 2001 (Q2
11   01), and an increase of more than 9 percent from the $123.1 million reported
in the first fiscal quarter of 2002 (Q1 02).  Brocade exited Q2 02 with $16.1
12   million in deferred revenue, which is an increase of $2.2 million from Q1 02.

13   Net income for Q2 02 was $14.0 million, which is an increase of nearly 17
percent from the $12.0 million reported in Q2 01 and a nearly 20 percent
14   increase from the $11.7 million reported in Q1 02.  Diluted net income per
share for Q2 02 was $0.06, an increase from the $0.05 reported in Q1 02 and
15   $0.05 for Q2 01.  During Q2 02, gross margins were 60.2 percent.

16   In Q2 02 cash and investments increased by $23.8 million, after purchasing
approximately $17.8 million in capital equipment.  Total cash and
17   investments at the end of Q2 02 were a record $847.7 million.  For Q2 02,
accounts receivable days sales outstanding were 53 days, an improvement of
18   1 day over that reported in Q1 02.  Inventory at the end of Q2 02 was $5.5
million.

19
     Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We
20   are extremely pleased with our results for the second fiscal quarter of 2002.
In today's business environment, the value proposition for Brocade Storage
21   Area Networks (SANs) resonates more powerfully than ever before with end
users; allowing companies to optimize asset utilization, increase
22   productivity, and significantly reduce the total cost of ownership of their
storage environments.  As companies continue to expand their SAN
23   deployments over a common storage networking platform, the SAN
architectural decision is now becoming a strategic business decision to
24   support storage and server consolidation, deliver secure, efficient data
backup and assure high data availability and business continuity."

25
     Reyes continued, "With more than 1.6 million Brocade SAN ports deployed
26   worldwide, Brocade is uniquely positioned to expand our market leadership
position as the intelligent storage networking platform of choice.  We
27   believe that our continued investments in our business, combined with our
product leadership and vision, strong OEM and industry partnerships, and
28   unrelenting focus on execution, uniquely position Brocade to capitalize on

1   the expanding market opportunity for intelligent storage area networking
2   infrastructure."

3   48.    On August 14, 2002, the Individual Defendants caused the Company to issue a press

release entitled "Brocade Reports Third Quarter 2002 Financial Results; Achieves 30 Percent

Revenue Growth and 52 Percent Net Income Growth."  The press release stated in part:

> Brocade Communications Systems, Inc. Reported financial results today for
> the third fiscal quarter ended July 27, 2002 (Q3 02).  In Q3 02, net revenues
> were $151.2 million, an increase of 30 percent over the $116.3 million
> reported in the third fiscal quarter of 2001 (Q3 01), and an increase of 12
> percent over the $135.0 million reported in the second fiscal quarter of 2002
> (Q2 02).  Brocade exited Q3 02 with $18.3 million in deferred revenue, an
> increase of $2.2 million from Q2 02.
>
> Net income for Q3 02 was $18.3 million, an increase of 52 percent from the
> $12.0 million reported in Q3 01 and a 31 percent increase from the $14.0
> million reported in Q2 02.  Diluted net income per share for Q3 02 was
> $0.08, an increase from the $0.05 reported in Q3 01 and the $0.06 reported
> in Q2 02.
>
> During Q3 02 cash, cash equivalents, and investments increased by $34.6
> million from Q2 02.  Total cash, cash equivalents, and investments at the end
> of Q3 02 were $882.3 million.  For Q3 02, days sales outstanding were 53
> days, consistent with that reported in Q2 02.  Net inventory at the end of Q3
> 02 was $7.1 million.
>
> Greg Reyes, Brocade Chairman and CEO, commented on the quarter, We
> are extremely pleased with our results for the third fiscal quarter of 2002.  IN
> today's business environment, the value proposition for Brocade Storage
> Area Networks (SANs) resonates more powerfully than ever, allowing
> companies to optimize asset utilization, increase productivity, and
> significantly reduce the total cost of ownership of their storage
> environments.  As companies continue to expand their SAN deployments
> utilizing a common storage networking architecture, SANs are emerging as
> the critical building block to enable storage and server consolidation; secure,
> efficient data backup; and lower cost high availability and business
> continuity.
>
> Reyes continued, Our vision and product leadership, strong OEM and
> industry partnerships, and unrelenting focus on execution, combined with
> our installed base of more than 1.8 million Brocade Fibre Channel ports,
> uniquely position Brocade to capitalize on the expanding market opportunity
> for intelligent SAN infrastructure.

