1   FARUQI & FARUQI, LLP
    Nadeem Faruqi
2   Adam Gonnelli
    320 East 39th Street
3   New York, NY 10016
    Telephone: (212) 983-9330
4   Facsimile: (212) 983-9331

5   FEDERMAN & SHERWOOD
    William B. Federman
6   120 N. Robinson, Suite 2720
    Oklahoma City, OK 73102
7   Telephone: (405) 235-1560
    Facsimile: (405) 239-2112

8
    Co-Lead Counsel for Plaintiffs
9

10                          UNITED STATES DISTRICT COURT
11                         NORTHERN DISTRICT OF CALIFORNIA
                               SAN FRANCISCO DIVISION
12
    IN RE BROCADE COMMUNICATIONS          Case No. C05-02233 CRB
13  SYSTEMS, INC. DERIVATIVE LITIGATION
                                          **CONSOLIDATED AMENDED**
14  This Document Relates to:             **COMPLAINT**

15      ALL ACTIONS

16

17

18                          PART TWO OF TWO

19

20

21

22

23

24

25

26

27

28

1    percent from $133.5 million reported in the third quarter of fiscal year 2003
     (Q3 03). Net revenue reported in the fourth quarter of fiscal year 2002 (Q4
2    02) was $153.1 million. Net revenue for FY 03 was $525.3 million, as
     compared to net revenue of $562.4 million reported in fiscal year 2002 (FY
3    02).

4    Non-GAAP net income for Q4 03 was $4.6 million, or $0.02 per share, as
     compared to a non-GAAP net income of $2.0 million, or $0.01 per share, in
5    Q3 03. Non-GAAP net income for Q4 03 excludes gains related to
     repurchases of convertible subordinated debt, a gain on the disposition of
6    private strategic investments, a reduction of previously recorded
     restructuring costs, and deferred stock compensation expense related to the
7    acquisition of Rhapsody Networks, Inc. For FY03, non-GAAP net income
     was $5.6 million, or $0.02 per share. Non-GAAP net income for FY 03
8    excludes gains related to repurchases of convertible subordinated debt, net
     gains on the disposition of private strategic investments, restructuring costs,
9    and deferred stock compensation and in-process research and development
     expenses related to the Rhapsody acquisition.

10
     59.    In fact, Brocade's FY 2003 EPS was overstated by as much as $0.01 per share as a
11
result of the Company's failure to properly expense stock based compensation during Fiscal 2001.
12
     60.    On February 11, 2004, the Individual Defendants caused the Company to issue a
13
press release entitled "Brocade Reports First Quarter of Fiscal 2004 Results; Revenues Increase 5%
14
Sequentially and 18% Year Over year." The press release stated in part:
15
16    Brocade Communications Systems, Inc. Reported today financial results for
      its first quarter of fiscal year 2004 (Q1 04) which ended January 24, 2004.
17    Net revenues for Q1 04 were $145.0 million, an increase of five percent
      from $137.8 million reported in the fourth quarter of fiscal year 2003 (Q4
18    03) and an increase of 18 percent from $123.1 million reported in the first
      quarter of fiscal 2003 (Q1 03).

19    Our first quarter was a good one, and fiscal 2004 is off to an excellent start
      for Brocade. During the first quarter, we saw revenue growth across our
20    entire business," said Greg Reyes, Brocade Chairman and CEO. "This
      represents our 4th quarter in a row of improved revenue, gross margin and
21    operating margin. With our upcoming product cycle and improving trends in
      the storage sector, we continue to be confident in our market position and
22    future prospects."

23    Non-GAAP net income for Q1 04 was $8.0 million, o $0.03 per share, as
      compared to non-GAAP net income of $4.6 million, or $0.2 per share,
24    reported inQ4 03 and non-GAAP net income of $0.0 million, or $0.00 pr
      share, reported in Q1 03. Non-GAAP net income for Q1 04 excludes gains
25    related to repurchases of convertible subordinated debt, deferred stock
      compensation expense related to the acquisition of Rhapsody Networks, Inc.
26    (Rhapsody), and lease termination, facilities consolidation and other related
      costs. Non-GAAP net income for Q4 03 excludes gains related to
27    repurchases of convertible subordinated debt, a gain on the disposition of
      private strategic investments, a reduction of previously recorded
28    restructuring costs, and deferred stock compensation expense related to the

1
2
3

acquisition of Rhapsody.  Non-GAAP net income for Q1 03 excludes net gains on the disposition of private strategic investments and restructuring costs associated with a company-wide workforce reduction in Q1 03.  A reconciliation between GAAP and non-GAAP information is contained in the tables below.

4
5

Reporting on a GAAP basis, net loss for Q1 04 was $35.8 million, or $(0.14) per share.  This compares to GAAP net income for Q4 03 of $14.8 million, or $0.06 per share, and GAAP net loss for Q1 03 of $6.9 million, or $(0.03) per share.

6
7
8
9
10
11
12
13
14
15
16
17

61.    On February 23, 2004, the Individual Defendants caused the Company to issue  the Company's Proxy Statement on Schedule 14A for the annual meeting of shareholders ("2004 Proxy").  The 2004 Proxy reported that the board of directors had approved an increase in the amounts paid to non-employee directors from $20,000 per year to $25,000 per year.. In addition, each member of a standing committee of the Board of Directors received additional compensation for their services on such committee, with each member of the Compensation Committee and Nominating and Corporate Governance Committee receiving an annual fee of $5,000, and each member of the Audit Committee receiving an annual fee of $10,000  The 2004 Proxy further contained a proposal submitted, approved and recommended by the board of directors seeking shareholder approval of an amendment to the 1999 Director Option Plan.  The Individual Defendants caused the Proxy to represent:

18
19
20
21
22
23

We are asking our stockholders to approve the amended and restated 1999 Director Option Plan so that we can continue to use the current 1999 Director Option Plan to attract and retain the best available personnel for service as non employee directors and to encourage their continued service on our Board of Directors. Our Board has approved the amended and restated 1999 Director Option Plan, subject to approval from our stockholders at the Annual Meeting. If the stockholders approve the amended and restated 1999 Director Option Plan, it will replace the current version of the 1999 Director Option Plan. Otherwise, the current version of the 1999 Director Option Plan will remain in effect. All of our non employee directors, to the extent that they may receive additional stock options under the 1999 Director Option Plan in the future, have an interest in this proposal.

24
25
26
27
28

We are proposing to amend the 1999 Director Option Plan to provide our Board of Directors with the flexibility to determine the terms and conditions of the stock options to be granted thereunder, including, without limitation, when the options are granted, the number of shares subject to the options, the vesting provisions associated with the options and the term of the options. Currently, stock options are granted pursuant to a formula. New non employee directors receive an initial stock option to purchase 80,000 shares of Brocade Common Stock upon becoming a director, and all non employee directors receive an annual stock option to purchase 20,000 shares of

1    Common Stock on each anniversary of the date on which such person first
     became a non employee director. The initial stock option vests as to 1/16 of
2    the shares each quarter, so as to be fully vested on the fourth anniversary of
     the date of grant; and the annual stock option vests as to 1/4 of the shares
3    each quarter commencing on the third anniversary of the date of grant, so as
     to be fully vested on the fourth anniversary of the date of grant. In addition,
4    all stock options granted under the 1999 Director Option Plan must have a
     term of ten years. The Board of Directors has no flexibility to determine
5    these and other terms of the stock options because the terms may not vary.

6                                              * * *

7    A committee of the Board of Directors (the "Committee") administers the
     amended and restated 1999 Director Option Plan. The Committee shall
8    consist of not less than two directors who are "non employee directors"
     under Rule 16b 3 of the Securities Exchange Act. Subject to the terms of the
9    amended and restated 1999 Director Option Plan, the Committee has the sole
     discretion to select the non employee directors who will receive options,
10   determine the terms and conditions of options (for example, the number of
     shares, vesting provisions, term and exercise price, which must be at least
11   fair market value), and interpret the provisions of the amended and restated
     1999 Director Option Plan and outstanding options. The Committee may
12   delegate any part of its authority and powers under the 1999 Director Option
     Plan to one or more directors; provided, however, that the Committee may
13   not delegate its authority and powers in any way that would jeopardize the
     amended and restated 1999 Director Option Plan's qualification under
14   certain Securities and Exchange Commission rules.

