1   received at least 2,712,539 faulted options.  Cuthbert sold at least 1,014,316 shares of Brocade

2   stock, receiving gross sales proceeds of $54,085,721.

3        21.    Defendants Dempsey, Leslie, and Neiman, who were members of the

4   Compensation Committee (as well as the Board) for most or all of the relevant period, shall

5   sometimes be referred to collectively as the "Compensation Committee Defendants."  As

6   members of the Compensation Committee, the Compensation Committee Defendants had a

7   special responsibility for compensation-related matters at Brocade.  To the extent they were

8   acting as Board members on compensation-related matters, the Compensation Committee

9   Defendants also owed heightened fiduciary duties to Brocade as to those matters.

10       22.    During the period from January 1999 to May 2, 2002, the Board was controlled

11  by Reyes and the Compensation Committee Defendants.  Between May 2002 and March 2003,

12  the Board was controlled by Reyes, Dempsey, and Neiman.

13                          **JURISDICTION AND VENUE**

14       23.    The claims asserted in this action arise under the Exchange Act, RICO, SOX, and

15  state law.  In connection with the acts, conduct, and other wrongs complained of in this

16  Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate

17  commerce, the facilities of a national securities market, and the United States mail.

18       24.    This Court has subject-matter jurisdiction over the action pursuant to 28 U.S.C.

19  § 1331, in that this Complaint asserts federal questions under the Exchange Act, RICO, and

20  SOX.  The Court also has subject-matter jurisdiction over the Exchange Act claims under

21  15 U.S.C. § 78aa, and over the RICO claim under 18 U.S.C. § 1964.

22       25.    This Court has supplemental jurisdiction over the state-law claims pursuant to

23  28 U.S.C. §1367(a).

24       26.    The Court has jurisdiction over Defendants, because each Defendant resides in or

25  otherwise has sufficient minimum contacts with this District so as to render the Court's exercise

26  of jurisdiction permissible.

27       27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a

28  substantial part of the events giving rise to the claims in this action occurred in this District,

8

SECOND AMENDED COMPLAINT

1   including Defendants' participation in the wrongful conduct alleged in this Complaint.  In

2   addition, Brocade is located in and conducts its business in this District; Defendants conduct

3   business in this District, and certain Defendants are citizens of California and reside in this

4   District.

5        28.     Venue in this District also is proper pursuant to 15 U.S.C. § 78aa, because acts

6   constituting violations of the Exchange Act occurred in this District and because Defendants are

7   found in, inhabit, and/or transact business in this District.

8        29.     Venue in this District also is proper pursuant to 18 U.S.C. § 1965(a), because

9   Reyes resides, is found, or transacts his affairs in this District.

10   **NATURE AND SUMMARY OF THE ACTION**

11        30.     Brocade is the leading supplier of storage area network equipment and a leading

12   provider of data center networking solutions that help enterprises connect and manage their

13   information.  The Company was founded in 1995, soon became a pioneer in developing the

14   market for storage area network-based solutions, and quickly grew into a leader in storage-

15   networking infrastructure.

16        31.     During the late 1990s, a host of technology companies in Silicon Valley and

17   elsewhere began to experience a rapid expansion in their revenues, profitability, and size of

18   operations.  To drive this growth, technology companies needed to recruit, hire, and retain large

19   numbers of highly skilled employees.

20        32.     Companies such as Brocade therefore found themselves in a highly competitive

21   labor market, and they had to act aggressively to attract top-caliber employees.  However, start-

22   up companies such as Brocade lacked the capital to compete for highly trained employees based

23   solely on cash compensation.

24        33.     Accordingly, like its competitors, Brocade used compensatory stock options to

25   attract new personnel without having to pay them large salaries.  Stock options also offered the

26   added benefit of discouraging employees from leaving, because employees could not gain the

27   full advantages of their stock options until the options had vested over a period of time.

28

9

**Stock Options and Accounting Issues**

34.     Stock options generally give employees the right to buy shares of common stock from a company at a set price – called the "exercise" or "strike" price – on a future date after the option has vested.  An option is "in the money" whenever its exercise price is lower than the stock's quoted market price.  An option is "at the money" whenever the exercise price is the same as the stock's quoted market price.  An option is "underwater," or "out of the money," whenever the exercise price is greater than the stock's quoted market price.

