DEWEY & LEBOEUF LLP
Barbara A. Caulfield (SBN 108999)
E-mail: bcaulfield@dl.com
Peter E. Root (SBN 142348)
E-mail: proot@dl.com
1950 University Avenue, Suite 500
East Palo Alto, California 94303
Telephone:      (650) 845-7000
Facsimile:      (650) 845-7333

DEWEY & LEBOEUF LLP
1101 New York Avenue, N.W., Suite 1100
Washington, DC 20005
Telephone:      (202) 346-8000
Facsimile:      (202) 346-8102

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone:      (212) 259-8537
Facsimile:      (212) 259-6333

Attorneys for
BROCADE COMMUNICATIONS SYSTEMS, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

IN RE BROCADE COMMUNICATIONS
SYSTEMS, INC. DERIVATIVE LITIGATION

This Documents Relates to:

ALL ACTIONS

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. C 05-02233 CRB

**SUBMISSION OF SECOND
AMENDED COMPLAINT WITH
ERRATA CORRECTED**

*DEWEY & LeBOEUF LLP*
*1950 University Avenue, Suite 500*
*East Palo Alto, CA 94303-2225*

1       Brocade Communications Systems, Inc. ("Brocade") filed a Notice of Erratum on August 4,

2   2008 (Docket No. 226) regarding the Second Amended Complaint filed by Brocade (Docket No.

3   220), which Notice of Erratum gave notice that pages 81-90 of the Second Amended Complaint

4   were inadvertently omitted from the electronic filing of the Second Amended Complaint, and

5   attached copies of the omitted pages.

6       Brocade hereby submits and attaches hereto a complete copy of the Second Amended

7   Complaint with the previously omitted pages (pages 81-90) inserted therein.

8

9   Dated:  August 6, 2008                    DEWEY & LEBOEUF LLP

10

11                                            By: /s/ Peter E. Root
                                              Barbara A. Caulfield (SBN 108999)
12                                            E-mail: bcaulfield@dl.com
                                              Peter E. Root (SBN 142348)
13                                            E-mail: proot@dl.com
                                              1950 University Avenue, Suite 500
14                                            East Palo Alto, California 94303
                                              Telephone:     (650) 845-7000
15                                            Facsimile:     (650) 845-7333

16
                                              Attorneys for
17                                            BROCADE COMMUNICATIONS SYSTEMS, INC.

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT WITH
ERRATUM CORRECTED - CASE NO.:  C-05-02233 CRB

**DEWEY & LeBOEUF LLP**
1950 University Avenue, Suite 500
East Palo Alto, CA 94303-2225

1  DEWEY & LEBOEUF LLP
   1950 University Avenue, Suite 500
2  East Palo Alto, California  94303
   Tel:  (650) 845-7000
3  Fax:  (650) 845-7333

4  DEWEY & LEBOEUF LLP
   1101 New York Avenue, N.W., Suite 1100
5  Washington, D.C.  20005
   Tel:  (202) 346-8000
6  Fax:  (202) 346-8102

7

   *Attorneys for Plaintiff*
8  *Brocade Communications Systems, Inc.*

9

10            **UNITED STATES DISTRICT COURT**

11           **NORTHERN DISTRICT OF CALIFORNIA**

12  _____
                                        )
13  **BROCADE COMMUNICATIONS**           )
    **SYSTEMS, INC.,**                   )
14                                       )
                     **Plaintiff,**      )  **Case No. C05-02233 CRB**
15                                       )
    **vs.**                              )
16                                       )
    **GREGORY L. REYES, STEPHANIE**      )  **SECOND AMENDED COMPLAINT**
17  **JENSEN, MICHAEL J. BYRD, ANTONIO** )
    **CANOVA, NEAL DEMPSEY, MARK**       )
18  **LESLIE, SETH D. NEIMAN, PAUL R.**  )
    **BONDERSON, JR., ROBERT D. BOSSI,** )
19  **AND JACK CUTHBERT,**               )  <u>**JURY TRIAL DEMANDED**</u>
                                        )
20                 **Defendants.**       )
    _____)
21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2  Introduction ................................................................................................................1

3  The Parties ................................................................................................................3

4  Jurisdiction and Venue ...........................................................................................8

5  Nature and Summary of the Action .......................................................................9

6  Brocade's Option-Granting Process .....................................................................27

7  Committee-of-One Grants ....................................................................................38

8  Compensation Committee Grants ......................................................................103

9  Board of Directors Grants ..................................................................................109

10  Leaves of Absence and Related Matters ............................................................120

11  Brocade's Finance Department ..........................................................................137

12  Defendants' Knowledge and Roles:  General Allegations ...............................150

13  Defendants' Knowledge and Roles:  Defendant-Specific Allegations ............173

14  Harms Suffered By Brocade ..............................................................................248

15  FIRST CAUSE OF ACTION .............................................................................250

16  SECOND CAUSE OF ACTION ........................................................................260

17  THIRD CAUSE OF ACTION ............................................................................262

18  FOURTH CAUSE OF ACTION ........................................................................264

19  FIFTH CAUSE OF ACTION .............................................................................266

20  SIXTH CAUSE OF ACTION .............................................................................267

21  SEVENTH CAUSE OF ACTION ......................................................................268

22  EIGHTH CAUSE OF ACTION .........................................................................270

23  NINTH CAUSE OF ACTION ............................................................................271

24  TENTH CAUSE OF ACTION ...........................................................................276

25  ELEVENTH CAUSE OF ACTION ...................................................................277

26  TWELFTH CAUSE OF ACTION ......................................................................279

27  THIRTEENTH CAUSE OF ACTION ...............................................................279

28  Prayer For Relief ...............................................................................................280

1

Jury Demand ................................................................................................................282

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT

1    **<u>SECOND AMENDED COMPLAINT</u>**

2    "Q.    Did you come to understand that one of Brocade's kind of corporate

3    philosophies or policies was to try to get the most advantageous stock price for –

4    or stock option price for its employees?

5    A.    Yes." – Paul R. Bonderson, Jr.

6

7    "Q.    Do you believe Mr. Reyes understood the implications of granting an

8    option below fair market value?

9    A.    Well, . . . I don't know how you could work in Silicon Valley and not

10    know the implications of that, so . . . yeah." – Craig Isom (Arthur Andersen

11    partner on Brocade account)

12

13    "IT IS ILLEGAL TO BACK DATE OPTION GRANTS." – Gregory L. Reyes

14    * * * *

15    Plaintiff Brocade Communications Systems, Inc. ("Brocade" or the "Company"),

16    by its attorneys and acting through the Special Litigation Committee of its Board of Directors,

17    submits this Second Amended Complaint (the "Complaint") and alleges as follows:

18    **INTRODUCTION**

19    1.    Brocade brings this action against ten of its former officers, directors, and

20    employees (collectively, the "Defendants") for losses it has suffered as a result of a six-year

21    scheme in which Defendants sought to provide enhanced compensation to Brocade personnel

22    (including themselves) while understating and misrepresenting the financial costs of the extra

23    compensation they were distributing.  Defendants implemented this scheme by backdating and

24    otherwise manipulating the Company's stock options, falsifying employment records and

25    documents relating to stock options, filing inaccurate financial statements with the Securities and

26    Exchange Commission (the "SEC"), and making misrepresentations to Brocade's independent

27    auditors and the public.

28    2.    The revelation of Defendants' conduct required Brocade to restate its prior

---

SECOND AMENDED COMPLAINT

1    financial statements twice in 2005 to reflect hundreds of millions of dollars in previously

2    unreported non-cash compensation expenses arising from improper conduct related to stock

3    options.

4    　　　　3.    The results of this misconduct have been devastating.  Brocade already has spent

5    hundreds of millions of dollars to investigate the underlying activity, to defend legal actions by

6    shareholders and government regulators, to advance defense costs to Defendants and other

7    present and former personnel in connection with governmental and private investigations and

8    judicial proceedings, and to settle a shareholder class action asserting that Brocade had

9    misrepresented its financial condition between 2000 and 2005.  In addition, Brocade was unable

10   to complete a sale of the Company because of the accounting issues and other problems arising

11   from the options-backdating scheme.  And two defendants – Brocade's former Chairman and

12   Chief Executive Officer and its former Vice President of Human Resources – were found guilty

13   of federal criminal charges and were sentenced to prison terms.

14   　　　　4.    On or about February 22, 2008, Brocade's Board of Directors established a

15   Special Litigation Committee (the "SLC") to act on behalf of the Company in connection with

16   various shareholder derivative actions that had been filed in federal and state courts.  The Board

17   gave the SLC plenary authority to pursue or resolve the claims raised in the derivative actions

18   and all other claims relating to Brocade's historical stock-option practices.

19   　　　　5.    The SLC has concluded that the Company's best interest would be served by

20   seeking to hold Defendants responsible for the damage they inflicted on Brocade.

21   　　　　6.    The SLC, on behalf of Brocade, therefore decided to assert claims against

22   Defendants for one or more of the following:  (*i*) violation of the Racketeering Influenced and

23   Corrupt Organizations Act ("RICO"); (*ii*) violation of section 10(b) of the Securities Exchange

24   Act of 1934 (the "Exchange Act") and SEC Rule 10b-5; (*iii*) forfeiture of bonuses and stock-

25   trading profits pursuant to section 304 of the Sarbanes-Oxley Act ("SOX"); (*iv*) violation of

26   section 13(b) of the Exchange Act and SEC Rules 13b2-1 and 13b2-2; (*v*) breach of the fiduciary

27   duty of care; (*vi*) breach of the fiduciary duty of loyalty in connection with self-dealing

28   transactions; (*vii*) breach of the fiduciary duty of loyalty and the obligation to act in good faith;

(*viii*) breach of the fiduciary duty of loyalty in connection with a failure of oversight; (*ix*) fraud and deceit, in violation of sections 1709 and 1710 of the California Civil Code; (*x*) contribution; (*xi*) unjust enrichment; (*xii*) breach of an employee's duty of undivided loyalty to an employer; and (*xiii*) aiding and abetting breaches of fiduciary duty.

7.    This Complaint is based on Brocade's books and records and on information and belief.

8.    The Complaint will first identify the parties and the bases for jurisdiction and venue, and will summarize the background of the case and the underlying facts.  The Complaint then will discuss the stock-option process at Brocade in greater detail, describing the various plans under which stock options were granted and some of the categories of grants that Brocade made.  The Complaint next will describe stock-option grants made by the "Committee of One" (Greg Reyes, acting in his sole capacity), the Compensation Committee, and the Board of Directors, with specific facts about particular faulted grants.  The Complaint then will discuss faulted grants made to departing employees and to employees on leaves of absence.  Next will come a discussion of the Finance Department's activities.

9.    The Complaint then will address certain information generally available to Defendants about Brocade's stock-option policies and the accounting implications of not following them and granting "in-the-money" options.  The next section will address each Defendant individually, summarizing his or her involvement in the various activities previously discussed, and alleging additional allegations specifically relating to his or her liability to Brocade.  The Complaint then will address the harms that Brocade suffered as a result of Defendants' misconduct and will lay out the causes of action asserted against the various Defendants.

## THE PARTIES

10.    Plaintiff Brocade Communications Systems, Inc. was originally incorporated as a California corporation in August 1995.  In 1999, the Company was reincorporated in Delaware and made an initial public offering (the "IPO") of its shares.  Brocade is currently listed on the NASDAQ Global Select Market.  Brocade employs almost 2,400 people worldwide and is the

leading supplier of storage area network equipment and a leading provider of data center networking solutions that help enterprises connect and manage their information.

11.    Defendant Gregory L. Reyes was Brocade's Chief Executive Officer (the "CEO") from July 1998 until January 2005. From January 2005 until July 2005, Reyes was an advisor to the Company. Reyes served as Brocade's President from July 1998 until May 2001 and was the Chairman of its Board of Directors from May 2001 until January 2005. Reyes served as a Brocade director from July 1998 through April 2005. He was a Section 16 officer of the Company from 1999 to early 2005. Reyes was involved with and often solely responsible for granting faulted stock options to employees, routinely approving grants as a Committee of One for Brocade's Board. As a Board member, Reyes was involved in stock-option grants to officers and directors, including himself. Reyes knew of the improper option-granting practices at Brocade. He also signed financial statements that later needed to be restated or corrected because they had incorrectly reported Brocade's compensation-related expenses. Reyes received at least 13,272,133 faulted stock options. He sold at least 14,591,023 shares of Brocade stock, receiving gross sales proceeds of $581,295,038. (All numbers of shares or options and all prices in this Complaint have been adjusted, except in quoted materials or where otherwise noted, to reflect three 2-for-1 stock splits effective December 3, 1999, March 15, 2000, and December 22, 2000.)

12.    Defendant Stephanie Jensen was Brocade's Vice President of Human Resources ("HR") from October 1999 until February 2004. Jensen then served as a consultant to the Company from February 2004 until August 2004. As Vice President of HR, Jensen was responsible for Brocade's compensation and benefits programs, including stock options. Jensen participated in and facilitated the granting of faulted stock options, including by altering Brocade's records, and she knew of the improper option-granting practices at Brocade. Jensen received at least 1,129,901 faulted stock options. She sold at least 564,242 shares of Brocade stock, receiving gross sales proceeds of $24,604,671. Before joining Brocade in October 1999, Jensen had held other HR positions, including Senior Director of HR at Apple Computer, Director of HR at Net Dynamics, and Senior Director of HR at Netscape.

13. Defendant Michael J. Byrd was Brocade's Vice President and Chief Financial Officer ("CFO") from May 1999 until May 2001. Byrd then served as Brocade's Chief Operating Officer ("COO") and President from June 2001 to January 2003. Byrd was a Section 16 officer of the Company from 1999 until 2002. As CFO and COO, Byrd was aware of and participated in Brocade's faulted stock-option grant processes. Byrd also signed certain of Brocade's financial statements that later needed to be corrected because they had inaccurately reported Brocade's compensation-related expenses. Byrd received at least 4,531,268 faulted stock options. He sold at least 1,651,480 shares of Brocade stock, receiving gross sales proceeds of $96,631,676. Before joining Brocade in 1999, Byrd had served as CFO of Maxim Integrated Products from February 1994 to April 1999 and had worked at the accounting firm of Ernst & Young LLP – where he had been a partner – from 1982 to 1994.

14. Defendant Antonio Canova was Brocade's Vice President, Finance from November 2000 until November 2004, and Brocade's Vice President, Administration from November 2004 to December 2005. Canova also served as Brocade's CFO from May 2001 until December 2005. Canova was a Section 16 officer of the Company from 2001 until 2005. As CFO and Vice President of Finance, Canova was involved in the granting of faulted stock options and was aware of the improper option-granting practices at Brocade. He also had responsibility to ensure that Brocade properly accounted for and reported its stock-option expenses. Canova signed certain of Brocade's financial statements that later needed to be restated because they had incorrectly reported Brocade's compensation-related expenses. Canova received at least 1,441,506 faulted stock options. Canova sold at least 776,927 shares of Brocade stock, receiving gross sales proceeds of $7,948,589. Before joining Brocade in November 2000, Canova had served as Executive Vice President, CFO, and Secretary of Wireless, Inc. from April to November 2000, and had worked at the accounting firm of KPMG – where he had been an audit partner – from 1984 to 2000.

15. Defendant Neal Dempsey served on Brocade's Board of Directors from at least December 1996 through April 2007. Dempsey sat on the Board's Audit Committee from at least February 26, 1998 through October 2004 and on the Compensation Committee from at least

1    February 26, 1998 through at least February 2007.  As a member of the Board and the

2    Compensation Committee, Dempsey was involved in granting stock options to officers and

3    directors and in ratifying grants to employees, and he was aware of the improper option-granting

4    practices at Brocade.  Dempsey also signed certain of Brocade's financial statements that later

5    needed to be restated or corrected because they had incorrectly reported Brocade's

6    compensation-related expenses.  Dempsey received at least 155,000 faulted stock options.  He

7    sold at least 378,868 shares of Brocade stock, receiving gross sales proceeds of $21,045,719.

8    Dempsey has been a general partner of Bay Partners – a venture-capital firm – from 1989 to the

9    present.  He also has served on numerous boards of directors.

10        16.    Defendant Mark Leslie served on Brocade's Board of Directors from January

11   1999 until May 2002.  Leslie sat on the Audit Committee from June 2001 until May 2002.

12   Leslie was on the Compensation Committee from March 1999 until August 2001.  As a member

13   of the Board and the Compensation Committee, Leslie was involved in granting stock options to

14   officers and directors and in ratifying grants to employees, and he was aware of the improper

15   option-granting practices at Brocade.  Leslie also signed certain of Brocade's financial

16   statements that later needed to be restated or corrected because they had incorrectly reported

17   Brocade's compensation-related expenses.  Leslie received at least 60,000 faulted options.  He

18   sold at least 804,848 shares of Brocade stock, receiving gross sales proceeds of $37,793,225.

19   Leslie also served as the CEO of Veritas Software, Inc. from 1990 to November 2000, and he has

20   been a member of numerous boards of directors.

21        17.    Defendant Seth D. Neiman was one of Brocade's founders, and he served on the

22   Company's Board of Directors from August 1995 until April 2006.  Neiman sat on the

23   Compensation Committee from August 2001 until October 2004, and on the Audit Committee

24   from at least February 26, 1998 until October 2001.  In addition, Neiman served as Brocade's

25   CEO in 1995 and 1996.  As a member of the Board and the Compensation Committee, Neiman

26   was involved in granting stock options to officers and directors and in ratifying grants to

27   employees, and he was aware of the improper option-granting practices at Brocade.  Neiman also

28   signed certain of Brocade's financial statements that later needed to be restated or corrected

6

1    because they had incorrectly reported Brocade's compensation-related expenses.  Neiman

2    received at least 155,000 faulted options.  He sold at least 3,522,756 shares of Brocade stock,

3    receiving gross sales proceeds of $197,570,276.  Neiman has been a partner in Crosspoint

4    Venture Partners – a venture-capital firm – from 1994 to the present.  He also has served as a

5    director on numerous boards of directors.

6            18.    Defendant Paul R. Bonderson, Jr. was one of Brocade's founders.  From August

7    1995 until November 2001, Bonderson served as Brocade's Vice President of Engineering.

8    From November 2001 until January 2003, Bonderson was the Vice President of Strategic

9    Development.  Bonderson served as the Company's Chief Technology Officer and Chief

10   Engineer from April 2003 until his retirement in early 2005.  Bonderson was a Section 16 officer

11   from 1999 to 2001 and from 2003 to 2004.  Bonderson was involved in the granting and pricing

12   of employees' stock options and was aware of the improper option-granting practices at the

13   Company.  Bonderson received at least 1,486,446 faulted options.  He sold at least 4,838,640

14   shares of Brocade stock, receiving gross sales proceeds of $273,355,777.

15           19.    Defendant Robert D. Bossi was Brocade's Controller from May 1999 until June

16   2003.  As Controller, Bossi participated in administrative and reporting functions relating to

17   stock options.  Bossi was involved in preparing Brocade's financial statements that needed to be

18   restated or corrected.  He also was involved in various faulted grants of stock options and was

19   aware of the improper option-granting practices at Brocade.  Bossi received at least 415,498

20   faulted options.  He sold at least 233,974 shares of Brocade stock, receiving gross sales proceeds

21   of $12,918,118.  Before joining Brocade in 1999, Bossi had worked at two technology

22   companies in the 1990s, and at the accounting firm of Coopers & Lybrand for eight years in the

23   1980s as a financial reporting manager and/or revenue reporting manager.

24           20.    Defendant Jack Cuthbert joined Brocade in 1998 as Director Channel Sales.  He

25   served as Vice President, North American Sales in 1999, as Vice President, Worldwide Sales

26   from 2000 to 2003, and as Vice President, OEM sales from 2003 through 2004.  Cuthbert was a

27   Section 16 officer from 2000 until 2003.  Cuthbert was involved in Brocade's stock-option

28   grants and was aware of the improper option-granting practices at the Company.  Cuthbert

1  received at least 2,712,539 faulted options.  Cuthbert sold at least 1,014,316 shares of Brocade

2  stock, receiving gross sales proceeds of $54,085,721.

3       21.    Defendants Dempsey, Leslie, and Neiman, who were members of the

4  Compensation Committee (as well as the Board) for most or all of the relevant period, shall

5  sometimes be referred to collectively as the "Compensation Committee Defendants."  As

6  members of the Compensation Committee, the Compensation Committee Defendants had a

7  special responsibility for compensation-related matters at Brocade.  To the extent they were

8  acting as Board members on compensation-related matters, the Compensation Committee

9  Defendants also owed heightened fiduciary duties to Brocade as to those matters.

10       22.    During the period from January 1999 to May 2, 2002, the Board was controlled

11  by Reyes and the Compensation Committee Defendants.  Between May 2002 and March 2003,

12  the Board was controlled by Reyes, Dempsey, and Neiman.

13                    **JURISDICTION AND VENUE**

14       23.    The claims asserted in this action arise under the Exchange Act, RICO, SOX, and

15  state law.  In connection with the acts, conduct, and other wrongs complained of in this

16  Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate

17  commerce, the facilities of a national securities market, and the United States mail.

18       24.    This Court has subject-matter jurisdiction over the action pursuant to 28 U.S.C.

19  § 1331, in that this Complaint asserts federal questions under the Exchange Act, RICO, and

20  SOX.  The Court also has subject-matter jurisdiction over the Exchange Act claims under

21  15 U.S.C. § 78aa, and over the RICO claim under 18 U.S.C. § 1964.

22       25.    This Court has supplemental jurisdiction over the state-law claims pursuant to

23  28 U.S.C. §1367(a).

24       26.    The Court has jurisdiction over Defendants, because each Defendant resides in or

25  otherwise has sufficient minimum contacts with this District so as to render the Court's exercise

26  of jurisdiction permissible.

27       27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a

28  substantial part of the events giving rise to the claims in this action occurred in this District,

1   including Defendants' participation in the wrongful conduct alleged in this Complaint.  In

2   addition, Brocade is located in and conducts its business in this District; Defendants conduct

3   business in this District, and certain Defendants are citizens of California and reside in this

4   District.

5          28.    Venue in this District also is proper pursuant to 15 U.S.C. § 78aa, because acts

6   constituting violations of the Exchange Act occurred in this District and because Defendants are

7   found in, inhabit, and/or transact business in this District.

8          29.    Venue in this District also is proper pursuant to 18 U.S.C. § 1965(a), because

9   Reyes resides, is found, or transacts his affairs in this District.

10                       **NATURE AND SUMMARY OF THE ACTION**

11         30.    Brocade is the leading supplier of storage area network equipment and a leading

12  provider of data center networking solutions that help enterprises connect and manage their

13  information.  The Company was founded in 1995, soon became a pioneer in developing the

14  market for storage area network-based solutions, and quickly grew into a leader in storage-

15  networking infrastructure.

16         31.    During the late 1990s, a host of technology companies in Silicon Valley and

17  elsewhere began to experience a rapid expansion in their revenues, profitability, and size of

18  operations.  To drive this growth, technology companies needed to recruit, hire, and retain large

19  numbers of highly skilled employees.

20         32.    Companies such as Brocade therefore found themselves in a highly competitive

21  labor market, and they had to act aggressively to attract top-caliber employees.  However, start-

22  up companies such as Brocade lacked the capital to compete for highly trained employees based

23  solely on cash compensation.

24         33.    Accordingly, like its competitors, Brocade used compensatory stock options to

25  attract new personnel without having to pay them large salaries.  Stock options also offered the

26  added benefit of discouraging employees from leaving, because employees could not gain the

27  full advantages of their stock options until the options had vested over a period of time.

28

**Stock Options and Accounting Issues**

34.    Stock options generally give employees the right to buy shares of common stock from a company at a set price – called the "exercise" or "strike" price – on a future date after the option has vested.  An option is "in the money" whenever its exercise price is lower than the stock's quoted market price.  An option is "at the money" whenever the exercise price is the same as the stock's quoted market price.  An option is "underwater," or "out of the money," whenever the exercise price is greater than the stock's quoted market price.

35.    During the relevant period, Brocade accounted for compensation expenses related to stock options under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25").  APB 25 prescribes that "[c]ompensation for services that a corporation receives as consideration for stock issued through employee stock option . . . plans should be measured by the quoted market price of the stock at the measurement date less the amount, if any, that the employee is required to pay."  This amount is the option's "intrinsic value."

36.    APB 25 also defines the measurement date for determining any compensation costs as "the first date on which are known both (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price, if any."

37.    A measurement date thus does not exist until certain information is known, including the identity of the grantee, the number of options granted, and the options' exercise price.

38.    If a stock option is granted with terms that are fixed and known on the grant date, and if those terms are not subject to any performance-related or other conditions, future changes in the option's intrinsic value are not reflected in the issuer's financial statements.  This method of accounting is commonly called "fixed accounting."

39.    In contrast, if a stock option, when granted, includes performance-related or other conditions that could affect its vesting or exercise price, or if for any other reason the option's terms cannot be assumed to be fixed, the measurement date would be delayed.  In these instances, changes in the option's intrinsic value continue to be reflected in the issuer's financial

1  statements until a measurement date is reached.  This method of accounting is commonly called

2  "variable accounting."

3        40.     Under APB 25, if a stock option has no intrinsic value on the measurement date

4  and qualifies for fixed accounting, the issuer need not recognize any compensation expense for

5  the option.  Thus, as long as an issuer grants at-the-money or out-of-the-money options with

6  fixed terms, it can provide compensation to its employees without incurring any related

7  compensation expense for the life of the option.

8        41.     This benefit was particularly important to high-tech start-up companies like

9  Brocade, which tended to be cash-poor and relied heavily on stock options to attract and retain

10  employees.

11        42.     If, however, an option is "in the money" on the measurement date, the issuer must

12  recognize the intrinsic value as compensation expense, which reduces the issuer's reported

13  earnings.

14        43.     Accordingly, for an option whose terms are fixed, the difference between the

15  quoted market price and the exercise price on the measurement date dictates whether an issuer is

16  or is not required to recognize compensation expense.  Determination of the measurement date

17  thus is critical to the accounting analysis.

18        44.     For example, if an issuer grants an option with fixed terms to an employee on

19  November 1 at a strike price of $10 per share, and if the issuer's quoted market price on that date

20  is $30 per share, the option's measurement date is November 1, and the issuer must recognize

21  compensation expense equal to $20 per share under APB 25.  If, however, the issuer's quoted

22  market price on October 1 was $10 per share, and if the issuer falsely documents (or

23  "backdates") the option's grant date (and, therefore, the measurement date) as October 1, no

24  compensation expense would appear to be required – even though, in reality, the issuer would

25  have had to record the $20-per-share expense if it had properly documented the measurement

26  date as November 1.

27        45.     APB 25 applies only to stock options granted to "employees," not to non-

28  employee service providers, independent contractors, or any other providers of goods or services

1    who are not employees.  Financial Accounting Standards Board ("FASB") Interpretation 44,

2    "Accounting for Certain Transactions Involving Stock Compensation" ("FIN 44"), issued in

3    March 2000, clarified the definition of an employee under APB 25.)  Therefore, a stock option

4    cannot have an APB 25 measurement date that is earlier than the employee's start date.

5        46.    Options granted in exchange for services to be performed by consultants and other

6    non-employees must be accounted for based on the option's fair value on the date that the non-

7    employee provides the services.  The measurement date (and therefore the final determination of

8    expense) for non-employee stock options generally does not occur until the option vests.

9        47.    For example, if an employee's start date is November 1, and if he or she is

10   granted an at-the-money option on that date, the measurement date is November 1, and the issuer

11   need not recognize any compensation expense.  However, if the issuer retains the person on

12   October 1 as a consultant, or if the person performs limited or part-time services before starting

13   full-time work on November 1, or if the issuer simply grants the option on October 1 even

14   though the employee will not be performing any substantive service before his or her start date,

15   the option's measurement date under APB 25 would still be November 1 (the grantee's

16   employment-start date), and the issuer would be required to recognize compensation expense at

17   least equal to the difference between the stock's quoted market price on October 1 and its quoted

18   market price on November 1.

19       48.    It is not uncommon for companies to "reprice" options that have gone out of the

20   money due to changes in the underlying stock price after the options' grant date.  Such repricings

21   typically involve resetting the options' strike price to the quoted market price of the stock on the

22   date of the repricing.  Before the issuance of FIN 44, accounting standards did not address the

23   appropriate accounting for repricings.  Companies would often account for repricings as if the

24   repriced option had been newly granted on the repricing date with fixed terms and a strike price

25   equal to the quoted market price, resulting in no recorded compensation expense.

26       49.    With the adoption of FIN 44 in March 2000, if an issuer reduces the exercise price

27   of a stock option that previously had been accounted for using fixed accounting, the issuer must

28   account for using variable accounting from the date of the modification to the date the option is

1  exercised, forfeited, or expires unexercised.  FIN 44 reasons that, if the options' terms were

2  changed after having appeared to be fixed, the terms cannot be assumed to be fixed in the future.

3      50.    Additionally, under APB 25 and FIN 44, if the issuer changes the vesting terms or

4  extends the exercise period for a stock option accounted for using fixed accounting, a new

5  measurement date occurs on the date of the change in the vesting terms or exercise period.

6  Accordingly, the issuer must recognize the difference between the strike price and the quoted

7  market price on the new measurement date as compensation expense.

8      51.    There are two types of compensatory stock options for taxation purposes:

9  incentive stock options ("ISOs") and nonstatutory stock options ("NSOs").  ISOs qualify for

10  favorable tax treatment if certain conditions are met, including:  (*i*) the recipient is an employee;

11  (*ii*) the option's exercise price equals or exceeds the stock's market price on the grant date;

12  (*iii*) the option is granted under a shareholder-approved plan; and (*iv*) the employee was

13  employed for the entire period up to three months before the option's exercise date (except in the

14  case of the employee's death or disability).

15      52.    If these conditions (and others) are met, the employee's exercise of the option

16  does not result in ordinary income (or a corresponding deduction by the company), and any gain

17  on the sale of the stock is taxed at more favorable capital gains rates.  In addition, the issuer is

18  not required to withhold for ordinary income taxes and FICA taxes or pay its share of FICA

19  taxes upon exercise of an ISO.  Exercise of an NSO, by comparison, results in ordinary income

20  (and a corresponding deduction by the company) and triggers income tax and FICA tax

21  withholding and payment obligations.

22              **Summary of Options Practices at Brocade**

23      53.    Starting in 1999 and continuing through 2004, Defendants engaged in a course of

24  conduct to enhance the compensation paid to Brocade personnel (including themselves) while

25  hiding the true financial cost of that remuneration.

26      54.    At the heart of the misconduct was an enterprise directed by Brocade's former

27  CEO, Reyes, in association with Jensen.  Reyes routinely provided extra remuneration to

28  employees through backdated stock options and participated in the falsification of documents to

1   avoid recording the required compensation expenses on the Company's financial statements.

2      55.    The Defendants individually and in concert with one another damaged Brocade

3   by causing the Company to materially misstate its equity option compensation expenses between

4   2000 and 2004, requiring Brocade to restate its published financial statements on two occasions.

5      56.    During the relevant period, Brocade's stock-option plans generally required the

6   Company to grant stock options with exercise prices based on the stock's fair market value on

7   the grant date – *i.e.*, "at-the-money" grants.  Moreover, Brocade repeatedly assured its auditors,

8   the SEC, and the public that it recognized compensation charges under APB 25 to the extent that

9   it granted any in-the-money options.

10      57.    Defendants knew, however, that they were not adhering to the option plans' terms

11   and the Company's public disclosures when granting stock options on behalf of Brocade.

12   Instead, to compete in Silicon Valley's tight labor market (while enriching themselves in the

13   process), Reyes and Jensen, as well as the other Defendants, regularly granted in-the-money

14   stock options, for which Brocade was required to record – but did not record – an expense on its

15   financial statements.

16      58.    To hide the negative impact that these additional expenses would have on

17   Brocade's reported income (and their own stock holdings and performance bonuses), Reyes,

18   Jensen, and other Defendants participated in the falsification of, and directed others to falsify,

19   Company records to create the appearance that the options had been granted at the market price

20   on an earlier date and thus did not require a compensation charge.  In so doing, Defendants

21   violated the applicable accounting rules and Brocade's own stock-option plans and internal

22   policies by manipulating the timing and exercise prices of stock-option grants.

23      59.    That manipulation took many forms, including the falsification of the dates of

24   stock-option grants, the forging of records relating to Board and Board committee meetings, and

25   the creation of various sham programs to lower the exercise prices of stock-option grants or to

26   change the options' vesting and exercise periods.

27      60.    To implement these practices, Reyes and the other Defendants manipulated the

28   authority purportedly given to Reyes to grant stock options as a Committee of One.  Reyes

SECOND AMENDED COMPLAINT

1    abused his virtually unchecked delegated power by granting in-the-money options based on

2    falsified documentation that created the appearance that the options had been granted on an

3    earlier date, when the stock's market price was lower.  Reyes also granted stock options to

4    persons and under option plans that were not within the bounds of his delegated authority.

5    　　　　61.    Reyes carried out this enterprise with Jensen's assistance.  Reyes directed Jensen

6    and others to prepare documentation of options grants for his signature.

7    　　　　62.    Jensen and other members of her HR Department provided Reyes with a list (by

8    name of employee, number of options, hire date for new hires, and other information) of options

9    granted at a purported "Compensation Committee Meeting" occurring on a given date.  Jensen

10   and her supervisees also supplied Reyes with Brocade's stock-price history over a period of time.

11   Jensen or other employees under her direction highlighted the lowest closing price during the

12   relevant period, which was at times as long as three months.  Reyes then signed the

13   documentation for each such grant, attesting that he, as a Committee of One, had granted the

14   options to the specified persons on that date.

15   　　　　63.    The documentation supplied by Jensen and her department purported to specify

16   the date on which the Committee-of-One meeting occurred.  In reality, however, the specified

17   date was simply the date selected from Brocade's stock-price history because it was the date with

18   the lowest (or nearly the lowest) closing stock price in the period.

19   　　　　64.    Thus, Reyes and Jensen both knew that Reyes had not granted the options on the

20   supposed grant date.  Instead, at a later date when the market price was higher, Reyes and Jensen

21   had backdated the grant documentation to an earlier date, using hindsight, to create the

22   appearance that the options had been granted on the earlier date at a lower exercise price.

23   　　　　65.    Various other Defendants also knew about and participated in these faulted

24   Committee-of-One grants.  And the Board members responsible for supervising Reyes' activities

25   breached their duties to Brocade in failing to monitor them.

26   　　　　66.    In addition to manipulating the Committee-of-One minutes for rank-and-file

27   employees, Defendants also participated in the falsification of records for the Board's and the

28   Compensation Committee's stock-option grants to senior executives (including to some of the

1   Defendants themselves).

2       67.    For example, on April 17, 2001, the Compensation Committee, consisting of

3   Dempsey and Leslie, purportedly approved the issuance of options to eight Brocade executives,

4   including Reyes.  But no such meeting occurred.  The meeting did not appear on either

5   Dempsey's or Leslie's personal calendars, and Reyes was in Boston that day for the Boston

6   Marathon.  However, by using April 17 as the purported grant date, the Defendants involved

7   with that grant were able to award options at an exercise price equal to the lowest price for

8   Brocade's shares during April 2001.  The timing thus enhanced the options' value, and the

9   manipulations caused Brocade not to book the necessary compensation charge.

10      68.    Defendants also manipulated the grant dates for new hires in an effort to find

11  supposedly cost-free ways to attract key employees.  For example, Byrd, with other Defendants'

12  knowledge and consent, implemented a program that allowed new hires to select their own grant

13  date, which could be any time between their hire date and the end of the calendar year.  This

14  practice had the effect of permitting employees retroactively to select the lowest price for their

15  grant, in contravention of the stock-option plans' terms.

16      69.    In some instances, Defendants gave new hires even more latitude to select a low

17  exercise price by implementing a "part-time" program that created artificially early start dates for

18  new employees.  Byrd created this program as well.  Byrd would invent a "part-time" start date

19  for certain employees as soon as they were offered a position at Brocade.  The employees then

20  were permitted to select any grant date after that "part-time" start, regardless of whether they

21  actually were performing work for Brocade during that period.  This program was frequently

22  used by some groups such as the engineering group headed by Bonderson.

23      70.    These and other similar practices led Brocade to issue tens of millions of faulted

24  stock options that were mispriced under the Company's plans and policies.

25      71.    Defendants hid these practices and the true cost of the manipulated grants by

26  deceiving Brocade's independent auditors and signing false and misleading financial statements.

27  For example, Reyes falsely represented in letters to Brocade's external auditors that the

28  Company's financial statements were fairly presented in accordance with generally accepted

accounting principles ("GAAP") and that he was not aware of any instances of fraud involving management or any material transactions that had not been properly recorded. Additionally, Reyes and Canova repeatedly signed SOX certifications that falsely assured investors that nothing untrue had been disclosed in Brocade's Forms 10-K and 10-Q filings and that any instances of fraud had been reported to Brocade's Audit Committee and external auditors.

72.    In reality, however, Defendants were not recording the compensation expenses that APB 25 required Brocade to record for the manipulated stock options.

73.    During fiscal years 2000 through 2004, defendants Byrd, Canova, and Bossi prepared financial statements and other documents that contained materially false and misleading statements that Brocade was recording appropriate compensation charges for the stock-option grants it made employees and that materially misrepresented the magnitude of the charges so recorded. Reyes, Byrd, Canova, Dempsey, Leslie, and Neiman falsely swore to the veracity of those disclosures.

74.    These artifices allowed Defendants to hire and retain key employees while hiding the true costs of their actions from the Company, allowing them to falsely inflate the quality of Brocade's financial performance. Moreover, virtually all of the Defendants received faulted stock options.

75.    Defendants' practices also increased both the volume and the value of the stock options that Defendants received – and allowed Defendants to sell substantial amounts of Brocade stock. In other words, the manipulative practices allowed Defendants to enrich themselves at the expense of the Company and its shareholders.

### Discovery of Options and Accounting Problems at Brocade

76.    Defendants' misconduct was first discovered in late 2004 and in 2005.

77.    In late October 2004, Brocade received a draft complaint that a terminated employee named Daniel Cudgma said he intended to file against the Company. Cudgma himself had received backdated options under Brocade's "part-time" program when he first joined the Company. Reyes and Jensen later repriced the options to a more favorable exercise price by purporting to change the grant date when Cudgma threatened to leave to work for Cisco.

1  Cudgma's draft complaint described these options manipulations, including Reyes' role in the

2  repricing.

3       78.     Brocade turned over the Cudgma complaint to the Board's Audit Committee,

4  which promptly began an investigation on November 1, 2004 into alleged option-granting

5  improprieties at the Company (the "First Investigation").

6  <u>Internal Investigations and Restatements</u>

7       79.     The First Investigation focused on the grant process for the period May 1999

8  through October 2004.  The two principal issues were (*i*) how Brocade accounted for grants to

9  new employees hired between May 1999 and October 2002 and (*ii*) documentation for grants

10  that Reyes approved in his Committee-of-One capacity.

11       80.     The Audit Committee completed the First Investigation in early January 2005 and

12  concluded that Brocade had incorrectly accounted for stock-based compensation granted to new

13  hires between May 1999 and July 2000 and to persons purportedly working for Brocade on a

14  part-time basis before their full-time employment between August 2000 and October 2002.  The

15  Audit Committee determined that grants to employees before their actual start dates did not meet

16  the requirements for establishing a measurement date and that fixed accounting thus could not be

17  used for those grants.

18       81.     The Audit Committee also concluded that some of Reyes' grants as a Committee

19  of One lacked contemporaneous information to corroborate the dates that appeared on the

20  documents evidencing the grants.  The Committee suspected that minutes of meetings

21  documenting certain grants might have been backdated to provide lower exercise prices for the

22  stock options granted.  In addition, the Audit Committee found that HR records had been altered

23  for five employees (Cudgma, Steve Daheb, Richard Geruson, Andy Taylor, and Dean Traut) to

24  give them lower exercise prices on their options.

25       82.     On January 6, 2005, Brocade announced that it expected to restate certain of its

26  financial statements to record additional stock-based compensation expenses as a result of the

27  First Investigation.  The press release stated that the Audit Committee's review had "determined

28  that the way in which [Brocade] accounted for stock option grants was incorrect and requires

1   restatement."

2        83.    Brocade announced the results of the restatement on January 24, 2005.  The

3   Company restated its financial statements for fiscal years 2002 and 2003 to correct the

4   accounting treatment for stock-based compensation, resulting in an overall reduction in net

5   income of approximately $304 million for years before 2002.

6        84.    Brocade used variable accounting for the restatement, because it concluded that

7   its historical books and records were not sufficiently reliable to permit the use of fixed

8   accounting to determine the compensation expense attributable to improperly granted stock

9   options.

10       85.    Brocade also announced on January 24, 2005 that Reyes would step down as

11  CEO.

12       86.    The First Investigation had focused only on options-granting activities before

13  August 2003, in part because the Audit Committee and its consultants believed that Brocade had

14  changed its options-granting policies at that time and that no further improprieties had occurred.

15       87.    In early March 2005, however, information emerged that "look-back" or

16  backdating practices had in fact been used after July 2003.

17       88.    Based on the new information, the Audit Committee and its consultants in May

18  2005 began another investigation of Brocade's options-granting practices (the "Second

19  Investigation").

20       89.    Brocade also announced on May 16, 2005 that it would restate its financial

21  statements for the fiscal years ending 2002 through 2004 to record additional charges for stock-

22  based compensation expense, because the new information showed (among other things) that

23  Brocade could not rely on the documentation used to support the recorded measurement dates for

24  stock options granted from August 2003 through November 2004.

25       90.    The Audit Committee completed the Second Investigation in November 2005,

26  concluding that Brocade had incorrectly accounted for stock-based compensation related to

27  (*i*) measurement dates for the period August 2003 through November 2004, (*ii*) employees on

28  leave of absence or in transitional roles before leaving the Company, primarily in fiscal years

1999 through 2001, and (*iii*) recorded dates for certain stock-option exercises.

91.    The Audit Committee found that, between August 2003 and November 2004, HR personnel had selected grant dates and exercise prices based on the lowest price for the week of the grant, rather than as of the actual grant date.  The Committee therefore concluded that the documentation for those grants was unreliable and that Brocade needed to increase its non-cash compensation expense for fiscal 2003 and 2004.

92.    The Second Investigation also uncovered problems with Brocade's accounting for stock-based compensation for employees on leaves of absence and in advisory roles before leaving the Company.

93.    On November 14, 2005, Brocade restated its financial statements for fiscal years ending 2002 through 2004 and made adjustments to its financial information for fiscal years 1999 through 2001, resulting in an increase in non-cash compensation expense totaling $72.3 million.  The restatement included non-cash stock-based compensation charges of $900,000 for the process issues in fiscal years 2003 and 2004, $71 million for the leave-of-absence issues spanning fiscal years 1999 to 2004, and $400,000 for the exercise-date issues between fiscal years 1999 and 2002.

94.    The evidence suggests that Brocade's stock-option and accounting problems derailed a merger that the Company was in the process of negotiating with Cisco Systems, Inc. Brocade and Cisco had been nearing agreement on a definitive merger agreement, pursuant to which (according to deposition testimony from Brocade executives) Cisco was going to pay $9.00 per share for Brocade's approximately 254.5 million outstanding shares of stock (not counting those held by insiders) – a premium of about $1.85 per share over the stock's market price at the time the deal was expected to close.

95.    The Audit Committee's investigation and the ensuing events caused the deal to collapse.  For example, on November 21, 2004, Andy Johnson e-mailed Reyes that Cisco "essentially want[s] to be able to walk from the deal if the internal investigation causes a restatement or other significant issue.  Both sides have indicated this is a deal breaker if they can't get what they want."  Reyes responded and agreed that Cisco's stance on the internal

1   investigation "is a deal killer."  Similarly, on November 29, 2004, Reyes e-mailed Canova that:

2   "If [the internal investigation] goes on until the end of December we can kiss the [Cisco] deal

3   good bye!"

4                                      Remedial Actions

5          96.    As a result of the two Audit Committee investigations, the Board recommended

6   and adopted remedial measures.  On January 30, 2005, the Compensation Committee resolved to

7   reprice options granted to Reyes on August 15, 2003 and December 10, 2003, changing the strike

8   price to the average price of Brocade stock during the fourth quarter of fiscal 2003 and the first

9   quarter of fiscal 2004, respectively.  The strike price of the August 15, 2003 grant of 600,000

10  options thus was increased from $5.53 to $5.82, and strike price of the December 10, 2003 grant

11  of 500,000 options was increased from $5.52 to $6.34.

12         97.    The Compensation Committee also approved, ratified, and confirmed the options

13  that Reyes had granted as a Committee of One (although it did not ratify the conduct underlying

14  the grants), except for the new-hire grants made to Cudgma, Geruson, Taylor, Daheb, and Traut.

15  In addition, the Compensation Committee reviewed and later adopted new options-granting

16  practices that it deemed to be consistent with best practices in the industry.

17                          **Legal Proceedings and Investigations**

18         98.    The events described above led to a barrage of legal proceedings and

19  investigations involving Brocade and its current and former officers and directors, including

20  (*i*) criminal prosecutions of Reyes and Jensen by the U.S. Department of Justice, (*ii*) an SEC

21  investigation of Brocade, (*iii*) the SEC's civil-enforcement actions against Reyes, Jensen, Byrd,

22  and Canova, (*iv*) federal- and state-court securities-law class actions, and (*v*) federal- and state-

23  court shareholder derivative actions.

24                          Criminal Prosecutions and Convictions

25         99.    The Department of Justice filed a criminal complaint against Reyes and Jensen on

26  July 20, 2006, and the two were indicted on August 11, 2006.

27         100.   On August 7, 2007, a jury in this Court convicted Reyes on ten counts of criminal

28  activity:  (*i*) criminal conspiracy, (*ii*) securities fraud, (*iii*) three counts of making false SEC

                                            21

filings through Brocade's Forms 10-K for the fiscal years ended October 27, 2001, October 26, 2002, and October 25, 2003, (*iv*) falsifying books, records, and accounts, (*v*) two counts of making false statements to an accountant in management representation letters for the fiscal years ended October 26, 2002, and October 25, 2003, and (*vi*) two counts of making false statements to an accountant in certifications filed with the Forms 10-K for those fiscal years.

101.    On January 16, 2007, the Court sentenced Reyes to 21 months in prison and a $15 million fine.  The sentence included four extra months that the Court added based on Reyes' having submitted a false declaration to the Court in connection with Jensen's motion to sever her trial from Reyes'.  Reyes had sworn to the Court that the two trials should be severed because no options backdating had occurred and because he intended to testify in Jensen's favor at her trial. After the Court granted the severance motion, however, Reyes essentially conceded at his own trial that backdating had in fact occurred – and he did not testify at Jensen's trial.

102.    In connection with Reyes' sentencing, Brocade asked the Court to order Reyes to pay restitution to the Company, including costs related to Brocade's internal investigations of the historical stock-option practices, the SEC investigation and settlement, and the defense of civil proceedings – totaling $37,570,939.76 – plus an additional $64,478,039 for defense costs the Company had advanced to directors, officers, and employees (mostly to Reyes) in connection with those matters.  The Court denied Brocade's request, citing the Company's ability to seek recovery of those costs in the pending derivative litigation.

103.    On December 5, 2007, Jensen was convicted of (*i*) conspiracy to falsify books, records, and accounts, in violation of 18 U.S.C. § 371, and (*ii*) falsifying books, records, and accounts, in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff, and 17 C.F.R. § 240.13b2-1.  The Court sentenced Jensen to a four-month prison term on March 19, 2008.

104.    Brocade asked the Court to order Jensen to pay restitution for the same categories of damages the Company requested from Reyes.  The total amount requested was $104,478,604.51, with $66,827,664.75 of that amount representing fees and expenses advanced to directors, officers, and employees.  The Court denied Brocade's request.

<div align="center">SEC Investigation of Brocade</div>

105.    In 2005, the SEC informed Brocade that it was conducting a formal investigation, captioned *In re the Matter of Brocade Communications Systems, Inc.*, File No. SF-02932, concerning Brocade's stock-option granting practices.  Brocade cooperated with the SEC's Division of Enforcement and produced substantial numbers of documents.

106.    Brocade began settlement discussions with the Staff of the Division of Enforcement and recorded $7 million for an estimated settlement expense for the fiscal quarter ended January 28, 2006.  The SEC approved the settlement on May 31, 2007, and the Court entered a final judgment approving the settlement on August 27, 2007.  Brocade paid the $7 million settlement amount on August 31, 2007.

<div align="center">SEC Civil Enforcement Actions Against Reyes, Jensen, Canova, and Byrd</div>

107.    The SEC currently is pursuing civil enforcement actions against Reyes, Jensen, Canova, and Byrd in this Court for violating the federal securities laws.  The SEC brought the action against Reyes, Jensen, and Canova on July 20, 2006, and sued Byrd separately on August 17, 2007.  The cases have now been consolidated and are proceeding.

<div align="center">Securities Class Actions</div>

108.    **Federal Securities Class Actions.**  Beginning in May 2005, several federal securities class actions were filed in this Court against Brocade and certain of its then-current and former officers on behalf of shareholders who had purchased Brocade stock when the market price allegedly was inflated as a result of Brocade's false financial statements.  The consolidated complaint asserted claims under §§ 10(b) and 20(a) of the Exchange Act and alleged that Brocade and the individual defendants had made false or misleading public statements about Brocade's business and operations.  The Court denied Brocade's and certain other defendants' motions to dismiss.

109.    On October 12, 2007, the Court certified a class of all purchasers of Brocade stock from May 18, 2000 through May 15, 2005, and partially granted the class plaintiffs' motion for partial summary judgment against Reyes, prohibiting him from relitigating the criminal jury's finding that he knowingly and willfully had made material misrepresentations in

<div align="center">23</div>

Brocade's Forms 10-K for 2001, 2002 and 2003.

110.    On May 13, 2008, the Court granted plaintiffs' motion for partial summary judgment that Reyes had been acting within the course and scope of his employment at Brocade when he signed Forms 10-K for fiscal years 2001 through 2003.

111.    In light of the Court's rulings and other factors relating to the litigation, Brocade agreed on May 30, 2008 to settle the federal class action for $160 million.

112.    **State Securities Class Action.**  On October 23, 2007, a putative class-action complaint captioned *Huang v. Reyes* was filed against Brocade and certain of its current and former officers and directors in the California Superior Court, Santa Clara County, on behalf of persons who owned Brocade stock between February 21, 2001 and May 16, 2005.  The complaint (which actually appears to be a disguised derivative action) alleges that Brocade and the individual defendants breached their duty of disclosure by failing to disclose the conduct at issue in the federal securities litigation.  The case is currently being litigated.

Shareholder Derivative Actions

113.    Beginning in May 2005, several putative shareholder derivative actions were filed in the California Superior Court, Santa Clara County, alleging claims for breach of fiduciary duty and various other state-law claims against certain of Brocade's current and former officers and directors based largely on the same factual allegations underlying the federal class actions.  The cases were assigned to the Honorable Jack Komar, in the court's Complex Litigation Department, and were consolidated as *In re Brocade Communications Systems Derivative Litigation*, No. 1:05CV041683.

114.    Beginning in June 2005, several additional putative shareholder derivative actions were filed in this Court alleging claims similar to those asserted in the state-court derivative suits, as well as a federal claim under § 20(a) of the Exchange Act.  The Court related the federal derivative actions to the pending securities class actions and consolidated the derivative actions under the caption *In re Brocade Communications Systems, Inc. Derivative Litigation,* No. C05-02233 CRB.

115.    On January 6, 2006, the Court dismissed the consolidated federal derivative

24

1    actions based on the plaintiffs' failure to plead with sufficient particularity why a pre-suit

2    demand on Brocade's Board would have been futile.  The federal plaintiffs then made a demand

3    on the Board on January 13, 2006.

4         116.    In response to the federal plaintiffs' demand, Brocade entered into settlement

5    discussions with the plaintiffs, and the parties reached an agreement to settle the federal

6    derivative actions.  The Court preliminarily approved the proposed settlement on February 14,

7    2007, but declined to grant final approval at the fairness hearing on April 27, 2007, after the

8    federal plaintiffs expressed their unwillingness to proceed with the settlement in light of the

9    confirmatory discovery they had undertaken.

10         117.    The parties then engaged in certain motion practice in the consolidated state-court

11    derivative action, although – pursuant to the parties' agreement – the state court deferred ruling

12    on most of the pending motions.  The parties also participated in mediation sessions with Judge

13    Komar on September 27, 2007, November 14, 2007, and February 8, 2008, but were unable to

14    reach a settlement.

15         118.    Another federal putative shareholder derivative action – *Barbour v. Reyes*,

16    No. 08-02029 CRB – was filed in this Court on April 15, 2008.  The case has been related to, but

17    not consolidated with, the consolidated federal derivative action.

18         119.    **Section 16(b) Action.**  Yet another putative shareholder derivative action,

19    captioned *Roth v. Reyes*, was filed in this Court on April 24, 2006 against Brocade (as a nominal

20    defendant) and four former officers, including Reyes, Byrd, Canova, and Cuthbert, alleging

21    violations of § 16(b) of the Exchange Act and seeking to recover "short-swing" trading profits.

22    The Court dismissed the action on August 27, 2007.  Plaintiff has appealed the dismissal to the

23    Ninth Circuit.

24                       Appointment of SLC

25         120.    On February 22, 2008, after settlement efforts in the federal and state derivative

26    actions had stalled, Brocade's Board of Directors appointed the SLC to handle all matters

27    relating to the derivative litigation.  The Board delegated to the SLC "plenary authority to decide

28    whether it is in the best interests of the Company and its shareholders to pursue or otherwise

SECOND AMENDED COMPLAINT

1  resolve the claims raised in the Derivative Lawsuits and to pursue or resolve such claims . . . and

2  any other Company claims the [SLC] deems necessary or appropriate to its decisions relating to

3  the Derivative Lawsuits . . . ."  The Board also granted the SLC full authority "to pursue or

4  resolve all other Claims of the Company relating to its historical stock option practices to the

5  extent necessary or appropriate . . . ."

6        121.   The SLC retained separate counsel on behalf of Brocade in mid-March 2008 and,

7  with counsel's assistance, examined the underlying events before filing this Complaint.  The

8  SLC also retained an accounting expert, an economic consulting firm, a California law expert

9  and Delaware counsel.

10       122.   After consulting with counsel to the SLC and Delaware counsel on the legal

11 issues concerning its independence under Delaware law, the SLC concluded that each of its

12 members was independent for the purpose of determining the Company's best interests and

13 course of action regarding the derivative actions.  The SLC also determined that neither of its

14 members had an economic interest in the derivative actions or the type of personal or

15 professional relationship with any of the named or potential defendants that would influence his

16 decision, and that neither of its members had participated in the events underlying the derivative

17 actions or stood to derive any personal financial benefit from their outcome.  The SLC also noted

18 that its members had been named only as peripheral or nominal defendants in one of the

19 derivative actions, so there was no substantial likelihood of the SLC members' being held liable

20 for the claims asserted.

21       123.   In addition, the SLC considered that it had retained experienced, independent

22 counsel to assist it in its investigation, and such counsel had not previously represented any of

23 the named or potential defendants in the derivative actions.  The SLC concluded that both of its

24 members could determine the Company's course of action concerning all claims and all actual or

25 potential defendants considered without the need to recuse themselves, and that no question of

26 material fact existed concerning the SLC members' independence.

27       124.   The SLC also consulted with counsel to the SLC and Delaware counsel on the

28 legal issues concerning the thoroughness of its review under Delaware law.  Based on those

1  discussions, the SLC concluded that its review of the issues raised in the derivative actions met

2  the applicable standard of thoroughness.

3      125.    Counsel to the SLC spent more than 10,000 hours, and Delaware counsel to the

4  SLC spent more than 500 hours, gathering and analyzing relevant facts and legal issues and

5  reporting them to the SLC.  The SLC's accounting expert and economic consultants spent more

6  than 80 and 1,000 hours, respectively, analyzing relevant facts and reporting to the SLC.

7      126.    The SLC's counsel reviewed millions of pages of documents, deposition

8  transcripts, and testimony, and met in person or by telephone or videoconference with many

9  prospective defendants or their counsel, and with all counsel for the derivative plaintiffs.  The

10  SLC members themselves participated in many of these meetings.  The SLC also consulted with

11  its other professional advisors.

12      127.    The SLC held 27 meetings since March 2008 with counsel and, on occasion, with

13  its experts and with other interested parties.  During those meetings, the SLC addressed each

14  allegation in the derivative actions and investigated possible corporate injuries and potential

15  defendants that had not been mentioned in the pending derivative actions.  The SLC also

16  considered other related factors that, in its members' good-faith business judgment, had a

17  bearing on the Company's best interest.

18  **BROCADE'S OPTION-GRANTING PROCESS**

19  **<u>Overview of Principal Participants in Options-Granting Process</u>**

20      128.    The principal participants in the options-granting process at Brocade were the HR

21  Department, Reyes (acting as a Committee of One), the Compensation Committee, the Board of

22  Directors (mostly the Compensation Committee Defendants plus Reyes), the Finance

23  Department, and certain senior operating executives.

24      129.    The HR Department – under the oversight of the Compensation Committee,

25  Reyes, and Jensen – was responsible for employee recruiting and hiring, personnel management,

26  employee relations, separation and termination, and compensation and benefits, including equity

27  incentives such as stock options.

28      130.    HR used industry data compiled by external consultants to develop general

27

guidelines each year for salary, bonus, and equity compensation. The Compensation Committee reviewed these general guidelines, and HR used them to develop specific salary, bonus, and equity recommendations for individual directors, executives, and employees.

131. The Compensation Committee (or the Board) reviewed and approved the HR Department's compensation recommendations for directors and officers, including Reyes. Stock options for directors and executives usually were purportedly granted either at a meeting of the Board or the Compensation Committee (memorialized in meeting minutes) or through Unanimous Written Consents ("UWCs").

132. Minutes of a meeting purport to record decisions formally made at the meeting and generally are prepared after the meeting has occurred. UWCs, in contrast, enable directors (or officers) to make decisions without needing to meet. Decisions reflected in UWCs do not take effect until all necessary signatories have signed the UWC.

133. Reyes himself reviewed and approved the compensation recommendations for employees. He also acted, pursuant to purported delegations of authority from the Board, as a Committee of One to grant millions of stock options to Brocade employees between 1999 and 2005.

134. After the Board, Compensation Committee, or Committee of One approved stock-option grants, the signed minutes or UWCs recording the grants were delivered to Elizabeth Moore, Brocade's Stock Plan Administrator, who entered the grant information into Equity Edge, Brocade's share-tracking software. Moore then generated Stock Option Agreements that typically were signed by the Controller and distributed to the option grantees for execution.

135. The Finance Department was responsible for reporting compensation expenses to Brocade's independent auditors, through a periodic reconciliation process, and to the public through Brocade's SEC filings. In fulfilling these duties, members of the Finance Department (including Byrd, Canova, and Bossi) had regular contact with Brocade's outside auditors, first Arthur Andersen ("Andersen") and later KPMG. Brocade's Controller was responsible for preparing Brocade's financial statements and public disclosures, with ultimate responsibility residing with the CFO and CEO.

1

**Description of Brocade's Stock-Option Plans**

2    136.    Before Brocade's IPO on May 25, 1999, Brocade could grant stock options under

3  the 1995 Equity Incentive Plan, the 1998 Equity Incentive Plan, and the 1998 Executive Equity

4  Incentive Plan.  After the IPO, Brocade granted options under the 1999 Stock Plan, the 1999

5  Nonstatutory Stock Option Plan, and the 1999 Director Option Plan.

6                                    Pre-IPO Plans

7    137.    **The 1995 Plan.**  The 1995 Equity Incentive Plan (the "1995 Plan") was adopted

8  by Brocade's Board of Directors (including Neiman) on August 24, 1995, and was subsequently

9  amended on March 21, 1996, July 18, 1996, November 25, 1996, and August 28, 1997.

10  Brocade's shareholders also approved the 1995 Plan.

11    138.    The 1995 Plan authorized grants of incentive stock options to employees

12  (including officers and directors who also were employees) and grants of other types of stock

13  options to employees, officers, directors, consultants, independent contractors, and advisors.

14    139.    The 1995 Plan was administered by Brocade's Board or by a committee appointed

15  by the Board.  The committee was empowered to "delegate to one or more officers of the

16  Company the authority to grant an Award under the Plan to [recipients] who are not Insiders of

17  the Company."  On February 26, 1998, the Board confirmed the prior establishment of a

18  Compensation Committee, which was to administer the Company's stock-option plans.

19    140.    The 1995 Plan required the date of a grant of stock options to be "the date on

20  which the Committee makes the determination to grant such Option, unless otherwise specified

21  by the Committee."

22    141.    The 1995 Plan also imposed certain restrictions on the exercise price of a grant.

23  The Committee determined the exercise price.  However, the exercise price of a grant of stock

24  options could not be less than 85% of the fair market value on the date of grant.  The exercise

25  price of a grant of incentive stock options could not be less than 100% of the fair market value

26  on the date of grant.  The exercise price of a grant of options to a ten-percent shareholder could

27  not be less than 110% of the fair market value on the date of grant.  Because Brocade's stock was

28  not publicly traded at the time, the Board was required to determine the stock's fair market value

29

1   "in good faith."

2       142.   **The 1998 Plan.**  The 1998 Equity Incentive Plan (the "1998 Plan") was adopted

3   by Brocade's Board (including Dempsey and Neiman) on February 26, 1998, and was

4   subsequently amended by the Board (including Dempsey, Neiman, and Reyes) on October 9,

5   1998.  Brocade's shareholders also approved the 1998 Plan.

6       143.   The 1998 Plan authorized grants of incentive stock options to employees

7   (including officers and directors who also were employees) and grants of nonqualified stock

8   options to employees, officers, directors, and consultants.

9       144.   The 1998 Plan was administered by the Board or a committee appointed by the

10  Board.  The committee was empowered to "delegate to one or more officers of the Company the

11  authority to grant an Award under this Plan."  On February 26, 1998, the Board confirmed the

12  prior establishment of a Compensation Committee, which was to administer the Company's

13  stock-option plans.

14      145.   The 1998 Plan required the date of a grant of stock options to be "the date on

15  which the Committee makes the determination to grant such Option, unless otherwise specified

16  by the Committee."

17      146.   The 1998 Plan also prescribed certain restrictions on the exercise price of a grant.

18  The Committee determined the exercise price.  However, the exercise price of a grant of stock

19  options could not be less than 85% of the fair market value on the date of grant.  The exercise

20  price of a grant of incentive stock options could not be less than 100% of the fair market value

21  on the date of grant.  The exercise price of a grant of options to a ten-percent shareholder could

22  not be less than 110% of the fair market value on the date of grant.  Because Brocade's stock was

23  not publicly traded at the time, the committee (or the Board, if no committee) was required to

24  determine the stock's fair market value "in good faith."

25      147.   **The 1998 Executive Plan.**  The 1998 Executive Equity Incentive Plan (the "1998

26  Executive Plan") was adopted by Brocade's Board (including Dempsey, Neiman, and Reyes) on

27  October 9, 1998.

28      148.   The 1998 Executive Plan authorized grants of stock options to officers, directors,

30

1   and consultants.

2        149.    The 1998 Executive Plan was administered by the Board or by a committee

3   appointed by the Board.  The committee was empowered to "delegate to one or more officers of

4   the Company the authority to grant an Award under this Plan."

5        150.    The 1998 Executive Plan required the date of grant to be "the date on which the

6   Committee makes the determination to grant such Option, unless otherwise specified by the

7   Committee."

8        151.    The 1998 Executive Plan imposed certain restrictions on the exercise price of a

9   grant.  The Committee determined the exercise price.  However, the exercise price of an option

10   under the 1998 Executive Plan could not be less than 85% of the fair market value on the date of

11   grant.  Because Brocade's stock was not publicly traded at the time, the committee (or the Board,

12   if no committee) was required to determine the stock's fair market value "in good faith."

13        152.    On March 17, 1999, before Brocade's IPO, the Board (including Dempsey,

14   Leslie, Neiman, and Reyes) approved the combination of the 1995 Plan, the 1998 Plan, and the

15   1998 Executive Plan into the 1999 Stock Plan, discussed below.  This combination required

16   conforming the pre-IPO plans to the applicable requirements of Delaware law (because Brocade

17   became a Delaware corporation in connection with the IPO).

18                   Post-IPO Plans

19        153.    **The 1999 Stock Plan.**  Brocade's Board (including Dempsey, Leslie, Neiman,

20   and Reyes) approved the 1999 Stock Plan on March 17, 1999, and resolved that the Plan would

21   be implemented upon the effectiveness of Brocade's IPO (which occurred in May 1999).

22   Brocade's shareholders approved the 1999 Stock Plan in April 1999.

23        154.    The Administrator of the 1999 Stock Plan is the Board or a committee of the

24   Board.

25        155.    The 1999 Stock Plan empowers the Administrator to determine – with some

26   limitations – who may receive stock options under the plan.  "Employees," "Directors," and

27   "Consultants" are eligible to receive options.  The term "Employees" includes "Officers" of the

28   company.  "Officers" is defined to only include Section 16 officers.

156.    The 1999 Stock Plan requires the date of a grant to be "the date on which the Administrator makes the determination granting such Option or Stock Purchase Right, or such other later date as is determined by the Administrator."  The plan thus prohibits the Administrator from choosing a grant date earlier than the date the Administrator actually determines to grant options.  In other words, the plan prohibits "backdating."

157.    The 1999 Stock Plan imposes some restrictions on the exercise price of a grant. The Administrator determines the exercise price of an option.  However, if the option is a nonstatutory option and is "intended to qualify as 'performance-based compensation,'" the exercise price cannot be less than 100% of the fair market value on the grant date.  The exercise price of an incentive stock option also cannot be less than 100% of the fair market value on the grant date.  If an incentive stock option is granted to someone who owns more than 10% of the voting power of the stock, the exercise price cannot be less than 110% of the fair market value on the grant date.  The fair market value is the stock's closing price on the last trading day "prior to the time of determination."

158.    On October 22, 1999, the Board (including Dempsey, Leslie, Neiman, and Reyes) approved an amended Compensation Committee Charter (the "1999 Charter"), which empowered the Compensation Committee "to review proposals set forth by the Company's Chief Executive Officer and make recommendations to the Board of Directors regarding all forms of compensation to be provided to the executive officers . . . and directors . . . [,] including stock compensation and loans, and all bonus and stock compensation to all employees."  The Compensation Committee was made the Administrator of the 1999 Stock Plan and was required to provide written reports to the Board about the Committee's compensation recommendations.

159.    On November 3, 2000, the Board (including Dempsey, Leslie, Neiman, and Reyes) approved an amended Compensation Committee Charter, attached as Exhibit A to the Board minutes.  Exhibit A includes two documents, both titled "CHARTER FOR THE COMPENSATION COMMITTEE."  Both documents reflect an expansion of the Compensation Committee's purpose to include approving "all forms of compensation to be provided to employees . . . including stock compensation and loans."  One of the documents expands the

1    Compensation Committee's role as Administrator to include both the 1999 Stock Plan and the

2    "2000 Nonstatutory Stock Option Plan."  (A "2000 Nonstatutory Stock Option Plan" does not

3    exist, but a 1999 Nonstatutory Stock Option Plan does.)  Both documents require the

4    Compensation Committee to continue to provide written reports to the Board about its

5    compensation recommendations.

6        160.    On January 17, 2003, the Board (including Dempsey, Neiman, and Reyes)

7    approved another amended Compensation Committee Charter.  The 2003 Charter provides for

8    the same purpose and responsibilities as the 1999 Charter.  The Compensation Committee's

9    responsibilities include, among other things, acting as the Administrator of the 1999 Stock Plan

10   and providing written reports to the Board regarding its recommendations.

11       161.    **The 1999 NSO Plan.**  The 1999 Nonstatutory Stock Option Plan (the "1999 NSO

12   Plan") was approved by Brocade's Board (including Dempsey, Leslie, Neiman, and Reyes) in

13   September 1999, by UWC dated September 1, 1999.

14       162.    The Administrator of the 1999 NSO Plan is the Board or a committee of the

15   Board.  If a committee is delegated the power to administer the plan, its power is limited by the

16   plan's terms and by "the specific duties delegated by the Board to such Committee."

17       163.    The 1999 NSO Plan empowers the Administrator to select the "Service

18   Providers" to whom options may be granted.  The plan defines "Service Providers" as "an

19   Employee, Consultant or Director."  However, the Plan's "[e]ligibility" provision states that

20   "[o]ptions may *not* be granted to Officers and Directors; *except as an essential inducement to an*

21   *Officer entering into an employment agreement regarding his or her initial service* with the

22   Company" (emphasis added).

23       164.    Accordingly, the 1999 NSO Plan prohibits options grants to Directors.  It also

24   prohibits options grants to Officers except in connection with their initial entry into employment.

25       165.    The plan defines "Officers" to include "an officer of the Company within the

26   meaning of Nasdaq guidelines, including all employees with the corporate rank of vice-president

27   or higher, and employees with lesser rank but comparable authority."

28       166.    The 1999 NSO Plan requires that the grant date for stock options be "the date on

33

1  which the Administrator makes the determination granting such Option, or such other later date

2  as is determined by the Administrator."  The plan thus prohibits the Administrator from choosing

3  a grant date earlier than the date the Administrator actually determines to grant options.  In other

4  words, the plan prohibits "backdating."

5      167.    As discussed in this Complaint, the amended Compensation Committee Charter

6  adopted on November 3, 2000 appointed the Compensation Committee as Administrator of the

7  "2000 Nonstatutory Stock Option Plan."  No such plan exists, so the Charter presumably refers

8  to the 1999 NSO Plan.

9      168.    The Compensation Committee Charter amendment adopted on January 17, 2003

10  appears to have revoked the Compensation Committee's authority to act as Administrator of the

11  1999 NSO Plan, leaving the administrative power with the Board.

12      169.    **The Director Plan.**  The 1999 Director Option Plan (the "Director Plan") was

13  approved by Brocade's Board (including Dempsey, Leslie, Neiman, and Reyes) on March 17,

14  1999, to be implemented upon the effectiveness of Brocade's IPO.  Brocade's shareholders

15  approved the Director Plan in April 1999.  The Director Plan was amended and restated as of

16  April 17, 2001.

17      170.    The Director Plan does not have an Administrator.

18      171.    The Director Plan provides for automatic, nondiscretionary grants to outside

19  directors on "the date on which such person first becomes an Outside Director" and on "the first

20  day of each quarter of each year provided he or she is then an Outside Director and if as of such

21  date, he or she shall have served on the Board for at least the preceding month" (the "Subsequent

22  Option").

23      172.    The exercise price of a grant under the Director Plan cannot be less than 100% of

24  the fair market value on the grant date.  The fair market value is the stock's closing price on the

25  last trading day "prior to the time of determination."

26      173.    The Board (including Dempsey, Leslie, Neiman, and Reyes) amended the

27  Director Plan as of April 17, 2001, to provide, among other things, one-time option grants to

28  Dempsey, Leslie, and Neiman.  The amendment also changed the timing of the Subsequent

34

1    Option to be "on each anniversary of [the grantee's] becoming an Outside Director, provided he

2    or she is then an Outside Director."

3    ### Defendants' Options Practices

4    174.    During the period at issue, Defendants used a number of options-related practices

5    to provide extra compensation to new hires, current employees, and employees who were on

6    leave or were departing from Brocade.  Some of those practices were inherently deceptive;

7    others were executed in deceptive ways.  Moreover, the appropriate compensation expenses were

8    not recorded for any of these faulted stock options.

9    ### New Hires

10    175.    Defendants used stock options to recruit new employees in various ways,

11    including through an "offer and acceptance" program and a "part-time" program.

12    176.    **"Offer and Acceptance" Program.**  A fundamental premise of employee stock

13    options is that they be granted only to *employees*.  An option that is not granted to an employee is

14    not eligible for favorable tax treatment and cannot be accounted for under APB 25.

15    177.    When Byrd joined Brocade in connection with the Company's IPO in May 1999,

16    he created an options-granting protocol informally known as the "offer and acceptance"

17    program.  This program continued until as late as July 2000.

18    178.    Pursuant to the "offer and acceptance" program, Reyes and Jensen, with the

19    assistance of other Defendants, granted stock options to prospective Brocade employees as early

20    as the date the prospective employees accepted offers of employment from Brocade, instead of

21    the date each such employee actually began to work for the Company.  In an era of steadily

22    rising stock prices, the earlier grant date meant that new hires could obtain a lower exercise price

23    for their options than they would have obtained on their actual start dates.

24    179.    The program was improper and deceptive, because the prospective new hires were

25    not actually employees on the purported grant date of their stock options.  Brocade therefore was

26    not entitled to treat the employees' acceptance date as the stock options' measuring date and was

27    required to record a compensation charge at least equal to the difference between the stock's

28    quoted market price on the acceptance date and the market price on the employee's start date.

1    No such expense was recorded, however, because the "offer and acceptance" program was

2    designed to disguise the fact that non-employees were receiving stock options before their

3    employment began.

4        180.    The program also led to the frequent backdating of employment offer letters and

5    other records by Jensen and the HR Department.  In some cases, offer letters were backdated to

6    the applicants' interview dates, instead of the dates the applicants started work and even before

7    they were given offers of employment.

8        181.    By October 1999, Byrd and Reyes knew that the FASB was considering issuing a

9    formal interpretation of APB 25 confirming that companies had to record compensation charges

10   for stock options granted to persons who were not "employees" (under IRS rules) on the relevant

11   grant date.  And in March 2000, the FASB issued FIN 44, which became effective July 2000,

12   confirming that APB 25 applied to stock options issued to employees but not to contractors or

13   others who were not actually employed by the issuer.

14       182.    To address FIN 44, Byrd implemented what he described in an e-mail to Reyes as

15   a "silly solution" that he had devised at his previous employer, Maxim Integrated Products, Inc.

16   (which is now embroiled in options-backdating litigation of its own).

17       183.    **"Part-Time" Program.**  Byrd's "silly solution" was to modify the improper

18   "offer and acceptance" program by purporting to employ new hires on a "part-time" basis and

19   paying them for four hours per week until they actually started working at Brocade.  Under this

20   "part-time" program, which began in early 2000, prospective employees who accepted a job

21   offer from Brocade were assigned both part-time and full-time employment start dates.

22       184.    Reyes, Jensen, Byrd, Canova, and Bossi all were involved in the granting of

23   options to those ostensibly "part-time" employees as of their "part-time" start dates, and the

24   employees supposedly were expected to begin to transition to Brocade by performing certain

25   activities to be determined by their new managers.

26       185.    Many of these purportedly part-time employees either failed to perform any work

27   at all for Brocade during their part-time tenure or were assigned fictitious part-time start dates by

28   Jensen and her team after the employees had commenced full-time employment at Brocade.

1    Part-time new hires were not required physically to report to Brocade's facilities; nor were they

2    given e-mail accounts, employee badges, or office assignments.  In some instances, the

3    employees continued to work at their prior jobs even though they theoretically had commenced

4    their part-time employment with (and received their new-hire options from) Brocade.

5         186.    With this program in place, Reyes and Jensen had unfettered control over the

6    option strike prices they could offer to new hires, because Reyes, Jensen, and other Defendants

7    routinely manipulated the new hires' part-time start dates with the benefit of hindsight.  The part-

8    time program was discontinued by the end of 2002.

9                             Current Employees

10        187.    Defendants also provided additional compensation to current employees through

11   stock-option grants and by repricing existing grants to provide more favorable exercise prices.

12        188.    **Additional Option Grants.**  Brocade relied on lucrative stock-option grants not

13   only to attract new hires but also to retain employees during a period of intense competition

14   among technology companies for talented personnel.  From 1999 through 2005, Defendants

15   made a variety of option grants to existing employees, officers, and directors.

16        189.    Brocade issued "Pillar" or "Top Talent" grants to employees ranked in the top

17   10% of each department.  The Company also issued anniversary grants – known as "Focal" or

18   "Quarterly Salary Administration Process" ("QSAP") grants – to current employees and officers

19   during the annual performance-review process.

20        190.    **Repricing Prior Grants.**  Jensen's HR Department, at Reyes' direction,

21   fabricated or doctored option-grant documentation after the fact to create the false impression

22   that stock options had been granted to certain employees on earlier dates with more favorable

23   exercise prices.  In addition, HR increased option allocations after the relevant grant date, so that

24   employees effectively could obtain lower strike prices for previously approved grants.  Under

25   FIN 44, such manipulations after the measurement date constitute a "repricing" of the option

26   grant, requiring the issuer to record a variable accounting charge for the option.  The deceptive

27   conduct, however, concealed the need for Brocade to record such a charge.

28

37

1

<u>Employees on Leave or Departing</u>

2      191.    Defendants also manipulated the terms of option grants for employees who were

3    on leaves of absence or were departing from the Company.  Brocade policies required that any

4    terminated employee's options immediately cease to vest and remain exercisable for only

5    90 days after the employee left the Company.  Time limitations also applied to the vesting of

6    stock options during employees' leaves of absence.

7      192.    Several Defendants, despite their awareness of the relevant policies and

8    accounting rules, provided certain employees with improper vesting or exercise periods (or both)

9    extending beyond the limits that Brocade's policies imposed.  These deviations from Brocade's

10   formal policies required Brocade to record compensation charges for those employees' options,

11   because the failures to adhere to the policies effectively changed the options' terms.  Brocade,

12   however, did not record those compensation charges, because Defendants' deceptive conduct

13   obscured the need to do so.

14                            **COMMITTEE-OF-ONE GRANTS**

15           **<u>Establishment of Committee of One and Violations of Authority</u>**

16                  <u>Pre-IPO Activity by Committee of One</u>

17     193.    Before Brocade's IPO on May 25, 1999, none of its three stock-option plans

18   authorized Brocade's CEO to issue stock options in his sole capacity, *i.e.*, as a Committee of

19   One.  Only the Board or a committee authorized by the Board had the authority to issue stock

20   options, unless the Board or a committee expressly delegated such authority to an officer.

21     194.    After Reyes became President and CEO of Brocade in July 1998, the Board held

22   an August 27, 1998 meeting, attended by Reyes and Dempsey (among others), at which the

23   Board resolved to give Reyes the authority to award "bonuses in the form of stock option grants"

24   under the 1998 Equity Incentive Plan.  The authorization limited Reyes to granting 400,000

25   options.

26     195.    By October 9, 1998, Reyes had granted all of those 400,000 bonus-related

27   options.  At a purported October 9, 1998 Board meeting attend by Reyes, Neiman, and Dempsey,

28   the Board ratified the "bonuses in the form of stock option grants" that Reyes had approved.

1    196.    Apart from the authorization to grant those 400,000 bonus-related stock options,

2    neither the Board nor a committee of the Board ever authorized Reyes to grant any other options

3    before the IPO.

4    197.    Nevertheless, shortly after the purported October 9, 1998 Board meeting, Reyes –

5    without any authority – granted numerous stock options under Brocade's pre-IPO Stock Plans.

6    For example, Reyes was the sole signatory of a Board UWC, dated February 19, 1999, that

7    purported to grant options to Kent Bernat.

8    198.    The February 19, 1999 UWC that Reyes signed states that Reyes authorized the

9    grant in his capacity as the sole member of the "Stock Option Committee of the Board of

10    Directors of Brocade."  But the Board never officially formed a "Stock Option Committee," and

11    it never appointed Reyes as the sole member of any such committee.  Rather, the Board

12    authorized only the Compensation Committee to administer Brocade's stock-option plans before

13    the IPO, and the Board required that the Compensation Committee comprise at least two

14    directors.

15    199.    Reyes made many other pre-IPO stock-option grants by UWC in his purported

16    capacity as the sole member of the "Stock Option Committee."

| Date of UWC | Number of Options Granted |
|---|---|
| February 22, 1999 | 20,000 |
| February 26, 1999 | 1,196,000 |
| March 1, 1999 | 64,000 |
| March 5, 1999 | 320,000 |
| March 8, 1999 | 80,000 |
| March 10, 1999 | 200,000 |
| April 1, 1999 | 1,272,800 |
| April 28, 1999 | 152,000 |
| April 30, 1999 | 320,000 |
| May 5, 1999 | 400,000 |
| May 7, 1999 | 468,000 |
| May 19, 1999 | 1,388,000 |

200.    Bonderson received 268,000 options as part of the unauthorized February 26,
1999 grant.

201.    Board members Dempsey, Leslie, and Neiman knew, or consciously disregarded
their duties in not knowing, that Reyes was granting stock options without any authority, but

39

1  they made no effort to stop the improper practice.  Instead, they approved Reyes' unauthorized

2  option grants and effectively condoned practices that usurped the Board's and the Compensation

3  Committee's authority.

4  202.    For example, at a purported March 17, 1999 Board meeting that Reyes attended in

5  person and that Dempsey, Leslie, and Neiman attended by telephone, the Board approved and

6  ratified the stock-option grants that the "Stock Option Grant Committee" – *i.e.*, Reyes – had

7  made in February and March 1999.  By ratifying those grants, Dempsey, Leslie, and Neiman not

8  only acknowledged that the grants had been unauthorized, but also recognized that Reyes was

9  granting options in the name of the "Stock Option Grant Committee," which the Board had never

10  formed.

11  203.    Reyes continued to make unauthorized Committee-of-One grants by UWC after

12  the purported March 17, 1999 Board meeting, as the table above shows.  Dempsey, Leslie, and

13  Neiman voted to approve and ratify Reyes' unauthorized grants between April 28 and May 19,

14  1999 at a Board meeting purportedly held on June 24, 1999.  However, the Compensation

15  Committee never attempted to ratify Reyes' April 1, 1999 grant.

16  204.    By June 24, 1999, the Board also knew, or consciously disregarded its duties to

17  Brocade in not knowing, that the "Stock Option Committee" – if it existed at all – did not consist

18  solely of Reyes.  Dempsey, Leslie, Neiman, and Reyes all had signed a UWC dated April 1,

19  1999, in which they themselves purported to act as the "Stock Option Committee" in granting

20  2,640,000 options to Byrd, who was to become Brocade's new CFO one month later, in May

21  1999.  The April 1, 1999 UWC represented that all of Brocade's Board members were the

22  directors "constituting the Stock Option Committee."

23  205.    The Compensation Committee (which from February 26, 1998 included

24  Dempsey, and from March 17, 1999 included Leslie) was responsible for administering

25  Brocade's pre-IPO stock-option plans.  Dempsey and Leslie breached their duties as

26  Compensation Committee members because they knew or consciously disregarded the fact that

27  Reyes was improperly granting stock options.

28

SECOND AMENDED COMPLAINT

1

### Post-IPO Activity by Committee of One

2     206.     Following Brocade's IPO, the Company granted stock options to directors,

3  employees, and Section 16 officers under the 1999 Stock Plan.  Brocade also combined its pre-

4  IPO options plans into the 1999 Stock Plan.

5     207.     By its terms, the 1999 Stock Plan could be administered only by the Board or a

6  committee appointed by the Board.  Reyes was never authorized to grant options under the 1999

7  Stock Plan.  Nevertheless, Reyes granted options without authority under the 1999 Stock Plan,

8  while Dempsey, Leslie, and Neiman knew of or consciously disregarded Reyes' improper grants.

9     208.     Even though Dempsey, Leslie, Neiman, and Reyes had approved changing

10  Brocade's stock-option plans following the IPO, none of them bothered to change the form of the

11  UWCs that Reyes signed in granting stock options as the sole member of the "Stock Option

12  Committee."  For example, the post-IPO UWCs that Reyes signed still stated that Brocade was a

13  California corporation and that the "Stock Option Committee" was acting pursuant to § 307(b) of

14  the California Corporations Code.  However, Brocade had reincorporated in Delaware on

15  May 14, 1999 in preparation for its IPO – a decision made by Dempsey, Leslie, Neiman, and

16  Reyes.

17     209.     Because the Board had never formally created a "Stock Option Committee,"

18  Reyes knew, or consciously disregarded his duties in failing to understand, that the "Stock

19  Option Committee" was no longer valid after the reincorporation, because Brocade was no

20  longer operating under the California Corporations Code.  Moreover, the UWCs that Reyes

21  signed purported to grant stock options pursuant to the "Equity Incentive Plan," even though that

22  plan no longer existed after the IPO and had been replaced by the 1999 Stock Plan.

23     210.     Nevertheless, Reyes made the following stock-option grants without any

24  authority, and pursuant to a non-existent option plan, in August 1999:

25

26

27

28

| Date of UWC | Number of Options Granted |
|---|---|
| August 4, 1999 | 1,958,776 |
| August 6, 1999 | 104,000 |
| August 10, 1999 | 232,000 |
| August 12, 1999 | 240,000 |
| August 18, 1999 | 935,200 |
| August 23, 1999 | 80,000 |
| August 27, 1999 | 16,000 |

211.    Cuthbert received 480,000 options as part of the unauthorized August 18, 1999 grant.

212.    Reyes continued to grant stock options on his own between September 1999 and December 1999 by signing UWCs as the purported sole member of the "Stock Option Committee" under the defunct, pre-IPO "Equity Incentive Plan":

| Date of UWC | Number of Options Granted |
|---|---|
| September 2, 1999 | 308,000 |
| September 8, 1999 | 96,0000 |
| October 4, 1999 | 64,000 |
| December 13, 1999 | 675,952 |

213.    At a Board meeting that Dempsey, Leslie, Neiman, and Reyes purportedly attended on October 22, 1999, the Board approved and ratified the stock-option grants that Reyes had made as the Stock Option Committee between August 1999 and October 1999.  Those Defendants ignored, however, that the grants had been made under the nonexistent "Equity Incentive Plan," so the ratification was ineffective.  Additionally, the Compensation Committee never attempted to ratify the August 10, 1999 or October 4, 1999 grants.

214.    At that same meeting, Dempsey, Leslie, Neiman, and Reyes approved a Compensation Committee Charter that appointed the Compensation Committee – not Reyes – as the Administrator of the 1999 Stock Plan.  They did not authorize Reyes to grant options under either the 1999 Stock Plan or the 1999 NSO Plan (which the Board purportedly adopted on September 1, 1999).

215.    Nevertheless, Reyes signed yet another UWC (dated December 13, 1999) as the "Stock Option Committee," granting 675,952 options to more than 30 persons under the

42

nonexistent "Equity Incentive Plan."  At a Board meeting purportedly held on April 20, 2000, Dempsey, Leslie, Neiman, and Reyes approved and ratified Reyes' December 13, 1999 grants. This ratification was ineffective, because Reyes had made the grants under a defunct stock-option plan (although Brocade's Finance Department recorded the grants as having been made under the 1999 NSO Plan).

216.    Between December 13, 1999 and February 21, 2001, Reyes, in either his individual capacity or as the sole member of a fictitious committee, continued to grant stock options without any authority from the Board or the Compensation Committee and in violation of the terms of both the 1999 Stock Plan and the 1999 NSO Plan.

217.    Dempsey, Leslie, and Neiman knew of Reyes' misconduct, but did not do anything to stop it; alternatively, they consciously disregarded their duties in failing to stop Reyes' misconduct.

218.    The following table lists some of the improper grants that Reyes made between December 13, 1999 and February 21, 2001.

| Date of UWC/Minutes | Number of Options Granted |
|---|---|
| January 6, 2000 | 856,000 |
| January 31, 2000 | 2,197,100 |
| April 24, 2000 | 2,075,336 |
| May 23, 2000 | 2,145,100 |
| May 26, 2000 | 166,600 |
| July 28, 2000 | 2,156,209 |
| August 28, 2000 | 181,200 |
| September 12, 2000 | 555,000 |
| December 21, 2000 | 5,537,680 |
| January 2, 2001 | 274,350 |

219.    Finally, on February 21, 2001, almost two years after Dempsey, Leslie, and Neiman knew that Reyes was granting unauthorized stock options, the Board (controlled by those three Defendants as well as Reyes) gave Reyes the authority "to grant nonstatutory options under the NSO Plan . . . to such non-executive officer employees in such amounts as Mr. Reyes shall determine in his sole discretion with such grants to be evidenced by a certificate delivered to the Board verifying the same."  This delegation imposed two conditions on Reyes:  (*i*) he

could grant options only to "non-executive officer employees," and (*ii*) he had to deliver a certificate to the Board evidencing his grants.

220.    Neither the Board nor the Compensation Committee ever gave Reyes authority to grant options under the 1999 Stock Plan.  Indeed, the Board had already designated the Compensation Committee as the Administrator of the 1999 Stock Plan.

221.    Furthermore, although the Board gave Reyes the authority to "grant nonstatutory options under the [1999] NSO Plan," the Board never appointed Reyes as the Administrator of that plan.  Rather, the Compensation Committee was responsible for administering the 1999 NSO Plan (at least from November 3, 2000 to January 17, 2003).

222.    Reyes, as a Committee of One, proceeded to grant numerous stock options to Brocade employees below the level of vice-president, *i.e.*, "rank-and-file employees."  However, even though the Board had granted Reyes such authority under the *1999 NSO Plan*, Reyes also made grants to rank-and-file employees under the *1999 Stock Plan*, for which he never had been given Committee-of-One authority.  Accordingly, all of Reyes' grants under the 1999 Stock Plan were invalid, including the following grants:

| Date of UWC/Minutes | Number of Options Granted |
| --- | --- |
| October 30, 2001 | 847,389 |
| November 28, 2001 | 158,200 |
| January 22, 2002 | 500,050 |
| February 28, 2002 | 3,204,555 |
| July 2, 2002 | 2,245,798 |
| October 8, 2002 | 2,310,010 |
| January 27, 2003 | 2,434,667 |
| February 14, 2003 | 473,550 |
| May 22, 2003 | 1,078,100 |
| July 28, 2003 | 335,650 |
| August 15, 2003 | 8,308,871 |
| September 2, 2003 | 634,000 |
| September 15, 2003 | 65,500 |
| September 30, 2003 | 164,600 |
| October 6, 2003 | 19,130 |
| October 20, 2003 | 133,944 |
| December 10, 2003 | 2,006,750 |
| January 16, 2004 | 126,250 |
| January 22, 2004 | 270,500 |
| February 4, 2004 | 284,850 |

44

SECOND AMENDED COMPLAINT

| | |
|---|---|
| March 22, 2004 | 520,775 |
| April 20, 2004 | 317,750 |
| April 29, 2004 | 125,000 |
| May 21, 2004 | 3,149,000 |
| June 9, 2004 | 3,357,997 |
| June 21, 2004 | 383,000 |
| July 8, 2004 | 431,450 |
| July 26, 2004 | 233,800 |
| August 9, 2004 | 729,500 |
| August 12, 2004 | 1,079,800 |
| August 19, 2004 | 74,000 |
| August 20, 2004 | 600,000 |
| August 31, 2004 | 70,780 |
| September 16, 2004 | 315,047 |
| September 28, 2004 | 141,750 |
| October 5, 2004 | 69,250 |
| October 20, 2004 | 297,800 |
| November 1, 2004 | 363,375 |

223.    The members of the Compensation Committee (Dempsey, Leslie, and Neiman), which was responsible for administering the 1999 Stock Plan, breached their duties in consciously failing to supervise the administration of that Plan and in allowing Reyes to continue granting stock options under that Plan for many years.

<u>Reyes' Improper Grants to Senior Executives and Section 16 Officers</u>

224.    Even when acting under the 1999 NSO Plan, Reyes violated the Plan's terms. The 1999 NSO Plan does not authorize stock-option grants to employees "with the corporate rank of vice-president or higher, and employees with lesser rank but comparable authority," unless the grants are made "as an essential inducement to [the employee's] *entering into an employment agreement regarding his or her initial service* with the Company" (emphasis added).

225.    However, Reyes made many grants under the 1999 NSO Plan to *then-current* senior-level employees who were *not* being induced to enter into employment agreements for their "initial service."

226.    For example, in a series of grants purportedly made on April 17, 2001, Reyes granted well over 1,000,000 options under the 1999 NSO Plan to current Brocade employees

45

with the rank of vice-president or higher, and to employees with lesser rank but comparable authority.  Recipients of those options included Jensen and Canova, who were Vice Presidents, and Bossi, who (as Controller) had a lesser corporate rank but comparable authority.

227.    The April 17, 2001 grant was not an isolated incident.  For example, on July 23, 2001, Reyes granted options under the 1999 NSO Plan to Julie Chiu, Vice President of Marketing Operations, as well as to Bossi.

228.    These grants – and any others made under the 1999 NSO Plan to Vice Presidents or higher and to employees with lesser rank but comparable authority, unless made "as an essential inducement" to the employee to join Brocade – were void, and any subsequent ratification attempts by the Compensation Committee or the Board were ineffective, because such grants were impermissible under the 1999 NSO Plan.

229.    Dempsey, Leslie, and Neiman, as Board members who approved the February 21, 2001 delegation of Committee-of-One authority to Reyes, knowingly breached or consciously disregarded their duties to Brocade, or acted with gross negligence, when they purported to give Reyes more authority under the 1999 NSO Plan than the Plan actually allowed.  The Board's February 21, 2001 delegation allowed Reyes to grant options to all employees except *executive* officers, but the 1999 NSO Plan prohibited grants to *all* officers (except in limited circumstances).

230.    Reyes also exceeded his delegated authority under the 1999 NSO Plan when he acted as a Committee of One in granting stock options to executive officers because the February 21, 2001 delegation of authority applied only to "non-executive officer employees." Reyes thus did not have authority to grant 5,996 options to Bonderson on October 1, 2001.

231.    Reyes also violated his delegated authority under the 1999 NSO Plan by failing on almost every occasion to provide the Board with a certificate verifying the grants he had made.  Although Reyes made numerous different grants under the NSO Plan since February 21, 2001, he appears to have signed only one such certificate (on April 17, 2001).

232.    In addition, Reyes' grants to executive officers under the *1999 Stock Plan* were improper because neither the Board nor the Compensation Committee ever authorized Reyes to

SECOND AMENDED COMPLAINT

make grants to *anyone* under that plan. The following grants thus were unauthorized:

| Date of Grant | Grant Recipient | Number of Options Granted |
|---|---|---|
| October 1, 2001 | M. Byrd | 250,000 |
| October 1, 2001 | M. Byrd | 7,218 |
| October 1, 2001 | T. Canova | 100,000 |
| October 1, 2001 | T. Canova | 75,000 |
| October 1, 2001 | T. Canova | 3,756 |
| October 1, 2001 | J. Cuthbert | 5,451 |
| October 1, 2001 | J. Cuthbert | 200,000 |
| October 1, 2001 | G. Reyes | 12,113 |
| October 1, 2001 | G. Reyes | 1,250,000 |
| August 15, 2003 | P. Bonderson | 200,000 |
| August 15, 2003 | T. Canova | 150,000 |
| August 15, 2003 | J. Cuthbert | 300,000 |
| August 15, 2003 | M. Klayko | [ ] |
| August 15, 2003 | M. Klayko | [ ] |
| August 15, 2003 | J. Lalonde | [ ] |
| August 15, 2003 | G. Reyes | 600,000 |
| December 10, 2003 | G. Reyes | 500,000 |
| May 21, 2004 | T. Canova | 200,000 |
| May 21, 2004 | J. Cuthbert | 100,000 |
| May 21, 2004 | M. Klayko | [ ] |
| May 21, 2004 | G. Reyes | 1,100,000 |
| August 20, 2004 | T. Canova | 175,000 |
| August 20, 2004 | D. Jaworski | [ ] |
| August 20, 2004 | M. Klayko | [ ] |

233.    Dempsey, Leslie, and Neiman, in turn, consciously disregarded their duties as Board and Compensation Committee members by failing to oversee Reyes' Committee-of-One grants and by allowing Reyes to violate the sole procedural restriction they imposed on him: delivery of the certificates.

### Reyes' Improper Grants to Himself

234.    Reyes had no authority to grant any options to anyone – let alone to himself – under Brocade's 1999 Stock Plan. Nevertheless, Brocade's records reflect that Reyes, in his capacity as the Committee of One, approved the grant dates and strike prices of his own stock options on several occasions.

235.    **August 15 and December 10, 2003.** Compensation Committee minutes dated June 12, 2003 record that the Committee approved a "CEO equity recommendation of 1,100,000

stock options, with 600,000 to be granted in Q4 2003 Stock Focal and 500,000 to be granted in Q1 2004," but the minutes did not specify the exercise prices and specific dates of the grants. Brocade's stock price closed at $6.54 on June 12, 2003.

236.   Brocade's records show that Reyes, as the Committee of One, purportedly granted 600,000 stock options to himself on August 15, 2003, with a strike price of $5.53, and another 500,000 stock options to himself on December 10, 2003, with a strike price of $5.52, the closing prices of Brocade's stock on those two dates.

237.   After the Audit Committee's First Investigation, the Compensation Committee elected on January 30, 2005 to ratify Reyes' grants to himself, but with amended exercise prices. The Committee changed the exercise prices of Reyes' August 15 and December 10, 2003 grants to $5.82 and $6.34, respectively.

238.   **May 21, 2004.**  Brocade's records show that Reyes signed a Committee-of-One UWC purportedly granting options under the 1999 Stock Plan to key Company executives on May 21, 2004, at a strike price of $5.84, the closing price of Brocade's stock on that date.  Reyes granted 1,100,000 stock options to himself, together with grants to other Section 16 officers including Canova and Cuthbert, as well as to other senior executives.  These grants were void, because Reyes had no authority under the 1999 Stock Plan.

239.   The Compensation Committee also purported to make a similar grant on the same date.  However, the Compensation Committee UWC dated May 21, 2004 was executed by only one of the two Committee members.  Although the UWC had a signature block for both Dempsey and Neiman, only Neiman ever signed it.  Accordingly, the Compensation Committee's attempt to make stock-option grants that "mirrored" Reyes' improper May 21, 2004 grant was also invalid.

## **Manipulation of Committee-of-One Grants**

240.   In addition to violating option-plan terms and delegated authority as described in this Complaint, Reyes – in collaboration with Jensen and other Defendants – improperly manipulated the stock-option process from 1999 until 2004 to maximize stock profits for themselves, the remaining Defendants, and countless Brocade employees, while causing Brocade

1    to issue inaccurate financial statements that misrepresented hundreds of millions of dollars in

2    equity-related compensation expenses that the Company should have recorded.

3        241.    Reyes perpetrated this course of conduct by repeatedly granting in-the-money

4    options while pretending that the options actually had been granted on an earlier date, when

5    Brocade's stock price was lower.  He accomplished this ruse by claiming to have "met with

6    himself" as a Committee of One on those earlier dates, rather than on the later dates when he

7    actually approved the relevant option grants.

8        242.    Jensen and her HR Department participated in this plan by falsifying Brocade's

9    records to create the erroneous appearance that Reyes had approved the grants on the earlier

10   dates.  Reyes then signed an untold number of Committee-of-One grant minutes or UWCs that

11   he knew had been backdated by Jensen and her staff.

12       243.    Reyes and Jensen also were responsible for (*i*) doctoring the lists of option

13   recipients or the number of options allocated to certain recipients and (*ii*) improperly altering

14   options-vesting schedules, all after the relevant Committee-of-One minutes ostensibly had been

15   approved.

16       244.    In addition, Reyes and Jensen were responsible for falsifying other HR records,

17   such as employment-offer letters, to cover up the backdated Committee-of-One minutes and

18   UWCs by creating a fraudulent paper trail that would induce Brocade to provide improper

19   equity-related compensation to employees and would minimize the risk of detection by the

20   Company's auditors and investors.

21       245.    In fact, Reyes has conceded that backdating occurred and that it enabled

22   Defendants to understate Brocade's compensation expenses.  When the Government proved at

23   Reyes' criminal trial that Reyes had not "met with himself" on the dates that appeared in the

24   Committee-of-One minutes or UWCs that he had signed (and that Jensen or her staff had

25   prepared), Reyes argued in his unsuccessful motion for a new trial:

26       After more than five weeks of trial, the only thing the prosecution has managed to

27       prove beyond reasonable doubt was the one fact *uncontested by the Defense* – that

28       Brocade . . . had periodically used the benefit of hindsight to price stock options

1    to its rank-and-file employees and that its accounting for those options had to be

2    corrected in a financial restatement.  [Emphasis added.]

3    <u>Overview of Committee of One's Options-Backdating</u>

4    246.    To implement the backdating practices, the HR department first prepared

5    Committee-of-One option-grant documentation for Reyes' signature.  Jensen or a member of her

6    staff provided Reyes with (*i*) a list of options purportedly granted at a Committee-of-One

7    meeting on a particular past date and (*ii*) a printout of Brocade's historical stock prices.  The

8    price list was highlighted or circled to show that the historical date on the accompanying

9    Committee-of-One meeting grant list corresponded to the date of a "low" in the stock price.

10    247.    Reyes then signed the documentation for each such grant, attesting that, in his

11    Committee-of-One capacity, he had granted the options to the specified employees on that past

12    date.

13    248.    The actual form of documentation changed over time and included "minutes,"

14    UWCs, or simple lists of grantees.  For purposes of this overview of the process, all such

15    documentation will be called "minutes."  (Unless otherwise specified, references to a witness'

16    testimony in this section refer to sworn testimony that the witness gave at Reyes' or Jensen's

17    criminal trial, or at both such trials.)

18    249.    Reyes and Jensen frequently turned their attention to granting stock options,

19    although they did not have a formal schedule for this process.

20    250.    Jensen told the FBI that, in connection with option grants to new hires and

21    existing employees, Reyes began asking her in approximately March 2000 to provide him with a

22    historical stock-performance printout, together with the list of employees whose options were to

23    be determined.  Later, as Jensen and her HR team became familiar with Reyes' retrospective

24    pricing practice, they printed the stock-price chart before Reyes asked them to do so.

25    251.    Jensen or one of her HR staff members would obtain a report tracking the price of

26    Brocade's stock since the previous option-grant date from either the NASDAQ or the Yahoo!

27    website.

28    252.    Colleen Burgess (née Devine), a Compensation Analyst, and Stephen Beyer, a

50

1    Human Resources Manager, both testified that they used the Yahoo! website when Jensen asked

2    them to generate these reports.

3        253.    Burgess' "New Hire Stock Processing Memo" – known as the "Beer Truck

4    Memo," because Ward later forwarded it to June Weaver (the Director of Compensation and

5    Benefits) with the message "[i]n case I get hit by a beer truck" – described this step in the

6    retrospective pricing scheme:

7        Knowing when to price stock 1. Brocade prices stock 1-3 times during a quarter.

8        2. Steph [Jensen] will either ask you for a pricing report to be created or I will talk

9        with her about creating one. 3. To recommend a pricing date, go to

10       http://table.finance.yahoo.com/k?=brcd&g=d. 4. *Discern which date is the lowest*

11       *since the last pricing date and create the New Hire Pricing Report*. . . .  Place a

12       'sign here' sticker on the report and update and print out a copy of the Stock

13       Pricing History.  [Emphasis added.]

14       254.    Margaret Lee, from Brocade's Recruiting Operations, testified that she and Jensen

15   both used the NASDAQ website.  Patricia Kada, a Compensation Analyst, testified that she did

16   so as well.  Weaver testified that she determined a recommended price and date for a proposed

17   option grant by going to a "public website like Yahoo, or NASDAQ."

18       255.    Jensen told the FBI that the HR employee who printed the stock-price chart

19   sometimes would highlight the low price for the relevant period.  On other occasions, Jensen

20   would point out the low price to Reyes, or Reyes would review the report himself.

21       256.    Lee testified that Jensen initially would give her a NASDAQ website printout of

22   Brocade's closing stock prices for the previous 30 days with a specific date indicated (usually by

23   highlighting), and Jensen would tell Lee to prepare the stock-option grant minutes with that date.

24   Later, Jensen instructed Lee to print the NASDAQ stock-price history and highlight the three

25   dates with the lowest stock prices to show to Jensen, who – in Lee's presence – would select one

26   of the highlighted dates, and then instruct Lee to prepare the grant minutes for that date.

27       257.    Similarly, Burgess testified that, after she had printed the stock-price chart, Jensen

28   would instruct her to use a highlighter pen to highlight a couple of low dates and that, if one date

1    were significantly lower than others, Burgess should highlight that date.  Burgess testified that

2    "[o]ur process[] was to price the stock at low points during the quarter."

3        258.    Beyer also testified that Jensen had instructed him to circle or highlight two or

4    three of the lowest closing prices on the chart for the relevant period.

5        259.    Weaver testified along the same lines, stating that she looked back and

6    highlighted when Brocade's stock was at a low to recommend a grant date.

7        260.    Burgess and Beyer testified that they then took the stock-price chart – with the

8    highlighted low prices – to Jensen, so that she and Reyes could select which historical date to use

9    for options grants.  Beyer testified that, upon receiving the chart, Jensen "would take a slip and

10   essentially say, we will get back to you.  I'll talk to Greg about it."

11       261.    Both Burgess and Beyer testified that, whenever Jensen returned and gave them a

12   date to use for Committee-of-One grant minutes they were to prepare, the date was an earlier

13   date.  Burgess testified that Jensen told her which date and price to use after Jensen had reviewed

14   the lows highlighted on the Yahoo! stock-price chart that Burgess had given to her.  Beyer

15   testified that "they would instruct us which date to use, which corresponded with the pricing

16   selection."  When he was asked "[w]hen you say 'they,' who are you referring to?," Beyer

17   responded "Stephanie Jensen at the request of Greg."

18       262.    Burgess and Beyer testified that, after Jensen told them which date she, or she and

19   Reyes, had decided to use, an HR employee would create a stock-option report for new hires,

20   listing any whose options had not yet been granted.  If the grant were a QSAP grant for current

21   employees, the HR employee would create a QSAP report showing those employees eligible to

22   receive their anniversary grants.

23       263.    After the HR employee obtained a list of prospective grantees from the staffing

24   organization, he or she would format it into a particular template referred to as the "stock

25   minutes" or "pricing minutes," which usually had a date and signature line for Reyes.

26       264.    Jensen told the FBI that she usually took the grantee list and stock-price chart to

27   Reyes for his approval, although other HR employees sometimes performed that task.

28   According to Jensen, Reyes would examine both the grantee list and the stock-price chart and

1    choose a date and price for the stock-option grant.

2        265.    Burgess testified that her regular practice was to attach the Yahoo! stock-price

3    chart to the top of the stock-option report for new hires, so Reyes and Jensen could "see the

4    performance."  Burgess also testified that, after she printed out the historical price list and the

5    grant paperwork, she stapled them together, affixed a "Sign Here" sticker as a reference point for

6    Reyes to sign, and gave the documents to Jensen.

7        266.    Beyer testified that "[t]here may have been times when we included [the Yahoo!

8    stock-price chart] with the document for Stephanie's reference" when she was to take the

9    material to Reyes.

10        267.    Burgess and Beyer understood that Jensen then took the documents they had

11    prepared to Reyes so he could approve the stock-option grants.

12        268.    Weaver also testified that she would staple the stock-price chart to the grant

13    minutes she had prepared.  She would "typically highlight [the printout] or circle [the printout]"

14    showing the price and date she recommended, "and that was to have it kind of pop out for Greg

15    so he could see it fairly quickly."  Weaver would attach to the documents a cover letter that said

16    "'Greg, here is some information.  We need your signature,' recommended grant price and the

17    date…."  She then would personally deliver the documents to Reyes or to his assistant (Bessie

18    Rishel) or Chief of Staff (Yin Cantor) for Reyes to sign the grant minutes.  According to

19    Weaver's testimony, Ward or, later, Kada would prepare the documents that would be stapled

20    together in this fashion and that Weaver would deliver to Reyes.

21        269.    Kada testified that she would prepare the grant materials for Reyes in accordance

22    with the instructions in a document that was similar to the "Beer Truck Memo."  She would

23    collate an unsigned UWC, a sheet summarizing the stock options being granted, a "NASDAQ

24    download," and a cover memorandum from Weaver or Ward requesting approval of the options.

25    She would place them in a red folder on Ward's desk for Reyes' signature.

26        270.    Cantor testified that Rishel would bring Reyes stacks of papers, and he would sign

27    the option-grant lists in the same manner he signed expense reports, simply by flipping to the

28    "Sign Here" sticker and signing his name.

SECOND AMENDED COMPLAINT

271.    Weaver testified that, after she assumed greater responsibility for stock-option grants in mid-2003, she met face-to-face with Reyes in his office to obtain his approval of option grants.  Weaver testified that she brought Reyes an unexecuted set of the grant minutes with the affixed stock-performance chart during these meetings.  When asked whether she recalled Reyes' reviewing the historical price information that she had affixed to the grant documentation, she testified:

A.    Yes.  I do remember one or two occasions where . . . he flipped through the information and I do remember him looking at the pricing.

Q.    . . . Do you have an understanding . . . as to what he was doing with the historical price information that you were providing to him?

A.    I believe he was looking at making sure that we got a low stock price . . . .

Q.    Do you recall any occasion where a new grant hire that you proposed to Mr. Reyes in the manner you have described was rejected by him or where he said no to the price that you were recommending?

A.    I do not remember a time.

272.    Similarly, Burgess testified that she could not recall Reyes' ever selecting dates other than the ones with the low stock prices that she had highlighted and presented to Jensen. Beyer also testified that he could not recall options' ever being priced on a date other than one of those with the low stock prices that he had circled on the Yahoo! stock-price chart to include with the minutes given to Reyes.

273.    Jensen told the FBI that it soon became obvious that Reyes consistently picked the date with the lowest stock price for the grant date.  Jensen said that Reyes was responsible for the option-pricing process and that she was simply following his orders.  Jensen told the Audit Committee during its First Investigation that Reyes had told her that "I made decisions on pricing" and that stock-option pricing was his "domain."

274.    Jensen also told the FBI that, when she informed Reyes that consistently pricing Committee-of-One grants at a low price did not "look good," Reyes responded that he was "going to [price] on the lows" and that he was "head of the compensation committee" and would

1  "make the decisions."

2      275.    Jensen also oversaw the falsification of other grant documentation.  For example,

3  members of the HR Department occasionally forged Reyes' signature on grant minutes or cut his

4  signature from one set of grant minutes and pasted it into another set.

5                          Attempts to Conceal the Backdating

6      276.    HR personnel took steps to conceal the process of granting and pricing stock

7  options based on historical stock-price information.

8      277.    Lee testified that, after giving Jensen the stock-option grant minutes she had

9  prepared, she (Lee) disposed of the highlighted stock-price charts in a confidential destruction

10  bin.  Jensen also told the FBI that she generally would destroy the stock-performance chart after

11  Reyes had selected the grant date.

12      278.    Liza Cuevas, a Senior Human Resources Manager, testified that, when she asked

13  Jensen about the highlighted prices on a historical stock-performance chart, Jensen explained

14  that Reyes did not want the backdating process to be too obvious.

15      279.    Burgess testified that, on another occasion, Jensen told her that she (Jensen)

16  would not pick the lowest price for a new-hire grant because she did not want the fact that she

17  and Reyes consistently selected a low price for options grants to be too obvious.

18      280.    Jensen also instructed her team to communicate only face-to-face about their

19  option-granting protocol.  Beyer, Devine, and Lee all testified that Jensen directed them not to

20  discuss option pricing by e-mail, and Lee testified that Jensen told her to refrain from using

21  either e-mail or voicemail to discuss option-pricing issues.

22                  Concerns about Legality and Ethics of Options Practices

23      281.    Several HR employees testified that they feared that the options-backdating

24  practices they were carrying out for Reyes and Jensen were at least unethical and possibly illegal.

25      282.    Beyer, for example, testified that, "[i]nitially, my concerns were based more on

26  was this really an ethical practice in reference to the stock option process.  Later on that changed

27  to a concern about the possible legality of the process."

28      283.    Beyer had been involved in creating different versions of offer letters for a new

                                    55

hire (Richard Geruson), and he testified that "[w]e essentially changed Mr. Geruson's offer I believe as many as three times . . . simply to reflect the strike price. . . ."  Beyer testified that he told Jensen that he was concerned about the legality of the process being used to grant stock options, and Jensen responded that "she was not concerned about the legality of the issue, and that we had been directed by Greg Reyes to complete the process, and we were going to do so." According to Beyer, Jensen later directed him to tell the payroll department that Geruson had been a Brocade employee since October 30, 2001 – a fact that Jensen knew was not true.

284.    Lee testified that the process of changing new-hire offer letters for Dan Cudgma, Geruson, and Dean Traut troubled her:  "I didn't want to change our offer letters.  I didn't think it was a true reflection of when they started . . . .  I also was struggling with changing people's hire dates and them not knowing it. . . ."

285.    Lee felt so uncomfortable about making changes to offer letters that, as a precautionary measure in case her conduct were ever questioned, she took documents home as evidence, "[b]ecause I was being asked to do something I thought was unethical."  Lee testified that she told Teresa Uchida, Director of Recruiting, that she (Lee) no longer wished to be involved in the options process because of the time pressures involved and the concerns "in terms of the ethics involved with the process . . . .  I knew that Stephanie was picking off a list, and I didn't believe that there was a meeting.  And I just thought that that was unethical."

286.    Weaver also testified that she was uneasy about the retrospective pricing of options, so she attempted to shorten the "look-back."  In addition, Weaver testified that she was concerned that Reyes was purporting to have granted options when he was not in the office.

287.    Robert Morris was a Human Resources Information System Administrator who, at Jensen's direction, oversaw the deletion and subsequent recreation of employment records in Brocade's Oracle database for Cudgma and Traut.  Morris testified that he was concerned that his actions were wrong or illegal, and he told Jensen that he would not continue to assist her because he felt uncomfortable changing the Oracle records in this fashion.  According to Morris, Jensen told him that she would not ask him to do anything he was uncomfortable doing and that, "if they ever come after us, they will come after me or Greg."

1

### Finance Department's Role

2    288.    After Reyes had signed the stock-option grant minutes according to the process

3    described in this Complaint, an HR employee would deliver the signed minutes to Elizabeth

4    Moore, Brocade's Stock Plan Administrator, who was a member of Brocade's Finance

5    Department and reported to the Controller (Bossi).

6    289.    Moore would review the grant minutes for errors and input the grant information

7    (grantee's name, number of options granted, grant date, exercise price, closing stock price on

8    grant date, and vesting schedule) into the Equity Edge computer program (previously called

9    Share Data), which tracked Brocade's stock-option transactions.  Each Brocade employee who

10    received stock options had his or her own account in Equity Edge.

11    290.    Moore would next use Equity Edge to generate and print out a Stock Option

12    Agreement for each option recipient, detailing the number of options granted, the exercise price,

13    and the vesting schedule for the grant.

14    291.    Moore would then take the printed Stock Option Agreements to Brocade's

15    Controller (Bossi), and both Moore and Bossi would check the Agreements against the signed

16    grant minutes for accuracy.  If the information in the Stock Option Agreements matched the

17    information in the grant minutes, Bossi typically would sign the Stock Option Agreements or the

18    Notice of Grant of Stock Options attaching the Agreement on behalf of Brocade (unless Bossi

19    himself received options, in which case the CFO typically would sign the Agreement).

20    292.    Moore would then distribute the signed Stock Option Agreements to the

21    employees for them to execute and return to the Finance Department.

22    293.    To exercise options, employees would complete a "Notice to Exercise" form and

23    submit it to the Finance Department.  Bossi would then send a letter to the transfer agent holding

24    shares of Brocade's stock to effect the transfer.  Copies of the Notice to Exercise Form also were

25    sent to the payroll and accounting departments.

26    294.    Employees could exercise options by writing a check to Brocade to cover the

27    exercise price or by electing a "cashless" exercise, which involved using a brokerage house to

28    exercise the options and sell the stock.  The employee would pay a commission to the brokerage

1    house and receive the net cash proceeds of the difference between the options' exercise price and

2    the stock's sale price on the market.

3    **Particular Faulted Committee-of-One Grants**

4    295.    As discussed in detail below, the Committee of One (*i.e.*, Reyes) made at least 40

5    faulted stock-option grants that were improperly backdated and/or made to persons who had not

6    yet started working for Brocade.  (As discussed above, some of those grants also were defective

7    because Reyes purportedly approved them under plans that did not give him authority to do so.)

8    296.    Various Brocade employees knew about and assisted Reyes in making those

9    improper grants, including, but not limited to, Jensen, Byrd, Canova, and Bossi.

10    297.    The Board members who created the Committee of One and delegated to it the

11    authority to make certain grants either knew about the improper grants and failed to act, or

12    consciously disregarded their duties to oversee the Committee of One.

13    298.    The faulted Committee-of-One grants were made pursuant to the 1999 NSO Plan

14    or the 1999 Stock Plan, both of which required the grant date to be the date the Administrator

15    determined to make the grant, or a later date.  Nothing in either Plan permitted a grant to be

16    dated earlier than the date the grant actually was made.

17    299.    In addition, the Board's purported February 21, 2001 delegation of authority to

18    Reyes under the 1999 NSO Plan required him to execute a certificate informing the Board of the

19    grants he made as a Committee of One.  Reyes appears to have executed only one such

20    certificate, and (as discussed below) there is no evidence that even that lone certificate was sent

21    to the Board.

22    300.    Dempsey, Leslie, and Neiman failed to take any steps to require Reyes to comply

23    with the certificate requirement.

24    301.    Some of the faulted grants made by the Committee of One are described below.

25    May 19, 1999 Grant

26    302.    Brocade's records reflect that the Committee of One granted 360,000 stock

27    options to Bossi when he was hired.  Those options had a strike price of $1.00 and a purported

28    grant date of May 19, 1999, even though Bossi was not a Brocade employee on that date.  The

58

1   Committee-of-One minutes state that the options were granted under the "Equity Incentive

2   Plan."  However, as discussed in this Complaint, Reyes had no authority to make grants under

3   the 1998 Equity Incentive Plan after October 9, 1998 when he had granted all 400,000 bonus-

4   related options that he was authorized to make, and he had no authority to grant options under

5   any of the other pre-IPO stock-option plans.

6        303.    Bossi signed an offer letter dated May 17, 1999 when he accepted the position of

7   Controller.  The offer letter, which Byrd also signed, said that Bossi would be granted 360,000

8   stock options, and listed his start date as June 21, 1999.  Beside the listed start date, however, is a

9   handwritten note that states:  "START DATE ONE WEEK EARLIER."  Bossi thus appears to

10  have begun working for Brocade on or about June 14, 1999 – nearly a month after the grant date

11  of his stock options.

12       304.    The closing price of Brocade's stock on June 21, 1999 was $10.56; the closing

13  price one week earlier on June 14, 1999 was $6.62.  Both of those prices (which are post-IPO

14  prices) are significantly higher than the $1.00 price of the May 19, 1999 grant (which

15  purportedly was issued before the IPO).

16                                    July 20, 1999 Grant

17       305.    Brocade's records show that the Committee of One appears to have granted stock

18  options to Shunjia (or "Jacqueline") Yu on July 20, 1999 as a new-hire grant.  These options,

19  which purportedly were issued under the 1999 Stock Plan, had a strike price of $13.5625, the

20  closing price for Brocade stock on that date.  The evidence demonstrates that the grant was not

21  made until after July 20, 1999.

22       306.    The strike price apparently was based on Yu's request that her options be priced

23  in accordance with the closing price for Brocade stock on July 20, 1999.  In a July 21, 1999 e-

24  mail to Byrd, Yu stated:  "I would like to have my . . . shares of stock at the option price of

25  yesterday's closing price."

26       307.    That same day, Byrd forwarded Yu's e-mail to Bossi and instructed Bossi to have

27  the request processed.  This e-mail exchange demonstrates that the earliest possible grant date

28  was actually July 21, not July 20, 1999.

308.    Brocade's stock price on July 20, 1999 ($13.5625) was the lowest stock price from July 14, 1999 to August 2, 1999.  Brocade's shares closed at $13.97 on July 21, 1999 – $0.4075 higher than on the purported grant date.

<u>August 4, 1999 Grants</u>

309.    Brocade's records show that the Committee of One granted stock options to Kevin Clark, Jan Nordh, and Nick Urick at the time each was hired.  These options had a strike price of $12.2735, the closing price for Brocade stock on August 4, 1999.  Brocade's records reflect that none of those individuals were Brocade employees on that date.  Equity Edge records the options as having been issued under the 1999 Stock Plan.  However, the Committee-of-One minutes state that the options were issued under the "Equity Incentive Plan," which appears to be one of the pre-IPO plans that were no longer in existence at the time of the purported grant.

310.    Clark, who was hired for the position of Assistant Controller reporting to Bossi, executed an offer letter dated August 4, 1999.  However, Clark was still being evaluated for the position two weeks later, as an interview assessment form dated August 18, 1999 reveals.  Furthermore, the date of Clark's Offer Letter Authorization form and the dates next to Reyes' and Bossi's signatures on that form have been visibly altered to reflect an August 4, 1999 date.

311.    Nordh's Offer Letter Authorization, which Reyes also signed, is dated August 17, 1999.  Nordh's offer letter is dated August 4, 1999 and was executed on August 19, 1999.  Thus, the authorization to hire Nordh and his acceptance of that offer did not occur until approximately two weeks after the purported August 4, 1999 grant date of his stock options.

312.    Urick's offer letter was dated August 9, 1999, and Urick signed it on August 11, 1999 – a week after the stock options' purported grant date.  Bonnie Adamson-Smith contacted Byrd around this time asking for "approval to up Nick's offer to include up to $[ ] sign on."  Byrd approved this increase on August 9, five days after the purported grant date.  Reyes, Byrd, and Cuthbert all signed the Offer Letter Authorization for Urick's hiring.  Reyes and Cuthbert signed the related Employment Requisition form.

313.    The offer letters to Clark, Nordh and Urick all stated that the offeree could decide whether his options would be priced on the date he was hired or on some other date of his

choosing.  It is not clear whether any of the offerees chose his grant date, but, in any event, each of them received options with a grant date before his date of actual employment.  The Company's stock price on August 4, 1999 was $12.27, which was the lowest stock price from July 1, 1999 to September 13, 2002.

<u>August 6, 1999 Grants</u>

314.    Brocade's records show that the Committee of One granted stock options to Daniel Chung at the time he was hired.  Those options had a strike price of $13.6875, the closing price for Brocade stock on August 6, 1999.  The records reflect that Chung was not a Brocade employee on that date.  Equity Edge records the options as having been issued under the 1999 Stock Plan.  However, the Committee-of-One minutes state that the options were issued under the "Equity Incentive Plan," which appears to be one of the pre-IPO plans that were no longer in existence at the time of the purported grant.

315.    On August 5, 1999, Bonderson e-mailed Reyes asking him to approve an offer to Chung and to increase the number of options granted to him.  Reyes approved Bonderson's request.

316.    Chung's offer letter, which Bonderson signed, is dated August 6, 1999.  Chung did not execute the letter accepting employment until August 9, 1999, three days after his purported grant date.

317.    Chung's offer letter allowed him to decide whether his options (which were to be granted in two installments) would be granted on his first date of employment or on any two other dates of his choice.  It is not clear whether Chung chose his grant date.

<u>September 1, 1999 Grants</u>

318.    Brocade's records show that the Committee of One appears to have granted stock options to Jeffrey Seltzer and Derek Granath when they were hired.  Those options, which were purportedly issued under the 1999 NSO Plan, had a strike price of $23.12, the closing price for Brocade stock on September 1, 1999.  The evidence demonstrates that Seltzer's and Granath's grants were not made on September 1, 1999, but at some later date.

319.    Seltzer's grant date was based on his request in an October 21, 1999 e-mail asking

61

Byrd to price his options based on the September 1, 1999 stock price: "I've decided to set all my options at 9/1/99 close. . . .  Thanks for your guidance during the decision making process." Byrd responded on October 22, 1999: "I already took care of this."  Seltzer's offer letter is dated September 24, 1999, and Seltzer signed it on September 27, 1999 – nearly a month after the purported grant date.

320.    As for Granath, he was not even employed by Brocade on September 1, 1999. The Offer Letter Authorization form for his offer – which Reyes and Byrd signed – is dated September 16, 1999.  Granath's offer letter, which Byrd signed, is dated September 20, 1999, and Granath signed it on September 21, 1999.  Moreover, a note from Peter Tarrant to Reyes, dated September 1, 1999, requests a grant of a particular number of options for Granath.  Reyes signed the Offer Letter Authorization with a September 16, 1999 date and wrote "approved" on Tarrant's note.  The option grant thus was not determined until several weeks after the purported September 1 grant date.

321.    The offer letters to both Seltzer and Granath informed them that they could decide whether their options would be granted on the first date of their employment or on another date of their choice.  Seltzer chose September 1, 1999 as his grant date.  It is not clear whether Granath chose his grant date.

322.    Brocade's stock price on September 1, 1999 ($23.21) was its second-lowest price for the period from September 1, 1999 to March 27, 2001.  The only lower price occurred on September 2, 1999 ($22.81).  The price on October 21, 1999 was $32.42; the price on September 16, 1999 was $28.67.

<u>October 4, 1999 Grants</u>

323.    Brocade's records show that the Committee of One appears to have granted stock options to several new hires (Bradley Morgan, Paul Trowbridge, and Jennifer Hart) with a strike price of $25.85 ($206.81 before splits), the closing price for Brocade stock on October 4, 1999.  The evidence demonstrates that these grants, which purportedly were issued under the 1999 NSO Plan, were not made until some later date.

324.    The offer letter of Bradley Morgan, who was hired as Director of System

1   Engineering, is dated October 3, 1999, and the offer purports to have been accepted on that date.

2   However, the Offer Letter Authorization that authorized the hiring – and that Jensen signed – is

3   dated October 4, 1999.

4         325.    The Offer Letter Authorization states that the offer will be valid for eight days.

5   This notation is followed by a parenthetical note stating "till 11/5" – thus suggesting that the

6   Offer Letter Authorization was executed eight days before November 5, or on October 28, 1999

7   (rather than October 4). Nonetheless, the Offer Letter Authorization explicitly states that

8   Morgan is to receive her options "@ 10/4/99 stock price of $206.813."

9         326.    Paul Trowbridge received options with a purported October 4, 1999 grant date

10  when he was hired as European Marketing Manager. His offer letter is dated October 1, 1999,

11  but the Offer Letter Authorization for his employment and the related Employment Requisition

12  form – both of which Byrd signed – are dated October 13, 1999.

13        327.    Trowbridge's HR file also contains a handwritten note from Tarrant to Reyes

14  recommending the grant for Trowbridge. The note is dated October 4, 1999, even though

15  Trowbridge's hiring was not approved until October 13, 1999. Reyes signed the note and

16  approved the grant.

17        328.    As with other new hires, Trowbridge's offer letter said he could choose his own

18  grant date.

19        329.    Jennifer Hart – initially hired as a consultant and then as an employee in the

20  position of External Communications Manager – received stock options with a purported

21  October 4, 1999 grant date when she joined Brocade as an employee, but the evidence shows that

22  the terms of Hart's employment were not finalized until after that date.

23        330.    A handwritten note in Hart's HR file sets out Tarrant's recommendation to Reyes

24  about Hart's option grant, and it contains Reyes' signature next to the word "APPROVED." The

25  handwritten note is dated October 4, 1999, but an October 31, 1999 e-mail from Tarrant to

26  Jensen (copied to Hart) states that Tarrant "had to tweak the final offer to get Jennifer to

27  accept. . . . Could you please have Bonnie redo the offer letter and send to Jennifer ASAP. . . .

28  P.S. Greg's input was do what we needed to do to close, but no Director title."

331.    Jensen forwarded the e-mail to Adamson-Smith on November 2, 1999, and wrote "please update letter, I can do final review and then you can send e-mail to her . . . hard copy for Peter T[arrant] to sign when he gets back in the office."  Thus, as of November 2, 1999 – well after Hart's purported grant date – Hart's employment terms and the underlying employment documents had not yet been finalized.

332.    Brocade's stock price on October 4, 1999 was $25.85, which was Brocade's lowest stock price from September 14, 1999 to March 23, 2001.

### October 12, 1999 Grant

333.    Brocade's records show that the Committee of One appears to have granted stock options to Pamela Alvarez when she was hired.  These options, which were purportedly issued under the 1999 NSO Plan, had a strike price of $28.75, the closing price for Brocade stock on October 12, 1999.  The evidence demonstrates that this grant was not made until sometime after that date.

334.    On October 20, 1999, Byrd e-mailed Jensen a schedule of new hires, including Alvarez.  Byrd asked Jensen to "look at whether it's to the employees [*sic*] advantage to grant the option on their start date.  Let's discuss how to handle."  Thus, eight days after the purported grant, Byrd and Jensen were discussing which grant date to select.

335.    Brocade's stock price on October 12, 1999 ($28.75) was Brocade's third lowest stock price for the period from October 12, 1999 to March 8, 2001.

### October 13, 1999 Grant

336.    Brocade's records reflect that the Committee of One granted stock options to Ganapathy Subbaraman (or "Josh Maxwell") when he was hired.  The options had a strike price of $27.48 ($219.88 before splits), the closing price for Brocade stock on October 13, 1999.  The evidence demonstrates that the October 13, 1999 grant was not made until sometime after October 28, 1999.  Equity Edge records the options as having been issued under the 1999 NSO Plan.  However, the Committee-of-One minutes state that the options were issued under the "Equity Incentive Plan," which appears to be one of the pre-IPO plans that were no longer in existence at the time of the purported grant.

337.    On October 15, 1999, two days after the purported grant date, Subbaraman e-mailed Byrd and Adamson-Smith stating:  "I have decided today (Friday – October 15, 1999) will be the day that I want my stock options . . . granted so has [*sic*] to fix the exercise price of the option."  Two days later, Byrd forwarded Subbaraman's e-mail to Adamson-Smith and requested, "Please let me know if we already set his price."

338.    Adamson-Smith responded to Byrd in an October 18, 1999 e-mail, stating: "Subbu started on the 12th, and there is a lower price out there than what he's chosen.  On the 13th, the closing price was $219.875.  I would like to grant his options at that price instead of the $221.125 he asked for."  Adamson-Smith added that "Hal [Smith] was mentioning special deals we [*sic*] on the stock price for new hires in front on [*sic*] Subbu so he [Subbaraman] knows there's the potential for something better."

339.    Byrd replied by e-mail on the same day, stating, "Please get me a list asap of the people who the price may not have been set for.  I'd like to see the offer date, accept date and start date."

340.    Over a week later, in an October 26, 1999 e-mail, Adamson-Smith asked Byrd: "Is there any way we can update Subbu on this?"  Byrd answered by e-mail on October 28, 1999, stating that he would "resolve when I am in the office next week."

341.    This evidence thus demonstrates that, as late as October 28, 1999 – approximately two weeks after the purported grant date – the terms of Subbaraman's grant were not final.

342.    Brocade's stock price on October 13, 1999 ($27.49) was the lowest price for the week from October 11, 1999 to October 15, 1999.  The price on October 28, 1999 was $34.49.

<div align="center">October 15, 1999 Grant</div>

343.    Brocade's records reflect that the Committee of One appears to have granted stock options to Santokh Sohal when he was hired.  The options, which purportedly were issued under the 1999 Stock Plan, had a strike price of $27.64, the closing price for Brocade stock on October 15, 1999.  The evidence demonstrates that this grant was not made on October 15, 1999 – when Sohal was not even an employee of Brocade – but at a later date.

344.    A November 2, 1999 e-mail from Lovas to Byrd and Bonderson advised them that

<div align="center">65</div>

Sohal "is to start tomorrow," two-and-a-half weeks after the purported grant date. Lovas' e-mail also stated that Sohal was having second thoughts about working for Brocade and wanted to "bail" on his offer because he was "concerned about our stock price compared to" that of his current employer. Lovas suggested that someone from management speak with Sohal.

345.    An October 20, 1999 e-mail from Byrd to Jensen that includes a list of new hires similarly identifies Sohal as having a start date of November 3, 1999.

346.    Because Sohal did not begin working at Brocade until – at the earliest – November 3, he could not have been granted stock options on October 15, 1999.

347.    Brocade's stock price on October 15, 1999 ($27.64) was the lowest price from October 15, 1999 to March 8, 2001. The stock price on November 3, 1999 was $34.12.

<u>October 18, 1999 Grant</u>

348.    Brocade's records show that the Committee of One appears to have granted stock options to Jim Rothstein when he was hired by Brocade. These options, which purportedly were issued under the 1999 NSO Plan, had a strike price of $28.41 ($227.25 before splits), the closing price for Brocade stock on October 18, 1999. The evidence demonstrates that the grant was not made on October 18, 1999, but, rather, sometime after November 4, 1999, when Brocade's stock price was significantly higher.

349.    A November 4, 1999 e-mail from Jensen to Byrd shows that Rothstein's options grant was not final – and that Rothstein had not even been sent an offer letter – more than two weeks after the purported October 18 grant date. Jensen wrote:

Jack [Cuthbert] and Charlie [Smith] have identified Sales Exec candidate for
Northwest, Jim Rothstein. Agree on comp package, Greg has approved. . . .
Candidate issue-Charlie called and would like to get stock price set -- to "intv
date" of Thursday, Oct 18 @ 227.25 . . . the date Charlie qualified him for the job
. . . and kind of made a verbal . . . . Otherwise the offer goes out this week.

350.    Byrd replied by e-mail the same day: "Please see me on this. When did he interview with Greg. [*sic*] In the future I want to handle these issues verbally if we can."

351.    Byrd's e-mail demonstrates that he recognized the problematic nature of Jensen's

SECOND AMENDED COMPLAINT

1   request to backdate Rothstein's options grant to a date before Rothstein was even employed.  But

2   instead of rejecting Jensen's request to backdate Rothstein's options, Byrd simply suggested that

3   Jensen handle these types of issues verbally.  And Rothstein's grant was in fact backdated to a

4   date before he began working for Brocade.

5          352.    Brocade's stock price on October 18, 1999 ($28.41) was the lowest price from

6   October 18, 1999 to March 8, 2001.  The stock price on November 4, 1999 was $36.12.

7                                      January 6, 2000 Grant

8          353.    Brocade's records show that the Committee of One appears to have granted stock

9   options, purportedly under the 1999 Stock Plan, to David Smith when he was hired, with a strike

10  price of $37.27 ($149.06 before splits), the closing price for Brocade stock on January 6, 2000.

11  The evidence demonstrates that Smith's grant was not made until sometime after January 6,

12  2000, when Brocade's stock price was significantly higher.

13         354.    More than a month after the purported January 6, 2000 grant date, Smith had not

14  yet received an employment offer from Brocade.  In a February 10, 2000 e-mail from Jensen to

15  Stacey Connelly (attaching a draft offer letter to Smith), Jensen stated:  "[P]lease print this [draft

16  offer letter], and I'd like Mike to do a final review . . . .  We'll then give it to Greg to sign and

17  fax to Dave [Smith] . . . .  I'll need to call him to get his home address . . . or Greg can get that

18  from him when he calls him to extend the offer."

19         355.    The metadata for the draft offer letter show that the document was created, last

20  printed, and last saved on February 10, 2000.

21         356.    Even though the draft offer letter that Jensen sent to Connelly was not drafted

22  until February 10, 2000, it bears a January 6, 2000 date and states:  "Brocade is offering you a

23  stock option on . . . shares of Common Stock . . . with your start date of January 6, 2000, your

24  stock will be priced at 149.063 per share."

25         357.    On February 10, 2000, Connelly sent an e-mail to Jensen, advising that Smith's

26  offer letter was "faxed to Dave and sent out Fedex with enclosures and Brocade goodies."

27         358.    On February 15, 2000, Jensen e-mailed Reyes and Byrd asking them to review a

28  draft e-mail that Jensen planned to send to Smith in which she stated:  "Dave, we are VERY

67

SECOND AMENDED COMPLAINT

1    excited about you joining the Brocade team. . . .  Greg structured a very aggressive stock

2    package, [ ] shares presplit [*sic*] with a stock price set on your part-time start date with Brocade."

3    Reyes and Byrd approved the draft e-mail that same day.  Later that day, Jensen sent the e-mail

4    to Smith, with a copy to Reyes.

5        359.    On February 18, 2000, Jensen updated the offer letter to Smith and then

6    forwarded it to Joanie Morgado and Connelly, stating:  "Please print . . . and get Greg's

7    signature."

8        360.    The evidence thus demonstrates that Brocade did not transmit an offer letter to

9    Smith until (at the earliest) February 10, 2000, long after the purported January 6 grant date.  The

10   letter was backdated to give the false appearance that the grant had been properly made.

11       361.    In addition to the various offer letters, further support that the January 6, 2000

12   grant to Smith was backdated includes the fact that interviews with Smith were scheduled for

13   January 16 and February 7, 2000, as evidenced by a January 14, 2000 e-mail from Jensen to

14   Reyes confirming the January 16, 2000 interview and an electronic calendar entry for a 10:00

15   a.m. interview with Smith on February 7, 2000.  Moreover, a March 6, 2000 e-mail from Jensen

16   to Smith states that Smith's start date will be April 3, 2000.

17       362.    Brocade's stock price on January 6, 2000 ($37.26) was at its lowest point for the

18   entire year 2000.  The stock price on February 10, 2000 was $50.41; the price on February 18

19   was $68.97.

20                              May 23, 2000 Grants

21       363.    Brocade's records reflect that the Committee of One purportedly granted stock

22   options under the 1999 NSO Plan or the 1999 Stock Plan to certain new hires and to a promoted

23   employee on May 23, 2000, with a strike price of $47.50, the closing price for Brocade stock on

24   that date.  The evidence demonstrates that at least a substantial number of those grants were not

25   made on May 23, 2000, but on a later date.

26       364.    Multiple versions exist of minutes memorializing a purported May 23, 2000

27   Committee-of-One meeting at which grants supposedly were made to various individuals.  The

28   different versions of the minutes are signed by Reyes, and, in some instances, also by Jensen

(even though Jensen was not authorized to grant stock options).

365.    The evidence shows that all but one version of the minutes were finalized after May 23, 2000 and that the purported May 23 minutes were revised numerous times after that date, with the apparent purpose of awarding in-the-money options to employees hired after May 23.  These new hires thus received the benefit of Brocade's relatively low stock price on May 23, even though they were not employed by Brocade until after that date.

366.    The first version of minutes relating to the purported May 23 grants is found in a document titled "Minutes of [Committee of One] Compensation Committee meeting on May 23, 2000" (the "Original May 23 Minutes").  These minutes, which bear a date of May 23, 2000, are signed by Reyes and Jensen and list persons to whom options are being granted.

367.    A second document – titled "Addendum to [Committee of One] Compensation Committee Minutes" –  also bears a May 23, 2000 date and is signed by Reyes (the "May 23 Addendum").  This document purports to grant stock options to new hires who are not identified in the Original May 23 Minutes.  Moore testified that the May 23 Addendum was prepared after May 23, 2000, but the stock-option grants it purports to authorize are listed in Brocade's records as having been granted on May 23, 2000.

368.    Moore testified that the May 23 Addendum authorized grants to new hires who inadvertently had been left off the list in the Original May 23 Minutes.

369.    An untitled document, also dated May 23, 2000 and signed by Reyes, approves a stock-option grant to Bill Lewis.  This grant was not authorized in either the Original May 23 Minutes or the May 23 Addendum, even though it is listed in Brocade's records as having been made on May 23, 2000.  Moore testified that she received the Lewis grant documentation from HR sometime after May 23, 2003.

370.    Brocade's records also include a second version of minutes memorializing a purported May 23, 2000 meeting of the Committee of One (the "Second May 23 Minutes").  The Second May 23 Minutes, which Reyes signed, grant stock options to additional new hires who were not identified in any of the prior documents that purport to relate to the May 23, 2000 Committee-of-One meeting.  Only one grantee identified in the Second May 23 Minutes (Karen

SECOND AMENDED COMPLAINT

1    Collins) is also identified in the Original May 23 Minutes.

2        371.    While most of the grants in the Second May 23 Minutes are listed in Equity Edge

3    as having been made on May 23, 2000, the Second May 23 Minutes also purport to grant stock

4    options to the following individuals who are *not* identified in Equity Edge as having received

5    grants on May 23, 2000:  Esther Birsky, David de Simone, Diane Duffy, Scott Eaton, and Irene

6    Jiang.  In addition, a handwritten notation crosses out the grants to Esther Birsky and Irene Jiang

7    with the notation "Term?" next to their names.

8        372.    Moore testified that she received the Second May 23 Minutes after having

9    received the Original May 23 Minutes, the May 23 Addendum, and the Lewis grant documents.

10   Moore also testified that she returned the Second May 23 Minutes to HR to correct the document

11   based on the handwritten notations.

12       373.    Yet another document titled "Minutes of [Committee of One] Compensation

13   Committee meeting on May 23, 2000" and bearing a May 23, 2000 date purports to memorialize

14   a May 23, 2000 meeting of the Committee of One (the "Third May 23 Minutes").

15       374.    The Third May 23 Minutes, which both Reyes and Jensen signed, authorize some,

16   but not all, of the stock-option grants authorized in the Original May 23 Minutes, the May 23

17   Addendum, and the Second May 23 Minutes (but not the grant to Lewis).

18       375.    Most of the grants authorized in the Third May 23 Minutes are listed in Equity

19   Edge as having been granted on May 23, 2000, but the Third May 23 Minutes also purport to

20   authorize grants to two individuals (Diane Duffy and Lalit Pathak) who are *not* identified in

21   Equity Edge as having been granted stock options on that date.

22       376.    Brocade's records show that a document substantially similar to the Third May 23

23   Minutes was created on June 7, 2000 and was last saved on August 7, 2000.

24       377.    Moore testified that the Third May 23, 2000 Minutes – which she received after

25   receiving the Original May 23 Minutes – were the final, correct version of the minutes of the

26   purported May 23, 2000 Committee-of-One meeting.  Moore also said that the various versions

27   of the minutes of the meeting purportedly held on May 23 were finalized at some point after

28   May 23, even though all versions of the minutes (and related documents) bear the same May 23,

1  2000 date.

2      378.    At least one of the new hires who purportedly were granted stock options on

3  May 23, 2000 was not employed by Brocade on that date.  That individual – Anthony Logan –

4  apparently did not even receive an offer letter until June 27, 2000.

5      379.    Brocade's stock price of $47.50 on May 23, 2000 was the lowest price of the

6  preceding month and subsequent nine months.

7                                  August 28, 2000 Grants

8      380.    Brocade's records reflect that the Committee of One purportedly granted stock

9  options with a strike price of $102.8125, the closing price for Brocade stock on August 28, 2000.

10  The grants were made pursuant to the "New Hire" program and were issued under either the

11  1999 NSO Plan or the 1999 Stock Plan.  The evidence establishes that many of the grants were

12  not made until after August 28, 2000, when Brocade's stock price was higher.

13      381.    For example, a new hire named Mayura Jayam received a grant dated August 28,

14  2000.  However, Brocade's records reflect that Jayam was not even an employee on that date.  In

15  a December 15, 2000 e-mail to Moore, Jayam stated that she had started work on September 6

16  but had not yet received her options grant.

17      382.    Moore replied in a December 18, 2000 e-mail, stating "I have not received stock

18  pricing for you yet.  The Comp Committee has not issued new option prices because of the

19  recent stock market decline.  Please check again with me next week."  Moore testified that she

20  meant to refer to Reyes – rather than the Compensation Committee – in this e-mail.  In any

21  event, the e-mail shows that Jayam's grant had not been finalized nearly four months after it

22  purportedly was made.

23      383.    Brocade's stock price on August 28, 2000 was the lowest it had been for the

24  three-month period beginning August 17, 2000 and ending November 17, 2000.

25                                  April 17, 2001 Grants

26      384.    Brocade's records reflect that the Committee of One purportedly made several

27  stock-option grants on April 17, 2001, with a strike price of $20.70, the closing price for Brocade

28  stock on that date.  The grants were made pursuant to the New Hire, "Stock Add-On," and "Q2

SECOND AMENDED COMPLAINT

1   QSAP" programs and appear to have been issued under the 1999 NSO Plan.

2       385.    As discussed in this Complaint, the grants under the 1999 NSO Plan to employees

3   at the level of vice president were invalid, because that plan prohibited granting options to

4   employees with the rank of vice president or higher, unless the grant was part of the employee's

5   offer of employment.  Thus, the purported April 17, 2001 grants of 176,460 options to Jensen,

6   377,750 options to Canova, and 7,020 options to Bossi (among others) were void.

7       386.    Moreover, the evidence establishes that the purported April 17, 2001 grants were

8   not made on that date, but at a later time when Brocade's stock price was significantly higher.  In

9   fact, Reyes was in Boston on April 17 for the Boston Marathon.  He was not in his office in

10  California.

11      387.    **Stock Add-On Program.**  On April 17, 2001, Moore sent an e-mail to one of the

12  Stock Add-On Program grantees (employee Dave Robinson) advising him that "[t]he stock add

13  on program has not been priced yet.  Hopefully we will hear something late next week[.]"

14      388.    The price for the Stock Add-On Program options still had not been decided as of

15  April 20, when Gary Blucher sent a 7:57 a.m. e-mail to Brocade employee Brian Grant, saying:

16  "As for the supplemental stock program, a pricing decision has not yet been made by

17  management."

18      389.    A few minutes later – at 8:00 a.m. on April 20, 2001 – Reyes sent an e-mail to

19  "Employees" stating:

20      Brocadians,

21      I also owe you all an answer to the questions of the strike price for the

22      incremental options grants that were announced earlier in the quarter.

23      In anticipation of the dynamics of the stock market – through the powers granted

24      to me by Brocade's Board of Directors – I approved the option price for the

25      regrant program on April 17, 2001 at a price of $20.70.

26      390.    This grant was the largest single stock-option grant in Brocade's history, totaling

27  at least 14,819,200 options granted to non-executive officer employees.

28      391.    Later that day, Lewis e-mailed Reyes and said:  "Way to go on the announcement

1   and con[ference] call today!  You have the Midas touch!!  Thanks for the $20 shares!!"

2       392.    Brocade's shares closed at $31.34 on April 19, 2001 and at $36.78 on April 20,

3   2001.  Both prices were significantly above the $20.70 strike price for the purported April 17,

4   2001 grants.

5       393.    Reyes had a motive to price the options retroactively to $20.70, rather than at the

6   closing stock price on April 19 or April 20, 2001.  Canova, Byrd and Bossi, who were all

7   involved in creating the financial formula used to determine the number of supplemental options

8   to grant through the Add-On Program, had "capped" the formula to ensure that option recipients

9   would not receive more than a certain number of supplemental options.  For the formula to work

10  properly within the "cap," the exercise price of the supplemental shares had to be below $23.80.

11  Indeed, Brocade's closing stock price was higher than $23.80 for April 18, April 19, and

12  April 20, 2001.

13      394.    Of the supplemental options priced by Reyes on April 20, 2001, Bossi received

14  7,020, Canova received 242,750, and Jensen received 96,460.  However, Reyes made additional

15  grants of supplemental options under the Add-On Program specifically to Brocade Vice

16  Presidents, including Canova and Jensen.

17      395.    Between April 30 and May 2, 2001, Byrd, Jensen, and Reyes had "ongoing

18  conversations" about the number of supplemental options to grant to these Vice Presidents.

19  Sometime on or after May 2, 2001, Reyes signed a grant list that granted over 1,000,000

20  supplemental options under the 1999 NSO Plan to Vice Presidents, including grants of 80,000

21  options to Jensen and 135,000 options to Canova.  Reyes also dated the grant list "4/17/01."

22  Brocade's closing stock price on May 2, 2001 was $49.94.

23      396.    The April 17, 2001 grants under the Stock Add-On Program appear to be the only

24  Committee-of-One grants for which Reyes executed a certificate as required by the Board's

25  delegation of authority to him.  The certificate states:  "Pursuant to the authority delegated in the

26  February 21, 2001 Unanimous Written Consent of the Board of Directors of Brocade

27  Communications Systems, Inc., Greg Reyes has approved the attached list of Stock Option

28  grants to non-executive officer employees in accordance with the Company's Stock Add-On

Program[.]"

397.    Nevertheless, Reyes' certificate to the Board appears to be flawed in at least two respects.

398.    First, although the certificate is dated April 17, 2001, Reyes appears not to have signed it until either May 8 or May 9.  Blucher wrote a May 8, 2001 e-mail saying that he would send the original certificate "as soon as it's approved by Greg."  On May 9, Blucher sent another e-mail saying "the Certificate from Greg to the Board is in the mail to your attention . . . ."

399.    Second, Reyes does not appear to have actually sent the certificate to the Board, and there is no record of the Board's having received it.

400.    The Stock Add-On Program should have received particular attention from the Board, because it was the largest single grant of stock options in Brocade's history.

401.    **New-Hire and Q2 QSAP Grants.**  Similar improprieties arose with the purported April 17, 2001 grants made under the New Hire and Q2 QSAP programs.

402.    Reyes' April 20 e-mail concerning the strike price of the options issued under the Stock Add-On Program did not address the new-hire and QSAP grants.  However, on April 24, 2001, Jensen sent an e-mail to "Employees" (copying herself, Canova, Bossi, and Byrd), informing them that:

As Greg's [Reyes'] email from last Friday [*i.e.*, April 20, 2001] announced, the Board of Directors approved the stock price on April 17, 2001 at a price of $20.70 for the following stock programs:

• Supplemental Stock Add-On grant program, announced on February 28, 2001

• New Hire stock grants for all new hires who joined Brocade, either in a part-time or full-time capacity, from January 3, 2001 through April 17, 2001

• Q2 2001 QSAP (Quarterly Salary Administration Program) stock recommendations

403.    Jensen's e-mail was incorrect in at least two respects:  Reyes' April 20 e-mail did not say anything about the price for the new-hire or the QSAP grants, and the Board did not

1    approve those grants.

2        404.    Before sending her April 24 e-mail to Brocade employees, Jensen sent a draft of it

3    to Canova, and Bossi (copying Byrd).  Bossi – who had received Reyes' April 20, 2001 e-mail –

4    responded that Jensen's draft looked "fine" to him despite the inaccuracies contained in it.  The

5    other recipients (all of whom also had received Reyes' April 20, 2001 e-mail) appear not to have

6    commented; there is no evidence that any of them corrected Jensen's misstatements.

7        405.    When Jensen made the misstatements in her April 24 e-mail, she knew that the

8    purported April 17, 2001 new-hire and QSAP grants had not been approved even as of April 24,

9    2001.  Three days later, on April 27, Jensen e-mailed Reyes to try to schedule a meeting with

10    him about the Stock Add-On Program, noting that she still had the "rest of the QSAP, new hire

11    grant paperwork for you for approval."

12        406.    Reyes and Jensen appear to have met on April 27 to discuss stock options, as

13    evidenced by an electronic calendar entry for a 9:00 a.m. meeting on that date of Reyes and

14    Jensen with the subject "Greg/Steph re: stock."

15        407.    The minutes of the Committee-of-One meeting that purportedly took place on

16    April 17 also demonstrate that the April 17 grants were not made on that date.  Lee (who drafted

17    the minutes for the April 17 new-hire grants) testified that she had not finished drafting the

18    minutes, which included the list of option recipients, until May 7, 2001 – weeks after the grants

19    supposedly had been made.  Sometime on May 7, Lee sent a draft of the minutes to Moore.

20        408.    The evidence also shows that the list of new-hire grant recipients, as attached to

21    the final version of the minutes for the purported April 17, 2001 meeting of the Committee of

22    One, was not final until after that date.

23        409.    This "final" list includes two individuals – James Gonzalez and Joel Sherwood –

24    whose names are not included in the draft minutes Lee prepared in May.  An undated,

25    handwritten note (author unknown) states:  "James Gonzalez – moved from 1/2/01 list to 4/17/01

26    list."  Gonzalez' name is crossed out on the signed Committee of One new-hire grant minutes

27    dated January 2, 2001.  A list titled "Stock Options and Awards Cancelled From 1/1/96 to

28    4/5/01" confirms that Gonzalez' options granted on January 2, 2001 were cancelled.

410.    Similarly, a July 2001 e-mail exchange concerning Juan de Zulueta show that a decision had not yet been made about when to issue his stock options.  De Zulueta's name was originally placed on the July 10, 2001 grant list, then moved to the July 23, 2001 list, and finally placed on the April 17, 2001 list.  Once placed on the April 17, 2001 list, his name appears crossed out on the other lists.

411.    In addition, at least one of the new hires on the final list of purported April 17 grantees – Subhojit Roy – was not employed by Brocade on April 17, 2001.  Roy did not terminate his employment with his former employee until approximately June 18, 2001, and he was not employed by Brocade until June 28.

412.    The final version of the minutes that Reyes signed for the new-hire grants contains a handwritten notation (author unknown) that states "Final 7/19/01," suggesting that the supposed April 17, 2001 new-hire grants were not final until July 19, 2001, three months after they purportedly had been made.

413.    Brocade's stock price on April 17, 2001 ($20.70) was the lowest price from April 6, 2001 ($21.57) to September 4, 2001 ($22.85).  Brocade's stock price doubled between April 17 and May 1, 2001.  The price on July 19, 2001 was $32.10.

<u>October 1, 2001 Grants</u>

414.    Brocade's records reflect that the Committee of One purportedly made grants under several programs on October 1, 2001, with a strike price of $12.90, the closing price for Brocade stock on that date.  These grants – made pursuant to the New Hire, "Quarterly Incentive," and "Pillar" programs – appear to have been issued under the 1999 NSO Plan or the 1999 Stock Plan.

415.    **New-Hire Grants.**  The evidence demonstrates that purported October 1, 2001 grants made to new hires (as well as other Company records relating to those employees' hiring) were falsified to provide those persons with employment start dates of October 1, 2001 or earlier, even though they did not actually begin working at Brocade until after October 2, 2001.  The purpose of backdating the start dates was to allow those new hires to benefit from an October 1 strike price, when Brocade's stock price was at a relative low.

76

416.    Moreover, documents titled "Options and Awards Summary" contain handwritten notes showing that the terms of many of the purported October 1, 2001 grants were not final until long after that date.  (Options and Awards Summaries are formatted versions of Brocade data that appear in read-only format when accessed by an employee.  If printed, the Summaries will contain the date on which they were printed.)

417.    Seong Sik Baeck's Options and Award Summary illustrates the falsification relating to the October 1, 2001 grants.  Baeck's Options and Awards Summary file contains handwritten notes showing an intent to falsify records to reflect an October 1, 2001 start date. These handwritten notations read:  "need to change their start date to 10/1/01," and "we can't have hire date after the pricing date."  Other notes on the same document, under a heading of "must do," read:  "change start date in oracle to 10.1.01," "update offer letter to reflect 10/1/01 start date," and "[r]evise 10/1/01 Comp minutes to reflect start date of 10/1/01."  These handwritten notes were written on a document that was printed on March 20, 2002, indicating that, as late as March 2002, Brocade's records relating to the October 1, 2001 new-hire grants were still being altered.

418.    Similarly, Timothy Duffy's March 20, 2002 Options and Awards Summary bears a handwritten note stating:  "Please make sure his offer letter is 10-1-01," even though Duffy's actual start date was October 8, 2001.  Duffy later was paid retroactively for supposed part-time work beginning on October 1, 2001, to create the impression that his employment had begun earlier than it actually had.

419.    A December 13, 2001 e-mail from Robert Morris to Inez Morales and Margaret Lee contains a similar request to backdate records to create an October 1 part-time start date for Duffy:  "Can you please create another applicant tracking record for Tim Duffy?  The new record needs to be backdated to September 29.  I need to create a new record for him in Oracle with a part-time start date of October 1."

420.    Duffy testified that, after receiving his initial September 21, 2001 offer letter with a October 8, 2001 start date, he received another offer letter, dated October 1, 2001, that reflected a part-time start date of October 1, 2001.  Duffy further testified that, when he

expressed surprise that his options were dated October 1, 2001, Cuthbert told him that the earlier date was a "gift" from Reyes.

421.    Sworn testimony further establishes that documents were backdated in connection with the purported October 1, 2001 grants.  For example, Lee (a staffing specialist) testified that, in mid-November 2001, Jensen asked her to prepare grant minutes for a meeting that supposedly had taken place on or around October 30, 2001.  Jensen later told Lee to change the date of the minutes to October 1, 2001.

422.    Lee also testified that, in March 2002, Theresa Uchida asked her to change the hire dates and vesting-commencement dates for everyone who was listed in the minutes dated October 1, 2001 as having received stock options.  Lee testified that she prepared a new set of minutes as well as new offer letters for all affected persons.

423.    Stephen Beyer testified that he received stock options with an October 1, 2001 grant date even though he did not start work until October 8, 2001, and that the price of Brocade stock rose by about $8 during that period.

424.    Other documentation demonstrates that vesting dates also were changed for some of the new hires who received options dated October 1, 2001.  For example, on the Options and Awards Summary for David Cordner, the full vesting date of October 3, 2002 is crossed out, and the date "10/1/01" is handwritten in.  Vesting dates also were changed for Thomas DeLorenzo, Jason Ibarra, Guo-Dong (Gordon) Lu, Harvey Shaw, and Jianzhang Xu.

425.    Furthermore, the document titled "Minutes of [Committee of One] Compensation Committee meeting on October 1, 2001" was edited to change the "vesting commencement date" to October 1, 2001 for those who originally had later dates.

426.    **Quarterly Incentive Grants.**  The evidence also suggests that many of the quarterly incentive grants dated October 1, 2001 were backdated or were otherwise improper.

427.    Reyes purportedly approved Quarterly Incentive grants for Bonderson, Byrd, Canova, and Cuthbert even though each of those recipients was an executive officer, and Reyes lacked the authority to grant stock options to them under the 1999 Stock Plan.

428.    In addition, a late-October 2001 e-mail exchange among Reyes, Bossi, James

1    LaLonde, and other Brocade personnel demonstrates that the Quarterly Incentive grants were not

2    finalized on October 1, 2001.  On October 24, 2001, Bossi wrote to LaLonde:  "If my info is

3    correct, your Q3 MBO is [$]. . . .  If you would like, we can effectively reverse the amount

4    previously paid to you . . . and grant you a stock option instead.  The number of shares would be

5    [X] shares . . . ."

6         429.    LaLonde ultimately received options for [X] shares at the October 1, 2001 price

7    under the Quarterly Incentive program approved by Reyes, even though the e-mail exchange

8    demonstrates that the grant had not been made as of late October.

9         430.    **Pillar Grants.**  Brocade's records also demonstrate that the purported October 1,

10   2001 "Pillar" grants were not actually made until at least November 14, 2001.  The grantees were

11   set out in a list that (according to the Company's records) was modified as late as November 14,

12   2001.  Reyes therefore could not have signed and approved the list before that date.

13        431.    Brocade's stock price on October 1, 2001 ($12.90) was the lowest it had been

14   since August 10, 1999 and until September 12, 2002.

15        432.    To the extent the purported October 1, 2001 grants were issued under the 1999

16   NSO Plan, Reyes did not send a certificate to the Board evidencing those grants, and the Board

17   failed to ask him for the certificate.

18                           <u>October 30, 2001 Grants</u>

19        433.    The Company's records reflect that the Committee of One purportedly made

20   grants dated October 30, 2001 under the "New Hire" and "QSAP" programs, with a strike price

21   of $24.20, the closing price for Brocade stock on that date.  These grants purportedly were issued

22   under the 1999 Stock Plan.  The evidence establishes that the grants were not made until after

23   October 30, 2001.

24        434.    Indeed, Beyer testified that the process for creating the October 30, 2001 grant

25   minutes did not even begin until January 2002.  The documents support his testimony.

26        435.    On January 22, 2002, Beyer e-mailed a distribution list called "HR Business

27   Partners," carbon-copying Jensen and Devine, about the first-quarter QSAP grants and said:  "Q1

28   stock recommendations are NOT final until actually reviewed and signed by Greg.  Until we

                                     79

have that approval, Colleen [Devine] will be holding each of your final stock recommendation number sheets."

436.    In a separate e-mail exchange that day with Devine and Lee, Beyer also wrote that "Stephanie [Jensen] has requested that we do an additional audit prior to submission to Greg."

437.    The QSAP grants were still not final on January 28, 2002, when Bossi e-mailed Jensen and Beyer, stating:  "we need the Q1 new hire stock grant list as soon as possible so we can input into sharedata to support the upcoming q1 review by [Andersen]."

438.    Beyer responded that he would get the data to Bossi that day, and he relayed Bossi's request to Jensen.  Beyer testified that he understood Bossi's request to mean that Moore needed the new-hire grant list to enter into Brocade's stock database.

439.    The minutes purporting to memorialize an October 30, 2001 Committee-of-One meeting still were not finalized as of late January 2002.  Moore received an unsigned copy of the October 30, 2001 Committee-of-One new-hire and QSAP grant minutes before Reyes approved them.  After reviewing the draft, she sent a January 30, 2002 e-mail to Beyer stating that the grant lists contained inaccurate vesting schedules that the "auditors might pick up on . . . ." Moore also noted in the e-mail that she would "need copies of offer letters for Richard Geruson [and] Dean Traut" – both of whom are identified as grantees in the copy of the minutes signed by Reyes and purportedly dated October 30, 2001.  Beyer responded to Moore by asking Devine to make the changes Moore requested to the grant minutes "as the copies are sitting on Greg's desk."

440.    Reyes did not approve and sign the purported October 30, 2001 grant minutes until February 5, 2002.  A February 6, 2002 e-mail from Beyer to "HR Business Partners" (copied to Jensen, Bossi, and Blucher) stated:  "as of yesterday afternoon we have signature approval for all QSAP stock as well as new hire stock through Jan 22."  Beyer testified that "final signature approval" referred to Reyes' signature.

441.    Brocade's stock price of $24.20 on October 30, 2001 was the lowest price until February 27, 2002.  The price of Brocade's stock on February 5, 2002, when Reyes approved the grants, was $34.93.

442.    But even after Reyes provided his supposedly final approval on February 5, 2002, the grants were still being manipulated.  As discussed below, the grants made to Geruson and Traut on February 5, 2002, but dated October 30, 2001 (when Brocade's stock price was $24.20), were subsequently redated to February 28, 2002 (when the stock price was $21.97).  This change in grant date effectively repriced Geruson and Traut's stock options to provide Geruson and Traut with even lower-priced, in-the-money options.

<center>November 28, 2001 Grants</center>

443.    Brocade's records reflect that the Committee of One purportedly awarded several grants to new hires on November 28, 2001, with a strike price of $28.82, the closing price for Brocade's stock on that date.  The grants purportedly were issued under the 1999 Stock Plan. The evidence establishes that the grants were not made until sometime after November 28, 2001, when Brocade's stock price was higher.

444.    In January 2002, the responsibility for preparing the spreadsheets that form the minutes underlying new-hire grants passed from Lee to Devine.  In connection with this reassignment of responsibility, Devine was asked to make some "aesthetic corrections" to the spreadsheets.  Also, around this time, Jensen asked for an "additional audit" of the information relating to outstanding grants "prior to submission to [Reyes]."

445.    Devine testified that she did not begin drafting the minutes for the purported November 28, 2001 grants until late January 2002.  The format of those minutes differs from the format of minutes for previous grants, reflecting the "aesthetic corrections" that Devine made when she took over responsibility for preparing the minutes.  Thus, the grant list dated November 28, 2001 was not created before late January 2002, and Reyes could not have approved the grant list anytime before then.

446.    Indeed, as of January 28, 2002 – the date of an e-mail from Bossi discussed above in connection with the October 30, 2001 grant – the Finance Department had not received any information about the purported November 28, 2001 grant.

447.    On January 28, 2002, Beyer e-mailed Jensen, saying:

Steph, per Bob [Bossi] any stock that we wish to give with a pre 01/26 price will

<center>81</center>

1  need to be submitted prior to the end of this week.  In light of that I suggest we

2  catch up with the new hire options via 2 separate grants;

3  NH 10/31-11/28  $28.82

4  NH 11/29-01/22  $31.76

5  I do not believe we'll see lower prices than these going forward.

6  448.  Beyer testified at Jensen's criminal trial that he suggested that Jensen use

7  November 28, 2001 for new-hire grants because that date had a low closing stock price.

8  449.  As discussed above in connection with the October 30, 2001 grants, a February 6,

9  2002 e-mail from Bossi shows that Reyes did not approve the November 28, 2001 grants until

10  February 5, 2002.

11  450.  In addition, as occurred with the October 30, 2001 grants, the November 28, 2001

12  grant list was modified even after Reyes issued his final approval.  Two October 30, 2001

13  grantees (Cudgma and Taylor) were removed from the November 28, 2001 grant list; the

14  October 30 minutes were modified to reflect this change, and Reyes signed the modified

15  minutes.

16  451.  Brocade's closing stock price on November 28, 2001 was $28.82.  This price was

17  a significant "low," because Brocade's stock did not close below $28.82 on any other date

18  between November 6, 2001 and February 19, 2002.  The closing price of Brocade's stock on

19  February 5, 2002 was $34.93.

20  452.  The evidence establishes not only that the entire November 28, 2001 grant was

21  backdated, but also that at least one employee – Daniel Cudgma – should never have been on the

22  grant list at all.  Reyes, Jensen, Byrd, and Cuthbert all were involved in the efforts to grant

23  backdated stock options to Cudgma and fabricate HR documentation to create the false

24  impression that Cudgma began his employment earlier than he actually did.

25  453.  E-mail correspondence among Reyes, Jensen, Cuthbert, Byrd, and others shows

26  that they knew Cudgma had not yet accepted an employment offer on his purported grant date of

27  November 28, 2001.

28  454.  For example, on January 9, 2002, Todd Kirkpatrick sent an e-mail to Reyes and

Cuthbert with a subject line saying "Dan Cudgma let go from STOR."  Reyes forwarded the e-mail several minutes later to Duffy, with a note saying "FYI."

455.    On January 15, 2002, Bill Scannell, of EMC, e-mailed Reyes and said that Cudgma was looking for employment.  Reyes responded on January 21, saying "[i]t would be great if you could have Dan [Cudgma] send me his paper. . . .  [W]e may still have an opportunity that may be of interest to Dan."

456.    Brocade's records show that Cudgma interviewed with Byrd and Cuthbert on January 31, 2002, and with Reyes on February 1.  Reyes, Jensen, Byrd, and Cuthbert all exchanged or received e-mails about Cudgma's interviews.

457.    On February 8, 2002, Morales, from the "Brocade Staffing Team," sent an e-mail announcing that "we have received confirmation of the following New Hire:  . . . Daniel Cudgma," with a "Part Time Start Date" of November 28, 2001, and a "Full Time Start Date" of February 1, 2002.

458.    Other company documents also suggest that Cudgma started working at Brocade in the first half of February 2002.

459.    Cudgma's offer letter also was dated November 28, 2001, and it showed a part-time start date of November 28, 2001 – before he even had been interviewed.  The letter also showed a full-time start date of February 1, 2002, which appears to be incorrect as well.

<div align="center">January 22, 2002 Grants</div>

460.    Brocade's records reflect that the Committee of One purportedly made several option grants on January 22, 2002 to new hires, with a strike price of $31.76, the closing price for Brocade stock on that date.  The grants purportedly were issued under the 1999 Stock Plan. The evidence shows that the grants were not made until a later date, when Brocade's stock price was higher.

461.    As discussed in connection with the November 28, 2001 grants, Beyer sent Jensen an e-mail on January 28, 2002 – six days after the purported January 22 grant date – stating:

Steph, per Bob [Bossi] any stock that we wish to give with a pre 01/26 price will need to be submitted prior to the end of this week.  In light of that I suggest we

<div align="center">83</div>

1    catch up with the new hire options via 2 separate grants;

2    NH 10/31-11/28  $28.82

3    NH 11/29-01/22  $31.76

4    I do not believe we'll see lower prices than these going forward.

5    462.    As discussed in this Complaint, Beyer testified that this e-mail demonstrates that

6    stock options were priced through look-backs, based on the closing stock prices from the Yahoo!

7    finance page.

8    463.    The Company's records contain three versions of minutes of a January 22, 2002

9    Committee-of-One meeting, two of which are signed by Reyes.  One version lists 499,300 new-

10   hire stock-option grants.  This version has a handwritten "X" across the first page.  The other

11   version lists 500,050 new-hire grants – the number recorded in Brocade's records for that grant

12   date.  Although both versions of the minutes are dated January 22, 2002, the evidence

13   demonstrates that the minutes were not finalized until after that date.

14   464.    As discussed in connection with the October 30, 2001 grants, a February 6, 2002

15   e-mail from Beyer shows that Reyes did not approve new-hire grants through January 22, 2002

16   until February 5, 2002.  In addition, Beyer testified that the pricing for new-hire stock options

17   granted through January 22, 2002 was completed on February 5, 2002.

18   465.    Brocade's stock price on January 22, 2002 ($31.76) was the lowest it had been

19   between December 20, 2001 and February 7, 2002.  The price on February 5, 2002 was $34.93.

20   <u>February 28, 2002 Grants</u>

21   466.    Brocade's records reflect that the Committee of One purportedly made several

22   grants to new hires on February 28, 2002, with a strike price of $21.97, the closing price of

23   Brocade's stock on that date.  The grants purportedly were issued under the 1999 Stock Plan.

24   The evidence demonstrates that these grants were not made until sometime after February 28,

25   2002.

26   467.    On March 13, 2002 – approximately two weeks after the purported February 28

27   grant date – Beyer e-mailed Lee (with copies to Uchida and Devine) directing her to compile a

28   list of individuals who were to receive new-hire options.  Beyer told Lee that "Stephanie [Jensen]

84

and Greg [Reyes] have decided that its [*sic*] time to price stock" for new-hire grants.  Beyer asked Lee to prepare the list within a week.

468.    Devine testified that, in response to this e-mail, she created a list of the purported February 28, 2002 grantees during the week of March 13, 2002.

469.    Beyer testified that February 28, 2002 was chosen as the grant date at Jensen's instructions and because the stock closed at a low price on that date.

470.    Brocade's stock price of $21.97 on February 28, 2002 was the quarterly low, and also was the lowest stock price from October 18, 2001 ($22.41) to May 3, 2002 ($22.38).

471.    **Cudgma.**  Cudgma is one of the individuals who improperly received options pursuant to the February 28, 2002 grants.  As discussed above, Cudgma originally was hired in February 2002, but his offer letter was backdated to November 28, 2001, and he received options as of that date.  Cudgma's options – which had been "in the money" when granted – were "out of the money" by February 28, 2002, because Brocade's stock price had fallen.

472.    A copy of the list of November 28, 2001 grantees (including Cudgma) has the handwritten word "old" on it, and an annotation that Cudgma was moved from the November 28, 2001 list (with a strike price of $28.82) to the February 28, 2002 list (with a strike price of $21.97).

473.    This change in grant dates – which effectively repriced Cudgma's stock options to a lower, more desirable strike price – appears to have occurred between late March and the first half of April 2002.  Reyes and Jensen were involved with the manipulation of the grant date and the fabrication of related documentation.

474.    The repricing appears to have arisen from Cudgma's contemplation of leaving Brocade for another company.  On March 27, 2002, Cudgma e-mailed Reyes to say "I wanted to bring something up to you last night but forgot.  When you have a minute later today give me a call . . . ."

475.    The next day, Reyes e-mailed Cudgma and said:  "Please promis[e] me that you won't accept another offer u[n]til we talk.  You are [right] for Brocade – Brocade is right for you.  I am committed to doing whatever it takes to address your issues."

476.    Three days later, on Sunday, March 31, Cudgma e-mailed Reyes to discuss the vesting schedule for his stock options:

I appreciate our discussions last week.  Here are some thoughts on what we discussed Friday afternoon:

A shorter vesting period which would increase the number of shares on an annual basis.  I would like to be on a three year vesting schedule versus four.

I currently have an accelerated vesting period on my initial stock grant . . . .  I would like my additional shares that have been proposed to follow the same schedule.

I would like my vesting to be monthly after the six months whereby I would be vesting 1/36 each month.

477.    By the next day, April 1, 2002, everything apparently had been arranged:  Byrd e-mailed Reyes and said "thanks, Congrats on saving Dan."

478.    Reyes e-mailed Cudgma on April 6 to tell him that he (Reyes) had spoken to Jensen on April 4 and had given her "the green light to make sure that the 6 month vesting clock would be synchronized with your initial start date.  She indicated that based on her conversations with you that we should have everything 'Bolted Down' as per our discussion."

479.    On April 12, Jensen e-mailed Reyes and said "Dan [Cudgma] is all set.  The docs have been corrected and sent to him – we have spoken several times and he is feeling well taken care of and glad with his decision."  Reyes responded on April 14:  "Great – thank you!"

480.    In an undated letter, Jensen asked Cudgma to sign a new offer letter dated January 28, 2002, instead of November 28, 2001 (the date of his previous offer letter).  Jensen's letter (and handwritten notes by Cudgma) show that Bossi also was involved in implementing the changes to Cudgma's compensation package.

481.    The new offer letter contained a part-time start date of January 28, 2002 and a full-time start date of February 1, 2002.  Additionally, a May 13, 2002 e-mail from Morris, a Human Resources Information System Administrator, provided that Cudgma's part-time start date would be January 28, 2002 and his full-time start date would be February 2, 2002.

SECOND AMENDED COMPLAINT

1    482.    An April 18, 2002 e-mail from Beyer to Lee and Devine noted that "[w]e have to

2    remember back dated changes to so as in the case of Dan Cudgma who's [*sic*] offer has changed

3    a couple of times. . . ."

4    483.    The Notice of Grant of Stock Options and Option Agreement that Cudgma

5    received in connection with the February 28, 2002 grants is dated May 20, 2002.

6    484.    **Geruson.**  Richard Geruson also was purportedly granted options on February 28,

7    2002.  He originally had received his new-hire options with a grant date of October 30, 2001.

8    485.    As with Cudgma, however, Geruson was later transferred from the October 30,

9    2001 grant list to the February 28, 2002 list.  The word "old" is handwritten on a version of the

10    October 30, 2001 list that includes Geruson's name.  Another note reads:  "Geruson – off . . . .

11    Added to 2/28/02," and Geruson's name is crossed off the list.  The strike price for the

12    October 30, 2001 options was $24.20, $2.23 higher than the strike price for the February 28,

13    2002 grants ($21.97).

14    486.    As with Cudgma, Geruson received two offer letters – one dated October 30,

15    2001, the other dated January 23, 2002.

16    487.    The evidence demonstrates that Geruson did not actually receive an offer from

17    Brocade until January 2002.  In a January 26, 2002 e-mail, Bossi informed Moore and Eileen

18    Peeples (with a copy to Blucher) that an offer was being made to Geruson and that it contained

19    "somewhat unusual vesting provisions."

20    488.    Bossi also discussed Geruson's options in an October 31, 2002 e-mail to Canova

21    (copied to Jensen, among others), in which Bossi stated:  "If you recall we had all been jumping

22    through hopes [*sic*] and bending over backwards for this guy [Geruson] including forging option

23    paperwork and offer letters so he could get better priced options."

24    489.    Byrd also knew about the handling of Geruson's options.  In a series of e-mails on

25    February 11, 2002, Byrd was informed that Geruson's start date would be changed to

26    February 13, 2002, and that, at Byrd's request, Geruson had an earlier part-time start date of

27    October 30, 2001.

28    490.    **Traut.**  As noted in connection with the October 30, 2001 grants, Dean Traut also

87

1  was removed as a grantee under the October 30, 2001 grants and instead received his new-hire

2  options under the February 28, 2002 grants, at a lower strike price.

3      491.    Like Geruson and Cugdma, Traut's documentation also was falsified.  Traut

4  received two offer letters, both of which he signed.  One is dated October 30, 2001; the other is

5  dated January 25, 2002.  A May 13, 2002 e-mail from Morris to Gurinder Ghallon lists Traut's

6  "new start date[]" as January 28, 2002.

7      492.    The Notice of Grant of Stock Options and Option Agreement that Traut received

8  in connection with the February 28, 2002 grants is dated May 20, 2002.

9      493.    Lee testified that the documentation for Cudgma and Geruson was falsified to

10  provide them with lower-priced options.

11                              July 2, 2002 Grants

12      494.    Brocade's records reflect that the Committee of One purportedly made grants

13  pursuant to the New Hire and Q3 QSAP programs on July 2, 2002, with a strike price of $14.26,

14  the closing price for Brocade's stock on that date.  These grants purportedly were issued under

15  the 1999 Stock Plan.  The evidence establishes that all of the grants actually were made at a later

16  date, when Brocade's stock was higher.

17      495.    Devine testified that she did not begin drafting the minutes for the July 2, 2002

18  Committee-of-One meeting until after July 2, 2002, and that she backdated the minutes to July 2,

19  2002.  She also testified that Jensen had asked her to prepare the documents after July 2, 2002.

20  Devine testified that this request was consistent with the process of choosing a date in the past

21  when Brocade stock closed at a low price, and creating backdated Committee-of-One minutes,

22  reflecting a grant on that past date, for Reyes' approval.

23      496.    Brocade's closing stock price of $14.26 on July 2, 2002 was the lowest price of

24  the preceding two months and subsequent two months.

25                              October 8, 2002

26      497.    Brocade's records reflect that the Committee of One purportedly made grants

27  under the New Hire program on October 8, 2002, with a strike price of $5.378, the closing price

28  for Brocade stock on that date.  These grants purportedly were issued under the 1999 Stock Plan.

1    The evidence shows that the grant was not actually made until December 2002.

2    498.    For example, on November 27, 2002, one-and-a-half months after the purported

3    October 8 grant date, Devine e-mailed Lisa Shone and Moore stating that a new Brocade

4    employee "will be priced as part of the france [*sic*] employees pricing on October 8th which I

5    hope to have Greg sign next week."  Devine testified (on two occasions) that Jensen had

6    instructed her to leave the grant date blank on the list of grantees that she was preparing, so

7    Reyes could pick the date he preferred.  Devine also testified that "most likely, this – grant list

8    was [prepared] at some point after 10/8" and that none of the grants were final until Reyes signed

9    them.  She further testified that the grant list was likely prepared around November 27, 2002.

10    499.    On December 4, 2002, Devine e-mailed Shone that the list of grantees for the

11    October 8, 2002 Grants "is going to Greg [Reyes] this week."

12    500.    The next day, December 5, Moore informed Norma Olmos and Devine that the

13    paperwork for the October 8 grants "is finally (hopefully) going to be signed this afternoon."

14    501.    Brocade's stock price on October 8, 2002 ($5.378) was the lowest price from the

15    May 1999 IPO until November 21, 2002 ($7.28).  The stock price on December 5, 2002 was

16    $5.04.

17                                  August 15, 2003 Grants

18    502.    Brocade's records reflect that the Committee of One purportedly made several

19    grants on August 15, 2003, with a strike price of $5.53, the closing price for Brocade's stock on

20    that date.  The grants were made pursuant to the "Focal" and "Winter Release" programs; they

21    also included a correction of a previous grant to an employee.  The grants were issued under the

22    1999 Stock Plan.  The evidence establishes that many of the grants were not made until after

23    August 15, 2003.

24    503.    **Focal Grants.**  One of the earliest references to the August 15, 2003 Focal grants

25    is an August 14, 2003 e-mail from Weaver to the HR Business Partners distribution list, stating:

26              Stock focal approved.

27              Individual letters with stock amount will be given to business partners no later

28              than AM Friday, August 22nd.

1     Pricing has not been set yet. IF pricing is set before the letters are printed then we

2     will put the price in the letters. IF NOT, the letters will just include the stock

3     amount.

4 Shortly after sending this e-mail, Weaver e-mailed Jensen stating: "Meeting went well with

5 Greg. The stock focal was approved, but is still to be priced. I'll keep you posted."

6     504.    The next day, August 15, Jensen received an e-mail identifying the approved

7 Focal grants for the Section 16B officers and advising that "Price is TBD (probably today)."

8 Thus, as of the supposed grant date, the grants had not yet been priced, and Jensen knew that

9 fact.

10     505.    Although e-mail correspondence indicates that the exercise price of the August

11 15, 2003 grants was settled by August 18, the details of at least some of the grants still remained

12 in flux even after that date.

13     506.    For example, on August 21, 2003, Jensen e-mailed Reyes suggesting changes to

14 the number of grants being made to Bonderson and Cuthbert. The original recommendations

15 were to grant Bonderson 400,000 options and Cuthbert 250,000 options, but Jensen suggested

16 changing the amounts to 200,000 shares and 300,000 shares, respectively. The next day,

17 August 22, 2003, Reyes responded to Jensen's e-mail, stating: "Thanks – do it."

18     507.    The grant list attached to the UWC pursuant to which the August 15, 2003 grants

19 were made reflects a grant of 200,000 options to Bonderson and a grant of 300,000 options to

20 Cuthbert, thus confirming that Reyes did not approve the August 15, 2003 grants until at least

21 August 22, when the changes in Bonderson's and Cuthbert's options were determined.

22     508.    **Winter Release Grants.** Documents relating to the grants under the Winter

23 Release program similarly show that the list of recipients and the numbers of shares purportedly

24 granted on August 15, 2003 were not finalized until the end of August.

25     509.    E-mail correspondence in late August 2003 indicates that the list of grantees was

26 not finalized until August 29, 2003 at the earliest.

27     510.    A draft memorandum from Weaver to Reyes that appears to have been created on

28 September 5, 2003 further demonstrates that, as of early September, the Winter Release grants

1  (dated August 15, 2003) had not yet been approved:  "Hi Greg … Attached are four stock

2  documents for your signature ….  4. Winter Bonus Release documents that you committed to."

3      511.    Brocade's actual closing stock price of $5.53 on August 15, 2003 was not the

4  lowest price for the relevant week, but was the lowest price for the remainder of the month.  The

5  actual closing stock price on September 5 was $6.00.

6                              <u>February 26, 2004 Grants</u>

7      512.    Brocade's records reflect that the Committee of One purportedly awarded several

8  grants on February 26, 2004, under the New Hire and "Product Introduction Bonus" programs,

9  with a strike price of $6.58, the closing price for Brocade stock on that date.  The plan pursuant

10  to which these options were issued is unclear.  Equity Edge records the options as having been

11  issued under the 1999 Stock Plan.  The Committee-of-One minutes also state that the options

12  were issued under the 1999 Stock Plan; however, the word "NSO" is written on the minutes by

13  hand.  If these options were issued under the 1999 NSO Plan, Reyes did not send a certificate to

14  the Board evidencing these grants, and the Board failed to ask Reyes for the relevant certificate.

15  The evidence suggests that these grants were not approved until after February 26, 2004.

16      513.    On March 2, 2004, Weaver received instructions "to print out cover sheets for

17  Greg to sign and fill in stock numbers for new hires," and she received the grantee lists for the

18  February 26, 2004 grants.

19      514.    Apparently following up on these instructions, Weaver sent two notes to Reyes

20  about the February 26, 2004 grants.  Although neither is dated, metadata show that these

21  documents were first created on March 2, 2004.  In the first note, Weaver stated:

22      Hi Greg:

23      There are two stock documents that need your signature:

24      1.    Product Introduction "best in class" bonus.  That is the program that you

25      and Luc approved.

26      2.    New hires.

27      Note that the Fall and Spring "best in class" programs are currently being

28      finalized and will be to you shortly for your signature.

1    June

2    515.    In the second note, Weaver stated:

3    Hi Greg:

4    I have made the changes you indicated on the first revision.  I will assume that

5    you will let Mike and Don know the good news.  Let me know if you want me to

6    do letters for you to give them or just want to verbally tell them.  Note:  this

7    information will hit their e-trade account by the end of the week.

8    516.    Although Weaver's notes to Reyes suggest that Reyes approved the February 26,

9    2004 grants on March 2, other documents demonstrate that at least some of the grants were not

10    final as of that date.

11    517.    For example, the final list of new-hire grantees contains two additional names –

12    Mike Vescuso and Don Jaworski – that did not appear on the March 2, 2004 list.  Metadata for

13    the copy of that grant list that was posted to the Albatross Shared file (an electronic shared

14    document repository) show a creation date of March 4, 2004, which suggests that the grants were

15    not final until after that date.

16    518.    A March 2, 2004 e-mail from Weaver to Lisa Loscavio about the "product intro

17    bonus plan" grants also shows that certain aspects of those grants (including the strike price)

18    were not finalized until at least March 2.  Weaver wrote:  "I am finalizing the pricing of this

19    stock.  I'll have that information to you after Greg Reyes signs the document, should be PM

20    today."  Later that day, Loscavio replied to Weaver to let her know that "Greg announced stock

21    price to team."

22    519.    On March 2, 2004, Brocade's stock closed at $7.34, which was higher than the

23    closing stock price of $6.58 on the February 26, 2004 grant date.

24                                   March 22, 2004 Grants

25    520.    Brocade's records reflect that the Committee of One purportedly made grants

26    under the New Hire, "Fall Release," and "Condor Release" programs on March 22, 2004, with a

27    strike price of $6.60, the closing price of Brocade's stock on that date.  The grants were issued

28    under the 1999 Stock Plan.  The evidence suggests that these grants were not made until a later

date.

521.     Two UWCs purport to authorize the March 22, 2004 grants.  Reyes signed both UWCs, and both are dated March 22, 2004.

522.     However, Weaver testified that March 26, 2004 was the first date on which Reyes could have approved the stock price for the March 22 grants.

523.     Weaver testified that, on March 26, she prepared a packet of material relating to the March 22 grants to give to Reyes for his review, approval and signature.  The packet included lists of the grantees under each of the New Hire, Fall Release, and Condor Release programs, and a stock-price history that highlighted March 22, 2004 as the low stock-price date.  Weaver further testified that including a highlighted stock-pricing history report in Reyes' grant packet was part of her standard practice.

524.     A March 26, 2004 e-mail from Ward to Rick Brown confirms that Reyes had not yet approved or priced the March 22 grant.  Ward wrote:  "Attached please find Fall Release employee stock option letters . . . .  The last step is for us to obtain Greg Reyes [*sic*] approval on stock option price.  We are hoping to have an answer for you later today or early next week."

525.     The metadata recovered from the hard drive of Ward's computer for the "New Hire" grant list show that the March 22 list was created on March 26.

526.     Brocade's stock price on March 22, 2004 ($6.60) was the lowest price of the month.  The price on March 26, 2004 was $7.12.

<u>June 21, 2004 Grants</u>

527.     The Company's records reflect that the Committee of One purportedly made grants under the New Hire and "Spring Mars Engineering Product Development" ("Spring/Mars") programs on June 21, 2004, with a strike price of $5.64, the closing price for Brocade's stock on that date.  The grants were issued under the 1999 Stock Plan.  The evidence demonstrates that the grants were not awarded on June 21, 2004, but later that week, when Brocade's stock price was higher.

528.     On June 18, 2004, three days before the purported grant date, Brown e-mailed Yin Cantor (copying Weaver) and said he had "completed collecting a final round input from the

functional VP's . . . and needed to get Greg's [Reyes'] approval prior to having June Weaver

generate letters with grant amounts."  In response to Cantor's question as to when such approval

would occur, Brown replied, "No huge sense of urgency.  Would by next Wednesday [June 23]

work?"

529.    That same day, Weaver forwarded the exchange between Brown and Cantor to

Kada and Ward, stating:

> Fyi looks like approval for spring mars will come next week [*sic*] I will not be
>
> giving Greg [Reyes] the stock list until after that approval and a good stock price.
>
> Patricia since the letter and names are confirmed. Ill [*sic*] get u the letter if u
>
> could do the mail merge early next week we can give Rick the letters after he gets
>
> Greg's [Reyes'] ok.

530.    On June 22, 2004, one day after the purported grant date, Weaver e-mailed Kada

and Ward about the Spring/Mars grants and stated:  "The list of employees is ready for the

spring/mars letters.  Attached is the new list of employees and the approved letter template.  Can

you do the letters by noon today and get the pricing sheet ready (no cover page yet . . . we will

watch the stock price) . . . ."  Kada responded by e-mailing Cathlyn Reem on June 22 stating:

"Attached you will find soft copies of the Spring/Mars 7.1 stock option grant letters for

distribution.  We will monitor and price the options when appropriate."

531.    Kada testified that the phrase "[w]e will monitor and price the options as

appropriate" meant that she and her colleagues would compile a packet of materials and look for

the week's low stock price.  Kada also testified that she "meant that we were waiting to do a

pricing."

532.    On June 23, 2004, Kada forwarded her June 22, 2004 e-mail to Weaver and Ward,

advising, "Fyi, it looks like the stock price is going up this week.  Monday closed at $5.64.

Tuesday closed at $5.92.  Today it's $6.04 so far.  I'll keep tracking it."

533.    Weaver similarly testified that, concerning the June 23 e-mail, Kada was "keeping

[Weaver] informed of what the stock price [was] doing for the week" and that the purpose of

doing so was to provide "a recommended price to Greg Reyes to sign for this group of

1    employees that would be getting stock options."

2           534.    Weaver responded to Kada's forwarded e-mail on June 23, 2004, requesting:

3    "Patricia, pls put the Monday price for spring mars and the new hires and have Greg [Reyes] sign

4    today." Kada testified that she prepared the Spring/Mars and new-hire grants after she had

5    received Weaver's June 23 e-mail directing her to do so.

6           535.    Weaver testified that her June 23 e-mail to Kada "referenc[ed] back to the prior

7    email that the price was going up, so as to make a recommendation of the Monday price." She

8    explained that she had recommended the Monday price because "[i]t was lower than the Tuesday

9    price."

10          536.    In fact, the price on Monday, June 21 ($5.64) was the lowest price of the week.

11   Weaver also admitted that Wednesday, June 23, was the first time that the purported June 21

12   grant was submitted to Reyes with the recommended price for his approval.

13          537.    A June 23, 2004 e-mail from Ward to Kada and Weaver advises that "Greg

14   [Reyes] signed the stock docs," two days after the purported grant date, when the stock price was

15   $6.14 – $.50 higher than the June 21 exercise price of $5.64.

16                                        Other Faulted Grants

17          538.    Brocade's records reflect numerous other Committee-of-One grants that were not

18   made on their purported grant dates and that involved falsification of Company documents.

19   Those faulted grants include, but are not limited to, those made on December 13, 1999,

20   January 28, 2000, January 31, 2000, April 24, 2000, July 28, 2000, February 14, 2003,

21   May 22, 2003, July 28, 2003, September 2, 2003, October 20, 2003, January 22, 2004,

22   September 28, 2004, and October 20, 2004.

23                      **Overall Pattern of Faulted Committee-of-One Grants**

24          539.    An overview of the faulted grants discussed above shows the frequency with

25   which the Committee of One granted stock options at a low, or near-low, exercise price.

26

27

28

SECOND AMENDED COMPLAINT



Faulted Committee-of-One Grant Dates Fiscal Year 1999



Faulted Committee-of-One Grant Dates Fiscal Year 2000

96





SECOND AMENDED COMPLAINT

**Faulted Committee-of-One Grant Dates Fiscal Year 2003**



**Faulted Committee-of-One Grant Dates Fiscal Year 2004**



98

SECOND AMENDED COMPLAINT

540.    In fact, Reyes' own econometrics expert witness (Professor David Gulley) testified at Reyes' criminal trial that he and his colleagues had used "statistical methods to establish if the grant dates appeared to be difficult to explain from the point of view of random organizational processes," and that their "very thorough" analysis "basically establish[ed] that . . . certain grant dates appeared to be very, very lucky or unusual, and that . . . the way in which the grants were processed over time by the company, [was] . . . not a pure random process."

<u>**Oversight Failures by Board and Compensation Committee**</u>

<u>Before Brocade's IPO</u>

541.    Before Brocade's IPO on May 25, 1999, Brocade's Board and Compensation Committee utterly failed to implement any reporting or information systems or controls to supervise Reyes' conduct as a Committee of One.  Dempsey, Leslie, and Neiman were all members of Brocade's Board from January 6, 1999 through the date of Brocade's IPO. Dempsey was also a member of the Compensation Committee from as early as February 26, 1998, and was joined on that Committee by Leslie on March 17, 1999.  Both served as the only two members of the Compensation Committee from March 17, 1999 until Brocade's IPO.

542.    Brocade's operative stock plans before its IPO were the 1995 Plan, the 1998 Plan, and the 1998 Executive Plan (collectively the "Pre-IPO Plans").  Dempsey, Leslie, and Neiman knew the terms and conditions of Brocade's Pre-IPO Plans because, on numerous occasions, all three of them, as either Board members or Compensation Committee members, or both, approved stock-option grants under all three of those plans.  If the Compensation Committee members did not know the Plans' terms, they were grossly negligent and consciously disregarded their duties to Brocade.

543.    The Pre-IPO Plans all provided that they were to be administered by a Committee of the Board or the Board acting as a Committee.  Nothing in those plans explicitly authorized a sole director or officer to grant options.

544.    Additionally, Dempsey, Leslie, and Neiman knew that the Compensation Committee was appointed by the Board to administer Brocade's Pre-IPO Plans and had to consist of *at least* two directors.  On February 26, 1998, the Board, including Dempsey and

99

1    Neiman, approved a resolution stating that the "Compensation Committee shall, among other

2    things, administer [Brocade's] stock option plans and any successor plans thereto [and shall be]

3    not less than two directors."

4        545.    Dempsey had even more reason to know about the minimum number of directors

5    needed on the Compensation Committee, because he was confirmed as one of the two members

6    of that Committee on February 26, 1998.

7        546.    Leslie joined Dempsey on the Compensation Committee on March 17, 1999, so

8    he also understood the role of the Compensation Committee and appreciated the requirement that

9    it needed to comprise at least two directors.

10       547.    At a bare minimum, Dempsey, Leslie, and Neiman knew who was authorized to

11   grant options under the Pre-IPO Plans.  They knew that none of the plans gave Reyes the sole

12   authority to grant options.  Indeed, as discussed in this Complaint, over the course of two

13   separate Board meetings, Dempsey, Leslie, and Neiman ratified at least *thirteen* different stock

14   option grants made solely by Reyes as the "Stock Option Committee" between February 1999

15   and May 1999.  Dempsey, Leslie, and Neiman's ratification of these grants shows that they knew

16   that Reyes lacked the authority to grant options as the sole member of the "Stock Option

17   Committee," or that they consciously disregarded their duties in not ascertaining whether Reyes

18   had such authority.

19       548.    Even though Dempsey, Leslie, and Neiman knew that Reyes was exceeding his

20   authority and usurping the role of the Compensation Committee by acting as the sole member of

21   the "Stock Option Committee," they made absolutely no effort to curb Reyes' stock-option

22   granting practices.  Rather, they condoned the practice by continuing to approve and ratify the

23   option grants made by Reyes.  Dempsey and Leslie, as members of the Compensation

24   Committee formally appointed to administer Brocade's Pre-IPO Plans, had a heightened duty to

25   prevent Reyes' improper stock option granting practices during the pre-IPO period, but they

26   consciously disregarded their duties in failing to do so.

27                        May 25, 1999 until February 21, 2001

28       549.    Dempsey, Leslie, and Neiman continued to act in conscious disregard of their

                                            100

1    responsibilities by deliberately ignoring Reyes' improper stock-option granting practices even

2    after Brocade went public and adopted two new stock option plans, the 1999 Plan and the 1999

3    NSO Plan.  As discussed in this Complaint, after Brocade's IPO, Reyes continued to grant stock

4    options as the sole member of the "Stock Option Committee," and Dempsey, Leslie, and Neiman

5    continued to turn a blind eye to this misconduct until they eventually got around to ratifying it.

6        550.    The Compensation Committee Defendants' complete failure to monitor Reyes'

7    conduct is exemplified by the fact that, until December 13, 1999, Reyes made many of these

8    grants under one of Brocade's *Pre*-IPO Plans, the 1998 Plan, which was no longer in existence

9    after May 24, 1999.  Nevertheless, on October 22, 1999 and April 20, 2000, Dempsey, Leslie,

10   and Neiman attempted to ratify these grants without acknowledging that they should have been

11   made pursuant to the 1999 Plan or the 1999 NSO Plan (and by the Compensation Committee,

12   rather than by Reyes on his own).  Their attempted ratifications thus were ineffective.

13       551.    Dempsey, Leslie, and Neiman also knew that, before at least February 21, 2001,

14   Reyes lacked the authority to grant stock options under either the 1999 Stock Plan or the 1999

15   NSO Plan, or they consciously disregarded their duties in not ascertaining that fact.  As

16   discussed in this Complaint, Dempsey, Leslie, and Neiman all approved the adoption of both

17   stock-option Plans, neither of which gave Reyes the authority to act as a Committee of One.

18       552.    Further, Dempsey and Leslie comprised the Compensation Committee that had

19   been delegated the responsibility to administer both the 1999 Plan and the 1999 NSO Plan, so

20   they had even more reason to appreciate that Reyes lacked the authority.  Indeed, on both

21   October 22, 1999 and November 3, 2000, the Board, including Dempsey, Leslie, and Neiman,

22   reaffirmed that the Compensation Committee was the "Administrator" of the 1999 Plan, without

23   delegating any authority to Reyes to grant stock options.

24       553.    Indeed, the fact that the Board, including Dempsey, Leslie, and Neiman,

25   eventually decided in 2001 to give Reyes the authority to grant stock options as a Committee of

26   One under the 1999 NSO Plan meant they knew that Reyes had made his prior stock-option

27   grants without any proper authority.

28       554.    Dempsey, Leslie, and Neiman also were obliged to circumscribe and control any

1  grant of sole authority to Reyes to grant stock options under the 1999 NSO Plan, in light of

2  Reyes' history of improperly granting stock options as a Committee of One, but the

3  Compensation Committee Defendants utterly failed to do so.

4      <u>After the Board's February 21, 2001 Delegation of Authority Under 1999 NSO Plan</u>

5      555.    Despite Reyes' history of exceeding his option-granting authority, the Board –

6  including Dempsey, Leslie, and Neiman – authorized Reyes "to grant nonstatutory options under

7  the [1999] NSO Plan . . . to such non-executive officer employees in such amounts as Mr. Reyes

8  shall determine in his sole discretion with such grants to be evidenced by a certificate delivered

9  to the Board verifying the same."  This delegation was made through a UWC dated February 21,

10  2001.

11      556.    This authorization shows that Dempsey, Leslie, and Neiman were at least grossly

12  negligent and consciously disregarded their duties, because the 1999 NSO Plan's terms were

13  *more restrictive* than the delegation of authority to Reyes.  The Board (including the

14  Compensation Committee Defendants) purported to give Reyes the authority to grant options to

15  non-executive officers, but, as discussed in this Complaint, the 1999 NSO Plan *prohibited* grants

16  to non-executive officers except under very limited circumstances.  Thus, Dempsey, Leslie, and

17  Neiman attempted to vest Reyes with the authority to grant options that violated the very terms

18  of the 1999 NSO Plan.

19      557.    Both the Board and the Compensation Committee utterly failed to implement any

20  reporting or information systems or controls by not imposing any guidelines or directions on

21  appropriate options-granting practices.  Indeed, Neiman testified at his SEC deposition that it

22  would not have been the Board's role to institute such controls.  Neiman also testified that he

23  expected Reyes would receive guidance from the CFO, the General Counsel, and possibly other

24  executives.  Neiman thus consciously disregarded his responsibility to impose controls on Reyes

25  or to ensure that others did so.

26      558.    The Board, including Dempsey, Leslie, and Neiman, made a single attempt to

27  oversee Reyes' stock-option granting practices as a Committee of One.  This attempt was the

28  requirement in the UWC dated February 21, 2001 that Reyes deliver a certificate to the Board

1  evidencing his stock option grants.

2      559.    Having created that certificate requirement, Dempsey, Leslie, and Neiman

3  consciously failed to monitor Reyes' noncompliance with it.  Reyes signed only one such

4  certificate, and there is no evidence that Reyes delivered that certificate, or any other, to the

5  Board.

6  **COMPENSATION COMMITTEE GRANTS**

7  <u>**Overview**</u>

8      560.    The Board of Directors delegated specific responsibilities for stock compensation

9  to the Compensation Committee by way of the Compensation Committee Charter.  Those

10  responsibilities changed over time.

11      561.    At the very least, the Compensation Committee was responsible for, among other

12  things, reviewing proposals by the CEO and making recommendations to the Board regarding

13  stock compensation, and acting as the Administrator of the 1999 Stock Plan.  From November 3,

14  2000 through January 16, 2003, the Compensation Committee also was responsible for

15  reviewing and approving stock compensation for all employees.

16      562.    In addition to this oversight responsibility, the Compensation Committee also

17  granted options to executives.  The process for granting executive stock options began with the

18  Human Resources department, which would generate compensation data that was then used by

19  Jensen and Reyes to develop recommendations.  Then Jensen, and in some instances Reyes,

20  would present these recommendations to the Compensation Committee for approval.  The

21  Compensation Committee would then grant options either via UWC or via resolution at a

22  Compensation Committee meeting.  Generally, there were two Compensation Committee

23  meetings per year.

24  <u>**Particular Faulted Grants**</u>

25  <u>November 19, 1999 Officer Grant</u>

26      563.    Brocade's records reflect a grant of stock options to officers purportedly made on

27  November 19, 1999, with a strike price of $32.13, the closing price for Brocade stock on that

28  date.  The Compensation Committee (Dempsey and Leslie) granted these options under the

1999 Stock Plan.  The strike price for the November 19, 1999 grants was the lowest price at which Brocade stock closed in November 1999.

564.    The documents demonstrate that the Compensation Committee did not properly approve this grant and that the grant was made after November 19, 1999.

565.    A set of minutes purports to show that a Compensation Committee meeting was held on November 19, 1999, but other evidence demonstrates that no meeting occurred on that day.  A November 19, 1999 e-mail from Byrd to Dempsey and Leslie (with a copy to Reyes) reflects that an attempt to set up a conference call with the Compensation Committee members during the week of November 19 had failed, because one of the members – Leslie – was not available:

> Enclosed is [*sic*] our recommendations for executive compensation and stock options.  The recommended amounts are completely consistent with the guidelines and framework you approved at the compensation committee meeting last week . . .
>
> *We have tried to schedule a conference call for this week and were told that Mark [Leslie] was not available.*  Rather than wait, we want to get this information to you asap.  If you have any questions or concerns, please feel free to call Greg [Reyes] or myself.  We would like to be in position to grant the officer stock options in the event the stock has any weakness over the next few weeks.  *Once we have your approval I would propose that we take care of the grant by unanimous written consent of the board . . . .*  [Emphasis added.]

566.    Although no meeting occurred, a set of minutes purports to memorialize a meeting on November 19, 1999.  The minutes reflect attendance by Dempsey, Leslie, and Reyes, and state that the Committee reviewed, among other things, "Equity Recommendations (True-Up and Add-Ons)."

567.    Among the attachments to the minutes is a document titled "Executive Equity Review Brocade Officers Final Recommendations", which recommends grants for Reyes, Byrd,

1    and Bonderson (among others).  The minutes state that the Compensation Committee approved

2    the "Compensation Recommendations for Brocade's Officers" set out in the attached document

3    and also determined to grant additional options to, or change Equity and True-up for, certain

4    officers – including Reyes and Bonderson.

5        568.    Despite the fact that the Compensation Committee did not meet on November 19,

6    1999, Dempsey signed the minutes that purport to memorialize such a meeting.

7                        November 29, 2000 Officer Grant

8        569.    Brocade's records reflect a grant of incentive stock options to officers purportedly

9    made on November 29, 2000, with a strike price of $76.88, the closing price for Brocade stock

10   on that date.  The Compensation Committee (Dempsey and Leslie) granted these options under

11   the 1999 Stock Plan, pursuant to a resolution that the Committee purports to have passed at a

12   November 29, 2000 meeting.  The strike price for the November 29, 2000 grant was the lowest

13   price at which Brocade stock closed in November 2000.

14       570.    The documents underlying this grant show that it could not have been made on

15   November 29, 2000, because a number of details about the grant were not finalized until

16   sometime after that date.

17       571.    The minutes for the purported November 29, 2000 meeting – which Dempsey

18   signed – together with the attached exhibit, state that the Compensation Committee made a grant

19   of incentive options to a number of officers, including Reyes, Byrd, Bonderson and Cuthbert.

20   The list of grantees and option amounts (set out in the exhibit to the meeting minutes) reflects a

21   grant of 171,000 options (342,000 after splits) to Cuthbert.

22       572.    However, a January 4, 2001 e-mail from Jensen says that the "Compensation

23   Committee approved the Equity Stock Recommendations per attached Exhibit A for Brocade's

24   Officers and VPs, with vesting commencing on November 1st during the years outlined in the

25   attached Exhibit A," and it attaches a document titled "final-officers stock.xls" showing a grant

26   of 271,000 – not 171,000 – options to Cuthbert.

27       573.    When Jensen was asked about the difference in the amount of options granted, she

28   replied on January 9, 2001:  "the original add-on grant was for 171,000.  Prior to finalizing

                                    105

1    50,000 was added . . . thus increasing the total grant by 100,000 shares to a total of 271,000."

2    574.    Jensen's reference to an additional 50,000 shares that increased Cuthbert's "total

3    grant by 100,000 shares" apparently refers to a split-adjusted number of shares, because

4    Brocade's stock split two for one on December 22, 2000.  Thus, the grant list attached to the

5    minutes probably was prepared on or after that date, not on November 29.

6    575.    Another version of an Exhibit A – called "2001 Compensation Review" – also

7    exists, with "November 29, 2000 $76.88" handwritten on top.  This version is signed with the

8    initials "GR" and lists the same option recipients included in the November 29, 2000 minutes.

9    The closing price of Brocade's stock on November 29, however, was $153.75, not $76.88.  The

10   $76.88 price represents the split-adjusted value of $153.75, so this version also was probably not

11   prepared until several weeks after November 29.

12   576.    Thus, the grant to Cuthbert was not finalized until well after November 29, 2000,

13   and the minutes that Dempsey signed were inaccurate.

14   <u>October 1, 2001 Officer Grant</u>

15   577.    Brocade's records reflect a grant of options to executive employees purportedly

16   made on October 1, 2001, with a strike price of $12.90, the closing price for Brocade stock on

17   that date.  The Compensation Committee (Dempsey and Neiman) granted these options pursuant

18   to a UWC, dated October 1, 2001.  The grants were issued under either the 1999 Stock Plan or

19   the 1999 NSO Plan, both of which required that the date of the grant be the date the

20   Administrator determines to make the grant, or a later date.  The strike price of $12.90 was the

21   lowest price at which Brocade's stock had closed since the date of the previous executive officer

22   option grants on April 17, 2001, and also was the lowest price at which Brocade's stock had

23   closed between August 10, 1999 and September 12, 2002.

24   578.    The documents underlying this grant demonstrate that the grant was not made

25   until well after October 1, 2001 and that the grants under the 1999 NSO Plans were improper.

26   579.    The UWC reflects approval of grants to "the executive employees listed on

27   Exhibit A."  The attached Exhibit A identifies the executive officers receiving grants, including

28   (among others):  Reyes (1,250,000 options under the 1999 Stock Plan), Byrd (250,000 options

under the 1999 Stock Plan), Canova (175,000 options under the 1999 Stock Plan), Jensen (80,000 options under the 1999 NSO Plan), and Cuthbert (200,000 options under the 1999 Stock Plan). Exhibit A also sets out the vesting schedule for the options being granted.

580. The UWC is signed by both members of the Compensation Committee – Dempsey and Neiman – on the same page, thus suggesting that they were in the same place at the time they signed the UWC.

581. But other evidence suggests that no meeting took place that day. Neiman's calendar does not have an entry for a Brocade meeting on October 1, 2001, and Neiman has testified that he was not in California on that date.

582. Moreover, both the UWC and its Exhibit A (which lists the number of options and the vesting schedule for each grantee) were not finalized until well after October 1, 2001. An unsigned version of the UWC and a draft of Exhibit A were sent to Blucher on November 15, 2001, as attachments to an e-mail. The attached draft of Exhibit A shows a different vesting schedule for Byrd's grant than is reflected in the final version of Exhibit A.

583. Other evidence demonstrates that the grants were not actually approved until December 2001. On December 11, 2001, Jensen sent an e-mail to Dempsey and Neiman saying she "[w]anted to confirm [their] approval of the CEO recommendations, reflected in the October 1, 2001 minutes." The e-mail (which was forwarded to Reyes) recapped the recommendation for Reyes' grant – 1,250,000 options vesting over four years – and stated that "if [Dempsey and Neiman] wanted to do more given the market data, we could do so in our 2002 plan." Later that same day, Neiman responded to Jensen's e-mail saying "Ok with me."

584. On December 12, 2001, Jensen forwarded Neiman's message to Reyes, stating that "Neal [Dempsey] confirmed approval via voice-mail. I will confirm all the appropriate documentation is in place."

585. Later that day, Jensen confirmed the Compensation Committee's approval of the stock-option grants in an e-mail to Dempsey and Neiman, saying "[t]hanks for confirming your approval, via this email and Neal's voice message."

586. Still later on December 12, Karla Fields (an employee at Dempsey's venture-

capital firm, Bay Partners) e-mailed Jensen to memorialize a message from Dempsey: "Here's Neal's message to you: I approve the compensation for execs and Greg."

587.    The October 1, 2001 grant thus appears not to have been finalized until December 12, 2001 (if not later), when the closing price of Brocade stock ($39.98) was substantially higher than it was on October 1, 2001 ($12.90).

588.    In addition, the grant to Jensen, among others, appears to violate the terms of the 1999 NSO Plan, which prohibits options to officers "except as an essential inducement to an Officer entering into an employment agreement regarding his or her initial service with the Company." This was not Jensen's initial option grant, thus it was improper.

### Overall Pattern of Faulted Grants

589.    An overview of the faulted grants discussed above shows the frequency with which the Compensation Committee granted stock options at a low, or near-low, exercise price.

**Compensation Committee Faulted Grant Dates Fiscal Year 2000**





**Compensation Committee Faulted Grant Dates Fiscal Year 2001**

## BOARD OF DIRECTORS GRANTS

### <u>Overview</u>

590.    Outside directors generally received options under the 1999 Director Plan.  Those options were nondiscretionary and occurred upon becoming a director and on certain anniversary dates.  In 2001, the 1999 Director Plan was amended and restated as of April 17, 2001.  The amended and restated 1999 Director Option Plan changed the anniversary dates and granted additional shares to the then outside directors.

591.    The Board also granted options to directors under the 1999 Plan.  Such options required full Board approval.

592.    In addition, the Board of Directors granted options to officers.  The entire Board of Directors acted as the Compensation Committee for fiscal year 1999.  The process for granting executive stock options was similar to the process followed by the Compensation Committee.

SECOND AMENDED COMPLAINT

593.   The Board of Directors ratified grants by Reyes as a Committee of One.

**Particular Faulted Grants**

April 1, 1999 Grant to Byrd

594.   Brocade's records reflect a pre-IPO grant of 2,640,000 shares to Byrd at $0.625 per share, with a grant date of April 1, 1999, pursuant to a UWC of the Board's "Stock Option Committee" bearing the date of April 1, 1999.  The UWC was signed by Dempsey, Leslie, Neiman, and Reyes (among others), with all of their signatures appearing on different pages. The grant was made pursuant to the "Equity Incentive Plan."

595.   The documents underlying this grant show that the UWC was not signed until after April 1, 1999.  The grant therefore could not have been made on that date.

596.   The UWC was not even circulated to Board members for signature until after April 1, 1999.  On April 14, 1999, Loretta Gardner Miller (from Brocade) sent the UWC "for the stock option issuance and the promissory note to exercise the stock option to Mr. Michael Byrd" to the Board members and asked them to sign it and return it to her.

597.   Dempsey did not return his signature page until April 26, 1999.  A letter dated April 26, 1999 from Marda Helling (of Bay Partners, Dempsey's venture-capital firm) to Gardner Miller transmitted Dempsey's signature page and said:  "In connection with Neal Dempsey's position on the Board of Directors at Brocade Systems please find enclosed the executed signature page for a Unanimous Written Consent for the stock option issuance and the promissory note."

598.   Moreover, Byrd was not even a Brocade employee on April 1, 1999.  Minutes of a Board of Directors meeting dated April 2, 1999 reflect the Board's appointment of Byrd as CFO and Assistant Secretary of the Company, effective April 28, 1999, and Brocade's offer letter to Byrd was dated April 5, 1999.  Byrd does not appear to have signed Brocade's offer letter until May 3, 1999.  Thus, not only did Dempsey, Leslie, Neiman, and Reyes sign a backdated UWC, they also purported to grant stock options to someone who was not yet a Brocade employee – and had not even been offered a position.

SECOND AMENDED COMPLAINT

<u>October 4, 1999 Grants</u>

599.     Brocade's records reflect a grant of options to Peter Tarrant and Jean Zorzy, both Vice Presidents, at the "current fair market value of the Company's Common Stock" on October 4, 1999.  Brocade's stock closed at $25.85 on that date – the stock's lowest closing price in October 1999.  The Board granted those options by UWC under the 1999 NSO Plan.  The UWC, dated October 4, 1999, was signed by Dempsey, Leslie, Neiman, and Reyes (among others).

600.     The available evidence suggests that the UWC was not executed on October 4, 1999, that the grants were not made until sometime after that date, and that the grants violated the 1999 NSO Plan.

601.     The UWC has all five directors' signatures on the same page, thus suggesting that the directors all were in the same place when they signed the UWC.  But there is no evidence that the Board members met on October 4, 1999.

602.     There are, however, Board meeting minutes that bear a date of October 22, 1999 and reflect the attendance of Dempsey, Leslie, Neiman, and Reyes (among others) – the same directors who signed the UWC dated October 4, 1999.   The October 22, 1999 minutes reflect Board approval of minutes for a June 24, 1999 Board meeting, but do not mention a Board meeting held on October 4, 1999.

603.     The UWC thus appears to have been signed on October 22, 1999, when the directors gathered for the October 22 Board meeting, or perhaps on some later date – but in any event not on October 4, when the stock price ($25.85) was lower than it was on October 22 ($33.67) or on any other date that month.

604.     In addition, the grants appear to violate the 1999 NSO Plan, which prohibits option to grants to officers "except as an essential inducement to an Officer entering into an employment agreement regarding his or her initial service with the Company."  This was neither Tarrant's nor Zorzy's initial option grant; thus it was improper.

<u>April 17, 2001 Officer Grant</u>

605.     Brocade's records reflect a grant of stock options to executive officers, including

111

Bonderson, purportedly made on April 17, 2001, with a strike price of $20.70, the closing price for Brocade stock on that date. Most of these stock options were granted pursuant to the Stock Add-On Program. The Board (including Dempsey, Leslie, Neiman, and Reyes) purported to grant some of these options pursuant to a UWC dated April 17, 2001. The Board delegated certain details about the grant (including the vesting schedule) to the Compensation Committee (Dempsey and Leslie), which addressed those issues, and others, in minutes of a meeting that purportedly took place on April 17, 2001. Collectively, the options were issued under either the 1999 NSO Plan or the 1999 Stock Plan, which required the grant date to be either the date the Administrator makes the grant or a later date.

606. The evidence and documents relating to this grant show that it was made after April 17, 2001, and that the grants violated the 1999 NSO Plan's prohibition on grants to officers except "as an essential inducement to an Officer entering into an employment agreement regarding his or her initial service with the Company."

607. The executed version of the Board's UWC (dated April 17, 2001) appears to have two exhibits, both labeled Exhibit A. The first exhibit identifies certain executives (including Bonderson) being granted options and the number of options granted to each under the 1999 NSO Plan. This exhibit provides that the vesting schedule for the options would be "as determined by the Compensation Committee." The second exhibit is a set of minutes for a Compensation Committee meeting purportedly held on April 17, 2001 discussed in more detail below.

608. The minutes of a Compensation Committee meeting purportedly held on April 17, 2001 contain such a vesting schedule.

609. Although it bears an April 17, 2001 date, the Board UWC was drafted well after that date. Similarly, the evidence suggests that the Compensation Committee did not meet on April 17, 2001, and that the minutes purporting to memorialize a meeting on that date were not finalized until June.

610. **Board UWC.** On April 26, 2001 – nine days after the Board members purportedly executed the UWC – Blucher e-mailed Bossi stating that a "Consent will then need

to be prepared with respect to the Board approving the grants to the Section 16 officers."

Blucher's e-mail identified seven grantees (including Bonderson, Byrd, Cuthbert, and Reyes) and

the number of options granted to each. Although the e-mail listed Byrd as a grantee, it did not

reflect the final number of options granted to him (as set out in the final version of the

Compensation Committee minutes).

611.     Other evidence demonstrates that the grant details – and even the plans under

which the options were being granted – continued to change after April 17, 2001. For example,

on May 2, 2001, Jensen e-mailed Reyes and Byrd (copying Bossi) about "updated Stock and

Comp recommendations based on our ongoing conversations." Jensen identified the following

key changes in the options granted: (*i*) "adjusted Mike's [*i.e.*, Byrd's] promo stock to 200k/yr;"

(*ii*) added stock for certain promotions; and (*iii*) made "slight shifts to stock grants to better level

these promo folks."

612.     Among the documents attached to Jensen's May 2 e-mail were drafts of the

April 17 Board UWC and the April 17 Compensation Committee meeting minutes. These drafts

show that, as of May 2 (two weeks after the grant purportedly had been made), the Board had not

yet determined under which stock plan the options would be granted. The draft UWC states that

the grants were "pursuant to the terms and conditions of the Company's 1999 Stock Plan (. . .

*with potential for some stock from NSO Plan – Bossi working on this*)" (emphasis in original).

613.     A week later, on May 8, Blucher sent an e-mail saying: "Attached is my attempt

at re-wording the 4/17/01 consent showing the split of grants between the 1999 Plan and the

NSO plan. I will forward you the 'Exhibit A' as soon as it's finalized by HR."

614.     **Compensation Committee Minutes.**  During the same time period, the minutes

for the purported April 17, 2001 Compensation Committee also were being drafted and revised.

615.     The April 17, 2001 Compensation Committee minutes, signed by Dempsey,

reflect attendance by Dempsey, Leslie, and Reyes. The minutes state that the Compensation

Committee "reviewed and approved the Compensation Recommendations for Brocade's

Officers" and also detail specific option grants and related vesting schedules – including grants

to Byrd, Cuthbert, and Reyes under the 1999 Stock Plan and grants to Bonderson and others

under the 1999 NSO Plan.  The grant the Compensation Committee approved for Bonderson is the same grant approved by the Board UWC dated April 17, 2001.  Most of the Compensation Committee grants were made pursuant to the Stock Add-On Program, except for a specific grant of 800,000 options to Byrd in connection with his promotion to COO and President, and a grant to an officer named Vic Rinkle.

616.    On May 8, 2001, Jensen sent an e-mail to Dempsey in which she summarized "the compensation and stock recommendations which we discussed for Mike Byrd" and stated that she was "enclos[ing] the complete document that summarizes all recommendations for approval by the Compensation Committee for Brocade's Officers."  Attached to this e-mail was a draft of the Compensation Committee minutes; this draft did not contain certain information about Byrd's grant that is reflected in the final minutes.

617.    A May 9, 2001 e-mail shows that the plan(s) under which the options would be granted still had not been decided.  On that day, Blucher wrote to Jensen about the Compensation Committee minutes and said:  "I changed Cuthbert to '1999 Plan' and added 'under the '1999 Plan'' for Mike's [Byrd] promo grant."

618.    Jensen forwarded the May 9 e-mail to Reyes, Byrd, Bossi, and Blucher on May 10, saying that the Compensation Committee minutes should include "the agreement that Mike's promo option will have a 'double trigger' component," and she asked Reyes and Byrd to confirm the terms.  Jensen added that, upon receiving confirmation, she would work "to ensure the stock option language correctly reflects this for Mike's promo stock."

619.    Reyes confirmed the terms of Byrd's options in a May 14 e-mail to Jensen, Byrd, Bossi, and Blucher.

620.    The Board UWC and the Compensation Committee minutes were not finalized until sometime in June 2001.  A June 18, 2001 e-mail to Blucher stated that "minor corrections" to the UWC were still being made.  The Compensation Committee minutes were modified again on June 20 and June 26.  On June 26, Blucher received an e-mail attaching the "very final version of the Comp Committee Minutes."

621.    Although the Compensation Committee minutes purport to document a meeting

held on April 17, 2001, the evidence suggests that the Compensation Committee did not meet on that date. Neither Dempsey nor Leslie – who are listed as attendees – has any specific recollection of the meetings having occurred on that date. Leslie's calendar does not contain an entry for any type of Brocade-related meeting on April 17, 2001. And Reyes, who also is listed as an attendee, was in Boston on April 17 following the Boston Marathon. A Board of Directors meeting was held on Friday, April 20, 2001, but not on Tuesday, April 17, 2001.

622. Despite having no specific recollection of an April 17, 2001 Compensation Committee meeting, Dempsey signed the minutes that purport to memorialize such a meeting.

623. In addition, the grants to Bonderson, and others, appear to violate the terms of the 1999 NSO Plan, which prohibits option grants to officers "except as an essential inducement to an Officer entering into an employment agreement regarding his or her initial service with the Company." The purported April 17 grants to Bonderson and the other grantees were not those persons' initial option grants – and were thus improper.

624. Brocade's stock price on April 17, 2001 ($20.70) was the lowest price from April 6, 2001 ($21.57) to September 4, 2001 ($22.85). Brocade's stock price doubled between April 17, 2001 and May 1, 2001. And the stock price on June 26, 2001 – when the allegedly "final" version of the Compensation Committee minutes were distributed for signature – was $38.31.

<u>April 17, 2001 Director Grant</u>

625. Brocade's records also reflect a grant of options to Brocade's outside directors on April 17, 2001, with a strike price of $20.70, the closing price for Brocade stock on that date. The Board (including Dempsey, Leslie, Neiman, and Reyes) granted these options by UWC under the Director Plan, amended and restated as of April 17, 2001, which provided that Dempsey and Neiman "shall each be granted an Option to purchase 80,000 shares on April 17, 2001" and that Leslie "shall . . . be granted an Option to purchase 60,000 shares on April 17, 2001" (collectively the "Interim Options").

626. The evidence and documents relating to this grant demonstrate that it was made long after April 17, 2001.

<div align="center">115</div>

627.    As discussed in this Complaint, the evidence shows that a Board meeting did not take place on April 17, 2001 (although a meeting did occur on April 20).

628.    The documentary record confirms that the Director Plan amendment pursuant to which the Interim Options were granted was not finalized until at least mid-June 2001, well after the purported grant date.

629.    On April 26, 2001, nine days after the purported grant date, Blucher e-mailed Bossi a *draft* of the amended Director Plan (dated "as of January 18, 2001"), stating:  "This hasn't yet been approved by the Board."  That draft did not include the Interim Options.

630.    On May 29, 2001 – nearly 1½ months after the purported grant date – Bossi and Blucher received a revised draft of the amended Director Plan (dated "as of April 20, 2001") as an attachment to an e-mail.  Although the so-called April 20 draft did include the Interim Options, it stated that they were granted "on April 20, 2001," when Brocade's stock price closed at $36.78, rather than on April 17, 2001, when the stock closed at $20.70.  (By May 29, Brocade's stock was trading at $41.16.)

631.    The amended Director Plan continued to be revised in June 2001 and was still dated "as of April 20" as late as June 15.

632.    On June 1, 2001, Bossi and Blucher received another draft of the amended Director Plan.  The draft again was dated "as of April 20, 2001" and stated that the Interim Options were to be granted "on April 20, 2001."

633.    On June 1, 2001, Blucher received draft option agreements for Dempsey, Leslie, and Neiman relating to the Interim Options.  The cover e-mail stated:  "The only missing information is the exercise price (BRCD's stock price on 4/17/01).  I'm sending out a Board package later today, but I assume that we won't be able to get these finalized/approved by then."  The attached option agreements refer to the "1999 Director Option Plan, as amended and restated as of April 20, 2001."

634.    Thus, even though the draft Director Plan amendments authorizing the Interim Options were dated as of Friday, April 20, the Board apparently was planning to grant itself additional options with an exercise price based on Brocade's stock price on Tuesday, April 17 –

*before* the amendments purportedly took effect, and when the closing price was $16.08, lower than it was on April 20.

635.    The manipulations continued. On June 15, 2001, Blucher was sent an unsigned UWC dated April 20, 2001, approving the amended 1999 Director Plan. Attached as Exhibit A to the UWC was the 1999 Director Plan "amended and restated as of April 20, 2001."

636.    On June 19, 2001, Bossi sent a letter to the "Brocade Communications Board of Directors" saying:

> Enclosed please find a copy of the amended and restated 1999 Director Option
>
> Plan and a unanimous written consent dated April 17, 2001, related to the
>
> adoption of the plan. The terms and conditions of the amended plan are
>
> consistent with those discussed during the January 2001 Board meeting.
>
> Also enclosed is your respective stock option paperwork for grants under the
>
> amended plan (Seth [Neiman], Neal [Dempsey], [and] Mark [Leslie] . . .) and any
>
> outstanding grants under the old plan (Seth and Neal only).
>
> *Please sign the unanimous written consent* and the back page(s) of the Director
>
> Option Agreement(s), make one copy of the agreements(s) [*sic*] for your records,
>
> and return all originals to my attention. [Emphasis added.]

637.    On June 19, 2001, Blucher sent an e-mail that "attach[ed] a copy of the amended Director Plan and consent that I mailed off today. I will forward you the original signature pages when I get them."

638.    Sometime after June 19, 2001, Dempsey, Leslie, Neiman, and Reyes (among others) all signed the UWC approving the amended Director Plan and the Interim Options. The UWC was dated April 17, 2001, even though it was not signed until at least two months later, and even though neither the amended Director Plan nor the individual grant agreements had been prepared by that date.

639.    Brocade's stock price on April 17, 2001 ($20.70) was the lowest price from

117

April 6, 2001 ($21.57) to September 4, 2001 ($22.85).  Brocade's stock price doubled between April 17, 2001 and May 1, 2001.

<u>October 1, 2001 Director Grant</u>

640.    Brocade's records reflect a grant of 75,000 options each to Dempsey and Neiman purportedly made on October 1, 2001, with a strike price of $12.90, the closing price for Brocade stock on that date.  The Board (including Reyes, Dempsey, Leslie, and Neiman) granted those options by UWC dated October 1, 2001, under the 1999 Stock Plan, which required that the date of a stock-option grant be the date the Administrator makes the determination, or a later date.

641.    The documents underlying this grant show that it was made well after October 1, 2001.

642.    Unsigned minutes of a Compensation Committee meeting, purportedly held on October 1, 2001, reflect attendance by Dempsey, Neiman, and Reyes, among others.  The minutes also reflect Reyes' approval of stock option grants of 75,000 shares each to Dempsey and Neiman.  While the minutes are unsigned, the signature block is drafted for Reyes' signature as CEO and Chairman of the Board.

643.    A decision to grant options to Dempsey and Neiman was likely not made on October 1, 2001.  As an initial matter, Reyes was not a member of the Compensation Committee and had no authority to grant options to directors.  Moreover, grants to Directors were required to be approved by the full Board.  Nevertheless, the evidence suggests that no meeting took place.  There is no entry for this meeting on Neiman's calendar, and Neiman testified that he was not even in California on October 1, 2001.

644.    In fact, the UWC – which was signed by Dempsey, Leslie, and Neiman (among others) – was not even circulated for signature until late December 2001.

645.    E-mails show that signatures pages were sent to Dempsey, Leslie, and Neiman on December 27, 2001.  The UWC thus could not have been finalized until (at the earliest) late December 2001, months after the purported October 1, 2001 grant date.

646.    The strike price set for this grant – which was based on the stock price on October 1, 2001 – was the lowest price for Brocade's stock since the date of the prior director

<div align="center">118</div>

grant made on April 17, 2001, and was also the lowest price at which Brocade stock closed

between October 1, 2001 and December 27, 2001.

### Overall Pattern of Faulted Grants

647.    An overview of the faulted grants discussed above shows the frequency with

which the Board – controlled by Reyes and the Compensation Committee Defendants – granted

stock options at a low, or near-low, exercise price.



**Board of Directors Faulted Grant Dates Fiscal Year 1999**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



**Board of Directors Faulted Grant Dates Fiscal Year 2001**

16

### LEAVES OF ABSENCE AND RELATED MATTERS

17        648.    The Audit Committee's second investigation of Brocade's historical stock-option

18 practices uncovered accounting issues related to Brocade's treatment of the vesting and

19 exercising of stock options held by employees on leaves of absence ("LOAs") or in advisory

20 roles before leaving Brocade.  These accounting issues required Brocade to record additional

21 non-cash compensation expenses attributable to those options.

22        649.    Accordingly, Brocade announced on November 14, 2005 that it was restating

23 certain of its financial statements because it had "determined that from 1999 through 2004 we

24 had not appropriately accounted for the cost of stock-based compensation for certain employees

25 on leaves of absences . . . and in transition or advisory roles prior to ceasing employment with

26 us."

27        650.    Brocade was forced to record this increased compensation expense because it had

28 not previously taken compensation charges when it had deviated from its formal policies in

1    connection with the vesting or exercise provisions in employees' stock options.

2        651.    Appendix A to FIN 44 states:

3        The Board … concluded that a modification to accelerate vesting effectively

4        results in a renewal of an award if, after the modification, an employee is able to

5        exercise (vest in) a stock option or award that, under the original terms, would

6        have expired unexercisable (unvested).  The Board concluded that a new

7        measurement of compensation cost should be made at the date of the modification

8        to the award's vesting provisions.

9        652.    Brocade granted stock options pursuant to plans and policies that specified rules

10   governing vesting and expiration of stock options.  A formal modification of those rules, or a

11   failure to follow them, thus could effectively constitute a renewal of the option grant and trigger

12   a compensation charge.

13       653.    Brocade's policies regarding the stock options of terminated employees or

14   employees taking LOAs were clearly stated.

15       654.    A terminated employee's stock options ceased to vest on the day of termination,

16   and were exercisable for only 90 days after that date.  The 90 days were to be measured from the

17   date of actual or constructive termination, rather than from an artificially chosen date.

18       655.    Brocade's policies for employees taking LOAs were detailed in the Employee

19   Handbook at least since July 2000.  The Employee Handbook stated that an employee's stock

20   options would continue to vest for only three months after the LOA began.  This three-month

21   rule applied to all types of leave, including family and medical leave, pregnancy leave, work-

22   related medical leave, and unpaid personal leave.  Brocade confirmed the three-month vesting

23   rule in an October 2, 2001 chart titled "Leave of Absence Matrix."

24       656.    In 2002, Brocade decided to change its policies for personal LOAs.  The

25   Company sought the advice of its auditors at the time, Andersen, to determine the accounting

26   consequences that would result from a more limited vesting period for employees taking these

27   types of LOAs.

28       657.    Andersen responded to Brocade's request for advice, and, on February 1, 2002,

121

Bossi e-mailed Jensen and Canova to inform them that "[o]ptions granted under our 1999 Plan allow company discretion re vesting during a LOA.  Accordingly, we should be fine changing our policy not to allow vesting during a LOA.  Our NSO plan is silent on this question: accordingly, [Andersen] does not see this as a problem."

658.     On February 15, 2002, Jensen e-mailed all Brocade employees to inform them that, for unpaid personal leaves of absence, stock options would cease to vest immediately upon the start of an employee's LOA.  The policies relating to other types of LOAs remained the same.  Jensen wrote:

> Effective immediately, we will continue to make every effort to accommodate
> employee's [*sic*] and their personal needs as related to granting unpaid personal
> leaves of absence.  We will continue to leave your stock option outstanding;
> however, your vesting will be suspended until you return to active employment.
> Please note that our policy concerning leaves that are not considered for the
> convenience of the employee remain unchanged.

**Defendants' Awareness of Policies and Accounting Implications**

659.     Defendants were aware that Brocade had policies governing the vesting and exercise of stock options.

660.     For example, all Defendants received stock options on many different occasions. On each such occasion, option recipients generally signed a Notice of Grant of Stock Options and acknowledged that they agreed "that these options are granted under and governed by the terms and conditions of the Company's Stock Option Plan as amended and the Option Agreement, all of which are attached and made part of this document."

661.     The Stock Option Agreements stated that the "optionee acknowledges and agrees that the vesting of shares pursuant to the vesting schedule hereof is earned only by continuing as a service provider at the will of the company."

662.     The Stock Option Agreements also explained that, barring specific circumstances, the options could be exercised for only three months "after the Optionee ceases to be a Service Provider."

663.     E-mail correspondence further demonstrates that Jensen, Reyes, Byrd, Canova, and Bossi were aware that changing or deviating from Brocade's policies concerning stock-option vesting and exercise for terminated employees or employees on LOA could have accounting implications requiring the Company to record additional compensation charges.  For example, Bossi received an e-mail from an Andersen accountant (Tricia Gugler) with literature related to FIN 44, explaining that:

> [i]f the terms of a nonvested stock option or award are modified in conjunction with a change in employee status, that, under the original terms, cause the stock option award to be forfeited, the modified option or award should be accounted for (prospectively) as an entirely new grant . . . . In that case, any compensation cost measured is fully recognized over the remaining vesting (service) period.

664.     Bossi later summarized the same information in a communication to Jensen.

<u>Communications About Accounting Implications</u>

665.     On January 18, 2001, Charlie Smith e-mailed Reyes and Jensen that he had negotiated an extension of Renee Linde's employment by agreeing to change the vesting of her stock options.  Reyes reviewed Smith's proposal and responded that "I think that what you have worked up is excessively generous and *could also result in a charge against earnings*" (emphasis added).  In response to Reyes' concerns, Smith modified the proposal and wrote to Reyes that, "if we can have your support for this vesting strategy with a reduced $$ comp, pursuant to my discussion with Stephanie [Jensen], we can structure it in a fashion not to create a charge against earnings."  Reyes approved the revised proposal but noted that "this is a one time and one time only deal for Renee, based on all that she has done for the company and because her services are so unique and strategic."  Both Byrd and Canova were added to the e-mail string and were thus made aware of the conversation about the change in Linde's vesting.

666.     In an electronic calendar entry for a proposed meeting on December 18, 2001, Bossi wrote to Jensen:

> We can also discuss the following arrangements which should be avoided, as *they create accounting compensation charge issues:  Terminations - acceleration of*

123

1    *vesting or allowing any stock vesting beyond the date of "actual" termination,*

2    which is the last day the employee works for and provides services to Brocade.

3    This is not necessarily the same date through which the employee remains on the

4    payroll system, or is entitled to benefits.  We also need to work on the paper trail

5    and documentation, such that our PAN's [*i.e.*, Personnel Action Notice],

6    Settlement Agreements and any other documentation with the employee reflect

7    consistent date references, etc.

8    667.    On December 19, 2001, Bossi e-mailed Jensen, copying Canova, regarding

9    changing Brocade's policy on vesting during LOAs.  Bossi wrote:

10    I have consulted with [outside counsel] on this issue.  Options granted under our

11    1999 Plan allow company discretion re vesting during a LOA.  Accordingly, we

12    should be fine changing our policy to not allow vesting during a LOA. . . .  Our

13    NSO plan is silent on this question. . . .  [Counsel] feels this situation also has

14    more of a chance to be considered *a change to the option terms, resulting in*

15    *accounting compensation issues*. . . .  [As for] [c]hanging the number of shares

16    and pushing out vesting for employees taking on new jobs – we should stop this

17    practice immediately.  *The new EITF on option accounting basically creates an*

18    *accounting problem for any change to an option agreement*.  In the past, as long

19    as we didn't change the price, increase the number of shares or accelerate vesting,

20    we were ok.  *Now even reducing the number of shares and pushing out vesting*

21    *can create variable accounting or comp charges*.  [Emphasis added.]

22                          Bonderson's Own Violation of Brocade's Policies

23    668.    Bonderson demonstrated his awareness of Brocade's policies and the implications

24    of violating them when – in violation of standard Company policies – he arranged for his own

25    stock options to continue vesting and remain exercisable for more than eight months after his

26    employment was constructively terminated in June 2004.

27    669.    Bonderson became a "part-time employee" in June 2004 and remained on

28    Brocade's payroll as an "advisor" until his supposedly official termination on March 1, 2005.

124

SECOND AMENDED COMPLAINT

1   However, in connection with the Audit Committee's second investigation, KPMG examined

2   Bonderson's so-called part-time employment and concluded that "[t]here was no specific

3   evidence that Bonderson fulfilled his advisory duties."

4       670.    Bonderson and Vescuso artificially picked Bonderson's March 2005 "termination

5   date" to give Bonderson more time for his options to vest and to be exercisable, and Canova was

6   aware of the scheme.

7       671.    In a January 27, 2005 e-mail exchange, Bonderson asked whether there was

8   "[a]ny answer from Tony [Canova] on extending the period of time to exercise my options?"

9   Vescuso told Bonderson that "Tony and I both agree it is best to select a date at a point when you

10  are not under a black out so that you can have a full 90 days to exercise."

11      672.    When the black-out period ended, Vescuso e-mailed Bonderson on February 17,

12  2005 that "I will make you[r] last day on the payroll Tuesday, March 1st.  You will have 90

13  [days] from that date to exercise your vested options."

14      673.    Bonderson was concerned only about extending his options' exercise period as

15  long as possible, so he responded to Vescuso:  "Sounds good to me . . . as long as I have no more

16  black outs" that would effectively shorten his options' exercise period.

17      674.    Despite his constructive termination in June 2004, Bonderson exercised vested

18  options on March 1, 2005, in violation of Brocade's policies that required options to expire

19  within three months after the effective termination of employment.

20      675.    Bonderson was aware of Brocade's policies regarding the treatment of terminated

21  employees' stock options, and he knew that he was violating those policies.

22      676.    Each options grant he received was accompanied by information about the vesting

23  and exercising limitations that would apply if his employment were terminated.  For example,

24  the options that Bonderson exercised in March 2005 came from a February 26, 1999 grant under

25  a Stock Option Agreement that stated:  "If Participant is Terminated for any reason, except

26  death, Disability or for Cause, the Option, to the extent (and only to the extent) that it would

27  have been exercisable by Participant on the Termination Date, may be exercised by Participant

28  no later than three (3) months after the Termination Date."

677.    The 1999 Stock Option Agreement also stated that the options would continue to vest "for so long (and only for so long) as Participant continuously provides services to the Company. . . .  No Shares will become Vested Shares after the Termination Date."

678.    The language in the 1999 Stock Option Agreement was not unique; Bonderson saw it, or similar language, in every other grant made to him.  Equity Edge records reflect that Bonderson received two stock option grants in 1999, one in 2000, three in 2001, and six in 2003.

### Specific Violations of LOA Policy

679.    In addition to Bonderson's own violation of Brocade's policies on these issues, Defendants knowingly enabled many violations by other Brocade employees, or were grossly negligent in administering those policies and consciously disregarded their duties to Brocade.

680.    For each of the individual policy violations described below, the relevant Defendants' conduct is discussed.  Moreover, even where no Defendant was directly involved in a particular improper transaction, the numerous violations of the policies governing LOAs and terminated employees demonstrate that Jensen, as head of HR, consciously disregarded her duty to exercise appropriate supervision and oversight to ensure that her own department complied with the relevant Company policies.  Similarly, the many violations show that Reyes (as CEO), Byrd (as CFO and then COO), Canova (as CFO), and Bossi (as Controller) knowingly failed to exercise appropriate supervision and oversight over HR's stock-option granting practices and breached their duties to Brocade in actually participating in faulted practices.

### Jack Rubinson

681.    Reyes, Byrd, and Bossi improperly allowed Rubinson's options to continue vesting and remain exercisable long after the periods that Brocade's policies prescribed. Brocade ultimately had to record a compensation charge because of those policy violations.

682.    Rubinson's employment ended on May 31, 1999.  However, on July 20, 2000, Elizabeth Moore e-mailed Byrd and Bossi stating that Rubinson "wanted to do a same day sale of his options" but that the "database shows him terminated 5/31/99 and options continued to vest through 5/31/00."  Moore explained that "I called him to let him know he had no options available to exercise.  He then informed me he had a confidential agreement between you and

1  Greg that he was to continue vesting through December 2002.  I asked him to fax me the

2  document but he declined."

3      683.    Records of the status of Rubinson's stock options show that, between May 31,

4  1999 (when Rubinson's employment ended) and December 31, 2002, additional options vested.

5      684.    On November 13, 2001, Blucher sent an e-mail, copying Jensen, and attaching a

6  chart of stock sheets including information about Rubinson.  The chart showed Rubinson's

7  options were still vesting and that he still had exercisable options, even though his employment

8  had been terminated 2½ years earlier.

9      685.    Furthermore, Equity Edge records show a comment in Rubinson's account stating

10  that, "[p]er Mike Byrd, employment agreement states that options will continue to vest thru

11  12/31/02."  Brocade's Personnel Grant Status records also demonstrate that Rubinson's options

12  continued to vest and be exercised long past the end of the three-month period after his

13  termination, some as late as June 2002.

14                                    David Banks

15      686.    David Banks, an engineer at Brocade, took a LOA that began in February 2002

16  and lasted 2¾ years before his employment was terminated on November 30, 2004, but his

17  options remained exercisable during his LOA, even though the LOA really constituted an end to

18  Banks' employment.

19      687.    On February 26, 2002, Banks e-mailed Eduardo Salaz requesting that his leave of

20  absence be immediately effective and continue for a year.  Salaz responded to Banks' e-mail,

21  copying Jensen, approving the request, and stating that Banks' options would cease vesting.

22  However, Banks was permitted to continue exercising options until as late as January 2005.

23      688.    KPMG concluded that "it appears the employee never intended to come back

24  from his LOA and therefore should have terminated on [March 1, 2002]."  Banks thus should not

25  have been allowed to continue exercising options more than three months after March 1, 2002.

26                                    Paul Ramsey

27      689.    Paul Ramsey, a Software Senior Staff Engineer who reported to Bonderson, went

28  on a personal LOA on November 1, 2000 and never returned to work.  Ramsey's employment

127

1    was terminated 11 months later, but his options continued to vest during that 11-month period.

2         690.    The continued vesting occurred despite an e-mail from Heidi Rado to Eduardo

3    Salaz stating that Ramsey's options would continue to vest only for three months.  A Personnel

4    Action Notice for Ramsey dated September 30, 2001, approved by Bonderson 11 months after

5    Ramsey had begun his LOA, noted:  "didn't return from personal LOA; confirmed by Paul

6    Bonderson."  Jensen also signed the Personnel Action Notice.

7         691.    On November 8, 2000, eight days after Ramsey's LOA had begun, Moore e-

8    mailed Jensen saying that Ramsey had contacted her "asking if the vesting of his options were

9    froze[n] due to the LOA."  Jensen responded, copying Bonderson, that "we need to follow our

10   EE Handbook and Stock Plan document on this."

11        692.    Despite these communications, and despite Jensen's and Bonderson's knowledge

12   of Brocade's policies, Ramsey's options were allowed to vest for the duration of his 11-month

13   LOA.  Brocade's records show that, during Ramsey's LOA between January and September

14   2001, additional options vested.

15                          **Constructive Termination**

16        693.    Constructive termination refers to circumstances in which employees effectively

17   stopped working for Brocade even though their employment had not yet been officially

18   terminated.  The date of constructive termination could occur before the recorded termination

19   date, as employees were in some instances permitted to remain on Brocade's payroll even though

20   their responsibilities to the company had ceased.

21        694.    Whether a termination is constructive or recorded, the same time limitations on

22   stock-option vesting and exercisability apply:  vesting must end immediately, and the vested

23   options were exercisable for only three more months.  Any variation from these policies required

24   Brocade to assign a new measurement date to the stock options and (depending on the quoted

25   market price of Brocade's stock) to take a compensation charge.

26        695.    Nevertheless, Defendants used various ruses to deviate from Brocade's policies,

27   including using "advisory" roles, "part-time" work, and LOAs to create the fiction of continued

28   employment beyond the constructive termination date.

Advisory Roles and Part-Time Work

696.    To ensure that the termination of certain employees did not disrupt Brocade's operations, Brocade sometimes gave advisory roles to certain employees who either had a specific, uniquely valuable skill or were very senior in the organization (*i.e.*, Executive Vice Presidents or direct reports to the CEO).  However, Brocade's policies did not allow these advisory roles to create the fiction of continued employment to extend stock options' vesting.

697.    Defendants enabled, or consciously ignored, many violations of these policies and caused the need for Brocade to restate its financial statements.

698.    During the advisory period, advisors were required to perform specific duties and responsibilities, and also were expected to meet with Brocade representatives at regular intervals to review the progress on assigned projects.

699.    During the advisory period, employees continued to receive standard Company benefits, including the vesting of stock options.

700.    Advisors were required to keep contemporaneous records sufficient to show that their advisory work was real.

701.    In connection with the Audit Committee's second investigation in 2005, KPMG reviewed the circumstances behind the terminations of all Vice Presidents during the period under investigation and examined correspondence, HR files, and other available evidence. KPMG concluded that Brocade's financial statements needed to be restated to reflect additional compensation charges for, among other issues, "stock options that employees were able to exercise during periods they were on leaves of absence (or in transition/advisory roles) that were not bona fide."

702.    KPMG identified a number of circumstances where Brocade had agreed to retain employees in part-time or advisory capacities, but where the evidence did not show that those "advisors" actually had done any work.  KPMG concluded that Brocade should have recorded compensation charges for those employees' stock options.

Ronald Epstein

703.    Ronald Epstein, was released from his day-to-day responsibilities as Brocade's

129

General Counsel on November 28, 2003.  According to his Separation Agreement, he was then to serve in an advisory capacity for seven months, during which time his options continued to vest.  Correspondence shows that Reyes was involved in the discussions about Epstein and knew the terms of his arrangement with Brocade.

704.    On March 29, 2004, four months after having been relieved of his official duties, Epstein wrote to Mark Cochran (Brocade's new General Counsel) with comments about his severance.  Epstein stated that he had

> no problem stopping the vesting [of stock options] on May 31, 2004, but I would like to have the right to exercise the stock through the earnings announcement following the end of FY 2004.  It was the one issue I felt most strongly about when we discussed the package in December.  There are a variety of ways to do this that do not affect Brocade's financial obligation.  The easiest would be to have the Advisory Period extended to Sept 15, 2004.  *This avoids any accounting charges for Brocade*.  [Emphasis added.]

705.    Cochran conveyed Epstein's request to Reyes and responded to Epstein that he (Cochran) "understood all along that you want to have as much time as possible to exercise your options. . . .  I have passed your request along to the new VP of HR, Mike Vescuso, who meets regularly with Greg [Reyes] on issues like this and expect to hear back from him shortly."

706.    Two weeks later, on April 13, 2004, Cochran e-mailed Epstein stating that "Greg Reyes and Mike Vescuso have both reviewed your requests and here is what they have approved":  "We can off[er] a personal leave of absence for a period long enough for your 90 day exercise period to reach Sept 30, 2004, provided that you continue to provide consulting services . . . at no charge to Brocade through the end of Sept 30, 2004."

707.    Based on the lack of evidence that Epstein had provided any advisory services, KPMG concluded that Epstein had been terminated on the day his normal employment ended (November 28, 2003).  Reyes and others thus should not have allowed Epstein's options to continue vesting, or to remain exercisable more than three months after Epstein's termination.

708.    But Epstein exercised options as late as March 2004, and his options remained

exercisable until September 30, 2004.  His options also continued to vest until June 30, 2004.

<u>David de Simone</u>

709.    David de Simone, an employee in the CFO's office, ceased to work in his full-time position on March 15, 2002.  His Separation Agreement stated that he would have a transition role for two months, followed by a six-month "advisory role."  De Simone's stock options continued to vest throughout that "advisory" period until his eventual termination on December 15, 2002, even though he apparently never performed any advisory services.

710.    On March 8, 2002, Jensen e-mailed Bossi and others about de Simone's Severance Agreement.  Jensen wrote that, in exchange for signing the agreement, de Simone would receive a three-month transition role followed by a four-month advisory role.   In a follow-up e-mail to Bossi, Jensen wrote that de Simone's offer had been "[c]hanged . . . to 3 month transition role and 6 mo advisory role – at 50% pay (so full 3 mo severance) and full vesting for this 6 months."

711.    KPMG found only "limited evidence" that de Simone had acted in an advisory capacity and concluded that de Simone's employment actually had been terminated before the "transition role" began.  Jensen, Bossi, and others thus failed to prevent de Simone's stock options from continuing to vest.

712.    Brocade's records show that, between March 15 (de Simone's effective termination date) and December 15, 2002, additional options vested.

<u>Timothy Duffy</u>

713.    Timothy Duffy, who reported to Cuthbert, ceased to act in his full-time capacity as a Brocade employee on October 9, 2002.  His resignation letter addressed to Reyes is dated October 10, 2000.  His Severance Agreement, which Jensen signed, stated that Duffy would serve as an "Advisor" for a little under four months, during which time he would continue to receive full pay, and his stock options would continue to vest until January 31, 2003.  Duffy's work was officially terminated on January 31, 2003.

714.    An October 9, 2002 letter from Reyes to Duffy states that Brocade decided to remove Duffy from his current role and place him in an advisory role through January 2003 after

131

1    which he would be terminated.  The letter provides details of what the advisory role would entail,

2    and it explains that vesting of Duffy's options would continue until the end of the advisory

3    period.

4        715.    However, KPMG found little evidence that Duffy actually had served in an

5    advisory capacity.  KPMG therefore determined that Duffy's termination had occurred at the end

6    of his normal employment on October 9, 2002, and his stock options should not have continued

7    to vest past that date.

8        716.    Jensen thus violated Brocade's policies in signing a Severance Agreement that

9    allowed Duffy's options to continue vesting for another 3½ months.

10                                    William James LaLonde

11        717.    William James LaLonde, Vice President of Asia Pacific reporting to Cuthbert,

12    assumed an advisory role on May 1, 2004.  According to the Separation Agreement signed by

13    Reyes, LaLonde acted in this advisory capacity until he was terminated six months later, and his

14    termination date was entered in Brocade's Oracle database as October 31, 2004.

15        718.    During this time period, LaLonde's options continued to vest as provided for in

16    LaLonde's Separation Agreement, even though he apparently did not provide services to

17    Brocade.  In addition, LaLonde exercised options as late as December 2004.

18        719.    On May 13, 2004, LaLonde e-mailed Vescuso:  "Please allow me to recap what

19    we discussed just before I signed the contract yesterday. . . .  I do not have to show up for work

20    at Brocade at all during the 'transition period' . . . .  In order to complete my duties at Brocade I

21    need to have 5 phone calls with you to discuss the 'Advisory Project' . . . .  I do not have to do

22    any other work for Brocade outside these telephone conversations."

23        720.    The correspondence on the subject indicates that Reyes and Canova were aware

24    of the terms of the arrangement with LaLonde.

25        721.    Reyes was kept informed of the terms of the agreement, and he agreed to sign a

26    recommendation for LaLonde as one of the terms.  In addition, on April 11, 2004, Reyes

27    forwarded a draft of LaLonde's Separation Agreement to Canova for his review.

28        722.    Three days later, on April 14, 2004, Mark Cochran forwarded a draft of

132

SECOND AMENDED COMPLAINT

LaLonde's Separation Agreement to Richard Deranleau (the Controller), who reported to Canova.

723.    Deranleau responded that "the advisory project is not substantive enough to ensure that KPMG would agreed that he is a bona fi[de] employee during the transition period. . . .  The concern here is that KPMG would require us to take a compensation charge if they did not agree with his employee status."  Deranleau suggested that Brocade take a compensation charge.

724.    KPMG found insufficient evidence that LaLonde actually had performed any advisory duties for Brocade and that his employment effectively had been terminated on the day he stopped working full-time.

<div align="center">Use of LOAs to Create Fictional Employment</div>

<div align="center">Kumaraswarmy Malavalli</div>

725.    Kumaraswarmy Malavalli, Advisor to the Chairman and CEO, transitioned to part-time employment on May 1, 2001.  For the part-time work, Malavalli was paid a certain amount per month for nearly three years until his termination on September 1, 2004, and his options continued to vest during that period even though he did not perform services for Brocade.

726.    The e-mail correspondence concerning Malavalli's part-time employment and termination shows that Reyes, Jensen, and Byrd were all aware of the terms of Malavalli's arrangement.

727.    On October 15, 2001 Malavalli wrote to Jensen (copying Reyes) that he had discussed his future role with Reyes and would continue in an advisory capacity effective November 1, 2001.

728.    Three months later, on January 18, 2002, Jennifer Hart (VP of Corporate Communications) e-mailed Reyes, Jensen, and Byrd (copying Canova) asking about Malavalli's role and stating that, "[i]f he will not be actively involved in the company, we may want to consider making an [sic] brief external statement . . . thanking him for his contributions, etc."

729.    Reyes responded that "I am supportive of putting out a brief statement thanking

<div align="center">133</div>

him for his contributions and mentioning that he will continue working with the company in a[n] advisory role."

730.    On August 31, 2004, Malavalli e-mailed Reyes offering his resignation and stating that he would "be delighted to remain as a strategic advisor for Brocade."

731.    Reyes responded and accepted Malavalli's offer.  Reyes then forwarded the e-mail exchange to Bonderson and Neiman, informing them of Malavalli's decision and that "[o]ther than helping us in India Kumar hasn't been involved in the business for the . . . past couple of years.  I think that this is just his way of saying goodbye."

732.    KPMG concluded that Malavalli's employment duties ended when his full-time work ended and that his stock options should not have continued to vest after that date.

733.    However, Brocade's records show that Malavalli's options continued to vest until at least September 1, 2004 and that he exercised options as late as November 2004.

<u>Bradley Morgan</u>

734.    Bradley Morgan was a Brocade employee whose employment was involuntarily terminated by a letter dated March 21, 2001.  The letter stated that the termination would be effective on March 23, 2001.  Under Brocade's policies, Morgan's stock options should have ceased vesting immediately on March 23, 2001, and any vested shares should have only been exercisable for 90 additional days.

735.    Morgan's March 21, 2001 termination letter was accompanied by a proposed Settlement Agreement and Release – and signed by Jensen – stating that Morgan's options would cease to vest on March 23, 2001.  However, Morgan did not agree to the terms of the proposal.

736.    Instead, the version of the Settlement Agreement that Morgan eventually signed on August 15, 2001 (nearly five months after her termination date) said that her stock would continue to vest until May 23, 2001 (two months after her termination date).

737.    In a letter to Andersen dated October 27, 2001, Jensen explained that Morgan had been involuntarily terminated on March 23, 2001 but that a settlement had not been reached until August 15, 2001, after Morgan had retained counsel to negotiate an increased severance package.

738.    On October 30, 2001, an Andersen employee (Tricia Gugler) asked Bossi to

<div align="center">134</div>

1  request a memorandum from Jensen documenting the settlement agreement with Morgan.

2  Gugler noted in particular that "[t]here are many dates used in the fact pattern . . . and I want to

3  be sure we are using the proper date for purposes of calculating the charge under [Statement of

4  Financial Accounting Standards] 123" ("SFAS 123" or "FASB 123").

5          739.    Bossi responded that Morgan had been terminated on March 23, 2001, and that, as

6  part of the settlement agreement, Brocade had granted her stock options with a strike price of

7  $20.70 (the fair market value on April 17, 2001, which was selected because Morgan claimed

8  she should have been allowed to participate in the Stock Add-On Program initiated on April 17

9  for employees with underwater stock options).  Displaying his understanding of the relevant

10  accounting rules, Bossi explained that "we are computing a comp[ensation] charge based on the

11  strike price."

12          740.    A new Personnel Action Notice dated May 23, 2001 was created to reflect an

13  "adjusted term[ination] date to reflect terms of settlement agreement."  However, inasmuch as

14  that settlement was not reached until August, the May 23 Personnel Action Notice must have

15  been backdated.   Moreover, the Personnel Action Notice was not executed by an HR employee

16  until August 16, 2001.

17          741.    The final settlement agreement that Morgan signed on August 15, 2001 contained

18  a termination date of May 23, 2001 and a statement that Brocade "agrees to transition [Morgan]

19  to a special project role, with full pay, benefits and vesting for a two month period, from

20  March 23, 2001 through May 23, 2001."  In light of the fact that the second Personnel Action

21  Notice and the settlement agreement were not executed until months after the "special project

22  role" supposedly existed between March and May, Morgan could not have retroactively executed

23  those duties as described.

24                                    Victor Rinkle

25          742.    Victor Rinkle, a VP of Operations reporting directly to Reyes, took a LOA for

26  approximately 10 months beginning on November 1, 2001.  Rinkle never returned from his

27  LOA; employment records reflect that Rinkle's employment was terminated on September 1,

28  2002.  However, the vesting and exercise periods for Rinkle's stock options continued beyond

1   the time periods allowed under Brocade's policies.

2          743.    If Rinkle's LOA was not legitimate, that is, he did not intend to return, and if his

3   actual termination date was November 1, 2001, then his options should have stopped vesting on

4   that date, and they should have ceased being exercisable three months later, on February 1, 2002.

5          744.    If the LOA was legitimate, Rinkle's options should have stopped vesting on

6   February 1, 2002, three months after the LOA began.

7          745.    Instead, however, Rinkle's shares were allowed to vest until September 1, 2002,

8   and he exercised shares as late as August 13, 2002.

9                                          Jean Zorzy

10         746.    Jean Zorzy, a VP of Program Management who reported to Byrd, took a five-

11  month LOA beginning on December 26, 2001, and did not return before her employment was

12  terminated on May 31, 2002.  However, Zorzy's options improperly continued to vest during –

13  and possibly even beyond – that five-month period.

14         747.    On November 8, 2001, Zorzy e-mailed Reyes that she wanted to make a smooth

15  transition out of her position, but that, for health reasons, she would not be able to accomplish

16  the "strategic initiatives role."  Reyes therefore understood even before Zorzy's leave began that

17  Zorzy would not be performing further services for Brocade.

18         748.    Despite Zorzy's apparent intention not to continue working, the Personnel Action

19  Notice for her LOA – which Jensen signed – stated that Zorzy would be taking a three-month

20  leave and that her stock options would continue to vest during the LOA.

21         749.    A separate Personnel Action Notice, dated May 31, 2002 and signed by Jensen,

22  states that Zorzy was voluntarily resigning effective that date.  Another Personnel Action Notice

23  with the same date, also signed by Jensen, states that "Jean is now officially coming off of leave

24  [and] terminating effective 5/31/02."

25         750.    Brocade's records show that additional options vested between December 26,

26  2001 (when Zorzy's LOA began) and May 31, 2002.  Inasmuch as Zorzy apparently did not

27  intend to return from her LOA, vesting should have ended on December 26, 2001.  Even if

28  Zorzy's LOA was entirely legitimate, vesting should not have continued beyond March 26, 2002.

751.     Bossi was aware that Zorzy's options continued to vest while Zorzy was on leave: on April 11, 2002, Blucher informed him that Zorzy "began her LOA on 12/21/01 and her vesting will stop on 6/30/02."

### BROCADE'S FINANCE DEPARTMENT

752.     Although Brocade's corporate structure changed between 1999 and 2005, Brocade's Finance Organization (also known as the Finance Department and, from 1999 to 2000, the Accounting and Finance Department) was supervised during the relevant times by the CFO, who reported directly to Reyes in his CEO capacity.

753.     Byrd was CFO from May 1999 to May 2001.  Canova was the Vice President of Finance under Byrd from November 2000 to May 2001, and continued in this position until November 2004.  Canova also succeeded Byrd as CFO, serving in this position from May 2001 through December 2005.

754.     During his tenure as CFO, Byrd supervised the "Accounting and Finance Department."

755.     During at least 1999 to 2000, Byrd also supervised the Human Resources Department.  During this period, Bossi – Brocade's Controller – was the head of the Accounting and Finance Department, and Jensen was the head of the HR Department.

756.     As set out in a November 2002 organizational chart, Canova supervised the Finance Department and its four subdivisions, including Accounting (headed by Bossi until June 2003), during his tenure as CFO.

757.     Bossi served as Brocade's Controller, reporting to the CFO, from May 1999 to June 2003.

### Finance Department's Responsibilities

758.     The Finance Department principally was responsible for Brocade's financial records and ledgers, and for preparing the Company's financial disclosures, including its Forms 10-K and 10-Q.

759.     During their tenures as CFO, Byrd and Canova were responsible for overseeing and signing Brocade's public filings and for ensuring their accuracy – including the accuracy of

1   Brocade's accounting for and disclosure of its compensation-related expenses from stock

2   options.

3         760.    For example, Blucher, who worked under Bossi, testified that Canova regularly

4   chaired meetings to review Brocade's financial statements in connection with quarterly earnings

5   calls.  Blucher also testified that Canova reviewed various sections of the Forms 10-K and 10-Q

6   before they were filed.

7         761.    The Controller also was involved in Brocade's public reporting and disclosures,

8   including preparing the Company's financial statements for filing with the SEC.  Although the

9   Controller did not sign the SEC filings, he assisted in their preparation and was responsible for

10  ensuring the accuracy of their financial information – including the accuracy of Brocade's

11  accounting for and disclosure of its compensation-related expenses from stock options.

12        762.    Brocade's Controller also had responsibility for stock administration, including

13  stock options.  The Finance Department was responsible for maintaining accurate records of

14  stock-option grants and the shares issued upon exercise of those options.  These responsibilities

15  included conducting quarterly reconciliations of the often inaccurate option-grant data received

16  from the HR Department, and providing that information to Brocade's outside independent

17  auditors, Arthur Andersen and, starting in 2002, KPMG.

18        763.    With respect to stock administration, the Finance Department – and the CFO and

19  Controller in particular – was also responsible for understanding and remaining informed about

20  the accounting requirements applicable to stock options, including the proper accounting

21  treatment for in-the-money grants, grants to non-employees, extensions of vesting and exercise

22  periods, repricings of stock options, changes in measurement dates, and other such issues.

23                          **Involvement in Faulted Grants**

24        764.    Members of the Finance Department – and especially Byrd, Canova, and Bossi –

25  knew that various stock-option grants made to Brocade personnel between 1999 and 2004 were

26  backdated or otherwise manipulated and that Brocade's financial statements did not properly

27  account for Brocade's compensation-related expenses.

28        765.    The Finance Department played a key role in recruiting, particularly when Byrd

                                      138

1  supervised both HR and Finance.  From the time he joined Brocade in May 1999, Byrd was

2  focused on using stock options to recruit new employees.

3       766.    For example, in a July 1999 e-mail he sent to "Greg's group" just a few months

4  after becoming CFO, Byrd touted the potential benefits that stock options could provide:

5            I am more than willing to trade sign-on bonuses for base salary if it means that we

6            don't create an equity issue with our existing employees.  Also [it's] important

7            that we sell the value of the stock.  For example a 10,000 share option is an option

8            on $1.2 million of Brocade stock.  If we double in value in the next four years the

9            candidate will make over a million dollars or $300k per year!!!!  All of our

10           managers need to be coached through this so they can sell the candidate without

11           paying high salaries.

12      767.    Byrd created the "offer and acceptance" program, which granted stock options to

13 new hires based on the date they accepted Brocade's employment offer (or even on the date of

14 the offer letter or the job interview), rather than the date the new hires actually began working for

15 Brocade.  The new hire thus received the benefit of an earlier grant date and a lower exercise

16 price, even if he or she did not do any work for Brocade before his or her actual full-time start

17 date.

18      768.    Byrd also created the "part-time" program.  As Byrd acknowledged when he was

19 interviewed during the First Investigation, he conceived of and implemented this program in part

20 to avoid the compensation charges associated with granting stock options to non-employees.

21      769.    As described above, the impetus for Byrd's creation of the "part-time" program

22 was the FASB's proposed accounting interpretation of the definition of "employee" in the fall of

23 1999.  Under the proposed interpretation, options granted to new hires before their employment

24 start dates would be considered grants to non-employees and would have to be recorded as an

25 expense.

26      770.    To get around this interpretation, Byrd suggested in an October 8, 1999 e-mail to

27 Reyes that Brocade grant stock options to new hires before their full-time start dates by hiring

28 them on a part-time basis and "pay[ing] them for four hours a week until they start."

771.    The "part-time" program apparently became standard operating procedure for issuing stock options to new hires.  The evidence shows that new hires received stock options based upon part-time start dates even if the grantees never actually performed any work for Brocade while they were considered part-time employees.

772.    For example, one employee – Gary Blucher – testified that Bossi explained the "part-time" program to him when he was hired.  According to Blucher, Bossi told him that he (Blucher) "would kind of be on call" during the time he was considered a part-time employee and that participating in the program "would allow [Brocade] to basically issue [Blucher] stock as of the time that [he] signed that intention to join on a part-time basis."

773.    Blucher further testified about the program that "basically . . .  you sign up as a part-time employee, you're kind of on call, if [Brocade] need[ed] something from you, to come in, attend a meeting or whatever, you're kind of agreeing to do that, and by doing that . . .  you're now an employee and [Brocade] can issue you stock options at that point in time."

774.    Blucher testified that he thought he was on part-time status for "about a week" and that, other than being on call, he did not remember being asked to do anything.

775.    Many of the faulted grants previously described show the knowledge and involvement of Finance Department members in using the "offer and acceptance" and the "part-time" program as a way to issue backdated options, including, for example, the October 18, 1999 grant described in this Complaint.

776.    Senior members of the Finance Department knew of these practices.  Canova, for example, understood that new hires were granted stock options with exercise prices based on dates before their full-time employment began.  He also understood that those earlier dates were chosen because the stock prices were lower on those dates.

777.    For example, on April 9, 2001, a Brocade manager, Jieming Zhu, forwarded to Canova an e-mail exchange between Zhu and a candidate.  The e-mail advised the candidate that the Board would price his options and that, "[i]f history is any indication, the price is usually the lowest closing price between now and the Board meeting.  Therefore, should our stock price continue going down in the short term, you are protected until you join Brocade."

1    778.    Upon receiving this e-mail, Canova e-mailed Jensen and urged her to "[p]lease

2    caution [J]eiming to not make statements about the board granting shares at the lowest price.  To

3    date this has been a complete coincidence.  I actually worry that others may say the same."

4    779.    Jensen replied that she "did caution Jieming on that, he realized, after the fact . . .

5    that he should not have stated that in the email."

6    780.    Canova also received an October 31, 2002 e-mail from Bossi in which Bossi

7    acknowledged that he had forged stock-option paperwork to allow a new hire to obtain a lower

8    strike price for his options:

9         If you recall we had all been jumping through hopes [*sic*] and bending over

10        backwards for [Richard Geruson] including forging option paperwork and offer

11        letters so he could get better priced options . . . .  I'm sick of Mike [Byrd] as [*sic*]

12        his style complicating everything … he comes up with.  We work our asses off to

13        try to do the right things.  We shouldn't be blamed for Mike['s] hiring mistakes

14        and the fact we now have to fire a guy less than a year after hiring him.

15    781.    Thus, members of the Finance Department, including Byrd, Canova, and Bossi,

16    knew of, and in some cases actively participated in, the improprieties relating to stock options at

17    Brocade.  And if they did not know of those improprieties, their conduct was deliberately

18    reckless and grossly negligent, and they consciously disregarded their responsibilities to

19    Brocade.

20                    **False Financial Statements and Certifications**

21    782.    During the relevant period, members of the Finance Department – including Byrd,

22    Canova, and Bossi – issued false management representation letters to Brocade's independent

23    auditors, and prepared and signed false financial statements that needed to be corrected or re-

24    stated.

25    783.    Byrd, Canova, and Bossi, knew that those statements they prepared or signed

26    were materially false and misleading in their representations relating to stock options and the

27    accounting for equity-compensation expenses.  And if they did not know of those inaccuracies,

28    Byrd, Canova, and Bossi were deliberately reckless and grossly negligent, and they consciously

141

1  disregarded their responsibilities to Brocade.

2      784.    The following chart lists certain materially false management representation

3  letters and public filings signed by Reyes, Byrd, and Canova (among others):

| Date | Document | Gregory L. Reyes | Michael J. Byrd | Antonio Canova |
|---|---|---|---|---|
| 9/15/1999 | 10-Q | | X | |
| 1/31/2000 | 10-K | X | X | |
| 1/31/2000 | 10-K/A | X | X | |
| 2/28/2000 | 10-K/A | X | X | |
| 3/13/2000 | 10-Q | | X | |
| 6/13/2000 | 10-Q | | X | |
| 9/12/2000 | 10-Q | | X | |
| 1/26/2001 | 10-K | X | X | |
| 2/16/2001 | Management Rep. Letter to Arthur Andersen | X | X | |
| 3/13/2001 | 10-Q | | X | |
| 5/11/2001 | Management Rep. Letter to Arthur Andersen | X | | X |
| 6/12/2001 | 10-Q | | | X |
| 8/10/2001 | Management Rep. Letter to Arthur Andersen | X | | X |
| 9/11/2001 | 10-Q | | | X |
| 11/20/2001 | Management Rep. Letter to Arthur Andersen | X | | X |
| 1/24/2002 | 10-K | X | | X |
| 3/11/2002 | Management Rep. Letter to Arthur Andersen | X | | X |
| 3/12/2002 | 10-Q | | | X |
| 5/30/2002 | 10-Q | | | X |
| 8/14/2002 | Management Rep. Letter to KPMG | X | | X |
| 8/27/2002 | 10-Q | X (SOX) | | X (SOX) |
| 11/18/2002 | Management Rep. Letter to KPMG | X | | X |
| 1/22/2003 | 10-K | X (SOX) | | X (SOX) |
| 2/10/2003 | Management Rep. Letter to KPMG | X | | X |
| 3/7/2003 | 10-Q | X (SOX) | | X (SOX) |
| 6/9/2003 | 10-Q | X (SOX) | | X (SOX) |
| 6/9/2003 | Management Rep. Letter to KPMG | X | | X |
| 8/11/2003 | Management Rep. Letter to KPMG | X | | X |
| 9/8/2003 | 10-Q | X (SOX) | | X (SOX) |
| 11/14/2003 | Management Rep. Letter to KPMG | X | | X |
| 1/20/2004 | 10-K | X (SOX) | | X (SOX) |
| 2/6/2004 | Management Rep. Letter to KPMG | X | | X |
| 3/8/2004 | 10-Q | X (SOX) | | X (SOX) |
| 5/14/2004 | Management Rep. Letter to KPMG | X | | X |
| 6/14/2004 | 10-Q | X (SOX) | | X (SOX) |

142

SECOND AMENDED COMPLAINT

| Date | Document | Gregory L. Reyes | Michael J. Byrd | Antonio Canova |
|------|----------|------------------|-----------------|----------------|
| 9/13/2004 | 10-Q | X (SOX) | | X (SOX) |
| SOX = Sarbanes Oxley Certification | | | | |

785.   All of those documents contained material misstatements that subjected Brocade to class-action lawsuits and SEC penalties and caused extensive damage to Brocade.

<u>Management Representation Letters</u>

786.   During their respective tenures as CFO, Byrd and Canova signed and participated in preparing, reviewing, and transmitting false management representation letters to Brocade's auditors, including those listed in the chart above.  Both Byrd and Canova signed such management representation letters certifying the accuracy of Brocade's financial statements even though they knew those financial statements were false in material respects.

787.   For example, on February 16, 2001, Byrd and Reyes signed a management representation letter to Andersen in connection with Andersen's review of Brocade's condensed financial statements as of January 27, 2001 that were to be included in the Company's quarterly Form 10-Q report to be filed with the SEC.  This letter stated, among other things:

(a)   "The financial statements to be included in the interim report to shareholders are fairly presented, in accordance with generally accepted accounting principles, on a basis consistent with that of the audited financial statements as of October 28, 2000."

(b)   "The financial statements to be included in the Form 10-Q quarterly report comply as to form in all material respects with the applicable accounting requirements of the Securities Exchange Act of 1934 and the related rules and regulations adopted by the SEC, and they are presented on a basis consistent with that of the audited financial Statements as of October 28, 2000."

(c)   "There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements."

(d)    "There has been no — a. Fraud involving management or employees who have significant roles in internal control [or] b. Fraud involving others that could have a material effect on the financial statements."

(e)    "The accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company."

788.    These statements were materially inaccurate.

789.    Similarly, during his term as CFO, Canova signed at least 12 quarterly and annual management representation letters to Brocade's auditors (Andersen and then, starting in August 2002, KPMG), even though he knew they were materially false.

790.    For example, the management representation letter dated November 20, 2001 to Andersen, signed by Canova and Reyes, stated that it was being provided to Andersen:

in connection with your audit of the consolidated financial statements of Brocade . . . (the "Company") as of October 27, 2001 and October 28, 2000 and for the three years ending October 27, 2001 for the purpose of expressing an opinion as to whether those financial statements present fairly, in all material respects, the financial position, results of operations, changes in equity, and cash flows of the Company in conformity with accounting principles generally accepted in the United States.  We confirm that we are responsible for such fair presentation in those financial statements.

791.    The November 20, 2001 management representation letter further stated that:

(a)    "The financial statements are fairly presented in conformity with the accounting principles referred to above."

(b)    "We have made available to you all financial records and related data."

(c)    "There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements."

(d)    "There has been no –

(a)    Fraud involving management or employees who have significant roles in internal control.

1        (b)      Fraud involving others that could have a material effect on the

2                 financial statements."

3        (c)      "The accounting records underlying the financial statements accurately

4                 and fairly reflect, in reasonable detail, the transactions of the Company."

5    792.    These statements also were materially inaccurate.

6    793.    Starting in 2002, the management representation letters associated with annual

7    SEC filings included a statement under the heading "Compensation," providing that:

8            Stock-related awards to employees have been accounted for in accordance with

9            the provisions of [APB 25].  The disclosures required for such awards by

10           [SFAS 123] have been made where appropriate.

11   794.    These statements also were materially inaccurate.

12   795.    Reyes and Canova signed a number of other substantially similar letters,

13   including, for example, a letter for the preceding quarter, dated August 14, 2002, to KPMG

14   relating to the Company's Form 10-Q, stating that:

15       (a)      "[W]e confirm that, to the best of our knowledge and belief, the financial

16                information included in the aforementioned [10-Q and quarterly]

17                documents is presented in conformity with generally accepted accounting

18                principles in the United States of America."

19       (b)      "There have been no:

20                •        Instances of fraud involving any member of management or

21                         employees who have significant roles in internal control

22                         . . . .

23                •        Violations or possible violations of laws or regulations the

24                         effects of which should be considered for disclosure in the

25                         financial information or as a basis for recording a loss

26                         contingency.

27                •        Allegations, either written or oral, of deficiencies in

28                         internal control that could have a material effect on the

145

1  Company's consolidated financial statements that have not

2  been disclosed to you in writing."

3  (c)  "There are no . . . [m]aterial transactions that have not been properly

4  recorded in the accounting records underlying the financial information."

5  (d)  "The Company has properly accrued for all employee compensation (i.e.

6  commission, bonus, etc.) as of July 27, 2002."

7  (e)  "Further, we confirm that we are responsible for the presentation in the

8  consolidated financial information of financial position, results of

9  operations, and cash flows in conformity with generally accepted

10  accounting principles."

11  796.  These statements were materially inaccurate.

12  797.  Canova and Reyes signed at least ten other management representation letters to

13  Brocade's auditors substantially similar to the ones described in the preceding paragraphs.

14  Those other representation letters are listed in the above table.

15  798.  Although Bossi did not sign the management representation letters, he was

16  responsible for, and had a role in, ensuring the accuracy of the underlying financial documents

17  supporting the statements in those letters.  He also appears to have participated in the

18  preparation, drafting, and transmission of the management representation letters to the

19  independent auditors while he was Controller, between May 1999 and June 2003.

20  SEC Filings

21  799.  Brocade's public filings during the relevant period contained false and misleading

22  statements similar to those in the management representation letters.

23  800.  **Forms 10-K.**  Between 2000 and 2004, Byrd and Canova (as well as Reyes,

24  Dempsey, Leslie, and Neiman) repeatedly certified in Brocade's 10-K filings that the Company

25  was properly accounting for stock options in its financial statements.

26  801.  For example, the Form 10-K for fiscal year 2001, signed by Canova (as well as by

27  Reyes, Neiman, Leslie, and Dempsey) included the assurance that "[t]he Company accounts for

28  its stock option plans . . . in accordance with the provisions of Accounting Principles Board

146

Opinion 25 . . . whereby the difference between the exercise price and the fair value at the date of grant is recognized as compensation expense."

802.    The same or similar statements appeared in Brocade's annual filings for fiscal years 1999 (signed by Reyes, Byrd, Neiman, Leslie, and Dempsey), 2000 (signed by Reyes, Byrd, Neiman, Dempsey and Leslie), 2002 (signed by Reyes, Canova, Neiman, and Dempsey), and 2003 (signed by Reyes, Canova, Neiman, and Dempsey).

803.    These statements were materially inaccurate.

804.    During Byrd's and Canova's respective tenures as Brocade's CFO, Brocade's SEC filings – which Byrd and Canova signed – also informed the investing public that Brocade was not recording any compensation charges for in-the-money stock options, thereby creating the false impression that no in-the-money options were granted.

805.    For example, Brocade's Form 10-K for fiscal year 2002 declared that "[n]o additional deferred stock compensation was recorded during the years ending October 26, 2002, October 27, 2001, and October 28, 2000."

806.    Nearly identical statements were included in the Forms 10-K for fiscal year 2000, which Byrd signed as CFO, and for fiscal years 2001 and 2003, which Canova signed as CFO.

807.    The statements that Brocade was accounting for its stock options in accordance with APB 25 and that Brocade was not recording any additional deferred compensation expense created the materially misleading impression that Brocade was not granting in-the-money options – and therefore not recording additional deferred compensation expense because it had no reason to do so.  The collective statements in the Forms 10-K, thus, were materially false and misleading.

808.    **Forms 10-Q.**  Brocade's quarterly reports on Form 10-Q filings were prepared by the Finance Department and were signed on behalf of the Company by either Byrd or Canova, as well as by Reyes in some instances.  The Forms 10-Q also misstated Brocade's financial position by not reporting compensation-related expenses for stock options.

809.    Many of the Forms 10-Q contained (*i*) affirmative statements similar to those in the Forms 10-K, stating that Brocade accounted for stock options in accordance with APB 25

147

and (*ii*) certifications similar to those in the Forms 10-K, stating that all fraud and internal control deficiencies had been disclosed.  These statements were materially inaccurate.

810.  **SOX § 302 Certifications.**  Canova and Reyes also signed numerous SOX § 302 certifications attesting that they had disclosed to Brocade's auditors and Audit Committee all instances of fraud, whether or not material, involving management or others with responsibility over internal controls.

811.  For example, Canova and Reyes signed two certifications in the Form 10-K for fiscal year 2002, filed on January 22, 2003, stating that:

> [Brocade's] other certifying officer and I have disclosed, based on our most recent evaluation, to [Brocade's] auditors and the audit committee of [Brocade's] board of directors (or persons performing the equivalent functions):
>
> a.  all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for [Brocade's] auditors any material weaknesses in internal controls; and
>
> b.  any fraud, whether or not material, that involves management or other employees who have a significant role in [Brocade's] internal controls….

812.  These certifications were materially false and misleading, because Canova and Reyes had not made those disclosures.

813.  **SOX § 906 Certifications.**  In addition to the other certifications previously described in this Complaint, Canova and Reyes each signed separate SOX § 906 certifications in connection with at least nine Forms 10-K and 10-Q filed between August 27, 2002 and September 13, 2004.

814.  These SOX certifications were titled (in all-capital letters) "Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. 1350, as Adopted Pursuant

to Section 906 of the Sarbanes-Oxley Act of 2002" and stated, in substantially similar form, that:

> I, Antonio Canova, certify, pursuant to 18 U.S.C. Section 1350, as adopted
>
> pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly
>
> Report of Brocade . . . on Form 10-Q for the fiscal quarter ended July 26, 2003
>
> fully complies with the requirements of Section 13(a) or 15(d) of the Securities
>
> Exchange Act of 1934 and that information contained in such Quarterly Report on
>
> Form 10-Q fairly presents in all material respects the financial condition and
>
> results of operations of Brocade . . . .

815.    The certifications were followed by Canova's signature and title, which listed his positions as Brocade's "Vice President, Finance and Chief Financial Officer," or "Vice President, Administration and Chief Financial Officer."  Reyes signed nearly identical certifications on the same page, which listed his position as Brocade's "Chairman of the Board and Chief Executive Officer."

816.    Canova and Reyes signed similar SOX certifications for the Forms 10-K after 2002.

817.    The statements in these SOX certifications were materially false and misleading.

818.    **Other Public Statements.**  Byrd and Canova also participated in public telephone conferences reporting on Brocade's quarterly financial results and responding to questions from stock analysts.  During these conference calls, Byrd and Canova – as well as Reyes – misrepresented the compensation expenses that Brocade should have been taking for stock-option grants.

<p style="text-align:center">Bossi's Role</p>

819.    Although Bossi did not sign Brocade's SEC filings, he nevertheless had a major role as Controller in compiling the information included in the Forms 10-K and 10-Q.  For example, an undated document titled "Process Summary:  SEC Reporting" lists Canova as the "Executive Owner" and Bossi as the "Process Leader" and describes the SEC reporting process as follows:

> This process occurs quarterly resulting in the preparation and filing of condensed

<div style="text-align:center">149</div>

1    and/or full GAAP financial statements pursuant to SEC rules and regulations.

2    Process includes preparation of financial statements, related footnotes, MD&A,

3    risk factors, and other required disclosures.  Process also includes the filing of

4    other SEC required documents as necessary such as S-8's and proxies.

5    820.    The document also contains bullet points for "[w]hat is working:  Reporting and

6    filing requirements are being met timely," and "[w]hat is not working: . . .  Focus by senior

7    management [and] [t]imeliness of external Legal inputs."

8    821.    As "Process Leader," Bossi therefore was closely involved with all aspects of

9    Brocade's SEC reporting.

10                    **DEFENDANTS' KNOWLEDGE AND ROLES:**

11                         **GENERAL ALLEGATIONS**

12    822.    Stock options were a major focus of attention among the members of Brocade's

13    management, because the Company viewed recruitment and retention of employees as a key

14    business challenge – and stock options as a critical recruitment and retention tool.

15    823.    For example, the Management Discussion and Analysis sections in each of

16    Brocade's Forms 10-K for 1999 through 2005 listed the challenge of attracting and retaining

17    qualified employees as a "risk factor" and stated (in identical or equivalent language) that

18            our future success will . . . depend in large part upon our ability to attract and

19            retain highly skilled managerial, engineering, sales and marketing, and finance

20            and operations personnel.  Competition for these personnel is intense, especially

21            in the San Francisco Bay area. . . .  The loss of the services of any of our key

22            personnel in the future or delays in hiring required personnel, particularly

23            engineers and sales personnel, could delay the development and introduction of

24            and negatively impact our ability to sell our products.

25    824.    Brocade's management also understood that stock options were crucial to

26    Brocade's recruitment and staff-retention strategy.  Indeed, in his response to the Government's

27    Sentencing Memorandum after his criminal trial, Reyes himself attributed Brocade's rapid

28    growth to the Company's strategy of liberally granting stock options:  "By offering options to

1   attract and retain the most talented employees possible in a highly competitive job market, cash-

2   poor Brocade grew from 182 employees in 1999, to 1,332 employees in 2002."

3       825.    Because stock options were so important to Brocade's functioning, the

4   Company's officers, directors, and employees repeatedly discussed – and were aware of –

5   Brocade's policies concerning stock options and their accounting implications.  Company

6   publications that Defendants themselves signed and/or received stressed that Brocade granted

7   only at-the-money stock options and that Brocade would have to take a compensation charge if

8   an option's exercise price were less than the stock's fair market value on the grant date.

9                                **Forms 10-K and 10-Q**

10      826.    Similarly, as discussed in this Complaint, every Form 10-K that Brocade filed

11  during the relevant period stated that the Company purportedly had recorded a compensation

12  charge for any in-the-money options granted.  And the Forms 10-K represented that Brocade had

13  accounted for any such in-the-money grants in accordance with APB 25.

14      827.    For example, Brocade's first Form 10-K, filed on January 31, 2000, for the fiscal

15  year ended October 30, 1999, recorded a "cheap stock charge" in conjunction with the

16  Company's IPO:

17          In connection with the grant of certain stock options to employees, *we recorded*

18          *deferred compensation* of $307,000, and $5.1 million during fiscal 1998 and 1999

19          respectively. . . *representing the difference between the deemed value of our*

20          *common stock for accounting purposes, and the option exercise price of these*

21          *options at the date of the grant* . . . .

22          Brocade accounts for the plans and the purchase plan in accordance with [APB

23          25] whereby, the difference between the exercise price and the fair market value

24          at the date of the grant is recognized as compensation expense.  [Emphasis

25          added.]

26      828.    Reyes, Byrd, Dempsey, Leslie, and Neiman signed the 1999 Form 10-K.

27      829.    All of Brocade's subsequent Forms 10-K contained substantively similar

28  disclosures.

                                    151
                        _____
                         SECOND AMENDED COMPLAINT

830.    Reyes, Byrd, Neiman, Dempsey, and Leslie signed the 2000 Form 10-K filed on January 26, 2001.

831.    Reyes, Canova, Neiman, Leslie, and Dempsey signed the 2001 Form 10-K filed on January 24, 2002.

832.    Reyes, Canova, Neiman, and Dempsey signed the 2002 Form 10-K filed January 22, 2003.

833.    Reyes, Canova, Neiman, and Dempsey signed the 2003 Form 10-K filed on January 20, 2004.

834.    Multiple Forms 10-Q also reported that Brocade accounted for its option plans in accordance with APB 25, whereby, as stated in the Form 10-Q filed June 9, 2003: "no compensation expense is recognized in the Company's Condensed Consolidated Statements of Operations because the exercise price of the Company's employee stock options equals the market price of the underlying common stock on the date of grant."  Similar disclosures were included in Brocade's Forms 10-Q filed on June 9, 2003, September 8, 2003, March 8, 2004, June 14, 2004, and September 13, 2004.  Each of these Forms 10-Q was signed by Canova.

835.    Reyes and Canova also signed SOX certifications for Brocade's Forms 10-K and 10-Q filings starting on August 27, 2002.  In doing so, Reyes and Canova each certified, on nine occasions, that he had reviewed the relevant quarterly or annual report, that to his knowledge it contained nothing untrue, that he had established adequate internal controls, and that he had reported any fraud or internal control deficiencies to Brocade's Audit Committee and external auditors.

836.    When she was asked at her SEC deposition whether she recalled Reyes' reviewing Brocade's financials, Laurie Webb testified that, during board meetings when Canova gave financial presentations, she recalled "Mr. Reyes evaluating or reviewing the financial statements."  She was then asked "[a]nd that was along with the other members of the board?"  Webb responded, "Oh, yes."

**Management Representation Letters**

837.    Reyes, Byrd, and Canova each repeatedly signed annual representation letters to

Brocade's external auditors certifying that Brocade had recorded a compensation charge for "the difference between the exercise price [of stock options] and the fair market value at the date of grant." In doing so, these defendants represented that:

> We have made available to you . . . [a]ll minutes of the meetings of stockholders, directors and committees of directors, or summaries of actions for recent meetings for which minutes have not yet been prepared . . . .

> There have been no instances of fraud, whether or not material, involving management or other employees who have a significant role in internal controls.

> Compensation number 31. Stock-related awards to employees have been accounted for in accordance with the provisions of APB Opinion No. 25, Accounting for Stock Issued to Employees.

### Employment Offer Letters

838. Brocade's standard form offer letter informed new hires that their stock-option grant would be priced at the fair market value of the Company's stock on the date of grant. The letter also usually notified new hires that their options would cease to vest if the employment relationship ended.

839. Most of the Defendants not only reviewed this language and signed their own employment letters containing these types of provisions, they also signed similar offer letters to potential new hires to whom they were offering employment.

840. For example, Reyes' employment letter, which was dated June 25, 1998, and counter-signed by Dempsey, stated:

> Brocade is offering you a nonstatutory stock option to purchase . . . shares of Brocade Common Stock. . . . The exercise price of the option will be equal to the *fair market value of Brocade's Common Stock on the date the Board grants your stock option*. Your option will commence vesting upon your start of employment and is *contingent on continued employment*. [Emphasis added.]

841.    Jensen's employment offer letter, dated September 30, 1999, and signed by Jensen and Byrd (on behalf of Brocade), stated that "Brocade is offering you a stock option . . . . The exercise price of the option will be equal to the *fair market value of Brocade's Common Stock on the date the option is granted*. . . .  Vesting of this option will commence when the stock option is granted and is *contingent on continued employment*."  (emphasis added).

842.    Canova's employment letter, dated November 13, 2000, and counter-signed by Byrd, stated:

> Brocade is also offering you a stock option. . . .  The exercise price of the option will be equal to the *fair market value of Brocade's Common Stock on the grant date*, which will be the *first date of your employment* with Brocade.  Vesting of this option will commence upon your start of employment and is *contingent on continued employment* . . . . The terms and conditions of this vesting are specified in the stock option agreement.  [Emphasis added.]

843.    Bonderson's employment letter – dated August 4, 1995, and counter-signed by Neiman (then Brocade's CEO) – stated:  "Brocade is offering you a stock grant. . . .  The exercise price of the grant will be equal to the *fair market value of Brocade's Common Stock on the date of Board approval*" (emphasis added).

844.    Bossi's employment letter, dated May 17, 1999, and counter-signed by Byrd, and Cuthbert's employment letter, dated June 10, 1998, both stated:  "Brocade is offering you a stock option . . . .  The exercise price of the option will be equal to the *fair market value of Brocade's Common Stock on the date of Board approval*.  Vesting of this option will commence upon your start of employment and is *contingent on continued employment*" (emphasis added.)

### Stock-Option Agreements and Exercise Notices

845.    The Stock Option Agreements and exercise notices that Defendants received and signed provided further notice that Brocade purported to grant options at fair market value on the date of the grant and that vesting could continue only while the grantee provided services to the Company.

846.    Each time a Brocade employee – including Reyes, Jensen, Byrd, Canova,

Bonderson, Bossi and Cuthbert – was granted stock options, he or she was required to sign a Stock Option Agreement, together with a Notice of Grant of Stock Options.  By signing the Notice, the grantee agreed that "these options are granted under and governed by the terms and conditions of the Company's Stock Option Plan as amended and the Option Agreement, all of which are attached and made a part of this document."

847.    The Stock Option Agreement typically included similar language stating that: [Y]ou and the Company agree that this Option is granted under and governed by the terms and conditions of the Plan and this Option Agreement.  Optionee has reviewed the Plan and this Option Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option Agreement and fully understands all provisions of the Plan and Option Agreement.

848.    The Stock Option Agreement contained language restricting the vesting and exercising of options for terminated employees, typically stating that the "optionee acknowledges and agrees that the vesting of shares pursuant to the vesting schedule hereof is earned only by continuing as a service provider at the will of the Company."

849.    Except for some specific exceptions, the Stock Option Agreement provided that options were exercisable for three months after termination of the grantee's employment.

850.    To exercise options and purchase shares of Brocade stock, the option-holder – including Reyes, Jensen, Byrd, Canova, Bossi, Bonderson, and Cuthbert – signed an Exercise Notice, which incorporated the applicable option plan by reference.  By signing the Exercise Notice, the option-holder represented that he or she had "received, read and understood the [Stock Option Plan] and Option Agreement" and agreed "to abide by and be bound by their terms and conditions."

851.    The 1999 Stock Plan stated that in the case of certain "Nonstatutory Stock Option[s], . . . the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant."

852.    The 1999 NSO Plan stated:  "The date of grant of an Option shall be, for all

purposes, the date on which the Administrator makes the determination granting such Option, or such other later date as is determined by the Administrator." The 1999 Stock Plan contained nearly identical language.

### Employee Quick Reference Guide

853.    Reyes, Jensen, Byrd, Canova, Bonderson, Bossi, and Cuthbert received a copy of the "Brocade Employee Quick Reference Guide," dated June 30, 2000, which stated:

> **Your Stock.** Pricing of stock options will be equal to the fair market value of Brocade's common stock on the date the option is approved by the Compensation Committee of the Board of Directors.

### Employee Handbook

854.    Brocade's Employee Handbook – which was available to Reyes, Jensen, Byrd, Canova, Bonderson, Bossi, and Cuthbert, and which they received – detailed Brocade's policies on stock options and leaves of absence. Since approximately July 2000, the Employee Handbook stated that an employee's stock options would continue to vest for only three months during an employee's leave of absence. This rule applied to all types of leave, including family and medical leave, pregnancy leave, work-related medical leave, and unpaid personal leave.

### Stock Add-On Program

855.    In early 2001, Brocade's stock price had weakened to the point that it was threatening the Company's ability to retain staff whose outstanding options were significantly "underwater."

856.    Brocade could have repriced those options by canceling them and granting new ones at lower exercise prices, but it might have incurred a compensation charge under FIN 44 had it done so.

857.    FIN 44 provides that, if an issuer cancels an option and then grants a new option to the same employee at a lower price within six months before or after the cancellation date, the new grant will be deemed a repricing of the original option, and the employer must take a variable accounting charge for the remainder of the option's life.

858.    To qualify for fixed accounting under FIN 44, (*i*) the new grant must be made

more than six months before or after the cancellation of the original grant; (*ii*) the employee must not be compensated for any changes in stock price during the six-month period, and (*iii*) the issuer must not have agreed to cancel or repurchase options at a future date.  If the issuer grants the new options at fair market value more than six months before or after the cancellation, and if it complies with the other conditions, the new grant does not require a compensation charge.

859.    Accordingly, Reyes, Jensen, Byrd, Canova and Bossi sought to address Brocade's employees' underwater options without effecting a repricing of those options and incurring a compensation charge under FIN 44.

860.    Reyes, Jensen, Byrd, Canova and Bossi's solution was the "Stock Add-On Program."  On February 28, 2001, Jensen and Canova announced to all employees that Brocade would grant additional options to existing employees whose options were "underwater."  The add-on options' exercise price was to be fixed as of the date of the new grant, thereby avoiding compensation charges (although the add-on options' vesting mirrored that of the original grant).

861.    The Stock Add-On Program announcement was sent to all Brocade employees on February 28, 2001 from Jensen and Canova.  The announcement stated:

> As Greg [Reyes] and Mike [Byrd] shared at the Company meeting last week, we
> fully acknowledge the importance of the situation, and though *we cannot just re-*
> *price options*, we have worked with our Executive Team and the Board of
> Directors to design a program which we believe will address the situation.
> [Emphasis added.]

862.    The announcement stated that Jensen and Canova would hold "Brown Bag sessions over lunch" on March 7 and 8, 2001, to discuss the Stock Add-On Program.  The announcement also included a "Stock Add-On Program FAQ," which asked:

> 8.  Why didn't Brocade just re-price my stock options?
>
> Recent SEC rulings have made this an unfavorable option for companies.  *There*
> *would be a significant financial impact to earnings based on the impact of having*
> *to take a compensation charge which would negatively impact the future financial*

1    *results of Brocade.*  [Emphasis added.]

2    863.    Reyes, Jensen, Byrd, Canova, Bonderson, Bossi, and Cuthbert participated in the

3    Stock Add-On Program.  (Outside directors such as Dempsey, Leslie, and Neiman were not

4    eligible.)

5    864.    Reyes and the Compensation Committee purportedly made the Stock Add-On

6    grants on April 17, 2001, and they amounted to the largest option grant in Brocade's history.

7    **Option Regrant Tender Offer**

8    865.    Brocade faced the same situation in late 2002 when, once again, most employees'

9    options were appreciably underwater.  This time, rather than undertake another "add-on" grant,

10    Brocade launched the Option Regrant Tender Offer, which was filed with the SEC on

11    December 9, 2002 (the "Regrant Tender Offer").  Like the Stock Add-On Program, the Regrant

12    Tender Offer required a lot of careful planning and was specifically designed to avoid triggering

13    any compensation charges.

14    866.    The Regrant Tender Offer, also known as the "Six Month and a Day Program,"

15    was designed by Reyes, Canova, Bossi, and Jensen and allowed Brocade employees to surrender

16    their underwater options in exchange for new options that would be issued six months and one

17    day later.  The new options would be priced at the market price of Brocade's stock on that date –

18    a price likely to be much lower than the original options' exercise prices.

19    867.    Reyes signed Brocade's Form SC TO-I filing for the Regrant Tender Offer, which

20    explained how the tender offer was designed to avoid compensation charges that a simple

21    repricing of underwater options could have triggered:

22        If we were to grant the new options under a traditional stock option repricing, in

23        which an employee's current options would be immediately repriced, or on any

24        date that is earlier than six months and one day after the date on which we cancel

25        the options accepted for exchange, *we would be required for financial reporting*

26        *purposes to treat the new options as variable awards*.  This means that we would

27        be required to record the *non-cash accounting impact of increases in stock price*

28        *as a compensation expense for the new options issued under this offer. . . .*

1

2          *By deferring the grant of the new options for six months and one day, we believe*

3          *that we will not have to treat the new options as variable awards, and will avoid*

4          *these accounting charges.*  [Emphasis added.]

5          868.    Reyes also e-mailed all employees ("Brocadians") on December 9, 2002, to

6   explain the Regrant Tender Offer, and a copy of his message was filed as an exhibit to Brocade's

7   Form SC TO-I.  Reyes' e-mail explained some of the terms of the tender offer and emphasized

8   the accounting considerations that underlay its structure:

9          Vesting:  The new options will be subject to the same vesting schedule as the

10         exchanged options, subject to your continued employment on each relevant

11         vesting date.

12

13         Exercise Price of the New Options:  The exercise price of the new options will be

14         the *fair market value on the date of grant*, which will generally be equal to the

15         closing price of Brocade common stock on the Nasdaq National Market on the

16         new option grant date.

17

18         *Accounting regulations require us to wait a minimum of six months and one day*

19         *from the cancellation date before we grant the new options.*  [Emphasis added.]

20         869.    Reyes' letter also asked employees to attend the "2003 Human Resources Kickoff

21  Meetings scheduled during the weeks of December 9th and 16th" to "address the Stock Option

22  Exchange Program."  Some of the employee Defendants likely attended those meetings.

23         870.    Dempsey and Neiman, as members of the Compensation Committee, approved

24  the Regrant Tender Offer pursuant to a UWC dated November 20, 2002.  Dempsey and Neiman

25  thus approved the restriction requiring the new grants to be made only "at the price per share of

26  the Company's common stock on the New Option Grant Date."

27         871.    Reyes, Dempsey, and Neiman signed a Board UWC dated December 11, 2002,

28  ratifying the Compensation Committee's approval of the Regrant Tender Offer.  That UWC also

1    stated that the new options "shall be . . . granted at the price per share of the Company's common

2    stock on the Nasdaq National Market on the last trading day before such date."

3        872.    Reyes, Jensen, Canova, Bonderson, and Cuthbert all participated in the Regrant

4    Tender Offer.  (The outside directors were not eligible to participate.)

5        873.    The Regrant Tender Offer was a protracted and complex way for Brocade to

6    address its employees' "out-of-the-money" options problem.  It required SEC filings, the

7    retention of external advisors, and cumbersome paperwork for the participating employees.

8    Nevertheless, Brocade went to the considerable expense and effort of completing the tender offer

9    because of the commercial imperative of avoiding compensation expenses that would have

10   affected Brocade's bottom line.

11       874.    Canova and Jensen were particularly familiar with the rationale underlying the

12   Regrant Tender Offer.  As early as February 11, 2001, Canova e-mailed Jensen about "[s]tock

13   options":

14           Looked into cancellation and regrant [of options] . . . .  I have talked to a number

15           of people and believe an appropriate way to deal with this [*i.e.*, underwater

16           options] is to grant a 6 month vest restricted stock grant at today's price and then

17           6 mnths [*sic*] and 1 day from now the option at the then far [*sic*] value . . . .  *There*

18           *would be a comp charge on the restricted part* but in an example where you had

19           10000 options you would give 500 rest anf [*sic*] 9500 options later.  We would

20           need to get our lawyers to advise us as the second [*i.e.* SEC] has started to take

21           the position that the cancellation and regrant could be a tender offer.  [Emphasis

22           added.]

23                                    **iQuantic Buck**

24       875.    In late 2002, Brocade began to use iQuantic Buck ("iQuantic") – a compensation

25   consulting firm – for assistance in formulating stock-option compensation recommendations and

26   apprising the Company of the then-current rules governing the accounting for stock-option

27   expenses, as well as proposed amendments to those rules.

28       876.    iQuantic's name surfaces in connection with the November 4, 2002

1   Compensation Committee meeting attended by Dempsey, Neiman, Reyes, and Jensen.

2        877.    A document that appears to be draft notes from that meeting and that was

3   recovered from the hard drive of Jensen's computer states:  "[a]greed to fax to Seth [Neiman]

4   and Neal [Dempsey] a copy of iQuantic's 'Responding to Underwater Options and Volatile

5   Stock Market Conditions, April 2002' paper."

6        878.    The iQuantic paper – which was found on Reyes' laptop – discusses a regrant

7   tender offer such as the one Brocade implemented and states:

8        The delayed regrant, a program *exploiting 'loopholes' in [FASB] accounting rules*

9        *designed specifically to curb traditional option repricing*, has proved to be the

10       strategy that can best mirror repricing.  The critical difference – and substantial

11       rub – is that companies must convince employees to surrender options for

12       cancellation and wait at least six months and one day for a new grant.  *Otherwise,*

13       *variable charges to corporate earnings will be incurred.*  [Emphasis added.]

14       879.    Reyes, Jensen, Dempsey, and Neiman all knew about this iQuantic report.

15       880.    In addition, in the spring of 2003, Reyes, Jensen, Canova, Dempsey, Neiman, and

16  Bossi all attended, or received a copy of, a PowerPoint presentation that iQuantic gave at

17  Brocade about stock-option expensing.  Jensen coordinated Brocade's interaction with iQuantic.

18       881.    On May 8, 2003, Weaver e-mailed an iQuantic White Paper to Jensen and

19  Canova, copying Bossi.  The paper dealt with stock-option expensing and FASB 123, and was

20  titled "Option Expensing:  By Choice or By Mandate?"  Weaver's cover e-mail stated:

21       Stephanie [Jensen] … and Tony [Canova]:  Attached is a newly released White

22       Paper on FASB 123 from iQuantic . . . .  [T]wo folks from iQuantic will be at

23       Brocade tomorrow, Friday, May 9th to meet with us to review:  1. their findings

24       on our current positions regarding stock options with recommendations for

25       changes and 2. updates on FASB 123 summary that can be provided to the Comp

26       Committee if desired.

27

28       Bob [Bossi] and Grace [Ward]:  FYI.  Attached is additional information on

expensing of stock options.  I have created a repository for all information that

you send me regarding expensing of stock options.  Please keep it coming.  I am

looking into a 'group' repository for all of us to drop information into but until I

get IT help on how to do that . . . please send to me and I'll collect.

882.    Page 2 of the iQuantic White Paper received by Bossi, Canova, and Jensen

informed them that:

Early 1970s

The [APB] – the predecessor to FASB – issues APB 25 stating that *companies*

*must recognize a charge to earnings equal to the difference between the exercise*

*price and the stock's fair market value at the time when the price and number of*

*shares in known* (typically on the date of grant . . .  For most companies, *this*

*"spread" is zero for all options granted "at-the-money," and, therefore, no*

*expense is recognized.*

Mid-1990s

FASB issues SFAS 123 requiring companies to recognize an expense for stock

options equal to the "fair value" (e.g., calculated Black-Scholes value) over the

vesting period.  In the face of severe corporate and Congressional backlash, FASB

relents and gives companies a choice as to whether to continue using APB 25 (and

report expenses in financial footnotes) or to fully adopt SFAS 123.  Almost all

companies elect to continue using APB 25.  [Emphasis added.]

883.    On May 14, 2003, Jensen e-mailed Reyes, copying Canova, about "Planning for

Compensation committee" on a presentation that iQuantic had given to Jensen and Canova

"[l]ast week" on "Stock Option Expensing."  Jensen stated that "I will provide you with a copy

of this preliminary information for your review," and she attached a schedule of planned

meetings, including a meeting with Reyes and Canova on "May 27th" to discuss various topics

including "FASBE, education," and a meeting with the Compensation Committee.

884.    Reyes also met with Jensen and others to discuss the preparation for the

Compensation Committee meeting, which was to be held on June 12, 2003.  On May 23 Jensen

e-mailed Reyes and stated that "Grace [Ward] and June [Weaver] are updating the prezo and spreadsheets following our meeting with you."  Jensen also mentioned that "[t]he consultants from iQuantic will join us to further the discussion on expensing options and potential other stock considerations for our review."  On May 27, 2003, Reyes responded to Jensen that the proposed meeting with iQuantic "[s]ounds good."

885.    On May 26, 2003, Weaver e-mailed iQuantic about "Details for Brocade/iQuantic Meeting set for Wed 5/28 3:00pm."

> Our CEO, *Greg Reyes, is very interested in keeping up to date with the issue of expensing stock options* . . . .  [Jensen's assistant] has set up a meeting for you all to review the current state of affairs with Greg and a team of others who are interested in knowing more . . . .
>
> Attendees: . . .
>
> Greg Reyes – CEO . . .
>
> Bob Bossi . . .
>
> Grace [Ward] . . . Stephanie [Jensen] – HR
>
> Tony Canova – CFO
>
> Purpose of the Meeting:  For iQuantic to provide Brocade with an update of the *current state of affairs for expensing of options . . . Greg has talked with a number of his colleague [sic], reads about this topic in newspapers and articles and is very interested in Brocade handling this properly.*  [Emphasis added.]

886.    Weaver's May 26, 2003 e-mail attached a Brocade/iQuantic PowerPoint presentation titled "Stock Option Expensing Discussion Document" dated May 7, 2003.  The May 7 PowerPoint was substantially identical to the June 12, 2003 presentation discussed below, and included the same slide excerpted below.

887.    On June 3, 2003, Weaver wrote an e-mail discussing SFAS 123 meetings that "are scheduled every month . . . .  If there are decisions made or information to talk about we

meet. . . .  This is part of the due diligence that we committed to Greg [Reyes] and the Comp

Committee."

888.    Attached to Weaver's e-mail was a PowerPoint presentation titled "Brocade Team

– Expensing Stock Options May 2003."  The second slide showed Bossi as "[r]esponsible for

maintaining a pulse on the current regular updates and changes (FASB, IASB etc), interpreting

the accounting aspects of the policy."

889.    On June 10, 2003, Jensen e-mailed Dempsey and Neiman, copying Reyes, about a

June 12, 2003 "Brocade Compensation Committee Meeting" and attached iQuantic's "Stock

Option Expensing document for your reference."

890.    The iQuantic PowerPoint presentation that Jensen sent to Reyes, Dempsey, and

Neiman (dated June 12, 2003) summarizes the "expensing debate status:"  "The stock option

expensing debate re-ignited last year in the wake of corporate malfeasance at several high-profile

companies and a proposal by the IASB to require an earnings charge for all share-based

payments."

891.    The fourth slide of the iQuantic PowerPoint states:

IMPACT OF STOCK OPTION EXPENSING

**So, what does it mean to "expense" stock options?**

► Stock option expensing will effectively "level the playing field" from a
financial accounting perspective by requiring a company to recognize an
expense for all equity-based compensation

| Vehicle | APB 25 (Current Rules) | SFAS 123 (Expensing Rules) |
|---|---|---|
| | ► No charge to earnings for options granted at or above FMV<br>► Fixed accounting charge equal to "spread" for options granted at a discount<br>► Variable accounting required for performance-based options or stock appreciation rights | ► Fixed charge to earnings for <u>all awards</u> equal to the "fair value" (e.g., Black-Scholes) at the time of grant amortized over the vesting period |

892.    Jensen also e-mailed iQuantic's June 12 PowerPoint to Reyes on June 9, 2003,

informing him that she planned to give the presentation to the Compensation Committee

1    members at their June 12 meeting.  The Compensation Committee minutes for that date reflect

2    that Jensen did in fact present the document to Dempsey and Neiman at that meeting.

3    **Accounting Rules and Regulatory Developments**

4         893.    In early 2002, both the FASB and the International Accounting Standards Board

5    ("IASB"), based in London, were considering introducing new stock-option expensing rules, and

6    Senators John McCain and Carl Levin proposed legislation – "The Ending Double Standards for

7    Stock Options Act" (S. 1940) – that would have required companies either to recognize the cost

8    of stock options on their income statements or relinquish option-related tax deductions.  Thus, an

9    issuer would benefit from a tax deduction for stock-option expenses only to the extent it actually

10   recognized the same stock-option expense on its income statement.

11        894.    Reyes, Jensen, Byrd, Canova and Bossi monitored these developments closely,

12   and Bonderson and Cuthbert also were apprised of key changes.  As Canova said in an e-mail to

13   Reyes, "the issue is near and dear to all of us."

14        895.    On February 16, 2002, Jennifer Hart (Brocade's VP of Corporate

15   Communications) e-mailed Reyes, Byrd, and Canova an article from *Barron's Tech Trader* titled

16   "Will Tech Companies Get Called on Options?"  The article discussed the IASB proposal and

17   the McCain/Levin Bill and its impact on issuers, including Brocade.  The author had

18        studied the footnotes of some celebrity firms. . . .  Brocade Communications

19        Systems, the leading-edge networking vendor, reported October year earnings of

20        $2.8 million, or one cent.  But if Brocade counted the cost of stock options, it

21        would've shown a huge loss of $592 million, or $2.68 a share, and the trailing

22        earnings multiple on Brocade's $30 shares would go from astronomical to

23        incalculable.  Tony Canova, Brocade's chief financial officer, says his firm's

24        October 2001 year option awards were exceptionally large, with half issued to

25        replace higher-priced options awarded when Brocade enjoyed a bubble market

26        share price above 100.  Brocade hired most of its employees before the stock

27        market peaked, and Canova says Brocade issued new options in its October 2001

28        year to retain those workers.

896.    That same day, a Goldman Sachs analyst named Laura Conigliaro e-mailed Reyes about the *Barron's* article, stating: "As I mentioned to Tony [Canova] . . . [t]here was a small article in Barron's this weekend (and there actually are articles cropping up all over the place) and I'm sure this is going to come to the front burner. We're trying to figure out how to deal with it because I'm not sure that investors are in the frame of mind to 'proforma' it away."

897.    Reyes responded to the Goldman Sachs analyst:

With regard to the Barron's article. If this McCain/Levin bill is passed, the entire stock market will crater in a self inflicted and unnecessary form of political self flagellation because of the sins of Enron. If this happens, Brocade will not be singled out for persecution. Things are almost becoming silly as the politicians try to prove how pure they are by proposing legislation like this.

898.    Reyes was particularly anxious about the proposed changes in the disclosure regime. On February 18, 2002, Reyes forwarded Hart's e-mail to his friend Kevin Compton, a member of the venture-capital and consulting firm Kleiner Perkins Caufield & Byers, and asked:

In your opinion, how real is the threat that this McCain/Levin bill which calls for companies to report the cost of stock options as an expense will be passed?

Is there anything that Brocade can be doing from a lobbying standpoint to help stop this over reaction [*sic*] to Eron [*sic*]?

899.    Compton responded: "Right now it has enough energy to pass. As you can imagine TechNet is working this VERY hard. Does Brocade belong to TechNet?"

900.    Reyes replied: "I have never heard of TechNet. Please have Doerr provide me with the details of what Brocade can do."

901.    There is a record of further communications between Reyes and Compton. For example, on March 28, 2002, Compton sent Reyes and Stratton Sclavos (VeriSign's CEO until 2007 and Reyes' co-defendant in VeriSign's options-backdating litigation) a March 25, 2002 letter by former SEC Chief Accountant Walter Schuetze discussing the expensing of stock options. Much later, in 2005, Reyes informed Compton of Reyes' removal from Brocade's

1 | board before it was publicly announced.

2 |      902.    On February 19, 2002, Reyes received an e-mail from Sara Fiske, of TechNet, a

3 | political lobbying network of CEOs and senior executives from the technology sector.  Fiske

4 | wrote: "I understand . . . that you are interested in getting involved in lobbying efforts around

5 | the reporting and expensing of stock options issue," and she invited Reyes to a breakfast with

6 | Senator Joseph Lieberman "where this issue will, undoubtedly, be raised."

7 |      903.    Reyes responded on February 20, 2002 that he could not attend the breakfast

8 | because of his travel schedule, but he asked Fiske to set up a conference call with Reyes,

9 | Canova, Fiske, and others "as early as possible from the road."

10 |      904.    That same day, Canova responded to Reyes and Fiske, stating:

11 |     I would love to get involved as the issue is near and dear to all of us . . . .  Its [*sic*]

12 |     also a topic that is building strong momentum again, and, unfortunately, this time,

13 |     I feel as though the analyst community is becoming more supportive of the

14 |     change. . . .  I will forward you a piece that Goldman Sachs put out that you may

15 |     find interesting.

16 |      905.    On February 19, 2002, Canova and Bossi had already received the Goldman

17 | Sachs piece that Canova mentioned the following day.  The report, titled "Accounting for

18 | Employee Stock Options: Fact vs Fiction," stated:

19 |     DISCLOSURE REQUIREMENTS

20 |     Under FAS 123, firms that continue to apply Opinion 25 are required to disclose

21 |     [pro] forma net income and, if earnings per share is presented, pro forma earnings

22 |     per share as if the fair value method accounting had been used to account for

23 |     stock-based compensation cost.  The pro forma amounts reflect the difference

24 |     between compensation cost, if any, included in net income in accordance with

25 |     Opinion 25 and the related cost measured by the fair value approach, as well as

26 |     additional tax effects.

27 |

28 |     All companies must disclose the following information REGARDLESS OF THE

1     METHOD SELECTED to account for employee stock-based compensation: . . .

2

3     (2) the weighted-average grant-date fair value of options granted during the year.

4     If the exercise prices of some options differ from the market price of the stock on

5     the grant date, weighted-average exercise prices and weighted-average fair values

6     of options shall be disclosed separately for options whose exercise price equals,

7     exceeds, or is less than the market price of the stock on the grant date . . . .

8

9     (5) total compensation cost recognized in income for stock-based compensation

10    awards; and

11

12    (6) the terms of significant modifications to outstanding option grants. . . .

13

14    FASB INTERPRETATION NO. 44 ON OPTION REPRICING

15    The FASB raised the hurdle to repricing ESOs [employee stock options] by

16    issuing an amendment to [APB 25] (the former ruling governing stock

17    compensation) in March 2000.  This interpretation requires firms to record the

18    intrinsic value of their repriced ESOs at the date of exercise as compensation

19    expense on the face of the income statement; the adjusted strike price will be used

20    to derive intrinsic value (i.e., the difference between the market value of the

21    underlying stock and the exercise price of the option). . . .OPTION REPRICING

22    CAN NO LONGER BE IMPLEMENTED WITHOUT INCOME STATEMENT

23    REPERCUSSIONS.

24    906.    On February 26, 2002, Reyes, Canova, and Hart were scheduled to participate in a

25    Conference Call with the CEO of TechNet, Fiske and others.

26    907.    On March 12, 2002, Weaver and Deranleau e-mailed Reyes and Canova:

27    As you know, the preliminary determination from FASB on stock option

28    expensing is scheduled to be released by the end of March.  This change in stock

168

1    option expensing will have a significant impact on our current stock option

2    practices and reporting methodology.  We are keeping on top of this preliminary

3    determination and will be conducting detailed analysis after hearing the outcome.

4    908.    Reyes responded to Weaver, Deranleau, and Canova on March 14, 2002:

5    "Thanks – please keep us posted."

6    909.    On March 13, 2002, Fiske again e-mailed Reyes, this time inviting him to attend a

7    TechNet meeting with then-SEC Chairman Harvey Pitt to discuss "the operations and practices

8    of technology companies and key issues including stock option accounting, corporate

9    governance and financial reporting."  Canova was invited to a similar meeting with Chairman

10    Pitt on the same date for "TechNet CFOs."

11    910.    On March 15, 2002, Jim Hulburd, of Merrill Lynch's San Francisco office, e-

12    mailed Reyes (copying Byrd and Canova) about his firm's March 15, 2002 "TechStrat Thoughts

13    Update," titled "The Impact of Expensing Options" (the "Merrill Update").  Hulburd stated that,

14    "[a]lthough nobody is sighting [*sic*] it, this piece may have something to do with BRCD

15    weakness today."

16    911.    Hulburd was not a stranger to Reyes, or to others at Brocade.  By 2002, Hulburd

17    had been providing financial services to Reyes for approximately seven years.  Before he began

18    working at Merrill Lynch, Hulburd had worked for Deutsche Bank Alex Brown and had

19    provided stock and financial services to employees and executives at Brocade.  (In fact, Hulburd

20    was so close to Reyes that he even attended the closing arguments of Reyes' criminal trial.)

21    Canova also appears to have met with Hulburd on occasion:  his calendar shows a November 29,

22    2001 appointment for "Compliance questions with Jim Hulbert [*sic*]."  Hulburd's e-mail thus did

23    not come out of nowhere.

24    912.    The Merrill Update that Hulburd sent to Reyes, Byrd, and Canova explained the

25    McCain/Levin bill's background, noting that, "[t]oday, companies enjoy the win-win of a tax

26    benefit without having to expense options."  The report continued:

27    How Options Are Recognized Today

28    Companies generally grant stock options with an exercise price equal to 100% of

the market value of a share of common stock on the day of the grant.  This

approach allows companies not to recognize compensation costs associated with

granted stock options.  *If the stock options happened to be granted at a strike*

*price less than the market value, the company would have to expense the cost (the*

*difference between the quoted market price as of the date of the grant and the*

*contractual purchase price of the shares) as stock compensation expense. . . .*

Companies can account for options using the intrinsic-value method outlined in

[APB 25].  Companies are not required to record compensation expense when

stock options are granted to employees as long as the exercise price is not less

than the fair market value of the stock when the option is granted.  [Emphasis

added.]

913.     The Merrill Update considered 32 technology companies that had issued

Forms 10-K and concluded that "[w]e came across four situations where reported profits would

have turned into losses in F2001."  Brocade was one of those four companies.  The report also

concluded that "[c]ompanies that would have suffered the greatest profit degradation included

. . . Brocade . . . ."

914.     A table titled "Stock Option Plan Earnings Implications" in the Merrill Update

showed that, if stock options were expensed, the pro forma decrease in net income for Brocade

for 2001 would have been 208.76%, while the average pro forma decrease in net income across

the 32 companies was only 0.67% and the median pro forma decrease in net income across those

companies was only 0.43%.  No other company among the 32 would have shown a pro forma

decrease of more than 14.84%, compared to Brocade's 208.76% decrease.

915.     In light of the colossal impact the McCain/Levin proposal would have had on

Brocade's reported net income, it is no wonder that Reyes, Byrd, Canova, and others were

scrutinizing its chances of success.

916.     On March 19, 2002, Canova e-mailed Hart that he "had the opportunity to speak

with Greg [Reyes]" about Brocade's paying to join TechNet and that Reyes "was supportive of

SECOND AMENDED COMPLAINT

1   moving forward given my input.  The benefits we discussed were clear with him and he

2   understands the time commitment. . . .  [C]ould we please . . . get a check cut to them beginning

3   of next quarter.  I believe it will be 30K to 50K."

4        917.    On April 7, 2002, Reyes forwarded an e-mail to Canova and Hart from John

5   Palafoutas of Advancing the Business of Technology (a technology-industry lobbying

6   organization).  Palafoutas' e-mail to Reyes called for "help to stop Congress from harming or

7   eliminating your company's stock options program."

8        918.    Reyes asked Canova and Hart whether "someone on either of your teams" could

9   "draft letters . . . to our Senator and Congressman to go out under my signature" about the

10   McCain/Levin Bill.

11        919.    Canova responded on April 8, 2002:  "G[r]eg, Yes we can do this," and he asked

12   Bossi and Hart "take the lead on this."

13        920.    That same day, Hart e-mailed Canova, copying Bossi, about the proposed letter-

14   writing campaign and the creation of a team to work on "government/legislative [*sic*] affairs –

15   You, Bob [Bossi,] . . . I and others will be on the core team."

16        921.    On April 29, 2002 Reyes followed up with Hart by e-mail to ask about "any status

17   with regard to the letters."

18        922.    On June 9, 2002, Hart forwarded Reyes and Canova an article from the *San Jose*

19   *Mercury News* titled "Brocade Wide:  Paving the Way for Future Winners."  The article

20   discussed stock-option grants to top Silicon Valley executives and stated that "[n]ew options are

21   usually priced at the fair market value as of the day they are granted.  Most options expire . . .

22   within 90 days after an employee leaves the company."  The article also stated that 10,032,133

23   options had been granted to Reyes in 2001.

24        923.    Canova e-mailed Reyes on June 10, 2002 to remind him that "if you get hit up on

25   this all of the details are oin [*sic*] the proxy."  Reyes responded to Canova on the same date,

26   copying Byrd:  "Thank you for the color."

27        924.    On July 31, 2002 Canova e-mailed Conigliaro (the Goldman Sachs analyst) some

28   comments from Tom Siebel, the founder of Siebel Systems, Inc., including a statement that, "[if]

1  they change the accounting regulations, which I think is highly probable, we're basically

2  eliminating employee stock options."  Canova forwarded his e-mail to Reyes, who responded the

3  following day:  "Great comments – thank you for the color."

4        925.    On July 13, 2003, Neil Miotto, the lead audit partner at KPMG on the Brocade

5  account, e-mailed KPMG's "July 2003 Defining Issues" publication to Canova, Dempsey, and

6  others.  The publication highlighted general developments in stock-option accounting and

7  discussed the FASB decision that all companies would need to expense the value of employee

8  stock options and measure the cost according to fair value.

9        926.    On August 13, 2003, Jim Parker e-mailed Reyes, copying Canova and Jensen, to

10  send him "what I could find on [Cisco's CEO's] specific comments on possible reforms/changes

11  as an alternative to the expensing proposal."  Parker noted that a website available at

12  "http://www.savestockoptions.org" "appears to be a reasonably good resource for tracking

13  developments," and he noted that Brocade was "indirectly participating in this effort through our

14  affiliation with AEA [American Electronics Association]."

15        927.    On March 31, 2004, Weaver e-mailed Reyes, Canova, and Vescuso about the

16  release of a FASB exposure draft that would treat all forms of stock-option grants in the same

17  fashion as other forms of compensation and therefore require a compensation charge:

18        Today, FASB published an exposure draft which replaces the current account

19        requirements for stock-based compensation . . . .  Under the Board's proposal, all

20        forms of share-based payments to employees, including employee stock options,

21        would be treated the same as other forms of compensation by recognizing the

22        related cost in the income statement.  The expense of the award would generally

23        be measured at fair value at the grant date.

24        928.    The next day, April 1, 2004, Weaver forwarded this e-mail to Cuthbert,

25  Bonderson, and others, stating:  "[T]hought you would be interested in receiving an update on

26  the recent FASB decision regarding stock-based compensation.  Below is an e-mail that I sent

27  yesterday to assure Greg [Reyes], Tony [Canova] and Mike [Vescuso].  Also, attached is the

28  exposure draft, if you are so inclined to want to review . . . ."

929. On May 17, 2004, Miotto e-mailed Canova and Dempsey KPMG's "May 2004 Defining Issues," which explained the FASB's exposure draft requiring companies to recognize the grant-date fair value of stock options issued to employees starting with 2005 reporting periods.

930. Accordingly, the accounting rules relating to stock options were well known throughout Brocade and were of substantial concern to Defendants.

## DEFENDANTS' KNOWLEDGE AND ROLES:

## DEFENDANT-SPECIFIC ALLEGATIONS

### Greg Reyes

931. Reyes served as Brocade's CEO from July 1998 to January 2005. He also was Chairman of the Board of Directors from May 2001 to January 2005, a Director from July 1998 to April 2005, and an advisor from January to July 2005.

932. From 2001 to 2006, Reyes also served on the Board of Directors and the Compensation Committee of VeriSign, Inc. ("VeriSign"), a provider of internet infrastructure services listed on NASDAQ. VeriSign also has been sued for stock-option backdating, and Reyes has been named as a defendant in shareholder derivative litigation relating to VeriSign's stock-options practices.

933. From 1997 to 2000, Reyes also served as a Director of Proxim, Inc. ("Proxim"), a broadband wireless network provider also listed on NASDAQ.

Familiarity with Stock-Option Accounting and Disclosure Rules

934. As the CEO of a NASDAQ-listed technology company, and as the director of two other such companies, Reyes knew (or was grossly negligent and consciously disregarded his duties in not knowing) that issuers such as Brocade must record stock-compensation expenses for stock options whose exercise price are below the stock's fair market value on the grant date. Stock options were essential to such companies' ability to function, and Reyes was well informed of the accounting and disclosure rules relating to stock options.

935. Indeed, Craig Isom, the Andersen partner who had worked on the Brocade account, was asked at his SEC deposition whether he believed Reyes "understood the

implications of granting an option below fair market value." Isom responded: "I don't know how you could work in Silicon Valley and not know the implications of that . . . ."

936.    In early 2002, Reyes received the Merrill Update from his long-time friend and personal financial advisor, Jim Hulburd of Merrill Lynch, concerning stock-option accounting. As discussed above, the report explained the need to record a compensation expense for stock options "granted at a strike price less than the market value."

937.    In connection with the Audit Committee's First Investigation, Reyes told the Audit Committee's counsel (Craig Martin, of Morrison & Foerster LLP) that, at some point during his tenure as Brocade's CEO, he understood the accounting implications of in-the-money option grants.

938.    Reyes also thought that backdating stock-option grants to historical dates with favorable stock prices was illegal. On October 8, 2004, Jim Bidzos, the founder of VeriSign and a member of VeriSign's Compensation Committee together with Reyes, e-mailed Reyes that a VeriSign officer was "asking us to backdate option grants despite my having told [him] . . . that it was unacceptable . . . . Do you guys ask your comp committees to backdate option grants?"

939.    Reyes responded: "No – under current law it is not illegal . . . . The only way around this issue that I know of is to delegate option granting authority to the CEO provided that the grants are within Board approved guidelines." Reyes later corrected his typographical error and wrote in a subsequent e-mail: "Oooops – TYPE [*sic*] – IT IS ILLEGAL TO BACK DATE OPTION GRANTS."

940.    Bidzos then replied to Reyes: "If that's true, I find it very unsettling that we get a request from a company officer – with the CEO, CFO, and counsel copied – to do that." Reyes responded: "Agreed – This is a BIG issue and should be addressed."

941.    Reyes' knowledge of the wrongfulness of his conduct is apparent from his blanket denial of his backdating activities in his Audit Committee interview with Craig Martin on January 3, 2005. In that interview, Reyes consistently denied that he ever had looked back to price employee's stock options. Martin's memo of the interview states that Reyes claimed he

1   never granted options with the benefit of historical performance . . . . [H]e never

2   picked a date after the fact . . . . [H]e does not recall the 'sign here' sticker, nor

3   does he recall a stock pricing history accompanying the materials . . . .

4   [E]very day he granted options, there had been a discussion or decision that

5   day. . . . [U]ltimately the decision to grant options is Mr. Reyes' and the decision

6   was made that day . . . . [T]hey might discuss deferring a grant, but that he

7   always picked the date . . . .

8   [H]e does not recall finalizing minutes months after the date of a grant . . . . [He]

9   said that "the day I set the price is the day I set the price." Mr. Reyes said,

10  however, that some corrections may have been made after the fact . . . .

11

12  [Martin] noted that [Jensen] said Mr. Reyes had selected grant dates based on a

13  "look back" at the historical stock price, days or weeks after the fact. Mr. Reyes

14  said, "If that is what she says, that is what she says." Mr. Martin asked Mr. Reyes

15  whether he disagreed with what Ms. Jensen had said. Mr. Reyes replied, "I do."

16  Mr. Martin noted that Ms. Jensen claimed that she had urged him not to continue

17  to select grant dates occurring on historical lows. Mr. Reyes said he did not recall

18  that conversation.

19

20  Mr. Martin said that Ms. Jensen claimed that Mr. Reyes was presented with a

21  stock chart when signing grant minutes so that he could confirm the grant was, in

22  fact, at the low. Mr. Reyes said that this did not refresh his recollection.

23  Mr. Martin stated that Ms. Jensen said Mr. Reyes had told her to nullify a prior

24  grant so that he could pick a new date. Mr. Reyes said that he had no recollection.

25      942.     Martin's recollection of Reyes' denial is consistent with the sworn testimony of

26  James Meehan, of PricewaterhouseCoopers, who also attended Martin's interview with Reyes,

27  and who testified in his SEC deposition that "someone explained to [Reyes] the concept of a

28

SECOND AMENDED COMPLAINT

1   look-back and asked him if that was a practice that he ever participated in at Brocade and . . . his

2   response was that they never did that."

3        943.    After his criminal trial, however, Reyes asserted in his new-trial motion that he

4   did not contest – and that the Government had proven beyond a reasonable doubt – that "look-

5   backs" had in fact occurred for stock-option grants at Brocade.

6        944.    Reyes played a leadership role in implementing the Stock Add-On Program and

7   the Regrant Tender Offer, both of which were designed to avoid the compensation charges that

8   Brocade would have incurred had it repriced underwater options or granted new in-the-money

9   options.  Reyes, for example, signed Brocade's Form SC TO-I filing for the Regrant Tender

10  Offer, which explained how the tender offer was designed to avoid compensation charges.

11       945.    Accordingly, Reyes knew that Brocade would have had to record compensation

12  charges if it had repriced existing stock options, and that any such charges would have had a

13  negative impact on the Company's financial results.  In addition, Reyes himself told all

14  employees in a letter about the Regrant Tender Offer that "the exercise price of the new options

15  will be the fair market value on the date of grant."

16       946.    Reyes himself participated in both the Stock Add-On Program and the Regrant

17  Tender Offer.  He received 3,970,020 options under the Stock Add-On Program, and he turned in

18  options on 11,032,133 shares in January 2003 and received options on 1,103,214 shares on

19  July 10, 2003 in the Regrant Tender Offer.

20       947.    Reyes closely monitored and actively lobbied against the proposed legislation that

21  would have required Brocade to report all stock-option expenses on its income statement,

22  regardless of whether options were "in" or "at" the money.

23       948.    Reyes received iQuantic's presentations, appears to have attended an iQuantic

24  presentation, interacted with lobbyists from both TechNet and Advancing the Business of

25  Technology, conceived a letter-drafting campaign and urged Brocade employees to contact their

26  Senators and Representatives to protest the proposed legislation, and followed the issue so

27  attentively that Brocade formed a "Government Relations" team.

28

949.     Reyes was concerned about the implications of FAS 123R for Brocade, and he told a reporter in September 2002 that, in terms of expensing all stock options, Brocade "would never do this voluntarily."  The article in which Reyes is quoted, "National Business Panel Urges 'Expeditious' Change to Accounting Rules; Valley Execs Voice Opposition," goes on to state that "[e]xpensing options would have turned [Brocade's] $3 million profit into a $592 million loss in 2001."

950.     Reyes thus understood the impact that FAS 123R would have on Brocade's bottom line.  He also understood that, by purporting to grant at-the-money options through manipulating the grant dates, Brocade had been avoiding disclosing compensation charges it should have recorded under APB 25.

951.     In its August 27, 2007 Order Denying Reyes' Motion for a Judgment of Acquittal, this Court held that Reyes' communications about proposed legislation requiring the expensing of all stock options "suggest quite a bit about Reyes' state of mind" and

> indicate his understanding that the accounting rules then applicable permitted
> Brocade to grant options at fair market value without a compensation charge.
> They indicate that he was opposed to a proposal that would have required
> compensation charges for all grants.  They indicate his perception of the proposal
> as a "threat" . . . .  [A]nd they imply his belief that additional compensation
> charges would have "harm[ed] or eliminat[ed]" Brocade's stock options program.
> [Order Denying Mot. For a Judgment of Acquittal at 7.]

952.     In addition, on many occasions, Reyes signed certifications that he could not have signed unless he understood the accounting rules governing the expensing of stock options and believed that Brocade was complying with them.

953.     Reyes not only signed such certifications on behalf of Brocade, he also signed VeriSign's Forms 10-K for the fiscal years 2001, 2002, 2003, and 2004, which stated that VeriSign – like Brocade – accounted for its stock-compensation plans "using the intrinsic value method of [APB 25]" (2001) or "under the recognition and measurement principals [*sic*] of APB Opinion No. 25" (for 2002 through 2004).

954.    VeriSign treated the proposed changes in the option-expensing rules as a risk factor warranting disclosure in its Form 10-K for the 2003 fiscal year (filed on March 15, 2004):

[FASB], among other agencies and entities, is currently considering changes to U.S. GAAP that, if implemented, would require us to record a charge to earnings for employee stock option grants.  This proposal would negatively impact our earnings.  For example, recording a charge for employee stock options under [SFAS 123] . . . would have increased after tax loss by approximately $216 million, $222 million and $256 million for the years ended December 31, 2003, 2002 and 2001, respectively. . . .  To the extent that new policies or regulations make it more difficult or expensive to grant options to employees, we may incur increased cash compensation costs or find it difficult to attract, retain and motivate employees, either of which could materially harm our business.

955.    Reyes' signature on VeriSign's Form 10-K shows that he appreciated the relationship between expensing stock-option costs and corporate earnings.

956.    Reyes also signed Proxim's Forms 10-K for 1997, 1998, and 1999.  Each Form 10-K disclosed that Proxim "accounted for stock-based compensation using the intrinsic value method prescribed in [APB 25]."

### Knowledge of Policies and Accounting Rules for LOAs and Terminations

957.    Reyes knew Brocade's polices regarding the vesting and exercising of options by employees on extended LOAs and by terminated employees.

958.    When he received his own stock options, Reyes signed numerous Notices of Grant of Stock Options and Stock Option Agreements, which, as discussed above, explained Brocade's policies about departing employees' stock options.  The documents informed Reyes that Brocade's policies allowed departing employees to exercise their options for only three months after the termination date and that the options ceased to vest immediately.

959.    Reyes further understood the accounting consequences if those rules were not followed – namely, that a compensation charge would accrue.

SECOND AMENDED COMPLAINT

960.    For example, when Reyes responded concerning the terms of a LOA agreement proposed by Smith for another Brocade employee, he objected because he thought that Smith's proposal was "excessively generous and could also result in a charge against earnings."  In response to Reyes' concerns, Smith modified the proposal and stated that "we can structure it in a fashion not to create a charge against earnings."

961.    Despite his knowledge that the failure to abide by Brocade policies in this area could result in a compensation charge, Reyes permitted employees to continue vesting and exercising options in violation of those policies.  Reyes knew that the terms of the agreements with William James LaLonde, Ronald Epstein, and Kumaraswarmy Malavalli permitted vesting and exercising in violation of Brocade's policies.  Reyes nonetheless knowingly allowed those violations to occur and did nothing to cause Brocade to record a compensation charge.

### The Driving Force Behind Brocade's Improper Options Practices

962.    Reyes was the driving force behind Brocade's improper stock-option practices even though he knew the rules, policies, and accounting principles relating to stock options.

963.    For example, Reyes filed a sworn declaration in this Court accepting responsibility for option-pricing at Brocade.  In connection with Jensen's March 9, 2007 motion to sever her criminal trial from Reyes' trial, Reyes submitted a sworn declaration stating:

> The Indictment alleges . . . that Ms. Jensen conspired with me to choose a historically low closing price for Brocade's stock option grants, and then backdated committee meeting minutes of the Board of Directors to conceal the date on which the options were granted.  If our trials were severed, I would testify that *Ms. Jensen and I did not conspire to choose historically low stock prices* for Brocade's stock option grants, nor did we conspire to backdate committee meeting minutes in order to conceal the dates on which options were granted. *Ms. Jensen did not have the authority to choose the date or stock price of options. Only I had that authority, and only I knew when I made my decisions.  I told Ms. Jensen that the option grant dates were the dates that I made the granting*

179

1    *decisions.*  Options were priced at the fair market value on the grant dates.

2    [Emphasis added.]

3    964.    As discussed above, however, Reyes later contradicted his pretrial position and

4    conceded that backdating had occurred – *i.e.*, that options had *not* been priced at the fair market

5    value on the grant dates.

6    965.    Reyes engineered Brocade's scheme to retrospectively grant stock options at

7    favorable strike prices.  Jensen informed the FBI that Reyes had told her "I'm going to [price] on

8    the lows," and he directed her to bring him historical stock-performance printouts to facilitate

9    this illicit objective.  According to Jensen, Reyes' instruction to her was clear:  "I'll price when I

10   want, you [Jensen] just bring the reports."

11   966.    Reyes backdated stock options for a reason.  As this Court stated in its August 29,

12   2007 Order Denying Reyes' Motions for a New Trial and to Dismiss the Indictment, "[t]he fact

13   that [Reyes] knowingly approved backdated options suggests he intended its chief consequence,

14   namely the concealment of compensation charges."

15   967.    Reyes understood the illicit nature of the options-backdating scheme he had

16   instigated at Brocade.  For example, Weaver testified at Reyes' criminal trial that Reyes once

17   told her, when she was alone with him in his office in 2003, that "[i]t's not illegal if you don't

18   get caught."  Weaver also testified that she had been uncomfortable discussing this comment

19   with anyone from Brocade, but had discussed it with her husband at that time.

20   968.    In denying Reyes' Motion for an Acquittal, the Court concluded that Weaver did

21   not recall going into Reyes' office alone for any reason other than to provide the option-grant

22   lists and exercise prices that she was recommending.

23   969.    As discussed above, Reyes was convicted of criminal conspiracy, securities fraud,

24   making false SEC filings, falsifying Brocade's books and records, and making false statements

25   to an accountant.

26   970.    For each of these counts the jury needed to find that Reyes had acted "willfully."

27   Several counts also required a finding that Reyes had acted "knowingly," and the securities-fraud

28   count required a finding that Reyes had acted with an "intent to cheat or deceive."

SECOND AMENDED COMPLAINT

971.    This Court instructed the jury that

[g]ood faith on the part of Mr. Reyes is inconsistent with a finding that Mr. Reyes

knowingly or willfully committed the alleged offenses.  Thus, if the evidence in

the case leaves you with a reasonable doubt about . . . whether he possessed a

good-faith belief that the alleged false or misleading statements were in fact

accurate, you must find Mr. Reyes not guilty on that count.

972.    The Court's jury instructions defined "willfully" as "done . . . intentionally and with the purpose of violating a known legal duty."

973.    By convicting Reyes on ten counts requiring "willful" misconduct, the jury necessarily concluded that Reyes had not acted in good faith in committing the offenses and that he had acted intentionally and with the purpose of violating a known legal duty.

<div align="center">Reyes' Involvement with Faulted Stock-Option Grants</div>

974.    Not only was Reyes the chief architect of Brocade's illicit backdating scheme, he played the lead role in its implementation.

975.    **Reyes as Committee of One.**  Before Brocade's IPO, Reyes granted options as a fictitious "Stock Option Committee" on at least 12 occasions, even though he never had been vested with any authority under any option plan to do so.

976.    Nor did the assumption of new responsibilities to public shareholders in connection with Brocade's May 1999 IPO deter Reyes from usurping the Board's authority to grant options.  To the contrary, Reyes directly participated in making faulted grants and signing false documentation.

977.    Over a period of approximately 21 months after the IPO, Reyes purported to grant stock options on more than 20 occasions under either the "Equity Incentive Plan," the 1999 Stock Plan or the 1999 NSO Plan, even though (*i*) the "Equity Incentive Plan" no longer existed, (*ii*) Reyes *never* had been authorized to grant *any* options under the 1999 Stock Plan, and (*iii*) the Board did not authorize Reyes to grant options to "non-executive officer employees" under the 1999 NSO Plan until after February 21, 2001.

978.    Even after the Board's purported February 21, 2001 delegation gave Reyes authority to grant options to a limited category of employees, Reyes knowingly and repeatedly failed to comply with the scope and terms of that delegation, or demonstrated gross negligence or conscious disregard of his duties in failing to comply.

979.    For example, on at least 40 occasions, Reyes purported to make grants as a Committee of One under the 1999 Stock Plan (under which he lacked Committee of One authority), rather than the 1999 NSO Plan.

980.    Reyes also failed at least 25 times to abide by the prohibition on his ability to grant options to "non-executive officer employees."

981.    In addition, Reyes prepared only one certificate to the Board, as mandated by the purported February 21, 2001 delegation (and there is no evidence that even this lone certificate was ever delivered to the Board).

982.    Furthermore, as discussed above, when Reyes granted all these options *ultra vires*, he also routinely backdated the grants to give the recipients the benefit of favorable historic strike prices.

983.    Reyes also violated the Board- and shareholder-approved option plans by granting options to himself on August 15, 2003, December 10, 2003, and May 21, 2004.  This conduct constituted the kind of self-dealing that the 1999 Stock Plan was designed to prevent.

984.    From 1999 to 2004, as outlined above, Reyes, with Jensen's assistance, personally authorized backdated Committee-of-One grants to new hires and current Brocade employees on at least 30 occasions.

985.    From 1999 to 2000, as outlined above, Reyes used the "offer and acceptance" program to improperly grant stock options to prospective employees as early as the date the prospective employees accepted his or her employment offer from Brocade, instead of the date the employee actually began to work for the Company.

986.    Even after the "offer and acceptance" program changed into the "part-time program" in 2000, ostensibly to comply with FIN 44, Reyes continued to use the "part-time"

1  program on numerous occasions to improperly manipulate the grant date and exercise price of

2  the options he granted.

3       987.    Reyes knew he was signing backdated options paperwork that granted options at

4  an exercise price below the market price of Brocade's stock on the date he actually signed the

5  relevant grant documents, and he knew the accounting implications of his doing so.

6       988.    As Brocade's CEO, Reyes utterly failed to implement any reporting or

7  information system or controls to monitor the HR Department's options-granting practices.

8       989.    Alternatively, if Reyes did implement reporting or information systems or

9  controls, he consciously failed to oversee or monitor those systems' or controls' operations.

10       990.    **Reyes as Board Member.**  As a Board member, Reyes utterly failed to

11  implement any reporting or information system or controls to monitor the Compensation

12  Committee's options-granting practices.

13       991.    Alternatively, if Reyes did implement reporting or information systems or

14  controls, he consciously failed to oversee or monitor those systems' or controls' operations.

15       992.    As discussed above, in his capacity as a Director, Reyes also participated in

16  approving improper option grants made by the Board.

17                      Reyes' Signing of False Financial Statements

18       993.    Reyes falsely certified in Brocade's Forms 10-K for fiscal years 1999, 2000,

19  2001, 2002, 2003 and 2004 that Brocade "accounts for its stock option plans . . . in accordance

20  with . . . APB No. 25 whereby the difference between the exercise price and the fair market value

21  at the date of the grant is recognized as a compensation expense."

22       994.    Reyes signed SOX certifications in Brocade's Form 10-Q and 10-K filings

23  between August 27, 2002 and September 13, 2004, certifying that he had reviewed the relevant

24  quarterly or annual report and falsely stating that, to his knowledge the report contained nothing

25  untrue, that he had established adequate internal controls, and that he had reported any fraud or

26  internal-control deficiencies to Brocade's Audit Committee and external auditors.

27       995.    Reyes also acknowledged in letters to Brocade's external auditor, KPMG, that he

28  knew the accounting rules that governed the expensing of stock options.  Between 2002 and

1    2004, Reyes signed management representation letters falsely certifying that "[s]tock-related

2    awards to employees have been accounted for in accordance with the provisions of [APB 25].

3    The disclosures required for such awards by [SFAS 123] have been made where appropriate."

<u>Reyes' Receipt of Options and Sale of Brocade Stock</u>

5    996.    Reyes received at least the following faulted stock options:

**Reyes' Faulted Grants (1)**

| Grant Date | Options Granted | Option Number | Strike Price | Exercise Date | Options Exercised | Shares Sold | Sales Price | Net Gain from Sale | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 11/19/1999 | 1,040,000 | 00000512 | $32.1300 | 9/19/2000 | 40,000 | 40,000 | $107.0200 | $2,995,600 | Same day exercise/sale |
| 11/29/2000 | 4,800,000 | 00001590 | $76.8800 | None exercised | | | | | |
| 4/17/2001 | 161,440 | 00001745 | $20.7000 | None exercised | | | | | |
| 4/17/2001 | 3,808,580 | 00001746 | $20.7000 | None exercised | | | | | |
| 10/1/2001 | 12,113 | 00004034 | $12.9000 | None exercised | | | | | |
| 10/1/2001 | 1,250,000 | 00004588 | $12.9000 | None exercised | | | | | |
| 8/15/2003 | 600,000 | 00011008 | $5.8200 | None exercised | | | | | |
| 12/10/2003 | 500,000 | 00011199 | $6.3400 | None exercised | | | | | |
| 5/21/2004 | 1,100,000 | 00011686 | $5.8400 | None exercised | | | | | |
| **TOTAL:** | **13,272,133** | | | | **40,000** | **40,000** | | **$2,995,600** | |

(1) -  Numbers of shares, strike prices and sales prices have been adjusted for all stock splits.

997.    Reyes knew that Brocade's financial statements were false in that they failed to

reflect compensation-related expenses arising from improperly granted stock options.

998.    Reyes sold substantial amounts of stock while in possession of this information.

999.    As shown in the table below, between September 22, 1999 and February 24,

2005, Reyes sold a total of 14,591,023 shares of Brocade stock, receiving gross sales proceeds of

$581,295,038.

**Reyes' Stock Sales**

| Sale Date | No. of Shares (1) | Sales Price per Share (1) | Gross Proceeds | Net Proceeds (If Known) | Option No. Exercised | Comments |
|---|---|---|---|---|---|---|
| 9/22/1999 | 74,400 | $28.2907 | $2,104,830 | $2,083,905 | 00000202 & 00000211 | (2) |
| 9/23/1999 | 117,600 | $28.1409 | $3,309,371 | $3,276,296 | | |
| 9/27/1999 | 120,000 | $26.2832 | $3,153,983 | $3,120,233 | | |
| 9/28/1999 | 128,000 | $26.6432 | $3,410,333 | $3,374,333 | | |
| 9/28/1999 | 188,000 | $27.0394 | $5,083,405 | $5,030,530 | | |
| 9/30/1999 | 132,000 | $26.4643 | $3,493,289 | $3,456,164 | | |
| 10/1/1999 | 105,600 | $26.0026 | $2,745,875 | $2,716,175 | | |
| 10/4/1999 | 160,000 | $25.7891 | $4,126,250 | $4,081,250 | | |
| 10/5/1999 | 80,000 | $25.9414 | $2,075,313 | $2,052,813 | | |
| 10/6/1999 | 134,400 | $26.2310 | $3,525,445 | $3,487,645 | | |
| 12/15/1999 | 200,000 | $30.8906 | $6,178,125 | $6,121,875 | | |
| 12/15/1999 | 100,000 | $31.1094 | $3,110,938 | $3,082,813 | | |
| 12/16/1999 | 242,000 | $32.2208 | $7,797,434 | $7,729,371 | | |
| 12/17/1999 | 200,000 | $34.7767 | $6,955,345 | $6,899,095 | | |
| 12/17/1999 | 46,000 | $35.2500 | $1,621,500 | $1,608,563 | | |
| 12/20/1999 | 60,000 | $36.2500 | $2,175,000 | $2,158,125 | | |
| 12/21/1999 | 400,000 | $37.9500 | $15,180,000 | $15,067,500 | | |
| 2/22/2000 | 70,000 | $66.7500 | $4,672,500 | $4,652,813 | | |
| 2/23/2000 | 50,000 | $66.9742 | $3,348,708 | $3,334,645 | | |
| 2/24/2000 | 120,000 | $67.0914 | $8,050,962 | $8,017,212 | | |
| 2/25/2000 | 100,000 | $68.5000 | $6,850,000 | $6,821,875 | | |
| 2/25/2000 | 160,000 | $67.2891 | $10,766,256 | $10,721,256 | | |
| 2/25/2000 | 200,000 | $67.7078 | $13,541,565 | $13,485,315 | | |
| 2/28/2000 | 100,000 | $68.8244 | $6,882,438 | $6,854,313 | | |
| 2/28/2000 | 400,000 | $70.9267 | $28,370,680 | $28,258,180 | | |
| 3/7/2000 | 384,000 | $84.3845 | $32,403,658 | $32,295,658 | | |
| 3/8/2000 | 20,000 | $83.1094 | $1,662,188 | $1,656,563 | | |
| 3/9/2000 | 196,000 | $81.3325 | $15,941,165 | $15,886,040 | | |
| 3/10/2000 | 22,000 | $85.7273 | $1,886,000 | $1,879,812 | | |
| 3/13/2000 | 40,000 | $83.9875 | $3,359,500 | $3,348,250 | | |
| 3/14/2000 | 24,000 | $84.6485 | $2,031,563 | $2,024,813 | | |
| 3/17/2000 | 114,000 | $76.5362 | $8,725,121 | $8,693,059 | | |
| 5/19/2000 | 200,000 | $50.0106 | $10,002,120 | $9,945,870 | | |
| 5/23/2000 | 200,000 | $55.2703 | $11,054,060 | $10,997,810 | | |
| 5/31/2000 | 50,000 | $60.1013 | $3,005,063 | $2,991,000 | | |
| 6/2/2000 | 150,000 | $66.5917 | $9,988,748 | $9,946,560 | | |
| 6/2/2000 | 50,000 | $66.6521 | $3,332,603 | $3,318,540 | | |
| 6/8/2000 | 50,000 | $75.8938 | $3,794,688 | $3,780,625 | | |
| 6/9/2000 | 10,000 | $77.5000 | $775,000 | $772,188 | | |
| 6/14/2000 | 100,000 | $71.0938 | $7,109,375 | $7,081,250 | | |
| 6/15/2000 | 200,000 | $70.1219 | $14,024,370 | $13,968,120 | | |
| 6/16/2000 | 100,000 | $71.6250 | $7,162,500 | $7,134,375 | | |
| 6/26/2000 | 44,290 | $78.5963 | $3,481,030 | $3,468,574 | | |
| 8/21/2000 | 65,000 | $106.2500 | $6,906,250 | $6,887,969 | | |
| 8/22/2000 | 100,000 | $106.8069 | $10,680,690 | $10,652,565 | | |
| 8/22/2000 | 135,000 | $106.0035 | $14,310,466 | $14,272,497 | | |
| 8/23/2000 | 100,000 | $107.2719 | $10,727,190 | $10,699,065 | | |
| 8/24/2000 | 20,000 | $111.7500 | $2,235,000 | $2,229,375 | | |
| 8/24/2000 | 80,000 | $109.7625 | $8,781,000 | $8,758,500 | | |
| 8/30/2000 | 11,884 | $109.8125 | $1,305,012 | $1,301,669 | | |
| 9/18/2000 | 254,000 | $107.1292 | $27,210,804 | $27,139,367 | | |
| 9/18/2000 | 1,946 | $107.1292 | $208,473 | $207,926 | | |
| 9/19/2000 | 40,000 | $107.0157 | $4,280,626 | $2,995,426 | 00000512 | Same day exercise/sale |
| 12/5/2000 | 150,000 | $87.9708 | $13,195,620 | $13,153,433 | | |

SECOND AMENDED COMPLAINT

| Date | Shares | Price | Total | | Notes |
|------|--------|-------|-------|------|-------|
| 12/5/2000 | 100,000 | $94.6350 | $9,463,500 | $9,435,375 | |
| 12/6/2000 | 50,000 | $97.4375 | $4,871,875 | $4,857,813 | |
| 12/7/2000 | 100,000 | $98.4112 | $9,841,120 | $9,812,995 | |
| 12/8/2000 | 72,886 | $106.6184 | $7,770,989 | $7,750,490 | |
| 12/8/2000 | 420 | $106.6184 | $44,780 | $23,616 | |
| 12/11/2000 | 39,000 | $113.5104 | $4,426,906 | $4,415,937 | Sale by Reyes Family Foundation |
| 12/27/2000 | 100,000 | $88.0938 | $8,809,380 | $8,781,255 | |
| 12/28/2000 | 100,000 | $93.3500 | $9,335,000 | $9,306,875 | |
| 12/28/2000 | 20,944 | $96.4217 | $2,019,456 | $2,013,566 | |
| 12/29/2000 | 35,000 | $97.8839 | $3,425,937 | $3,416,093 | |
| 5/17/2001 | 250,000 | $46.4713 | $11,617,825 | $11,547,513 | |
| 5/17/2001 | 50,000 | $47.0000 | $2,350,000 | $2,335,938 | |
| 6/7/2001 | 300,000 | $46.3500 | $13,905,000 | $13,820,625 | |
| 12/4/2001 | 250,000 | $33.1000 | $8,275,000 | $8,204,688 | |
| 12/5/2001 | 250,000 | $36.1810 | $9,045,250 | $8,974,938 | |
| 12/10/2001 | 500,000 | $37.5179 | $18,758,950 | $18,618,325 | |
| 12/11/2001 | 630,000 | $39.0963 | $24,630,669 | $24,453,482 | (2) |
| 1/4/2002 | 85,600 | $37.9916 | $3,252,081 | $3,228,006 | Sale by Reyes Family Foundation |
| 3/31/2004 | 100,000 | $6.6400 | $664,000 | | Gift by Reyes Family Foundation to Saratoga HS Foundation (3) |
| 2/22/2005 | 449 | $6.3000 | $2,829 | | |
| 2/22/2005 | 124,985 | $6.3200 | $789,905 | | |
| 2/22/2005 | 173,495 | $6.3300 | $1,098,223 | | |
| 2/22/2005 | 221,710 | $6.3400 | $1,405,641 | | |
| 2/22/2005 | 183,152 | $6.3500 | $1,163,015 | | |
| 2/22/2005 | 69,875 | $6.3600 | $444,405 | | |
| 2/22/2005 | 31,239 | $6.3700 | $198,992 | | |
| 2/22/2005 | 136,712 | $6.3800 | $872,223 | | |
| 2/22/2005 | 109,300 | $6.3900 | $698,427 | | |
| 2/22/2005 | 13,900 | $6.4000 | $88,960 | | |
| 2/22/2005 | 4,000 | $6.4100 | $25,640 | | |
| 2/22/2005 | 40,700 | $6.4200 | $261,294 | | |
| 2/22/2005 | 1,500 | $6.4300 | $9,645 | | |
| 2/22/2005 | 15,000 | $6.4500 | $96,750 | | |
| 2/22/2005 | 3,900 | $6.4600 | $25,194 | | |
| 2/22/2005 | 833 | $6.4700 | $5,390 | | |
| 2/22/2005 | 5,000 | $6.4900 | $32,450 | | |
| 2/22/2005 | 48,600 | $6.5000 | $315,900 | | |
| 2/22/2005 | 31,150 | $6.5100 | $202,787 | | |
| 2/22/2005 | 1,500 | $6.5200 | $9,780 | | |
| 2/23/2005 | 809 | $6.0700 | $4,911 | | |
| 2/23/2005 | 365,221 | $6.0800 | $2,220,544 | | |
| 2/23/2005 | 179,331 | $6.1000 | $1,093,919 | | |
| 2/23/2005 | 134,970 | $6.1100 | $824,667 | | |
| 2/23/2005 | 82,800 | $6.1200 | $506,736 | | |
| 2/23/2005 | 7,369 | $6.1300 | $45,172 | | |
| 2/23/2005 | 5,893 | $6.1500 | $36,242 | | |
| 2/23/2005 | 14,700 | $6.1600 | $90,552 | | |
| 2/23/2005 | 12,600 | $6.1700 | $77,742 | | |
| 2/23/2005 | 31,907 | $6.1800 | $197,185 | | |
| 2/23/2005 | 20,000 | $6.1900 | $123,800 | | |
| 2/23/2005 | 25,600 | $6.2000 | $158,720 | | |
| 2/23/2005 | 39,800 | $6.2100 | $247,158 | | |
| 2/23/2005 | 55,000 | $6.2200 | $342,100 | | |
| 2/23/2005 | 14,000 | $6.2300 | $87,220 | | |

SECOND AMENDED COMPLAINT

| | Date | Quantity | Price | Amount | | | Note |
|---|---|---|---|---|---|---|---|
| | 2/23/2005 | 9,893 | $6.2400 | $61,732 | | | |
| | 2/23/2005 | 5,600 | $6.2500 | $35,000 | | | |
| | 2/23/2005 | 16,100 | $6.2900 | $101,269 | | | |
| | 2/23/2005 | 54,700 | $6.3000 | $344,610 | | | |
| | 2/23/2005 | 18,700 | $6.3100 | $117,997 | | | |
| | 2/23/2005 | 42,000 | $6.3200 | $265,440 | | | |
| | 2/23/2005 | 5,000 | $6.3300 | $31,650 | | | |
| | 2/23/2005 | 10,315 | $6.3400 | $65,397 | | | |
| | 2/23/2005 | 900 | $6.3500 | $5,715 | | | |
| | 2/23/2005 | 11,434 | $6.3700 | $72,835 | | | |
| | 2/23/2005 | 6,358 | $6.3800 | $40,564 | | | |
| | 2/24/2005 | 900,000 | $6.1000 | $5,490,000 | | | Sale by Reyes Family Foundation |
| | 2/24/2005 | 12,466 | $6.1000 | $76,043 | | | |
| | 2/24/2005 | 373,747 | $6.1100 | $2,283,594 | | | |
| | 2/24/2005 | 464,788 | $6.1200 | $2,844,503 | | | |
| | 2/24/2005 | 175,777 | $6.1300 | $1,077,513 | | | |
| | 2/24/2005 | 67,445 | $6.1400 | $414,112 | | | |
| | 2/24/2005 | 127,698 | $6.1500 | $785,343 | | | |
| | 2/24/2005 | 165,453 | $6.1600 | $1,019,190 | | | |
| | 2/24/2005 | 62,000 | $6.1700 | $382,540 | | | |
| | 2/24/2005 | 138,479 | $6.1800 | $855,800 | | | |
| | 2/24/2005 | 50,400 | $6.1900 | $311,976 | | | |
| | 2/24/2005 | 30,800 | $6.2000 | $190,960 | | | |
| **TOTAL** | | **14,591,023** | | **$581,295,038** | **$545,976,714** | | |

Notes: (1) All quantities and prices adjusted for three 2-for-1 splits effective December 3, 1999, March 15, 2000, and December 22, 2000.

(2) Reyes reported shares in the Reyes Family Trust (or "by Trust") as direct holdings until May, 2003, at which time he began categorizing such shares as indirectly held. For continuity, they are treated herein as direct holdings throughout.

(3) Gifted shares are valued at the closing price on date of gift.

(4) Exercised options on 12,285,296 shares at $0.28125/sh. (after adjustments for all stock splits) on 12/8/98.
It is assumed that these shares were sold until Reyes began acquiring shares in the market in February 2003.

Source: SEC Forms 4 and 5 filings.

1000.   The following table shows the amounts that Reyes is required to forfeit to Brocade under SOX § 304, to the extent the relevant information currently is available to Brocade.

### Reyes' SOX 304 Liability

| Twelve Mos. Following First Disclosure | Bonus | Total Non-salary Compensation | Proceeds of Sales (1) (2) | Total Sec. 304 Liability |
|---|---|---|---|---|
| 11/22/02 - 11/21/03 | $0 | $0 | $0 | $0 |
| 11/21/03 - 11/20/04 | $344,820 | $344,820 | $664,000 | $1,008,820 |
| 11/23/04 - 11/22/05 | $0 | $0 | $30,677,900 | $30,677,900 |
| **Total** | **$344,820** | **$344,820** | **$31,341,900** | **$31,686,720** |

(1) - Includes a gift of 100,000 shares at $6.64/sh on 3/31/04. Includes a sale of 900,000 shares by the Reyes Foundation on 2/24/05 at $6.10 /sh.

(2) - Unable at this time to determine the cost of shares sold.

**Stephanie Jensen**

1001.   As alleged above in detail, Stephanie Jensen was Brocade's Vice President of HR from October 1999 until February 2004 and was responsible for Brocade's compensation and benefits programs, including stock options.

1002.   During that period, Jensen helped Reyes and others implement a scheme of granting in-the-money options to Brocade employees by backdating stock-option grants and concealing the backdating from Brocade's auditors and investors by falsifying meeting minutes, employment records, and other related documentation.

1003.   Despite knowing that options were being improperly granted, processed, or otherwise manipulated, Jensen utterly failed to take any steps to rectify the problems or to implement any systems or controls over the options-granting process, and, in fact, participated in the deceptive conduct.

<u>Committee-of-One Grants</u>

1004.   As alleged above in detail, Jensen received documents explaining how Brocade purported to grant and price stock options.  For example, Jensen's own offer letter informed her that her stock-option grant would be priced at the fair market value of the Company's stock on the date of the grant and that her options would cease to vest if her employment with Brocade terminated.

1005.   Jensen also personally signed Notices of Grant of Stock Options and Stock Option Agreements when she received options grants.  These documents, as discussed above, provided further notice that Brocade purported to grant options at fair market value on the date of the grant.  The documents also explained Brocade's policies regarding the treatment of stock options of departing employees.  Jensen thus had been informed that Brocade's policies mandated that the options of a terminated employee were only exercisable for three months after the termination date and ceased to vest immediately.

1006.   Moreover, it is likely that Jensen also received a copy of the "Brocade Employee Quick Reference Guide," which stated that "[p]ricing of stock options will be equal to the fair

1   market value of Brocade's common stock on the date the option is approved by the

2   Compensation Committee."

3        1007.   Through her own misconduct, however, Jensen knew that Brocade did not always

4   grant and price stock options in the manner described in these documents.

5        1008.   As alleged above in detail, Jensen reviewed Brocade's historical stock prices to

6   determine when the stock price was at the lowest (or a relatively low) point in the relevant

7   period.  She then fabricated (or directed others to fabricate) meeting minutes and grant

8   documentation so that Reyes – as a Committee of One – appeared to have "met with himself"

9   and granted stock options at market value on dates when Brocade's stock price was relatively

10  low.  Jensen also fabricated (or directed others to fabricate) employment-offer letters and other

11  employment records to further conceal the backdating.

12       1009.   Jensen's activities thus caused, and helped Reyes to cause, Brocade to issue stock

13  options at lower exercise prices than it would have done had the options properly been priced as

14  of their actual grant dates – and to issue false financial statements that did not report necessary

15  compensation expenses.

16       1010.   Jensen's statements to her own colleagues demonstrate her knowledge that

17  backdating or manipulating options grants was improper.  For example, Jensen told Reyes that

18  always pricing Committee-of-One grants at a low price did not "look good."  And when Morris

19  told Jensen that he was not comfortable deleting and recreating employee records to reflect

20  falsified start dates, Jensen told him, "If they ever come after us, they will come after me or

21  Greg."

22       1011.   Jensen's repeated warnings to her staff about not discussing grants in e-mails or

23  voicemails further illustrate her awareness of her wrongful conduct.  Similarly, Jensen's efforts

24  to conceal the facts about the option-granting process from Brocade employees demonstrate her

25  knowledge that the process was improper.  For example, Burgess testified at Jensen's criminal

26  trial that Jensen directed HR personnel "not to discuss the stock option grant – the actual process

27  of how it worked with the general employee population, but to only tell the employees that we do

28  the best to process the grants in a timely manner at the best price possible."

SECOND AMENDED COMPLAINT

1012.   Notwithstanding her knowledge of the impropriety of the backdating scheme, however, Jensen continued to facilitate and participate in improper grants of stock options.  Such conduct was intentionally wrongful or, at a minimum, grossly negligent and lacking good faith.

### Compensation Committee and Board Grants

1013.   Jensen also helped Brocade's Compensation Committee and Board of Directors grant in-the-money options to Brocade directors and officers.  She was involved in creating backdated Compensation Committee meeting minutes and falsifying other records to conceal the backdated minutes and to minimize the risk of detection by Brocade's auditors and investors.

### Familiarity with Stock-Option Accounting

1014.   As Vice President of HR of a NASDAQ-listed technology company that at its peak had over 1,300 employees and for which stock options were a crucial component of the Company's recruitment and staff-retention strategy, Jensen was familiar with Brocade's policies concerning stock options and their accounting implications.

1015.   For example, through her coordination of the Stock Add-On Program in 2001, and her election to participate in this program, Jensen understood that issuers such as Brocade must record stock-compensation expenses for stock options with an exercise price below the stock's fair market value on the grant date.

1016.   Jensen sent e-mails to all Brocade employees announcing the Stock Add-On Program.  These e-mails explained that if Brocade simply repriced stock options, "[t]here would be a significant financial impact to earnings based on the impact of having to take a compensation charge which would negatively affect the future financial results of Brocade."

1017.   Jensen was granted options on 176,460 shares at $20.70 on April 17, 2001 as part of the Stock Add-On Program.  Jensen exercised options on 17,863 of the April 17, 2001 grants.

1018.   Jensen also participated in the Option Regrant Tender Offer in 2002-2003 and was familiar with the rationale underlying the Offer which, like the Stock Add-On Program, was specifically designed to avoid triggering any compensation charges.

SECOND AMENDED COMPLAINT

1019.   Jensen turned in options on 779,984 shares in January 2003 as part of the Regrant Tender Offer.  She received options on 423,095 shares at $6.54 on July 10, 2003 and exercised options on 291,409 shares of the July 10, 2003 grants.

1020.   Accordingly, Jensen received the materials distributed to employees about both of these programs, informing her that Brocade would have had to take compensation charges if it had repriced existing stock options and that any such charges would have had a negative impact on Brocade's financial results.

1021.   Moreover, Jensen received and circulated iQuantic presentations that explained the accounting rules for expensing stock options.  She even was involved in coordinating Brocade's interaction with iQuantic.  She also appears to have attended a presentation by iQuantic.

1022.   In addition, Jensen was aware that Brocade's stock-option grants would be audited regularly by the Company's external auditors, as shown by a January 28, 2002 e-mail from Bossi to Jensen and Beyer, copying Moore and Blucher, stating, "we need the Q1 new hire stock grant list as soon as possible so we can input into [S]haredata to support the upcoming q1 review by [Andersen]."

### Knowledge of Policies and Accounting Rules for LOAs and Terminations

1023.   Jensen was familiar with Brocade's policies regarding the treatment of stock options held by terminated employees or employees on leaves of absence.  She knew that a failure to follow the Company's policies could have accounting implications and could require a compensation charge, and she sent and received e-mails demonstrating her awareness of those accounting rules.

1024.   Jensen knew that the stock options of terminated employees ceased to vest on the date of termination and were exercisable for only 90 days after that date.

1025.   When Jensen received her own option grants, she signed Notices of Grant of Stock Options and Stock Option Agreements.  As discussed above, these documents explained Brocade's policies regarding the treatment of stock options of departing employees.  In

1   particular, Jensen was informed that Brocade's policies allowed departing employees to exercise

2   their options for only three months from the date of termination and vesting ceased immediately.

3         1026.   Jensen also knew that, at least since July 2000, Brocade's LOA policies provided

4   that an employee's stock options could continue to vest for only three months after the

5   employee's leave of absence began.  The three-month period applied to all types of leaves,

6   including family and medical leave, pregnancy leave, work-related leave, and unpaid personal

7   leave.

8         1027.   Jensen knew that Brocade subsequently changed its LOA policies, and, on

9   February 15, 2002, she e-mailed all Brocade employees informing them that for unpaid, personal

10   LOAs, stock options would cease to vest immediately upon the start of an employee's LOA.

11   (The policies relating to other types of LOAs remained the same.)

12         1028.   Jensen knew that Brocade's policies for terminated employees and employees on

13   LOAs were being violated in certain cases.  For example, Jensen was copied on a November 13,

14   2001 e-mail from Blucher attaching a chart showing that former employee Jack Rubinson's

15   options were still vesting and that he had remaining exercisable options, even though he had

16   been terminated in 18 months earlier, in May 1999.

17         1029.   Moreover, on November 8, 2000, Moore e-mailed Jensen about the vesting of

18   options held by Paul Ramsey, an employee who had taken a personal leave of absence on

19   November 1, 2000 but never returned to Brocade.  Moore told Jensen that Ramsey had contacted

20   her "asking if the vesting of his options were froze[n] due to the LOA."  Jensen responded –

21   copying Bonderson – and stated that "we need to follow our EE Handbook and Stock Plan

22   document on this – I know vesting continues for a period of time while on LOA and then

23   suspends. . . .  He [*i.e.*, Ramsey] should receive the appropriate vesting per the policy."  But

24   despite Jensen's evident knowledge of Brocade's policies, Ramsey's options were allowed to

25   vest for the duration of his leave of absence.

26                 Jensen's Receipt of Options and Sale of Brocade Stock

27         1030.   Jensen received at least the following faulted stock options:

28

SECOND AMENDED COMPLAINT

**Jensen's Faulted Grants (1)**

| Grant Date | Options Granted | Option Number | Strike Price | Exercise Date | Options Exercised | Shares Sold | Sales Price | Net Gain from Sale | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 10/4/1999 | 624,544 | 00000608 | $25.8500 | 10/4/2000 | 156,136 | 156,136 | $106.9600 | $12,664,191 | Same day exercise/sale |
| | | 00000608 | $25.8500 | 12/6/2000 | 13,400 | 13,400 | $95.6300 | $935,052 | Same day exercise/sale |
| | | 00000608 | $25.8500 | 12/7/2000 | 12,622 | 12,622 | $100.0000 | $935,921 | Same day exercise/sale |
| | | 00000608 | $25.8500 | 5/17/2001 | 25,337 | 25,337 | $46.7387 | $529,257 | Same day exercise/sale |
| | | 00000608 | $25.8500 | 5/21/2001 | 10,000 | 10,000 | $50.0000 | $241,500 | Same day exercise/sale |
| **Sub-total** | **624,544** | | | | **217,495** | **217,495** | | **$15,305,921** | |
| 10/4/1999 | 15,456 | 00000670 | $25.8500 | 10/4/2000 | 3,864 | 3,864 | $106.9600 | $313,409 | Same day exercise/sale |
| | | 00000670 | $25.8500 | 12/7/2000 | 644 | 644 | $100.0000 | $47,753 | Same day exercise/sale |
| | | 00000670 | $25.8500 | 5/17/2001 | 1,610 | 1,610 | $46.7387 | $33,631 | Same day exercise/sale |
| **Sub-total** | **15,456** | | | | **6,118** | **6,118** | | **$394,792** | |
| 11/29/2000 | 80,000 | 00001598 | $76.8800 | None exercised | | | | | |
| 4/17/2001 | 80,000 | 00002968 | $20.7000 | None exercised | | | | | |
| 4/17/2001 | 32,180 | 00001764 | $20.7000 | 5/17/2001 | 12,737 | 12,737 | $46.7387 | $331,655 | Same day exercise/sale |
| | | 00001764 | $20.7000 | 1/3/2002 | 500 | 500 | $37.6600 | $8,480 | Same day exercise/sale |
| | | 00001764 | $20.7000 | 1/3/2002 | 3,180 | 3,180 | $37.6500 | $53,901 | Same day exercise/sale |
| | | 00001764 | $20.7000 | 1/3/2002 | 1,013 | 1,013 | $37.6100 | $17,130 | Same day exercise/sale |
| **Sub-total** | **32,180** | | | | **17,430** | **17,430** | | **$411,166** | |
| 4/17/2001 | 800 | 00001765 | $20.7000 | 5/17/2001 | 316 | 316 | $46.7387 | $8,228 | Same day exercise/sale |
| | | 00001765 | $20.7000 | 1/3/2002 | 117 | 117 | $37.6100 | $1,978 | Same day exercise/sale |
| **Sub-total** | **800** | | | | **433** | **433** | | **$10,207** | |
| 4/17/2001 | 63,480 | 00001766 | $20.7000 | None exercised | | | | | |
| 10/1/2001 | 3,441 | 00003708 | $12.9000 | 10/4/2001 | 3,441 | 3,441 | $19.8800 | $24,018 | Same day exercise/sale |
| 10/1/2001 | 80,000 | 00004592 | $12.9000 | 12/4/2001 | 3,333 | 3,333 | $32.9000 | $66,660 | Same day exercise/sale |
| | | 00004592 | $12.9000 | 1/3/2002 | 1,667 | 1,667 | $38.0600 | $41,942 | Same day exercise/sale |
| **Sub-total** | **80,000** | | | | **5,000** | **5,000** | | **$108,602** | |
| 12/4/2002 | 50,000 | 00006618 | $4.8100 | None exercised | | | | | |
| 8/15/2003 | 100,000 | 00011012 | $5.5300 | 10/4/2004 | 22,916 | 22,916 | $6.0900 | $12,833 | Same day exercise/sale |
| **Totals** | **1,129,901** | | | | **272,833** | **272,833** | | **$16,267,539** | |

(1) -  Numbers of shares, strike prices and sales prices have been adjusted for all stock splits.

1031.   Jensen knew that Brocade's financial statements were false in that they failed to reflect compensation-related expenses arising from improperly granted stock options.

1032.   Jensen sold substantial amounts of stock while in possession of this information.

1033.   As shown in the table below, between October 4, 2000 and November 1, 2004, Jensen sold a total of 564,242 shares of Brocade stock, receiving gross sales proceeds of $24,604,671.

**Jensen's Stock Sales**

| Sale Date | No. of Shares (1) | Sales Price per Share (1) | Gross Proceeds | Net Proceeds (If Known) | Option No. Exercised | Comments |
|---|---|---|---|---|---|---|
| 10/4/2000 | 156,136 | 106.9600 | $16,700,307 | $12,664,191 | 00000608 | Same day exercise/sale |
| 10/4/2000 | 3,864 | 106.9600 | $413,293 | $313,409 | 00000670 | Same day exercise/sale |
| 12/6/2000 | 13,400 | 95.6300 | $1,281,442 | $935,052 | 00000608 | Same day exercise/sale |
| 12/7/2000 | 12,622 | 100.0000 | $1,262,200 | $935,921 | 00000608 | Same day exercise/sale |
| 12/7/2000 | 644 | 100.0000 | $64,400 | $47,753 | 00000670 | Same day exercise/sale |
| 5/17/2001 | 25,337 | 46.7387 | $1,184,218 | $529,257 | 00000608 | Same day exercise/sale |
| 5/17/2001 | 1,610 | 46.7387 | $75,249 | $33,631 | 00000670 | Same day exercise/sale |
| 5/17/2001 | 12,737 | 46.7387 | $595,311 | $331,655 | 00001764 | Same day exercise/sale |
| 5/17/2001 | 316 | 46.7387 | $14,769 | $8,228 | 00001765 | Same day exercise/sale |
| 5/21/2001 | 10,000 | 50.0000 | $500,000 | $241,500 | 00000608 | Same day exercise/sale |
| 10/4/2001 | 3,441 | 19.8800 | $68,407 | $24,018 | 00003708 | Same day exercise/sale |
| 12/4/2001 | 3,333 | 32.9000 | $109,656 | $66,660 | 00004592 | Same day exercise/sale |
| 1/3/2002 | 500 | 37.6600 | $18,830 | $8,480 | 00001764 | Same day exercise/sale |
| 1/3/2002 | 3,180 | 37.6500 | $119,727 | $53,901 | 00001764 | Same day exercise/sale |
| 1/3/2002 | 1,013 | 37.6100 | $38,099 | $17,130 | 00001764 | Same day exercise/sale |
| 1/3/2002 | 117 | 37.6100 | $4,400 | $1,978 | 00001765 | Same day exercise/sale |
| 1/3/2002 | 1,667 | 38.0600 | $63,446 | $41,942 | 00004592 | Same day exercise/sale |
| 10/4/2004 | 22,916 | 6.0900 | $139,558 | $12,833 | 00011012 | Same day exercise/sale |
| 10/27/2004 | 51,666 | 6.5902 | $340,489 | $2,594 | 00008554 | Same day exercise/sale |
| 10/27/2004 | 39,583 | 6.5902 | $260,860 | $1,987 | 00008555 | Same day exercise/sale |
| 10/28/2004 | 35,683 | 6.7402 | $240,511 | $7,144 | 00008546 | Same day exercise/sale |
| 10/28/2004 | 3,113 | 6.7402 | $20,982 | $623 | 00008547 | Same day exercise/sale |
| 10/28/2004 | 30,000 | 6.7402 | $202,206 | $6,006 | 00008549 | Same day exercise/sale |
| 10/28/2004 | 7,375 | 6.7402 | $49,709 | $1,476 | 00008550 | Same day exercise/sale |
| 10/28/2004 | 184 | 6.7402 | $1,240 | $37 | 00008551 | Same day exercise/sale |
| 10/28/2004 | 23,805 | 6.7402 | $160,450 | $4,766 | 00008552 | Same day exercise/sale |
| 10/29/2004 | 53,996 | 6.7900 | $366,633 | $13,499 | 00008546 | Same day exercise/sale |
| 11/1/2004 | 46,004 | 6.7011 | $308,277 | $7,411 | 00008546 | Same day exercise/sale |
| **Totals** | **564,242** | | **$24,604,671** | **$16,313,082** | | |

(1) -  Numbers of shares and share prices have been adjusted for all stock splits.

## **Michael Byrd**

1034.   As CFO from May 1999 to May 2001, Byrd was responsible for overseeing the Company's Finance Department.  He also had ultimate responsibility for overseeing and signing the Company's public filings with the SEC and other financial documentation, including management representation letters, and for ensuring the accuracy of those documents.

1035.   In addition, during at least some of this period, Byrd supervised the Human Resources Department and directly supervised Jensen.  Byrd was also Brocade's COO and President from May 2001 to 2003, and although in these positions he no longer signed the Company's filings with the SEC, as an officer he still owed the Company fiduciary duties.

SECOND AMENDED COMPLAINT

1036.   As a highly qualified and credentialed accountant, Byrd knew that companies granting in-the-money options had to recognize a compensation expense equal to the difference between the market price and the exercise price.

1037.   Byrd was a licensed CPA.  Before working at Brocade, he was CFO at Maxim for over five years, and he was previously a partner at one of the world's most prominent accounting firms, Ernst & Young, where he worked from 1982 to 1994.  Byrd also received a B.S. in Business Administration from California Polytechnic State University, San Luis Obispo, California.

1038.   Byrd's positions at the Company required him to understand and comply with applicable accounting and financial reporting rules, and, in particular, to understand that a compensation change had to be taken for grants of in-the-money stock options.

1039.   Byrd has admitted that he knew the accounting rules meant compensation charges needed to be taken for in-the-money grants, and that he even implemented the part-time program in an effort to avoid such charges.  He has also admitted that he knew that a non-employee could not receive employee stock options under APB 25.

1040.   Aside from his own admission, the available evidence shows that Byrd was well aware of the accounting rules relating to stock options as early as October 1999, if not before that.  Byrd even made Company presentations on the stock expensing requirements.  As described above in more detail, on February 28, 2001, Jensen sent an e-mail titled "Stock Add-On program details" to a group called "Employees," attaching three documents from Jensen, Canova and Elizabeth Moore, which describes the Company's response to steep stock price declines and its effect on options.  The attachment indicates that Byrd and Reyes made a presentation to Company employees approximately one week before on the issue.

1041.   In addition, Byrd received the March 15, 2002 Jim Hulburd e-mail described above, which, as noted, included an analysis showing the significant impact that expensing options could have on Brocade's net income.

1042.   Byrd also was involved in the implementation of the Stock Add-On Program.  As he explained in a Company meeting in February 2002, the program was designed to avoid compensation charges resulting from a simple repricing.

1043.   Byrd himself participated in the Stock Add-On Program, which was designed to avoid the compensation charges that Brocade would have incurred had it simply repriced underwater stock options or granted "in-the-money" options.  Byrd was granted 339,050 options on April 17, 2001 at $20.70 under the Stock Add-On Program.

1044.   Accordingly, Byrd received the materials distributed to employees about this program, informing him that Brocade would have had to take compensation charges if it had repriced existing stock options and that any such charges would have had a negative impact on Brocade's financial results.

<div align="center">Byrd's Role in the Stock-Option Process</div>

1045.   While he was CFO, Byrd played a central role in the option-grant process.  As described in detail in the above sections, Byrd acted in a variety of ways to implement and facilitate the misconduct relating to stock options, including by forwarding grant-date requests to Bossi for implementation after requests were made to Byrd directly (even if the date was in the past),  formally approving and authorizing backdated grants, and falsifying documents such as offer letters.

1046.   Byrd also was well aware of the value options could potentially be to new hires, and he routinely touted the potential benefits of the program to job candidates.

1047.   Byrd has admitted that he conceived of and implemented the "part-time program," as described above.  Byrd ran the program and permitted stock options to be issued, regardless of whether the new employees actually performed work for the Company during their part-time period.

1048.   Similarly, Byrd approved the offer/acceptance program described above, whereby Brocade would recruit employees and stock options would be granted as soon as the individual interviewed or signed his offer letter, rather than when the employee actually started work.

1049.   Byrd did not monitor whether such "employees" actually worked; he stated that he allowed the new employee's supervisors to exercise their discretion about whether the new hire should do any work.

1050.   Byrd also received warning signals relating to the improper options grants.  Byrd has admitted that offer letters were changed if Reyes said that he hired the employee on an earlier day than that reflected on the offer letter.

1051.   The October 31, 2002 Bossi e-mail described in greater detail above identifies Byrd as being centrally involved in options paperwork "forgery."  In that e-mail, Bossi complained to Canova about a loan that Brocade offered to Richard Geruson, a highly sought-after vice-president-level candidate, as a recruitment tool, as well as Byrd's role in the recruitment.  Bossi wrote:

> If you recall we had all been jumping through hopes [*sic*] and bending over
> backwards for this guy [Geruson] *including forging option paperwork and offer*
> *letters so he could get better priced options*. . . .  I'm sick of Mike [Byrd] as [*sic*]
> his style complicating everything he touches and then laying blame on people
> trying to execute the concoctions he comes up with.  We work our asses off to try
> do the right things.  We shouldn't be blamed for Mike['s] hiring mistakes and the
> fact we now have to fire a guy less than a year after hiring him.  [Emphasis
> added.]

1052.   The numerous other e-mails and testimony described above relating to specifically problematic grants show Byrd's knowledge of and involvement in the backdating scheme at Brocade.  Employees often informed him directly of their decisions to exercise options (in many cases retroactively), and Byrd repeatedly complied with their requests, facilitating backdating and even offering "guidance" through the process in many cases (as, for example, in the September 1, 1999 grants described above).

1053.   In sum, Byrd was involved in faulted Committee-of-One grants purportedly made by Reyes on at least the following dates: May 19, 1999, July 20, 1999, August 4, 1999, September 1, 1999, October 4, 1999, October 12, 1999, October 13, 1999, October 15, 1999,

<div align="center">197</div>

October 19, 1999, January 6, 2000, April 17, 2001, October 1, 2001, November 28, 2001, and February 28, 2002. Additionally, Byrd was involved in the faulted Compensation Committee grants purportedly made on the following dates: November 19, 1999, November 29, 2000, and October 1, 2001. Byrd also was involved in the faulted Board grants purportedly made on April 1, 1999 and April 17, 2001.

1054.   Moreover, Byrd – with his extensive accounting background – knew that the treatment of stock options held by employees taking leaves of absence and departing employees could result in a compensation charge. He also saw internal corporate documents on this issue. For example, when employee Renee Linde sought to take vacation, Charlie Smith wrote to Reyes suggesting that Brocade offer her accelerated vesting in exchange for delaying her leave. Reyes responded to Smith and noted his concern that the proposal was "excessively generous" and "could also result in a charge against earnings." Byrd was forwarded this exchange.

1055.   Despite Byrd's knowledge of the potential compensation-charge consequences, Equity Edge records reflect that Byrd personally extended the vesting period of employee Jack Rubinson. The records show a comment in Rubinson's account stating that "[p]er Mike Byrd, employment agreement states that options will continue to vest thru 12/31/02."

1056.   Byrd also signed Notices of Grant of Stock Options and Stock Option Agreements when he received his own option grants. As discussed above, these documents explained to him the policies relating to vesting and exercising of stock options for departing employees. The documents made clear that options could only be exercised for three months after an employee's termination, and vesting ceased immediately.

<center>Byrd's Signing of Financial Documents</center>

1057.   During his tenure as Brocade's CFO, Byrd signed and had a role in reviewing, preparing and transmitting false "management representation letters" to the Company's independent auditors, including the one dated February 16, 2001 to Arthur Andersen, discussed and quoted above in detail. Byrd signed at least one such management representation letter to Brocade's auditors certifying the accuracy of the Company's financial documentation, even though he knew that documentation was not accurate.

<center>198</center>

1058.   Byrd also reviewed public filings before signing and filing them during his tenure as Brocade's CFO, and he knew at the time that these documents were materially false and misleading.

1059.   As described above in more detail, between 1999 and 2001, Byrd repeatedly certified in Brocade's 10-K filings that the Company's stock option plans were being properly accounted for, notwithstanding the fact that the filings were materially inaccurate because compensation charges for in-the-money grants were not reported.  The Company's Forms 10-Q signed by Byrd also did not report the required charges.  As such, these filings also were materially false and misleading.

1060.   In connection with the Company's public filings each quarter, Byrd participated in public telephone conferences with analysts and shareholders reporting on the Company's financial results on November 29, 2000, February 21, 2001, and May 15, 2001, among other dates.  These communications were materially misleading to the finance community and the public at large, because they did not include the required compensation charges in Brocade's financial results.

1061.   Brocade is not the first company with which Byrd has had substantial involvement in questionable accounting practices relating to stock options.  Byrd is a named defendant in *Ryan v. Gifford* (No. 2213-CC), a case pending in the Delaware Chancery Court involving allegations of backdating at Maxim, where Byrd was CFO from 1994 to 1999.  According to the Complaint in that case, Byrd signed false public filings during his time at Maxim, including a Form 10-K dated September 24, 1998, which provided, among other things: "The Company accounts for its stock option and employee stock purchase plans in accordance with provisions of [APB 25]"  Byrd also signed Maxim 10-Q's, which allegedly did not disclose compensation expenses, on the following dates:  February 5, 1998, May 12, 1998, November 8, 1998 and February 5, 1999.

1062.   In sum, while at Brocade, Byrd consciously disregarded his obligation to oversee the stock-options program.  He also facilitated, and in many instances actively participated in,

1  the improper backdating of stock-option documentation, thereby engaging in knowing

2  misconduct or at least gross negligence evidencing a lack of good faith.

3      1063.   In addition, Byrd signed grant documentation and financial statements that he

4  knew, or was deliberately reckless in not knowing, were materially false and misleading.  Byrd

5  thus knowingly deceived the Company or consciously disregarded his duties to Brocade.

6                  <u>Byrd's Receipt of Options and Sale of Brocade Stock</u>

7      1064.   Byrd received at least the following faulted stock options:

**Byrd's Faulted Grants (1)**

| Grant Date | Options Granted | Option Number | Strike Price | Exercise Date | Options Exercised | Shares Sold | Sales Price | Net Gain from Sale | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 04/01/1999 | 2,640,000 | 00000387 | $0.6250 | 04/01/1999 | 2,640,000 | 1,651,480 | | $95,599,501 | (2) |
| 11/19/1999 | 85,000 | 00000513 | $32.1300 | None exercised | | | | | |
| 11/29/2000 | 410,000 | 00001591 | $76.8800 | None exercised | | | | | |
| 04/17/2001 | 13,730 | 00001747 | $20.7000 | None exercised | | | | | |
| 04/17/2001 | 325,320 | 00001748 | $20.7000 | None exercised | | | | | |
| 04/17/2001 | 800,000 | 00002966 | $20.7000 | None exercised | | | | | |
| 10/01/2001 | 7,218 | 00003448 | $12.9000 | None exercised | | | | | |
| 10/01/2001 | 250,000 | 00004589 | $12.9000 | None exercised | | | | | |
| Total | 4,531,268 | | | | 2,640,000 | 1,651,480 | | $95,599,501 | |

(1) -  Numbers of shares strike prices and sales prices have been adjusted for all stock splits.
(2) -  Exercised the option on April 1, 1999 with cash provided by a loan from the Company.
        For details of the sales of these shares see the Share Sales chart.

19     1065.   Byrd knew that Brocade's financial statements were false in that they failed to

20  reflect compensation-related expenses arising from improperly granted stock options.

21     1066.   Byrd sold substantial amounts of stock while in possession of this information.

22     1067.   As shown in the table below, between September 22, 1999 and July 5, 2002, Byrd

23  sold a total of 1,651,480 shares of Brocade stock, receiving gross sales proceeds of $96,631,676.

SECOND AMENDED COMPLAINT

**Byrd's Stock Sales**

| Sale Date | No. of Shares (1) | Sales Price per Share (1) | Gross Proceeds | Net Proceeds (If Known) | Option No. Exercised | Comments |
|---|---|---|---|---|---|---|
| 9/22/1999 | 51,160 | $28.2907 | $1,447,353 | $1,415,378 | 00000387 (4) | |
| 9/22/1999 | 51,160 | $28.2907 | $1,447,353 | $1,415,378 | | Trust for Son (A) |
| 9/22/1999 | 51,160 | $28.2907 | $1,447,353 | $1,415,378 | | Trust For Son (B) |
| 9/22/1999 | 51,160 | $28.2907 | $1,447,353 | $1,415,378 | | Trust for Daughter |
| 9/23/1999 | 14,840 | $28.1409 | $417,611 | $408,336 | | |
| 9/23/1999 | 14,840 | $28.1409 | $417,611 | $408,336 | | Trust for Son (A) |
| 9/23/1999 | 14,840 | $28.1409 | $417,611 | $408,336 | | Trust For Son (B) |
| 9/23/1999 | 14,840 | $28.1409 | $417,611 | $408,336 | | Trust for Daughter |
| 12/23/1999 | 134,000 | $39.2969 | $5,265,781 | $5,182,031 | | |
| 12/23/1999 | 14,000 | $39.2969 | $550,156 | $541,406 | | Trust for Son (A) |
| 12/23/1999 | 14,000 | $39.2969 | $550,156 | $541,406 | | Trust For Son (B) |
| 12/23/1999 | 14,000 | $39.2969 | $550,156 | $541,406 | | Trust for Daughter |
| 12/23/1999 | 800 | $39.6250 | $31,700 | $31,200 | | Gift (3) |
| 4/6/2000 | 75,000 | $70.6021 | $5,295,154 | $5,248,279 | | |
| 4/7/2000 | 130,000 | $72.8378 | $9,468,908 | $9,387,658 | | |
| 5/2/2000 | 644 | $63.4380 | $40,854 | $40,452 | | Gift (3) |
| 5/2/2000 | 156 | $63.4380 | $9,896 | $9,799 | | Gift (3) |
| 6/16/2000 | 120,000 | $70.8813 | $8,505,750 | $8,430,750 | | |
| 7/3/2000 | 13,000 | $90.2524 | $1,173,281 | $1,165,156 | | |
| 7/5/2000 | 20,000 | $90.1563 | $1,803,125 | $1,790,625 | | |
| 7/6/2000 | 8,000 | $86.7188 | $693,750 | $688,750 | | |
| 7/6/2000 | 10,000 | $86.5782 | $865,782 | $859,532 | | |
| 7/6/2000 | 11,000 | $87.0313 | $957,344 | $950,469 | | |
| 8/24/2000 | 54,000 | $109.2431 | $5,899,125 | $5,865,375 | | |
| 9/5/2000 | 56,000 | $114.5913 | $6,417,110 | $6,382,110 | | |
| 10/3/2000 | 34,000 | $112.4283 | $3,822,562 | $3,801,312 | | |
| 10/4/2000 | 20,000 | $110.0938 | $2,201,875 | $2,189,375 | | |
| 12/6/2000 | 108,000 | $95.3130 | $10,293,804 | $10,226,304 | | (2) |
| 5/22/2001 | 250,000 | $52.7423 | $13,185,575 | $13,029,325 | | (2) |
| 12/11/2001 | 300,000 | $38.5820 | $11,574,600 | $11,387,100 | | |
| 7/5/2002 | 880 | $17.4700 | $15,374 | $14,824 | | Gift (3) |
| **Totals** | **1,651,480** | | **$96,631,676** | **$95,599,501** | | |

Notes: (1) All quantities and prices adjusted for three 2-for-1 splits effective December 3, 1999, March 15, 2000, and December 22, 2000.

(2) Dispositions on December 6, 2000 and May 22, 2001 were reported without a transaction code, but treated herein as sales due to reporting of a transaction (sale) price.

(3) Gifted shares are valued at the closing price on the date of the gift.

(4) Exercised options on 2,640,000 shares at $0.625/sh. (adjusted for all stock splits) on 4/1/99.

Source: SEC Forms 4 and 5

## **Antonio Canova**

1068.   Canova held the position of Vice President of Finance from November 2000 to November 2004, Vice President of Administration from November 2004 to December 2005, and CFO from May 2001 to December 2005.  While in those positions, Canova had ultimate responsibility for overseeing and signing the Company's public filings with the SEC and for ensuring the accuracy of those filings, as well as, according to the Company's May 9, 2001 press

SECOND AMENDED COMPLAINT

release announcing his promotion to CFO, "responsibility for all finance operations, including investor relations."

1069.   Canova was a licensed CPA and had significant accounting experience before serving as Brocade's CFO.  He was CFO at Wireless, Inc. in 2000, and he was previously an Audit Partner at one of the world's most prominent accounting firms, KPMG, where he worked from 1984 to 2000.

1070.   Canova's positions at Brocade required him to know and comply with applicable accounting and financial-reporting rules, and, in particular, to understand that during the relevant period a compensation change had to be taken for in-the-money grants.

1071.   As a highly qualified and credentialed accountant, Canova knew that for financial reporting purposes, companies granting in-the-money options had to recognize a compensation expense equal to the difference between the market price and the exercise price.

1072.   Substantial other evidence also demonstrates that Canova knew the accounting requirements for in-the-money grants.  For example, the February 28, 2001 e-mail sent by Jensen described above attached three documents from Jensen, Canova and Elizabeth Moore, which describe the Company's response to steep stock price declines and its effect on options expensing.  The attachment, which appears to be authored by Jensen and Canova, includes a question: "Why didn't Brocade just re-price my stock options?" followed by the answer: "Recent SEC rulings have made this an unfavorable option for companies.  There would be significant financial impact to earnings based on the impact of having to take a compensation charge which would negatively impact the future financial results of Brocade."  The e-mail also states that any questions can be directed to Canova, Jensen, or Elizabeth Moore, and that Jensen and Canova would hold "Brown Bag sessions over lunch" on March 7 and 8, 2001, to discuss the program.

1073.   Canova was also copied on the March 15, 2002 Jim Hulburd e-mail detailed above, which described the impact of expensing options and the dramatic effect it could have on the Company's finances.

1074.   As described in more detail above, starting in late 2002, members of the Finance Department, including Canova, were tracking developments related to proposed changes to FASB 123 and the possible requirement for expensing of options.  For example, June Weaver, the Company's Compensation Director, sent a March 20, 2003 e-mail to Canova, stating that:

> A team has been created to meet monthly to keep a pulse and early awareness of the [*sic*] how FASB 123 is proceeding on the determination regarding the expensing of stock options.  The team consists of: Bob Bossi [and others] and June Weaver.  Our role will be to collective [*sic*] look at the progress/process by which FASB is looking at any changes and how the ruling will impact the competitive landscape, employee compensation, Wall Street and financial reporting.  As we hear more definitive information, we will be providing you both with information on alternatives and financial modeling.

1075.   Similarly, on May 8, 2003, Weaver e-mailed a white paper from iQuantic to Canova regarding FASB 123 and options expensing, titled "option expensing: By Choice or by Mandate?"  Weaver's cover e-mail states:

> Stephanie [Jensen] . . . and Tony [Canova]: Attached is a newly released White Paper on FASB 123 from iQuantic, the consulting firm providing is [*sic*] our stock consulting recommendations.  In addition to this information, two folks from iQuantic will be at Brocade tomorrow, Friday, May 9th to meet with us to review: 1. their findings on our current positions regarding employees stock options with recommendations for changes and 2. updates on FASB 123 summary that can be provided to the Comp Committee if desired . . . Bob [Bossi] . . . FYI. Attached is additional information on expensing of stock options.  I have created a repository for all information that you send me regarding expensing of stock options.  Please keep it coming.  I am looking into having a 'group' repository for all of us to drop information into but until I get IT help on how to do that . . . please send to me and I'll collect.

1076.   Weaver and Deranleau sent Reyes and Canova a March 12, 2004 e-mail noting that an FASB determination regarding option expensing was due by the end of the month that would "have a significant impact on our current stock option practices and reporting methodology."

1077.   Furthermore, on January 8, 2001, Canova e-mailed Deanne Ebner (at KPMG) that "[w]e have some option holders who are under water . . . who we are planning to grant some additional options to.  I want . . . fixed accounting. . . .  Have you seen any other tricks that work that don't get you variable?"  Ebner gave a detailed response explaining the accounting implications of various approaches.

1078.   Canova's own employment letter, dated November 13, 2000, and signed by Canova informed him that the exercise price of his options would equal the fair market value of Brocade's stock as measured on the grant date.  The offer letter further explained that vesting of the stock options was contingent on his continued employment.

1079.   Canova also co-authored an announcement to all Brocade employees regarding the Stock Add-On Program.  The announcement explained that the Stock Add-On Program was undertaken to avoid compensation charges that would have accompanied a repricing.

1080.   Canova himself participated in the Stock Add-On Program and the Regrant Tender Offer, both of which were designed to avoid the compensation charges that Brocade would have incurred had it simply repriced underwater stock options or granted "in-the-money" options.  Canova received 377,750 options under the Add-On Program, and he turned in options on 831,162 shares in January 2003 and received options on 545,149 shares on July 10, 2003 in the Regrant Tender Offer.

1081.   Accordingly, Canova received the materials distributed to employees about both of these programs, informing him that Brocade would have had to take compensation charges if it had repriced existing stock options and that any such charges would have had a negative impact on Brocade's financial results.  In addition, Canova summarized the rationale of the Regrant Tender Offer in an e-mail to Jensen in February 2002.

SECOND AMENDED COMPLAINT

1082.   Furthermore, Canova received a presentation from iQuantic — a compensation consulting firm — explaining the accounting rules for expensing stock options.  He appears to have also attended a presentation by iQuantic on these materials.

1083.   Canova thus was well aware of the options-expensing issue and was kept informed on that issue by others in the Finance Department and at Brocade.

<u>Canova's Role in the Stock-Option Process</u>

1084.   Early in his tenure at the Company, Canova received warning signals relating to the backdating activities.  For example, on April 9, 2001, Jieming Zhu, a Brocade manager, forwarded Canova an e-mail exchange that Zhu had had with a job candidate, and Zhu asked Canova to reassure the candidate about Brocade's financial stability.  As part of the exchange with the candidate, Zhu stated that the candidate's options would be priced by the Board and that, "[i]f history is any indication, the price is usually the lowest closing price between now and the Board meeting.  Therefore, should our stock price continue going down in the short term, you are protected until you join Brocade."

1085.   Canova then e-mailed Jensen, saying he would contact the candidate, but urged Jensen to "[p]lease caution [J]eiming to not make statements about the board granting shares at the lowest price.  To date this has been a complete coincidence.  I actually worry that others may say the same."  Jensen replied that she "did caution Jieming on that, he realized after the fact . . . that he should not have stated that in the email."  Canova consciously disregarded his duties to Brocade in failing to investigate this alert about the favorable timing of options grants.

1086.   Canova was also the primary recipient of Bossi's October 31, 2002 e-mail, in which Bossi complained about a loan that Brocade had offered to Geruson as a recruitment tool and described the "forging [of] option paperwork and offer letters so [Geruson] could get better priced options."  Canova took no steps to investigate this red-flag alert relating to forged options paperwork.

1087.   Canova approved the backdating of options.  On June 18, 2007, Colleen Devine Burgess, Brocade's Compensation Analyst from April 2000 to July 2003, and who was responsible for helping to prepare options grant paperwork, testified at Reyes' criminal trial that

1   Brocade had hired two operations directors at the same time, but one was granted options at an

2   earlier and lower strike price, leading the other employee to complain about getting a less

3   favorable option and requesting to have his grant changed to mirror his colleague's.

4       1088.   In response to the question as to whether Canova approved the changes, Devine

5   stated: "If I remember correctly, he said he would approve it but that we couldn't do something

6   – that he didn't want this happening again."  In response to the follow-up question: "So he said

7   that he would approve it?," Devine responded:  "Yes."

8       1089.   During her interview by Morrison & Foerster LLP during the First Investigation

9   on November 15, 2004, Jensen also stated that Canova knew about backdating.  The

10  memorandum memorializing her interview states:

11          Ms. Jensen said she knew of only one employee who obtained a change in his

12          options – Tim Duffy.  Mr. Duffy went to Mr. Reyes and obtained a better deal.

13          Mr. Duffy had an employment agreement prepared by Theresa Uchida.  Ms.

14          Uchida said she had been asked to change Mr. Duffy's employment agreement

15          because Cisco had been trying to recruit him back.  Ms. Jensen could not recall

16          whether the change related to the number of shares or the dates the options were

17          awarded.  She said she raised it with Greg Reyes, and, she believed, Tony

18          Canova.

19      1090.   Jensen further stated that "she thought Mr. Duffy got a better price or an increased

20  number of options.  Ms. Jensen said Ms. Uchida would have changed the letter.  She thought Mr.

21  Canova was aware of it."  Canova consciously disregarded his duties to Brocade in failing to

22  investigate this red-flag alert about the changing of options paperwork.

23      1091.   As discussed above, Canova was involved in faulted Committee-of-One grants

24  purportedly made by Reyes on at least the following dates:  April 17, 2001, October 1, 2001,

25  February 28, 2002, August 15, 2003, May 21, 2004, and August 20, 2004.  Canova also was

26  involved in the faulted October 1, 2001 officer grant made by the Compensation Committee.

27      1092.   Canova — who had extensive accounting experience — knew that a failure to

28  adhere to Company policies governing stock options held by employees taking leaves of absence

1  and by departing employees could result in a compensation charge.  Canova also was copied on

2  an e-mail from Bossi to Jensen on December 19, 2001 in which Bossi explained that changing

3  the terms of an option could result in accounting compensation issues.

4      1093.   In addition, when employee Renee Linde sought to take vacation, Charlie Smith

5  wrote to Reyes suggesting that Brocade offer her accelerated vesting in exchange for delaying

6  her leave.  Reyes responded to Smith and noted his concern that the proposal was "excessively

7  generous" and "could also result in a charge against earnings."  Canova was forwarded and knew

8  of this exchange.

9      1094.   When he received his own option grants, Canova signed Notices of Grant of

10  Stock Options, which incorporated the terms of the Stock Option Agreements explaining

11  Brocade's policies relating to departing employees' vesting and exercising of stock options.

12  These documents explained that options could be exercised for only three months after an

13  employee's termination and that vesting ceased immediately.

14      1095.   Notwithstanding this knowledge, Canova helped select an artificial termination

15  date for Bonderson to give Bonderson a longer exercise period for his options.  In a January 27,

16  2005 e-mail exchange, Bonderson asked whether there was "[a]ny answer from Tony [Canova]

17  on extending the period of time to exercise my options?"  Vescuso told Bonderson that "Tony

18  and I both agree it is best to select a date at a point when you are not under a black out so that

19  you can have a full 90 days to exercise."

20      1096.   Canova was also aware of the terms of LaLonde's termination, which provided

21  extended vesting and exercising periods for which Brocade should have taken a compensation

22  charge.  On April 11, 2004, Reyes forwarded a draft of the LaLonde separation agreement to

23  Canova for his review.

24                          Canova's Signing of Financial Documents

25      1097.   Canova signed and had a role in reviewing, preparing, and transmitting false

26  management representation letters to the Company's auditors.  As described above, during his

27  term as CFO, Canova signed at least 12 quarterly and annual management representation letters

28  to the Company's auditors (Andersen and KPMG) starting in May 2001.  Those letters certified

the accuracy of the Company's financial documentation, even though Canova knew or was deliberately reckless in not knowing that they were materially false and misleading.

1098.   Canova also reviewed public SEC filings before signing them.  The financial statements prepared and filed during Canova's tenure as Brocade's CFO misrepresented Brocade's compensation expenses.

1099.   Between 2001 and 2004, Canova repeatedly certified in Brocade's 10-K filings that the Company's stock option plans were being properly accounted for, even though the financial statements were materially false and misleading because they did not include compensation charges for in-the-money grants.

1100.   Canova also signed SOX certifications in connection with at least nine Forms 10-K and 10-Q filed between August 27, 2002 and September 13, 2004.  Those certifications falsely asserted that Brocade's financial condition and results of operations were "in all material respects," being fully reported.

1101.   Canova thus knowingly and consciously disregarded his fiduciary and other obligations to Brocade, and facilitated the illicit backdating practices taking place within the Company.  He facilitated and, in many instances, actively participated in, the granting of faulted stock options, thereby engaging in knowing misconduct or at least gross negligence evidencing a lack of good faith.

1102.   He also signed grant documentation and financial statements that he knew, or was deliberately reckless in not knowing, were materially false and misleading.

<u>Canova's Receipt of Options and Sale of Brocade Stock</u>

1103.   Canova received at least the following faulted stock options:

**Canova's Faulted Grants (1)**

| Grant Date | Options Granted | Option Number | Strike Price | Exercise Date | Options Exercised | Shares Sold | Sales Price | Net Gain from Sale | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 12/21/2000 | 5,844 | 00001359 | $68.4400 | None exercised | | | | | |
| 12/21/2000 | 354,156 | 00001360 | $68.4400 | None exercised | | | | | |
| Sub-total | 360,000 | | | | | | | | |
| 04/17/2001 | 135,000 | 00002974 | $20.7000 | 5/21/2001 | 5,000 | 5,000 | $53.2000 | $162,500 | Same day exercise/sale |
| 04/17/2001 | 3,950 | 00001790 | $20.7000 | 5/17/2001 | 150 | 150 | $46.7387 | $3,906 | Same day exercise/sale |
| | | 00001790 | $20.7000 | 5/21/2001 | 344 | 344 | $53.2000 | $11,180 | Same day exercise/sale |
| | | 00001790 | $20.7000 | 12/10/2001 | 380 | 380 | $37.4500 | $6,365 | Same day exercise/sale |
| Sub-total | 3,950 | | | | 874 | 874 | | $21,451 | |
| 04/17/2001 | 238,800 | 00001791 | $20.7000 | 5/17/2001 | 15,000 | 15,000 | $46.8000 | $391,500 | Same day exercise/sale |
| | | 00001791 | $20.7000 | 5/17/2001 | 14,850 | 14,850 | $46.7387 | $386,675 | Same day exercise/sale |
| Sub-total | 238,800 | | | | 29,850 | 29,850 | | $778,175 | |
| 10/01/2001 | 3,756 | 00003455 | $12.9000 | 12/10/2001 | 3,756 | 3,756 | $37.4000 | $92,022 | Same day exercise/sale |
| 10/01/2001 | 100,000 | 00004590 | $12.9000 | 12/5/2001 | 30,000 | 30,000 | $37.0500 | $724,500 | Same day exercise/sale |
| | | 00004590 | $12.9000 | 12/10/2001 | 12,739 | 12,739 | $37.4000 | $312,106 | Same day exercise/sale |
| Sub-total | 100,000 | | | | 42,739 | 42,739 | | $1,036,606 | |
| 10/01/2001 | 75,000 | 00004591 | $12.9000 | 12/10/2001 | 3,125 | 3,125 | $37.4000 | $76,563 | Same day exercise/sale |
| 08/15/2003 | 150,000 | 00011002 | $5.5300 | None exercised | | | | | |
| 05/21/2004 | 200,000 | 00011678 | $5.8400 | None exercised | | | | | |
| 08/20/2004 | 175,000 | 00012566 | $4.9700 | 3/14/2006 | 58,333 | 58,333 | $5.5900 | $36,166 | Same day exercise/sale |
| Totals | 1,441,506 | | | | 143,677 | 143,677 | | $2,203,482 | |

(1) - Numbers of shares, strike prices and sales prices have been adjusted for all stock splits.

1104.   Canova knew that Brocade's financial statements were false in that they failed to reflect compensation-related expenses arising from improperly granted stock options.

1105.   Canova sold substantial amounts of stock while in possession of this information.

1106.   As shown in the table below, between May 17, 2001 and April 3, 2006, Canova sold a total of 776,927 shares of Brocade stock, receiving gross sales proceeds of $7,948,589.

209

SECOND AMENDED COMPLAINT

**Canova's Stock Sales**

| Sale Date | No. of Shares (1) | Sales Price per Share (1) | Gross Proceeds | Net Proceeds (If Known) | Option No. Exercised | Comments |
|---|---|---|---|---|---|---|
| 5/17/2001 | 150 | $46.7387 | $7,011 | $3,906 | 00001790 | Same day exercise/sale |
| 5/17/2001 | 15,000 | $46.8000 | $702,000 | $391,500 | 00001791 | Same day exercise/sale |
| 5/17/2001 | 14,850 | $46.7387 | $694,070 | $386,675 | 00001791 | Same day exercise/sale |
| 5/21/2001 | 344 | $46.8000 | $16,099 | $8,978 | 00001790 | Same day exercise/sale |
| 5/21/2001 | 5,000 | $53.2000 | $266,000 | $162,500 | 00002974 | Same day exercise/sale |
| 12/5/2001 | 30,000 | $37.0500 | $1,111,500 | $724,500 | 00004590 | Same day exercise/sale |
| 12/10/2001 | 12,739 | $37.4000 | $476,439 | $312,106 | 00004590 | Same day exercise/sale |
| 12/10/2001 | 3,756 | $37.4000 | $140,474 | $92,022 | 00003455 | Same day exercise/sale |
| 12/10/2001 | 3,125 | $37.4000 | $116,875 | $76,563 | 00004591 | Same day exercise/sale |
| 12/10/2001 | 380 | $37.4500 | $14,212 | $6,365 | 00001790 | Same day exercise/sale |
| 6/2/2003 | 4,903 | $6.4300 | $31,526 | $10,270 | | |
| 3/14/2006 | 58,333 | $5.5900 | $326,081 | $36,166 | 00012566 | Same day exercise/sale (2) |
| 3/16/2006 | 87,500 | $5.8600 | $512,750 | $29,242 | 00011002 | Same day exercise/sale (2) |
| 3/17/2006 | 72,300 | $6.1400 | $443,922 | $21,690 | 00011678 | Same day exercise/sale (2) |
| 3/20/2006 | 72,335 | $6.1700 | $446,307 | $23,890 | 00011678 | Same day exercise/sale (2) |
| 3/21/2006 | 32,812 | $6.4600 | $211,966 | $15,094 | 00012983 | Same day exercise/sale (2) |
| 3/31/2006 | 100,000 | $6.7052 | $670,520 | $16,520 | 00007389 | Same day exercise/sale (2) |
| 3/31/2006 | 31,700 | $6.6500 | $210,805 | $3,487 | 00007391 | Same day exercise/sale (2) |
| 3/31/2006 | 50,000 | $6.6650 | $333,250 | $6,250 | 00007392 | Same day exercise/sale (2) |
| 4/3/2006 | 2,922 | $6.7510 | $19,726 | $617 | 00007388 | Same day exercise/sale (2) |
| 4/3/2006 | 22,433 | $6.6680 | $149,583 | $2,871 | 00007389 | Same day exercise/sale (2) |
| 4/3/2006 | 1,538 | $6.7600 | $10,397 | $338 | 00007390 | Same day exercise/sale (2) |
| 4/3/2006 | 25,000 | $6.6700 | $166,750 | $3,250 | 00007391 | Same day exercise/sale (2) |
| 4/3/2006 | 80,000 | $6.7030 | $536,240 | $13,040 | 00007392 | Same day exercise/sale (2) |
| 4/3/2006 | 26,440 | $6.7320 | $177,994 | $5,076 | 00007393 | Same day exercise/sale (2) |
| 4/3/2006 | 23,367 | $6.6800 | $156,092 | $3,271 | 00007394 | Same day exercise/sale (2) |
| **Totals** | **776,927** | | **$7,948,589** | **$2,356,187** | | |

Notes: (1) All quantities and prices adjusted for three 2-for-1 splits effective December 3, 1999, March 15, 2000, and December 22, 2000.

    (2) Information from Equity Edge database maintained by the Company.

Source:   SEC Forms 4 and 5 filings.

1107.   The following table shows the amounts that Canova is require to forfeit to Brocade under SOX § 304 (to the extent the relevant information currently is available to Brocade).

**Canova's SOX 304 Liability**

| Twelve Mos. Following First Disclosure | Bonus | Total Non-salary Compensation | Gain Realized on Sales | Total Sec. 304 Liability |
|---|---|---|---|---|
| 11/22/02 - 11/21/03 | $55,826 | $55,826 | $10,270 | $66,096 |
| 11/21/03 - 11/20/04 | $151,750 | $151,750 | | $151,750 |
| 11/23/04 - 11/22/05 | $350,001 | $350,001 | | $350,001 |
| 12/07/05 - 12/06/06 | $0 | $0 | $180,831 | $180,831 |
| **Totals** | **$557,577** | **$557,577** | **$191,101** | **$748,678** |

SECOND AMENDED COMPLAINT

1

**Neal Dempsey**

2      1108.   Dempsey was a member of Brocade's Board from at least December 1996

3   through 2007, a member of the Compensation Committee from at least February 26, 1998

4   through at least February 2007, and a member of the Audit Committee from at least February 26,

5   1998 through October 2004.

6      1109.   Dempsey graduated from the University of Washington with a degree in business

7   administration.

8      1110.   Dempsey is a general partner of Bay Partners, a venture-capital firm where he has

9   worked since 1989, focusing on Internet and software companies.

10      1111.   Dempsey had significant financial and corporate-governance experience, having

11   served on the boards of directors of some 35 companies, including those of Barneyscan Corp.,

12   BoardVantage, Inc., Cardiometrics, Inc., Celequest Corporation, CenterBoard, CTSpace, Eloqua

13   Corporation, EnvisionTec GmbH (where he also was CEO), Epatterns, Eventful, Inc., Exeros,

14   Inc., Extricity, Inc. GEO Works, Inc., Groxis, Inc., Intraspect Software, Inc., IPWireless, Inc.,

15   Jamcracker, Inc., Moonlight Systems, Inc., Net Dialog, Inc., Nuera Communications, Inc., Ojos,

16   Inc., Riya, ShopTalk Networks, Inc., SilverStorm Technologies, Inc., Sonoa Systems, Inc.,

17   Staccato Communications, Inc., Track Master, Inc., WebLogic, Inc., WhereNet Corporation, and

18   Zentech Manufacturing, Inc.

19      1112.   Dempsey was aware of the requirement that issuers record compensation charges

20   for in-the-money stock options.  For example, Dempsey received iQuantic's presentation and

21   attended the June 12, 2003 Compensation Committee meeting that included discussions of

22   APB 25's requirement that a "fixed accounting charge [be] equal to [the] 'spread' for options

23   granted at a discount" and that "variable accounting [is] required for performance-based options

24   or stock appreciation rights."

25      1113.   Dempsey also received at least two e-mails from KPMG, on July 13, 2003 and

26   May 17, 2004, attaching the firm's newsletter called "Defining Issues," which discussed

27   developments in stock-option accounting.

28      1114.   Furthermore, Dempsey signed Brocade's 2002 Form 10-K, which included as an

211

exhibit a copy of the 1999 NSO Plan and the relevant templates for a Stock Option Agreement and an Exercise Notice for a recipient of options under that Plan.  The Exercise Notice incorporated by reference the terms of the 1999 NSO Plan which, as discussed above, prohibits the Administrator from choosing a grant date earlier than the date the Administrator actually determines to grant options.  Dempsey thus understood that Brocade's employees who received grants under this Plan were not permitted to receive backdated grants.

1115.   Dempsey also signed numerous Forms 10-K that discussed Brocade's rules for granting stock options and the accounting implications of such grants.

1116.   Dempsey voted to approve the Regrant Tender Offer, which was expressly designed to avoid the compensation charges that Brocade would have incurred had it simply repriced its employees' underwater options.

1117.   In addition, as a member of Brocade's Audit Committee, Dempsey knew, or was grossly negligent and consciously disregarded his duties to Brocade in not knowing, how companies grant and account for stock options.

1118.   Despite his knowledge of and responsibility for issues relating to Brocade's granting of stock options, Dempsey knowingly or with deliberate recklessness approved numerous improper grants, utterly failed to implement any reporting or information system or controls to monitor Reyes' Committee-of-One grants, signed false financial statements, and otherwise breached and consciously disregarded his duties to the Company and its shareholders.

<u>Involvement in Faulted Grants</u>

1119.   As a member of Brocade's Board of Directors and Compensation Committee, Dempsey had a significant role in approving faulted grants of stock options.  Dempsey signed minutes of Compensation Committee meetings that never took place on the purported meeting date, and minutes that reflected details about grants that actually had not been finalized on the date of the purported meeting.

1120.   Dempsey also signed UWCs reflecting approval of stock option grants on particular dates, even though he knew he was not signing the UWCs on the dates they reflected.

1121.   In addition, Dempsey approved grants of options to himself and other directors

1    even though he knew that the grants had not been made on the purported grant dates.

2        1122.   Dempsey knowingly participated in all of the faulted grants that the Board of

3    Directors and the Compensation Committee approved.

4        1123.   Dempsey signed a UWC of the Stock Option Committee of the Board, dated

5    April 1, 1999, approving a grant of incentive stock options to Michael Byrd, even though the

6    grant was not finalized until after that date.

7        1124.   Dempsey signed a Board UWC dated October 4, 1999, approving grants to Peter

8    Tarrant and Jean Zorzy, even though the UWC was not executed until after that date.

9        1125.   Dempsey signed minutes of a purported November 19, 1999 Compensation

10   Committee meeting approving grants to officers, even though the grants were not finalized until

11   after that date.

12       1126.   Dempsey signed minutes of a purported November 29, 2000 Compensation

13   Committee meeting approving grants to officers, even though he knew no meeting had been held

14   on that date.

15       1127.   Dempsey signed a Board UWC dated April 17, 2001, approving grants to officers

16   even though the grant was not finalized until sometime in June 2001.  Dempsey also signed

17   minutes of a purported April 17, 2001 Compensation Committee meeting, attached as Exhibit A

18   to the Board UWC, approving grants to officers even though the meeting did not take place on

19   that date.

20       1128.   Dempsey signed a Board UWC dated April 17, 2001, approving amendments to

21   the 1999 Director Plan, which also provided for an option grant to himself, even though neither

22   the plan amendments nor the UWC were finalized until June 2001.

23       1129.   Dempsey signed a Compensation Committee UWC dated October 1, 2001,

24   approving grants to officers even though the grant was not finalized until December 2001.

25       1130.   Dempsey signed a Board UWC dated October 1, 2001, approving grants to both

26   himself and Neiman even though the UWC was not finalized until at least December 2001.

27                      Failure to Monitor Committee-of-One Grants

28       1131.   On November 3, 2000, the Board of Directors, including Dempsey, approved an

                                             213

amended Compensation Committee Charter that made the Compensation Committee responsible for reviewing and approving all stock compensation at Brocade, including options granted by Reyes as a Committee of One.

1132.   Despite his responsibility to do so, Dempsey utterly failed to implement any reporting or information system or controls to monitor Reyes' activities in granting stock options.

1133.   Dempsey also consciously disregarded Reyes' failure to provide the Board with certificates verifying the grants that Reyes was making.

<u>Signing False Financial Statements</u>

1134.   Dempsey signed numerous Forms 10-K that were materially inaccurate and that Brocade later had to restate or correct because they had not properly accounted for and disclosed the Company's compensation-related expenses.

<u>Other Evidence of Dereliction of Duty</u>

1135.   As a Board member, Dempsey approved all of Brocade's relevant stock-option plans, including the 1999 Stock Plan and the 1999 NSO Plan, both of which state that the date of a stock-option grant shall be "the date on which the Administrator makes the determination granting such Option . . . or such other later date as is determined by the Administrator."  He also approved the Compensation Committee Charter and amendments thereto, which set out specific rules and responsibilities for granting of stock options.

1136.   Among the Compensation Committee's responsibilities was the duty to review proposals and recommendations related to stock compensation and to review and approve all stock compensation (including options).

1137.   Dempsey nevertheless testified that there was "no definitive process" for stock-option grants at Brocade.  "[S]ometimes we, the compensation committee, approved, but in some cases the whole board approved.  There was really no definitive process."

1138.   Despite his duties to oversee Brocade's stock-option and compensation practices, Dempsey did not act to implement "definitive process[es]"; nor did he ensure that the processes in place were actually followed.

1139.   In addition, Dempsey was grossly negligent and consciously disregarded his duties to Brocade in not focusing on the dates of stock-option grants or their financial and accounting consequences at all.  He therefore failed to satisfy his duties to Brocade.

<div align="center">Dempsey's Receipt of Options and Sale of Brocade Stock</div>

1140.   Dempsey received at least the following faulted stock options:

<div align="center">Dempsey's Faulted Grants (1)</div>

| Grant Date | Options Granted | Option Number | Strike Price | Exercise Date | Options Exercised | Shares Sold | Sales Price | Net Gain from Sale | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 4/17/2001 | 80,000 | BD000013 | $20.7000 | None exercised | | | | | |
| 10/1/2001 | 75,000 | 00004906 | $12.9000 | None exercised | | | | | |
| Totals | 155,000 | | | | | | | | |

(1) -  Numbers of shares, strike prices and sales prices have been adjusted for all stock splits.

1141.   Dempsey knew that Brocade's financial statements were false in that they failed to reflect compensation-related expenses arising from improperly granted stock options.

1142.   Dempsey sold substantial amounts of stock while in possession of this information.

1143.   As shown in the table below, between December 1, 1999 and September 24, 2002, Dempsey sold a total of 378,868 shares of Brocade stock, receiving gross sales proceeds of $21,045,719.

SECOND AMENDED COMPLAINT

**Dempsey's Stock Sales**

| Sale Date | No. of Shares (1) | Sales Price per Share (1) | Gross Proceeds | Net Proceeds (If Known) | Option No. Exercised | Comments |
|---|---|---|---|---|---|---|
| 12/1/1999 | 27,384 | 35.4205 | $969,954 | | | Dempsey Family Ltd. Partnership |
| 12/3/1999 | 10,000 | 35.6563 | $356,563 | | | Dempsey Family Ltd. Partnership |
| 1/5/2000 | 20,000 | 37.5938 | $751,875 | | | Dempsey Family Ltd. Partnership |
| 1/5/2000 | 20,000 | 38.7500 | $775,000 | | | Dempsey Family Ltd. Partnership |
| 1/5/2000 | 20,000 | 39.7188 | $794,375 | | | Dempsey Family Ltd. Partnership |
| 1/5/2000 | 20,000 | 42.0625 | $841,250 | | | Dempsey Family Ltd. Partnership |
| 3/23/2000 | 5,000 | 87.2222 | $436,111 | | | Dempsey Family Ltd. Partnership |
| 3/24/2000 | 10,000 | 87.5000 | $875,000 | | | Dempsey Family Ltd. Partnership |
| 3/30/2000 | 5,000 | 87.1875 | $435,938 | | | Dempsey Family Ltd. Partnership |
| 3/31/2000 | 10,000 | 87.7657 | $877,657 | | | Dempsey Family Ltd. Partnership |
| 5/24/2000 | 78,000 | 48.5715 | $3,788,577 | | | Dempsey Family Revocable Trust |
| 5/24/2000 | 42,000 | 50.4380 | $2,118,396 | | | Gift by Dempsey Family Ltd. Partnership (2) |
| 6/14/2000 | 80 | 69.0700 | $5,526 | | | Gift by Dempsey Family Ltd. Partnership (2) |
| 6/14/2000 | 100 | 69.0700 | $6,907 | | | Gift by Dempsey Family Ltd. Partnership (2) |
| 6/29/2000 | 16,000 | 88.1880 | $1,411,008 | | | Dempsey Family Revocable Trust (3) |
| 8/22/2000 | 8,000 | 107.5000 | $860,000 | | | Dempsey Family Revocable Trust |
| 8/23/2000 | 8,000 | 107.6250 | $861,000 | | | Dempsey Family Revocable Trust |
| 12/7/2000 | 20,000 | 97.3800 | $1,947,600 | $1,275,000 | BD000001 | Same day exercise/sale |
| 12/11/2000 | 10,000 | 114.1000 | $1,141,000 | | | Dempsey Family Revocable Trust |
| 1/4/2001 | 8,000 | 90.2810 | $722,248 | | | Dempsey Family Ltd. Partnership |
| 12/12/2001 | 9,648 | 39.2595 | $378,776 | | | Bay Partners SBIC, L.P. |
| 12/12/2001 | 5,656 | 39.2595 | $222,052 | | | Bay Partners SBIC, L.P. |
| 3/6/2002 | 13,826 | 25.1600 | $347,862 | | | Gift by Dempsey Family Ltd. Partnership (2) |
| 9/23/2002 | 4,875 | 10.1152 | $49,312 | | | Dempsey Family Ltd. Partnership |
| 9/24/2002 | 7,299 | 9.8280 | $71,735 | | | Dempsey Family Ltd. Partnership |
| **Totals** | **378,868** | | **$21,045,719** | **$1,275,000** | | |

Notes: (1) All quantities and prices adjusted for three 2-for-1 splits effective December 3, 1999, March 15, 2000, and December 22, 2000.

(2) Gifted shares a valued at the closing price on the date of the gift.

(3) Sale price was not reported for transaction on June 29, 2000; the day's closing price is used to estimate the value of this transaction.

Source:   SEC Forms 4 and 5 filings.


# **Mark Leslie**

1144.   Leslie was a member of Brocade's Board from January 1999 through May 2002, a member of the Compensation Committee from March 1999 to August 2001, and a member of the Audit Committee from at least June 2001 to May 2002.

1145.   Leslie has an extensive background in business.  He was the CEO of Veritas Software, Inc. for ten years and had experience with stock options in that position.

1146.   Leslie also attended the Executive Management Program at Harvard Business School, where he took an accounting class.

1147.   Dempsey testified that Leslie was "very knowledgeable in the accounting realm."

1148.   Leslie also has significant corporate-governance experience, having served on the boards of directors of some 27 companies, including those of Aurum Software, Inc., Avaya, Inc., Azure Capital Partners, Cassatt Corporation, db4objects, Inc., EverGrid, iGlobe Partners, Integration Appliance, Kenamea, Keynote Systems, Inc., Metric Steam, Model N. Inc., Network Appliance, Inc., Outer Bay Technologies, Inc., PANTA Systems, Inc., PostX, Prassi Europe SAS, Scalix Corporation, SugarCRM, Veritas Software Corp., Versant, VMware, Wall Street Systems, WebEx Communications, Inc., Wellsphere, Inc., Woodside Fund and Xsigo Systems, Inc.  Network Appliance, Inc. was sued in connection with alleged stock-option backdating, and Leslie was named as a defendant in the derivative litigation (but the plaintiffs dismissed the case).

1149.   Leslie signed numerous Forms 10-K that discussed Brocade's rules for granting stock options and the accounting implications of such grants.

1150.   In addition, as a member of Brocade's Audit Committee, Leslie knew, or was grossly negligent and consciously disregarded his duties to Brocade in not knowing, how companies grant and account for stock options.

1151.   Leslie understood that an issuer had to record an accounting charge if it granted stock options below fair market value.  Concerning Brocade's cheap-stock charge in connection with its IPO, Leslie testified that "an expense charge that had to be taken on a continuing basis to reconcile the cheap stock with what was perceived at the time to be the true stock value, and that could change over time."

1152.   Leslie understood that a stock-option grant date was the date "in which the price was set and the option was actually granted."  He also understood that the price was the fair market price on the date of the grant.

1153.   Despite his knowledge of and responsibility for issues relating to Brocade's granting of stock options, Leslie knowingly or with deliberate recklessness approved numerous improper grants, utterly failed to implement any reporting or information system or controls to monitor Reyes' Committee-of-One grants, signed false financial statements, and otherwise breached and consciously disregarded his duties to the Company and its shareholders.

217

1

<u>Involvement in Faulted Grants</u>

2      1154.   As a member of Brocade's Board of Directors and Compensation Committee,

3   Leslie had a significant role in approving faulted grants of stock options.

4      1155.   Leslie signed UWCs reflecting approval of stock option grants on particular dates,

5   even though he knew he was not signing the UWCs on the dates they reflected.

6      1156.   In addition, Leslie approved grants of options to himself and to other directors

7   even though he knew that the grants had not been made on the purported grant dates.

8      1157.   Leslie was involved in all of the faulted grants that the Board of Directors

9   approved and two of the faulted grants that the Compensation Committee approved.

10      1158.   Leslie signed a UWC of the Stock Option Committee of the Board, dated April 1,

11   1999, approving a grant of incentive stock options to Michael Byrd, even though the grant was

12   not finalized until after April 1, 1999.

13      1159.   Leslie signed a Board UWC dated October 4, 1999, approving grants to Peter

14   Tarrant and Jean Zorzy, even though the UWC was not executed until after October 4, 1999.

15      1160.   Leslie is listed as an attendee at a purported November 29, 2000 Compensation

16   Committee meeting that approved grants to officers, although no meeting had been held on that

17   date.

18      1161.   Leslie signed a Board UWC dated April 17, 2001, approving grants to officers

19   even though the grant was not finalized until sometime in June 2001.

20      1162.   Leslie signed a Board UWC dated April 17, 2001, approving amendments to the

21   1999 Director Plan, which also provided for an option grant to himself, even though neither the

22   plan amendments nor the UWC were finalized until June 2001.

23      1163.   Leslie signed a Compensation Committee UWC dated October 1, 2001, approving

24   grants to officers even though the grant was not finalized until December 2001.

25      1164.   Leslie signed a Board UWC dated October 1, 2001, approving grants to Dempsey

26   and Neiman even though the UWC was not finalized until at least December 2001.

27

<u>Failure to Monitor Committee-of-One Grants</u>

28      1165.   On November 3, 2000, the Board of Directors, including Leslie, approved an

218

1   amended Compensation Committee Charter that made the Compensation Committee responsible

2   for reviewing and approving all stock compensation at Brocade, including options granted by

3   Reyes as a Committee of One.

4       1166.   Despite his responsibility to do so, Leslie utterly failed to implement any

5   reporting or information system or controls to monitor Reyes' activities in granting stock

6   options.

7       1167.   Leslie also consciously disregarded Reyes' failure to provide the Board with

8   certificates verifying the grants that Reyes was making.

9                           Signing False Financial Statements

10      1168.   Leslie signed numerous Forms 10-K that were materially inaccurate and that

11  Brocade later had to restate or correct because they had not properly accounted for and disclosed

12  the Company's compensation-related expenses.

13                          Other Evidence of Dereliction of Duty

14      1169.   As a Board member, Leslie approved some of Brocade's relevant stock-option

15  plans, including the 1999 Stock Plan and the 1999 NSO Plan, both of which state that the date of

16  a stock-option grant shall be "the date on which the Administrator makes the determination

17  granting such Option . . . or such other later date as is determined by the Administrator."  He also

18  approved amendments to the Compensation Committee Charters, which set out specific rules and

19  responsibilities for granting of stock options.

20      1170.   Among the Compensation Committee's responsibilities was the duty to review

21  proposals and recommendations related to stock compensation and to review and approve all

22  stock compensation (including options).

23      1171.   Nevertheless, Leslie testified that stock option plans were a Board issue, "not a

24  compensation committee issue."  Leslie was not even sure whether options were granted by the

25  Compensation Committee or the Board, and he acknowledged that he generally did not pay

26  attention to the date of the grants.

27                          Leslie's Receipt of Options and Sale of Brocade Stock

28      1172.   Leslie received at least the following faulted stock options:

219

**Leslie's Faulted Grants (1)**

| Grant Date | Options Granted | Option Number | Strike Price | Exercise Date | Options Exercised | Shares Sold | Sales Price | Net Gain from Sale | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 4/17/2001 | 60,000 | BD000014 | $20.7000 | None exercised | | | | | |
| **Total** | **60,000** | | | | | | | | |

(1) - Numbers of shares, strike prices and sales prices have been adjusted for all stock splits.

1173.   Leslie knew that Brocade's financial statements were false in that they failed to reflect compensation-related expenses arising from improperly granted stock options.

1174.   Leslie sold substantial amounts of stock while in possession of this information.

1175.   As shown in the table below, between August 23, 1999 and April 4, 2002, Leslie sold a total of 804,848 shares of Brocade stock, receiving gross sales proceeds of $37,793,225.

**Leslie's Stock Sales**

| Sale Date | No. of Shares (1) | Sales Price per Share (1) | Gross Proceeds | Net Proceeds (If Known) | Option No. Exercised | Comments |
|---|---|---|---|---|---|---|
| 8/23/1999 | 97,488 | $20.1563 | $1,964,993 | $1,937,574 | 00000323 (3) | Leslie Family Trust UDT 2/7/96 |
| 2/23/2000 | 70,000 | $66.8050 | $4,676,350 | $4,656,663 | | Leslie Investments LLC |
| 2/24/2000 | 36,656 | $67.0575 | $2,458,060 | $2,447,750 | | Leslie Investments LLC |
| 2/24/2000 | 93,344 | $67.2725 | $6,279,484 | $6,253,231 | | Leslie Family Trust UDT 2/7/96 |
| 8/25/2000 | 5,332 | $108.2100 | $576,976 | $575,476 | | Leslie Investments LLC |
| 8/25/2000 | 28,536 | $108.2100 | $3,087,881 | $3,079,855 | | Leslie Family Trust UDT 2/7/96 |
| 12/12/2000 | 6,000 | $114.2000 | $685,200 | $683,513 | | Leslie Investments LLC |
| 12/12/2000 | 28,000 | $114.2000 | $3,197,600 | $3,189,725 | | Leslie Family Trust UDT 2/7/96 |
| 5/18/2001 | 20,000 | $45.9100 | $918,200 | $912,575 | | Leslie Investments LLC - Estimated Value of Sale (2) |
| 5/18/2001 | 100,000 | $45.9100 | $4,591,000 | $4,562,875 | | Leslie Family Trust UDT 2/7/96 - Estimated Value of Sale (2) |
| 12/3/2001 | 35,324 | $31.0227 | $1,095,846 | $1,085,911 | | Leslie Investments LLC |
| 12/3/2001 | 144,168 | $31.0227 | $4,472,481 | $4,431,933 | | Leslie Family Trust UDT 2/7/96 |
| 4/4/2002 | 20,000 | $27.0654 | $541,308 | $535,683 | | Leslie Investments LLC |
| 4/4/2002 | 120,000 | $27.0654 | $3,247,848 | $3,214,098 | | Leslie Family Trust UDT 2/7/96 |
| **Totals** | **804,848** | | **$37,793,225** | **$37,566,862** | | |

Notes: (1) All quantities and prices adjusted for three 2-for-1 splits effective December 3, 1999, March 15, 2000, and December 22, 2000.
    (2) Sale prices were not reported for transactions on May 18, 2001. The day's closing price is used herein to estimate the value of the transactions.
    (3) Exercised an option on 974,848 shares at $0.28125/sh. (after adjustments for stock splits) on 1/29/99.

Source: SEC Forms 4 and 5 filings.

## Seth Neiman

1176.   Neiman was a member of Brocade's Board from 1995 through 2006, a member of the Compensation Committee from August 2001 through October 2004, and a member of the Audit Committee from February 1998 through October 2001.

1177.    Neiman also served as Brocade's CEO during its first year of existence.

1178.    Neiman is a partner of Crosspoint Venture Partners, a venture-capital firm where has worked since 1994.

1179.    Neiman has significant financial and corporate-governance experience, having served on the boards of directors of some 14 companies, including those of 280, Arithmos, Avanex Corp., Bluestep Inc., eSilicon, Foundry Networks, Inc., iPass, Inc., Juniper Networks, Inc., Mainsail Networks, NexPrise, Inc., Sanrise, Shoreline Communications, Inc., ShoreTel, Inc., and WinCom Systems, Inc.  Foundry and Juniper have been sued for alleged stock-options backdating.

1180.    Neiman was aware of the requirement that issuers record compensation charges for in-the-money stock options.  For example, Neiman received iQuantic's presentation and attended the June 12, 2003 Compensation Committee meeting that included discussions of APB 25's requirement that a "fixed accounting charge [be] equal to [the] 'spread' for options granted at a discount" and that "variable accounting [is] required for performance-based options or stock appreciation rights."

1181.    Furthermore, Neiman signed Brocade's 2002 Form 10-K, which included as an exhibit a copy of the 1999 NSO Plan and the relevant templates for a Stock Option Agreement and an Exercise Notice for a recipient of options under that Plan.  The Exercise Notice incorporated by reference the terms of the 1999 NSO Plan which, as discussed above, prohibits the Administrator from choosing a grant date earlier than the date the Administrator actually determines to grant options.  Neiman thus understood that Brocade's employees who received grants under this Plan were not permitted to receive backdated grants.

1182.    Neiman also signed numerous Forms 10-K that discussed Brocade's rules for granting stock options and the accounting implications of such grants.

1183.    Neiman voted to approve the Regrant Tender Offer, which was expressly designed to avoid the compensation charges that Brocade would have incurred had it simply repriced its employees' underwater options.

1184.    In addition, as a member of Brocade's Audit Committee, Neiman knew, or was

1  grossly negligent and breached his duties to Brocade in not knowing, how companies grant and

2  account for stock options. In fact, Neiman testified that he understood that the "date of the grant

3  legally would be the date at which [he] think[s] the documents are assembled and signed."

4  1185. Despite his knowledge of and responsibility for issues relating to Brocade's

5  granting of stock options, Neiman knowingly or with deliberate recklessness approved numerous

6  improper grants, utterly failed to implement any reporting or information system or controls to

7  monitor Reyes' Committee-of-One grants, signed false financial statements, and otherwise

8  breached and consciously disregarded his duties to the Company and its shareholders.

9  <u>Involvement in Faulted Grants</u>

10  1186. As a member of Brocade's Board of Directors and Compensation Committee,

11  Neiman had a significant role in backdating stock options at the Company.

12  1187. Neiman signed UWCs reflecting approval of stock option grants on particular

13  dates, even though he knew he was not signing the UWCs on the dates they reflected.

14  1188. In addition, Neiman also approved grants of options to himself and other

15  directors, even though he knew that the grants had not been made on the purported grant dates.

16  1189. Neiman was involved in all of the faulted grants that the Board of Directors

17  approved and one of the faulted grants approved by the Compensation Committee.

18  1190. Neiman signed a UWC of the Stock Option Committee of the Board, dated

19  April 1, 1999, approving a grant of incentive stock options to Michael Byrd, even though the

20  grant was not finalized until after April 1, 1999.

21  1191. Neiman signed a Board UWC dated October 4, 1999, approving grants to Peter

22  Tarrant and Jean Zorzy, even though the UWC was not executed until after that date.

23  1192. Neiman signed a Board UWC dated April 17, 2001, approving grants to officers

24  even though the grant was not finalized until sometime in June 2001.

25  1193. Neiman signed a Board UWC dated April 17, 2001, approving amendments to the

26  1999 Director Plan, which also provided for an option grant to himself, even though neither the

27  plan amendments nor the UWC were finalized until June 2001.

28  1194. Neiman signed a Compensation Committee UWC dated October 1, 2001,

222

SECOND AMENDED COMPLAINT

1   approving grants to officers even though the grant was not finalized until December 2001.

2       1195.   Neiman signed a Board UWC dated October 1, 2001, approving grants to both

3   himself and Dempsey even though the UWC was not finalized until at least December 2001.

4                    Failure to Monitor Committee-of-One Grants

5       1196.   On November 3, 2000, the Board of Directors, including Neiman, approved an

6   amended Compensation Committee Charter that made the Compensation Committee responsible

7   for reviewing and approving all stock compensation at Brocade, including options granted by

8   Reyes as a Committee-of-One.

9       1197.   Despite his responsibility to do so, Neiman utterly failed to implement any

10  reporting or information system or controls to monitor Reyes' activities in granting stock

11  options.

12      1198.   Neiman also consciously disregarded Reyes' failure to provide the Board with

13  certificates verifying the grants that Reyes was making.

14      1199.   Moreover, Neiman testified that the responsibility to provide guidance to Reyes as

15  a Committee of One belonged to the CFO, General Counsel, and other members of executive

16  management – but apparently not to the Board or the Compensation Committee.

17                      Signing False Financial Statements

18      1200.   Neiman signed numerous Forms 10-K that were materially inaccurate and that

19  Brocade later had to restate or correct because they had not properly accounted for and disclosed

20  the Company's compensation-related expenses.

21                    Other Evidence of Dereliction of Duty

22      1201.   As a Board member, Neiman approved all of Brocade's relevant stock-option

23  plans, including the 1999 Stock Plan and the 1999 NSO Plan, both of which state that the date of

24  a stock-option grant shall be "the date on which the Administrator makes the determination

25  granting such Option . . . or such other later date as is determined by the Administrator."  He also

26  approved the Compensation Committee Charters and amendments thereto, which set out specific

27  rules and responsibilities for granting of stock options.

28      1202.   Among the Compensation Committee's responsibilities was the duty to review

                                     223

proposals and recommendations related to stock compensation and to review and approve all stock compensation (including options).

1203.   Neiman nevertheless wrote in an e-mail to fellow director Christopher Paisley, that it was "silly" for the Compensation Committee to perform functions such as overseeing stock-options processes.

1204.   Neiman also claimed that he had never seen written policies or procedures of any kind related to stock options, and he testified that "it wouldn't be appropriate for me to be directly aware of that."

1205.   Neiman testified that the Compensation Committee was an "oversight committee" and that the Committee was not responsible for ensuring that options were granted in accordance with the requisite stock plans.  According to Neiman,

the company was taking actions to deal . . . [with] documentation issues.  And . . . some members of the board and of the audit committee advisors thought, mistakenly, that process control belonged in the comp. committee.  They were both mistaken at the beginning that they thought it was a prior responsibility, and then were attempting to improve the compliance regime of the business by adding them, and I thought that was just a bad idea.

<u>Neiman's Receipt of Options and Sale of Brocade Stock</u>

1206.   Neiman received at least the following faulted stock options:

**Neiman's Faulted Grants (1)**

| Grant Date | Options Granted | Option Number | Strike Price | Exercise Date | Options Exercised | Shares Sold | Sales Price | Net Gain from Sale | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 4/17/2001 | 80,000 | BD000015 | $20.7000 | None exercised | | | | | |
| 10/1/2001 | 75,000 | 00004907 | $12.9000 | None exercised | | | | | |
| Total | 155,000 | | | | | | | | |

(1) -  Numbers of shares, strike prices and sales prices have been adjusted for all stock splits.

SECOND AMENDED COMPLAINT

1207.  Neiman knew that Brocade's financial statements were false in that they failed to reflect compensation-related expenses arising from improperly granted stock options.

1208.  Neiman sold substantial amounts of stock while in possession of this information.

1209.  As shown in the table below, between September 22, 1999 and December 1, 2000, Neiman sold a total of 3,522,756 shares of Brocade stock, receiving gross sales proceeds of $197,570,276.

### Neiman's Stock Sales

| Sale Date | No. of Shares (1) | Sales Price per Share (1) | Gross Proceeds | Net Proceeds (If Known) | Option No. Exercised | Comments |
|---|---|---|---|---|---|---|
| 9/22/99 | 80,800 | $27.8838 | $2,253,007 | | | |
| 9/22/99 | 186,600 | $28.2907 | $5,279,049 | | | |
| 9/23/99 | 31,200 | $28.2916 | $882,699 | | | |
| 9/23/99 | 54,200 | $28.1409 | $1,525,237 | | | |
| 9/24/99 | 128,800 | $27.0568 | $3,484,909 | | | |
| 10/6/99 | 5,824 | $26.1484 | $152,289 | | | |
| 12/3/99 | 1,648 | $35.5000 | $58,504 | | | |
| 12/3/99 | 61,184 | $69.8125 | $4,271,408 | | | |
| 12/3/99 | 80,000 | $69.8125 | $5,585,000 | | | |
| 12/6/99 | 52,000 | $35.6250 | $1,852,500 | | | |
| 12/6/99 | 40,000 | $35.8450 | $1,433,800 | | | |
| 12/7/99 | 160,000 | $34.6175 | $5,538,800 | | | |
| 12/8/99 | 50,000 | $36.3000 | $1,815,000 | | | |
| 12/8/99 | 28,000 | $35.6250 | $997,500 | | | |
| 12/10/99 | 10,000 | $35.5000 | $355,000 | | | |
| 12/17/99 | 70,000 | $35.5375 | $2,487,625 | | | |
| 12/20/99 | 75,200 | $35.5475 | $2,673,172 | | | |
| 12/21/99 | 30,000 | $36.2325 | $1,086,975 | | | |
| 12/27/99 | 200,000 | $38.1925 | $7,638,500 | | | |
| 12/27/99 | 24,000 | $39.3130 | $943,512 | | | Gift of shares.  Value based on closing price on date of gift. |
| 12/28/99 | 200,000 | $38.8200 | $7,764,000 | | | |
| 12/29/99 | 200,000 | $40.6475 | $8,129,500 | | | |
| 1/3/00 | 200,000 | $42.4625 | $8,492,500 | | | |
| 2/22/00 | 200,000 | $66.4858 | $13,297,150 | | | |
| 2/23/00 | 200,000 | $67.0800 | $13,416,000 | | | |
| 2/28/00 | 124,600 | $70.7955 | $8,821,119 | | | |
| 3/1/00 | 181,684 | $73.9484 | $13,435,241 | | | |
| 3/2/00 | 6,000 | $78.7500 | $472,500 | | | |
| 3/3/00 | 194,000 | $78.8625 | $15,299,325 | | | |
| 3/6/00 | 160,000 | $80.6641 | $12,906,256 | | | |
| 3/7/00 | 40,000 | $84.1170 | $3,364,680 | | | |
| 3/7/00 | 40,000 | $84.5000 | $3,380,000 | | | |
| 3/7/00 | 40,000 | $85.0824 | $3,403,296 | | | |
| 3/10/00 | 20,000 | $85.0000 | $1,700,000 | | | |
| 3/10/00 | 20,000 | $86.2500 | $1,725,000 | | | |
| 3/20/00 | 42,000 | $83.7600 | $3,517,920 | | | |
| 3/22/00 | 38,000 | $84.1349 | $3,197,124 | | | |
| 6/20/00 | 27,016 | $79.5938 | $2,150,305 | | | |
| 8/21/00 | 193,000 | $105.5525 | $20,371,623 | | | |
| 8/22/00 | 7,000 | $105.5000 | $738,500 | | | |
| 12/1/00 | 20,000 | $83.6875 | $1,673,750 | $1,001,150 | BD000002 | Same day exercise/sale |
| **Totals** | **3,522,756** | | **$197,570,276** | **$1,001,150** | | |

Notes: (1) All quantities and prices adjusted for three 2-for-1 splits effective December 3, 1999, March 15, 2000, and December 22, 2000.

Source: SEC Forms 4 and 5 filings.

225

1

**Paul Bonderson, Jr.**

2      1210.   Bonderson, along with Seth Neiman and others, founded Brocade on August 28,

3  1995.

4      1211.   Bonderson served in a number of critical roles at Brocade.  He was the

5  Company's Vice President of Engineering from August 1995 to November 2001, Vice President

6  of Strategic Development from November 2001 to January 2003, Vice President of Engineering

7  from January 2003 to April 2003, and Chief Technology Officer & Chief Engineer from April

8  2003, until he formally retired in early 2005.  Bonderson was also a Section 16 officer of

9  Brocade from 1999 to 2001 and from 2003 to 2004.

10      1212.   Bonderson was so crucial to Brocade's operations that the Company specifically

11  mentioned the risk of losing him as a "risk factor" in the Management Discussion and Analysis

12  section of Brocade's first Form 10-K, filed on January 31, 2000:

13          Our success depends to a significant degree upon the continued contributions of

14          many of our key management, engineering and sales and marketing personnel,

15          many of whom would be difficult to replace.  In particular, we believe that our

16          future success is highly dependent on Gregory L. Reyes, our President and Chief

17          Executive Officer . . . and Paul R. Bonderson, Jr., our Vice President, Engineering

18          . . . .

19          Knowledge That Brocade Purported Not to Grant In-the-Money Options

20      1213.   Bonderson engaged in knowing misconduct in connection with stock-option

21  grants at Brocade or consciously disregarded his duties to the Company.

22      1214.   Bonderson knew that Brocade's stated policy was not to grant in-the-money stock

23  options.

24      1215.   His own offer letter, dated August 4, 1995, and signed by Bonderson and

25  Brocade's then-CEO, Neiman, stated that the exercise price of Bonderson's stock-option grant

26  would equal the fair market value of Brocade's stock on the date of Board approval.

27      1216.   Bonderson received a copy of Brocade's Employee Quick Reference Guide,

28  which confirmed that pricing of stock options "will be equal to the fair market value of

226

1    Brocade's common stock on the date the option is approved by the Compensation Committee."

2        1217.   As a founder and key executive at Brocade, Bonderson also was informed on

3    numerous other occasions that the Company purported to grant options at the fair market value

4    on the date of grant.

5        1218.   For example, and as discussed above, Bonderson signed Exercise Notices in

6    connection with his own exercise of stock options.  In so doing, he acknowledged that he had

7    received, read, and understood the 1999 Stock Plan and agreed to abide by its terms.  The 1999

8    Stock Plan provided that the "per Share exercise price" for certain types of Nonstatutory Stock

9    Options "shall be no less than 100% of the Fair Market Value per Share on the date of grant."

10       1219.   Bonderson was also told in the letter from Reyes about the Regrant Tender Offer

11   that "the exercise price of the new options will be the fair market value on the date of grant."

12       Knowledge of Improper Options Practices and Accounting and Disclosure Implications

13       1220.   During Reyes' criminal trial, Bonderson testified that recruiting and retaining

14   talented employees in Silicon Valley was very difficult from 1999 to 2001 and that he

15   understood that Brocade relied on stock-option grants to attract and retain those employees.

16       1221.   Bonderson was familiar with Brocade's stock-option granting practices as a result

17   of his participation in Brocade's recruiting and hiring process.  He testified at Reyes' criminal

18   trial that one of Brocade's corporate philosophies or policies was to try to get the most

19   advantageous stock-option price for its employees.

20       1222.   Bonderson also testified that he understood that the FASB rules on accounting for

21   stock options changed over time.

22       1223.   In addition, Bonderson testified that he knew of Brocade's practice of allowing

23   new employees to choose the grant date of their options by picking a low stock price within a

24   certain period of time.

25       1224.   Bonderson was copied on a June 24, 1999 e-mail from Robert Garner (the

26   Director of Hardware Engineering) to Byrd about an offer to a potential new hire.  Garner asked

27   Byrd about Byrd's "proposal of stock option contracts to allow a new hire to choose when to fix

28   option price," and Garner stated that the potential recruit believed another company's stock offer

was "better because Brocade stock is overvalued and [she] wanted to know if we had a creative pricing alternative."

1225.    Bonderson also was copied on a July 27, 1999 e-mail from Garner to Reyes, in which Garner presented an offer that Bonderson had signed for a potential new hire.  Garner informed Reyes that the candidate would have the "option to select low price within 6 mos" for the candidate's stock-option grant.

1226.    Bonderson testified at Reyes' criminal trial that this practice of allowing new hires to select their option price was no longer in place at Brocade by early 2000, because the FASB rules had changed.

1227.    Bonderson also testified that he knew about Brocade's "offer and acceptance" program and that he recalled executive staff meetings at which the program had been discussed. Bonderson further testified that the "offer and acceptance" program was an effective recruiting tool that helped build Brocade at a time when its stock price was increasing rapidly.

1228.    In addition, Bonderson testified that Byrd had explained to him sometime in 1999 that it was "okay for us to grant options based on the existing FASB rules at the time the person accepted an offer letter."  However, Bonderson went on to testify that, later in 1999, Byrd had told him that the practice "was no longer appropriate or legal."

1229.    Accordingly, Bonderson knew in 1999 that Brocade could not grant stock options to potential new hires at the time they accepted an offer.  Nevertheless, when he was copied on a January 11, 2000 e-mail in which Garner asked Byrd and Jensen whether Brocade could set a new hire's stock-option exercise price as the date the new hire first interviewed with Brocade, Bonderson did not respond and did not make any effort to prevent what he knew would be a violation of accounting principles.

1230.    Additionally, even though Bonderson had learned from Byrd in 1999 that the "offer and acceptance" program was inappropriate or illegal, Bonderson testified at Reyes' criminal trial about his awareness that the program had continued until 2000.

1231.    Bonderson participated in the Stock Add-On Program and the Regrant Tender Offer, both of which were designed to avoid the compensation charges that Brocade would have

SECOND AMENDED COMPLAINT

1    incurred had it simply repriced underwater stock options or granted "in-the-money" options.

2    Bonderson received 260,450 options under the Add-On Program, and he turned in options on

3    1,012,450 shares in January 2003 and received options on 423,555 shares on July 10, 2003 in the

4    Regrant Tender Offer.

5         1232.   Accordingly, Bonderson received the materials distributed to employees about

6    both of these programs, informing him that Brocade would have had to take compensation

7    charges if it had repriced existing stock options and that any such charges would have had a

8    negative impact on Brocade's financial results.

9         1233.   In early 2004 Bonderson was sent an e-mail about a FASB exposure draft that

10   would require all stock-options to be treated in the same fashion as other forms of compensation,

11   requiring a compensation charge.

12           <u>Recruitment of Employees Whose Stock Options Were Backdated</u>

13        1234.   Bonderson was active in Brocade's recruitment and hiring process, as he

14   interviewed potential recruits, signed offer letters, and communicated with employees who

15   received backdated or otherwise manipulated stock options.

16        1235.   For example, Bonderson signed an employment offer letter to Daniel Chung dated

17   August 6, 1999.  Chung executed, indicating his acceptance, on August 9, 1999.  Although

18   Chung did not start working for Brocade until August 16, 1999 (when Brocade's stock price was

19   $21.50), Equity Edge shows that Chung received stock options dated August 6, 1999 (when the

20   stock price was $13.69).

21        1236.   Equity Edge also lists a grant of stock options to Santokh Sohal on October 15,

22   1999, when Brocade's stock price was $27.64.  However, an e-mail from Mike Lovas to Byrd

23   and Bonderson on November 2, 1999 shows that Lovas did not expect Sohal to start working

24   until November 3, 1999, by which time Brocade's stock price had risen to $34.12.  Sohal was

25   having second thoughts about accepting Brocade's offer, so Lovas asked Bonderson to speak

26   with Sohal about Brocade's stock price compared to that of Sohal's employer at the time.

27        1237.   Equity Edge lists a new-hire option grant to John Owen on February 9, 2000,

28   when Brocade's stock price was $48.22.  However, on that date Jensen was still scheduling

1   Owen to interview with Bonderson later that night and tentatively with Reyes the next day.

2   Additionally, an e-mail that Jensen wrote on February 25, 2000 (when Brocade's stock price had

3   risen to $66.81) attached an unsigned offer letter to Owen dated February 9, 2000 – two weeks

4   earlier.  Owen's stock-option grant and his offer letter thus were backdated.

5   <u>Bonderson's Own Improper Vesting and Exercise of Options</u>

6   1238.   Bonderson's familiarity with Brocade's rules about stock options led him to

7   manipulate his own termination date so he could improperly extend his option vesting and

8   exercise periods, in violation of Brocade's policies.

9   1239.   As discussed above, Brocade's policies (*i*) did not allow stock options to vest after

10  an employee was terminated and (*ii*) did not allow options to be exercised more than three

11  months after an employee's termination date.  Any deviation from these policies would create a

12  new measurement date and could require a compensation charge.

13  1240.   Bonderson knew Brocade's policies governing the treatment of terminated

14  employees' options.  For example, in connection with stock options he was granted in a

15  February 26, 1999 grant, Bonderson signed a Stock Option Agreement that stated:

16      If Participant is Terminated for any reason, except death, Disability or for Cause,

17      the Option, to the extent (and only to the extent) that it would have been

18      exercisable by Participant on the Termination Date, may be exercised by

19      Participant no later than three (3) months after the Termination Date.

20  As discussed above, the February 26, 1999 grant to Bonderson was improper since Reyes had no

21  authority to grant options under Brocade's pre-IPO stock-option plans other than 400,000 bonus-

22  related options, which Reyes had already granted by October 9, 1998.

23  1241.   The Stock Option Agreement also stated that the options would continue to vest

24  "for so long (and only for so long) as Participant continuously provides services to the Company

25  . . . .  No Shares will become Vested Shares after the Termination Date."

26  1242.   Bonderson signed numerous other Stock Option Agreements containing this

27  language.  He was granted stock options on multiple occasions, and he had to sign a similar

28  agreement for each such grant.

1243.   Nevertheless, Bonderson arranged a fictitious "part-time" role for himself from June 2004 to March 2005 to circumvent these Company policies and enjoy a longer vesting and exercise window.

1244.   In connection with the Audit Committee's second investigation, KPMG examined Bonderson's purported "part-time" employment from June 2004 until his formal termination in March 2005 and concluded that "[t]here was no specific evidence that Bonderson fulfilled his advisory duties."  Accordingly, Bonderson was constructively terminated in June 2004, and he should not have been able to exercise options more than 90 days after that termination date.

1245.   In a January 27, 2005 e-mail exchange with Vescuso, Bonderson asked whether Vescuso had received an answer from Canova about extending the period of time to exercise his options.  Bonderson was trying to time his formal termination date to avoid any "blackout" periods that would interfere with his ability to exercise his stock options during the 90 days after his termination.  Vescuso responded to Bonderson that "Tony [Canova] and I both agree it is best to select a date at a point when you are not under a black out so that you can have a full 90 days to exercise."

1246.   When the blackout period ended, Vescuso e-mailed Bonderson on February 17, 2005, and said "I will make you[r] last day on the payroll Tuesday, March 1st.  You will have 90 [days] from that date to exercise your vested options."  Bonderson wrote back "[s]ounds good to me . . . as long as I have no more black outs."

1247.   Bonderson thus knowingly violated Brocade policies when his options continued to vest and he exercised options in March of 2005.  Bonderson earned net proceeds of $1,514,843 from his exercise of options after June 2004 and his sale of the stock obtained through that exercise.

<u>Bonderson's Receipt of Options and Sales of Brocade Stock</u>

1248.   Bonderson received at least the following faulted stock options:

---

231

SECOND AMENDED COMPLAINT

**Bonderson's Faulted Grants (1)**

| Grant Date | Options Granted | Option Number | Strike Price | Exercise Date | Options Exercised | Shares Sold | Sales Price | Net Gain from Sale | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 02/26/1999 | 268,000 | 00000372 | $0.6250 | 3/1/2005 | 268,000 | 268,000 | $6.2774 | $1,514,843 | Same day exercise/sale |
| 11/19/1999 | 532,000 | 00000514 | $32.1300 | None exercised | | | | | |
| 11/29/2000 | 220,000 | 00001592 | $76.8800 | None exercised | | | | | |
| 04/17/2001 | 85,890 | 00001716 | $20.7000 | None exercised | | | | | |
| 04/17/2001 | 174,560 | 00001717 | $20.7000 | None exercised | | | | | |
| 10/01/2001 | 5,996 | 00003425 | $12.9000 | None exercised | | | | | |
| 08/15/2003 | 200,000 | 00011000 | $5.5300 | None exercised | | | | | |
| Total | 1,486,446 | | | | 268,000 | 268,000 | | $1,514,843 | |

(1) -  Numbers of shares, strike prices and sales prices have been adjusted for all stock splits.

1249.   Bonderson knew that Brocade's financial statements were false in that they failed to reflect compensation-related expenses arising from improperly granted stock options.

1250.   Bonderson sold substantial amounts of stock while in possession of this information.

1251.   As shown in the table below, between August 23, 1999 and March 1, 2005, Bonderson sold a total of 4,838,640 shares of Brocade stock, receiving gross sales proceeds of $273,355,777.

**Bonderson's Stock Sales**

| Sale Date | No. of Shares (1) | Sales Price per Share (1) | Gross Proceeds | Net Proceeds (If Known) | Option No. Exercised | Comments (2) |
|---|---|---|---|---|---|---|
| 8/23/1999 | 160,000 | $20.5273 | $3,284,360 | | | |
| 8/24/1999 | 160,000 | $21.0841 | $3,373,462 | | | |
| 8/25/1999 | 216,000 | $22.6690 | $4,896,496 | | | |
| 8/26/1999 | 160,000 | $22.4228 | $3,587,650 | | | |
| 9/22/1999 | 62,000 | $28.2907 | $1,754,025 | | | |
| 9/23/1999 | 98,000 | $28.1409 | $2,757,809 | | | |
| 9/27/1999 | 80,000 | $26.2832 | $2,102,655 | | | |
| 9/28/1999 | 80,000 | $26.6432 | $2,131,458 | | | |
| 9/30/1999 | 80,000 | $26.4643 | $2,117,145 | | | |
| 12/8/1999 | 156,000 | $36.1243 | $5,635,383 | | | |
| 12/10/1999 | 84,000 | $35.0000 | $2,940,000 | | | |
| 12/10/1999 | 40,000 | $35.2500 | $1,410,000 | | | |
| 12/10/1999 | 40,000 | $35.3438 | $1,413,750 | | | |
| 12/17/1999 | 240,000 | $35.0830 | $8,419,920 | | | |
| 2/22/2000 | 2,000 | $69.0781 | $138,156 | | | Son |
| 2/22/2000 | 2,000 | $66.1406 | $132,281 | | | Daughter |
| 2/22/2000 | 200,000 | $66.5143 | $13,302,860 | | | |
| 2/23/2000 | 40,000 | $66.9742 | $2,678,966 | | | |
| 2/24/2000 | 86,000 | $67.0914 | $5,769,856 | | | |
| 2/24/2000 | 160,000 | $66.7637 | $10,682,184 | | | |
| 2/25/2000 | 74,000 | $67.2891 | $4,979,393 | | | |
| 3/7/2000 | 74,000 | $84.0085 | $6,216,625 | | | |
| 3/9/2000 | 126,000 | $81.3325 | $10,247,892 | | | |
| 4/4/2000 | 320 | $67.5000 | $21,600 | | | Son |
| 4/4/2000 | 320 | $67.5000 | $21,600 | | | Daughter |
| 5/30/2000 | 100,000 | $55.0135 | $5,501,345 | | | |
| 6/1/2000 | 80,000 | $60.2370 | $4,818,960 | | | |
| 6/2/2000 | 20,000 | $63.2500 | $1,265,000 | | | |
| 6/2/2000 | 100,000 | $66.5917 | $6,659,165 | | | |
| 6/15/2000 | 157,000 | $70.8929 | $11,130,185 | | | |
| 6/16/2000 | 15,000 | $72.5000 | $1,087,500 | | | |
| 6/16/2000 | 43,000 | $71.8125 | $3,087,938 | | | |
| 6/19/2000 | 85,000 | $72.5000 | $6,162,500 | | | |
| 8/18/2000 | 50,000 | $104.5000 | $5,225,000 | | | |
| 8/21/2000 | 20,000 | $106.1157 | $2,122,313 | | | |
| 8/22/2000 | 80,000 | $106.7625 | $8,541,000 | | | |
| 8/23/2000 | 30,000 | $107.0000 | $3,210,000 | | | |
| 8/24/2000 | 20,000 | $111.7500 | $2,235,000 | | | |
| 8/24/2000 | 100,000 | $110.0600 | $11,006,000 | | | |
| 8/30/2000 | 120,000 | $109.0798 | $13,089,576 | | | |
| 8/31/2000 | 40,000 | $113.7031 | $4,548,124 | | | |
| 9/1/2000 | 20,000 | $114.5000 | $2,290,000 | | | |
| 9/14/2000 | 30,000 | $109.7500 | $3,292,500 | | | |
| 9/20/2000 | 30,000 | $110.1875 | $3,305,625 | | | |
| 9/20/2000 | 30,000 | $111.6875 | $3,350,625 | | | |
| 9/20/2000 | 30,000 | $115.0938 | $3,452,813 | | | |
| 12/1/2000 | 40,000 | $86.7812 | $3,471,248 | | | |
| 12/4/2000 | 80,000 | $85.1895 | $6,815,160 | | | |
| 12/5/2000 | 100,000 | $95.2465 | $9,524,650 | | | |
| 12/5/2000 | 80,000 | $85.9610 | $6,876,880 | | | |
| 12/8/2000 | 100,000 | $108.7900 | $10,879,000 | | | |
| 1/4/2001 | 25,000 | $89.3750 | $2,234,375 | | | |
| 1/5/2001 | 75,000 | $79.6492 | $5,973,690 | | | |
| 5/17/2001 | 25,000 | $47.4922 | $1,187,305 | | | |
| 5/18/2001 | 25,000 | $46.5582 | $1,163,955 | | | |
| 5/21/2001 | 220,000 | $49.9551 | $10,990,122 | | | |
| 5/21/2001 | 18,000 | $49.9551 | $899,192 | | | PRB Family Trust Partnership, L.P. |
| 5/21/2001 | 12,000 | $49.9551 | $599,461 | | | Bonderson Family Foundation |
| 12/5/2001 | 50,000 | $36.0800 | $1,804,000 | | | |
| 12/7/2001 | 50,000 | $38.1520 | $1,907,600 | | | |
| 12/11/2001 | 50,000 | $39.0020 | $1,950,100 | | | |
| 3/1/2005 | 268,000 | $6.2774 | $1,682,343 | $1,514,843 | 00001716 | Same day exercise/sale (3) |
| **Totals** | **4,838,640** | | **$273,355,777** | **$1,514,843** | | |

Notes: (1) All quantities and prices adjusted for three 2-for-1 splits effective December 3, 1999, March 15, 2000, and December 22, 2000.

(2) All sales by the Bonderson Family Trust unless noted otherwise.
(3) Reported in Equity Edge database; not a Sec. 16 reporting person at the time.

Source: SEC Forms 4 and 5 filings.

233

SECOND AMENDED COMPLAINT

**Robert Bossi**

1252.   Bossi had significant accounting background.  He was the Company's Controller from May 1999 to June 2003.  He also had worked at Coopers & Lybrand from 1983 to 1990 as an Audit Manager, and then at two technology companies between 1991 and 1999, including Tandem Computers, Inc., where, as the Financial Reporting Manager, he was responsible "for all external financial reporting including earnings releases, annual reports, and Forms 10K and 10Q."

1253.   As Controller at Brocade, Bossi was responsible for maintaining the Company's general ledgers and associated functions, and he reported directly to the CFO (during this period, either Byrd or Canova).  He also was responsible for public reporting at Brocade, including the preparation and filing of the Company's financial statements with the SEC and the annual report to shareholders.

1254.   Bossi was also responsible for the tax department and the treasury department, as well as "stock administration," which included stock options.

1255.   With respect to stock administration, Bossi was responsible for maintaining an accurate record of stock option grants, and of shares issued upon stock option exercises and related equity grants, after he was informed of issued grants by the Human Resources Department.

1256.   Bossi was also responsible for compiling and ensuring the accurate preparation of the Company's financial statements (including footnotes) and public filings such as the Company's annual Forms 10-K and quarterly Forms 10-Q.  Although Bossi did not actually sign the forms filed with the SEC, assisting in the preparation of those documents and ensuring their accuracy was an important job function of the Controller position.

1257.   A memorandum dated November 2002 prepared for the Company by Ed de Haan of KPMG includes the following bullet point: "8C. Review and Authorization of Stock Options Exercises: Bob Bossi, Controller, approves Exercise Notices after reviewing the form and supporting documentation."

1258.   In addition, during the First Investigation, Jensen told Morrison & Foerster LLP that Bossi was responsible for interacting with outside counsel on issues concerning the legality of options grants.

1259.   As Controller, Bossi also was required to be informed of the current accounting requirements relating to Brocade's options program, including the requirement that in-the-money grants be accounted for with corresponding compensation charges.  The available evidence (including Bossi's extensive accounting background) demonstrates that Bossi knew about the compensation charges associated with in-the-money grants (or was grossly negligent and consciously disregarded his duties to Brocade if he did not know).

1260.   Bossi's own employment letter, dated May 17, 1999 and signed by Bossi, informed Bossi that the exercise price of his options would be the fair market value on the date of Board approval and that vesting was contingent on his continued employment.

1261.   In addition, as discussed above, Bossi collected materials monitoring stock-option expensing developments and sent them to Weaver.  Bossi also received the iQuantic paper explaining the accounting rules for expensing stock options.  He also appears to have attended an iQuantic presentation of these materials.

1262.   Furthermore, Bossi participated in and helped to design the Stock Add-On Program, which was intended to avoid the compensation charges that Brocade would have incurred had it simply repriced underwater stock options or granted "in-the-money" options.  Bossi was granted 7,020 options on April 17, 2001 at $20.70 under the Stock Add-On Program.

1263.   Accordingly, Bossi received the materials distributed to employees about this program, informing him that Brocade would have had to take compensation charges if it had repriced existing stock options and that any such charges would have had a negative impact on Brocade's financial results.

1264.   As previously noted, during their respective tenures as Brocade's CFO, both Byrd and Canova signed and had a role in reviewing, preparing and transmitting materially false management representation letters to the Company's auditors.  Although Bossi did not sign such letters, he had responsibility for, and a role in, ensuring the accuracy of the underlying financial

1   documents supporting the statements contained in those letters, and, given his other

2   responsibilities, he likely participated in their actual preparation and transmission to the

3   independent auditors.

4                           Bossi's Role in the Stock-Option Process

5          1265.   Bossi handled or supervised the procedural tasks relating to option-grant issues

6   and he was often informed of new grants directly by the CFO.  For example, in a July 21, 1999

7   e-mail to Byrd, Jacqueline Yu states "I would like to have my . . . shares of stock at the option

8   price of yesterday's closing price."  On July 21, 1999, Byrd twice forwarded Yu's e-mail to

9   Bossi.  In one of the forwarded e-mails, Byrd instructed Bossi to: "Please make sure that Lauretta

10  [another Brocade employee] processes this.  I would like us to get option paperwork to the

11  recruits timely."  In the other forwarded e-mail, Byrd stated:

12         "This candidate decided to split her grant to be 1/2 now and half later."

13         1266.   Bossi participated in the abuse of the part-time program.  Blucher testified in his

14  deposition that Bossi had explained to him "that there was a part-time basis that they would use

15  where I would kind of be on call and that would allow them to basically issue me the stock as of

16  the time that I signed that intention to join on a part-time basis."  Blucher later stated that the

17  "they" meant Bossi.  Blucher testified that he thought he had this part-time status for "about a

18  week" and that, other than being on call and committed to Brocade, he did not recall Bossi's

19  asking him to do anything else during this part-time period.

20         1267.   Bossi also played a key role in implementing the Company's improper accounting

21  policies while he was Controller.  For example, on April 22, 2003, in response to a question

22  about candidate Don Jaworski from June Weaver, Bossi responded:

23         Re grants – there is no rule for granting or pricing the options.  Options would be

24         granted on the date the comp committee or board approves the options and price

25         is the fmv on that date – the actual granting of options does not have to take place

26         within any specific timeline. . . .  New hire grants can happen whenever you want.

27         Just bear in mind that after this week you can't go back and use a date pre 4/25.

28

1268.   As described more fully above, Bossi also knew of the improper backdating at Brocade on account of the faulted grant that Bossi himself received, backdated to a date before he started work with the Company.

1269.   As discussed above, Bossi was involved in faulted Committee-of-One grants purportedly made by Reyes on at least the following dates:  May 19, 1999, July 20, 1999, August 4, 1999, April 17, 2001, July 23, 2001, October 1, 2001, October 30, 2001, November 28, 2001, January 22, 2002, and February 28, 2002.  Additionally, Bossi was involved in the faulted Board grants purportedly made on April 17, 2001.

1270.   Bossi himself even conceded his knowledge of the "forgery" of options paperwork in his October 31, 2002 e-mail to Canova, as described above.  In this e-mail, Bossi acknowledged his own culpability in the accounting and falsified paperwork improprieties at Brocade and his knowledge of Byrd's improper conduct.  The e-mail also shows Bossi's awareness of Canova's improper conduct or reckless disregard of clear warning signals about problems with grant documentation under the options program.

1271.   Bossi also understood the accounting implications of allowing stock options to vest beyond the date of an employee's termination.  As he explained to Jensen in an e-mail dated December 18, 2001, "the following arrangements . . . should be avoided, as they create accounting compensation charge issues:

> Terminations - acceleration of vesting or allowing any stock vesting beyond the date of 'actual' termination, which is the last day the employee works for and provides services to Brocade.

> This is not necessarily the same date through which the employee remains on the payroll system, or is entitled to benefits."

1272.   Bossi also signed numerous Notices of Grant of Stock Options and Stock Option Agreements that, as described above, detailed the policies relating to vesting and exercising of stock options for departing employees.  Not only did he sign these documents when he received his own options, but he also signed on behalf of Brocade when other employees received grants.

1  These documents explained that options could be exercised for only three months after an

2  employee's termination and that vesting would cease immediately.

3      1273.   Despite his awareness of the accounting implications, Bossi knew the terms of de

4  Simone's improper termination agreement and did not object.  On March 8, 2002 Jensen sent an

5  e-mail to Bossi and others regarding de Simone's Severance Agreement.  She wrote that, in

6  exchange for signing the severance agreement, de Simone would receive a three-month transition

7  role and an additional four-month advisory role following the transition role.  In a follow-up e-

8  mail also received by Bossi, Jensen wrote that the offer to de Simone had been "[c]hanged . . . to

9  3 month transition role and 6 mo advisory role – at 50% pay (so full 3 mo severance) and full

10  vesting for this 6 months."  KPMG concluded that there was "limited evidence" that de Simone

11  had acted in an advisory capacity and that he therefore had actually been terminated before the

12  transition role.

13      1274.   In addition, on at least one occasion, Bossi was made aware of improper vesting

14  of stock options for employees taking leaves of absence.  On April 11, 2002, Blucher wrote to

15  Bossi that Jean Zorzy began her LOA on December 21, 2001 and that her vesting would stop on

16  June 30, 2002.  Vesting should have ceased on March 21, 2002, instead.

17      1275.   As Controller, Bossi had a critical role in compiling the information included in

18  the Forms 10-K and 10-Q, including preparing and reviewing these documents before filing.

19      1276.   Additional evidence shows Bossi's extensive role in the SEC filing process.  For

20  example, an undated document titled "Process Summary: SEC Reporting" lists Canova as the

21  "Executive Owner" and Bossi as the "Process Leader" and describes the SEC reporting process

22  as follows:

23          This process occurs quarterly resulting in the preparation and filing of condensed

24          and/or full GAAP financial statements pursuant to SEC rules and regulations.

25          Process includes preparation of financial statements, related footnotes, MD&A,

26          risk factors, and other required disclosures.  Process also includes the filing of

27          other SEC required documents as necessary such as S-8's and proxies.

28

SECOND AMENDED COMPLAINT

1277.   The document also contains bullet points for "[w]hat is working: Reporting and filing requirements are being met timely," and "[w]hat is not working. . . .  Focus by senior management [and] [t]imeliness of external Legal inputs."

1278.   Notwithstanding his knowledge of the requirements of options expensing and his knowledge of the improper options practices at Brocade, Bossi acted knowingly or with deliberate recklessness in causing or permitting public filings to be made by the Company without disclosing compensation charges for the improperly granted options.

1279.   Bossi also acted with gross negligence and conscious disregard of his duties in preparing or assisting in the preparation of materially false and misleading financial statements or in failing to ensure their accuracy.

<u>Bossi's Receipt of Options and Sale of Brocade Stock</u>

1280.   Bossi received at least the following faulted stock options:

SECOND AMENDED COMPLAINT

**Bossi's Faulted Grants (1)**

| Grant Date | Options Granted | Option Number | Strike Price | Exercise Date | Options Exercised | Shares Sold | Sales Price | Net Gain from Sale | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 05/19/1999 | 317,504 | 00000427 | $1.0000 | 5/19/2000 | 42,000 | 42,000 | $56.0100 | $2,310,420 | Same day exercise/sale |
| | | | | 5/22/2000 | 8,000 | 8,000 | $54.1600 | $425,280 | Same day exercise/sale |
| | | | | 5/22/2000 | 10,000 | 10,000 | $52.5300 | $515,300 | Same day exercise/sale |
| | | | | 5/22/2000 | 3,160 | 3,160 | $48.2700 | $149,373 | Same day exercise/sale |
| | | | | 6/19/2000 | 5,262 | 5,262 | $72.8300 | $377,969 | Same day exercise/sale |
| | | | | 8/18/2000 | 5,262 | 5,262 | $103.4700 | $539,197 | Same day exercise/sale |
| | | | | 8/22/2000 | 5,264 | 5,264 | $105.9100 | $552,246 | Same day exercise/sale |
| | | | | 9/20/2000 | 5,262 | 5,262 | $112.3500 | $585,924 | Same day exercise/sale |
| | | | | 12/5/2000 | 6,000 | 6,000 | $94.8400 | $563,040 | Same day exercise/sale |
| | | | | 12/6/2000 | 4,526 | 4,526 | $97.9700 | $438,886 | Same day exercise/sale |
| | | | | 1/3/2001 | 5,264 | 5,264 | $87.8750 | $457,310 | Same day exercise/sale |
| | | | | 3/6/2001 | 15,000 | 15,000 | $40.0000 | $585,000 | Same day exercise/sale |
| | | | | 3/19/2001 | 7,500 | 7,500 | $30.4200 | $220,650 | Same day exercise/sale |
| | | | | 5/18/2001 | 7,500 | 7,500 | $46.7500 | $343,125 | Same day exercise/sale |
| | | | | 5/21/2001 | 7,500 | 7,500 | $49.4320 | $363,240 | Same day exercise/sale |
| | | | | 7/23/2001 | 15,000 | | | | (2) |
| | | | | 8/20/2001 | 7,500 | | | | (2) |
| | | | | 10/4/2001 | 7,500 | 7,500 | $21.0500 | $150,375 | Same day exercise/sale |
| | | | | 11/30/2001 | 7,500 | 7,500 | $32.8300 | $238,725 | Same day exercise/sale |
| | | | | 12/4/2001 | 7,500 | 7,500 | $32.1075 | $233,306 | Same day exercise/sale |
| | | | | 3/8/2002 | 10,000 | 10,000 | $29.6000 | $286,000 | Same day exercise/sale |
| | | | | 3/15/2002 | 12,500 | 12,500 | $26.3000 | $316,250 | Same day exercise/sale |
| | | | | 4/1/2002 | 7,500 | 7,500 | $28.0600 | $202,950 | Same day exercise/sale |
| | | | | 7/2/2002 | 22,500 | | | | (2) |
| | | | | 1/30/2004 | 82,504 | | | | (2) |
| Sub-totals | 317,504 | | | | 317,504 | 190,000 | | $9,854,567 | |
| | | | | | | | | | |
| 05/19/1999 | 42,496 | 00000428 | $1.0000 | 5/22/2000 | 16,840 | 16,840 | $48.2700 | $796,027 | Same day exercise/sale |
| | | | | 5/22/2000 | 10,000 | 10,000 | $47.5000 | $465,000 | Same day exercise/sale |
| | | | | 6/19/2000 | 2,236 | 2,236 | $72.8300 | $160,612 | Same day exercise/sale |
| | | | | 8/18/2000 | 2,236 | 2,236 | $103.4700 | $229,123 | Same day exercise/sale |
| | | | | 8/22/2000 | 2,000 | 2,000 | $105.9100 | $209,820 | Same day exercise/sale |
| | | | | 8/22/2000 | 236 | 236 | $105.9100 | $24,759 | Same day exercise/sale |
| | | | | 9/20/2000 | 2,238 | 2,238 | $112.3500 | $249,201 | Same day exercise/sale |
| | | | | 12/6/2000 | 1,474 | 1,474 | $97.9700 | $142,934 | Same day exercise/sale |
| | | | | 12/8/2000 | 2,998 | 2,998 | $110.4200 | $328,041 | Same day exercise/sale |
| | | | | 1/3/2001 | 2,238 | 2,238 | $87.8750 | $194,426 | Same day exercise/sale |
| Sub-totals | 42,496 | | | | 42,496 | 42,496 | | $2,799,943 | |
| | | | | | | | | | |
| 04/24/2000 | 20,000 | 00000849 | $45.5300 | None exercised | | | | | |
| 04/17/2001 | 7,020 | 00001719 | $20.7000 | None exercised | | | | | |
| 07/23/2001 | 5,500 | 00003159 | $28.1100 | None exercised | | | | | |
| 10/01/2001 | 1,478 | 00003427 | $12.9000 | 10/4/2001 | 1,478 | 1,478 | $21.0500 | $12,046 | Same day exercise/sale |
| 10/01/2001 | 15,500 | 00004624 | $12.9000 | None exercised | | | | | |
| 07/02/2002 | 6,000 | 00005716 | $14.2600 | None exercised | | | | | |
| Totals | 415,498 | | | | 361,478 | 233,974 | | $12,666,556 | |

(1) - Numbers of shares, strike prices and sales prices have been adjusted for all stock splits.

(2) - Options were exercised by paying cash. No current information regarding sales of these shares.

SECOND AMENDED COMPLAINT

1      1281.   Bossi knew that Brocade's financial statements were false in that they failed to

2  reflect compensation-related expenses arising from improperly granted stock options.

3      1282.   Bossi sold substantial amounts of stock while in possession of this information.

4      1283.   As shown in the table below, between May 19, 2000 and April 1, 2002, Bossi sold

5  a total of 233,974 shares of Brocade stock, receiving gross sales proceeds of $12,918,118.

**Bossi's Stock Sales (2)**

| Sale Date | No. of Shares (1) | Sales Price per Share (1) | Gross Proceeds | Net Proceeds (If Known) | Option No. Exercised | Comments |
|---|---|---|---|---|---|---|
| 5/19/2000 | 42,000 | $56.0100 | $2,352,420 | $2,310,420 | 00000427 | Same day exercise/sale |
| 5/22/2000 | 8,000 | $54.1600 | $433,280 | $425,280 | 00000427 | Same day exercise/sale |
| 5/22/2000 | 10,000 | $52.5300 | $525,300 | $515,300 | 00000427 | Same day exercise/sale |
| 5/22/2000 | 3,160 | $48.2700 | $152,533 | $149,373 | 00000427 | Same day exercise/sale |
| 5/22/2000 | 16,840 | $48.2700 | $812,867 | $796,027 | 00000428 | Same day exercise/sale |
| 5/22/2000 | 10,000 | $47.5000 | $475,000 | $465,000 | 00000428 | Same day exercise/sale |
| 6/19/2000 | 5,262 | $72.8300 | $383,231 | $377,969 | 00000427 | Same day exercise/sale |
| 6/19/2000 | 2,236 | $72.8300 | $162,848 | $160,612 | 00000428 | Same day exercise/sale |
| 8/18/2000 | 5,262 | $103.4700 | $544,459 | $539,197 | 00000427 | Same day exercise/sale |
| 8/18/2000 | 2,236 | $103.4700 | $231,359 | $229,123 | 00000428 | Same day exercise/sale |
| 8/22/2000 | 5,264 | $105.9100 | $557,510 | $552,246 | 00000427 | Same day exercise/sale |
| 8/22/2000 | 2,000 | $105.9100 | $211,820 | $209,820 | 00000428 | Same day exercise/sale |
| 8/22/2000 | 236 | $105.9100 | $24,995 | $24,759 | 00000428 | Same day exercise/sale |
| 9/20/2000 | 5,262 | $112.3500 | $591,186 | $585,924 | 00000427 | Same day exercise/sale |
| 9/20/2000 | 2,238 | $112.3500 | $251,439 | $249,201 | 00000428 | Same day exercise/sale |
| 12/5/2000 | 6,000 | $94.8400 | $569,040 | $563,040 | 00000427 | Same day exercise/sale |
| 12/6/2000 | 4,526 | $97.9700 | $443,412 | $438,886 | 00000427 | Same day exercise/sale |
| 12/6/2000 | 1,474 | $97.9700 | $144,408 | $142,934 | 00000428 | Same day exercise/sale |
| 12/8/2000 | 2,998 | $110.4200 | $331,039 | $328,041 | 00000428 | Same day exercise/sale |
| 1/3/2001 | 5,264 | $87.8750 | $462,574 | $457,310 | 00000427 | Same day exercise/sale |
| 1/3/2001 | 2,238 | $87.8750 | $196,664 | $194,426 | 00000428 | Same day exercise/sale |
| 3/6/2001 | 15,000 | $40.0000 | $600,000 | $585,000 | 00000427 | Same day exercise/sale |
| 3/19/2001 | 7,500 | $30.4200 | $228,150 | $220,650 | 00000427 | Same day exercise/sale |
| 5/18/2001 | 7,500 | $46.7500 | $350,625 | $343,125 | 00000427 | Same day exercise/sale |
| 5/21/2001 | 7,500 | $49.4320 | $370,740 | $363,240 | 00000427 | Same day exercise/sale |
| 10/4/2001 | 7,500 | $21.0500 | $157,875 | $150,375 | 00000427 | Same day exercise/sale |
| 10/4/2001 | 1,478 | $21.0500 | $31,112 | $12,046 | 00003427 | Same day exercise/sale |
| 11/30/2001 | 7,500 | $32.8300 | $246,225 | $238,725 | 00000427 | Same day exercise/sale |
| 12/4/2001 | 7,500 | $32.1075 | $240,806 | $233,306 | 00000427 | Same day exercise/sale |
| 3/8/2002 | 10,000 | $29.6000 | $296,000 | $286,000 | 00000427 | Same day exercise/sale |
| 3/15/2002 | 12,500 | $26.3000 | $328,750 | $316,250 | 00000427 | Same day exercise/sale |
| 4/1/2002 | 7,500 | $28.0600 | $210,450 | $202,950 | 00000427 | Same day exercise/sale |
| **Totals** | **233,974** | | **$12,918,118** | **$12,666,556** | | |

(1) -  Numbers of shares and share prices are adjusted for all stock splits.
(2) -  Source of data is Equity Edge database maintained by the Company.

1

## **Jack Cuthbert**

2      1284.   Cuthbert served as a Vice President and held various sales positions at Brocade

3   between 1998 and 2004.  He also was a Section 16 officer from 2000 to 2003.

4          Knowledge of Brocade's Option-Granting Practices and Accounting Implications

5      1285.   Cuthbert knew since mid-1998 that Brocade purported not to grant in-the-money

6   options, as his own offer letter (dated June 10, 1998) stated that "[t]he exercise price of the

7   option will be equal to the fair market value of Brocade's Common Stock on the date of Board

8   approval."

9      1286.   Cuthbert received a copy of Brocade's Employee Quick Reference Guide, which

10   confirmed that pricing of stock options "will be equal to the fair market value of Brocade's

11   common stock on the date the option is approved by the Compensation Committee."

12      1287.   Cuthbert also was informed on other numerous occasions that Brocade purported

13   to grant options at the fair market value on the date of grant.  For example, and as discussed

14   above, when Cuthbert signed Exercise Notices in connection with his own exercise of stock

15   options, he acknowledged that he had received, read, and understood the 1999 Stock Plan and

16   agreed to abide by its terms.  The 1999 Stock Plan provided that the "per Share exercise price"

17   for Nonstatutory Stock Options "shall be no less than 100% of the Fair Market Value per Share

18   on the date of grant."

19      1288.   Cuthbert participated in the Stock Add-On Program and the Regrant Tender

20   Offer, both of which were designed to avoid the compensation charges that Brocade would have

21   incurred had it simply repriced underwater stock options or granted "in-the-money" options.

22   Cuthbert received options on 541,760 shares under the Add-On Program, and he turned in

23   options on 1,818,223 shares in January 2003 and received options on 867,593 shares on July 10,

24   2003 in the Regrant Tender Offer.

25      1289.   Accordingly, Cuthbert received the materials distributed to employees about both

26   of those programs, informing him that Brocade would have had to take compensation charges if

27   it had repriced existing stock options and that any such charges would have had a negative

28   impact on Brocade's financial results.

SECOND AMENDED COMPLAINT

1290.   Cuthbert was also told in the letter from Reyes regarding the Regrant Tender Offer that "the exercise price of the new options will be the fair market value on the date of grant."

1291.   Additionally, Cuthbert was forwarded an e-mail on April 1, 2004 regarding an FASB exposure draft that would require all forms of stock option grants to be treated in the same fashion as other forms of compensation and therefore require a compensation charge.

<div align="center">Extensive Involvement in Recruiting</div>

1292.   Cuthbert was actively involved in recruiting and hiring new employees, including employees who received backdated stock option grants.

1293.   For example, Cuthbert signed an apparently backdated offer letter to Greig Patton, dated December 15, 1999, offering Patton backdated stock options.  The offer letter listed Patton's part-time start date as December 15, 1999 and his full-time start date as March 6, 2000. However, Patton's employment application was not even completed until February 18, 2000, more than two months after the date of the supposed offer letter.

1294.   Moreover, Patton did not sign the December 15, 1999 offer letter until March 6, 2000, when the closing price of Brocade stock was $80.38.  Nevertheless, Equity Edge reflects a grant date to Patton on December 15, 1999, when the price of Brocade's stock was only $30.72.

1295.   Cuthbert was also involved in recruiting Tim Duffy.  Duffy testified at his SEC deposition that Cuthbert was his primary contact at Brocade during the recruiting process and that Cuthbert interviewed him in August 2001.

1296.   Cuthbert signed an offer letter to Duffy dated September 21, 2001.  One version of the offer letter that Cuthbert signed showed Duffy's part-time start date as October 1, 2001, and his full-time start date as October 8, 2001.  Equity Edge records and the Committee-of-One minutes dated October 1, 2001 show that Duffy received grants of stock options on his supposed part-time start date of October 1, when the price of Brocade's stock was $12.90, rather than on his full-time start date of October 8, when the price was $21.58.

1297.   Duffy testified that, after he had started working at Brocade, Cuthbert told him in person that Duffy's option-grant date would be October 1, 2001.  As discussed above, Duffy also

1   testified that, when he asked Cuthbert for an explanation, Cuthbert told him that the grant date

2   was a "gift" from Reyes.  Duffy testified that he was surprised by the grant date.  Cuthbert

3   therefore knew that backdating was occurring.

4       1298.   Furthermore, Cuthbert was listed as the reporting Vice President for the stock-

5   option grant to Thomas de Lorenzo in the October 1, 2001 Committee-of-One minutes approving

6   a backdated grant to de Lorenzo.

7       1299.   De Lorenzo had received an offer letter on August 31, 2001 showing a part-time

8   start date of October 1, 2001 and a full-time start date of October 8, 2001.  However,

9   de Lorenzo's employment application, his signed non-disclosure agreement, his signed

10  acknowledgment of receipt of Brocade's policies on insider trading, and his acknowledgment of

11  receipt of the Employee Handbook are all dated October 8, 2001.

12      1300.   Nonetheless, Equity Edge records show that de Lorenzo was granted stock

13  options on October 1, when Brocade's stock price was $12.90, rather than on October 8, when

14  the stock price was $21.58.  A March 29, 2002 e-mail from Morris to payroll confirms that de

15  Lorenzo's start date was changed.

16      1301.   Reyes told the Audit Committee during the First Investigation that Cuthbert had

17  been involved in recruiting Cudgma, and Cudgma himself testified at his SEC deposition that he

18  met with and was interviewed by Cuthbert on January 31, 2002.

19      1302.   As explained above, Cudgma received an initial, improperly backdated stock-

20  option grant on his purported part-time start date of November 28, 2001, when Brocade's stock

21  price was lower than it was on his actual, full-time start date.  On February 1, 2002 – more than

22  two months after Cudgma supposedly had been hired – Cuthbert received an e-mail from Reyes

23  proving that Cudgma had not yet been hired.  Reyes wrote to Cuthbert:  "I love Dan – we would

24  be crazy not to hire him.  We must try to get in under the Q1 option $2x.xx option price bar.

25  Please work with hire to make it happen."  Cuthbert knew or consciously disregarded the fact

26  that Reyes was manipulating Cudgma's stock-option grant.

27      1303.   Cuthbert also interviewed Richard Geruson, for whom, as Bossi noted, Brocade

28  had "jump[ed] through hopes [*sic*] and ben[t] over backwards . . . [,] including forging option

1    paperwork and offer letters so he could get better priced options." Cuthbert appeared on

2    Geruson's interview schedule for January 11, 2002, several months after Geruson's purported

3    start date of October 30, 2001.

4        1304. As discussed in greater detail above, Cuthbert was also involved in faulted new-

5    hire grants made to Nick Urick and Jim Rothstein on August 4, 1999 and October 18, 1999,

6    respectively.

7        1305. Additionally, Cuthbert was familiar with the part-time program as a result of his

8    participation in Brocade's recruiting process, and he knew about efforts to manipulate new hires'

9    stock options. For example, Cuthbert received an e-mail from Jensen on January 31, 2002,

10    explaining that Brocade had implemented new measures to keep new hires' identities

11    confidential "so that we can get them into the system given p/t start and stock pricing."

12                  <u>Involvement in Faulted Grants to Current Employees</u>

13        1306. Cuthbert also participated in granting stock options to current Brocade employees,

14    including those who received improper grants.

15        1307. For example, Cuthbert asked Jensen on February 12, 2000 to accelerate the

16    vesting of stock options granted to Nick Urick, who reported to Cuthbert. Those options had

17    been granted on December 13, 1999, with an exercise price of $32.81. By February 14, 2000,

18    when Jensen changed Urick's vesting schedule, the closing price of Brocade shares had reached

19    $55.50. The change in the vesting schedule therefore created a compensation expense for

20    Brocade.

21        1308. Cuthbert also presented James LaLonde – another employee who reported to him

22    – with stock options backdated to October 1, 2001. Reyes informed LaLonde on October 28,

23    2001 that LaLonde would be receiving stock options "at the $12.90 strike price" of October 1,

24    2001. Equity Edge records and an executive stock-option grant list attached to an October 1,

25    2001 UWC confirms that LaLonde was purportedly granted stock options on October 1, even

26    though Reyes did not inform LaLonde of the grant until October 28. Reyes asked LaLonde to

27    "[a]ct surprised" when Cuthbert presented the options to him. As discussed above, the evidence

28    shows that the executive grant purportedly dated October 1, 2001 was not in fact made until well

<div align="center">245</div>

after October 1, 2001.

### Cuthbert's Receipt of Options and Sale of Brocade Stock

1309.  Cuthbert received at least the following faulted stock options:

**Cuthbert's Faulted Grants (1)**

| Grant Date | Options Granted | Option Number | Strike Price | Exercise Date | Options Exercised | Shares Sold | Sales Price | Net Gain from Sale | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 08/18/1999 | 480,000 | 00000470 | $20.2344 | 8/18/2000 | 96,000 | 96,000 | $104.0200 | $8,043,418 | Same day exercise/sale |
| | | 00000470 | $20.2344 | 9/18/2000 | 8,000 | 8,000 | $108.7200 | $707,885 | Same day exercise/sale |
| | | 00000470 | $20.2344 | 12/6/2000 | 16,000 | 16,000 | $96.7800 | $1,224,730 | Same day exercise/sale |
| | | 00000470 | $20.2344 | 12/18/2000 | 8,000 | 8,000 | $98.3800 | $625,165 | Same day exercise/sale |
| | | 00000470 | $20.2344 | 5/18/2001 | 40,000 | 40,000 | $46.2109 | $1,039,060 | Same day exercise/sale |
| | | 00000470 | $20.2344 | 12/6/2001 | 48,000 | 48,000 | $38.4600 | $874,829 | Same day exercise/sale |
| | | 00000470 | $20.2344 | 12/31/2001 | 5,796 | 5,796 | $33.2800 | $75,612 | Same day exercise/sale |
| | | 00000470 | $20.2344 | 1/3/2002 | 2,204 | 2,204 | $38.8600 | $41,051 | Same day exercise/sale |
| **Sub-total** | **480,000** | | | | **224,000** | **224,000** | | **$12,631,749** | |
| | | | | | | | | | |
| 11/19/1999 | 143,328 | 00000536 | $32.1300 | None exercised | | | | | |
| | | | | | | | | | |
| 1/31/2000 | 400,000 | 00000674 | $40.5000 | 7/5/2000 | 41,666 | 41,666 | $89.1700 | $2,027,884 | Same day exercise/sale |
| | | 00000674 | $40.5000 | 8/18/2000 | 8,334 | 8,334 | $104.0200 | $529,376 | Same day exercise/sale |
| | | 00000674 | $40.5000 | 8/31/2000 | 8,332 | 8,332 | $113.3800 | $607,236 | Same day exercise/sale |
| | | 00000674 | $40.5000 | 10/2/2000 | 8,334 | 8,334 | $116.9700 | $637,301 | Same day exercise/sale |
| | | 00000674 | $40.5000 | 12/6/2000 | 16,666 | 16,666 | $96.7800 | $937,962 | Same day exercise/sale |
| **Sub-total** | **400,000** | | | | **83,332** | **83,332** | | **$4,739,760** | |
| | | | | | | | | | |
| 11/29/2000 | 542,000 | 00001593 | $76.8800 | None exercised | | | | | |
| | | | | | | | | | |
| 4/17/2001 | 23,140 | 00001749 | $20.7000 | 12/6/2001 | 1,793 | 1,793 | $38.4600 | $31,844 | Same day exercise/sale |
| | | 00001749 | $20.7000 | 12/31/2001 | 359 | 359 | $33.2800 | $4,516 | Same day exercise/sale |
| **Sub-total** | **23,140** | | | | **2,152** | **2,152** | | **$36,360** | |
| 4/17/2001 | 88,560 | 00001750 | $20.7000 | 5/18/2001 | 27,675 | 27,675 | $46.2109 | $706,014 | Same day exercise/sale |
| | | 00001750 | $20.7000 | 12/6/2001 | 12,915 | 12,915 | $38.4600 | $229,370 | Same day exercise/sale |
| | | 00001750 | $20.7000 | 12/31/2001 | 1,845 | 1,845 | $33.2800 | $23,210 | Same day exercise/sale |
| **Sub-total** | **88,560** | | | | **42,435** | **42,435** | | **$958,595** | |
| 4/17/2001 | 430,060 | 00001751 | $20.7000 | 5/18/2001 | 39,673 | 39,673 | $46.2109 | $1,012,094 | Same day exercise/sale |
| | | 00001751 | $20.7000 | 12/6/2001 | 46,286 | 46,286 | $38.4600 | $822,039 | Same day exercise/sale |
| | | 00001751 | $20.7000 | 1/3/2002 | 6,612 | 6,612 | $38.8600 | $120,074 | Same day exercise/sale |
| **Sub-total** | **430,060** | | | | **92,571** | **92,571** | | **$1,954,207** | |
| 10/1/2001 | 5,451 | 00004270 | $12.9000 | 11/30/2001 | 5,451 | 5,451 | $31.3348 | $100,488 | Same day exercise/sale |
| | | | | | | | | | |
| 10/1/2001 | 200,000 | 00004597 | $12.9000 | 11/30/2001 | 37,458 | 37,458 | $31.3348 | $690,531 | Same day exercise/sale |
| | | 00004597 | $12.9000 | 12/4/2001 | 3,458 | 3,458 | $32.1000 | $66,394 | Same day exercise/sale |
| | | 00004597 | $12.9000 | 1/3/2002 | 3,459 | 3,459 | $38.8600 | $89,796 | Same day exercise/sale |
| **Sub-total** | **200,000** | | | | **44,375** | **44,375** | | **$846,720** | |
| 8/15/2003 | 300,000 | 00011005 | $5.5300 | None exercised | | | | | |
| 5/21/2004 | 100,000 | 00011680 | $5.8400 | None exercised | | | | | |
| **Totals** | **2,712,539** | | | | **494,316** | **494,316** | | **$21,267,878** | |

(1) -  Numbers of shares, strike prices and sales prices have been adjusted for all stock splits.

1310.  Cuthbert knew that Brocade's financial statements were false in that they failed to reflect compensation-related expenses arising from improperly granted stock options.

1311.  Cuthbert sold substantial amounts of stock while in possession of this information.

246

1312.   As shown in the table below, between August 18, 1999 and March 10, 2005, Cuthbert sold a total of 1,104,316 shares of Brocade stock, receiving gross sales proceeds of $54,085,721.

### Cuthbert's Stock Sales

| Sale Date | No. of Shares (1) | Sales Price per Share (1) | Gross Proceeds | Net Proceeds (If Known) | Option No. Exercised | Comments |
|---|---|---|---|---|---|---|
| 8/18/1999 | 52,000 | $20.0900 | $1,044,680 | $1,030,055 | 00000176 | Same day exercise/sale (2) |
| 9/23/1999 | 62,400 | $28.1400 | $1,755,936 | $1,738,386 | 00000176 | Same day exercise/sale (2) |
| 12/1/1999 | 41,432 | $34.8400 | $1,443,491 | $1,431,838 | 00000176 | Same day exercise/sale (2) |
| 12/16/1999 | 20,000 | $31.7100 | $634,200 | $628,575 | 00000275 | Same day exercise/sale (2) |
| 12/20/1999 | 9,168 | $35.9500 | $329,590 | $327,011 | 00000176 | Same day exercise/sale (2) |
| 2/22/2000 | 18,332 | $65.9900 | $1,209,729 | $1,204,573 | 00000176 | Same day exercise/sale (2) |
| 2/22/2000 | 3,332 | $65.9900 | $219,879 | $218,942 | 00000275 | Same day exercise/sale (2) |
| 3/21/2000 | 9,168 | $75.0100 | $687,692 | $685,113 | 00000176 | Same day exercise/sale (2) |
| 3/21/2000 | 1,668 | $75.0100 | $125,117 | $124,648 | 00000275 | Same day exercise/sale (2) |
| 5/17/2000 | 9,166 | $59.3400 | $543,910 | $541,333 | 00000176 | Same day exercise/sale (2) |
| 5/17/2000 | 3,332 | $59.3400 | $197,721 | $196,784 | 00000275 | Same day exercise/sale (2) |
| 5/18/2000 | 9,166 | $58.8100 | $539,052 | $536,475 | 00000176 | Same day exercise/sale (2) |
| 6/7/2000 | 1,668 | $71.4900 | $119,245 | $118,776 | 00000275 | Same day exercise/sale (2) |
| 6/19/2000 | 9,166 | $71.7800 | $657,935 | $655,358 | 00000176 | Same day exercise/sale (2) |
| 7/5/2000 | 41,666 | $89.1700 | $3,715,357 | $2,027,884 | 00000674 | Same day exercise/sale (2) |
| 7/7/2000 | 1,666 | $92.5900 | $154,255 | $153,786 | 00000275 | Same day exercise/sale (2) |
| 8/18/2000 | 96,000 | $104.0225 | $9,986,155 | $8,043,653 | 00000470 | Same day exercise/sale |
| 8/18/2000 | 18,334 | $104.0225 | $1,907,148 | $1,901,991 | 00000176 | Same day exercise/sale |
| 8/18/2000 | 1,666 | $104.0225 | $173,301 | $172,833 | 00000275 | Same day exercise/sale |
| 8/18/2000 | 8,334 | $104.0225 | $866,923 | $529,396 | 00000674 | Same day exercise/sale |
| 8/31/2000 | 8,332 | $113.3750 | $944,641 | $607,195 | 00000674 | Same day exercise/sale |
| 9/7/2000 | 1,668 | $110.4975 | $184,310 | $183,841 | 00000275 | Same day exercise/sale |
| 9/18/2000 | 9,168 | $108.7188 | $996,734 | $994,155 | 00000176 | Same day exercise/sale |
| 9/18/2000 | 8,000 | $108.7188 | $869,750 | $707,875 | 00000470 | Same day exercise/sale |
| 10/2/2000 | 8,334 | $116.9700 | $974,828 | $637,301 | 00000674 | Same day exercise/sale |
| 12/6/2000 | 18,332 | $96.7800 | $1,774,171 | $1,769,015 | 00000176 | Same day exercise/sale |
| 12/6/2000 | 3,332 | $96.7800 | $322,471 | $321,534 | 00000275 | Same day exercise/sale |
| 12/6/2000 | 16,000 | $96.7800 | $1,548,480 | $1,224,730 | 00000470 | Same day exercise/sale |
| 12/6/2000 | 16,666 | $96.7800 | $1,612,935 | $937,962 | 00000674 | Same day exercise/sale |
| 12/8/2000 | 1,668 | $108.2200 | $180,511 | $180,042 | 00000275 | Same day exercise/sale |
| 12/18/2000 | 9,168 | $98.3800 | $901,948 | $899,369 | 00000176 | Same day exercise/sale |
| 12/18/2000 | 8,000 | $98.3800 | $787,040 | $625,165 | 00000470 | Same day exercise/sale |
| 5/18/2001 | 27,675 | $46.2109 | $1,278,887 | $706,014 | 00001750 | Same day exercise/sale |
| 5/18/2001 | 39,673 | $46.2109 | $1,833,325 | $1,012,094 | 00001751 | Same day exercise/sale |
| 5/18/2001 | 45,833 | $46.2109 | $2,117,984 | $2,105,094 | 00000176 | Same day exercise/sale |
| 5/18/2001 | 8,333 | $46.2109 | $385,075 | $382,732 | 00000275 | Same day exercise/sale |
| 5/18/2001 | 40,000 | $46.2109 | $1,848,436 | $1,039,060 | 00000470 | Same day exercise/sale |
| 11/30/2001 | 55,000 | $31.3348 | $1,723,414 | $1,707,945 | 00000176 | Same day exercise/sale |
| 11/30/2001 | 10,000 | $31.3348 | $313,348 | $310,536 | 00000275 | Same day exercise/sale |
| 11/30/2001 | 5,451 | $31.3348 | $170,806 | $100,488 | 00004270 | Same day exercise/sale |
| 11/30/2001 | 37,458 | $31.3348 | $1,173,739 | $690,531 | 00004597 | Same day exercise/sale |
| 12/4/2001 | 3,458 | $32.1000 | $111,002 | $66,394 | 00004597 | Same day exercise/sale |
| 12/6/2001 | 48,000 | $38.4600 | $1,846,080 | $874,829 | 00000470 | Same day exercise/sale |
| 12/6/2001 | 1,793 | $38.4600 | $68,959 | $31,844 | 00001749 | Same day exercise/sale |
| 12/6/2001 | 12,915 | $38.4600 | $496,711 | $229,370 | 00001750 | Same day exercise/sale |
| 12/6/2001 | 46,286 | $38.4600 | $1,780,160 | $822,039 | 00001751 | Same day exercise/sale |
| 12/31/2001 | 9,167 | $33.2800 | $305,078 | $302,500 | 00000176 | Same day exercise/sale |
| 12/31/2001 | 1,667 | $33.2800 | $55,478 | $55,009 | 00000275 | Same day exercise/sale |
| 12/31/2001 | 5,796 | $33.2800 | $192,891 | $75,612 | 00000470 | Same day exercise/sale |
| 12/31/2001 | 359 | $33.2800 | $11,948 | $4,516 | 00001749 | Same day exercise/sale |
| 12/31/2001 | 1,845 | $33.2800 | $61,402 | $23,210 | 00001750 | Same day exercise/sale |
| 1/3/2002 | 3,459 | $38.8600 | $134,417 | $89,796 | 00004597 | Same day exercise/sale |
| 1/3/2002 | 2,204 | $38.8600 | $85,647 | $41,051 | 00000470 | Same day exercise/sale |
| 1/3/2002 | 6,612 | $38.8600 | $256,942 | $120,074 | 00001751 | Same day exercise/sale |
| 3/10/2005 | 55,000 | $5.6648 | $311,564 | $296,095 | 00000176 | Same day exercise/sale (2) |
| 3/10/2005 | 20,000 | $5.6648 | $113,296 | $107,671 | 00000275 | Same day exercise/sale (2) |
| **Totals** | **1,014,316** | | **$54,085,721** | **$42,550,094** | | |

Notes: (1) All quantities and prices adjusted for three 2-for-1 splits effective December 3, 1999, March 15, 2000, and December 22, 2000.

(2) Same day exercise/sales reported in Equity Edge prior to (or after) requirement to file Forms 4/5.

Source:  SEC Forms 4 and 5 filings.

SECOND AMENDED COMPLAINT

1

**HARMS SUFFERED BY BROCADE**

2    1313.   The impact of the options-related misconduct alleged in this Complaint has been

3 extraordinary.  The Company has suffered losses amounting to hundreds of millions – if not

4 billions – of dollars, including the out-of-pocket costs related to the defense and settlement of

5 legal proceedings arising from Brocade's historical stock-options practices as well as many other

6 injuries that have not yet been fully quantified.

7    1314.   The out-of-pocket injuries to Brocade include the following:

8          (a)    A settlement amount of $160,000,000 to resolve the federal securities
9                  class action;

10         (b)    A civil penalty of $7,000,000 to settle the SEC's investigation of the
11                  Company;

12         (c)    Fees and expenses of approximately $7,576,206 paid to lawyers,
13                  accountants, and consultants for the two Audit Committee Investigations
14                  in 2004 and 2005;

15         (d)    Fees and expenses of approximately $67,212,566 advanced to current and
16                  former officers, directors, and employees arising from the various legal
17                  proceedings, including $55,152,446 advanced to Reyes and Jensen alone;

18         (e)    Fees and expenses of approximately $30,600,000 for Brocade's own
19                  defense costs arising from the various legal proceedings;

20         (f)    Cash payments and losses of approximately $5,767,309 attributable to
21                  Brocade's forced early redemption of its 2% convertible notes because the
22                  Company was unable to file timely periodic financial reports with the SEC
23                  as a result of the options practices discussed in this Complaint;

24         (g)    Payments of approximately $3,475,910 to certain option holders to
25                  purchase or reprice options pursuant to Section 409 of the Internal
26                  Revenue Code;

27         (h)    Costs of approximately $260,385 paid to Reyes in severance and
28                  consulting fees; and

SECOND AMENDED COMPLAINT

1        (i)     Insurance premiums of $165,000 to obtain liability insurance for the SLC

2              members in connection with the performance of their SLC duties;

3   1315.  Other injuries include:

4        (a)    Losses ranging from approximately $64,000,000 to $82,000,000 that

5              Brocade would have received had it granted at-the-money, rather than in-

6              the-money, stock options (based on faulted grants that were exercised or

7              that remain outstanding and can still be exercised);

8        (b)    Losses of approximately $470,000,000 from cancellation of the

9              anticipated, negotiated merger with Cisco Systems, Inc. as a result of

10            Brocade's options-related accounting problems;

11       (c)    Costs of approximately $400,000 attributable to time spent by Company

12            employees on the Audit Committee investigations and external litigation;

13            and

14       (d)    Reputational injury, measured by a decline in the Company's market

15            capitalization and in other ways.

16   1316.  In addition to these injuries, most of which already have been incurred, Brocade

17 will suffer future losses resulting from the options-related practices, including:

18       (a)    Future costs of defending the state-court class actions;

19       (b)    Future costs associated with the SLC investigation and this lawsuit,

20            including fees for Brocade's lawyers, accountants, and consultants;

21       (c)    Future defense costs advanced to present and former directors, officers,

22            and employees;

23       (d)    Future costs of obtaining professional advice in connection with ongoing

24            criminal and civil litigation against former officers, directors and

25            employees;

26       (e)    Increased premiums for director and officer insurance; and

27       (f)    Potential harm to Brocade's business and ability to grow, to the extent

28            these ongoing costs divert resources from other corporate expenditures.

<div align="center">249</div>

# FIRST CAUSE OF ACTION

## Racketeering Influenced and Corrupt Organizations Act § 1962(c)

### (Against Reyes)

1317.   Brocade realleges and incorporates by reference the allegations contained above as though fully set forth herein.

1318.   During the period 1999 through 2004, Reyes devised and engaged in a scheme whereby he formed a separate enterprise, and/or an associated-in-fact enterprise with Jensen, to manipulate the granting and the terms of stock options at Brocade without having the Company report the compensation expenses associated with those stock options.

1319.   Reyes further sought to conceal his misconduct by signing false and misleading financial statements, management representation letters, and SOX certifications.

1320.   Reyes' actions caused direct injury to Brocade's business and property, all in violation of 18 U.S.C. § 1962(c).

1321.   Reyes constitutes a "person" under 18 U.S.C. §§ 1961(3) and 1962(c).

1322.   Brocade constitutes a "person" injured in its business and property by reason of a violation of 18 U.S.C. § 1962.

1323.   During the period 1999 through 2004, Reyes and Jensen constituted an associated-in-fact "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

1324.   Reyes conducted, and participated in the operation and management of, the affairs of the enterprise in violation of 18 U.S.C. § 1962(c).

1325.   The RICO enterprise was an ongoing and continuing organization formed for the purpose of making compensation decisions at Brocade, manipulating awards and terms of stock options at Brocade, and making material misrepresentations designed to conceal the evidence of that manipulation.

1326.   The RICO enterprise affected interstate commerce by setting compensation for directors, officers, and employees of a nationally traded public company, by causing misrepresentations to be made about that company's financial condition, and by allegedly affecting the market price of nationally traded securities.

1327.  As part of the RICO enterprise, Reyes communicated with Jensen and others through mail service provided by the U.S. Postal Service and by telephone and other interstate and foreign wire facilities, as well as in person.

1328.  Starting in 1999, Reyes conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering acts.  Those multiple acts of racketeering include, but are not limited to:

       (a)    Conspiring to commit securities fraud and mail fraud, in violation of 18 U.S.C. § 371.  Reyes was convicted of this offense on August 7, 2007.  Reyes' overt acts in furtherance of the conspiracy included backdating minutes of the Committee of One to falsely report that meetings had occurred on October 30, 2001, November 28, 2001, January 22, 2002, and February 28, 2002, and that the Committee of One had granted stock options on those dates at the market value of Brocade's stock on those dates.

       (b)    Falsifying documents to reflect improper stock-option grant dates and otherwise employing devices, schemes, and artifices to defraud as to a material matter in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, in connection with grants made as a Committee of One and dated May 19, 1999.

       (c)    Falsifying documents to reflect improper stock-option grant dates and otherwise employing devices, schemes, and artifices to defraud as to a material matter in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, in connection with grants made as a Committee of One and dated July 20, 1999.

       (d)    Falsifying documents to reflect improper stock-option grant dates and otherwise employing devices, schemes, and artifices to defraud as to a material matter in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, in connection with grants made as a Committee of One and

251

SECOND AMENDED COMPLAINT

1          dated August 4, 1999.

2          (e)    Falsifying documents to reflect improper stock-option grant dates and

3          otherwise employing devices, schemes, and artifices to defraud as to a

4          material matter in violation of Section 10(b) of the Exchange Act and SEC

5          Rule 10b-5, in connection with grants made as a Committee of One and

6          dated August 6, 1999.

7          (f)    Falsifying documents to reflect improper stock-option grant dates and

8          otherwise employing devices, schemes, and artifices to defraud as to a

9          material matter in violation of Section 10(b) of the Exchange Act and SEC

10         Rule 10b-5, in connection with grants made as a Committee of One and

11         dated September 1, 1999.

12         (g)    Falsifying documents to reflect improper stock-option grant dates and

13         otherwise employing devices, schemes, and artifices to defraud as to a

14         material matter in violation of Section 10(b) of the Exchange Act and SEC

15         Rule 10b-5, in connection with grants made as a Committee of One on and

16         dated October 4, 1999.

17         (h)    Falsifying documents to reflect improper stock-option grant dates and

18         otherwise employing devices, schemes, and artifices to defraud as to a

19         material matter in violation of Section 10(b) of the Exchange Act and SEC

20         Rule 10b-5, in connection with grants made as a Committee of One and

21         dated October 12, 1999.

22         (i)    Falsifying documents to reflect improper stock-option grant dates and

23         otherwise employing devices, schemes, and artifices to defraud as to a

24         material matter in violation of Section 10(b) of the Exchange Act and SEC

25         Rule 10b-5, in connection with grants made as a Committee of One and

26         dated October 13, 1999.

27         (j)    Falsifying documents to reflect improper stock-option grant dates and

28         otherwise employing devices, schemes, and artifices to defraud as to a

252

SECOND AMENDED COMPLAINT

1    material matter in violation of Section 10(b) of the Exchange Act and SEC

2    Rule 10b-5, in connection with grants made as a Committee of One and

3    dated October 15, 1999.

4    (k)    Falsifying documents to reflect improper stock-option grant dates and

5    otherwise employing devices, schemes, and artifices to defraud as to a

6    material matter in violation of Section 10(b) of the Exchange Act and SEC

7    Rule 10b-5, in connection with grants made as a Committee of One and

8    dated October 18, 1999.

9    (l)    Falsifying documents to reflect improper stock-option grant dates and

10    otherwise employing devices, schemes, and artifices to defraud as to a

11    material matter in violation of Section 10(b) of the Exchange Act and SEC

12    Rule 10b-5, in connection with grants made as a Committee of One and

13    dated January 6, 2000.

14    (m)    Falsifying documents to reflect improper stock-option grant dates and

15    otherwise employing devices, schemes, and artifices to defraud as to a

16    material matter in violation of Section 10(b) of the Exchange Act and SEC

17    Rule 10b-5, in connection with grants made as a Committee of One and

18    dated May 23, 2000.

19    (n)    Falsifying documents to reflect improper stock-option grant dates and

20    otherwise employing devices, schemes, and artifices to defraud as to a

21    material matter in violation of Section 10(b) of the Exchange Act and SEC

22    Rule 10b-5, in connection with grants made as a Committee of One and

23    dated August 28, 2000.

24    (o)    Falsifying documents to reflect improper stock-option grant dates and

25    otherwise employing devices, schemes, and artifices to defraud as to a

26    material matter in violation of Section 10(b) of the Exchange Act and SEC

27    Rule 10b-5, in connection with grants made as a Committee of One and

28    dated April 17, 2001.

SECOND AMENDED COMPLAINT

1        (p)    Falsifying documents to reflect improper stock-option grant dates and

2              otherwise employing devices, schemes, and artifices to defraud as to a

3              material matter in violation of Section 10(b) of the Exchange Act and SEC

4              Rule 10b-5, in connection with grants made as a Committee of One and

5              dated October 1, 2001.

6        (q)    Falsifying documents to reflect improper stock-option grant dates and

7              otherwise employing devices, schemes, and artifices to defraud as to a

8              material matter in violation of Section 10(b) of the Exchange Act and SEC

9              Rule 10b-5, in connection with grants made as a Committee of One and

10             dated July 2, 2002.

11       (r)    Falsifying documents to reflect improper stock-option grant dates and

12             otherwise employing devices, schemes, and artifices to defraud as to a

13             material matter in violation of Section 10(b) of the Exchange Act and SEC

14             Rule 10b-5, in connection with grants made as a Committee of One and

15             dated October 8, 2002.

16       (s)    Falsifying documents to reflect improper stock-option grant dates and

17             otherwise employing devices, schemes, and artifices to defraud as to a

18             material matter in violation of Section 10(b) of the Exchange Act and SEC

19             Rule 10b-5, in connection with grants made as a Committee of One and

20             dated August 15, 2003.

21       (t)    Falsifying documents to reflect improper stock-option grant dates and

22             otherwise employing devices, schemes, and artifices to defraud as to a

23             material matter in violation of Section 10(b) of the Exchange Act and SEC

24             Rule 10b-5, in connection with grants made as a Committee of One and

25             dated February 26, 2004.

26       (u)    Falsifying documents to reflect improper stock-option grant dates and

27             otherwise employing devices, schemes, and artifices to defraud as to a

28             material matter in violation of Section 10(b) of the Exchange Act and SEC

<div align="center">254</div>

SECOND AMENDED COMPLAINT

1    Rule 10b-5, in connection with grants made as a Committee of One and
2    dated March 22, 2004.

3    (v)    Falsifying documents to reflect improper stock-option grant dates and
4           otherwise employing devices, schemes, and artifices to defraud as to a
5           material matter in violation of Section 10(b) of the Exchange Act and SEC
6           Rule 10b-5, in connection with grants made as a Committee of One and
7           dated June 21, 2004.

8    (w)    Employing devices, schemes, and artifices to defraud as to a material
9           matter, and making and causing Brocade to make untrue statements of
10          material fact, in violation of Section 10(b) of the Exchange Act and SEC
11          Rule 10b-5.  Reyes was convicted of this offense on August 7, 2007.

12   (x)    Falsifying documents to reflect improper stock-option grant dates and
13          otherwise employing devices, schemes, and artifices to defraud as to a
14          material matter in violation of Section 10(b) of the Exchange Act and SEC
15          Rule 10b-5, in connection with option grants made by the Board and dated
16          October 4, 1999.

17   (y)    Falsifying documents to reflect improper stock-option grant dates and
18          otherwise employing devices, schemes, and artifices to defraud as to a
19          material matter in violation of Section 10(b) of the Exchange Act and SEC
20          Rule 10b-5, in connection with option grants made by the Board and dated
21          April 17, 2001.

22   (z)    Falsifying documents to reflect improper stock-option grant dates and
23          otherwise employing devices, schemes, and artifices to defraud as to a
24          material matter in violation of Section 10(b) of the Exchange Act and SEC
25          Rule 10b-5, in connection with option grants made by the Board and dated
26          October 1, 2001.

27   (aa)   Causing Brocade to make untrue statements of material fact in a Form 10-
28          K filing for the fiscal year ended October 30, 1999, in violation of

255

SECOND AMENDED COMPLAINT

1    Section 10(b) of the Exchange Act and SEC Rule 10b-5.

2    (bb)   Causing Brocade to make untrue statements of material fact in a Form 10-
3    Q filing dated March 13, 2000, in violation of Section 10(b) of the
4    Exchange Act and SEC Rule 10b-5.

5    (cc)   Causing Brocade to make untrue statements of material fact in a Form 10-
6    Q filing dated June 13, 2000, in violation of Section 10(b) of the Exchange
7    Act and SEC Rule 10b-5.

8    (dd)   Causing Brocade to make untrue statements of material fact in a Form 10-
9    Q filing dated September 12, 2000, in violation of Section 10(b) of the
10   Exchange Act and SEC Rule 10b-5.

11   (ee)   Causing Brocade to make untrue statements of material fact in a Form 10-
12   K filing for the fiscal year ended October 28, 2000, in violation of
13   Section 10(b) of the Exchange Act and SEC Rule 10b-5.

14   (ff)   Causing Brocade to make untrue statements of material fact in a Form 10-
15   Q filing dated March 13, 2001, in violation of Section 10(b) of the
16   Exchange Act and SEC Rule 10b-5.

17   (gg)   Causing Brocade to make untrue statements of material fact in a Form 10-
18   Q filing dated June 12, 2001, in violation of Section 10(b) of the Exchange
19   Act and SEC Rule 10b-5.

20   (hh)   Causing Brocade to make untrue statements of material fact in a Form 10-
21   Q filing dated September 11, 2001, in violation of Section 10(b) of the
22   Exchange Act and SEC Rule 10b-5.

23   (ii)   Causing Brocade to make untrue statements of material fact in a Form 10-
24   K filing for the fiscal year ended October 27, 2001, in violation of
25   Section 10(b) of the Exchange Act and SEC Rule 10b-5.  Reyes was
26   convicted of this offense on August 7, 2007.

27   (jj)   Causing Brocade to make untrue statements of material fact in a Form 10-
28   Q filing dated March 12, 2002, in violation of Section 10(b) of the

256

1                Exchange Act and SEC Rule 10b-5.

2         (kk)    Causing Brocade to make untrue statements of material fact in a Form 10-

3                Q filing dated May 30, 2002, in violation of Section 10(b) of the Exchange

4                Act and SEC Rule 10b-5.

5         (ll)     Causing Brocade to make untrue statements of material fact in a Form 10-

6                Q filing dated August 27, 2002, in violation of Section 10(b) of the

7                Exchange Act and SEC Rule 10b-5.

8        (mm)   Causing Brocade to make untrue statements of material fact in a Form 10-

9                K filing for the fiscal year ended October 26, 2002, in violation of

10             Section 10(b) of the Exchange Act and SEC Rule 10b-5.  Reyes was

11             convicted of this offense on August 7, 2007.

12        (nn)    Causing Brocade to make untrue statements of material fact in a Form 10-

13             Q filing dated March 7, 2003, in violation of Section 10(b) of the

14             Exchange Act and SEC Rule 10b-5.

15        (oo)    Causing Brocade to make untrue statements of material fact in a Form 10-

16             Q filing dated June 9, 2003, in violation of Section 10(b) of the Exchange

17             Act and SEC Rule 10b-5.

18        (pp)    Causing Brocade to make untrue statements of material fact in a Form 10-

19             Q filing dated September 8, 2003, in violation of Section 10(b) of the

20             Exchange Act and SEC Rule 10b-5.

21        (qq)    Causing Brocade to make untrue statements of material fact in a Form 10-

22             K filing for the fiscal year ended October 25, 2003, in violation of

23             Section 10(b) of the Exchange Act and SEC Rule 10b-5.  Reyes was

24             convicted of this offense on August 7, 2007.

25        (rr)     Causing Brocade to make untrue statements of material fact in a Form 10-

26             Q filing dated March 8, 2004, in violation of Section 10(b) of the

27             Exchange Act and SEC Rule 10b-5.

28        (ss)     Causing Brocade to make untrue statements of material fact in a Form 10-

<div align="center">257</div>

Q filing dated June 14, 2004, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

(tt)     Causing Brocade to make untrue statements of material fact in a Form 10-Q filing dated September 13, 2004, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

(uu)     Falsifying and causing to be falsified books, records, and accounts of Brocade as to a material matter during the period 2000 through 2004, in violation of Sections 10(b) and 13(b)(2)(A) of the Exchange Act and SEC Rule 10b-5.  Reyes was convicted of this offense on August 7, 2007.

(vv)     Making or causing to be made materially false and misleading statements and omissions to Brocade's auditors in connection with the audit and examination of Brocade's financial statements on or about November 18, 2002 in the management representation letter to KPMG for the fiscal year ended October 26, 2002, in violation of Section 32 of the Exchange Act and SEC Rule 13b2-2.  Reyes was convicted of this offense on August 7, 2007.

(ww)     Making or causing to be made materially false and misleading statements and omissions to Brocade's auditors in connection with the audit and examination of Brocade's financial statements on or about January 22, 2003 in the certification filed with Brocade's Form 10-K for the fiscal year ended October 26, 2002, in violation of Section 32 of the Exchange Act and SEC Rule 13b2-2.  Reyes was convicted of this offense on August 7, 2007.

(xx)     Making or causing to be made materially false and misleading statements and omissions to Brocade's auditors in connection with the audit and examination of Brocade's financial statements on or about November 14, 2003 in the management representation letter to KPMG for the fiscal years ended October 25, 2003 and October 26, 2002, in violation of Section 32

258

of the Exchange Act and SEC Rule 13b2-2.  Reyes was convicted of this offense on August 7, 2007.

(yy)  Making or causing to be made materially false and misleading statements and omissions to Brocade's auditors in connection with the audit and examination of Brocade's financial statements on or about January 20, 2004 in the certification filed with Brocade's Form 10-K for the fiscal year ended October 25, 2003, in violation of Section 32 of the Exchange Act and SEC Rule 13b2-2.  Reyes was convicted of this offense on August 7, 2007.

1329.  Because Reyes is a "person that [wa]s criminally convicted in connection with the fraud" alleged in the foregoing predicate acts, he is a proper RICO defendant under 18 U.S.C. § 1964(c).

1330.  Brocade has suffered substantial economic injury to its business or property within the meaning of 18 U.S.C. § 1964(c) by reason of Reyes' racketeering activities and violations of 18 U.S.C. § 1962(c).  The damages caused to Brocade, which are described above in greater detail, include, but are not limited to,

(a)  loss of the difference between the faulted stock options' strike price and the market value of Brocade stock on the actual date of grant, for all faulted options that were exercised,

(b)  the in-the-money value of all faulted stock options that were exercised after their proper expiration dates,

(c)  the fine that Brocade paid to settle the SEC's investigation,

(d)  the expenses that Brocade incurred in connection with the investigation and restatement of its financial results and the ensuing legal proceedings,

(e)  the attorneys' fees and expenses that Brocade has advanced – and might continue to advance – to current and former officers, directors, and employees in connection with investigations and legal proceedings arising out of the stock-option and accounting issues, and

259

SECOND AMENDED COMPLAINT

1   (f)  the settlement amount that Brocade has agreed to pay to resolve the

2 securities class action.

3         **SECOND CAUSE OF ACTION**

4   **Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5**

5    <u>**(Against Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman)**</u>

6   1331. Brocade realleges and incorporates by reference the allegations contained above

7 as though fully set forth herein.

8   1332. In violation of 15 U.S.C. § 78j and 17 C.F.R. §240.10b-5, defendants Reyes,

9 Jensen, Byrd, Canova, Dempsey, Leslie, and Neiman employed manipulative and deceptive

10 devices and contrivance in connection with the purchase or sale of securities.

11   1333. Defendants Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, and Neiman:

12 (*i*) employed devices, schemes, and artifices to defraud, (*ii*) made untrue statements of material

13 fact and/or omitted to state material facts necessary to make the statements not misleading, and

14 (*iii*) engaged in acts, practices, and courses of business that operated as a fraud and deceit upon

15 Brocade, all in connection with the purchase or sale of securities.

16   1334. Defendants Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, and Neiman,

17 individually and in concert, directly and indirectly, committed these acts through the use, means

18 or instrumentalities of interstate commerce and/or of the mails.

19   1335. As alleged above, Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, and Neiman

20 each knowingly or with deliberate recklessness made material misrepresentations and engaged in

21 other manipulative or deceptive conduct that caused Brocade to issue in-the-money stock options

22 or to extend stock options' vesting and/or exercise periods.  Through these misrepresentations

23 and other deceptions, these Defendants defrauded Brocade into (*i*) granting stock options with

24 lower strike prices than the Company otherwise would have granted and (*ii*) allowing vesting and

25 exercise periods to extend longer than the Company otherwise would have allowed.

26   1336. The material misrepresentations and deceptions consisted of, among other things,

27 misstatements about (*i*) the dates on which stock options actually were granted, (*ii*) the faulted

28 options' proper exercise prices, which were supposed to be equivalent to the fair market value of

Brocade's stock on the actual date of grant (determined in accordance with Brocade's stock-option plans and applicable accounting rules), and (*iii*) options' vesting and exercise periods.

1337.   The misrepresentations and deceptions were contained in UWCs, meeting minutes, e-mails, and other documentation granting faulted stock options, in HR and employment records, and in other documentation relating to faulted stock options' vesting and exercise periods.

1338.   Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, and Neiman made these misrepresentations and engaged in this deceptive conduct with knowledge that their representations were untrue and that their conduct was deceptive, or with deliberate recklessness as to the truth of their representations and the deceptiveness of their conduct.

1339.   The material misrepresentations and deceptive conduct were in connection with the purchase or sale of a security.  Stock options are securities, and a stock option is a sale of securities.  The material misrepresentations and deceptive conduct occurred in connection with Brocade's issuance or sale of faulted stock options.  The material misrepresentations and deceptive conduct also occurred in connection with the option holders' exercise of faulted stock options to obtain Brocade stock.

1340.   Brocade reasonably relied on the material misrepresentations and deceptive conduct in issuing stock options based on faulted grants, in allowing option holders to exercise those faulted options, and in allowing options to vest or be exercised beyond their proper time periods.  The grant documentation and other paperwork relating to the faulted stock options appeared facially proper, because the documents had been backdated or otherwise falsified, and Brocade did not have any other reason to believe that Defendants' representations about options-related matters were inaccurate.  Moreover, Brocade's stock-option plans usually required options to be granted at the fair market value of Brocade's stock on the actual grant date (determined in accordance with Brocade's stock-option plans and applicable accounting rules).  Brocade's reliance on the false documents and on Defendants' deceptive conduct in connection with those documents was therefore reasonable.

1341.   As described above, Brocade suffered economic loss from the Defendants' misconduct.  That loss consisted of, among other things, (*i*) the difference between the faulted stock options' strike price and the market value of Brocade stock on the actual date of grant, for all faulted options that were exercised, (*ii*) the in-the-money value of all faulted stock options that were exercised after their proper expiration dates, and (*iii*) the other costs, expenses, fines, and settlements described above.

1342.   The material misrepresentations and deceptive conduct proximately caused Brocade's loss.  Had the Defendants not engaged in the misconduct described above, Brocade would not have (*i*) issued faulted stock options with exercise prices that were less than the fair market value of Brocade's stock on the actual grant date (determined in accordance with Brocade's stock-option plans and applicable accounting rules), (*ii*) allowed option holders to exercise faulted options at improperly low strike prices, (*iii*) extended option holders' vesting and exercise periods beyond the limits prescribed by Brocade's stock-option plans and policies, or (*iv*) incurred other losses described in this Complaint.

1343.   By virtue of the foregoing, Defendants Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, and Neiman violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

1344.   Reyes was criminally convicted of having violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

1345.   These Defendants are jointly and severally liable for the full damage to Brocade because they knowingly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

### THIRD CAUSE OF ACTION

### Section 304 of the Sarbanes-Oxley Act

### (Against Reyes and Canova)

1346.   Brocade realleges and incorporates by reference the allegations contained above as though fully set forth herein.

1347.   Section 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243, provides that, if a public company prepares an accounting restatement due to material noncompliance with any financial reporting requirement under federal securities laws, and if such noncompliance resulted

from misconduct, then the company's CEO and CFO must reimburse the company for certain payments the company made to those executives.  Section 304(a), titled "Forfeiture of Certain Bonuses and Profits," provides, in relevant part:

> Additional compensation prior to noncompliance with commission financial reporting requirements.  If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for –
>
> (1)     any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
>
> (2)     any profits realized from the sale of securities of the issuer during that 12-month period.

1348.   During the period of at least 2002 through January 2005, Reyes served as Brocade's CEO.  In that role, Reyes certified Brocade's financial statements for fiscal years 2002 through 2004.

1349.   During the period of at least 2002 through December 2005, Canova served as Brocade's CFO.  In that role, Canova certified Brocade's financial statements for fiscal years 2002 through 2004.

1350.   Brocade restated its financial statements for fiscal years 2002 through 2004 to correct the accounting treatment for stock-based compensation, resulting in an overall reduction in net income, for years before 2002, of approximately $304 million related solely to stock-based compensation expense calculated using variable accounting and associated income tax adjustments.

1351.   Brocade was required to restate its financial statements filed from 2002 through 2004 due to the financial statements' material noncompliance with reporting requirements under

1   the federal securities laws.

2       1352.   These restatements resulted from "misconduct" within the meaning of SOX

3   § 304.  For example, Reyes was convicted of securities fraud and other crimes in connection with

4   the financial statements that Brocade needed to restate.

5       1353.   Reyes and Canova served as Brocade's CEO and CFO during the period when

6   those financial statements were issued.  Moreover, Reyes and Canova signed those materially

7   false financial statements.

8       1354.   Reyes and Canova therefore are required to forfeit and to reimburse Brocade for

9   all bonuses or other incentive-based or equity-based compensation they received from Brocade

10  during the 12-month period following the first public issuance or filing with the SEC (whichever

11  occurs first) of each financial document that needed to be restated.

12      1355.   Brocade's fiscal-year 2002 financial results were first issued on November 21,

13  2002.

14      1356.   Brocade's fiscal-year 2003 financial results were first issued on November 20,

15  2003.

16      1357.   Brocade's fiscal-year 2004 financial results were first issued on November 22,

17  2004.

18      1358.   Reyes and Canova therefore must forfeit and must reimburse Brocade for all

19  bonuses or other incentive-based or equity-based compensation they received from Brocade

20  during the 12-month period following the first issuance or filing of each of these financial

21  results, as calculated above.

22                          **FOURTH CAUSE OF ACTION**

23          **Section 13(b) of the Securities Exchange Act of 1934 and**

24                  **SEC Rules 13b2-1 and 13b2-2**

25                      **(Against Reyes and Canova)**

26      1359.   Brocade realleges and incorporates by reference the allegations contained above

27  as though fully set forth herein.

28      1360.   This cause of action is brought under 15 U.S.C. § 78m(b) and 17 C.F.R.

§§ 240.13b2-1 and 240.13b2-2 to obtain equitable relief against defendants Reyes and Canova, consisting of the forfeiture relief provided in SOX § 304.  This cause of action is pled as an alternative to the claim asserted directly under SOX § 304.

1361.   Defendants Reyes and Canova, by engaging in the conduct described above, directly or indirectly falsified or caused to be falsified Brocade's books, records, and accounts subject to Section 13(b)(2) of the Exchange Act.

1362.   Reyes and Canova violated Sections 13(b)(2) and 13(b)(5) of the Exchange Act by knowingly circumventing or failing to implement a system of internal accounting controls for stock-option grants and financial statements and by knowingly falsifying Brocade's books, records, and accounts relating to the Company's stock options and the expenses related to equity-based compensation.

1363.   Reyes and Canova directly or indirectly falsified, or caused to be falsified, Brocade's books, records, and accounts relating to stock options and the equity-compensation expenses, in violation of SEC Rule 13b2-1.

1364.   Reyes was an officer and director of Brocade, and Canova was an officer of Brocade.

1365.   Reyes and Canova directly or indirectly made or caused to be made materially false or misleading statements to Brocade's accountants in connection with the accountants' audit, review, or examination of Brocade's financial statements, in violation of SEC Rule 13b2-2(a).

1366.   Reyes and Canova directly or indirectly took actions to mislead or fraudulently influence Brocade's independent public accountant in its performance of an audit or review of Brocade's financial statements required to be filed with the SEC, and Reyes and Canova knew or should have known that their actions, if successful, could result in rendering Brocade's financial statements materially misleading, all in violation of SEC Rule 13b2-2(b)(1).

1367.   Reyes and Canova committed these violations by signing management representation letters to Brocade's auditors and SOX certifications that falsely stated that Brocade was properly accounting for its stock-option-related expenses in accordance with

<div align="center">265</div>

1  applicable accounting principles and that Reyes and Canova were not aware of any fraud or other

2  deficiencies relating to Brocade's financial statements.

3      1368.  Brocade was required to restate its financial statements for failing properly to

4  account for equity-related compensation expenses.

5      1369.  Reyes was criminally convicted of falsifying Brocade's books, records, and

6  accounts, in violation of Sections 13(b)(2)(a) and 13(b)(5) of the Exchange Act and SEC

7  Rules 13b2-1 and 13b2-2.

8      1370.  As a result of these violations, Brocade is seeking appropriate equitable relief

9  through reimbursement under SOX § 304 of all bonuses or other incentive-based or equity-based

10  compensation they received, as described above.

11      1371.  Brocade has no adequate remedy at law.

12  **FIFTH CAUSE OF ACTION**

13  **Breach of the Fiduciary Duty of Care**

14  **(Against Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, Bossi)**

15      1372.  Brocade realleges and incorporates by reference the allegations contained above

16  as though fully set forth herein.

17      1373.  This cause of action is brought for breach of the fiduciary duty of care against

18  defendants Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, and Bossi.

19      1374.  Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, and Bossi owed Brocade

20  the fiduciary obligation to act at all times with due care for Brocade's best interests in exercising

21  their responsibilities on behalf of the Company.

22      1375.  Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, and Bossi violated and

23  breached their fiduciary duty of care through conduct that amounts to at least gross negligence.

24      1376.  In fact, those Defendants' conduct fell so far below the requirements of the duty

25  of care as to constitute a lack of good faith.

26      1377.  As described in detail above, Reyes, Jensen, Byrd, Canova, Dempsey, Leslie,

27  Neiman, and Bossi participated in approving, administering, and ratifying faulted (and

28  sometimes even void) stock-option grants, falsifying corporate records relating to stock options,

1    and signing and issuing false financial statements, SOX certifications, and management

2    representation letters.  Certain of those Defendants also participated in obtaining, approving, and

3    administering improper extensions of stock options' vesting and exercise periods.

4          1378.   These Defendants knew, or were grossly negligent in not knowing, that the

5    faulted stock-option grants were improper, that Brocade's financial statements did not properly

6    account for the faulted option grants, and that the other conduct described throughout this

7    Complaint was improper.

8          1379.   These Defendants' actions were outside the bounds of reason and demonstrated a

9    reckless indifference to the whole body of stockholders.

10         1380.   The misconduct also involved significant corporate matters and required Brocade

11   to restate its financial statements to record hundreds of millions of dollars of compensation-

12   related expenses.

13         1381.   As a direct and proximate result of these Defendants' actions and their failure to

14   fulfill their fiduciary duty of care, Brocade has suffered significant damages, as detailed above.

15         1382.   By virtue of the foregoing, defendants Reyes, Jensen, Byrd, Canova, Dempsey,

16   Leslie, Neiman and Bossi are liable to the Company for breaching their fiduciary duty of care.

17         1383.   Brocade has no adequate remedy at law.

### SIXTH CAUSE OF ACTION

### Breach of the Fiduciary Duty of Loyalty – Self Dealing

### (Against Reyes, Jensen, Canova, Dempsey, Neiman, Bonderson, Bossi, Cuthbert)

21         1384.   Brocade realleges and incorporates by reference the allegations contained above

22   as though fully set forth herein.

23         1385.   This cause of action is brought against defendants Reyes, Jensen, Canova,

24   Dempsey, Neiman, Bonderson, Bossi, and Cuthbert for breach of the fiduciary duty of loyalty

25   based on self-dealing transactions.

26         1386.   Reyes, Jensen, Canova, Dempsey, Neiman, Bonderson, Bossi, and Cuthbert owed

27   Brocade the fiduciary obligation of loyalty, which mandates that the best interests of the

28   corporation and its shareholders take precedence over any interest possessed by a director,

267

1    officer, or controlling shareholder and not shared by the stockholders generally.

2    1387.   The duty of loyalty encompasses an obligation to act in good faith.  A director,

3    officer, or other corporate fiduciary cannot act loyally toward the Company unless he or she

4    believes in good faith that his or her actions are in the Company's best interests.

5    1388.   A breach of the duty of loyalty can arise from self-dealing transactions, in which a

6    fiduciary is involved in procuring for himself or herself a corporate benefit not available to the

7    stockholders generally.

8    1389.   Reyes, Jensen, Canova, Dempsey, Neiman, Bonderson, Bossi, and Cuthbert

9    violated and breached their fiduciary duty of loyalty by engaging in acts of self-dealing on terms

10    that were not entirely fair to Brocade.

11    1390.   As described in detail above, Reyes, Dempsey, and Neiman improperly granted

12    faulted stock options to themselves, and Reyes, Jensen, Canova, Dempsey, Neiman, Bonderson,

13    Bossi, and Cuthbert all accepted faulted stock options or other related benefits, including

14    improperly extended vesting or exercise periods.

15    1391.   As a direct and proximate result of these Defendants' actions and breaches of

16    their fiduciary obligations, Brocade has suffered significant damages, as detailed above.

17    1392.   By virtue of the foregoing, Reyes, Jensen, Canova, Dempsey, Neiman,

18    Bonderson, Bossi, and Cuthbert are liable to the Company for breaching their fiduciary duty of

19    loyalty in connection with self-dealing transactions.

20    **SEVENTH CAUSE OF ACTION**

21    **Breach of the Fiduciary Duty of Loyalty – Lack of Good Faith**

22    **(Against All Defendants)**

23    1393.   Brocade realleges and incorporates by reference the allegations contained above

24    as though fully set forth herein.

25    1394.   This cause of action is brought against defendants Reyes, Jensen, Byrd, Canova,

26    Dempsey, Leslie, Neiman, Bonderson, Bossi, and Cuthbert for breach of the fiduciary duty of

27    loyalty based on a failure to act in good faith.

28    1395.   Defendants owed Brocade the fiduciary duty of loyalty, which required them at

268

all times to act in good faith and in the Company's best interests.

1396.   These Defendants could not have acted in good faith if, for example, they intentionally acted with a purpose other than that of advancing Brocade's best interests, acted with an intent to violate applicable law, or demonstrated a conscious disregard for their duties.

1397.   Defendants breached their fiduciary duty of loyalty and their obligation to act at all times in good faith.

1398.   Defendants knowingly participated in improper activities relating to Brocade's stock options as described in detail above, including (without limitation) by (*i*) making, authorizing, or ratifying faulted grants of stock options (including, without limitation, by signing backdated minutes, UWCs, and other documents), (*ii*) extending options' vesting and exercise periods beyond the limits prescribed in Brocade's stock-option plans and policies, (*iii*) falsifying or participating in the falsification of the Company's books and records relating to stock options and employment information, and (*iv*) failing to stop or redress improper activities relating to stock options and to ensure that Brocade personnel complied with applicable legal requirements and with the Company's own stock-option plans and policies.

1399.   Alternatively, Defendants acted with conscious disregard for whether their conduct in connection with these activities and with the other activities described in this Complaint was in Brocade's best interests and was appropriate under positive law and the Company's stock-option plans and policies.

1400.   Reyes, Byrd, Canova, Dempsey, Leslie, Neiman, and Bossi also (*i*) knowingly participated in preparing, authorizing, or signing materially incorrect financial statements, or demonstrated a conscious disregard for whether the financial statements they prepared, authorized, or signed were accurate in all material respects, and (*ii*) knowingly failed to ensure that, or demonstrated a conscious disregard for whether, Brocade was properly accounting for its compensation-related expenses.

1401.   As a direct and proximate result of these Defendants' actions and breaches of their fiduciary obligations, Brocade has suffered significant damages, as detailed above.

1402.   By virtue of the foregoing, Defendants are liable to the Company for breaching

<div align="center">269</div>

1   their fiduciary duty of loyalty and for failing to act at all times in good faith and in Brocade's

2   best interests.

3   **EIGHTH CAUSE OF ACTION**

4   **Breach of the Fiduciary Duty of Loyalty – Oversight**

5   **(Against Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, Bossi)**

6   1403.   Brocade realleges and incorporates by reference the allegations contained above

7   as though fully set forth herein.

8   1404.   This cause of action is brought against defendants Reyes, Jensen, Byrd, Canova,

9   Dempsey, Leslie, Neiman, and Bossi for breach of the fiduciary duty of loyalty based on failure

10  of oversight.

11  1405.   Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, and Bossi had a duty to

12  be reasonably informed about Brocade's operations and to attempt to assure that Brocade had

13  information and reporting systems that were reasonably designed to provide senior management

14  and the Board (including these Defendants) with timely and accurate information sufficient to

15  allow management and the Board to reach informed judgments about Brocade's compliance with

16  the law and its business performance, including the Company's activities relating to stock

17  options, its accounting for compensation-related expenses, its dealings with its independent

18  auditors, and its preparation and dissemination of financial statements.

19  1406.   Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, and Bossi breached their

20  duty of loyalty and oversight by utterly failing to implement reporting or information systems or

21  controls to ensure compliance with applicable law and the Company's stock-option plans and

22  policies relating to stock options and accounting for compensation-related expenses.

23  1407.   Alternatively, if they implemented such reporting or information systems or

24  controls, these Defendants consciously failed to monitor or oversee those systems' or controls'

25  operations, thereby disabling themselves from being informed of risks or problems requiring

26  Defendants' attention.

27  1408.   Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, and Bossi failed to act in

28  the face of known duties concerning Brocade's stock-options practices and its accounting and

270

1    reporting obligations, thereby demonstrating a conscious disregard for their responsibilities.

2        1409.   As described in detail above, Reyes, Jensen, Byrd, Canova, Dempsey, Leslie,

3    Neiman, and Bossi knew that stock options were being improperly granted, processed,

4    documented, accounted for, and reported, and that insufficient controls existed over the stock-

5    option, accounting, and reporting processes at Brocade.  These Defendants therefore

6    demonstrated a conscious disregard for their responsibilities in failing to oversee those activities

7    and to ensure that any improprieties were stopped and redressed.

8        1410.   These Defendants knew, or consciously disregarded, that the lack of controls

9    could affect Brocade's proper granting of stock options, its financial-reporting process, and the

10   preparation of its financial statements.  Nevertheless, these Defendants took no steps in good

11   faith to correct or prevent those improprieties.

12       1411.   Defendants Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, and Bossi

13   violated and breached their fiduciary duty of loyalty through a failure of oversight and

14   supervision that amounted to a lack of good faith.

15       1412.   As a direct and proximate result of these Defendants' actions and breaches of

16   their fiduciary obligations, Brocade has suffered significant damages.

17       1413.   By virtue of the foregoing, defendants Reyes, Jensen, Byrd, Canova, Dempsey,

18   Leslie, Neiman, and Bossi are liable to the Company for breaching their fiduciary duty of loyalty

19   by consciously failing to exercise the requisite oversight over Brocade's stock-option,

20   accounting, and financial-reporting processes and practices.

21                              **NINTH CAUSE OF ACTION**

22                  **Sections 1709 and 1710 of the California Civil Code**

23            **(Against Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman)**

24       1414.   Brocade realleges and incorporates by reference the allegations contained above

25   as though fully set forth herein.

26       1415.   This cause of action is brought against defendants Reyes, Jensen, Byrd, Canova,

27   Dempsey, Leslie, and Neiman under Sections 1709 and 1710 of the California Civil Code.

28       1416.   Section 1709 provides that a person who willfully deceives another with intent to

                                      271

induce him or her to alter his or her position, to his or her injury or risk, is liable for any damage suffered as a result of the deceit.

1417.  Section 1710 provides that a deceit "is either":

1.     The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

2.     The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true,

3.     The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

4.     A promise, made without any intention of performing it.

1418.  Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, and Neiman fraudulently deceived Brocade within the meaning of California Civil Code §§ 1709 and 1710 for the reasons alleged throughout this Complaint, including the following:

(a)    These Defendants made material misrepresentations and engaged in deceptions that caused Brocade to issue unreported in-the-money stock options or to extend stock options' vesting and/or exercise periods.

(b)    The material misrepresentations and deceptions consisted of, among other things, misstatements about (*i*) the dates on which stock options actually were granted, (*ii*) the faulted options' proper exercise prices, which were supposed to be equivalent to the fair market value of Brocade's stock on the actual date of grant (determined in accordance with Brocade's stock-option plans and applicable accounting rules), and (*iii*) the options' vesting and exercise periods.

(c)    The misrepresentations and deceptions were contained in UWCs, meeting minutes and other documentation granting faulted stock options, in HR and employment records, and in other documentation relating to faulted stock options' vesting and exercise periods.

SECOND AMENDED COMPLAINT

(d)     These Defendants did not believe that their misrepresentations to Brocade were true.  For example, these Defendants did not believe that the faulted stock options actually had been granted on the purported grant dates, that the faulted options' exercise prices were equal to the fair market value of Brocade's stock on the actual grant date (determined in accordance with Brocade's stock-option plans and applicable accounting rules), that the faulted options' vesting and exercise periods were proper, or that the faulted options conformed to Brocade's stock-option plans or other applicable compensation policies under which the operations were authorized.

(e)     These Defendants intended to induce Brocade to rely on their false, material representations as alleged above, to the Company's detriment. For example, these Defendants intended to induce Brocade (*i*) to issue stock options with exercise prices that were less than the fair market value of Brocade's stock on the actual grant date (determined in accordance with Brocade's stock-option plans and applicable accounting rules), (*ii*) to allow option holders to exercise faulted options at improperly low strike prices, and (*iii*) to extend option holders' vesting and exercise periods beyond the limits prescribed by Brocade's stock-option plans and policies.

(f)     Brocade justifiably relied on these Defendants' misrepresentations.  For example, in justifiable reliance on these misrepresentations, Brocade (*i*) issued stock options with exercise prices that were less than the fair market value of Brocade's stock on the actual grant date (determined in accordance with Brocade's stock-option plans and applicable accounting rules), (*ii*) allowed option holders to exercise faulted options at improperly low strike prices, and (*iii*) extended option holders' vesting and exercise periods beyond the limits prescribed by Brocade's stock-option plans and policies.

273

SECOND AMENDED COMPLAINT

(g)    Brocade's reliance on these Defendants' misrepresentations was justifiable because the grant documentation and other paperwork relating to the faulted stock options appeared facially proper, in that the documents had been backdated or otherwise falsified. Nor did Brocade have any other reason to believe that Defendants' representations about options-related matters were inaccurate.

(h)    Brocade incurred damage as a proximate result of its reliance on these Defendants' misrepresentations. Had these Defendants not engaged in the misconduct described above, Brocade would not have (*i*) issued faulted stock options with exercise prices that were less than the fair market value of Brocade's stock on the actual grant date (determined in accordance with Brocade's stock-option plans and applicable accounting rules), (*ii*) allowed option holders to exercise faulted options at improperly low strike prices, (*iii*) extended option holders' vesting and exercise periods beyond the limits prescribed by Brocade's stock-option plans and policies, or (*iv*) incurred other losses described in this Complaint.

1419.  Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, and Neiman are also liable to Brocade for negligent misrepresentation under California Civil Code §§ 1709 and 1710 for the reasons alleged throughout this Complaint, including the following:

(a)    These Defendants made material misrepresentations and engaged in deceptions that caused Brocade to issue in-the-money stock options or to extend stock options' vesting and/or exercise periods.

(b)    The material misrepresentations and deceptions consisted of, among other things, misstatements about (*i*) the dates on which stock options actually were granted, (*ii*) the faulted options' proper exercise prices, which were supposed to be equivalent to the fair market value of Brocade's stock on the actual date of grant (determined in accordance with Brocade's stock-

1    option plans and applicable accounting rules), and (*iii*) options' vesting

2    and exercise periods.

3    (c)    The misrepresentations and deceptions were contained in UWCs, meeting

4    minutes and other documentation granting faulted stock options, in HR

5    and employment records, and in other documentation relating to faulted

6    stock options' vesting and exercise periods.

7    (d)    These Defendants made those material misrepresentations without any

8    reasonable ground for believing them to be true.

9    (e)    These Defendants intended to induce Brocade to rely on their false,

10    material representations as alleged above, to the Company's detriment.

11    For example, these Defendants intended to induce Brocade (*i*) to issue

12    stock options with exercise prices that were less than the fair market value

13    of Brocade's stock on the actual grant date (determined in accordance with

14    Brocade's stock-option plans and applicable accounting rules), (*ii*) to

15    allow option holders to exercise faulted options at improperly low strike

16    prices, and (*iii*) to extend option holders' vesting and exercise periods

17    beyond the limits prescribed by Brocade's stock-option plans and policies.

18    (f)    Brocade justifiably relied on these Defendants' misrepresentations.  For

19    example, in justifiable reliance on these misrepresentations, Brocade

20    (*i*) issued stock options with exercise prices that were less than the fair

21    market value of Brocade's stock on the actual grant date, (*ii*) allowed

22    option holders to exercise faulted options at improperly low strike prices,

23    and (*iii*) extended option holders' vesting and exercise periods beyond the

24    limits prescribed by Brocade's stock-option plans and policies.

25    (g)    Brocade's reliance on these Defendants' misrepresentations was justifiable

26    because the grant documentation and other paperwork relating to the

27    faulted stock options appeared facially proper, in that the documents had

28    been backdated or otherwise falsified.  Nor did Brocade have any other

275

SECOND AMENDED COMPLAINT

1   reason to believe that Defendants' representations about options-related

2   matters were inaccurate.

3       (h)    Brocade incurred damage as a proximate result of its reliance on these

4   Defendants' misrepresentations.  Had these Defendants not engaged in the

5   misconduct described above, Brocade would not have (*i*) issued faulted

6   stock options with exercise prices that were less than the fair market value

7   of Brocade's stock on the actual grant date, (*ii*) allowed option holders to

8   exercise faulted options at improperly low strike prices, (*iii*) extended

9   option holders' vesting and exercise periods beyond the limits prescribed

10   by Brocade's stock-option plans and policies, or (*iv*) incurred other losses

11   described in this Complaint.

12   1420.   Pursuant to California Civil Code §§ 1709 and 1710, Reyes, Jensen, Byrd,

13   Canova, Dempsey, Leslie, and Neiman are liable to Brocade for punitive damages.

14   **TENTH CAUSE OF ACTION**

15   **Contribution**

16   **(Against Reyes, Byrd, Canova, Dempsey, Leslie, Neiman)**

17   1421.   Brocade realleges and incorporates by reference the allegations contained above

18   as though fully set forth herein.

19   1422.   This cause of action is brought against defendants Reyes, Byrd, Canova,

20   Dempsey, Leslie, and Neiman for contribution in connection with Brocade's settlement of the

21   securities class action against the Company and various individual defendants.

22   1423.   As discussed above, Brocade has agreed to settle the securities class action for

23   $160,000,000.

24   1424.   Brocade's exposure in that case arose in whole or in part from the knowing or

25   deliberately reckless misconduct of Reyes, Byrd, Canova, Dempsey, Leslie, and Neiman, who

26   signed the materially false financial statements that Brocade later needed to correct or restate.

27   1425.   Brocade therefore is entitled to contribution from those Defendants according to

28   their relative percentages of fault, to be determined at trial.

1    1426.   The Private Securities Litigation Reform Act of 1995 does not bar this

2  contribution claim, because Reyes, Byrd, Canova, Dempsey, Leslie, and Neiman are persons

3  whose liability to the class of shareholders will be extinguished by Brocade's settlement.

4                              **ELEVENTH CAUSE OF ACTION**

5                                    **Unjust Enrichment**

6    **(Against Reyes, Jensen, Canova, Dempsey, Neiman, Bonderson, Bossi, Cuthbert)**

7    1427.   Brocade realleges and incorporates by reference the allegations contained above

8  as though fully set forth herein.

9    1428.   This cause of action is brought against defendants Reyes, Jensen, Canova,

10  Dempsey, Neiman, Bonderson, Bossi, and Cuthbert based on their exercises of faulted stock

11  options.

12    1429.   As alleged above, Reyes, Jensen, Canova, Dempsey, Neiman, Bossi, and Cuthbert

13  all received faulted stock options and exercised some or all of those options.

14    1430.   These Defendants all received a gain from those faulted stock options, in that they

15  were able to exercise those options at a strike price that was lower than it should have been and

16  thus were able to obtain Company stock for a lower price than they should have paid for it.

17    1431.   The gain to these Defendants was at Brocade's expense, because, when

18  Defendants exercised their faulted stock options and obtained Company stock from Brocade, the

19  Company received less consideration (*i.e.*, payment of a lower strike price) than it would have

20  received if the options had been properly granted.

21    1432.   Allowing these Defendants to retain their undeserved benefit at the expense of

22  Brocade and its shareholders would be unjust.

23    1433.   The unjust enrichment would be particularly inappropriate here, because these

24  Defendants were involved in causing the circumvention of Brocade's stock-option plans and

25  applicable accounting rules as described above.

26    1434.   Brocade has been injured by reason of this unjust enrichment.

27    1435.   Brocade therefore seeks disgorgement of these Defendants' unjust enrichment

28  from their exercise of faulted stock options, as measured by the difference between (*i*) each such

1  exercised option's strike price and (*ii*) the fair market value of each such option on the actual

2  date of grant (determined in accordance with Brocade's stock-option plans and applicable

3  accounting rules).

4      1436.   Brocade also has a claim for unjust enrichment against Bonderson based on the

5  value of stock options that he exercised more than three months after his actual termination date.

6      1437.   As alleged above, Bonderson's employment effectively ended in June 2004, but

7  he was improperly allowed to remain as an "advisor" until his supposedly official termination

8  date of March 1, 2005.

9      1438.   Under Brocade's established policies, Bonderson's stock options should have

10  expired three months after his effective termination date (*i.e.*, in September 2004), but he

11  continued to exercise stock options as late as March 2005.

12      1439.   Bonderson received a gain from his exercise of those stock options.

13      1440.   Bonderson's gain was at Brocade's expense, because Brocade should not have

14  had to issue stock to Bonderson when he exercised those options after September 2004.

15      1441.   Allowing Bonderson to retain his gain at the expense of Brocade and its

16  shareholders would be unjust.

17      1442.   The unjust enrichment is particularly egregious here, because Bonderson was

18  involved in obtaining the circumvention of Brocade's policies and procedures for his own

19  benefit.

20      1443.   Brocade has been injured by reason of this unjust enrichment.

21      1444.   Brocade therefore seeks disgorgement of Bonderson's unjust enrichment, as

22  measured by the difference between (*i*) the strike price of all exercised options that should have

23  expired three months after Bonderson's effective termination date and (*ii*) the fair market value

24  of each such option (determined in accordance with Brocade's stock-option plans and applicable

25  accounting rules) on the date of exercise.

26

27

28

1

**TWELFTH CAUSE OF ACTION**

2

**Employee's Duty of Undivided Loyalty to Employer**

3

**<u>(Against Jensen and Bossi)</u>**

4
1445.   Brocade realleges and incorporates by reference the allegations contained above

5
as though fully set forth herein.

6
1446.   This cause of action is brought against defendants Jensen and Bossi for breaching

7
their duty of undivided loyalty to their employer, Brocade.

8
1447.   Jensen and Bossi were employees of Brocade.

9
1448.   As Brocade employees, Jensen and Bossi owed their employer an undivided duty

10
of loyalty while employed by the Company.

11
1449.   As alleged above, Jensen and Bossi breached their duty of loyalty to Brocade by

12
not acting solely in the Company's interest in performing their employment duties.

13
1450.   Those breaches of duty consisted of the conduct alleged throughout this

14
Complaint, including, without limitation, these Defendants' participation in improper backdating

15
and other manipulation of stock-option grants, their participation in falsifying Company records

16
relating to stock options and employment information, and, in Bossi's case, his participation in

17
preparing inaccurate financial statements that did not properly reflect Brocade's compensation-

18
related expenses.

19
1451.   Brocade was harmed by these Defendants' breaches of their duty of undivided

20
loyalty.

21
1452.   By reason of the foregoing, Brocade has sustained and will continue to sustain

22
damages as described in greater detail above.

23

**THIRTEENTH CAUSE OF ACTION**

24

**Aiding and Abetting Breach of Fiduciary Duty**

25

**<u>(Against Jensen and Bossi)</u>**

26
1453.   Brocade realleges and incorporates by reference the allegations contained above

27
as though fully set forth herein.

28
1454.   This cause of action is brought against defendants Jensen and Bossi for aiding and

279

1    abetting breaches of fiduciary duty.

2        1455.  As alleged above, the Defendants other than Jensen and Bossi breached their

3    fiduciary duties to Brocade.

4        1456.  Jensen and Bossi knew that the other Defendants' conduct violated those

5    Defendants' fiduciary duties to Brocade.

6        1457.  As alleged above, Jensen and Bossi substantially aided or encouraged the other

7    Defendants to breach their fiduciary duties to Brocade.  Such aid and encouragement included,

8    without limitation, these Defendants' participation in administering Brocade's stock-option

9    program, their participation in improper backdating and other manipulation of stock-option

10   grants, their participation in falsifying Company records relating to stock options and

11   employment information, and, in Bossi's case, his participation in preparing inaccurate financial

12   statements that did not properly reflect Brocade's compensation-related expenses.

13       1458.  As alleged above, Brocade was harmed by the other Defendants' breaches of their

14   fiduciary duties.

15       1459.  By reason of the foregoing, Brocade has sustained and will continue to sustain

16   damages as described in greater detail above.

## PRAYER FOR RELIEF

18   WHEREFORE, Brocade demands for judgment as follows:

19   A.    Against Reyes for damages under 18 U.S.C. § 1964 resulting from Reyes'

20       violations of 18 U.S.C. § 1962(c);

21   B.    Awarding treble damages against Reyes under 18 U.S.C. § 1964 for his violations

22       of 18 U.S.C. § 1962(c);

23   C.    Against Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, and Neiman for the

24       damages that Brocade sustained as a result of their violations of  15 U.S.C. § 78j

25       and 17 C.F.R § 240.10b-5;

26   D.    Against Reyes and Canova for forfeiture of bonuses and stock-sale profits under

27       Section 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243 and/or as

28       equitable relief for Reyes' and Canova's violations of 15 U.S.C. § 78m and

1        17.C.F.R. § 240.13b2-1 and 240.13b2-2;

2    E.   Against Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, Neiman, Bonderson,

3         Bossi and Cuthbert for the damages that Brocade sustained as a result of their

4         breaches of fiduciary duty;

5    F.   Against Reyes, Jensen, Byrd, Canova, Dempsey, Leslie, and Neiman for the

6         damages that Brocade sustained as a result of their violations of Sections 1709

7         and 1710 of the California Civil Code;

8    G.   Against Reyes, Byrd, Canova, Dempsey, Leslie, and Neiman for an award of

9         contribution in connection with Brocade's settlement of the federal securities

10        class action;

11   H.   Against Reyes, Jensen, Canova, Dempsey, Neiman, Bonderson, Bossi, and

12        Cuthbert for an award equal to the amounts by which they have been unjustly

13        enriched;

14   I.   Against Jensen and Bossi for the damages that Brocade sustained as a result of

15        their breaches of their duty of undivided loyalty to their employer;

16   J.   Against Jensen and Bossi for the damages that Brocade sustained as a result of

17        their aiding and abetting breaches of fiduciary duty;

18   K.   Imposing a constructive trust on all Defendants' remaining exercisable Brocade

19        stock options, and on all proceeds that Defendants received from exercising

20        faulted stock options and selling the stock obtained from those exercises;

21   L.   Awarding restitution and disgorgement of all illicit proceeds generated as a result

22        of the misconduct alleged in this Complaint;

23   M.   Awarding punitive damages against all Defendants for their breaches of their

24        fiduciary duties, their violations of California Civil Code §§ 1709 and 1710,

25        and/or their aiding and abetting other Defendants' breaches of fiduciary duty;

26   N.   Awarding Brocade the costs and disbursements of this action, including

27        reasonable attorneys' fees and experts' fees, costs, and expenses available under

28        RICO and any other principles of law;

1    O.    Awarding Brocade any other damages and/or equitable relief to which it is

2          entitled; and

3    P.    Granting such other and further relief as the Court deems just and proper.

4                                **JURY DEMAND**

5    Plaintiff demands a trial by jury on all claims so triable.

6

7    Dated:  August 1, 2008                  DEWEY & LEBOEUF LLP

8

9                                    By:  /s/ Barbara A. Caulfield

10                                         Barbara A. Caulfield
                                           Peter Root

11

12                                   1950 University Avenue, Suite 500
                                     East Palo Alto, CA  94303

13                                   Tel:  (650) 845-7000
                                     Fax:  (650) 845-7333

14

15                                   Ralph C. Ferrara – *pro hac vice*
                                     Ann M. Ashton – *pro hac vice*

16                                   Jonathan E. Richman – *pro hac vice*
                                     DEWEY & LEBOEUF LLP

17                                   1101 New York Avenue, N.W., Suite 1100
                                     Washington, D.C.  20005

18                                   Tel:  (202) 346-8000
                                     Fax:  (202) 346-8102

19

20                                   *Attorneys for Plaintiff*

21   NYC 674121

22

23

24

25

26

27

28

                                        282