49.    On November 5, 2002, the Individual Defendants caused the Company to

announced its planned stock-for-stock acquisition of Rhapsody Networks, Inc., wherein the

Company proposed to issue some 20 million shares of Brocade stock in exchange for Rhapsody.

By issuing stock at inflated prices the Company was able to make the acquisition less dilutive to

1    defendants own shares. Ultimately the Company completed the acquisition of Rhapsody issuing

2    stock valued at $129.3 million.

3         50.    On November 21, 2002, the Individual Defendants caused the Company to issue a

4    press release entitled "Brocade Announces Q4 and Fiscal 2002 Financial Results; Storage

5    Networking Leader Achieves 31 Percent year over Year Revenue Growth in Q4 02; Reports

6    Record Revenue for Fiscal 2002 of $562.4 Million." The press release stated in part:

> Brocade Communications Systems, Inc. Announced today financial results
> for its fourth quarter ended October 26, 2002 (Q4 02). For Q4 02, net
> revenue was $153.1 million, an increase of 31 percent from $116.5 million
> reported in the fourth quarter of fiscal 2001 (Q4 01). This compares to
> $151.2 million reported in the third quarter of fiscal 2002 (Q3 02). For fiscal
> 2002 (FY 02), revenue was a record $562.4 million, an increase of 10
> percent from $513.0 million reported in fiscal 2001 (FY 01).

> Net income for Q4 02 was $15.7 million, or $0.07 per share. This compares
> to a net loss of $53.7 million for Q4 01 or $0.24 per share. For FY 02, net
> income was $59.7 million or $0.25 per share, as compared to net income of
> $2.8 million or $0.01 per share, reported in FY 01.

> Deferred revenue at the end of Q4 02 was $22.4 million, and increase of
> $4.1 million from $18.3 million at the end of Q3 02. During Q4 02, gross
> margins were 58.5 percent.

> During Q4 02 Brocade generated $20.6 million in cash flow from
> operations. For the year, cash flow from operations was $110.6 million.
> Excluding the proceeds from the convertible debt offering, cash and
> investments balances grew by $95.6 million for FY 02.

> "As the storage network market leader, we are pleased with our progress in
> expanding our leadership position in fiscal 2002. In a challenging economic
> environment we grew revenue and market share, expanded our intelligent
> platform for networking storage, increase dour installed base to more than 2
> million ports, strengthened our OEM relationships worldwide, and helped
> accelerate time to market for our broad ecosystem of partners," said Greg
> Reyes, Brocade Chairman and CEO.

> Brocade also announced today that it has realigned the organization and
> reduced its expense structure. Brocade expects these and other actions to
> result in a cost savings of more than $8 million in the first quarter of fiscal
> 2003. These actions include aligning the organization to better serve
> customers and streamlining management levels, resulting in a flatter, more
> efficient organization. These actions resulted in a workforce reduction of
> approximately 12 percent. Total employees worldwide is now
> approximately 1200.

> Reyes continued, "Aligning the company required some difficult decisions,
> but we believe that we made the right decisions for the business. With the
> expense reduction plan that we have implemented, and the strategic
> investments that we continue to make in our business, we believe that we are

> well positioned as the economy recovers. Our technology and market
> leadership, large installed base, storage networking expertise, and the
> industry's broadest ecosystem of application partners are a powerful
> combination that will uniquely position Brocade to lead the next phase of the
> evolution of the storage networking market."

51.     In fact, Brocade's fiscal year 2002 EPS was overstated by between $0.08 and $0.09 per share as a result of the Company's failure to properly expense stock based compensation during Fiscal 2001. Thus, Brocade's reported pro format EPS of $0.25 per share was overstated by as much as 56%.

52.     On December 9, 2002, the Individual Defendants caused Brocade to announced that the board of directors had approved a voluntary stock option exchange program (the Exchange Program) for employees, including Company executives. Under the Exchange Program, employees were offered the opportunity to exchange an aggregate of approximately 67.3 million outstanding out-of-the-money stock options with exercise prices equal to or greater than $12.00 per share, for newly priced stock options. In accordance with the Exchange Program, on January 9, 2003, Brocade cancelled 58.7 million outstanding stock options and issued promises to grant new stock options to participating employees. Of the 58.7 million stock options cancelled by participating employees, 15.3 million, or more than 26%, were surrendered by participating executive officers. On July 10, 2003, Brocade granted to participating employees 26.6 million new stock options at an exercise price of $6.54 per share.