15                                             * * *

16   The Committee selects the non employee directors who will be granted
     options under the 1999 Director Option Plan, and Brocade anticipates that all
17   non employee directors will be granted options. Employees, including the
     Chief Executive Officer, and consultants are not eligible to receive options
18   under the 1999 Director Option Plan.

19   62.    The 2004 proxy also contained a report of the Audit Committee, signed, inter alia,

20   by Defendants Dempsey and Moore, which stated:

21   The Audit Committee has reviewed and discussed our audited financial
     statements for the fiscal year ended October 25, 2003 with our management.
22   In addition, the Audit Committee has discussed with KPMG LLP, our
     independent auditors, the matters required to be discussed by Statement on
23   Auditing Standards No. 61 (Communications with Audit Committee). The
     Audit Committee also has received the written disclosures and the letter
24   from KPMG as required by the Independence Standards Board Standard No.
     1 (Independence Discussions with Audit Committees) and the Audit
25   Committee has discussed the independence of KPMG LLP with that firm.

26   Based on the Audit Committee's review of the matters noted above and its
     discussions with our independent auditors and our management, the Audit
27   Committee recommended to the Board of Directors that the financial
     statements be included in our Annual Report on Form 10 K
28

CONSOLIDATED AMENDED COMPLAINT                                                    37
CASE NO. C05-02233 CRB
45699

1    In seeking the shareholders approval of the amendment to the 1999 Directors Option Plan and

2    issuing the Audit Committee Report, however, the 2004 Proxy did not disclose that the Individual

3    Defendants had failed to properly expense stock based compensation granted by the board and the

4    Compensation Committee, nor that the Company's financial results for fiscal 2003 were falsely

5    overstated as a result.

6            63.    On May 19, 2004, the Individual Defendants caused the Company to issue a press

7    release entitled "Brocade Reports Second Quarter of Fiscal 2004 Results; Revenues and Gross

8    Margins Increase for Fifth Consecutive Quarter."   The press release stated in part:

9            Brocade Communications Systems, Inc. Reported today financial results for
             its second quarter of fiscal year 2004 (Q2 04) which ended May 1, 2004.
10           Net revenues for Q2 04 were $145.6 million, a slight increase from $145.0
             million reported in the first quarter of fiscal year 2004 (Q1 04) and an
11           increase of 11 percent from $130.9 million reported in the second quarter of
             fiscal 2003 (Q2 03).
12
             "In addition to delivering our fifth consecutive quarter of improvement in
13           revenue and gross margin, during the quarter we continued to execute on our
             long term strategy by extending our product portfolio with four major
14           product introductions," said Greg Reyes, Brocade Chairman and CEO.   "We
             also strengthened the company's position across the entire spectrum of the
15           SAN market and have set the stage to accelerate the achievement of our
             previously stated financial model targets by a full year."
16
             Non-GAAP net income for Q2 04 was $8.1 million, or $0.03 per share, as
17           compared to non-GAAP net income of $8.0 million, or $0.03 per share,
             reported in Q1 04 and non-GAAP net loss of $1.1 million, or $(0.00) per
18           share, reported in Q2 03.  Non-GAAP net income for Q2 04 excludes
             restructuring charges, settlement cost of a claim associated with the
19           acquisition of Rhapsody Networks, Inc. (Rhapsody), deferred stock
             compensation expense related to Rhapsody, and gains on the disposition of
20           private strategic investments.  Non-GAAP net income for Q1 04 excludes
             lease termination, facilities consolidation and other related costs, deferred
21           stock compensation expense related to the acquisition of Rhapsody, and
             gains related  to repurchases of convertible subordinated debt.  Non-GAAP
22           net loss for Q2 03 excludes restructuring charges, in-process research and
             development, and deferred stock compensation expense related to the
23           acquisition of Rhapsody.  A reconciliation between GAAP and non-GAAP
             net income (loss) is contained in the tables below.
24
             Reporting on a GAAP basis, net loss for Q2 04 was $2.0 million, or $(0.01)
25           per share.  This compares to GAAP net loss for Q1 04 of $36.8 million, or
             $(0.14) per share, and GAAP net loss for Q2 03 f $146.0 million, or $(0.57)
26           pr share.

27

28

1    Next Phase of Business Model Optimization

2    Building on its continued positive financial performance, improved
      operational efficiencies, and successful execution of product development
3    programs, Brocade today announced the next phase of its plan to optimize
      the company's business model to drive improved profitability while
4    sustaining revenue growth. This phase of the plan encompasses
      organizational changes that include a reduction in force of 110 employees,
5    focusing of resources to better support OEM partners, and continued
      investments in intelligent SAN switching technology. As a result, Brocade
6    will incur a $10.5 million restructuring charge for severance, asset
      impairments, and contract terminations. (See today's press release:
7    "Brocade Announces Next State In Strategic Growth and Market
      Segmentation Plan.")

8
      In addition, Brocade announced that it has recently settled a claim with
9    former Rhapsody shareholders regarding the Earn-Out Payment associated
      with the Rhapsody merger agreement. As disclose din Brocade's Form 10-K
10   for the fiscal year ended October 25, 2003 and Q1 04 Form 10-Q, Brocade
      did not issue the 2.9 million Earn Out shares because Brocade believed that
11   the milestones for making the Earn Out Payment were not met. "We
      continue to believe that the terms of the contract were not met," said Reyes.
12   "However, in the best interest of all concerned, we determined it was better
      to settle than litigate in a costly and protracted legal dispute." As a result of
13   the settlement Brocade has recorded a $6.9 million charge and will issue 1.3
      million shares of common stock to the former Rhapsody shareholders.

14
15        64.    On August 12, 2004,the Individual Defendants caused the Company to issue a press

16   release entitled "Brocade Announces Preliminary Q3 2004 Results; Revenue on Track, Exceeds

     EPS Guidance." The press release stated in part:
17
18        Brocade Communications Systems, Inc., the world's leading provider of
          infrastructure solutions for Storage Area Networks (SANs), today
19        announced preliminary results for the third quarter of fiscal 2004 (Q3 04)
          ended July 31, 2004. Brocade expects to report net revenue for Q3 04 in a
20        range of $149.5 to $150.5 million and GAAP net income per share of $0.06
          to $0.07. The GAAP earnings include a pre-tax gain of $3.5 million,
21        equivalent to $0.01 per share, related to repurchases of $47.4 million of the
          company's convertible subordinated debt.

22        "I am pleased to announce revenue that is in line with our previous outlook
          and better than expected EPS," said Greg Reyes, Brocade Chairman and
23        CEO. "Given the unusually large number of pre-announcements by storage-
          related companies with lower than expected financial results, we believe that
24        it is important to provide our preliminary results so the market can assess
          Brocade's performance and competitively position accurately."

25        65.    On November 22, 2004, the Individual Defendants caused the Company to issue a

26   press release entitled "Brocade Reports Fourth Quarter and Fiscal Year 2004 Results; Record
27
28

1    Annual Revenue of $596.3 Million Increases 14% Year Over Year Fourth Quarter Operating

2    Margin Increases 16%." The press release stated in part:

> Brocade Communications Systems, Inc. Reported today financial results for its fourth quarter (Q4 04) and fiscal year 2004 (FY 04) which ended October 30, 2004. Net revenues for Q4 04 were $155.6 million, an increase of four percent from $150.0 million reported in the third quarter of fiscal year 2004 (Q3 04) and an increase of13 percent from $137.8 million reported in the fourth quarter of fiscal 2003 (Q4 03). Net revenues for FY 04 were $596.3 million, an increase of 14 percent from $525.3 million reported in fiscal year 2003 (FY 03).
>
> Non-GAAP net income for Q4 04 was $18.6 million, or $0.07 per share, as compared to non-GAAP net income of $15.2 million, or $0.06 per share, reported in Q3 04 and non-GAAP net income of $4.6 million, or $0.02 per share, reported in Q4 03. Non-GAAP net income for Q4 04 excludes deferred stock compensation expense related to Rhapsody Networks, Inc. (Rhapsody), a reduction of previously recorded restructuring costs, and gains related to repurchases of the Company's convertible subordinated debt. Non-GAAP net income for Q3 04 excludes deferred stock compensation expense related to the acquisition of Rhapsody, gains related to repurchases of the Company's convertible subordinated debt, and gains on the disposition of private strategic investments. Non-GAAP net income for Q4 03 excludes deferred stock compensation expense related to the acquisition of Rhapsody, a reduction of previously recorded restructuring costs, gains related to repurchases of the Company's convertible subordinated debt, and gains on the disposition of private strategic investments. A reconciliation between GAAP and non-GAAP net income is contained in the tables below.
>
> Reporting on a GAAP basis, net income for Q4 04 was $20.4 million, or $0.08 pr share basic and diluted. This compares to GAAP net income for Q3 04 of $17.0 million, or $0.06 per share diluted, $0.07 per share basic, and GAAP net income for Q4 03 of $14.8million, or $0.06 per share basic and diluted.
>
> "Fiscal 2004 was a good year for Brocade and I am very proud of our results," said Greg Reyes, Brocade Chairman and CEO. "During the year we expanded and extended our product line, introduced new products in new segments, executed on our business strategy, achieved our financial model targets, and strengthened the overall position of the Company."