35.     During the relevant period, Brocade accounted for compensation expenses related to stock options under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25").  APB 25 prescribes that "[c]ompensation for services that a corporation receives as consideration for stock issued through employee stock option . . . plans should be measured by the quoted market price of the stock at the measurement date less the amount, if any, that the employee is required to pay."  This amount is the option's "intrinsic value."

36.     APB 25 also defines the measurement date for determining any compensation costs as "the first date on which are known both (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price, if any."

37.     A measurement date thus does not exist until certain information is known, including the identity of the grantee, the number of options granted, and the options' exercise price.

38.     If a stock option is granted with terms that are fixed and known on the grant date, and if those terms are not subject to any performance-related or other conditions, future changes in the option's intrinsic value are not reflected in the issuer's financial statements.  This method of accounting is commonly called "fixed accounting."

39.     In contrast, if a stock option, when granted, includes performance-related or other conditions that could affect its vesting or exercise price, or if for any other reason the option's terms cannot be assumed to be fixed, the measurement date would be delayed.  In these instances, changes in the option's intrinsic value continue to be reflected in the issuer's financial

1   statements until a measurement date is reached.  This method of accounting is commonly called

2   "variable accounting."

3           40.     Under APB 25, if a stock option has no intrinsic value on the measurement date

4   and qualifies for fixed accounting, the issuer need not recognize any compensation expense for

5   the option.  Thus, as long as an issuer grants at-the-money or out-of-the-money options with

6   fixed terms, it can provide compensation to its employees without incurring any related

7   compensation expense for the life of the option.

8           41.     This benefit was particularly important to high-tech start-up companies like

9   Brocade, which tended to be cash-poor and relied heavily on stock options to attract and retain

10  employees.

11          42.     If, however, an option is "in the money" on the measurement date, the issuer must

12  recognize the intrinsic value as compensation expense, which reduces the issuer's reported

13  earnings.

14          43.     Accordingly, for an option whose terms are fixed, the difference between the

15  quoted market price and the exercise price on the measurement date dictates whether an issuer is

16  or is not required to recognize compensation expense.  Determination of the measurement date

17  thus is critical to the accounting analysis.

18          44.     For example, if an issuer grants an option with fixed terms to an employee on

19  November 1 at a strike price of $10 per share, and if the issuer's quoted market price on that date

20  is $30 per share, the option's measurement date is November 1, and the issuer must recognize

21  compensation expense equal to $20 per share under APB 25.  If, however, the issuer's quoted

22  market price on October 1 was $10 per share, and if the issuer falsely documents (or

23  "backdates") the option's grant date (and, therefore, the measurement date) as October 1, no

24  compensation expense would appear to be required – even though, in reality, the issuer would

25  have had to record the $20-per-share expense if it had properly documented the measurement

26  date as November 1.

27          45.     APB 25 applies only to stock options granted to "employees," not to non-

28  employee service providers, independent contractors, or any other providers of goods or services

11

SECOND AMENDED COMPLAINT

1  who are not employees.  Financial Accounting Standards Board ("FASB") Interpretation 44,

2  "Accounting for Certain Transactions Involving Stock Compensation" ("FIN 44"), issued in

3  March 2000, clarified the definition of an employee under APB 25.)  Therefore, a stock option

4  cannot have an APB 25 measurement date that is earlier than the employee's start date.

5      46.     Options granted in exchange for services to be performed by consultants and other

6  non-employees must be accounted for based on the option's fair value on the date that the non-

7  employee provides the services.  The measurement date (and therefore the final determination of

8  expense) for non-employee stock options generally does not occur until the option vests.

9      47.     For example, if an employee's start date is November 1, and if he or she is

10  granted an at-the-money option on that date, the measurement date is November 1, and the issuer

11  need not recognize any compensation expense.  However, if the issuer retains the person on

12  October 1 as a consultant, or if the person performs limited or part-time services before starting

13  full-time work on November 1, or if the issuer simply grants the option on October 1 even

14  though the employee will not be performing any substantive service before his or her start date,

15  the option's measurement date under APB 25 would still be November 1 (the grantee's

16  employment-start date), and the issuer would be required to recognize compensation expense at

17  least equal to the difference between the stock's quoted market price on October 1 and its quoted

18  market price on November 1.