53.     On February 12, 2003, the Individual Defendants caused the Company to issue a press release entitled "Brocade Reports Financial Results for the First Quarter of Fiscal 2003; Storage Networking Leader Achieves Business Optimization Targets and Expands Market Leadership Position." The press release stated in part:

> Brocade Communications Systems, Inc. Reported financial results today for
> its first quarter of fiscal year 2003 ended January 25, 2003 (Q1 03). Net
> revenue for Q1 03 was $123.1 million. This compares to $153.1 million
> reported in the fourth quarter of fiscal year 2002 (Q4 02), and 123.1 million
> reported in the first quarter of fiscal year 2002 (Q1 02).
>
> Pro forma net income for Q1 03 was $0.03 million or $0.00 per share. Pro
> forma net income excludes a restructuring charge of $10.1 million associated
> with 12 percent reduction in workforce that was announced on November
> 21, 2002. Reporting on a Generally Accepted Accounting Principles
> (GAAP) basis, net loss for Q1 03 was $6.9 million, or $0.03 per share. This

compares to GAAP net income for Q4 02 of $15.7 million, or $0.07 per share, and GAAP net income of $11.7 million or $0.05 per share in Q1 02. A reconciliation between pro forma net income and net loss on a GAAP basis is provided in a table summary immediately following the Pro Forma Condensed Consolidated Statements of Operations.

Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are pleased with our financial results for the first quarter of fiscal year 2003. This was a quarter of continued execution for Brocade. We met our business optimization goals, reducing operating expenses by 12 percent quarter over quarter, and continued to expand our leadership position in delivering the industry's leading intelligent platform for networking storage, growing our installed base to 2.3 million Fibre Channel ports and completing the acquisition of Rhapsody Networks. By continuing to optimize and invest strategically in our business, we are positioned well for renewed growth in 2003 as we continue to drive the next phase of the evolution of the storage networking market.

54. On February 21, 2003, the Individual Defendants caused the Company to issue the Company's Proxy Statement on Schedule 14A for the annual meeting of shareholders ("2003 Proxy"). The 2003 Proxy reported that the board of directors had approved payment of $20,000 per year to each non-employee director, in addition to granting each non-employee director stock options under the 1999 Director Option Plan. The 2003 Proxy stated, in relevant part:

In July 2002, the Board of Directors approved an annual fee of $20,000 for each non employee director for their services as members of the Board of the Directors. We paid each non employee director a pro rata payment of $5,425 for fiscal year 2002, except for Mr. Paisley, who was elected to the Board in August 2002, and received a pro rata payment of $4,274 for fiscal 2002. We are also authorized to reimburse directors for expenses in connection with attendance at meetings.

Non employee directors have received grants of stock options to purchase shares of Common Stock under our 1999 Director Option Plan, as amended (the "Director Plan"). See "Certain Relationships and Related Transactions — Stock Option Grants to Certain Directors." Only non employee directors may participate in the Director Plan.

The Director Plan provides that new non employee directors will receive an initial grant to purchase 80,000 shares of Common Stock upon becoming a director (the "First Option"). The First Option vests as to 1/16 of the shares each quarter, so as to be fully vested on the fourth anniversary of the date of grant of the First Option. The Director Plan provides for the automatic grant of options to purchase 20,000 shares of Common Stock to each non employee director on each anniversary of the date on which such person first became a non employee director (the "Subsequent Option"). The Subsequent Option vests as to 1/4 of the shares each quarter commencing on the third anniversary of the date of grant so as to be fully vested on the fourth anniversary of the date of grant.

1      55.    The 2003 Proxy also contained a report from the Audit Committee, signed, *inter*

2   *alia*, by Defendant Dempsey, which stated:

> The Audit Committee has reviewed and discussed our audited financial
> statements for the fiscal year ended October 26, 2002 with our management.
> In addition, the Audit Committee has discussed with KPMG LLP, our
> independent auditors, the matters required to be discussed by Statement on
> Auditing Standards No. 61 (Communications with Audit Committee). The
> Audit Committee also has received the written disclosures and the letter
> from KPMG as required by the Independence Standards Board Standard No.
> 1 (Independence Discussions with Audit Committees) and the Audit
> Committee has discussed the independence of KPMG LLP with that firm.

> Based on the Audit Committee's review of the matters noted above and its
> discussions with our independent auditors and our management, the Audit
> Committee recommended to the Board of Directors that the financial
> statements be included in our Annual Report on Form 10 K.

The 2003 Proxy, however, did not disclose that the Company, under the guidance and control of

the Individual Defendants had failed to properly expense stock based compensation granted by the

board and the Compensation Committee, nor that the Company's financial results for fiscal 2002

were falsely overstated as a result.