22    66.    In fact, Brocade's FY 2004 EPS was overstated by as much as $0.01 per share as a

23    result of the Company's failure to properly expense stock based compensation during Fiscal 2001.

24                        **THE TRUTH BEGINS TO EMERGE**

25    67.    On January 6, 2005, the Individual Defendants caused the Company to issue a press

26    release entitled "Brocade Communications to Restate Financial Statements; Company Currently

27    Expects Adjustments to Relate to Stock Compensation; Company Plans to Delay the Filing of its

28    Form 10-K for Fiscal Year Ending October 30, 2004." The press release stated in part:

CONSOLIDATED AMENDED COMPLAINT
CASE NO. C05-02233 CRB
45699

-40

1

Brocade Communications Systems, Inc., the world's leading provider of
infrastructure solutions for Storage Area Networks (SANs), announced

2

today that it currently expects to restate its financial statements for fiscal
years ending 2002 and 2003 to record additional stock-based compensation

3

expense as a result of an internal review. During the course of the review,
which is still ongoing, the Company determined that the way in which it

4

accounted for stock option grants was incorrect and requires restatement.
The Company currently expects the restatement to relate to stock

5

compensation. The Company does not currently anticipate any material
adjustments to its historical revenues, non-stock option related operating

6

expenses or cash positions. The Company expects related adjustments will
be made to the Company's financial statements for fiscal years prior to 2002,

7

as necessary.

8

Specifically, the Company has determined it incorrectly accounted for, and
will record historical stock-based compensation charges relating to, (i) grants

9

that were made to new hires on their offer acceptance date, rather than the
date of their commencement of employment, during the period May 1999 to

10

July 2000, and (ii) grants that were made to persons engaged on a part-time
basis prior to their new hire full-time employment during the period August

11

2000 to October 2002.

12

***Brocade's audit committee is conducting the internal review with the
assistance of outside counsel and accountants, both of whom were***

13

***retained for this purpose. The review is ongoing. There can be no
assurance that additional adjustments will not be required. The Audit***

14

***Committee expects to complete the review process in the next few weeks.
The Company intends to provide more information as soon as it is***

15

***available.***

16

***"Our core business remains strong and the restatement does not affect the
underlying fundamentals of our business. We continue to successfully***

17

***execute on our strategies and plans and to further strengthen the overall
position of the Company," said Greg Reyes, Brocade Chairman and Chief***

18

***Executive Officer.***

19

68.    On January 24, 2005, the Individual Defendants caused the Company to issue a

20

press release entitled "Brocade Announces the Completion of Audit Committee Internal Review;

21

All Adjustments Are Non Cash and Relate to Stock-Based Compensation and Associated Tax

22

Adjustments." The press release stated in part:

23

Brocade Communications Systems, Inc., the world's leading provider of
infrastructure solutions for Storage Area Networks (SANs), announced

24

today that its Audit Committee has completed its previously announced
internal review. As a result of the findings of the review, the Company

25

expects to record additional stock-based compensation charges, which are
non-cash. In addition the Company expects to record a valuation allowance

26

associated with deferred tax assets related to previously recorded stock
option tax benefits.

27

The Company affirmed that none of the adjustments impact historical

28

revenues, cash positions, or non-stock option related operating expenses.

The Company emphasized that its core business remains strong and the financial restatement does not affect the underlying fundamentals of the business. Brocade is working to prepare revised financial statements to reflect the net stock compensation expenses and associated income tax effect. Brocade will provide more information as soon as it is available.

The table below reflects the Company's expectations of the approximate impact to the Company's Pre-Tax Income (Loss) and Net Income (Loss):

| (Amounts in Millions (1)) | FY02 (1) | FY03(1) | FY04(1) |
|---|---|---|---|
| Pre tax income (loss) as reported | $84 | $(134) | $(16) |
| Adjustments to pre tax income (loss): | | | |
| Stock based compensation | 47 | 1 | 2 |
| Adjusted pre tax income (loss) | $131 | $(135) | $(18) |
| Income tax provision (benefit) as reported | 24 | 2 | 14 |
| Adjustment to tax provision (benefit): | | | |
| Changes in effective tax rate | 19 | 10 | 28 |
| Adjusted tax provision (benefit) | $5 | $12 | $14 |
| Net income (loss) as restated | $126 | $(147) | $(32) |
| Net income loss) as reported | $60 | $(136) | $(2) |
| Change in reported net income | $66 | $(11) | $(30) |

(1) The amounts provided are estimates and subject to audit. The Company has not yet filed its Form 10-K report for the Year Ended October 30, 2004, and there can be no assurance that these amounts may not change.

As announced on January 6, the Company determined it incorrectly accounted for, and would record historical stock-based compensation charges relating to, (i) grants that were made to new hires on their offer acceptance date, rather than the date of their commencement of employment, during the period May 1999 to July 2000, and (ii) grants that were made to persons engaged on a part-time basis prior to their new hire full-time employment during the period August 2000 to October 2002.

*Upon completion of the internal review, the Audit Committee further determined that there was insufficient basis to rely on the Company's process and related documentation to support recorded measurement dates used to account for certain stock options granted prior to August 2003. As a result, the Company will record additional stock-based compensation charges relating to many of its stock option grants from the periods 1999 through the third quarter of fiscal 2003. In addition, it was concluded that there were improprieties in connection with the documentation of stock*

> *option grants and related employment records of a small number of*
> *employees prior to mid 2002, which resulted in immaterial adjustments*
> *included in this restatement.*

> These charges will affect the previously filed financial statements for fiscal
> years 2002 and 2003. The Company also expects to make stock based
> compensation and associated income tax adjustments to previously reported
> fiscal year 2004 financial results. These adjustments relate solely to matters
> pertaining to stock options granted prior to August 2003. For years prior to
> 2002, the Company will reduce previously reported net income by
> approximately $304 million (consisting of a reduction to net income for
> years 1999 and 2000 of $15 million and $1,019 million, respectively, and an
> increase to net income in 2001 of $730 million) relating solely to stock
> based compensation and associated income tax adjustments. The Company
> will calculate the additional historical stock based compensation charges
> using the variable method of accounting under APB 25. The stock
> compensation and related tax adjustments are all non-cash.

> As a result of the stock compensation adjustments, the Company's deferred
> tax assets previously recognized have now been fully reserved. The
> Company expects to realize a tax benefit in future reporting periods when it
> is able to utilize its Net Operating Losses to offset future Income. This will
> result in a lower future effective income tax rate than previously expected.

> Brocade also announced today that Michael Klayko, previously Vice
> President of Worldwide Sales, has been named Chief Executive Officer, and
> that David House, who previously served as lead outside director of the
> Company, has been named Executive Chairman of Brocade, effective
> immediately. Greg Reyes, who served in these positions for six years, will
> remain active as an employee advisor to Brocade. For more information,
> please see press release entitled, "Brocade Announces Executive
> Appointments" issued today.

> Brocade does not expect these developments to impact the timing of its
> release of financial results for the first quarter fiscal year 2005, ending
> January 29, 2005, expected to occur on February 15, 2005.

69.    Notwithstanding the fact that the Individual Defendants had been forced to admit

that the Company would be forced to restate its financial results, on February 18, 2005 the Director

Defendants announced that they had unanimously approved an increase in compensation paid to

themselves as directors. Under this increase, in addition to annual fees for sitting on the board and

each respective committee thereof, each non employee receives $1,500 for each committee meeting

the director attends in person and $1,000 for each committee meeting in which the director

participates by telephone. Moreover, the chairman of each committee receives an additional annual

cash payment of $5,000, and the non employee Lead Director will receive an annual cash payment

1    of $15,000. The Director Defendants made this increase retroactive to apply to all meetings

2    conducted during fiscal year 2005, including meetings that occurred prior to the date of approval.