19      48.     It is not uncommon for companies to "reprice" options that have gone out of the

20  money due to changes in the underlying stock price after the options' grant date.  Such repricings

21  typically involve resetting the options' strike price to the quoted market price of the stock on the

22  date of the repricing.  Before the issuance of FIN 44, accounting standards did not address the

23  appropriate accounting for repricings.  Companies would often account for repricings as if the

24  repriced option had been newly granted on the repricing date with fixed terms and a strike price

25  equal to the quoted market price, resulting in no recorded compensation expense.

26      49.     With the adoption of FIN 44 in March 2000, if an issuer reduces the exercise price

27  of a stock option that previously had been accounted for using fixed accounting, the issuer must

28  account for using variable accounting from the date of the modification to the date the option is

12

1   exercised, forfeited, or expires unexercised.  FIN 44 reasons that, if the options' terms were

2   changed after having appeared to be fixed, the terms cannot be assumed to be fixed in the future.

3          50.     Additionally, under APB 25 and FIN 44, if the issuer changes the vesting terms or

4   extends the exercise period for a stock option accounted for using fixed accounting, a new

5   measurement date occurs on the date of the change in the vesting terms or exercise period.

6   Accordingly, the issuer must recognize the difference between the strike price and the quoted

7   market price on the new measurement date as compensation expense.

8          51.     There are two types of compensatory stock options for taxation purposes:

9   incentive stock options ("ISOs") and nonstatutory stock options ("NSOs").  ISOs qualify for

10  favorable tax treatment if certain conditions are met, including:  (*i*) the recipient is an employee;

11  (*ii*) the option's exercise price equals or exceeds the stock's market price on the grant date;

12  (*iii*) the option is granted under a shareholder-approved plan; and (*iv*) the employee was

13  employed for the entire period up to three months before the option's exercise date (except in the

14  case of the employee's death or disability).

15         52.     If these conditions (and others) are met, the employee's exercise of the option

16  does not result in ordinary income (or a corresponding deduction by the company), and any gain

17  on the sale of the stock is taxed at more favorable capital gains rates.  In addition, the issuer is

18  not required to withhold for ordinary income taxes and FICA taxes or pay its share of FICA

19  taxes upon exercise of an ISO.  Exercise of an NSO, by comparison, results in ordinary income

20  (and a corresponding deduction by the company) and triggers income tax and FICA tax

21  withholding and payment obligations.

22                          **Summary of Options Practices at Brocade**

23         53.     Starting in 1999 and continuing through 2004, Defendants engaged in a course of

24  conduct to enhance the compensation paid to Brocade personnel (including themselves) while

25  hiding the true financial cost of that remuneration.

26         54.     At the heart of the misconduct was an enterprise directed by Brocade's former

27  CEO, Reyes, in association with Jensen.  Reyes routinely provided extra remuneration to

28  employees through backdated stock options and participated in the falsification of documents to

1    avoid recording the required compensation expenses on the Company's financial statements.

2        55.    The Defendants individually and in concert with one another damaged Brocade

3    by causing the Company to materially misstate its equity option compensation expenses between

4    2000 and 2004, requiring Brocade to restate its published financial statements on two occasions.

5        56.    During the relevant period, Brocade's stock-option plans generally required the

6    Company to grant stock options with exercise prices based on the stock's fair market value on

7    the grant date – *i.e.*, "at-the-money" grants.  Moreover, Brocade repeatedly assured its auditors,

8    the SEC, and the public that it recognized compensation charges under APB 25 to the extent that

9    it granted any in-the-money options.

10       57.    Defendants knew, however, that they were not adhering to the option plans' terms

11   and the Company's public disclosures when granting stock options on behalf of Brocade.

12   Instead, to compete in Silicon Valley's tight labor market (while enriching themselves in the

13   process), Reyes and Jensen, as well as the other Defendants, regularly granted in-the-money

14   stock options, for which Brocade was required to record – but did not record – an expense on its

15   financial statements.

16       58.    To hide the negative impact that these additional expenses would have on

17   Brocade's reported income (and their own stock holdings and performance bonuses), Reyes,

18   Jensen, and other Defendants participated in the falsification of, and directed others to falsify,

19   Company records to create the appearance that the options had been granted at the market price

20   on an earlier date and thus did not require a compensation charge.  In so doing, Defendants

21   violated the applicable accounting rules and Brocade's own stock-option plans and internal

22   policies by manipulating the timing and exercise prices of stock-option grants.