      56.    On May 14, 2003, the Individual Defendants caused the Company to issue a press

release entitled "Brocade Reports Second Quarter Fiscal 2003 Financial Results." The press

release stated in part:

> Brocade Communications Systems, Inc. Reported today financial results for
> its second quarter of fiscal year 2003, which ended April 26, 2003 (Q2 03).
> Net revenue for Q2 03 was $130.9 million, which compares to $123.1
> million reported in the first quarter of fiscal year 2003 (Q1 03), and $135.0
> million reported in the second quarter of fiscal year 2002 (Q2 02).

> Reporting on a Generally Accepted Accounting Principles (GAAP) basis,
> net loss for Q2 03 was $146.0 million, or $0.57 per share. This compares to
> a GAAP net loss for Q1 03 of $6.9 million, or $0.03 per share, and GAAP
> net income of $14.0 million or $0.06 per share in Q2 02.

> Non-GAAP net loss for Q2 03 was $1.0 million or $0.00 per share, as
> compared to non-GAAP net income of $0.3 million or $0.00 pr share in Q1
> 03. There was no difference between GAAP and non-GAAP net income in
> Q2 02. Non-GAAP net income for Q2 03 excludes in-process research and
> development, deferred stock compensation and other acquisition costs
> related to the acquisition of Rhapsody Networks, Inc. (Rhapsody) in Q2 03,
> and severance, asset impairment, and other charges related to the
> restructuring of business operations that was announced on April 10, 2003.
> A reconciliation between GAAP and non-GAAP information is attached to
> this press release.

> "I am pleased with the results that we have delivered in meeting our
> expectations of revenue, gross margin and operating expense," said Greg
> Reyes, Brocade Chairman and CEO. "Moving forward, we remain
> committed to driving revenue growth and profitability."

57.    On August 13, 2003, the Individual Defendants caused the Company to issue a press

release entitled "Brocade Reports Third Quarter Fiscal 2003 Financial Results; Storage Networking

Leader Increases Revenue, Net Income, and EPS On a Sequential Basis." The press release stated

in part:

> Brocade Communications Systems, Inc. Reported today financial results for
> its third quarter of fiscal year 2003 (Q3 03), which ended July 26, 2003. Net
> revenue for Q3 03 was $133.5 million, an increase from the $130.9 million
> reported in the second quarter of fiscal year 2003 (Q2 03). Net revenue
> reported in the third quarter of fiscal year 2002 (Q3 02) was $151.2 million.
>
> Non-GAAP net income for Q3 03 was $2.0 million, or $0.01 per share, as
> compared to a non-GAAP net loss of $1.0 million or $0.00 per share in Q2
> 03. Non-GAAP net income for Q3 03 excludes deferred stock compensation
> related to the acquisition of Rhapsody Networks, Inc. (Rhapsody) that was
> complete din Q2 03. A reconciliation between GAAP and non-GAAP
> information is contained in the tables below.
>
> Reporting on a Generally Accepted Accounting Principles (GAAP) basis,
> net income for Q3 03 was $1.9 million, or $0.01 per share. This compares to
> a GAAP net loss for Q2 03 of $146.0 million, or $0.57 per share, and a
> GAAP net income of $18.3 million or $0.08 per share in Q3 02. There was
> no difference between GAAP and non-GAAP net income in Q3 02.
>
> "We are pleased with our results for our third fiscal quarter in which we
> delivered increased revenue, operating income, and earnings per share to our
> shareholders," said Greg Reyes, Brocade Chairman and CEO. "Although
> the economic environment continues to be challenging, storage area
> networking remains an important area of IT investment as companies
> optimize their storage, server and application infrastructures to reduce cost
> and improve productivity. The actions that we have taken over the last
> several quarters have resulted in a more efficient and flexible business model
> more closely aligned with our go to market strategy. Moving forward, we
> are confident of our market position, and believe that we are well positioned
> for continued revenue and earnings growth."

58.    On November 20, 2003, the Individual Defendants caused the Company to issue a

press release entitled "Brocade Reports Fourth Quarter and Fiscal Year 2003 Results; Storage

Networking Leader Increases Revenue, Net Income, and EPS on a Sequential Basis." The press

release stated in part:

> Brocade Communications Systems, Inc. Reported today financial results for
> its fourth quarter (Q4 03) and fiscal year 2003 (FY 03) which ended October
> 25, 2003. Net revenue for Q4 03 was $137.8 million, an increase of three