3         70.    Also on February 18, 2005, the Individual Defendants caused the Company to enter

4    into an employment agreement with Defendant Reyes, whereby the Company agreed to pay Reyes

5    $910,000 per year for two years to serve as a consultant to the CEO of the Company.  In addition,

6    the Company agreed to continue to reimburse Reyes for all expenses incurred "in furtherance of his

7    duties," including the cost of operating his private plane.  Moreover, the employment agreement

8    extended Reyes rights to receive all Company benefits, his Brocade stock options continued to

9    vest, and Brocade committed to continue to cover Reyes under its Director's and Officer's

10   Insurance.

11        71.    On April 27, 2005, Wall Street's well-known analysts became aware that the

12   Company would fall short of its forecasted results.  Defendants realized that their improper

13   accounting scheme could go on no longer as the SEC was already investigating the Company.

14   Wall street analysts went on a rampage urging clients to immediately sell the Company's shares,

15   warning that the Company would not meet its forecast.

16        72.    For example, Merrill Lynch wrote on the morning of April 28, 2005:

17             - We are downgrading shares of Brocade Communications from Buy to
               Sell. We expect Brocade to miss consensus earnings expectations from the
18             April quarter by about $.02 (20%).  This could cause further downward
               pressure on the stock, even at currently depressed levels.  Also, as investors
19             weigh options-adjusted EPS more over the next few months, Brocade's
               shares could act weakly.  We estimate that when adjusted for full tax rate
20             and options-related expensing, Brocade's C2006 EPS is $.18, 49% lower
               than our $.37 estimate excluding such adjustments.
21
               - Revenue decline of 10% expected in FQ2 (Apr).  Our research suggests
22             that Brocade may post revenue of $145M (-10% seq.) Vs. Our prior estimate
               of $150M (-1% seq.) In its FQ2.  The consensus estimate is for revenue of
23             $159M.  This would imply a $14M (9%) revenue miss relative to
               expectations.
24
          73.    On these revelations the Company's shares fell more than 10% on huge volume of
25
     23 million shares traded.
26

27

28

1       74.    On May 2, 2005, the Individual Defendants caused the Company to issue a press

2 release entitled "Brocade Announces Preliminary Second Quarter Fiscal 2005 Results." The press

3 release stated in part:

> Brocade Communications Systems, Inc., the world's leading provider of
> infrastructure solutions for Storage Area Networks (SANs), today
> announced preliminary results for the second quarter of fiscal 2005 (Q2 05),
> ending April 30, 2005. Brocade expects to report net revenue for Q2 05 in a
> range of $144 to $145 million, which is below previous guidance issued on
> February 16, 2005 of $155 to $161 Million, and diluted GAAP net income
> per share of $0.07. The company expects non-GAAP results to be generally
> consistent with GAAP results. These preliminary results compare to net
> revenue of $161.6 million and diluted GAAP net income per share of $0.10,
> for the first quarter of fiscal 2005 (Q1 05) and net revenue of $145.6 million
> and GAAP diluted net income per share of $.01 for the second quarter of
> fiscal 2004 (Q2 04). As previously disclosed, fiscal 2004 was a 53-week
> year instead of a 52-week year and  the extra week fell into Q2 04. As a
> result, net revenue in Q2 04 included approximately $5 to $6 million in
> additional revenue, without which net revenue for Q2 04 would have been
> approximately $140 million.
>
> These preliminary results are based on management's initial estimates of
> operating results and there can be no assurance that the amounts may not
> change.
>
> Brocade attributed the revenue shortfall to greater seasonality than expected,
> reflected a lower level of enterprise spending, and an extended sales cycle
> causing business from end customers to push outside of the quarter.
>
> "Our sales pipeline indicates that the underlying fundamentals of our
> business remain intact, and while we are disappointed to miss our original
> guidance, we continue to manage expenses and remain at a healthy level of
> profitability," said Michael Klayko, CEO. "As reported recently by several
> industry observers, the storage environment in the last two weeks of March
> was weak and while April was a good month, it was not enough to offset the
> weakness in March. As we enter the third fiscal quarter, our sales pipeline
> continues to grow and the pipeline we see today is a stronger one than it was
> entering our second quarter," continued Klayko.
>
> Brocade will report final financial results for its second quarter fiscal year
> 2005 on Wednesday, May 18, 2005 after the close of market.

      75.    Then, on May 16, 2005, before the markets opened, the Individual Defendants

caused the Company to issue a press release entitled "Brocade Restates Financial Statements to

Reflect Additional Stock-Based Compensation Expense; Company Affirms That None of the

Adjustments Impact Historical Revenues, Cash Positions, or Non-Stock Option Related Operating

Expenses." The press release stated in part:

Brocade Communications Systems, Inc. announced today that the Company will restate its financial statements for the fiscal years ending 2002 through 2004 to record additional charges for stock-based compensation expense. The Company affirmed that none of the charges will have an impact on Brocade's historical revenues, cash positions, or non-stock option related operating expenses. The company expects related adjustments will be made to the Company's financial information for fiscal 2001, as necessary.

Following the completion of an Audit Committee review announced on January 24, 2005, additional information came to the Company's attention that indicated that its guidelines regarding stock option granting practices were not followed during the period from August 2003 through November 2004. After further review, the Company concluded that it could not rely on the documentation used to support the recorded measurement dates for stock options granted in that period. As a result, the Company will restate its financial statements to account for additional stock-based compensation for stock options granted from August 2003 through November 2004. The additional Charges are expected to result in a cumulative increase in non-cash stock option compensation expense of $0.8 million over fiscal years 2003 and 2004.

After discovering the additional information regarding non-compliance of its guidelines, the Company commenced a review of certain other practices that could impact stock option accounting. This review determined that from 2001 through 2004, the Company had not appropriately accounted for the cost of stock based compensation for certain employees on leaves of absences (LOA) and in transition roles prior to ceasing employment with Brocade. Prior to 2003, Brocade's LOA policy allowed certain employees to continue vesting in their stock options and to have extended stock option exercise periods for up to three months from the state of the LOA. The expected charges relate principally to options that continued to vest for employees who were on LOAs for a period greater than three months. The Company also expects to record additional adjustments related to options that continued to vest for certain employees in transition roles. Management estimates the total increase in non-cash compensation expense related to these matters to be in a range of approximately $31 to $52 million for fiscal years 1001 through 2004.

Brocade's Audit Committee has commenced an independent review of the Company's stock option accounting regarding LOAs. Based on that ongoing review, the Company's preliminary estimates of anticipated adjustments are subject to change.

The table below reflects the total effects of these combined adjustments and are the Company's preliminary estimate of the approximate impact to the Company's non-cash expenses and EPS. The Company does not currently expect that there will be any impact on non-cash expenses and EPS for any period in fiscal year 2005.

/       /       /

| Fiscal Year Ending: | Additional Non-Cash Expense | Reduction in EPS |
|---|---|---|
| 2001 | $12.0 - $25.0 million | $0.05 - $0.11 |
| 2002 | $19.0 - $23.0 million | $0.00 - $0.09 |
| 2003 | $0.2 - $0.8 million | $0.00 - $0.01 |
| 2004 | $0.8 - $2.8 million | $0.00 - $0.01 |

The Company also announced today that it has been informed that the Department of Justice (DOJ) is working with the SEC in a joint investigation regarding the Company's stock option granting practices. Brocade has no further information regarding the timing or scope of the investigation.

"It is no unusual in the current environment that multiple relevant government agencies will take an interest in these types of matters," said Michael Klayko, Brocade's newly appointed Chief Executive Officer. "We are cooperating fully with the SEC and DOJ and hope that the investigation can be concluded as quickly as possible." Klayko continued, "The Board and management team are absolutely committed to the highest standard of accounting and continuously improving our internal controls and compliance with our policies. I have confidence in my team and we remain focused on executing to our business plan."

76.     On June 8, 2005, Brocade filed a Form 8-K with the SEC in which it announced that it was delaying the filing of its 10-Q for the second fiscal quarter ended April 30, 2005. The Company also noted that until the review by Brocade's Audit Committee was complete, it would be unable to file its 10-Q for the second quarter or its amended 10-K for 2004.

77.     On June 9th, 2005, the SEC raised the level of its investigation from an informal inquiry to a formal order of investigation, indicating the seriousness of the defendants' misconduct. This action was announced by Brocade in a press release dated June 10, 2005.