23       59.    That manipulation took many forms, including the falsification of the dates of

24   stock-option grants, the forging of records relating to Board and Board committee meetings, and

25   the creation of various sham programs to lower the exercise prices of stock-option grants or to

26   change the options' vesting and exercise periods.

27       60.    To implement these practices, Reyes and the other Defendants manipulated the

28   authority purportedly given to Reyes to grant stock options as a Committee of One.  Reyes

14

SECOND AMENDED COMPLAINT

abused his virtually unchecked delegated power by granting in-the-money options based on falsified documentation that created the appearance that the options had been granted on an earlier date, when the stock's market price was lower. Reyes also granted stock options to persons and under option plans that were not within the bounds of his delegated authority.

61.    Reyes carried out this enterprise with Jensen's assistance. Reyes directed Jensen and others to prepare documentation of options grants for his signature.

62.    Jensen and other members of her HR Department provided Reyes with a list (by name of employee, number of options, hire date for new hires, and other information) of options granted at a purported "Compensation Committee Meeting" occurring on a given date. Jensen and her supervisees also supplied Reyes with Brocade's stock-price history over a period of time. Jensen or other employees under her direction highlighted the lowest closing price during the relevant period, which was at times as long as three months. Reyes then signed the documentation for each such grant, attesting that he, as a Committee of One, had granted the options to the specified persons on that date.

63.    The documentation supplied by Jensen and her department purported to specify the date on which the Committee-of-One meeting occurred. In reality, however, the specified date was simply the date selected from Brocade's stock-price history because it was the date with the lowest (or nearly the lowest) closing stock price in the period.

64.    Thus, Reyes and Jensen both knew that Reyes had not granted the options on the supposed grant date. Instead, at a later date when the market price was higher, Reyes and Jensen had backdated the grant documentation to an earlier date, using hindsight, to create the appearance that the options had been granted on the earlier date at a lower exercise price.

65.    Various other Defendants also knew about and participated in these faulted Committee-of-One grants. And the Board members responsible for supervising Reyes' activities breached their duties to Brocade in failing to monitor them.

66.    In addition to manipulating the Committee-of-One minutes for rank-and-file employees, Defendants also participated in the falsification of records for the Board's and the Compensation Committee's stock-option grants to senior executives (including to some of the

1  Defendants themselves).

2      67.    For example, on April 17, 2001, the Compensation Committee, consisting of

3  Dempsey and Leslie, purportedly approved the issuance of options to eight Brocade executives,

4  including Reyes. But no such meeting occurred. The meeting did not appear on either

5  Dempsey's or Leslie's personal calendars, and Reyes was in Boston that day for the Boston

6  Marathon. However, by using April 17 as the purported grant date, the Defendants involved

7  with that grant were able to award options at an exercise price equal to the lowest price for

8  Brocade's shares during April 2001. The timing thus enhanced the options' value, and the

9  manipulations caused Brocade not to book the necessary compensation charge.

10     68.    Defendants also manipulated the grant dates for new hires in an effort to find

11  supposedly cost-free ways to attract key employees. For example, Byrd, with other Defendants'

12  knowledge and consent, implemented a program that allowed new hires to select their own grant

13  date, which could be any time between their hire date and the end of the calendar year. This

14  practice had the effect of permitting employees retroactively to select the lowest price for their

15  grant, in contravention of the stock-option plans' terms.

16     69.    In some instances, Defendants gave new hires even more latitude to select a low

17  exercise price by implementing a "part-time" program that created artificially early start dates for

18  new employees. Byrd created this program as well. Byrd would invent a "part-time" start date

19  for certain employees as soon as they were offered a position at Brocade. The employees then

20  were permitted to select any grant date after that "part-time" start, regardless of whether they

21  actually were performing work for Brocade during that period. This program was frequently

22  used by some groups such as the engineering group headed by Bonderson.

23     70.    These and other similar practices led Brocade to issue tens of millions of faulted

24  stock options that were mispriced under the Company's plans and policies.

25     71.    Defendants hid these practices and the true cost of the manipulated grants by

26  deceiving Brocade's independent auditors and signing false and misleading financial statements.