78.     On June 10, 2005, Brocade received a written determination from Nasdaq stating that Brocade had violated Nasdaq's rules by not filing its 10-Q for the second fiscal quarter ending April 30, 2005. This action by Nasdaq subjected Brocade's shares to possible delisting.

79.     On the same date, Brocade filed a Form 12b-25 with respect to the 10-Q for the second quarter, which stated that Brocade would be unable to make the filing on time.

80.     On July 26, 2005, Brocade announced that it terminated the employment agreement with defendant Reyes that had been entered into in February 2005.

81.    On August 2, 2005, Brocade filed its Form 8-K with a press release announcing its preliminary financial results for the third quarter ending July 30, 2005.  Brocade noted that if it failed to file its 10-Q for the second quarter ended April 30, 2005 by August 23, 2005, it expected to be declared in default under $279 million in unpaid principal and interest on its 2% convertible subordinate notes which were due in 2007.

82.    On August 18, 2005, Nasdaq's Listing Qualifications Panel granting Brocade an extension until September 30, 2005 to make all its filings and restatements.  Nasdaq also allowed the Company to remain listed until September 30, 2005.

83.    On August 23, 2005, Brocade called for the redemption of all its outstanding 2% Convertible subordinated Notes because it failed to file its second quarter 2005 10-Q.  As a result of the default, Brocade deposited $276.1 million in U.S. Treasury securities with the Notes' trustee.  The Company also noted that a call premium of 0.4% of the face value of the Notes would be due and that the Company expected to record a loss on investments of $4.7 million in the quarter ending October 29, 2005 as a result of the placement of the treasury securities with the trustee.

84.    As of July 30, before the default, the Company's cash balance was $733.8 million.

85.    On September 9, 2005, Brocade filed a Form 12b-25 with the SEC stating that it could not complete its Form 10-Q for the third quarter ended July 30, 2005, its 10-Q for the second quarter ended April 30, 2005, or its amended 10-K for fiscal 2004.

86.    Yet again, on September 21, 2005, Brocade issued a press release and filed a Form 8-K with the SEC noting that it would not be able to file its long-overdue financial statements by September 30, 2005, as it had previously anticipated.  Instead, Brocade asked the SEC to allow it until November 15, 2005.

87.    On October 4, 2005 Brocade announced that several defendants will receive restricted shares of common stock once the SEC filings are up to date.  Defendant Canova will receive $525,000 and defendant Klayko will receive $562,500.

/    /    /

## UNDISCLOSED ADVERSE INFORMATION

88.     In fact, Brocade's financials had been false for at least four years due to its improper accounting for compensation expenses. As a result, Brocade's results were presented in violation of Generally Accepted Accounting Principles ("GAAP").

89.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Regulation S-X, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements.

90.     Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatements and revisions announced by Brocade were to correct for material errors in previously issued financial statements. APB No. 20, ¶¶7-13. The restatement for past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *Id.* ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Brocade's restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatements and revisions were an admission by defendants that Brocade's previously issued financial results and its public statements regarding those results were false and misleading. Moreover, immaterial corrections are not required to be restated. APB No. 20, ¶38. Thus, the restatement indicates that the errors were material.

1    91.    Given these accounting irregularities identified above, the Company announced

2    financial results that were in violation of GAAP, the Company's own announced policies, and the

3    following principles:

4         a.    The principle that "interim financial reporting should be based upon the same

5         accounting principles and practices used to prepare annual financial statements" (APB No.

6         28, ¶ 10);

7         b.    The principle that "financial reporting should provide information that is useful to

8         present to potential investors and creditors and other users in making rational investment

9         credit decisions" (FASB Statement of Concepts No. 1, ¶ 34);

10        c.    The principle that "financial reporting should provide information about the

11        economic resources of an enterprise, the claims to those resources, and effects of

12        transactions, events, and circumstances that change resources and claims to those

13        resources" (FASB Statement of Concepts No. 1, ¶ 40);

14        d.    The principle that financial reports should provide information about how

15        management of an enterprise has discharged its stewardship responsibility to owners

16        (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent

17        that management offers securities of the enterprise to the public, it voluntarily accepts wider

18        responsibilities for accountability to prospective investors and to the public in general.

19        (FASB Statement of Concepts No. 1, ¶ 50);

20        e.    The principle that "financial reporting should provide information about an

21        enterprise's financial performance during a period" (FASB Statement of Concepts No. 1, ¶

22        42).  Investors and creditors often use information about the past to help in assessing the

23        prospects of an enterprise.  Thus, although investment and credit decisions reflect investors'

24        expectations about future enterprise performance, those expectations are commonly based,

25        at least partly, on evaluations of past enterprise performance.

26        f.    The principle that "completeness, meaning that nothing is left out of the information

27        that may be necessary to insure that it validly represents underlying events and conditions"

28        (FASB Statement of Concepts No. 2, ¶ 79);

g.    The principle that "financial reporting should be reliable in that it represents what it purports to represent" (FASB Statement of Concepts No. 2 ¶ 5);

h.    The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered." (FASB Statement of Concepts No. 2 ¶ 95).

92.    As a result of these materially false and misleading statements and failures to disclose, Brocade's publicly traded securities traded at inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Brocade publicly traded securities relying upon the integrity of the market price of Brocade publicly traded securities and market information relating to Brocade, and have been damaged thereby.

## THE SELLING DEFENDANTS' ILLEGAL INSIDER SELLING

93.    During the Relevant Period, based on his knowledge of material non-public information regarding the Company, defendant Reyes sold 4,957,053 Brocade shares for insider trading proceeds of more than $30 million.  These sales were unusual in both their timing and amount.

94.    During the Relevant Period, based on his knowledge of material non-public information regarding the Company, defendant Canova sold 4,903 Brocade shares for insider trading proceeds of $31, 526.  These sales were unusual in both their timing and amount.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.    Plaintiff brings  this action derivatively in the right and for the benefit of Brocade to redress injuries suffered, and to be suffered, by Brocade as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Brocade is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.    Plaintiff will adequately and fairly represent the interests of Brocade in enforcing and prosecuting its rights.

97.     Plaintiff is and was an owner of Brocade common stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a Brocade shareholder.

98.     At the time this action was initiated, the Brocade Board consisted of the following nine individuals: defendants Klayko, Dempsey, Paisley, House, Moore, Krause, Neiman, Vaswani and Walker (the "Demand Directors"). Plaintiffs did not make a pre-suit demand on the Demand Directors to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     The Compensation Committee of the Board determines salaries and bonuses and considers employment agreements for elected officers of the Company, and prepares reports on these matters; considers, reviews and grants options under the Company's compensation plans and administers the plans; and considers matters of director compensation, benefits and other forms of remuneration. Throughout the Relevant Period, the Compensation Committee has approved and recommended repeated increases in the compensation and award of stock options pursuant to the Company's stock option plans to each of the Director Defendants. The Compensation Committee is comprised of defendants Dempsey, Krause and Vaswani. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Dempsey, Krause and Vaswani. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Klayko, Paisley, House, Moore, Neiman and Walker is futile;

(b)     The principal professional occupation of defendant Klayko is his employment with Brocade, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, for FY:05, Brocade has entered into an employment agreement pursuant to which he will receive a base salary of $520,000 with a target incentive bonus of 75% of his base salary or $390,000, and will also be granted 1,000,000 options to purchase common stock of the Company. Accordingly, defendant Patrick Smith lacks independence from defendants, Dempsey, Krause and Vaswani., defendants who are not disinterested and/or independent and who exert influence over defendant Klayko's compensation

1    by virtue of their position as the Compensation Committee. This lack of independence renders

2    defendant Klayko incapable of impartially considering a demand to commence and vigorously

3    prosecute this action;

4            (c)     According to Brocade's Amended Proxy Statement filed with the SEC on or about

5    March 4,2005, defendants Dempsey, Moore and Paisley were, during the Relevant Period,

6    members of the Audit Committee, and defendant Krause currently also sits on the Audit

7    Committee. The Audit Committee is responsible for "The Audit Committee oversees our

8    accounting, financial reporting and audit processes; makes recommendations to the Board of

9    Directors regarding the selection of independent auditors; reviews the results and scope of audit

10   and other services provided by the independent auditors; reviews the accounting principles and

11   auditing practices and procedures to be used in preparing our financial statements; and reviews our

12   internal controls." Specifically, the "Audit Committee works closely with management and our

13   independent auditors. The Audit Committee also meets with our independent auditors without

14   members of management present, on a quarterly basis, following completion of their quarterly