27  For example, Reyes falsely represented in letters to Brocade's external auditors that the

28  Company's financial statements were fairly presented in accordance with generally accepted

16

SECOND AMENDED COMPLAINT

1    accounting principles ("GAAP") and that he was not aware of any instances of fraud involving

2    management or any material transactions that had not been properly recorded.  Additionally,

3    Reyes and Canova repeatedly signed SOX certifications that falsely assured investors that

4    nothing untrue had been disclosed in Brocade's Forms 10-K and 10-Q filings and that any

5    instances of fraud had been reported to Brocade's Audit Committee and external auditors.

6          72.    In reality, however, Defendants were not recording the compensation expenses

7    that APB 25 required Brocade to record for the manipulated stock options.

8          73.    During fiscal years 2000 through 2004, defendants Byrd, Canova, and Bossi

9    prepared financial statements and other documents that contained materially false and misleading

10   statements that Brocade was recording appropriate compensation charges for the stock-option

11   grants it made employees and that materially misrepresented the magnitude of the charges so

12   recorded.  Reyes, Byrd, Canova, Dempsey, Leslie, and Neiman falsely swore to the veracity of

13   those disclosures.

14         74.    These artifices allowed Defendants to hire and retain key employees while hiding

15   the true costs of their actions from the Company, allowing them to falsely inflate the quality of

16   Brocade's financial performance.  Moreover, virtually all of the Defendants received faulted

17   stock options.

18         75.    Defendants' practices also increased both the volume and the value of the stock

19   options that Defendants received – and allowed Defendants to sell substantial amounts of

20   Brocade stock.  In other words, the manipulative practices allowed Defendants to enrich

21   themselves at the expense of the Company and its shareholders.

**Discovery of Options and Accounting Problems at Brocade**

23         76.    Defendants' misconduct was first discovered in late 2004 and in 2005.

24         77.    In late October 2004, Brocade received a draft complaint that a terminated

25   employee named Daniel Cudgma said he intended to file against the Company.  Cudgma himself

26   had received backdated options under Brocade's "part-time" program when he first joined the

27   Company.  Reyes and Jensen later repriced the options to a more favorable exercise price by

28   purporting to change the grant date when Cudgma threatened to leave to work for Cisco.

17

SECOND AMENDED COMPLAINT

1   Cudgma's draft complaint described these options manipulations, including Reyes' role in the

2   repricing.

3        78.    Brocade turned over the Cudgma complaint to the Board's Audit Committee,

4   which promptly began an investigation on November 1, 2004 into alleged option-granting

5   improprieties at the Company (the "First Investigation").

6                         Internal Investigations and Restatements

7        79.    The First Investigation focused on the grant process for the period May 1999

8   through October 2004.  The two principal issues were (*i*) how Brocade accounted for grants to

9   new employees hired between May 1999 and October 2002 and (*ii*) documentation for grants

10  that Reyes approved in his Committee-of-One capacity.

11       80.    The Audit Committee completed the First Investigation in early January 2005 and

12  concluded that Brocade had incorrectly accounted for stock-based compensation granted to new

13  hires between May 1999 and July 2000 and to persons purportedly working for Brocade on a

14  part-time basis before their full-time employment between August 2000 and October 2002.  The

15  Audit Committee determined that grants to employees before their actual start dates did not meet

16  the requirements for establishing a measurement date and that fixed accounting thus could not be

17  used for those grants.

18       81.    The Audit Committee also concluded that some of Reyes' grants as a Committee

19  of One lacked contemporaneous information to corroborate the dates that appeared on the

20  documents evidencing the grants.  The Committee suspected that minutes of meetings

21  documenting certain grants might have been backdated to provide lower exercise prices for the

22  stock options granted.  In addition, the Audit Committee found that HR records had been altered

23  for five employees (Cudgma, Steve Daheb, Richard Geruson, Andy Taylor, and Dean Traut) to

24  give them lower exercise prices on their options.

25       82.    On January 6, 2005, Brocade announced that it expected to restate certain of its

26  financial statements to record additional stock-based compensation expenses as a result of the

27  First Investigation.  The press release stated that the Audit Committee's review had "determined

28  that the way in which [Brocade] accounted for stock option grants was incorrect and requires

                                        18
                              SECOND AMENDED COMPLAINT