15   reviews and annual audit and prior to our earnings announcements, to review the results of their

16   work. The Audit Committee also meets with our independent auditors to approve the annual scope

17   of the audit services to be performed." Nonetheless, the Audit Committee recommended that the

18   Board include the improper financial statements and publish the improper and misleading press

19   releases throughout the Relevant Period. By such actions, defendants breached their duties by

20   causing or allowing the improper financials and press releases described above. As a result of

21   these defendants' breach of their duties, any demand upon them is futile. Pursuant to the Audit

22   Committee Charter, the purpose of the Audit Committee "shall be to: … Assist the Board in

23   oversight and monitoring of (i) the integrity of the Company's financial statements; (ii) the

24   Company's compliance with legal and regulatory requirements; (iii) the independent auditor's

25   qualifications, independence and performance; and (iv) the Company's internal accounting and

26   financial controls." Further, the Audit Committee Charter places the following responsibility, *inter*

27   *alia*, on the Audit Committee: "Reviewing on a continuing basis the adequacy of the Company's

28   system of internal controls, including meeting periodically with the Company's management and

1  the independent auditors to review the adequacy of such controls and to review before release the

2  disclosure regarding such system of internal controls required under SEC rules to be contained in

3  the Company's periodic filings and the attestations or reports by the independent auditors relating

4  to such disclosures.";

5      (d)   The entire Brocade Board and senior management participated in the wrongs

6  complained of herein.  Pursuant to their specific duties as Board members, each was charged with

7  the management of the Company and to conduct its business affairs.  Each of the Director

8  Defendants breached the fiduciary duties that they owed to Brocade and its shareholders in that

9  they failed to prevent and correct the improper financials.  Thus, the Brocade Board cannot

10 exercise independent objective judgment in deciding whether to bring this action or whether to

11 vigorously prosecute this action because its members are interested personally in the outcome as it

12 is their actions that have subjected Brocade to millions of dollars in liability for possible violations

13 of applicable securities laws;

14     (e)   The Individual Defendants, because of their inter related familiar, business,

15 professional and personal relationships, have developed debilitating conflicts of interest that

16 prevent the Board members of the Company from taking the necessary and proper action on behalf

17 of the Company as requested herein.  In addition to the conflicts that exist as a result of their

18 participation in the improper public statements and insider selling, as detailed herein supra, the

19 majority of the Board, including the defendants listed below, are subject to the following

20 prejudicial entanglements:

21        (i)   From September 1985 until May 2000, defendant. Paisley was the Senior

22        Vice President of Finance and Chief Financial Officer of 3Com Corporation

23        ("3Com").  Also from 1981 to 1990, defendant Krause was President and Chief

24        Executive Officer of 3Com. Because of their long standing and entangling business

25        and professional relationships,  defendants Paisley and Krause will not take the

26        action requested by plaintiffs herein against one another or the remainder of the

27        Individual Defendants; and

28

1      (ii)    Prior to forming Rhapsody networks, which was acquired by Brocade,

2      defendant Klayko held numerous executive sales and marketing positions at

3      Hewlett-Packard ("HP"). Also for 24 years, defendant Walker worked in a wide

4      range of positions at HP, including controller for various business groups, business

5      manager for U.S. field operations, and executive in charge of HP's Information

6      Technology function. Because of their long standing and entangling business and

7      professional relationships, defendants Klayko and Walker will not take the action

8      requested by plaintiffs herein against one another or the remainder of the Individual

9      Defendants.

10     (f)    As of February 14, 2005, defendants Klayko, Neiman, Dempsey, Paisley, House,

11     Moore and Vaswani owned millions of Brocade shares. Specifically, defendant Klayko owned

12     1,799,331 shares; defendant Neiman owned 240,625 shares; defendant Dempsey owned 240,625

13     shares; defendant Paisley owned 50,000 shares; defendant House owned 56,000 shares; defendant

14     Moore owned 40,000   shares; and defendant Vaswani owned 16,000 shares. Thus, these

15     defendants had every incentive to participate in the false and misleading press releases and

16     improper accounting in order to effectuate a commensurate rise in Brocade's stock price;

17     (g)    Each of the Director Defendants knew of and/or directly benefited from the

18     wrongdoing complained of herein;

19     (h)    The Director Defendants, as more fully detailed herein, participated in, approved

20     and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal

21     or disguise those wrongs from Brocade's stockholders or recklessly and/or negligently disregarded

22     the wrongs complained of herein, and are therefore not disinterested parties;

23     (i)    In order to bring this suit, all of the directors of Brocade would be forced to sue

24     themselves and persons with whom they have extensive business and personal entanglements,

25     which they will not do, thereby excusing demand;

26     (j)    The acts complained of constitute violations of the fiduciary duties owed by

27     Brocade's officers and directors and these acts are incapable of ratification;

28

1        (k)    Each of the defendant directors of Brocade authorized and/or permitted the false

2    statements disseminated directly to the public or made directly to securities analysts and which

3    were made available and distributed to shareholders, authorized and/or permitted the issuance of

4    various of the false and misleading statements and are principal beneficiaries of the wrongdoing

5    alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was

6    instituted by them;

7        (l)    Any suit by the current directors of Brocade to remedy these wrongs would likely

8    expose the Individual Defendants and Brocade to further violations of the securities laws that

9    would result in civil actions being filed against one or more of the Individual Defendants, thus,

10    they are hopelessly conflicted in making any supposedly independent determination whether to sue

11    themselves;

12        (m)    Brocade has been and will continue to be exposed to significant losses due to the

13    wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed

14    any lawsuits against themselves or others who were responsible for that wrongful conduct to

15    attempt to recover for Brocade any part of the damages Brocade suffered and will suffer thereby;

16        (n)    If the current directors were to bring this derivative action against themselves, they

17    would thereby expose their own misconduct, which underlies allegations against them contained in

18    class action complaints for violations of securities law, which admissions would impair their

19    defense of the class actions and greatly increase the probability of their personal liability in the

20    class actions, in an amount likely to be in excess of any insurance coverage available to the

21    Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses

22    they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile;

23    and

24        (o)    If Brocade's current and past officers and directors are protected against personal

25    liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in

26    this Complaint by directors' and officers' liability insurance, they caused the Company to purchase

27    that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders

28    of Brocade.  However, due to certain changes in the language of directors' and officers' liability

insurance policies in the past few years, the directors' and officers' liability insurance policies

covering the defendants in this case contain provisions that eliminate coverage for any action

brought directly by Brocade against these defendants, known as, *inter alia*, the "insured versus

insured exclusion." As a result, if these directors were to sue themselves or certain of the officers

of Brocade, there would be no directors' and officers' insurance protection and thus, this is a

further reason why they will not bring such a suit. On the other hand, if the suit is brought

derivatively, as this action is brought, such insurance coverage exists and will provide a basis for

the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all

then the current directors will not cause Brocade to sue them, since they will face a large uninsured

liability.

## AUDITOR LIABILITY

### KPMG'S Malfeasance and Misfeasance.

99.    Annual financial statements filed with the SEC on Form 10-K are required to be

audited by an independent auditor. In addition, interim financial statements filed wit the SEC on

Form 10-Q are required to be reviewed by independent auditors.[2]

100.    Generally Accepted Auditing Standards ("GAAS"), as approved and adopted by the

American Institute of Certified Public Accountants ("AICPA") governs the conduct of auditors in

performing and reporting on audit engagements. Auditing promulgations are set forth in, *inter*

*alia*, a publication entitled AICPA Professional Standards: U.S. Auditing Standards, Vol. 1 (2001).

Promulgations therein are abbreviated with the initial "AU" and will be cited as such.

101.    Indeed, as alleged herein, KPMG's so-called "reviews" amounted to no review at

all, in that it violated the most fundamental requirements of GAAS, which required an auditor to

---

[2]  SEC, Audit Committee Disclosure, 1999 SEC Lexis 2713 (Dec. 22, 1999). KPMG was not
required to use formal opinions in conjunction with its quarterly reviews. However, KPMG was
required to approve the quarterly financial statements because KPMG had a duty to notify the
Company if the financial statements were found not to comply with GAAP. AU § 722.10 states
the auditor's duty as follows: "The objective of a review of interim [i.e. quarterly] financial
information is to provide the accountant, based on ... inquiries and analytical procedures, with a
basis for reporting whether material modifications should be made for such information to conform
with generally accepted accounting principles."

obtain sufficient, competent evidence to support the assertions in financial statements permitting

reasonable assurance that such statements are free from material misstatements:

  a.  "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements."  AU 326.02

  b.  "The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly."

  c.  Representations from management "are not a suitable substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit."

  d.  "[W]ithout adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted."

102.  As previously discussed, Brocade's filings with the SEC throughout the Relevant Period were continuously false and misleading.  This is evidenced by the fact that the financial statements will soon be restated dating back to at least the beginning of the Relevant Period. KPMG played a pivotal role in the creation of these filings.

103.  KPMG conducted quarterly reviews and annual audits of each of Brocade's materially false and misleading interim and annual financial statements filed with the SEC on Forms 10-Q and 10-K, respectively.

104.  In providing its professional services over several years, members of KPMG had virtually limitless access to information concerning Brocade's true financial condition and operating results.  Specifically:

  a.  KPMG had the opportunity to be present at Brocade's offices;

  b.  KPMG had the opportunity to review Brocade's documents and interview Brocade's employees;

  c.  KPMG had the opportunity to review the Company's policies and procedures concerning the granting of equity based compensation, including the vesting of

1    options, with Brocade's Board of Directors, Audit Committee, Compensation

2    Committee, and Senior Management; and

3        d.    KPMG had the opportunity to perform audit, review, consulting and other services.

4        105.    KPMG knew of or recklessly disregarded the following adverse facts concerning

5    Brocade that rendered the Company's reported financial results during the Relevant Period

6    materially false and misleading: (1) that the Company's policies and procedures relating to the

7    accounting for equity-based compensation was not being followed; (2) that the Company's policies

8    and procedures relating to accounting for equity-based compensation and vesting of options for

9    persons on Leaves of Absence were not being followed; and, (3) the Company was applying the

10    incorrect methodology in accounting for the expense of equity-based compensation and the vesting

11    of options, in violation of GAAP.

12        106.    KPMG knew or recklessly ignored that it was required to be vigilant in auditing the

13    impact of equity-based compensation and granting of options. KPMG intentionally or recklessly

14    failed to comply with GAAS.

15        107.    KPMG provided a myriad of services to Brocade over the years. Accordingly,

16    Defendant KPMG has earned significant fees for performing these services. According to the

17    Amended Proxy Statement filed for 2004, KPMG was paid $104,000 for non-audit related services

18    and $596,000 for audit related services for the Company's fiscal year 2004. For fiscal year 2003,

19    KPMG was paid $508,000 for non-audit services and another $504,000 for audit related services,

20    of which $200,000 was spent on "assurance and related services by KPMG" including accounting

21    consulting relating to the acquisition of Rhapsody Networks, Inc. For fiscal year 2002, KPMG was

22    paid $88,010 in non-audit related fees and audit fees of $240,000. Included within the fees charged

23    for fiscal 2003 and 2004, were the services that KPMG performed ensuring that the Company's

24    internal controls were adequate and could be relied upon.

25        108.    The audits conducted by KPMG were knowingly or recklessly not preformed in

26    accordance with GAAS in the following respects:

27        a.    KPMG violated GAAS, General Standard No. 2, which requires an auditor to

28            maintain an independence in mental attitude in all matters related to the

1    engagement.  KPMG did not exercise independence in performing its audits and

2    reviews of the Company's financial statements.

3    b.    KPMG violated GAAS, Standard of Field Work No. 1, and the standards set forth in

4    Statements of Auditing Standards ("SAS") Nos. 1 and 53 by, among other things,

5    failing to adequately plan its audit and properly supervise the work of assistants, and

6    to establish and carry out procedures reasonably designed to search for and detect

7    the existence of errors and irregularities that could have a material effect upon the

8    financial statements.

9    c.    KPMG violated GAAS, Standard of Field Work No. 2, which requires the auditor to

10    make a proper study of existing internal controls, including accounting, financial

11    and management controls, to determine whether reliance thereon was justified, and

12    if such controls are not reliable, to expand the nature and scope of the auditing

13    procedures to be applied.  The standard requires that a sufficient understanding of an

14    entity's internal control structure be obtained to adequately plan the audit and to

15    determine the nature, timing and extent of tests to be performed.  KPMG knew or

16    recklessly disregarded facts which evidenced that it either failed to sufficiently

17    understand Brocade's internal control structure and/or it disregarded weakness and

18    deficiencies in Brocade's internal control structure, and it failed to adequately plan

19    its audit or expand its auditing procedures.

20    d.    KPMG violated GAAS, Standard of Filed Work No. 3, which requires sufficient

21    competent evidential matter be obtained through inspection, observation, inquiries,

22    and confirmations to afford a reasonable basis for an opinion regarding the financial

23    statements under audit.

24    109.    KPMG also failed to adhere to at least the following SAS provisions:

25    a.    KPMG violated SAS No. 54 by failing to perform the audit procedures required in

26    response to possible improper acts by Brocade;

27    b.    KPMG violated SAS No. 3, which requires that an auditor review all corroborating

28    information to support the financial statements being audited, including, but not

limited to, minutes of meetings, confirmations, written representations by
knowledgeable people, and information obtained from independent sources;

c.   KPMG violated SAS No. 19, which requires that an auditor not substitute client
representations for audit procedures necessary to form a reasonable basis as to the
opinion being given on financial statements;

d.   KPMG violated SAS No. 82, which requires that auditors "specifically assess the
risk of material misstatement of the financial statements due to fraud and should
consider that assessment in designing the audit procedures to be performed." AU §
316.  KMPG failed to consider obvious risk factors indicating the existence of fraud,
including:

i.   "an excessive interest by management in maintaining or increasing the
entity's stock price or earnings trends through the use of unusually
aggressive accounting practices." AU § 316.67.

108.   Given the fact that KPMG audited Brocade's financial statements for a considerable
period of time, had a thorough knowledge of the Company's financial history, accounting
practices, internal controls, and business operations, KPMG either failed to:

a.   Identify areas that needed special consideration or identified such areas and audited
them in a manner that was so deficient it amounted to no audit at all;

b.   Assess the conditions under which accounting data was produced, processed,
reviewed, and accumulated within the organization;

c.   Evaluation the reasonableness of Management's representations and the Company's
estimates or evaluated them in a manner which was so deficient that it amounted to
no evaluation at all; or

d.   Judges the appropriateness of the accounting principles applied and the adequacy of
disclosures in the Company's financial statements. In this regard, KPMG failed to
"recognize that management's selection and application of significant accounting
policies, ... may be missed." AU § 316A.19.

109.    In April, 2004, KPMG published a booklet entitled "Sarbanes-Oxley Section 404: An Overview of PCAOB's Requirements." This booklet contains a section entitled "The Audit of Internal Control Over Financial Reporting" ("the Booklet") which describes the independent auditor's objectives and duties in conducting an audit of a company's internal control over financial reporting ("ICOFR"). In the Booklet, KPMG states, in part as follows:

- "The auditor's objective in an audit of ICOFR is to express opinions on management's assessment of the effectiveness for the company's ICOFR and on whether the company maintained effective ICOFR. To form a basis for expressing such an opinion, the auditor must plan and perform the audit to obtain reasonable assurance about whether the company maintained, in all material respects, effective ICOFR as of the date specified in management's assessment." Booklet at p. 20.

- Auditors "should evaluate controls specifically intended to address the risks of fraud that are at least reasonably likely to have a material effect on the company's financial statements." Id. at p. 22.

- "Financially significant locations should be selected to cover a 'large portion' of the company's operations or financial position. A large portion is not specifically defined in Standard 2, but currently, we believe, should include no less than 65 percent to 70 percent of the company's operations and financial position." Id. at p. 23.

- "The auditor obtains an understanding of ICOFR by applying procedures that include making inquiries of appropriate entity personnel, inspecting documents, observing the application of specific controls and tracing transactions through the information systems (i.e. walkthroughs). Id. at p. 24.

- "In making the determination of operation effectiveness of ICOFR, the auditor must perform enough of the testing so that the auditor's own work provides the principal evidence supporting the audit opinion." Id. at p. 28.

/    /    /

1

2

## COUNT I
### Against the Insider Selling Defendants for Breach of Fiduciary
### Duties for Insider Selling and Misappropriation of Information

3

4

110.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

5

6

111.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Brocade common stock on the basis of such information.

7

8

9

10

11

112.    The information described above was proprietary non-public information concerning the Company's accounting and financial statements, together with its financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Brocade common stock.

12

13

14

15

113.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's financial statements, results and prospects were not as stated. The Insider Selling Defendants' sales of Brocade common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

16

17

18

19

114.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

20

## COUNT II

21

### Violation of Section 20(a) of the Exchange Act Against All Defendants

22

23

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

24

25

26

116.    The Individual Defendants owed and owe Brocade fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Brocade the highest obligation of good faith, fair dealing, loyalty and due care.

27

28

1    117.    The Individual Defendants, and each of them, violated and breached their fiduciary

2    duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

3    118.    Each of the Individual Defendants had actual or constructive knowledge that they

4    had caused the Company to improperly misrepresent its financial statements, prospects and results

5    and failed to correct the Company's public statements, as well as its publicly reported financial

6    results and guidance.  These actions could not have been a good faith exercise of prudent business

7    judgment to protect and promote the Company's corporate interests.

8    119.    As a direct and proximate result of the Individual Defendants' failure to perform

9    their fiduciary obligations, Brocade has sustained significant damages.  As a result of the

10    misconduct alleged herein, the Individual Defendants are liable to the Company.

11    120.    Plaintiff on behalf of Brocade has no adequate remedy at law.

**COUNT THREE**

**Against All Defendants for Abuse of Control**

14    121.    Plaintiff incorporates by reference and realleges each and every allegation

15    contained above, as though fully set forth herein.

16    122.    The Individual Defendants' misconduct alleged herein constituted an abuse of their

17    ability to control and influence Brocade, for which they are legally responsible.

18    123.    As a direct and proximate result of the Individual Defendants' abuse of control,

19    Brocade has sustained significant damages.

20    124.    As a result of the misconduct alleged herein, the Individual Defendants are liable to

21    the Company.

22    125.    Plaintiff on behalf of Brocade has no adequate remedy at law.

**COUNT FOUR**

**Against All Defendants for Gross Mismanagement**

25    126.    Plaintiff incorporates by reference and realleges each and every allegation

26    contained above, as though fully set forth herein.

27    127.    By their actions alleged herein, the Individual Defendants, either directly or through

28    aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

1 | to prudently managing the assets and business of Brocade in a manner consistent with the

2 | operations of a publicly held corporation.

3 |     128.    As a direct and proximate result of the Individual Defendants' gross

4 | mismanagement and breaches of duty alleged herein, Brocade has sustained significant damages in

5 | excess of hundreds of millions of dollars.

6 |     129.    As a result of the misconduct and breaches of duty alleged herein, the Individual

7 | Defendants are liable to the Company.

8 |     130.    Plaintiff on behalf of Brocade has no adequate remedy at law.

9 | **COUNT FIVE**

10 | **Against All Defendants for Waste of Corporate Assets**

11 |     131.    Plaintiff incorporates by reference and realleges each and every allegation contained

12 | above, as though fully set forth herein.

13 |     132.    As a result of the improper public statements, financial results and prospects as

14 | alleged herein, and by failing to properly consider the interests of the Company and its public

15 | shareholders by failing to conduct proper supervision, defendants have caused Brocade to waste

16 | valuable corporate assets by paying incentive based bonuses to certain of its executive officers and

17 | incur potentially millions of dollars of legal liability and/or legal costs to defend defendants'

18 | unlawful actions.

19 |     133.    As a result of the waste of corporate assets, the Individual Defendants are liable to

20 | the Company.

21 |     134.    Plaintiff on behalf of Brocade has no adequate remedy at law.

22 | **COUNT SIX**

23 | **Against All Defendants for Unjust Enrichment**

24 |     135.    Plaintiff incorporates by reference and realleges each and every allegation set forth

25 | above, as though fully set forth herein.

26 |     136.    By their wrongful acts and omissions, defendants were unjustly enriched at the

27 | expense of and to the detriment of Brocade.

28 |

137.   Plaintiff, as a shareholder and representative of Brocade, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT SEVEN

### Professional Negligence and Accounting Malpractice Against KPMG

138.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

139.   In performing auditing and accounting services on behalf of Brocade and engaging in the wrongful actions alleged herein, Defendant KPMG knew or should have known that its client would, and did, transmit false and misleading financial information to the investing public. However, Defendant KPMG failed to discharge its duties regarding Brocade's failure to adhere to GAAP and KPMG failed to conduct its audits in accordance with GAAS by failing to detect and report the intentional errors and irregularities in the Company's financial statements.

140.   In performing the auditing and accounting services for Brocade in the manner alleged herein, Defendant KPMG breached its fiduciary duty to Brocade and its shareholders to use such skill, care and diligence as members of their profession are required to exercise.

141.   Brocade relied, to its detriment, on Defendant KPMG and was damaged thereby.

142.   As a direct, foreseeable and proximate result of Defendant KPMG's breach of said duty owed to Brocade, Brocade was damaged in an amount to be proved at trial.

## COUNT EIGHT

### Aiding and Abetting Breaches of Fiduciary Duty Against KPMG

143.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.   Defendant KPMG aided and abetted the other Defendants in breaching their fiduciary obligations owed to Brocade resulting in the wrongdoing and damages to Brocade complained of herein.  KPMG knew or should have known that Brocade's financial statements during the Relevant Period contained materially false and misleading information.  KPMG also

1    knew or should have known that the false and misleading information would be used, in whole or

2    party, by Brocade to prepare its publicly reported financial results and financial statements.

3    Nonetheless, KPMG prepared and/or approved the false and misleading financial information and

4    thereby aided and abetted Defendants' breaches of fiduciary duty complained of herein.

5         145.    As a direct, foreseeable and proximate result of Defendant KPMG's aiding and

6    abetting of Defendants' breaches of fiduciary duties, Brocade has been damaged in amounts to be

7    proven at trial.

8                                    **COUNT NINE**

9    **Against Individual Defendants Pursuant to 15 U.S.C. § 7243 (Sarbanes-Oxley Act)**

10        146.    Plaintiff incorporates by reference and realleges each and every allegation set forth

11   above, as though fully set forth herein.

12        147.    Based upon the allegations made above, and pursuant to 15 U.S.C. § 7243, Brocade

13   is entitled to reimbursement of all bonuses and other incentive-based or equity-based compensation

14   paid to the Individual Defendants, as well as any profits realized from the sale of Brocade

15   securities by them.

16                                **PRAYER FOR RELIEF**

17        WHEREFORE, plaintiff demands judgment as follows:

18        1.    Against all of the Individual Defendants and in favor of the Company for the

19   amount of damages sustained by the Company as a result of the Individual Defendants' breaches of

20   fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust

21   enrichment, and extraordinary equitable and/or injunctive relief as permitted by law, equity and

22   state statutory provisions sued hereunder, including attaching, impounding, imposing a

23   constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their

24   other assets so as to assure that plaintiff on behalf of Brocade has an effective remedy;

25        2.    Awarding to Brocade restitution from the defendants, and each of them, and

26   ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

27   Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys'

28   fees, accountants' and experts' fees, costs, and expenses; and

1    3.    Granting such other and further relief as the Court deems just and proper.

2                                **JURY DEMAND**

3        Plaintiff demands a trial by jury.

4    Dated: October 7, 2005

5                                            FARUQI & FARUQI, LLP
                                             Nadeem Faruqi
6                                            Adam Gonnelli
                                             320 East 39th Street
7                                            New York, NY 10016
                                             Telephone: (212) 983-9330
8                                            Facsimile: (212) 983-9331

9                                            FEDERMAN & SHERWOOD
                                             William B. Federman
10                                           120 N. Robinson, Suite 2720
                                             Oklahoma City, OK 73102
11                                           Telephone: (405) 235-1560
                                             Facsimile: (405) 239-2112

12
                                             Co-Lead Counsel for Plaintiffs
13
                                             BRAMSON, PLUTZIK, MAHLER &
14                                           BIRKHAEUSER, LLP
                                             Alan R. Plutzik (Bar No. 077785)
15                                           Kathryn A. Schofield (Bar No. 202393)
                                             2125 Oak Grove Road, Suite 120
16                                           Walnut Creek, California 94598
                                             Telephone: (925) 945-0200
17                                           Facsimile: (925) 945-8792

18

19

20                                           Kathryn A. Schofield

21

22                                           MARY ALEXANDER & ASSOCIATES
                                             Mary Alexander
23                                           44 Montgomery Street, Suite 1303
                                             San Francisco, CA 94104
24                                           Telephone: (415) 433-4440
                                             Facsimile: (415) 433-5440

25                                           Co-Liaison Counsel for Plaintiffs

26

27

28